UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| *IN RE* TRI-STATE WATER | : | Civil Action File No. |
| RIGHTS LITIGATION | : | 3:07-MD-1-PAM |
| | : | |

**STATE OF ALABAMA'S AND STATE OF FLORIDA'S JOINT MOTION
AND MEMORANDUM IN SUPPORT OF JOINT MOTION FOR
PARTIAL JUDGMENT ON ALL PHASE I CLAIMS**

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION AND SUMMARY STATEMENT OF FACTS ...................................... 3

II.  LEGAL STANDARD IN APA CASES .............................................................. 10

III. THE CORPS' *DE FACTO* STORAGE REALLOCATION IS UNLAWFUL .................... 12

  A. Limits on the Corps' Authority to Reallocate Storage in Federal Reservoirs ................. 12

  B. The Corps Has Modified the Lake Lanier Project By Making a *De Facto* Reallocation
     to Include Storage for Water Supply .................................................................. 17

  C. The Corps Has Not Sought Congressional Approval, But Has Acknowledged That
     Such Approval is Required ............................................................................ 25

    1. The Corps' Long-Term Plan to Reallocate Storage at Lake Lanier, and Its
       "Interim" Measures to Increase M&I Water Supplies ......................................... 27

    2. The Corps' Acknowledgment of *De Facto* Storage Reallocation Under the WSA ..... 32

  D. The Corps' *De Facto* Storage Reallocation Violates the Water Supply Act. .................. 33

    1. The Corps Has Unlawfully Implemented Major Operational Change ........................ 35

    2. The Corps' *De Facto* Storage Reallocation Seriously Affected The Purposes For
       Which The Lake Lanier Project Was Authorized ................................................ 53

IV. THE CORPS' CURRENT ALLOWANCE OF INDIVIDUAL WATER SUPPLY
    WITHDRAWALS IS UNLAWFUL ...................................................................... 55

  A. Independent Offices Appropriations Act ............................................................ 56

  B. The River and Harbor Act of 1946 ................................................................... 57

  C. The Flood Control Act .................................................................................. 58

  D. The Water Supply Act .................................................................................. 60

V.  THE CORPS HAS TAKEN MAJOR ACTION AT LAKE LANIER IN A MANNER
    INCONSISTENT WITH NEPA AND OTHER FEDERAL LAW ..................................... 62

  A. NEPA Procedural Requirements ...................................................................... 63

  B. The Corps' Failure to Comply with NEPA .......................................................... 65

  C. Other Federal Requirements .......................................................................... 66

    1. Water Resources Development Act ("WRDA") .................................................. 66

    2. Regulations Governing Corps' Operation and Management ................................... 67

VI. THE CORPS' ACTIONS VIOLATE THE CZMA WITH REGARD TO FLORIDA'S
    COASTAL MANAGEMENT PROGRAM ............................................................. 67

VII. ALABAMA AND FLORIDA HAVE STANDING TO ASSERT THE CLAIMS AT
     ISSUE IN THIS MOTION ............................................................................... 69

VIII. CONCLUSION ......................................................................................... 71

## GLOSSARY

| | |
|---|---|
| ACF | Apalachicola-Chattahoochee-Flint |
| ACF Basin | Apalachicola-Chattahoochee-Flint River Basin |
| ACF Compact | Apalachicola-Chattahoochee-Flint River Basin Compact |
| Alabama | State of Alabama |
| APA | Administrative Procedure Act, 5 U.S.C § 551 |
| ARC | Atlanta Regional Commission |
| cfs | Cubic Feet Per Second |
| Corps or USACE | United States Army Corps of Engineers |
| CZMA | Coastal Zone Management Act, 16 U.S.C. § 1456 |
| Draft WCP | 1989 Draft Water Control Plan |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FCA | Flood Control Act of 1944, 33 U.S.C. § 708 |
| FCMP | Florida Coastal Management Program |
| Florida | State of Florida |
| FONSI | Finding of No Significant Impact |
| Georgia | State of Georgia |
| IOAA | Independent Offices Appropriations Act, 31 U.S.C. § 9701 |
| MAAWRM | Metropolitan Atlanta Area Water Resources Management Study |
| MGD | Million Gallons Per Day |

ii

| | |
|---|---|
| M&I | Municipal and Industrial |
| MOA | 1992 Memorandum of Agreement |
| MSL | Mean Sea Level |
| NEPA | National Environmental Policy Act, 42 U.S.C. 4321 *et seq.* |
| PAC Report | 1989 Draft Post Authorization Change Notification Report For The Reallocation of Storage From Hydropower To Water Supply At Lake Lanier, Georgia |
| SeFPC | Southeastern Federal Power Customers, Inc. |
| WRDA | Water Resources Development Act, 33 U.S.C. § 2312 |
| WSA | Water Supply Act of 1958, 43 U.S.C. 390b |

The State of Alabama ("Alabama") and the State of Florida ("Florida") respectfully move this Court to enter a partial judgment in their favor on all Phase One claims asserted by Alabama and Florida in this litigation.1/  Pursuant to the Administrative Procedure Act ("APA"), Alabama and Florida seek a partial judgment from this Court that certain final agency actions taken by the United States Army Corps of Engineers ("Corps") and officers of the Corps (collectively, the "Federal Defendants") are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or in excess of the Corps' statutory jurisdiction or authority.  The Federal Defendants have advised that they do not contest Alabama and Florida's standing for purposes of this motion.  As will be described in greater detail below, Alabama and Florida ask the Court to enter judgment as follows:

1.  The Federal Defendants' *de facto* reallocation of storage in Lake Lanier to water supply is unlawful under the Water Supply Act of 1958 ("WSA") because it involves major operational change and seriously affects authorized project purposes, and because the Federal Defendants did not obtain prior Congressional approval;

2.  The Federal Defendants' ongoing commitments to allow and facilitate water supply withdrawals by Gwinnett County, the City of Cumming, the City of Gainesville, and the Atlanta Regional Commission ("ARC"), separately and severally, are *ultra vires* and without any legal authority to support the withdrawals;

---

1/     In light of this Court's indication that it would take up the issue of the appropriate remedy with respect to any claim on which a party prevails after deciding the merits of the parties' claims, this motion seeks a partial judgment from this Court on the merits of Alabama's and Florida's claims, and Alabama and Florida will address the appropriate remedies in accordance with this Court's future directives on the subject.

3. The Federal Defendants have implemented the draft 1989 water control plan, including its action zones, in violation of the procedural requirements of the National Environmental Policy Act ("NEPA"), the Water Resources Development Act ("WRDA"), the WSA, and the Corps' own regulations;

4. The Federal Defendants entered into water supply contracts with and granted licenses or permission for water supply withdrawals to Gwinnett County, the City of Cumming, the City of Gainesville, and ARC, separately and severally, in violation of the procedural requirements of NEPA, WRDA, the WSA, and the Corps' own regulations;

5. The Federal Defendants have implemented the Upper Chattahoochee River Management Plan in violation of the procedural requirements of NEPA, WRDA, the WSA, and the Corps' own regulations;

6. The Federal Defendants have implemented Division Regulation DR 1130-2-16, pursuant to which the Federal Defendants operate Lake Lanier in a manner that protects storage for the benefit of recreational interests to the detriment of the reservoir's authorized purposes, in violation of the procedural requirements of NEPA, WRDA, the WSA, and the Corps' own regulations.

7. In addition, Florida asks the Court to enter judgment holding that the Corps has violated the Coastal Zone Management Act ("CZMA") by operating its Apalachicola-Chattahoochee-Flint ("ACF") reservoirs in a manner that affects Florida's coastal resources without providing to Florida a consistency determination as required by that statute.

2

As demonstrated below, Alabama and Florida are entitled to a partial judgment in their favor for all Phase One claims challenging the foregoing actions of the Corps.  A partial judgment in favor of Alabama and Florida is supported by the administrative record, the factual appendix and evidentiary materials filed by Alabama and Florida contemporaneously herewith, the pleadings in this action and the arguments set forth herein.

## I.     INTRODUCTION AND SUMMARY STATEMENT OF FACTS

This case involves challenges to final agency actions of the Corps relating to its management of Lake Lanier in Georgia.  That reservoir was created by the construction of Buford Dam on the Chattahoochee River.

At the heart of this motion is Alabama and Florida's challenge to the Corps' operation of Lake Lanier for the benefit of municipal and industrial ("M&I") water supply rather than the three authorized purposes for which Congress approved the reservoir's construction -- power generation, downstream navigation support, and flood control.  Since the 1970s, the Corps has allowed Atlanta-area water suppliers to withdraw ever increasing amounts of water from Lake Lanier, and this has continued to the present notwithstanding that all of the contracts purporting to authorize such withdrawals expired in 1990.[2]  Through its actions, the Corps has effected a *de facto* reallocation of storage in Lake Lanier from the congressionally authorized purposes of hydropower generation and downstream navigation support to M&I water supply.

---

[2]     The United States Court of Appeals for the D. C. Circuit in *Southeastern Federal Power Customers, Inc. v. Geren*, 514 F.2d 1316, 1318 (D.C. Cir. 2008), *cert. denied*, ___ U.S. ___, 2009 WL 56204 (Jan. 12, 2009) (No. 08-199) (hereinafter "*Southeastern*"), characterized these contracts as contracts for storage for water supply, which they are, although generally they are not so denominated.

As a result, during times of drought, releases from Buford Dam for hydropower generation are severely curtailed, and the Corps essentially eliminates navigation as an operating purpose.  While water supply was originally intended by Congress to be an *incidental* benefit of releases made to satisfy the authorized hydropower and navigation purposes, the Corps has converted it to the *dominant* purpose served by Lake Lanier.  The Corps has acknowledged that its actions effect a *de facto* storage reallocation.

Although this *de facto* storage reallocation at Lake Lanier constitutes "major operational change" and "seriously affects" the congressionally authorized purposes of the reservoir, the Corps has declined to seek, much less secure, congressional approval, as required by the WSA, 43 U.S.C. § 390b.  The Corps has acted unilaterally despite its numerous acknowledgements that, if these modifications were "permanent," congressional approval would be necessary to validate them.  The Corps has endeavored to justify its failure to secure congressional approval with its now discredited excuse that these modifications have been "interim."

The Corps has done so despite the passage of thirty years during which contracts, in one form or another, have ensured that the water suppliers are able to make water withdrawals in ever-increasing amounts.  All of the relevant contracts expired in 1990, but the Corps has continued to honor them as "holdover" contracts which, as of about 1999, collectively reallocated 13% of the conservation storage in Lake Lanier to water supply purposes.  In some instances, the Corps has allowed withdrawals beyond the maximum amounts allowed under the contracts; indeed, water supplier Gwinnett County has almost doubled the maximum withdrawal specified in its contract.  In other instances, such as the

downstream water supplier ARC, the Corps has agreed to a contract setting the maximum

withdrawal amount well beyond the level of current demands.

During the period of time this litigation was stayed (1990-2003), the three States and

the federal government attempted to negotiate a resolution of their disputes, including the

issues raised by this action.3/  However, after SeFPC filed its lawsuit against the Corps in

2000, the Corps, Georgia, the water suppliers, and SeFPC (without involving either Alabama

or Florida) negotiated a Settlement Agreement in January, 2003, which would have

authorized the Corps' longstanding practice of allowing water supply withdrawals, and then

allowed substantial expansion of them.  The vehicle to accomplish this feat was not a

congressionally-approved reallocation, but rather "interim" (10 years renewable for 10 years,

a total of 20 years) contracts.  The net result would have been the "interim" reallocation of

22% of the conservation storage of Lake Lanier to M&I water supply.

The D.C. Circuit struck down the Settlement Agreement, determining: (i) that the

base for assessing whether the reallocation required congressional approval was "zero,"

rather than the amount equivalent to the *de facto* reallocation already existing from the

"holdover" contracts (which that Court referred to as "gradual water storage allocation");

(ii) that the reallocation of 22% of the storage capacity of the reservoir violated the WSA

because congressional authorization had not been accomplished for this "major operational

---

3/      From 1992-1997 these negotiations proceeded under a Memorandum of Agreement
concurrently with efforts to complete a comprehensive study of the ACF Basin.  In 1997,
Congress approved a Compact between the three States and, after its ratification by the
legislatures of the three States, negotiations continued under the Compact.  The negotiations
terminated in mid-2003, largely because of the entry by the Corps, Georgia, the water
suppliers, and Southeastern Federal Power Customers, Inc. ("SeFPC") into the Settlement
Agreement struck down last year in *Southeastern*.

change;" (iii) that even if one measured the Corps' reallocation from the 13% base provided by the "holdover" contracts, the 9% increase would likewise be a non-congressionally authorized "major operational change;"4/ and (iv) that the WSA makes no distinction between "permanent" and "interim" reallocations.

In order to apply the D.C. Circuit's legal analysis of the WSA to the *de facto* storage reallocation effected by the Corps at Lake Lanier, one must note that the reallocation of storage to serve water supply for Gwinnett County alone is about 9.6% of Lake Lanier's conservation storage, and for all of the "holdover" contracts the total is about 18%. Either degree of change is "major operational change" as determined in *Southeastern* and, lacking congressional authorization, violates the WSA.

In addition, the Corps created a draft Water Control Plan (the "draft WCP") in 1989 establishing "action zones" for management of Lake Lanier. The draft WCP is an integral part of the Corps' *de facto* reallocation of storage. The draft WCP was part of a draft PAC Report5/, prepared for submission to Congress for approval of a contemplated storage reallocation, but never submitted because, according to the Corps, this lawsuit was initiated by Alabama. The Corps, without finalizing, formally adopting, or submitting the draft WCP to Congress for approval, has simply put it into effect.

---

4/      The D. C. Circuit also found that a 95,000 acre-foot reallocation (the difference between the then total unauthorized reallocation to storage for water supply and the total proposed to be covered by the Settlement Agreement's "interim" contracts) "would be the largest acre-foot reallocation ever undertaken by the Corps without prior Congressional approval." Ironically, 95,000 acre-feet is the approximate amount of storage today reallocated for Gwinnett County's actual M&I use.

5/      Post Authorization Change Notification Report For The Reallocation Of Storage From Hydropower To Water Supply at Lake Lanier, Georgia.

The draft WCP divides conservation storage into four "actions zones" from a relatively full Zone 1 to a *relatively depleted* Zone 4.6/  By the time Lake Lanier falls into Zone 3 during dry periods, drastic limitations are imposed by the Corps on navigation and hydropower generation.  In Zone 4, navigation disappears as an operational purpose, as does hydropower generation above the minimal amount needed to provide for Atlanta's water supply demands and dilution of its wastewater discharges.

The major operational change caused by the *de facto* reallocation is clear when one focuses on dry periods, when the importance of the Corps' withdrawal and release decisions to all interests is critical.  During the dry periods over the past three decades, the data show that M&I withdrawals have quadrupled while releases from Buford Dam (and, of course, the resultant hydropower generation) have decreased significantly.  At the same time, the average elevation of Lake Lanier has remained essentially unchanged from drought to drought.  During these periods, the percentage of releases from Buford Dam that is comprised of water from storage (as opposed to inflow to Lake Lanier) has plummeted.  This analysis confirms that the Corps has chosen, without congressional approval, to sacrifice hydropower generation and downstream navigation support in order to retain water in storage to serve ever-increasing M&I withdrawals from Lake Lanier.  The Corps has *never* allowed the Lake level to go below 1050 MSL, *fifteen* feet *above* the *bottom* of the conservation

---

6/      Zone 4 is reached when the reservoir level falls to 1060 mean sea level ("MSL") during September, which is only 10-11 feet below full pool, and still *twenty-five* feet *above* the bottom of the Lake's conservation pool.

storage pool, confirming that the Corps has made storage for water supply the *dominant* purpose of the reservoir.7/

The other requirement of the WSA—congressional approval of storage reallocations which "seriously affect the purposes for which the project was authorized"— also has been violated by these Corps actions. Releases from Buford Dam for hydropower generation have been restricted in dry periods to the minimum required for Atlanta's water supply uses and dilution of its pollution.  As noted, in such periods, navigation support is effectively eliminated.  In addition, some of the minimal hydropower generation produced by these releases has been shifted by the Corps to non-peak releases in order to provide for Atlanta's weekend water supply withdrawals.  This shift, which lessens the value of the power generated, also amounts to major operational change.

The "holdover" contracts are and always have been *ultra vires*.  At times, the Corps has acknowledged that it is relying on the WSA for legal authority to effectively reallocate Lake Lanier's conservation storage for implementing the "holdover" contracts, and that the WSA has been violated by fulfilling these contractual commitments without congressional approval.8/  But at other times, the Corps has purported to rely on other statutes as justification for those contracts.  One such statute was the Independent Offices Appropriations Act, 31 U.S.C. § 9701 (formerly 31 U.S.C. § 483a) ("IOAA") (a general

---

7/      The Corps also has made clear that its actions are designed to protect recreational interests, as well, even though no storage has been allocated in Lake Lanier at any time for recreational purposes.  In addition to this being a major operational change without congressional approval, in violation of the WSA, this action violates the Corps' own regulations.

8/      The individual "holdover" contracts also violate the WSA by not providing compensation to the Corps in the amounts required by that statute.

statute dealing with the pricing of services and goods provided by the Federal Government), but the Corps' own General Counsel had to tell the Corps to cease and desist its reliance on that statute.  The Corps also has occasionally referred to the River and Harbor Act of 1946, P.L. 79-525, which authorized construction of Buford Dam. But that Act does not mention the use of storage for M&I water supply, and the Stockdale Memorandum, cited with approval by the D.C. Circuit, confirmed that, in its passage of that Act, Congress viewed water supply as only an "incidental benefit" of downstream releases for authorized project purposes.  At one point, the Corps indicated the Flood Control Act, 33 U.S.C. § 708 ("FCA"), might provide authority for its "interim" plan, but this Act only applies to "surplus water," of which none exists in Lake Lanier,[9]/ and the Corps' own regulations restrict that authority to small amounts of water for temporary use.

The Corps also has committed procedural violations with abandon. The Corps' *de facto* reallocation of storage to water supply was implemented without compliance with NEPA, although clearly the reallocation is a "major Federal action" requiring the detailed evaluation of impacts and alternatives mandated by that statute.  The Corps' actions equally violated the procedural requirements of the WRDA, the Corps' own regulations governing water control plans, and the Corps' obligations to involve the public in management decisions.[10]/

---

[9]/      Congress itself confirmed this fact in 1955.

[10]/      Florida, but not Alabama, also demonstrates that the Corps has violated the CZMA, 16 U.S.C. §§ 1456-66, because its actions affect Florida's coastal resources and the Corps has not provided a consistency determination as required by that statute.

Finally, Alabama and Florida plainly have standing to bring this action. Notably, the Federal Defendants, the only defendants from which Alabama and Florida request any relief, have advised that they do not contest standing for purposes of this motion.  In addition, Georgia, at oral argument in *Southeastern,* expressly conceded that Alabama and Florida "have standing to assert a claim to their injury at the State Line relating to water flows." Further, in a prior appeal in this case, the Eleventh Circuit found both States have standing. *Alabama v. U. S. Army Corps of Eng'rs*, 424 F.3d 1117, 1130 (11th Cir. 2005) (noting that "Corps management of Lake Lanier that violates federal law may adversely impact the environment and economy downstream in the ACF Basin, thereby injuring Alabama and Florida" and "readily conclud[ing] that Alabama and Florida have standing to pursue this action.").  These conclusions drawn by the parties and the courts comport with the facts and common sense.  As downstream States, the Corps' actions in reducing releases for hydropower generation and navigation support have caused injury to Alabama and Florida, and compliance by the Corps with the laws at issue in this motion will address those injuries. Furthermore, Alabama and Florida are plainly within the zone of interests protected by the statutes at issue, so they satisfy the requirements of prudential standing.

## II.     LEGAL STANDARD IN APA CASES

With this motion, Alabama and Florida seek the entry of partial judgment on claims challenging certain final agency actions by the Corps under the APA, which provides that courts must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"

or "in excess of [the agency's] statutory jurisdiction" or "authority." 5 U.S.C. §§ 706(2)(A),

(C).

The APA applies to a wide swath of different agency actions.  The act broadly defines

"agency action" to include "the whole or a part of an agency rule, order, *license*, sanction,

*relief*, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13) (emphasis

added).  "License" is further defined under the APA to include "the whole or a part of an

agency permit, certificate, approval, registration, charter, membership, statutory exemption

or other form of permission."  5 U.S.C. § 551(8).  Likewise, the APA defines "relief" to

include "the whole or a part of an agency (A) grant of money, assistance, license, authority,

exemption, exception, privilege, or remedy; (B) recognition of a claim, right, immunity,

privilege, exemption, or exception; or (C) taking of other action on the application or petition

of, and beneficial to, a person."  5 U.S.C. § 551(11).

There are three categories of final agency actions at issue in this motion, and these

actions fall squarely within the parameters of the APA.  First, Alabama and Florida challenge

the Corps' unilateral *de facto* reallocation of water storage in Lake Lanier from its authorized

purposes of hydropower and navigation to water supply, which is not an authorized purpose

of the reservoir.  Second, Alabama and Florida challenge the Corps' actions allowing certain

Georgia parties to utilize water storage in Lake Lanier for water supply without any legal

authority to support the withdrawals.  Third, and finally, Alabama and Florida challenge the

Corps' implementation of specific operational controls at Lake Lanier in a manner

inconsistent with NEPA and other federal law.

In deciding whether or not to set aside these agency actions under the APA, this Court applies "the generally applicable standards of § 706," which require "a thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99, 97 (1977).  First, this Court determines whether the Corps acted within its scope of authority.  *See id.*; 5 U.S.C. § 706(2)(C).  Second, if this Court determines that the Corps acted within its scope of authority, "[§] 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Overton Park*, 401 U.S. at 416 (quoting 5 U.S.C. §  706(2)(A)).  Under the APA, "[q]uestions of law unlike questions of fact are freely reviewable by the courts."  *Pollgreen v. Morris*, 770 F.2d 1536, 1544 (11th Cir. 1985) (citing 5 U.S.C. § 706 ("the reviewing court shall decide all relevant questions of law....")).  Simply put, "[a]n administrative decision based upon incorrect legal principles cannot stand."  *Id.* at 1545 n.20.

## III.    THE CORPS' *DE FACTO* STORAGE REALLOCATION IS UNLAWFUL

### A.  Limits on the Corps' Authority to Reallocate Storage in Federal Reservoirs

In the WSA, 43 U.S.C. § 390b, Congress retained the authority to authorize any significant reallocation of storage in previously constructed reservoirs it had authorized and funded to serve specific purposes.  Congress determines the specific purposes of federal reservoirs when it approves the expenditure of funds for their construction.  It does so by approving the Army's official reports, which demonstrate the economic feasibility of the project by reference to those purposes for which storage space in the reservoir is to be "allocated." *See* Factual Appendix in Support of the States of Florida and Alabama's Motion

for Summary Judgment ("FA") (FA ¶¶ 587, 870, 872).11/  Congress left to the Corps the

power to "reallocate" only small amounts of the storage space in an existing project.  In

1969, the Army General Counsel confirmed these limitations on the Corps' authority in

characterizing "the legal requirements for seeking additional authorization in the general case

of post-authorization project changes":

> … [T]he *discretionary authority* given the Chief of Engineers to make post-
> authorization changes in projects *extends only to* what might be termed
> engineering changes:
> [and]
> …The discretionary authority is not *considered to include matters which
> materially alter the nature of the project, such as the deletion or addition of
> project purposes where not otherwise authorized by law, or substantial
> changes in the relative sizes of project purposes.*

SUPPAR001351 (emphasis added) (the "1969 Opinion"); (FA ¶ 20).  Ten years later, the

1969 Opinion was confirmed in *EDF v. Alexander*, 467 F. Supp. 885 (N.D. Miss. 1979), and

the Army's Deputy General Counsel in 2002 reconfirmed in the Stockdale Memorandum 12/

that *EDF* was settled law. 13/  Only Congress may reallocate significant amounts by

assigning a portion of the storage to a new purpose (at the expense of an original one) or by

---

11/     References to the Factual Appendix being filed contemporaneously with this Motion
will be as follows: (FA ¶ __(paragraph)).  Citations to the Administrative Record will appear
as "ACF_____" or "SUPPAR____" as each document is so stamped by the Federal
Defendants in the administrative record.  All other citations will adhere to bluebook
standards or as indicated in any stipulation related to such document.

12/     This is a memorandum to the Acting Assistant Secretary of the Army for Public
Works from Earl Stockdale, Deputy General Counsel, dated April 15, 2002 (Subject: Georgia
Request for Water Supply from Lake Lanier.  SUPPAR005079-91; (FA ¶¶ 589-607).  In
*Southeastern*, the D.C. Circuit discussed and utilized the Stockdale Memorandum
extensively.  *See* 514 F.3d at 1323.

13/     In *EDF*, moreover, the Corps' Chief of Engineers testified that, while certain latitude
exists to alter a project that is under construction, "once a project is complete, the
construction monies have been expended, and so you need new authorization" to make
significant changes.  467 F. Supp. at 902.

changing the mix among the amounts of storage assigned to the original purposes.  (FA ¶¶ 584-607).

As this Court and two federal appellate courts have determined, municipal water supply was not among the originally authorized purposes of the Lake Lanier reservoir. (FA ¶¶ 1025-28).  The Corps has conceded that no storage space in Lake Lanier was allocated by Congress to serve M&I water supply purposes. (FA ¶¶ 1023-24). Accordingly, a reallocation of storage space in Lake Lanier to serve that purpose must comply with the explicit restrictions laid down by Congress in the WSA.14/.

As the 1969 Opinion shows, the Army has acknowledged that, at most, it had authority to make only minor variations in the allocation of storage among *existing*, authorized project purposes, which in the case of Lake Lanier does not include water supply. (FA ¶¶ 20, 1018-24).  It further shows that the Army recognized it could not alter the Congressional allocation of reservoir storage to *add new purposes* without Congressional approval because such additions would "materially alter the nature of the project."  *Id*.  In the case of Lake Lanier, the provision of storage for M&I water supply would amount to the addition of a new authorized purpose. (FA ¶¶ 19, 584-607, 868-1028).

Prior to enactment of the WSA in 1958, "the Army did not have authority to expend federal appropriations for water supply storage in its projects," and therefore "if local municipalities wanted water supply storage . . . they had to request that existing plans for

---

14/    Moreover, even had M&I water supply been an originally authorized purpose of Lake Lanier, the Corps lacks authority to unilaterally reallocate substantially more storage to that purpose by diminishing the storage allocated to other purposes, as the Corps' Chief Counsel made clear in the 1969 Opinion, and as the Army's Deputy General Counsel confirmed in the Stockdale Memorandum.  (FA ¶¶ 20, 584-607).

projects be modified and pay the extra costs of accommodating water supply at the projects."
(FA ¶ 593); SUPPAR005085, n.1.  Buford Dam was authorized and constructed in the
1940s-50s; no municipalities requested or paid for any water supply storage.  *Id.*  At that
time, therefore, the Army's authority extended only to improving the Chattahoochee River
for navigation, flood control and hydropower generation.  *Id.*

Congress, in enacting the WSA, created a mechanism through which water supply
storage could be reallocated in previously constructed reservoirs.  *See* 43 U.S.C. § 390b.[15]/
Consistent with Congress's policy that States and local interests have the "primary
responsibilities . . . in developing water supplies for domestic, municipal, industrial and other
purposes" (*Id.* § 390b(a)), the new statute required that State and local interests must pay "the
entire amount of the construction costs . . . *allocated to water supply*" within fifty years.  *Id.*
§ 390b(b) (emphasis added).

The Corps' position in this case is that, despite the 1969 Opinion and the *EDF*
decision, the Corps may, to some extent, reallocate existing storage from the originally
authorized purposes to the water supply purpose.  But its regulations confirm that the power

---

[15]/     In 1937 legislation, the Corps had been given the authority to provide storage for
water supply in a dam to be constructed *if the local government paid for it*:

> …the plans for any reservoir project may, in the discretion of the Secretary of
> War, on recommendation of the Chief of Engineers, *be modified to provide
> additional storage capacity for domestic water supply…on condition that the
> cost of such increased storage capacity is contributed by local agencies*.

Pub. L. No. 75-208, 50 Stat. 515, 518 (1937) (emphasis added) (codified as subsequently
amended at 33 U.S.C. § 701(h)). Atlanta's Mayor explicitly rejected the opportunity to avail
his community of this statutory provision. (FA ¶¶ 956-62).

of the Corps to reallocate small amounts of existing storage without Congressional approval

applies only in rare circumstances.16/

The WSA explicitly restricts the Corps' authority:

[m]odification of a [pre-1958] reservoir project . . . to include storage [for water supply], . . .which would seriously affect the purposes for which the project was authorized . . . , or . . . which would involve major structural or operational changes shall be made only upon the approval of Congress . . . .

43 U.S.C. § 390b(d).

Congress established the purposes of Lake Lanier – navigation, flood control, and

hydropower generation.  *See Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1122

(11th Cir. 2005); *Southeastern*, 514 F.3d at 1326; *see also* (FA ¶¶ 868-1028).  While

Congress recognized that hydropower or navigation releases from Buford Dam could provide

incidental waste assimilation or water supply benefits to the Atlanta area,17/ such recognition

---

16/     Corps regulations specify that it may approve reallocations of up to 15 percent of a reservoir's total storage capacity or 50,000 acre-feet, whichever is less, if such actions do not require Congressional approval, as discussed in the text above.  *See* USACE ER 1105-2-100 § 3-8b(5) at 3-33.  The largest such reallocation ever made without Congressional approval, from 1958 to the present, was 75,000 acre-feet and this 75,000 acre-feet reallocation was done while approval legislation was pending in Congress, which legislation was adopted shortly thereafter.  (FA ¶¶ 578, 606-07); *see also Southeastern*, 514 F.3d at 1324 (recognizing that a 95,000 acre-foot reallocation would be "the largest acre-foot reallocation ever undertaken by the Corps without prior Congressional approval").

17/     As the Eleventh Circuit has concluded, "Lake Lanier was created for the explicitly authorized purposes of flood control, navigation, and electric power generation," and water supply was "not explicitly authorized by Congress."  *Alabama*, 424 F.3d at 1122.  The Army's reports to Congress prior to construction of Buford Dam so confirm (FA ¶¶ 879-999) and the Stockdale Memorandum confirms that:

[N]avigation, hydropower and flood control were the specifically authorized purposes – those purposes . . . which *govern the operation of the reservoir.* [W]ater supply was clearly one of the project's incidental benefits -- . . . a *byproduct of its operation for its specifically authorized purposes.*

fails to provide the Corps with the ability to ignore or circumvent Congressional intent as

reflected in the WSA.  The plain language of the WSA makes clear that its dual restrictions

apply whenever there is  "modification" of a project to "include storage" for M&I water

supply.  No *storage* for general water supply has ever been authorized by Congress.

The term "modification" includes "operational changes such as reallocation of

existing storage space from another purpose to a water supply purpose."  (SUPPAR05085).

Since no storage in the Lake Lanier reservoir was allocated by Congress for water supply, an

operational change (*i.e.*, a "modification") that includes such storage must pass muster under

the WSA.  The same would be true where the modification seriously affects the hydropower

generation or navigation purpose, the other prong of retained Congressional authority. When

the Corps makes such changes without Congressional approval, it is in violation of the WSA.

In the words of the APA, its actions are "not in accordance with law," and the "reviewing

court shall . . . hold unlawful and set aside" such actions.  5 U.S.C. § 706.

### B.  The Corps Has Modified the Lake Lanier Project By Making a *De Facto* Reallocation to Include Storage for Water Supply

In deciding the core issues posed by this motion, the Court should rely largely on the

D. C. Circuit's interpretation of the plain meaning of the WSA as well as concepts

acknowledged by the Corps, together with basic arithmetic.  The D.C. Circuit said that, in

interpreting the WSA, the two-step analysis under *Chevron, U.S.A., Inc. v. Natural Resources*

*Defense Council, Inc.*, 467 U.S. 837 (1984) required it to proceed no further than step one, at

---

*See* SUPPAR005082 (emphasis added).  This Court has, of course, reached the same
conclusion in its Order of Aug. 13, 2007.  *See* Doc. 41 at 1-2 ("Congress authorized the
creation of Lake Lanier for three purposes: flood control, navigation, and electric power
generation.").

which point it is settled that "[where] Congress has directly spoken to the . . . issue . . . that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Southeastern*, 514 F.3d at 1321, 1325. The same approach is required here.

To begin with, "operational changes such as reallocation of existing storage space from another purpose to a water supply purpose" is a "modification." SUPPAR05082; (FA ¶ 595). Thus, a reallocation of storage *is* operational change, and it *is* a project modification.

While the Corps does not appear to have directly defined "storage reallocation" in a regulation, its Water Supply Handbook provides a definition, stating that reallocation "is the reassignment of the use of existing storage space in a reservoir project . . . ." (FA ¶ 17). Thus, the Corps has recognized that storage reallocation equals the change in use of existing storage space in the reservoir – *i.e.*, that the Corps makes storage space, previously allocated for one purpose, available for some different purpose in the future.

The D.C. Circuit saw clearly that the "holdover" contracts were devices through which the Corps had sought to reallocate storage, observing that "[b]eginning in the 1970s, the Corps entered into a series of five-year renewable contracts that allowed some of Lake Lanier to be used for *storage* of local water supply." *Southeastern,* 514 F.3d at 1318 (emphasis added). It described these as "temporary local water *storage* contract[s]." *Id.* (emphasis added). And it noted that it had no occasion to decide whether the "previous *storage reallocations*" effected through these contracts were unlawful. *Id.* at 1324 n.4 (emphasis added). Since none of the storage in Lake Lanier originally was allocated by Congress for water supply (FA ¶¶ 593, 636-46, 1021), these contracts, now honored as

18

"holdover" contracts, have "reallocated" that storage to water supply.  In their pleadings, Georgia, the Water Suppliers and the Corps have all confirmed this understanding of the D.C. Circuit's conclusion.18/

Further, the contracts must be evaluated cumulatively, as the Corps acknowledged just one year after Congress adopted the WSA. On December 29, 1959, the Assistant Chief of Engineers for Civil Works explained how this new statutory authority must be administered when water supply storage is to be added at Corps reservoirs (the "1959 Policy"): "[i]t is important to recognize that the water supply storage provided under the terms of the [WSA] constitutes a modification of the original project authorization and thus has the effect of making water supply an authorized project purpose."  Because this new purpose must share equitably in the benefits of the project, the Assistant Chief also stressed that "[t]his precludes favoring water supply over other project purposes . . . ." (FA ¶ 19).  He therefore explained that the Corps "will approve requests for relatively small amounts of storage in completed projects…" but that "*if a multiplicity of such requests is in prospect it would be desirable to consider the overall effect…on other authorized project purposes…*"

---

18/      All parties agree that the D.C. Circuit has told us (1) that reallocation of storage *is* operational change, and (2) that one determines whether that change is "major" by examining the percentage of storage being reallocated. Thus, in their unsuccessful Joint Petition for Panel Rehearing, Georgia and the water suppliers said: "[t]he Court's decision equates a 'reallocation of storage' with an 'operational change' *per se*, such that the only question is whether the reallocation of storage, and hence the operational change, is 'major.'" (FA ¶ 651-52).  Similarly, in its Response to that Petition, the Corps characterized the D.C. Circuit's decision this way: "[t]he Court's opinion incorrectly concludes that the Settlement Agreement would work a major operational change based on nothing more than the percentage of storage proposed for reallocation." (FA ¶ 653).  The Corps also referred to "the Court's approach of using only percentages of reallocation to determine whether the proposed reallocation involves a major operational change…" (FA ¶ 653).

and make "a reasonably firm determination of whether or not additional approval of Congress is required."  (FA ¶ 19) (emphasis added).

Finally, there is essential agreement as to the amount of the storage reallocation effected by the Corps' "holdover" contracts.  The D.C. Circuit referred to the "total storage space [that] was being allocated for local use in 2002," and cited the Stockdale Memorandum, where that figure was placed at 145,460 acre-feet, or about 13.9 percent of the Lake's conservation storage.  *Southeastern*, 514 F.3d at 1320 (FA ¶¶ 641, 663-64, 1319-20). The Corps' reallocation now well exceeds the 2002 amount.

From the 1970s to the present, the Corps has continuously changed its operation of Lake Lanier to accommodate the Metro-Atlanta area's demand for M&I water supply, which has risen from approximately 7,700 acre-feet in 1977 to 149,680 acre-feet of actual use in 2006, an almost twenty-fold increase in the water suppliers' actual use of storage for M&I

water supply.19/ (FA ¶ 738).  These actual uses amount to more than 14 percent of Lake

Lanier's 1,087,600 acre-feet of conservation storage.20/  *Id.*

      But the Corps' reallocation of storage space is not limited to actual use when the

Corps has contractually promised water supply availability in excess of past actual use.  For

some of the water suppliers, the Corps' commitment is apparent from the amount the Corps

has allowed to be used—*i.e.,* actual withdrawals "under the terms of the expired contracts."

*Southeastern*, 514 F.3d at 1318.  For other water suppliers, the Corps' commitment is clear

from the terms of the contracts themselves, which specify the maximum withdrawal amounts

---

19/     While the Corps has not produced a reallocation document to memorialize these project modifications, as it did in the 1989 draft PAC Report and the unlawful D.C. Settlement Agreement, it has nonetheless effected a *de facto* storage reallocation through the practical effect of its continuous, systematic actions.  *De facto* conduct is recognized by its practical effect**.**  *See, e.g.*, *Christensen v. Harris County*, 529 U.S. 576, 588 (2000) (rejecting Department of Labor's interpretation of an unambiguous regulation, because that would "permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation"); *Hawkins v. Eslinger*, 2008 WL 215710, at *9 (M.D. Fla. Jan. 24, 2008) (citing Black's Law Dictionary 448 (8th ed., 2004)) ("The term '*de facto*' means 'having effect even though not formally or legally recognized.'").  Moreover, continuous, systematic actions constitute "*de facto*" conduct.  *See, e.g.*, *Power Reactor Dev. Co. v. Int'l Union of Elec., Radio and Machine Workers, AFL-CIO, et al.*, 367 U.S. 396, 408-9 (1961) (explaining that Congress's failure to amend the Atomic Energy Commission's licensing procedure after it was presented to them several times over a five year period constituted "a *de facto* acquiescence in and ratification of the Commission's licensing procedure"); *Bud Antle, Inc., v. Eastern Foods, Inc.*, 758 F.2d 1451, 1457-8 (11th Cir. 1985) (noting that the elements of a *de facto* merger include: "continuation of the enterprise of the seller corporation…, continuity of shareholders…[and] the uninterrupted continuation of normal business operations...").

20/     The original conservation storage amount in Lake Lanier was 1,049,000 (FA ¶¶ 281, 721, 724, 982).  This also was the amount utilized by the Settlement Agreement and cited by the D.C. Circuit.  (FA ¶¶ 622, 629-30).  The Administrative Record also shows the conservation storage in Lake Lanier to be 1,087,000 acre-feet, reflecting that the level of conservation storage is increased one foot for 6 months per year.  (FA ¶¶ 813-18).  Use of 1,049,000 as the conservation storage amount results in only a minor adjustment, less than a tenth of a percent, to this percentage.

that will be allowed (and where those maximums, thus far, exceed actual withdrawals).  The following analysis explains the Corps' total reallocation.

- Gwinnett County.  The "holdover" contract allows a maximum withdrawal of 53 million gallons per day ("MGD").  (FA ¶¶ 30, 53-54, 87).  The record demonstrates, however, that Gwinnett County's actual use totaled almost twice that amount, or 92.91 MGD, in average daily withdrawals during 2006.  (FA ¶¶ 30, 743).

- City of Cumming.  Similarly, while the contract specifies a maximum withdrawal of 10 MGD, Cumming averaged 18.79 MGD in 2006. (FA ¶¶ 30, 105-06, 127-28, 743).

- Gainesville.  The contract specifies a maximum withdrawal of 20 MGD, whereas the actual withdrawals in 2006 averaged only 18.99 MGD on a daily basis. (FA ¶¶ 30, 181-84, 743).  The Corps maintains that 8 MGD was originally allotted to Gainesville in the 1953 "relocation" contract, and if so the *reallocation* to Gainesville is 12 MGD.  (FA ¶¶ 30, 172-75).

- ARC.  Because ARC withdraws downstream of Buford Dam, the Corps has calculated that 327 MGD is available as an incidental benefit to ARC via

normal releases to generate hydropower and support navigation.21/  The contract

commits to allowing ARC a maximum withdrawal of 377 MGD, or 50 MGD of water

from storage that Congress allocated to other uses.  (FA ¶¶ 30, 135-45, 743).  The

reallocation to ARC is at least 50 MGD. 22/

Summing these reallocations results in a total of approximately 174 MGD, or over 196,100

acre-feet of storage. 23/  This represents 18% percent of the conservation storage in Lake

Lanier, as shown in Figure 1.

---

21/     As a result of the Corps' reallocation of storage to support Gwinnett County's enormous water supply withdrawals from the Lake itself, releases for hydropower generation and downstream navigation support have been correspondingly reduced, as discussed below. Consequently, the amount of "incidental" benefit to ARC that the Corps attributes to normal releases from Buford Dam (327 MGD, as of 1986) should be reduced as well.  This means that the calculation of storage that has been *reallocated* to ARC should be *increased* to reflect this substantial change in reservoir operations.  Indeed, in its 1989 PAC Report, the Corps said that only 200 MGD should be attributed to incidental releases from Buford Dam, and that this number "is borne out by recent experience."  ACF041301.  Consequently, the Corps estimated that, when ARC's usage reaches the maximum contract amount, the reallocation of storage to ARC alone is 65,225 acre-feet.  *Id.*

22/     The record demonstrates that as an annual average ARC has not utilized all of this storage thus far.  (FA ¶ 30 n.4).  But that fact is irrelevant, since the "holdover" contract embodies the Corps' allotment of storage to ARC's use, and thus represents a commitment to reallocation of storage.  Additionally, during the driest months of the year, ARC typically utilizes, if not surpasses, the full 50 MGD amount. (FA ¶ 30 n.4).

23/     The Administrative Record shows that the Corps has used various methods of converting MGD to storage in acre-feet. *See, e.g.*, SUPPAR035448 (D.C. Settlement Agreement); (FA ¶¶ 656-67; 732-36).  As noted above, the Corps also has used two slightly different figures for total conservation storage.  Using different combinations of withdrawal figures, conversion formulas and conservation storage levels, the mathematical calculations (shown in detail in the FA ¶¶ 732-36) show a range of approximately 150-199 thousand acre-feet of the Lake Lanier conservation storage used for water supply, or a range of 14.25 to 18% of conservation storage.  Anything in this range is, under the D.C. Circuit analysis, major operational change.

**FIGURE 1 – M&I Storage Allocation (in acre-feet and % of conservation storage) <span style="color:red">24</span>/**



The Corps contends that some of these reallocations were agreed to by the parties pursuant to the live-and-let-live provisions under the 1992 Memorandum of Agreement ("MOA") and the subsequent ACF Compact. However, this provision was in effect only for eleven years (1992-2003) of the three-decade increase in storage reallocation, and the Corps cannot explain why that increase occurred without Congressional approval during the fifteen years prior to the MOA or the five years since the ACF Compact terminated. In any case, on its termination, the live-and-let-live provision disappeared from consideration retroactively to

---

24/      The Factual Appendix at ¶¶ 732-37 sets forth Figure 1, with all data from the Administrative Record on which it is based (Tables 1, 1a, 2 and 2a), and arithmetical calculations therefrom. In addition to Figure 1 above, the Factual Appendix contains Figure 1a – M&I Use of Storage, which is based on the <u>actual</u> annual average withdrawals of the water suppliers for the same time period. (FA ¶ 738-39; Table 3 and 3a). Although the actual withdrawals are slightly lower when viewed as annual averages, the trend of the two charts is the same: storage to support water supply withdrawals is continually increasing. (FA ¶¶ 732-39).

its initiation, under the provision's specific statement that no vested rights were created by it. (FA ¶¶ 267-70, 277-78, 313-17).  Having expired with the ACF Compact, the now-defunct "live-and-let-live" provision offers no legitimate basis for the Corps to argue that the current storage reallocation at Lake Lanier is legally or contractually justified.  And the provision never prevented the Corps (or anyone else) from simply going to Congress whenever it might have decided to do so.25/

### C.  The Corps Has Not Sought Congressional Approval, But Has Acknowledged That Such Approval is Required

Because the Corps fully understands that the "holdover" contracts must be looked at cumulatively as the 1959 Policy mandates, it is not surprising that the Administrative Record shows that all parties knew Congressional approval is necessary to validate reallocation of storage in the aggregate amount of those contracts.  Why then has this approval never been sought by the Corps?  The Administrative Record reflects that one concern was that

---

25/      The MOA was entered into on January 3, 1992, among Alabama, Florida, Georgia and the Federal Government to develop a Comprehensive Study of the ACF Basin.  (FA ¶¶ 265-66).  The MOA's "live-and-let-live" provision provided that any person currently withdrawing, diverting, or consuming water resources within the ACF Basin could "increase the amount of water resources withdrawn, diverted or consumed to satisfy reasonable increases in the demand of such person for water during the Comprehensive Study as permitted by applicable law" provided that written notice was given for increases of more than 10 million gallons per day on an average annual daily basis.  (FA ¶¶ 268-69).  The ACF Compact carried forward the "live-and-let-live" provisions of the MOA in virtually intact language.  (FA ¶¶ 312-14).  The ACF Compact contained several termination provisions, including automatic termination if the states failed to agree on an equitable apportionment by December 31, 1998, unless the ACF Basin Commission unanimously agreed to extend the deadline.  (FA ¶ 315).  The Compact further stated that if terminated, "no party shall be deemed to have acquired  a specific right to any quantity of water because it has become a signatory to this Compact."  *Id*.  The ACF Compact expired, and the Corps has recognized that the "live and let live" provisions of the MOA and the ACF Compact expired. (FA ¶¶ 316-17, 325).

Congressional approval might be difficult to secure.  (FA ¶¶ 580, 635).  However, the

importance – and difficulty – of making such major decisions, affecting many upstream and

downstream interests, is exactly why Congress retained the right to approve such

fundamental alterations of its original project design.  But the principal excuse for not

seeking Congressional approval appears to be the Corps' unfounded assertion that, if the

reallocation were to be considered "interim" or "temporary," the Corps could make such

changes without Congressional approval.  The Federal Defendants have asserted that even a

20-year reallocation could be deemed "interim,"26/ but the D.C. Circuit has now eviscerated

the Corps' assertion, holding that the WSA permits no distinction between permanent and

non-permanent reallocations.27/

Beginning in the early 1970s, the Corps executed a series of contracts to provide

ever-increasing use of Lake Lanier's storage for M&I uses.  The Corps has acknowledged

that it was in fact making a commitment to set aside reservoir storage for the water suppliers'

use as soon as legal impediments, including *this litigation*, could be overcome.  The Corps

said that its actions were being undertaken pursuant to the WSA, acknowledged that it was

---

26/      The D.C. Settlement Agreement called for "interim" contracts to run for that period.
(FA ¶ 610).

27/      The D.C. Circuit opinion states: "Appellees maintain that the absence of a permanent
reallocation … removes the need for prior congressional approval. But it is unreasonable to
believe that Congress intended to deny the Corps authority to make major operational
changes without its assent, yet meant for the Corps to be able to use a loophole to allow these
changes as long as they are limited to specific time frames, which could theoretically span an
infinite period." *Southeastern*, 514 F.3d at1324-5. The concurring opinion states: "The Corps
argued, however, that even if a *permanent* reallocation of 10% of the reservoir would be
deemed 'major,' the Settlement Agreement does not require Congressional approval because
it is only an *interim* measure. That is not persuasive. The… text of [the WSA] draws no
distinctions between interim and permanent changes."  *Id.* at 1328.

effecting a *de facto* storage reallocation, and concluded that the amounts of storage involved

(which were *less* than the cumulative allocation under the "holdover" contracts), if

permanently reallocated, had to be approved by Congress as required by the WSA.  The

Administrative Record shows that Georgia and the water suppliers agreed with the Corps'

assessment.  Since there is no statutory authorization for the Corps' unilateral "interim"

reallocations in amounts less than those involved in the "holdover" contracts, the Corps'

*ultra vires* actions in implementing the "holdover" contracts were and are in direct violation

of the WSA.

### 1.   The Corps' Long-Term Plan to Reallocate Storage at Lake Lanier, and Its "Interim" Measures to Increase M&I Water Supplies

In practice, the Corps has done precisely what the Army General Counsel said it

could not do in the 1959 Policy and the 1969 Opinion.  For almost three decades, the Corps

has cooperated with Georgia and the water suppliers by adding water supply as a new

purpose at Lake Lanier, "materially alter[ing] the nature of the project," (FA ¶ 20) and by

operating the project pursuant to a 1989 draft WCP in a fashion that elevates water supply

from the *incidental* benefit envisioned by Congress to an *authorized* purpose, and then to the

*dominant* purpose being served.  While characterizing its actions as the sale of water to local

authorities on an *interim* basis, the Corps has acknowledged that using reservoir storage to

respond to water supply demands of the Metro-Atlanta area requires storage contracts that

would be subject to the WSA's prerequisite of Congressional approval.

This prospect was first raised in 1971, with a request by Gwinnett County to utilize

Lake Lanier for the County's water supply demands. (FA ¶ 33).  The Corps' response was

that this was possible through a contract under the WSA, but that the contract could be

entered into only after completion of a study of the cumulative effect of all withdrawals in the Atlanta area that might be requested.  (FA ¶¶ 43, 46).  Meanwhile, the Corps was willing to sell Gwinnett County water to meet any "acute" needs "based on the value of services rendered," but emphasized that such an arrangement "would be proposed only as a stop gap measure." (FA ¶ 47).

While the study continued in one form or another for almost two decades, the Corps repeatedly expanded and prolonged its "interim," measures, which morphed from understandings to contracts, the first being the 1973 contract between Gwinnett County and the Corps, signed by the then-Secretary of the Army (himself a Georgian), which acknowledged that reservoir storage was being used to implement it.  (FA ¶¶ 53, 464).  In 1974, the Corps amended that contract to make a storage-reallocation commitment to Gwinnett County.  (FA ¶¶ 65-70).  Further amendments followed in 1983, 1985[28]/ and 1988, with the last providing for withdrawals of 53 MGD.  (FA ¶¶ 73-97).[29]/  Similar contracts were executed with Cumming, Gainesville, and Buford, as well as the ARC on behalf of its coterie of local governments.[30]/  (FA ¶¶ 98-210).

---

[28]/     The 1985 contract reiterated the Corps' 1974 storage-reallocation commitment, specifying that the privilege being granted to Gwinnett County would last "until such time as other contractual arrangements are made providing for water storage space in the Project...." (FA ¶ 82); SUPPAR014846.

[29]/     Without further contractual amendments, the Gwinnett withdrawals are now over 90 MGD. (FA ¶ 97).

[30]/     The ARC contracts incorporated a document titled the "Chattahoochee Water Management System" pursuant to which the Corps gave ARC the right to instruct the Corps weekly as to the amount of releases from storage in Lake Lanier that would be necessary to serve downstream needs in the metro-Atlanta area. (FA ¶¶ 151-52).  The Corps agreed contractually to make such releases. (FA ¶¶ 135-70).

Meanwhile, the study continued, officially titled the Metropolitan Atlanta Area Water Resources Management (MAAWRM) Study.  (FA ¶¶ 476-99); SUPPAR001951-4053.  The Corps, Georgia, and the Water Suppliers formed an Executive Committee to oversee the Study, and were all active participants.31/  By 1981, the MAAWRM Study had narrowed the alternatives to three, which were then evaluated:

- Plan A: construction of a 4,100 acre-foot reregulation reservoir below Lake Lanier;

- Plan B: reallocation of substantial storage at Lake Lanier for water supply; and

- Plan C: dredge Morgan Falls Reservoir and reallocate a smaller amount of storage at Lake Lanier.

(FA ¶ 489); SUPPAR002089.  The Study further confirmed that adoption of *each* of these alternatives would require Congressional approval under the WSA. (FA ¶¶ 490, 492, 497). Specifically, the Executive Group's analysis of Plan B (reallocation of substantial storage at Lake Lanier) confirms that the Corps, Georgia and ARC knew Congressional authorization would be required to reallocate storage to water supply uses in an amount *less* than is presently achieved under the "holdover" contracts.  (FA ¶ 492).32/  Since the Corps, Georgia and the ARC have conceded that implementation of Plan B would require approval by Congress, it must follow that they concede Congressional authorization likewise was

---

31/     That Group also consulted closely with the Lake Lanier Task Force, which included citizens with a strong interest in Lake Lanier.  (FA ¶ 477).

32/     Plan B contemplated that, by the year 2010, 141,685 acre-feet of storage in Lake Lanier would be reallocated for Water Supply. By comparison, the estimated reservoir storage required to furnish water supply withdrawals under the "holdover" contracts, as of 2006, is over 196,000 acre-feet.  (FA ¶¶ 492-96, 667, 734).

required for reallocation of a *greater* amount of storage to water supply under the "holdover" contracts (the D.C. Circuit having confirmed their "*interim*" nature is to be ignored).

Plan A (the reregulation dam) also required Congressional approval, and Plan A was the initial choice.  In 1986, Congress authorized construction of the reregulation dam (FA ¶¶ 514, 516), but after reevaluating the costs and benefits, the Corps reversed course and concluded that reallocation of storage pursuant to Plan B would be more economical.[33]/ (FA ¶ 517).  In November 1988, Georgia's Governor formally concurred, and the ARC, Georgia DNR, and other local governments in the region supported the plan to reallocate storage.  (FA ¶ 537).

Of course, all parties knew this, too, required Congressional action to authorize the reallocation.  To accomplish this, Georgia forwarded proposed legislation to its U. S. Senator.[34]/

As noted above, the Corps and Georgia were not certain of Congress' approval, so they also attempted, once again, to make Congressional approval unnecessary through an *interim* "surplus water storage contract" (FA ¶¶ 228-32), this time purporting to rely on the

---

[33]/    At least one factor in the switch appears to be a decision by the then-Administration through the Office of Management and Budget that local interests should foot the bill for the reregulation dam and an unwillingness of Georgia to accept that requirement. (FA ¶ 510-13).

[34]/    Once the decision had been made to follow Plan B, the Corps decided to prepare, and submit to Congress, a PAC Report to assess the impacts of reallocating storage to water supply.  (FA ¶¶ 539, 545-49).  In preparation for that effort, Georgia's Governor met with local water supply interests, and reported to Georgia's U.S. Senator in a September 23, 1988 letter that those interests accepted the concept of Congressional "reauthorization of a portion of the storage in Lake Lanier from hydropower to water supply." (FA ¶ 529).  Georgia's proposed legislation was enclosed, accomplishing the storage reallocation and authorizing contracts for the use of that storage pursuant to the WSA, saying: "We are committed to the passage of this legislation."  (FA ¶ 529).

FCA, 33 U.S.C. § 708, to sell "surplus" water, but actually planning to sell storage as contemplated by the WSA.  In April 1989, the Corps decided to extend existing withdrawal contracts for six months.  (FA ¶ 227).  If they could not eventually be converted to storage contracts, then after the six-month extension expired the Corps would consider them "holdover" contracts. (FA ¶ 223).  At the same time, however, the Corps was preparing new hybrid contracts as another option that also could be used to provide "interim" relief.  (FA ¶¶ 342-47).  These contracts would recite the authority of the FCA, but would explicitly reserve large blocks of storage space in Lake Lanier to meet M&I demands, and would grant a "privilege" of withdrawing water from that storage for those purposes.  (FA ¶¶ 342-43).35/ The Corps even offered to apply payments under these contracts toward the eventual purchase of permanent storage once Congress approved the draft PAC Report.  (FA ¶ 343).36/  Now the device was totally transparent.  The new contracts would be WSA contracts, even as to form of payment, but would be called something else, and include the magic word "*interim*."

---

35/     In March 1990, the Corps prepared a status report for the Assistant Secretary of the Army, which noted that the re-regulation dam had been jettisoned in favor of storage reallocation (Plan B), but confirmed that "to effect the reallocation, Congressional approval must be attained." (FA ¶¶ 561-62).  With respect to the Corps' interim, hybrid solution, the report said: "*Interim* Water Supply contracts have been drafted to replace both the lake and downstream *interim* withdrawal contracts *to modify the payment provisions to that which would be required under storage space contracts and to identify a storage space necessary to yield the quantities previously authorized to be withdrawn*.  These proposed *interim* water supply contracts, with exception of the proposed ARC contract, are for the same quantities authorized in the *interim* withdrawal contracts." (FA ¶¶ 561-62); AFC017664 (emphasis added).

36/     Never willing to give up a new device for attempting to avoid the statutory requirement of Congressional approval, the Corps, Water Suppliers and Georgia included a similar crediting mechanism in the Settlement Agreement which was struck down by the D.C. Circuit.  (FA ¶ 638).

The Corps elected not to sign its interim, hybrid contracts or go forward with the PAC Report. In June, 1990, Alabama commenced this litigation in the U.S. District Court for the Northern District of Alabama, (FA ¶ 450) challenging both the contracts and the PAC Report. Thereafter, more than a decade of fruitless negotiations failed to resolve the underlying issues, and the litigation recommenced. Meanwhile, the Corps' slightly-less-patently-storage *interim* ("holdover") contracts remained in place, all in violation of the WSA.

## 2. The Corps' Acknowledgment of *De Facto* Storage Reallocation Under the WSA

While negotiations among the States and the Corps went on during the 1990's, SeFPC grew increasingly alarmed by the Corps' ballooning storage reallocations and the consequent adverse impacts on hydropower generation at Buford Dam. SeFPC submitted a series of pointed questions to the Corps on March 29, 1999. (FA ¶¶ 461-68). The Corps' answers are illuminating. (FA ¶¶ 461-68).

First, the Corps conceded that its "holdover" contracts rely for authority on the WSA, and that those contracts effect a *de facto* storage reallocation. In response to SeFPC's question about the Corps' authority to allow "interim" withdrawals, the Corps confirmed its position that "The…[WSA] was the basis for the withdrawal contracts. The *interim* contracts at Lanier *committed to storage space contracts to yield the* withdrawal *amounts provided for in those contracts and could, therefore, be considered defacto reallocation*." (FA ¶ 467); SUPPAR017778-79 (emphasis added).[37]/ This is but final confirmation that the Corps' sole

_____

[37]/   The Corps also conceded that the FCA does not furnish any authority for the "holdover" contracts. (FA ¶ 463).

justification for not honoring Congress' retention of authority to approve any reallocation was that the Corps' actions were *interim*, which justification did not survive the D.C. Circuit's opinion.

Second, the Corps said that its "holdover" contracts should be measured against the WSA's restrictions on the Corps' authority to reallocate storage.  The Corps discussed its own regulatory limitations on storage reallocation, and said it thought the "storage required to supply the withdrawal amounts authorized in the *interim* contracts was within these prescribed limits." (FA ¶ 464) (emphasis added); SUPPAR017772.  The Corps thus acknowledged that those contracts constituted a reallocation of storage.

Third, the Corps acknowledged that it had made "commitments to reallocate storage" to the water supply providers.  (FA ¶ 465); SUPPAR017773.  The Corps, once again, purported to justify the "holdover" contracts as an "*interim*" mechanism to ensure M&I withdrawals until the Corps could enter into a "new contract providing for water storage in that project" after the never-sought Congressional approval was received. (FA ¶ 465).

Finally, the Corps blamed Georgia for frustrating its plan to convert "withdrawal" contracts to "water supply" contracts.  The Corps said it had intended to charge "for interim reallocation of storage," under these contracts, and to credit the users' payments toward the "ultimate purchase of storage" once it completed the official reallocation, but that Georgia had vetoed these higher costs.  (FA ¶ 466).

### D.  The Corps' *De Facto* Storage Reallocation Violates the Water Supply Act.

The Corps, not having sought or obtained Congressional approval for its *de facto* storage reallocation, has violated the WSA if either of the two prongs of retained authority

has been violated.  Both have been violated through the cumulative effect of the "holdover" contracts.38/

Further, as will be discussed in more detail below, the Corps has memorialized its major operational changes in a 1989 draft WCP, which was never finalized or adopted, but which the Corps continuously has applied for the past 20 years. (FA ¶¶ 684, 691).39/  The draft Plan explains that the Corps' operations are designed to:  (1) protect the Corps' *de facto* reallocation of storage for M&I water supply; (2) enhance recreation and fish populations in Lake Lanier; (3) reduce hydropower generation, and thus releases to downstream users, during dry periods; and (4) sacrifice downstream navigation depths that Congress designed the Buford project to support through flow augmentation. (FA ¶¶ 676-84).  Application of the draft WCP violates both prongs of the WSA's restrictions on unilateral Corps actions.40/

---

38/     In addition to violating the substantive requirements of the WSA, the Corps has failed to meet the procedural prerequisites for reallocation of storage.  *See* ER 1105-2-100 ¶ E-57(e) at E-219, et seq.; ¶ E-57(d)(1) at E-215-16.  Specifically, the Corps has failed to prepare the reports and analyses mandated under these regulations prior to effecting the *de facto* reallocation of storage at Lake Lanier to water supply.

39/     As discussed in the text, the draft WCP violates the WSA as a major operational change (which also significantly affects the hydropower generation and flow regulation for navigation authorized purposes). It must also be noted that its utilization violates the Corps' own regulations.  The last adopted Water Control Plan is that of 1958-59.  "There cannot be a continuing or recurring deviation from approved water control plans. In the case of a continuing or recurring change [as the 1989 draft WCP most certainly was (*see* FA ¶ 676-90)], the water control plan must be changed and the required approval obtained from HQUSAE." *See* "Water Resources Policies and Authorities – Digest of Water Resources Policies and Authorities," Para. 18-2(f), EP 1165-2-1 (at 18-4) (July 30, 1999)

40/     The draft WCP is the Corps' foundation for all of the Corps' actions challenged in Phase 2 of this litigation, and the Fish and Wildlife Service's actions under review in Phase 2 were taken in response to those challenged Corps actions.  If the Court rules in favor of Alabama and Florida with respect to the draft WCP in Phase 1, those Phase 2 actions must fall as well.

1. **The Corps Has Unlawfully Implemented Major Operational Change**

   a. **The D.C. Circuit's Conclusions Are Dispositive**

The D.C. Circuit considered challenges by Alabama and Florida to the Settlement Agreement entered into by the Federal Defendants and the Georgia Parties. *Southeastern,* 514 F.3d at 1318-20. The Settlement Agreement would have allocated more than 241,000 acre-feet, or 22+ percent, of Lake Lanier's conservation storage to water supply. *Id.* at 1319. The court concluded that the Settlement Agreement must be set aside because its reallocation "unambiguously constitute[d] the type of major operational change for which section 301(d) of the WSA, 43 U.S.C. 390b(d), requires prior Congressional approval." *Id.* at 1325. In reaching that result, the D. C. Circuit resolved certain foundational issues.

First, the D.C. Circuit found that Congress did not allocate any storage in Lake Lanier to water supply. *Id.* at 1324. Accordingly, the court concluded that "the appropriate baseline for measuring the impact of the Agreement's reallocation of water storage is zero, which was the amount allocated to storage space for water supply when the lake began operation." *Id.*

The D.C. Circuit next determined that the entirety of the 241,000 acre-feet reallocated to water supply must be considered in measuring the impact of the Agreement on the operations at Lake Lanier. The existence of major operational change could, and should, then be determined by comparing the Agreement's reallocation of 241,000 acre-feet of storage to Lake Lanier's conservation storage capacity of 1,049,000 acre-feet. *Id.* at 1319, 1324-5. Accordingly, the court said: "*On its face*, then, reallocating more than twenty-two percent (22%, approximately 241,000 acre-feet) of Lake Lanier's storage capacity to local

consumptive uses, . . . constitutes the type of major operational change referenced by the WSA . . . .".  *Id*. at 1324 (emphasis added).

Third, the D.C. Circuit rejected the contention of the Corps and Georgia that the baseline should take into account "the status quo of gradual water storage reallocation" reflected in existing water supply consumption levels at Lake Lanier, created by the "holdover" contracts. The court held that this approach constituted "a chain of logic that would effectively bypass" the WSA.  *Id.* at 1324.  Zero is the base, not that created by bypassing the WSA's requirements through a series of interim agreements that gradually reallocated Lake Lanier storage for local consumption.  *Id.*

But the court did not ignore the artificial baseline created by the "holdover" contracts. Rather, it decided that, even if one were to accept that artificial baseline, the Settlement Agreement still amounted to major operational change.  *Id.*  According to the court's analysis, the Settlement Agreement would reallocate an additional 9 percent, or 95,000 acre-feet, over and above 2002 levels.  The D.C. Circuit concluded that, *facially,* "[t]he same conclusion applies to a reallocation of approximately nine percent (9%) of Lake Lanier's storage space, for it too presents no ambiguity."  *Id*. at 1325.41/

---

41/      At oral argument, counsel for the Corps conceded that this 9% increase over the artificial baseline created by the "holdover" contracts would be a major operational change, if adopted on a permanent basis. As noted above, the Court rejected the Corps' distinction because the WSA permits no distinction between permanent and non-permanent storage reallocations. *Id.* at 1324-25. Later, the Corps by letter sought to recant and withdraw the concession, but Judge Silberman, concurring, observed that the concession was "ineluctable." *Id*. at 1328.  Further, the D.C. Circuit found that a 95,000 acre-foot reallocation "would be the largest acre-foot reallocation ever undertaken by the Corps without prior Congressional approval."  *Id*. at 1324.

The D.C. Circuit's final position—that the WSA's mandate of Congressional approval *may not* be avoided by *interim* or *ad hoc* reallocations—has already been discussed 42/.

Because the D.C. Circuit already has decided the foregoing issues, the doctrine of issue preclusion prevents the Corps and the Georgia Parties from relitigating any of these issues in the present litigation.43/  In evaluating facts and legal issues pertinent to this Court's analysis of the "holdover contracts," the D.C. Circuit already has determined that :

(1)     No storage at Lake Lanier has ever been allocated by Congress to water supply;

(2)     The baseline against which to measure the Corps' reallocation of storage at Lake Lanier to water supply is  zero storage;

(3)     The determination of whether the Corps' reallocation of storage  to water supply involves major operational change is made by evaluating the percentage of Lake Lanier's conservation storage that has been reallocated to water supply;

(4)     The calculation of the percentage of storage at Lake Lanier that has been reallocated to water supply is made by comparing the amount of reallocated storage to the total conservation storage in the reservoir;

---

42/      See footnote 27.

43/      Issue preclusion (sometimes referred to as "collateral estoppel") "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979).  In short, the doctrine "precludes the relitigation of an issue that has already been litigated and resolved in a prior proceeding."  *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir. 1998).

This Court has already applied the doctrine of issue preclusion to this litigation based upon issues decided in the D.C. Litigation.  *See Memorandum and Order*, October 22, 2007, Doc. 66, at 6-8.  In granting motions to dismiss Alabama's and Florida's claims challenging the Settlement Agreement reached among the Federal Defendants and the Georgia Parties, this Court expressly applied issue preclusion.  *Id.* at 6 (*quoting* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4416); *see also Pleming*, 142 F.3d at 1359.

(5) The WSA applies equally to reallocations of storage in a federal reservoir to water supply, whether part of an *interim* contract or memorialized in a permanent contract;

(6) As of 2002, approximately 13% of Lake Lanier's storage capacity was being allocated to water supply;

(7) A reallocation of 95,000 acre-feet or more in a federal reservoir has never been undertaken by the Corps without seeking congressional approval; and

(8) A reallocation of 22% of Lake Lanier's storage capacity is major operational change on its face.

*Southeastern*, 514 F. 3d. at 1324-25. While it might be argued that the D.C. Circuit's determination that a 9% reallocation is major was unnecessary to its decision, the Corps has conceded that a 9% reallocation is major and, as Judge Silberman noted, a 9% change is "ineluctabl[y]" a major operational change. *Id.* at 1328.

### b. Major Operational Change has Occurred

The Administrative Record demonstrates that major operational change has occurred in the Lake Lanier reservoir, without Congressional approval. This is confirmed, first by a review of the Corps' record of storage reallocation to water supply and releases during drought periods (all established by or arithmetically computable from the Administrative Record), and second through the Corps' draft WCP, its formal operating plan.

### i. Major Operational Change Is Demonstrated by Record Evidence

The Corps has reallocated more than a twenty-fold increase in the amount of storage in Lake Lanier for M&I water supply during the past three decades. By 2006, the amount of such storage was over 196,100 acre-feet, or about 18 percent of the reservoir's conservation storage. (FA ¶¶ 732-34, Table 1). Overall, the growth in storage allocated to M&I uses has

38

been about 6,000 acre-feet *per year* during those three decades.  The current M&I allocation

is some 54,000 acre-feet more than the projected amount for 2010 under Plan B (which all

had conceded would require Congressional approval).

Applying the principles established by the D.C. Circuit, one must conclude that the

storage reallocation thus effected is major operational change.  The current change

approaches the 22 percent of conservation storage that the D.C. Circuit said is major

operational change "on its face," and already roughly doubles the 9 percent increase with

respect to which the D.C. Circuit said "[t]he same conclusion applies . . . for it too presents

no ambiguity."44/ *Southeastern*, 514 F.3d at 1324-25.

Major operational change also is apparent from an examination of how the Corps

operates Lake Lanier.  The Corps basically makes two kinds of decisions:  (1) to allow

withdrawals from the reservoir; and (2) to release water through the turbines in Buford Dam.

Of course, the Corps also can implement the converse of these two actions by limiting or

disallowing M&I withdrawals, and by storing water in the reservoir rather than releasing it.

These two sets of decisions (withdrawals and releases) operate in concert when the Corps

---

44/     The current "holdover" contract between the Corps and Gwinnett County provides for
53 MGD of water supply.  In fact, in 2006 the amount of water supply for Gwinnett County
was almost 93 MGD, which represents 104,928 acre-feet or 9.651 percent of the conservation
storage in Lake Lanier.  As observed by the D.C. Circuit, the Corps has *never* permitted a
reallocation of more than 75,000 acre-feet without Congressional approval, and, as
previously pointed out, that was a reallocation pending (and later receiving) Congressional
approval.  Therefore, it is apparent that the amount of water supply being furnished by the
Corps to Gwinnett County, *in and of itself*, involves major operational change and violates
the WSA.

decides, as it has, to protect and support M&I uses during dry conditions by storing water rather than releasing it through the turbines.[45]/

Major operational change is difficult to observe in short-term operating records because operational trends are masked by frequent fluctuations in wet and dry periods, withdrawals, releases and reservoir levels.  Change can be seen clearly over the long-term, however, by focusing on dry periods, when the importance of the Corps' withdrawal and release decisions to both upstream and downstream interests is critical. A comparison of the baseline operational parameters Congress envisioned against present conditions illustrates the major operational change demonstrated by data from the Administrative Record.

### (a) Baseline Operational Parameters

As originally envisioned by the Congress and the Corps, Lake Lanier would contain 1,049,000 acre-feet of conservation storage between elevations 1035 MSL and 1070 MSL to be used for hydropower production and downstream flow regulation. (FA ¶¶ 721-24, 982-83,

---

[45]/     Analysis of the Corps' operations is complicated slightly by the ARC's downstream withdrawals, which are enabled by releases from Buford Dam whenever ARC requires them pursuant to the Chattahoochee Water Management System, discussed above and in footnote 30, but which nonetheless require reservoir storage and involve operational change. Although some level of downstream M&I withdrawals were envisioned by the Congress when it authorized the Buford project, no infrastructure costs were allocated to this use, so that the arrangement between the ARC and the Corps for withdrawals above and beyond the flows resulting from normal hydropower generation and navigation plainly contravenes Congress' intent. The Corps thus utilizes reservoir storage that has been authorized for other purposes in order to satisfy the ARC M&I arrangement.  And in order to have available that extra increment of reservoir storage for releases at the times and in the amounts ARC demands, the Corps maintains water in storage that otherwise would have been released for normal hydropower generation or navigation.  Just as with the Corps' storage to support withdrawals from the reservoir itself, these actions represent operational decisions and, to the extent they deviate from the parameters envisioned by Congress, also involve operational change.

988).  From elevation 1070 MSL to 1085 MSL, the storage space would remain empty to

receive and control floodwaters from upstream runoff. (FA ¶¶ 721, 824, 987). Below the

turbines through which water could be released (elevation 1035 MSL), the reservoir contains

water in inactive storage, which serves to support the head above the turbines in the

conservation storage pool. (FA ¶ 721).

　　　　The anticipated power production from Buford Dam was to result from the

"drawdown" of 35 feet built into the reservoir's conservation storage pool between 1035

MSL and 1070 MSL (FA ¶ 722).  The releases to produce this power and to regulate

downstream flows for navigation in the lower Chattahoochee River and the Apalachicola

River would incidentally support water uses at Atlanta, some 50 miles downriver (FA ¶¶

984-89).  The Corps expected to release an average of 1,600 cfs from Buford during low-

flow periods to support navigation depths of nine feet downstream in the Apalachicola River

(FA ¶ 723).  The minimum flow from Woodruff Dam into the Apalachicola River to support

full navigation depths was expected to be about 9,300 cfs during normal operations. (FA ¶

726).

**(b) The Corps Has Changed its Operations Over Time to
Support Storage Reallocation for Water Supply**

　　　　From the 1970s to the present, the Corps has made major changes in its operation of

Lake Lanier to accommodate Metro-Atlanta's increasing demand for M&I water supply.

These systematic changes were reflected in the 1989 draft WCP, but also are apparent from

the operating records at Lake Lanier.  They are seen clearly during periods of drought.

The basin has experienced three droughts since the 1970s, when M&I withdrawals began to increase significantly.[46]/  Those were the droughts of 1981, 1986-88 and 1999-2001.  (FA ¶¶ 728-31).  The average daily inflow to Lake Lanier increased substantially from the 1981 drought (918 cfs) to the 1999-2001 drought (1015 cfs), as shown by the blue bars in Figure 2, indicating that dry conditions in the drainage area above the Lake were less severe in later droughts.  The maroon bars of Figure 2 show that average daily discharges from Lake Lanier exhibited the opposite trend, dropping over 19 percent from 1327 cfs in the 1981 drought to 1070 cfs in the 1999-2001 drought.  Consequently, the average daily portion of discharges that were drawn from conservation storage also dropped dramatically, from 31 percent in the 1981 drought to only 5 percent in the 1999-2001 drought, as shown in the yellow bars of Figure 2.

---

[46]/     The current drought, which began in 2006, cannot be included in the analysis set forth above.  Because the drought and its effects on the Basin's hydrology are ongoing, data are not yet available to support any examination of the trends exhibited by earlier droughts.

**FIGURE 2 – Comparison of Inflow, Discharge and Discharge from Storage (in cfs)** <u>47</u>/



The increase in withdrawals directly from Lake Lanier for M&I water supply during this period was extraordinarily large by comparison. As shown in Figure 3, M&I Lake withdrawals surged from only 24 MGD in the 1981 drought to 108 MGD on average during the 1999-2001 drought, nearly a five-fold increase from the first drought to the last.

---

<u>47</u>/     The Factual Appendix at ¶¶ 740-42 sets forth Figure 2, with all data from the Administrative Record on which it is based (Table 4), and arithmetical calculations therefrom.

43

**FIGURE 3 – Average Annual Actual Withdrawals from Lake Lanier for Water Supply During Droughts (in MGD)** <u>48</u>/



Given this huge increase in the use of storage for water supply drawn directly from the Lake, it is hardly surprising that releases for hydropower generation dropped significantly during the period.  The average annual energy generated at Buford Dam dropped by about one-third from the 1981 drought to the 1999-2001 drought (Figure 4).  This decrease was exacerbated by the Corps' shift from higher-value, weekday generation to weekend, or "off-peak," generation. <u>49</u>/  The percentage of power produced on Saturdays and Sundays has

---

<u>48</u>/     The Factual Appendix at ¶¶ 745-47 sets forth Figure 3, with all data from the Administrative Record on which it is based (Table 5), and arithmetical calculations therefrom.

<u>49</u>/     The Stockdale Memorandum identified the shift from week-day peak generation to weekend off-peak generation as a major operational change, as well as a serious impact on the authorized purpose of hydropower, as further discussed below.  SUPPAR005087.

risen significantly from 1989, when the draft WCP was implemented, to the present, as

shown in Figure 5.

**FIGURE 4 – Mean Hydropower Generation During Droughts (in megawatt hours)** <u>50</u>/



<u>50</u>/      The Factual Appendix at ¶¶ 748-49 sets forth Figure 4, with all data from the
Administrative Record on which it is based, and arithmetical calculations therefrom.

45

**FIGURE 5 – Percentage of Power Produced on Saturdays and Sundays (1989-2007)** 51/



Of course, the Corps' increasing use of storage in Lake Lanier for M&I supply also should be reflected in the record. And it is. As M&I uses increased and releases from the reservoir declined during drought periods, the surface level of Lake Lanier remained virtually constant – demonstrating that releases were reduced to compensate for increasing M&I withdrawals so that the Corps would not have to draw down the Lake. Figure 6 illustrates that, during the same three droughts, the average daily elevation of Lake Lanier remained essentially the same, about 1,062 feet MSL. (FA ¶ 757).

---

51/     The Factual Appendix at ¶¶ 750-52 sets forth Figure 5, with all data from the Administrative Record on which it is based, and arithmetical calculations therefrom.

**FIGURE 6 – Mean Elevation During Droughts (in ft)** <u>52</u>/



This level is some 27 feet *above* the maximum drawdown level for hydropower production of 1035 MSL.  Indeed, since Buford Dam was completed and filled in 1959, the Corps has *never* drawn the reservoir below 1050 MSL, effectively reducing the reservoir's conservation storage by 383,300 acre-feet or approximately 36 percent.<u>53</u>/  (FA ¶¶ 752-54, 863).  This is yet another illustration of the enormous storage reallocation effected through the Corps' "holdover" contracts, as the Corps sacrifices power generation to ensure Metro-Atlanta's growing water supply demand.

---

<u>52</u>/      The Factual Appendix at ¶¶ 755-57 sets forth Figure 6, with all data from the Administrative Record on which it is based, and arithmetical calculations therefrom.

<u>53</u>/      This operational change effectively reduces the conservation storage pool in Lake Lanier from 1,087,600 to 704,300 acre-feet.  The Corps' reallocation of storage to water supply (196,167 acre-feet) amounts to 28 percent of that reduced total of conservation storage.

In summary,

- M&I withdrawals from Lake Lanier more than quadrupled from the beginning of the first drought (1981) to the end of the last measurable drought (1999-2001).

- Even though inflow to Lake Lanier increased from the early drought to the last, both the releases from Buford Dam and the generation of hydropower during the span of those same three droughts decreased significantly.

- The average level of Lake Lanier during those same three droughts remained essentially unchanged, indicating that the Corps reduced its releases from Lake Lanier, sacrificing hydropower generation and downstream flows in order to retain water in storage to serve ever-increasing M&I withdrawals.

(FA ¶¶ 730-31, Table I).  These trends demonstrate major operational change and confirm the legal analysis set forth above, applying principles established by the D.C. Circuit.

### ii. Through Its Perpetual "Draft" Water Control Plan, the Corps Has Implemented Major Operational Change

As previously mentioned, the Corps memorialized its major operational changes in the 1989 draft WCP as part of its draft PAC Report. (FA ¶¶ 545-71, 668-719).  This draft WCP was neither finalized nor formally adopted.  (FA ¶¶ 545-71, 676-719).  Nonetheless, the Corps has continued to operate Buford Dam and Lake Lanier according to this draft WCP since 1989.  (FA ¶¶ 789, 684, 691-92).  The draft WCP confirms what the calculations just discussed show: water supply comes first, local recreation second, hydropower generation is reduced to third status and flow augmentation for navigation comes last.  But it was Congress that retained authority in the WSA to pass on significant reallocations for water supply storage so *it* could make those critical decisions, not the Corps.

48

The central objective of the draft WCP is to operate Buford Dam to preserve storage for metro-Atlanta's water supply during drought periods.  The Corps candidly explained in the draft WCP that:

> During extreme drought conditions, water supply and water quality are the major operating concerns. This water management approach has tended to produce an "either-or" situation under which project functions are nearly fully met or operations are directed only at water supply/water quality and other purposes [i.e., *all authorized purposes*] are essentially sacrificed or restricted.

(FA ¶ 677);  ACF017556.  The Corps elaborated:  "operations under the plan will meet specified minimum water quality/water supply releases while keeping the reservoir levels as near the guide curve elevation as practicable for water conservation and in-pool interests."  (FA ¶ 678); ACF017556.  Thus, the Corps decided to operate the project – one that had been designed to generate electricity and ensure continuous navigation – so as to guarantee water supply releases for Atlanta and protect "in-pool" interests, namely M&I withdrawals from the reservoir, fishing and boating.  *Id.*54/  Because Lake Lanier contains roughly two-thirds of the federal reservoir storage for the entire ACF Basin (FA ¶¶ 865, 1129), those priorities are reflected downstream.

---

54/      As the Corps developed this plan, it was worried about criticism because "the pool levels in the plan are held much higher all year than historically has occurred," and "[n]ot only would significant changes perhaps require an EIS evaluation and possibly represent a *de facto reallocation*, but it could also confound Georgia's attempt at storage reallocation in which state representatives have told upstream and downstream interests not to expect significant changes in pool frequencies and outflows."  (FA ¶ 689); ACF041714 (emphasis added).  The Corps added:  "We have been saying we treat the basin as a system, considering all project purposes at all lakes in an equitable fashion.  It is hard to be convincing to the other interests in the basin that this is so, unless we can delineate under what circumstances we would use Lake Lanier for anything but recreation and water supply and then be willing to apply these guidelines when the circumstances exist."  (FA ¶ 690); ACF041715.

The "guide curves" in the draft WCP are depicted as a set of four "action zones" that divide Lake Lanier's conservation storage vertically into areas that dictate the Corps' operations. (FA ¶ 678); ACF017568.  The operating rules change as the reservoir's elevation descends from Zone 1 toward Zone 4 during dry conditions.  The changes in those rules reflect the Corps' priorities: When Lake Lanier is in Zone 1 – i.e., relatively full – the Corps operates Buford Dam to serve the authorized purposes of hydropower and navigation, as well as for water supply and water quality flows at Atlanta. (FA ¶¶ 681, 683); when the reservoir falls into Zone 2, the authorized purposes start to be compromised:  "water to support seasonal navigation may be limited," and "[h]ydropower generation is supported at a reduced level" but "[w]ater supply and water quality releases are met."  (FA ¶ 683); when Zone 3 is reached, even more drastic limitations on navigation and hydropower generation are applied, but "[w]ater supply and water quality releases are met"  *id*.; finally, when the reservoir falls into Zone 4 at about elevation 1060 MSL during the dry months, the authorized purposes disappear, but, as always, "[w]ater supply and water quality releases are met."  *Id.*; ACF017568.[55/]  Other than those limited releases, water remains stored in order to support recreation in the Lake and M&I uses -- withdrawals by Gwinnett  County and others directly from the Lake.  And all of these operational changes take effect at the top of Zone 4, which is only 10-11 feet below full pool, but is still *twenty-five* feet *above* the bottom of the conservation pool.  It is no coincidence that this level—1060 MSL—is close to the average

---

[55/]     At Zone 4, "navigation is not supported" and "[h]ydropower demands will be met at minimum level and may only occur for concurrent uses." (FA ¶ 683). "Concurrent uses" are releases for ARC's M&I uses and releases to dilute Metro-Atlanta's waste. *Id.*.

reservoir level (1062 MSL) maintained by the Corps during the last three drought periods, as discussed above. 56/

The Corps' draft WCP and implementing procedures also effect an unlawful allocation of storage to support in-reservoir recreational uses. No storage has been allocated in Lake Lanier for recreational purposes. The *de facto* WCP, nonetheless, purports to utilize storage for the benefit of local recreation at the expense of the project purposes for which storage was allocated by Congress. The *de facto* WCP indicates that the Corps' policy of making releases only for M&I water supply and Atlanta's sewage dilution, especially in Zones 3 and 4, is designed to serve local recreation uses as well:

> Water Management for Recreation. Recreation interests desire that pools remain as close to the top of conservation pool as possible. . . . There may be times when water releases are reduced to levels which satisfy only water supply / water quality requirements. This conservation of storage will generally allow the pools to be maintained at a higher level throughout the prime recreation season.

> Management for recreation interests is incorporated into the plan in the manner in which the action zones were defined. . . . If lake levels fall to Zone 3 then releases will normally be limited to 2-hour-a-day generation and minimal navigation support, which will tend to stabilize the lake levels until the end of the season.

ACF041211. Thus, the Corps has implemented a specific policy aimed at maintaining water in storage for recreation at Lake Lanier. In addition, the Corps has implemented springtime

---

56/     The Corps recently has confirmed these operational changes. In a series of thirty-two ACF Stakeholder Teleconferences between September 2007 and November 2008, during which Lake Lanier was operating in Zone 4, the Corps repeatedly acknowledged that releases were being made solely for ARC's water supply demands and effluent dilution purposes. (FA ¶¶ 786-87). The Corps confirmed that it was operating according to the draft WCP, that navigation was not being supported, and that hydropower generation had been sacrificed in order to preserve storage in Lake Lanier. (FA ¶¶ 784-86, 789, 792-93).

storage-retention procedures that facilitate local fish spawning to serve those same interests. (FA ¶¶ 716).

In 2001, the Corps adopted division regulation DR 1130-2-16 (Lake Regulation and Coordination for Fish Management Purposes) providing procedures for water management during the fish-spawning season.  (ACF035903-06).  The regulation applies to Lake Lanier and "establish[es] priority for water level management to aid fish spawning for the purpose of maintaining balanced fish populations. . . ." (ACF035903).  Pursuant to this regulation, the Corps retains water in Lake Lanier to maintain stable lake levels for approximately 4 to 6 weeks during the spring spawn of reservoir sport-fish, primarily largemouth bass. (ACF035904).

The Corps has violated its own regulations by utilizing reservoir storage to support these local recreation interests.  Similar to the WSA's two-pronged restriction on reallocating storage for M&I water supply, the Corps' regulation specifically provides that "[s]torage reallocations for recreation which significantly affect other authorized purposes, or involve major structural or operational changes, require Congressional approval." ER 1105-2-100 E-49(a)(4).  By (1) restricting releases during dry periods in order to support boating recreation pursuant to its draft WCP, and (2) restricting springtime releases that could support *downstream* spawning of listed species, such as the Gulf sturgeon, in order to produce more bass in Lake Lanier, the Corps has undertaken major operational changes.  The Corps has not obtained Congressional approval to utilize storage in Lake Lanier for recreation. Accordingly, the Corps has acted unlawfully in reallocating storage to support in-reservoir recreational uses at the expense of downstream needs**.**

52

The draft WCP and associated recreation-support procedures embody the Corps' major change in Lake Lanier operations.  Together with the Corps' "interim" *de facto* storage reallocation plan accomplished through the "holdover" contracts, these operations have effectively and materially altered, if not obliterated, the Congressionally authorized purposes for the Lake Lanier project.  The Corps' draft WCP and recreational policies, all integral components of its major operational change at Lake Lanier, should be set aside as contrary to the Congressional retained authority in the WSA.

### 2.  The Corps' *De Facto* Storage Reallocation Seriously Affected The Purposes For Which The Lake Lanier Project Was Authorized

The *de facto* storage reallocation which the Corps has accomplished through the "holdover" contracts and through the draft WCP "seriously affects authorized project purposes" without the approval of Congress and therefore violates the second prong of retained Congressional jurisdiction in the WSA. The two authorized project purposes seriously and adversely affected are hydropower generation and flow regulation for navigation.

Hydropower generation is significantly and adversely impacted because the Corps' reallocation to support water supply and its operation pursuant to the draft WCP result in reduced hydropower capacity and lost energy benefits.  As noted above and shown in Figure 5, the Corps' storage reallocation also has resulted in a significant shift from week-day power generation to less-valuable, weekend generation, requiring power purchasers and users to pay more for their energy needs during periods of higher electricity usage.  These actions sacrifice the public's investment in low-cost, clean hydropower.  The payment mechanism under the holdover contracts, which reimburses the Government for its loss of revenues due

53

to lost capacity and energy at Buford, West Point, and Walter F. George Dams (*see* FA ¶¶ 62, 83-85, 113, 117-18, 159, 190), shows the Corps recognizes that its operations for water supply at Buford Dam seriously affect the hydropower generation purpose.  The Corps also recognized that Georgia's 2000 reallocation request would likely produce "serious impacts" on hydropower. 57/

The parties have recognized that the special non-peak, weekend releases being made to provide for ARC's downstream water supply withdrawals, seriously affect the hydropower project purpose.  *See* ACF042745; *see also* (FA ¶¶ 809-10; Sec. VI.B.5).  Independently, the reduction in available hydropower and the change from peak to non-peak production seriously affect hydropower generation at Buford Dam.  Alabama and Florida adopt and incorporate herein by reference any evidence submitted by SeFPC showing that the customers of SEPA who purchase electric power generated in the Georgia-Alabama-South Carolina systems have paid more for that power as a result of the challenged actions of the Corps with regard to the operation of Lake Lanier.

The impact of the draft WCP and its "action zones" is detailed above, and since, under drought conditions, it eliminates flow regulation for navigation and limits hydropower

---

57/    *See* SUPPAR005087 (calculating that Georgia's water supply request would result in a $3 million per year loss of energy benefits, and that "[t]his reduction represents a serious impact on the authorized project purpose of hydropower").  Further, the Settlement Agreement, dealing with amounts of water comparable to those the "holdover" contracts would reach in 2010, calculated a $3.1 million loss of hydropower benefits in 2003 dollars. *See* ACF042787; ACF042814; ACF042842.

generation to the minimum, its serious and negative effect on both authorized purposes is clear. 58/

## IV.  THE CORPS' CURRENT ALLOWANCE OF INDIVIDUAL WATER SUPPLY WITHDRAWALS IS UNLAWFUL

The Corps has at various times offered up legal authority for entry into and performance of the "holdover" contracts, but none of these purported authorities supports such contracts and therefore the entry into and performance of those contracts is *ultra vires.* The original water withdrawal contracts asserted they were entered into pursuant to the IOAA, 31 U.S.C. § 9701 (formerly 31 U.S.C. § 483a), and the River and Harbor Act of 1946, P.L. 79-525.  (FA ¶¶ 30, 58, 109, 146, 185). The IOAA is a general statute governing the pricing of charges made by the Federal Government for "each service or thing of value provided by an agency…to a person."  *See* FA ¶ 439 for the text of the IOAA.  The River and Harbor Act of 1946 was the authorizing statute for construction of Buford Dam.  Neither gives any authority for entering into any of these water withdrawal/water supply/water storage contracts.  Thus, the Corps has acted *ultra vires* in entering into these contracts and continuing to authorize increasing municipal and industrial withdrawals.

---

58/      Alabama also contends that the reallocation at Lake Lanier violates the WSA because it has had serious effects on the authorized purpose of navigation and has resulted in major operational changes insofar as navigation support is concerned.  As a result of the reallocation, the releases to support navigation steadily declined until the Corps essentially abandoned support of navigation.  (FA ¶¶ 819-63; Sec. VI.E.6).  The Corps plainly had no authority to do so without congressional approval.  Alabama adopts the arguments made by Alabama Power Company in its contemporaneously filed motion and brief that the challenged actions of the Corps have caused major operational change pertaining to navigation support and have seriously affected the authorized purpose of navigation support.

### A. Independent Offices Appropriations Act

Although the IOAA generally authorizes federal agencies to charge a fair fee for services and things they provide, it provides no legal authority for these contracts. The Comptroller General has specifically so recognized, acknowledging that the IOAA only authorizes charges for services or things of value that a federal agency already is authorized to provide pursuant to another independent source of authority. 59/ Unless an agency has an independent statutory basis to engage in the activity for which it seeks to impose fees, the agency cannot invoke the IOAA to charge for services provided to the public. 62 Comp. Gen. 262, 263 (1983). 60/

The Corps itself—through its General Counsel, and through a Corps guidance memorandum— came to recognize the inapplicability of the IOAA. In a May 23, 1986, Memorandum from Susan J. Crawford, General Counsel, to the Assistant Secretary of the Army, Civil Works, regarding a proposal to withdraw water from Dworshak Dam for use by

---

59/      In a 1983 opinion regarding the issue of whether the U.S. Customs Service could charge user fees to recover the cost of instructing travel agents, the Comptroller General stated:

> …31 U.S.C. § 9701 …does not in and of itself provide the authority for agencies to provide the services. Independent authority, either express or implied, must be relied upon to provide the legal basis for an agency undertaking the activity in the first place. Otherwise, the law would provide a facile means for agencies to circumvent congressional or judicial oversight and control over the limits of authorized agency activity.

62 Comp. Gen. at 263 (internal footnote omitted) (FA ¶ 440).

60/      *See also Seafarers Int'l Union of North America v. United States Coast Guard*, 81 F.3d 179, 186 (D.C. Cir. 1996) (holding that the Coast Guard was authorized to charge reasonable fees for the processing of merchant mariner licenses, but noting that "an agency is not free to add extra licensing procedures and then charge a user fee merely because the agency has general authority to regulate in a particular area . . . there must always be a statutory basis for any requirements giving rise to a fee.").

the City of Orofino (Idaho), the Corps' General Counsel explicitly stated that "the Corps should refrain from using § 9701 [of the IOAA] to obtain reimbursement for water withdrawals." (FA ¶ 441).  The Corps' General Counsel further opined that "[a]lthough the language of § 9701 implies that the statute applies to services or things of value provided by any agency, including the Corps of Engineers, it is questionable whether Congress really intended the act to serve as a water marketing statute." (FA ¶ 441).

To implement the opinion of its General Counsel, the Corps belatedly issued an October 30, 1987, Corps of Engineers Circular No. 1105-2-181, which provided guidance on water supply planning, stating therein that "[t]he Corps of Engineers is to refrain from using Section 501 of the [IOAA] to obtain reimbursement for water supply withdrawals.  Existing contracts under this authority should be allowed to expire under the terms of the contract. These contracts are not to be extended." (FA ¶ 442).

As applied here, the water withdrawal contracts in this case expired in 1990 in accordance with this directive, and continuing them in a so-called "holdover" status is in contradiction of the Corps' legal position.  The IOAA simply cannot be asserted as legal authority for "holdover" contracts.

**B.  The River and Harbor Act of 1946**

The Corps' reliance on the River and Harbor Act of 1946 as an alternative source of authority for the water supply contracts is likewise misplaced.  The Stockdale Memorandum, which the D.C. Circuit favorably cited and quoted, concluded that, under the River and Harbor Act of 1946, water supply was merely an "incidental benefit" and not a specifically authorized project purpose, a conclusion fully supported by the Administrative Record.  (FA

57

¶ 592). 61/  Because water supply is merely an "incidental benefit" and not a Congressionally

authorized purpose of Lake Lanier, the Corps cannot rely on the 1946 Act as a source of

authority for the water supply contracts.

### C.  The Flood Control Act

One possible source of authority which the Corps apparently explored—but

ultimately rejected—as a potential basis for entering into water supply withdrawal contracts

is the FCA.  But, as previously noted, the Corps explicitly told SeFPC that "Section 6 of the

[FCA] was not employed as the authority for the interim contracts at Lake Lanier." (FA ¶¶

462-67).  This is understandable since the "holdover" contracts do not comply with the

FCA's requirements.  Section 6 of the FCA provides, in relevant part:

> The Secretary of the Army is authorized to make contracts . . . for domestic
> and industrial uses for *surplus water* that may be available at any reservoir . . .
> *Provided,*  That no contracts for such water shall adversely affect then existing
> lawful uses of such water. . . .

33 U.S.C. § 708 (emphasis added).  The statute's command that only "surplus water" may be

sold means that the Corps cannot make water supply contracts that "impair the efficiency of

the project for its other stated purposes." *See ETSI Pipeline Project v. Missouri*, 484 U.S.

495, 506 n.3 (1988) (citation omitted).  The statute's prohibition against adversely affecting

"existing lawful uses" protects both the uses of water at the reservoir as well as downstream

---

61/     The Stockdale Memorandum does contain a footnote suggesting that the Corps has
"the discretionary authority to meet the current water supply needs of the municipalities
surrounding the reservoir." (FA ¶ 602).  But the D.C. Circuit recognized the futility and
weakness of that argument, observing that the "Corps' legal defense of then-existing water
withdrawals was limited to a footnote, without citation to authority. . . ." *Southeastern,* 514
F.3d at 1323.

uses, such as fish and wildlife habitat, that could be impaired as a result of municipal withdrawals. *Missouri v. Andrews*, 787 F.2d 270, 278 (8th Cir. 1986). 62/

The Corps' regulations impose concrete limitations and prescribe procedural requirements for use of the FCA's contracting authority. The regulations require that "[s]urplus water agreements will normally be for small amounts of water and/or for temporary use. . . [and n]ormally, surplus water agreements will be limited to a 5-year period." USACE ER 1105-2-100, app. E., § E-57b(3) at E-214-15 (Apr. 22, 2000). They also require that the Corps must prepare a surplus water report, issue a surplus water declaration, and obtain the views of affected states before executing water supply contracts. *Id.* at E-216.

The Corps' "holdover" contracts and the current permitted withdrawals patently do not comply with the FCA. The Corps has not prepared a surplus water report or issued a surplus water declaration. Furthermore, the Corps did not obtain the views of the affected states before executing—and then indefinitely extending—these water supply contracts, as required by the Corps' own regulations. The "holdover" contracts, now nearly twenty years old and allocating up to 18% of Lake Lanier to the water suppliers, also reach well beyond the provision of "small amounts of water" for "temporary use."

The Corps also has not made, and cannot make, the required determination that Lake Lanier contains "surplus water." The Corps can determine that water is "surplus" only if that water can be sold without "impair[ing] the efficiency of the project for its other stated purposes." *ETSI Pipeline*, 484 U.S. at 506 n.3. As discussed herein, the current water

---

62/       By omission of the word "significantly," the limitation in the FCA against adverse effects on existing uses is *even more* restrictive than that of the WSA.

withdrawals under the "holdover" contracts seriously affect the hydropower and downstream flow augmentation purposes of the Buford project.

Finally, the Corps cannot satisfy the FCA's requirement that contracting for water supply must not adversely affect other uses.  In that the contracts "seriously affect the purposes for which the project was authorized," it goes without saying that they "adversely affect other uses."

### D.  The Water Supply Act

As demonstrated above, the "holdover" contracts violate the requirements of Section 390b(d) of the WSA in that, viewed cumulatively, they both "involve major operational change" in the Lake Lanier reservoir and "would seriously affect the purposes for which the project was authorized."  Even when viewed individually, however, the Corps' holdover contracts also are inconsistent with Sections 390b(a) and (b) of the WSA, which address the payment of costs for water supply storage, as well as operation, maintenance, and replacement costs.

Section 390b(a) declares that it is the policy of the Congress "to recognize the primary responsibilities of the States and local interests in developing water supplies for domestic, municipal, industrial, and other purposes…." 43 U.S.C. § 390b(a).  In order to carry out this policy, Section 390b(b) requires that before "modification of any project including  water supply provisions for present demand is initiated, State or local interests shall agree to pay for the cost of such provisions in accordance with the provisions of this section. . . ."  43 U.S.C. § 390b(b).  Thus, in order for the WSA to furnish authority for any

of the individual "holdover" contracts, the Corps would have to comply with the WSA by charging for each user's share of the cost of water supply storage.

The Corps has not done so.  Indeed, the Corps has recognized that the water suppliers' payments for continued withdrawals have not been sufficient to comply with these WSA requirements. (FA ¶¶ 376, 381, 384).  When the water suppliers' contracts expired in 1990, they continued withdrawing water at the prices in effect at the time the contracts expired. (FA ¶¶ 376, 391-96).  In letters to the water suppliers dated February 4, 2000, the Corps increased the rates to be paid for water withdrawals as of March 1, 2000, for ARC ($6.85 per million gallons), City of Cumming ($13.65 per million gallons), City of Gainesville ($21.55 per million gallons), and Gwinnett County ($18.80 per million gallons). (FA ¶ 400).

But the Corps understood that the payments required by the WSA and Corps regulation ER 1105-2-100 should be much higher. (FA ¶ 384).  Chapter 3-8b(5)(a) of Corps regulation ER 1105-2-100 requires that water users be charged for the capital investment for the reallocated storage at the *highest* rate computed by four alternative methods: benefits foregone; revenues foregone; replacement cost; and updated cost of storage.  ER 1105-2-100, Ch. 3-8b(5)(a).  The Corps explained, however, that it would establish pricing based on hydropower revenues foregone because "any other method to establish payment rates would be objectionable to Georgia. . . ." (FA ¶ 395).

Consequently, in a 2001 draft memorandum, the Corps sought a policy exception to allow the pricing of interim water withdrawal contracts at Lake Lanier to be based on the *lowest* of the four methods—hydropower revenues foregone.  (FA ¶¶ 391-95).  Included in

61

the Corps' memorandum is a table presenting, among other things, the current user charges (as of 2001), as well as the rates based on several of the alternative methods. (FA ¶ 392). The Corps' table demonstrates that the Corps was charging the water suppliers amounts significantly below the rates calculated for all of those alternative methods. 63/  (FA ¶ 392). For example, as of 2001, the Corps was charging Gwinnett County $406,670 annually for water withdrawals from Lake Lanier, although the calculated rates for the alternative methods were: $800,740 (revenues foregone); $1,433,130 (updated cost of storage); and $1,998,100 (benefits foregone).  (FA ¶ 392).  By allowing continued and increasing withdrawals under the "holdover" contracts without payments for the full costs of their respective storage, the Corps has come nowhere near compliance with the WSA, and cannot rely on that statute as authority for those contracts.

In sum, regardless of how the Corps chooses to characterize its "holdover" contracts, the Corps has acted *ultra vires* in entering into and effectuating such contracts, and the Court should find that the Corps' actions in entering into the "holdover" contracts and allowing the water suppliers' increasing municipal and industrial withdrawals from Lake Lanier are unlawful.

## V.   THE CORPS HAS TAKEN MAJOR ACTION AT LAKE LANIER IN A MANNER INCONSISTENT WITH NEPA AND OTHER FEDERAL LAW

In addition to the substantive violations of federal law noted above, the Corps also has failed to comply with mandatory procedural requirements of NEPA and various other

---

63/     Florida and Alabama do not endorse the accuracy of the figures contained in the above-referenced table from the Corps' 2001 memorandum, but rather, utilize the table to merely demonstrate the substantial difference between user charges and the rates which the Corps calculated, using the three alternative methods of calculating rates.

federal laws and regulations applicable to its management of federal reservoirs.  There can be

no question that the Corps has actually undertaken major federal actions with significant

effects on the environment without first completing the assessments, studies, and public

vetting required by federal law.

### A.   NEPA Procedural Requirements

"NEPA establishes procedures that a federal agency *must* follow before taking *any*

action." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (emphasis

added).  The agency first must determine whether its proposed action constitutes a "major

Federal action," i.e., "an action 'significantly affecting the quality of the human

environment.'" *Id.* (*citing* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.18).  This

"Congressional mandate" is an "'action-forcing' provision designed to prevent agencies from

acting on incomplete information and to 'ensure that important effects will not be overlooked

or underestimated only to be discovered after resources have been committed or the die

otherwise cast.'" *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1214 (11th

Cir. 2002) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)).

The determination of whether a proposed action constitutes a "major Federal action"

requires the preparation of an Environmental Assessment ("EA").  *Sierra Club*, 295 F.3d at

1214-15 (citing *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998); 40 C.F.R. § 1501.3). "The

EA should provide enough evidence and analysis to guide the agency to one of two

conclusions: (1) a finding that the project will have a significant effect, or (2) a finding of no

significant impact ('FONSI')."  *Sierra Club*, 295 F.3d at 1215.  In its analysis, the agency

must assess "the cumulative impacts of a proposed project in conjunction with any other,

related actions." *City of Oxford, GA v. Federal Aviation Administration*, 428 F.3d 1346, 1353

(11th Cir. 2005) (citing 40 C.F.R. §1508.27).  This requires that the agency must consider

"the incremental impact of the action when added to other past, present, and reasonably

foreseeable future actions…."  *City of Oxford*, 428 F.3d at 1353 (quoting 40 C.F.R. §

1508.7).

      If the agency determines that the proposed action *is* a "major Federal action," then the

agency must study specific issues in a detailed Environmental Impact Statement ("EIS").

*Van Antwerp*, 526 F.3d at 1360.  "The EIS must provide 'full and fair discussion of

significant environmental impacts.'" *Sierra Club*, 295 F.3d at 1215 (quoting 40 C.F.R.

§1502.1).  This discussion "should include any potential impact on endangered or threatened

species." *Sierra Club*, 295 F.3d at 1215.  As part of the EIS process, the agency must

determine the appropriate scope of the analysis required. *Id.*  In doing so, the agency must

"consider[] exactly what type of action is involved, its direct and indirect impacts, and

potential alternatives."  *Id.*

      A reviewing court "must…look beyond the scope of the decision itself to the relevant

factors that the agency considered." *Sierra Club*, 295 F.3d at 1216 (citing *Motor Vehicle*

*Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The

Court has a duty "to ensure that the agency took a 'hard look' at the environmental

consequences of the proposed action."  *Sierra Club*, 295 F.3d at 1216 (citing *North Buckhead*

*Civic Ass'n v. Skinner*, 903 F.2d 1533, 1541 (11th Cir. 1990)).

> The court will overturn an agency's decision as arbitrary and capricious under
> 'hard look' review if it suffers from one of the following: (1) the decision does
> not rely on the factors that Congress intended the agency to consider; (2) the
> agency failed entirely to consider an important aspect of the problem; (3) the

agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise.

*Id.* (*quoting Motor Vehicle Mfrs.*, 463 U.S. at 43-44) (internal citations omitted).

## B. The Corps' Failure to Comply with NEPA

Though a federal agency has some discretion regarding the *substantive* outcome of its NEPA analysis, the *procedural* requirements of NEPA are mandatory. The Corps has failed to fully comply with those requirements in connection with its actions in the ACF Basin – and in fact has made no effort to finalize an appropriate NEPA analysis for any of the agency actions challenged by Alabama and Florida. The Administrative Record compiled and produced by the Corps in this litigation is devoid of any final EA, EIS, or other NEPA documentation for the following actions, all of which have patent and far-reaching environmental consequences:

1)  Effecting a *de facto* reallocation of storage in Lake Lanier to support water supply;

2)  Executing water supply contracts for massive withdrawals from the conservation storage pool at Lake Lanier;

3)  Granting license or permission to continue those withdrawals – at dramatically increased levels – pursuant to "holdover" contracts;

4)  Implementing the draft 1989 WCP;

5)  Establishing "action zones" at Lake Lanier that significantly impact the environment downstream by reducing available flows; and

6)      Establishing and implementing the "Upper Chattahoochee River Management System" which ensures that downstream flows will only be sufficient to meet the bare minimum requirements for waste assimilation and water quality.

Each of these agency actions constitutes major federal action at Lake Lanier and has significant effects on the environment.  In fact, the Corps' own NEPA regulations recognize that a full EIS is normally required for actions of this type. 64/  Nevertheless, the only NEPA analysis for these actions contained in the Administrative Record is a draft EA for the 1989 PAC Report and 1989 draft WCP.  (FA ¶ 684).  While the Corps' NEPA analysis remained a draft and was never finalized, the underlying actions – even those labeled "draft" – were actually undertaken and implemented with real-world impacts to the environment, as discussed above in detail.  *See* § III, *supra*.  The Corps' failure to conclude any NEPA analysis for any of the longstanding actions listed above is a clear violation of federal law. The Corps has ignored NEPA's statutory mandates altogether in undertaking the major actions listed above, and this Court should set aside those actions.

## C.  Other Federal Requirements

In addition to the Corps' complete failure to comply with NEPA requirements, the Corps has violated various other procedural mandates in connection with its actions.

### 1.  Water Resources Development Act ("WRDA")

The Corps has failed to comply with the public review and comment procedures of the Corps' own regulations and the mandates of WRDA.  *See* 33 U.S.C. § 2312.

---

64/      *See* 33 C.F.R. § 230.6 (c) (noting "[p]roposed major changes in the operation . . . of completed projects normally require an EIS.").

Additionally, the Corps has failed to comply with WRDA in that Corps has failed to coordinate and consult with Alabama, 65/  Florida and the public in general before reallocating storage or instituting major changes in the operation of federal reservoirs.  *Id*.

### 2.   Regulations Governing Corps' Operation and Management

The Corps has failed to properly prepare a "water control plan" in accordance with its regulations.  33 C.F.R. § 222.5; § 222.5(f)(1),(9) and (e)(1).  In addition, for deviations from its official water control plan, the Corps has failed to properly change the plan and obtain appropriate approval.  *See* EP 1165-2-1 ¶ 18-2(f) at 18-4.  The Corps has for twenty years followed a draft WCP, ignoring the last officially adopted plan of 1958, and ignoring compliance with the regulations to amend it.

The Corps' water control plans have not been clearly documented in appropriate water control manuals.  33 C.F.R. § 222.5(f)(3).  Likewise, an appropriate water control manual has never been created to define system regulation, EM 1110-2-3600 at 2-3 (Nov. 30, 1987).  Finally, the Corps has not prepared an appropriate Master Manual for the Corps' projects in the ACF Basin, which have interrelated purposes.  33 C.F.R. § 222.5(i)(2).  (FA ¶¶ 674-75).

## VI.   THE CORPS' ACTIONS VIOLATE THE CZMA WITH REGARD TO FLORIDA'S COASTAL MANAGEMENT PROGRAM 66/

Finally, the Apalachicola River and Bay—and indeed, the entire State of Florida—are protected by the enforceable policies of the federally approved Florida Coastal Management

---

65/     Alabama adopts the arguments made by Alabama Power Company in Section IV of the argument in its contemporaneously filed motion and brief.

66/     Alabama has not asserted a claim under the CZMA and thus does not join this argument.

Program ("FCMP").  *See* 46 Fed. Reg. 48,742 (1981) (initial approval of the FCMP); 53 Fed.

Reg. 50,069 (1988) (approval of FCMP amendments).  Therefore, pursuant to the CZMA, the

Corps' actions which affect the Apalachicola River and Bay must be consistent to the

maximum extent practicable with the FCMP.  *See* 16 U.S.C. § 1456(c)(1)(A).  The CZMA

further obligates the Corps to provide Florida with a consistency determination before

undertaking activities affecting Florida's coastal resources.  *See* 16 U.S.C. § 1456(c)(1)(C).

On December 15, 1989, January 30, 1990, and February 5, 1990, Florida notified the Corps

that the activities proposed in the PAC Report were inconsistent with enforceable policies of

the FCMP.  On January 6, 2005, May 19, 2005, and June 12, 2007, Florida again notified the

Corps that its reservoir operations at Lake Lanier and other ACF Basin reservoirs were

affecting Florida's coastal resources, requiring a determination that these activities were

consistent to the maximum extent practicable with enforceable policies of the FCMP.[67]

---

67/     The FCMP includes enforceable policies of 23 Florida statutes administered by eight
State agencies and five water management districts designed to ensure the wise use and
protection of the State's water and cultural, historic, and biological resources; to minimize
the State's vulnerability to coastal hazards; to ensure compliance with the State's growth
management laws; to protect the State's transportation system, and to protect the State's
proprietary interest as the owner of sovereign submerged lands.  Enforceable policies of the
FCMP which the Corps should consider include, but are not limited to, the following statutes:
Fla. Stat. §§ 373.016, 373.019(5), 373.171, 373.223, 373.233, 373.239(3) (regulating
consumptive uses of water) (implemented by Fla. Admin. Code R. 62-40.410, 40A-2.301,
40A-2.311, 40A-2.381); Fla. Stat. §§ 373.413, 373.414, 373.416 (regulating water storage
and management of reservoirs) (implemented by Fla. Admin. Code R. 40A-4.011, 40A-
4.301); Fla. Stat. § 373.430(1)(a), Fla. Stat. §§ 403.021, 403.031(7), 403.061, 403.161
(prohibiting pollution, which is broadly defined as any human-induced impairment of water);
Fla. Stat. §§ 258.36, 258.37, 258.39 (protecting Apalachicola Bay as an aquatic preserve);
Fla. Stat.  §§ 253.034, 259.032 (protecting submerged lands and lands purchased for
conservation) (implemented by Fla. Admin. Code R. 62-302.700 (protecting Outstanding
Florida Waters, including Apalachicola River and Bay)); Fla. Stat. § 379.2401 (formerly §
370.025) (protecting marine fisheries); Fla. Stat. § 379.2291 (formerly § 372.072); and Fla.

(FA ¶ 1064).  The Corps has declined to provide the required consistency determination or to take any other action required by the CZMA.

## VII.   ALABAMA AND FLORIDA HAVE STANDING TO ASSERT THE CLAIMS AT ISSUE IN THIS MOTION

As downstream states directly impacted by the reduction in flows resulting from the Corps' failure to abide by federal law in its operation of Lake Lanier, Alabama and Florida unquestionably have standing to assert the claims at issue in this motion.  As noted above, the Federal Defendants have advised that they do not contest Alabama and Florida's standing for purposes of this motion.

In order to establish standing, it is well-settled that a party must show (1) a concrete and particularized injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable ruling. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Alabama v.* 424 F.3d at 1130.  Furthermore, in cases such as this involving States, "the states' quasi-sovereign interests entitled them to 'special solicitude' in standing analysis."  *Southeastern*, 514 F.3d at 1322 (quoting *Massachusetts v. EPA*, 549 U.S. 497 (2007)).  Finally, to satisfy the prudential requirements for standing, a party must establish that "the interest sought to be protected by the complainant [be] arguably within the zone of interests to be protected or regulated by the statute . . . in question."  *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970).

---

Stat. § 379.411 (formerly § 372.0725) (protecting species which are endangered, threatened, or of special concern) (implemented by Fla. Admin. Code Rule 68A-1.004(31),(82),(86)).

The question of whether Alabama and Florida have standing in this case has already been addressed by the Eleventh Circuit. *Alabama*, 424 F.3d at 1130.  The Eleventh Circuit noted that "Corps management of Lake Lanier that violates federal law may adversely impact the environment and economy downstream in the ACF Basin, thereby injuring Alabama and Florida." *Id.* at 1130.  The Eleventh Circuit also held that "[a] favorable decision in this case could provide redress for that injury." *Id.*  Thus, the Eleventh Circuit "readily conclude[d] that Alabama and Florida have standing to pursue this action." *Id.*; *see also Georgia v. U.S. Army Corps of Engineers*, 302 F.3d 1242, 1251-56 (11th Cir. 2002) (concluding in another one of the MDL cases that Florida had a right to intervene due in part to the effects on Florida that would result from additional withdrawals for water supply at Lake Lanier). 68/ Similarly, in one of the other cases that is part of this MDL proceeding, the D.C. Circuit concluded that Alabama and Florida had satisfied both the constitutional and prudential requirements for standing to challenge a proposed reallocation of storage at Lake Lanier as being inconsistent with one of the requirements of the WSA.  *See Southeastern*, 514 F.3d at 1322-23.

Alabama and Florida plainly have standing.  Indeed, at oral argument before the D.C. Circuit in the *Southeastern* case, counsel for Georgia expressly conceded the standing point

---

68/      In its August 13, 2007 Order, this Court stated that the "Water flowing through the [ACF Basin], including the water flowing from Lake Lanier, affects all three states."  Doc. 41 at 1.  The Court further recognized that the three congressionally authorized purposes of flood control, navigation, and power "do not reduce the amount of water available downstream from Lake Lanier.  Although not expressly authorized by Congress, the Corps has maintained that water supply use is an incidental benefit from the creation of Lake Lanier and therefore has allowed some water to be used for municipal and industrial water supply use. *Unlike the congressionally authorized uses, the water supply use may diminish the water quantity flowing downstream from Lake Lanier*."  Doc. 41 at 1-2 (emphasis added).

when he stated that Georgia "will accept that [Alabama and Florida] have standing to assert a

claim to their injury at the State Line relating to water flows."  (FA ¶ 632).  The concession

was hardly surprising.  As detailed in the Factual Appendix, there is less water flowing out of

Buford Dam as a result of the illegal reallocation of storage to water supply and the resulting

operational changes, as well as due to the illegal water supply withdrawals that the Corps is

allowing to occur. 69/  (FA ¶¶ 727-749; 766-94).  This has caused injury in fact to Alabama

and Florida.  (FA ¶¶ 758-65, 790, 808-09, 811, 825-63, 1166-1226).  That injury will be

redressed if Alabama and Florida prevail in this case.  (FA ¶¶ 351, 362, 367, 371, 392, 396,

427-28, 463, 531, 705, 1207, 1209, 1211-13, 1216-17, 1220, 1223).  Furthermore, there is no

question that the injuries suffered by Alabama and Florida are within the zone of interests of

the federal statutes at issue.  *See, e.g.*, *Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 396-99

(1987) (discussing "zone of interests" analysis as "not especially demanding"); *Missouri*, 787

F.2d at 278 (Flood Control Act); *Lower Ark. Valley Water Conservancy Dist. v. United

States*, 578 F. Supp. 2d 1315, 1334 (D. Colo. 2008) (Water Supply Act).

## VIII.   CONCLUSION

For the foregoing reasons, the Court should enter a partial judgment against the Corps

on all Phase One claims asserted by Alabama and Florida in this litigation as described

above.

---

69   Alabama and Florida also have standing to challenge the failure of the Corps to
follow the requirements of federal law in promulgating various controls for Lake Lanier,
including the 1989 draft WCP.  These failures to adhere to the various federal statutes
identified above have caused injury in that the environmental and other harm suffered by
Alabama and Florida as a result of the Corps' actions has not been properly assessed.  Those
injuries will be redressed if the relief sought by Alabama and Florida is granted.  The injuries
suffered by Alabama and Florida are within the zone of interests of these federal statutes.
*See Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173 (11th Cir. 2006).

Respectfully submitted this 23rd day of January, 2009.

**COUNSEL FOR THE STATE OF FLORIDA:**

Bill McCollum

ATTORNEY GENERAL

Jonathan A. Glogau

Chief, Complex Litigation

The Capitol, Suite PL-01

Tallahassee, FL  32399

(850) 414-3300

jon.glogau@myfloridalegal.com


Thomas R. Wilmoth

Donald G. Blankenau

Husch Blackwell Sanders LLP

206 S. 13th Street, suite 1400

Lincoln, NE  68508

(402) 458-1500

tom.wilmoth@huschblackwell.com

don.blankenau@huschblackwell.com

/s/ James T. Banks

James T. Banks

HOGAN & HARTSON, LLP

555 13th Street, N.W.

Washington, D.C.  20004

(202) 637-5802

jtbanks@hhlaw.com


Parker D. Thomson

HOGAN & HARTSON, LLP

1111 Brickell Avenue, Suite 1900

Miami, FL  33139

(305) 459-6678

pdthomson@hhlaw.com


Christopher M. Kise

Foley & Lardner LLP

106 East College Avenue

Tallahassee, FL  32301

(850) 513-3367

ckise@foley.com


**COUNSEL FOR THE STATE OF ALABAMA:**

William D. Little, III

Assistant Attorney General for the State of Alabama

ATTORNEY GENERAL'S OFFICE

11 South Union Street

Montgomery, AL  36130


William S. Cox, III

W. Larkin Radney, IV

Lightfoot, Franklin & White, L.L.C.

400 North 20th Street

Birmingham, AL  35203

(205) 581-0700

wcox@lfwlaw.com

lradney@lfwlaw.com

/s/ Matthew H. Lembke

Matthew H. Lembke

Joel M. Kuehnert

Bradley Arant Boult Cummings, LLP

1819 5th Avenue North

Birmingham, AL  35203

(205) 521-8560

mlembke@ba-boult.com

jkuehnert@ba-boult.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Joint Motion and Memorandum in Support of Joint for Partial Summary Judgment on Phase 1 Claims was filed with the Clerk of the Court using the CM/ECF system, and was served upon counsel of record and all parties to this proceeding registered with the federal court system by electronic means on January 23, 2009.

/s/ James T. Banks