UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE TRI-STATE WATER RIGHTS      CASE NO. 3:07-MD-1-PAM-JRK
LITIGATION

_____/

**FACTUAL APPENDIX IN SUPPORT OF THE STATE OF ALABAMA'S**
**AND STATE OF FLORIDA'S JOINT MOTION FOR PARTIAL JUDGMENT**
**ON ALL PHASE 1 CLAIMS**

The State of Alabama ("Alabama") and the State of Florida ("Florida") file this

consolidated statement of facts in support of their joint motion for summary judgment of

Phase 1 issues.  This statement of facts distills the materials contained in the Phase 1

administrative record lodged with this Court, as supplemented by the Federal Defendants, as

well as the related statutes, case law and legislative history.[1]

---

[1]    Citations to the Administrative Record will appear as "ACF_____" or "SUPPAR_____" as
each document is so stamped by the Federal Defendants in the administrative record.  All other
citations will adhere to bluebook standards or as indicated in any stipulation related to such document.

TABLE OF CONTENTS

Page

I.   INTRODUCTION ..................................................................................................1
II.  THE CORPS' LIMITED AUTHORITY TO MODIFY PROJECTS FOR
     WATER SUPPLY ................................................................................................2
     A.  Surplus Water Agreements Under the Flood Control Act of 1944 ................2
     B.  Reallocation of Storage Under the Water Supply Act of 1958 .....................2
     C.  Limitations on the Corps' Discretionary Authority To Modify
         Projects For Water Supply .............................................................................7
III. THE CORPS' HISTORY OF PROVIDING WATER SUPPLY AT
     LAKE LANIER AND *DE FACTO* REALLOCATION OF RESERVOIR
     STORAGE THROUGH HOLDOVER CONTRACTS ...........................................11
     A.  The Corps' Issuance of Water Supply Contracts ...........................................11
         1.  Gwinnett County ...................................................................................13
         2.  The City of Cumming, Georgia .............................................................25
         3.  The Atlanta Regional Commission .........................................................31
         4.  The City of Gainesville, Georgia ...........................................................38
         5.  The City of Buford, Georgia ..................................................................44
     B.  Provision of Water Supply Following Expiration of the Contracts ...............44
         1.  Attempted Provisional 1990 Water Storage Contracts ...........................45
         2.  The Short-Term Water Supply Plan .......................................................53
         3.  The Conceptual Water Supply Plan ........................................................56
         4.  The Memorandum of Agreement and "Live and Let Live" ...................57
         5.  The ACF Compact and Allocation Formula Negotiations .....................65
         6.  The Corps' Recognition of the Limits of "Live and Let Live" ..............66
         7.  The Corps' Correspondence During Compact Negotiations ..................69
     C.  The Corps' Attempts to Develop Interim Surplus Water
         Agreements in 1999-2001 ...............................................................................77
         1.  The Corps' Attempts to Enter Into New Interim Withdrawal
             Contracts ...............................................................................................81
         2.  The Corps' Request for Policy Exception to Use Lower Pricing
             Method ...................................................................................................93
         3.  The Corps' Apparent Update of Contract Pricing in 2000 ....................99
     D.  The Corps' Treatment of the Water Supply Contracts as Storage
         Contracts .........................................................................................................101
         1.  Corps' Memoranda and Correspondence ...............................................101
         2.  Status Reports for Water Withdrawal Contracts ....................................107
         3.  Renunciation of the Independent Offices Appropriations Act
             and Recognition of the Need for Contracts Under the WSA ..................113
         4.  Further Recognition of the Need for New Storage Contracts
             Under the WSA ......................................................................................117

IV. ATTEMPTS TO SECURE A PERMANENT SOURCE OF WATER
    SUPPLY FROM THE ACF SYSTEM .................................................................125
    A.  The Metropolitan Interim Water Supply Plan.............................................125
    B.  Reregulation Dam (Plan A v. Plan B)..........................................................131
    C.  Draft PAC Report.........................................................................................144
    D.  Georgia Water Supply Request ...................................................................152
    E.  Stockdale Memorandum ..............................................................................155
    F.  D.C. Settlement Agreement .........................................................................163
    G.  D.C. Circuit Opinion ....................................................................................165
    H.  Accounting of Reservoir Storage Utilized for Water Supply .......................174
        1.  PAC Report Storage Conversion .........................................................177
        2.  Storage Conversion of Then-Existing Uses Per Stockdale
            Memorandum........................................................................................177
        3.  D.C. Settlement Storage Conversion ...................................................178
        4.  Georgia Water Supply Request Storage Conversion ...........................178
        5.  Alabama and Florida's Estimates of 2006 Allocated Storage .............179
V.  THE 1989 DRAFT WATER CONTROL PLAN .....................................................179
    A.  The Corps' Requirements to Maintain Water Control Plans ........................179
    B.  The 1989 Draft Water Control Plan for the ACF Represents De
        Facto Reallocation........................................................................................182
    C.  Navigation Windows Under the 1989 Draft Plan .........................................188
    D.  Recreation at Lake Lanier Under the 1989 Draft Water Control
        Plan...............................................................................................................191
VI. OPERATIONS AT BUFORD.................................................................................197
    A.  Baseline Operations .....................................................................................197
    B.  Summaries of Operational Data...................................................................199
        1.  Water Supply Withdrawals...................................................................201
        2.  Historical Inflows and Discharges at Lake Lanier................................215
        3.  Historical Lake Withdrawals for Water Supply....................................221
        4.  Historical Lake Lanier Hydropower Generation ..................................223
        5.  Historical Weekend Releases................................................................227
        6.  Historical Lake Lanier Elevations ........................................................229
    C.  Inflow and Outflow of Corps' Reservoirs in the ACF System .....................233
        1.  West Point Inflow and Outflow Data During Drought Periods..............233
        2.  Walter F. George Inflow and Outflow Data During Drought
            Periods..................................................................................................235
    D.  The Corps' References to Drought Operations.............................................236
        1.  Historical Drought Operations..............................................................236
        2.  Current Drought Operations .................................................................241
    E.  Changes from Baseline Operations..............................................................246
        1.  Minimum Releases in the Chattahoochee..............................................246
        2.  Special Releases for Water Supply .......................................................249
        3.  Hydropower Effects ..............................................................................249
        4.  Other Operational Changes...................................................................250

5.   Change in Elevation at Lake Lanier............................................251
6.   Navigation Effects .....................................................................253
7.   The Corps' Video.......................................................................267

VII. THE AUTHORIZED PURPOSES OF THE BUFORD DAM THAT ARE
     SERIOUSLY AFFECTED BY THE CORPS' *DE FACTO*
     REALLOCATION TO SUPPORT WATER SUPPLY ..........................................268

A.   The River and Harbor Act of 1945 ....................................................268
     1.   District Engineer's Report (Dec. 6, 1938) ...............................270
     2.   Division Engineer's Report (February 8, 1939) ......................275
     3.   Report of the Board of Engineers for Rivers and Harbors
          (April 10, 1939) ........................................................................275
     4.   Report of the Chief of Engineers (April 20, 1939) .................276

B.   The River and Harbor Act of 1946 ....................................................276
     1.   Report of the Division Engineer (March 20, 1946) ................277
     2.   Report of the Board of Engineers for Rivers and Harbors
          (April 29, 1946) ........................................................................280
     3.   Report of the Chief of Engineers (May 13, 1946) .................280
     4.   Letter of Federal Power Commission to Chief of Engineers
          (Sept. 19, 1946), and Letter of Chief of Engineers to Federal
          Power Commission (Feb. 6, 1947) ..........................................281

C.   Post-Authorization Congressional Testimony on Appropriations
     Bills .......................................................................................................282
     1.   Hearings on Appropriations for 1948 .....................................283
     2.   Hearings on Appropriations for 1949 .....................................284
     3.   Hearings on Appropriations for 1950 .....................................288
     4.   Hearings on Appropriations for 1951 .....................................289
     5.   Hearings on Appropriations for 1952 .....................................290
     6.   Hearings on Appropriations for 1953 .....................................293
     7.   Hearings on Appropriations for 1954 .....................................293
     8.   Hearings on Appropriations for 1955 .....................................295
     9.   Hearings on Appropriations for 1956 .....................................296
     10.  Hearings on Appropriations for 1957 .....................................297

D.   Relevant Correspondence From Mayor Hartsfield, Representative
     Davis, and the Corps Related to Water Supply.................................298

E.   Corps' Definite Project Report (December, 1949) ..........................300

F.   Corps' 1958 Apalachicola River Basin Reservoir Regulation
     Manual, and 1959 Appendix B on Buford Reservoir .....................303

G.   Corps' Cost Allocation Studies (May 1959)....................................305

H.   The Parties Have Continually Recognized the Authorized
     Purposes ...............................................................................................307
     1.   Corps Documents Recognizing the Authorized Purposes ......307
     2.   Court Orders and Pleadings Recognizing the Authorized
          Purposes ...................................................................................313

VIII. THE CORPS' ACTIONS ARE INCONSISTENT WITH NEPA AND
    OTHER FEDERAL LAWS....................................................................315
    A.  The Corps' Requirements Pursuant to NEPA ................................315
    B.  Requirements of the Water Resources Development Act................319
IX.  THE CORPS' ACTIONS VIOLATE THE CZMA WITH REGARD TO
    FLORIDA'S COASTAL MANAGEMENT PROGRAM .......................319
    A.  Corps' Requirements Pursuant to the CZMA ................................319
    B.  The Corps' Non-Compliance with Florida's Coastal Management
        Program (FCMP)...........................................................................324
X.   THE CORPS' OPERATIONAL CHANGES AT BUFORD HAVE A
    MAJOR NEGATIVE IMPACT ON FLORIDA AND ALABAMA .......324
    A.  Description of the Apalachicola River and Bay.............................324
    B.  Description of the Chattahoochee River System ...........................332
        1.  Jim Woodruff Lock and Dam ................................................332
        2.  George W. Andrews Lock and Dam........................................333
        3.  Walter F. George Lock and Dam............................................334
        4.  West Point Dam .....................................................................337
        5.  Buford Dam ...........................................................................339
        6.  Non-Corps of Engineers Dams ..............................................339
    C.  Harm to Florida and Alabama.......................................................340
        1.  Specific Impacts to Florida ...................................................340
        2.  Alabama's Interests................................................................354
        3.  Alabama's Injuries from Challenged Corps Actions ..............362

## I.        INTRODUCTION

1.        The Apalachicola River, part of the Apalachicola-Chattahoochee-Flint ("ACF") River System, is formed at the confluence of its tributaries, the Chattahoochee and Flint Rivers, in Southwest Georgia where it flows approximately 107 miles southward into the Apalachicola Bay in the Gulf of Mexico.  ACF006120; ACF015807-08; ACF017857.

2.        From the junction creating the Apalachicola River, the Chattahoochee River, approximately 434 miles long in total, reaches northward forming the boundary between Alabama and Georgia and then continuing in a northeasterly direction to its source in the Blue Ridge Mountains.  ACF006121; ACF015807.

3.        The Chattahoochee River is a federally-controlled river.  ACF015808-11.  A series of five federal dams were built on the Chattahoochee River, the first of which being Jim Woodruff Lock and Dam located at the confluence of the Chattahoochee and Flint Rivers.  ACF008206-07.

4.        Lake Sidney Lanier is a federally-operated reservoir formed by Buford Dam on the Chattahoochee River.  ACF0003632; ACF003962; s*ee also* August 13, 2007 Order, Doc. 41 at 1.

5.        As discussed in detail below, and as recognized by this court, Congress originally authorized the creation of Lake Lanier for three purposes:  flood control, navigation, and hydropower generation.  *See* August 13, 2007 Order, Doc. 41 at 1.

## II.   THE CORPS' LIMITED AUTHORITY TO MODIFY PROJECTS FOR WATER SUPPLY

### A.   Surplus Water Agreements Under the Flood Control Act of 1944

6.     Section 708 of the Flood Control Act of 1944 provides:

> The Secretary of the Army is authorized to make contracts with States, municipalities, private concerns, or individuals, at such prices and on such terms as he may deem reasonable, for domestic and industrial uses for surplus water that may be available at any reservoir under the control of the Department of the Army; *Provided*, That no contracts for such water shall adversely affect then existing lawful uses of such water. . . .

33 U.S.C. § 708.

7.     The Corp's regulations require that "[s]urplus water agreements will normally be for small amounts of water and/or for temporary use. . . [and n]ormally, surplus water agreements will be limited to a 5-year period."  USACE ER 1105-2-100, app. E., § E-57b(3) at E-214-15 (Apr. 22, 2000).  ACF035394-95.  These regulations also require that the Corps must prepare a surplus water report, issue a surplus water declaration, and obtain the views of affected states before executing water supply contracts. *Id.* at E-216.  ACF035396.

### B.   Reallocation of Storage Under the Water Supply Act of 1958

8.     Congress declared in 43 U.S.C. § 390b(d), enacted as part of the Water Supply Act of 1958, § 301(d):

> Modifications of a reservoir project heretofore authorized, surveyed, planned, or constructed to include storage as provided in subsection (b) of this section [for municipal and industrial purposes] which would seriously affect the purposes for which the project was authorized, surveyed, planned, or constructed, or which would involve major structural or operational changes shall be made only upon the approval of Congress as now provided by law.

9.      Paragraph 3-8(b)(5) of ER 1105-2-100 (at 3-33-34) elaborates on the

restrictions on reallocation and addition of storage in a Corps' project imposed by the Water

Supply Act of 1958:

> Reallocation of storage.   Reallocation or addition of storage that would
> seriously affect other authorized purposes or that would involve major
> structural or operational changes requires Congressional approval.  Provided
> these criteria are not violated, 15 percent of the total storage capacity allocated
> to all authorized project purposes or 50,000 acre feet, whichever is less, may
> be allocated from storage authorized for other purposes.  Or, this amount may
> be added to the project to serve as storage for municipal and industrial water
> supply at the discretion of the Commander, USACE.   When reallocating
> storage from the flood control pool to municipal and industrial water supply,
> the need to compensate existing water supply contract holders shall be
> evaluated.   Dependable yield mitigation storage (DYMS) shall be analyzed
> and implemented to compensate these users.    Compensation to existing
> hydropower users through minor operational changes, where appropriate, may
> also be considered.  Procedures and requirements to analyze and implement
> DYMS and operational changes are described in Appendix E.

Paragraph E-57(e) of ER 1105-2-100 (at E-219 et seq.) (ACF035399) sets forth the

"procedures and requirements for implementation of the DYMS analysis."

10.      Paragraph E-57(d)(1) of ER 1105-2-100 (at E-215-16) (ACF035395-96)

establishes the prerequisites for reallocation of storage over and above any requirement of

Congressional approval:

> Approval Authority.   Reallocation or addition of storage that would have a
> severe effect on other authorized purposes or that would involve major
> structural or operational changes requires Congressional approval.  Providing
> the above criteria are not violated, 15 percent of total storage capacity
> allocated to all authorized project purposes or 50,000 acre feet, whichever is
> less, may be allocated from storage authorized for other purposes or may be
> added to the project to serve as storage for municipal and industrial water
> supply at the discretion of the Commander, USACE.  For reallocations up to
> 499 acre-feet the Commander, USACE has delegated approval authority to the
> Division commanders.    Reallocations which exceed the Commander's
> authority may be approved at the discretion of the Secretary of the Army if
> such reallocations do not require Congressional approval as described above.

All reallocations or additions of storage should be to serve immediate needs. All reallocations or additions of storage must be accompanied by a report that includes:

(a) Purpose of the report and Background, including map

(b) Pertinent project data table

(c) Water supply needs analysis

(d) Test of financial feasibility

(e) Cost of storage analysis

(f) Analysis of alternatives considered to address the water supply needs

(g) Appropriate NEPA documentation of environmental impacts

(h) Pertinent letters from affected Federal, state and local interests, including documentation of public review and comment.  Opportunities for public review and comment must be provided.

(i) Commander's recommendation

11.     The Corps also concluded in engineer pamphlet EP 1165-2-1 (July 30, 1999), that no reallocation of storage in an existing project where the proposed reallocation would severely affect the project is permissible without Congressional authorization. Paragraph 18-2(a) (at 18-1) of that document cautioned that modification of existing projects to include storage for municipal and industrial purposes "which would severely affect the project, its other purposes, or its operation, requires Congressional authorization."  Again in ¶ 18-2(c) (at 18-1-2) of that pamphlet, the Corps declared:  "Reallocation of reservoir storage that would have a significant effect on other authorized purposes or that would involve major structural or operational changes requires Congressional approval."

12.     Paragraph 17-3(e) of EP 1165-2-1 (at 17-5) provides:

Reallocation of Reservoir Storage for Recreation.  Many projects, including those for which recreation facilities may have been included under general provisions of the Flood Control Act of 1944, as amended, do not have separable storage costs for recreation.  In these circumstances recreation is an authorized project purpose but it is secondary, as far as storage operation is concerned, to project functions for which the storage was formulated.  Any reallocation of reservoir storage to provide more stable recreation levels that would have a significant effect on other authorized purposes, or that would involve major structural or operational change, requires Congressional authorization.  Costs reallocated to recreation will be established as the highest of the benefits or revenues foregone, replacement costs, or the updated cost of the storage, will be treated as a separable cost, and will be subject to non-Federal cost sharing.  (ER 1105-2-100).

13.    The Water Supply Handbook, "A Handbook for Water Supply Planning and Resource Management," prepared for the Corp of Engineers and published in December 1998 focuses on water supply management and resource management.  SUPPAR025795. The Water Supply Handbook "is intended to serve as a comprehensive desk top reference on water supply topics that are spread throughout a voluminous body of Corps regulations, manuals, technical letters and memoranda, and also literature from the private sector." SUPPAR025797.

14.    In Chapter 2, entitled "Authorities, Policies and Procedures," the Handbook defines the term "storage."  "The term 'storage' conveys the right to store a resource (water) in a Corps reservoir project without guaranteeing that the resource will be available.  The right to withdraw water from the storage space usually requires a separate agreement." SUPPAR025815.

15.    When describing the reallocation of "storage" later in Chapter 2, the Handbook states, "A change in the use of storage in an existing reservoir project from its present use to M&I water supply (reallocation) is authorized by the Water Supply Act of

1958." SUPPAR025817.  However, the Handbook limits this authority, stating, "Reallocations or addition of storage that would seriously affect the purposes for which the project was authorized, surveyed, planned, or constructed, or which would involve major structural or operational changes, will be made only upon the approval of Congress." SUPPAR025817.

16.     Furthermore, with regard to "surplus water" agreements under the Flood Control Act of 1944, Chapter 2 of the Handbook specifies that, "[s]urplus water declarations citing use for higher beneficial purposes should be made with caution and only on a fixed period agreement for temporary use.  When long term use is desired by the user, a permanent storage reallocation should be performed under the authority of the 1958 Water Supply Act, as amended." SUPPAR025819.

17.     Chapter 4 of the Water Supply Handbook, entitled, "Storage Reallocation" defines the term "reallocation" as "the reassignment of the use of existing storage space in a reservoir project to a higher and better use." SUPPAR025844.  The Handbook further requires that, "[w]henever a reallocation is contemplated, a reallocation report must be prepared." SUPPAR025849.  The purposes and contents of a model reallocation report are described in detail. SUPPAR025849-51.

18.     In addition, Chapter 4 of the Handbook states that the appropriate cost for the reallocated storage is "the highest of the benefits or revenues foregone, the replacement cost, or the updated cost of storage in the Federal project." SUPPAR025851.

**C.      Limitations on the Corps' Discretionary Authority To Modify Projects
For Water Supply**

19.      A December 29, 1959 letter from the Assistant Chief of Engineers from Civil

Works to General Frank M. Albrecht of the South Atlantic U.S. Army Engineer Division,

addressing water supply policies under the Water Supply Act of 1958, explained that "[i]t is

important to recognize that the water supply storage provided under the terms of the Water

Supply Act constitutes a modification of the original project authorization and thus has the

effect of making water supply an authorized project purpose." ACF003445;

SUPPAR008608.  Because the then-new purpose of water supply must share equitably in the

benefits of the project, the Assistant Chief stressed that "[t]his precludes favoring water

supply over other project purposes." ACF003445; SUPPAR008608.  Consequently, the

Corps "will approve requests for relatively small amounts of storage in completed projects"

as "there would be no serious affect on authorized project purposes." *Id.* However, "if a

multiplicity of such requests is in prospect it would be desirable to consider the overall affect

of such conversion of storage use on other authorized project purposes…" and provide "a

reasonably firm determination of whether or not additional approval of Congress is

required." ACF003445-06; SUPPAR008608-09.

20.      In a January 21, 1969 Memorandum for the Special Assistant to the Secretary

of the Army for Civil Functions, from the General Counsel for the Chief of Engineers,

regarding post-authorization project changes, the General Counsel stated that:

> [i]t is the view of this office that the ***discretionary authority*** given the Chief
> of Engineers to make post-authorization changes in projects ***extends only*** to
> what might be termed engineering changes: that is, changes which involve the
> location, dimension, method of construction, ***minor variations in the***
> ***allocation of storage for the various project purposes***, and changes in the size

and scope of the project to meet needs which differ from those which existed at the time of authorization, so long as the scope and function of the project are not materially altered. The above changes may be made for engineering reasons (i.e., differing foundation conditions) or for economic reasons (i.e., expansion of the town to be protected or larger vessels being used in waterborne commerce). *The discretionary authority is not considered to include matters which materially alter the nature of the project, such as the deletion or addition of project purposes where not otherwise authorized by law, or substantial changes in the relative sizes of project purposes*.

SUPPAR001361 (emphases added).

21.     A March 13, 1986 memorandum from Susan Crawford, General Counsel of the Army to Robert Dawson, Acting Assistant Secretary of the Army (Civil Works), the General Counsel sought to expand the Corps' authority to enter into water withdrawal contracts under the Flood Control Act.  ACF040975.  The Army General Counsel concluded that water not being used for a reservoirs' primary purpose (in that case irrigation)  "at least, surely can be considered surplus water within the meaning of [FCA] section 6.  Thus, section 6 gives the Secretary of the Army discretion to determine whether this water should be used to provide municipal water supply, at least to the extent that his decision does not unreasonably impair the efficiency of the reservoir's other purposes." ACF040980.

22.     In enacting Public Law 841, Congress determined that no surplus water, within the meaning of Section 6 of the Flood Control Act, exists in Lake Lanier.  *See* SUPPAR001948; Senate Rep. No. 84-2689 at 2 (1956); H. Rep. 84-2672 at 2 (1956).

23.     In an August 6, 1990 letter from Milton Sorolar, Acting Comptroller General of the United States General Accounting Office to the Honorable Butler Derrick, House of Representatives, GAO concluded that the Corps has limited discretion as to when it may modify projects to include water supply.  The GAO's Comptroller General stated that:

8

> [U]nder the current statutory scheme [Water Supply Act of 1958 and the Flood Control Act of 1944], the Corps may supply municipal water from existing reservoirs only under the following circumstances:  1. Municipal water supply was included in the original construction of the reservoir and the municipality agreed to pay the cost before such construction or expansion.  2. The reservoir will be expanded to include municipal water supply and the municipality agrees to pay the cost of the expansion for such purpose.  3. The Corps has determined that the water to be reallocated to meet otherwise unauthorized municipal water supply needs is surplus to authorized reservoir purposes.

SUPPAR026243.

24.     In a February 5, 1991 letter to Charles Bowsher, Comptroller General of the United States Government Accounting Office, William J. Haynes II, General Counsel, Department of the Army, disagreed with GAO's August 6, 1990 assessment, arguing that "the Army has consistently held the view that the Corps may reallocate water storage space even in the absence of physical modifications to projects." SUPPAR001004.

25.     In an August 6, 1991 response to the Department of the Army, General Counsel of GAO, James F. Hinchman, stated that:

> [T]he [Water Supply Act of 1958] does not authorize the reallocation of water for purposes not included in the original construction or subsequent expansions of the reservoirs. We reached these conclusions on the basis of our analysis of the provisions of the statute and our examination of the relevant legislative history.  Specifically, we concluded that the legislative history of the Water Supply Act reflects the act's focus on the development of water supply capacity.  We found no legislative history suggesting that the act is also intended to authorize reallocation of already available water supplies.

SUPPAR000998.

26.     GAO further stated its disagreement with the Corps' interpretation of the Water Supply Act, replying that "we continue to disagree with [the Corps'] view that the

Water Supply Act 'plainly contemplates reallocation of water storage space as a result of non-structural, operational modifications.'" SUPPAR001000.

27.     In its August 20, 1991 report to Congress, examining whether the Corps had legislative authority to operate nine reservoirs, GAO concluded that, "all of the water supply contracts the Corps has entered into nationwide, on the basis of the Water Supply Act, lack a proper legal basis, since the reservoirs were not specifically constructed or expanded for water supply purposes." SUPPAR026206.

28.     A January 31, 2000 memorandum from Roger Burke (Chief, Plan Formulation Branch, Planning and Environmental Division, Mobile District COE) to Robert Kerr (Director, Pollution Prevention Assistance Division) containing "information regarding the usable storage (in acre-feet) at Federal reservoirs in the ACT and ACF basins and the threshold that would require Congressional authorization of reallocation" indicates that the "Threshold for Congressional Authorization for Water Supply Reallocations" at Lake Lanier is 50,000 acre-feet.  ACF034980-81.  The Burke memorandum equates 50,000 acre-feet to 4.76% of the "Total Usable Storage for 50,000 Acre-Feet" for Lake Lanier and further describes the "Total Usable Conservation Storage Acre-Feet" for Lanier as 1,049,000. ACF034981.

29.     Arguably, this document demonstrates that the Corps made a determination, as of January, 2000, that anything more than 50,000 acre-feet for Lake Lanier required Congressional approval.

III.   **THE CORPS' HISTORY OF PROVIDING WATER SUPPLY AT LAKE LANIER AND *DE FACTO* REALLOCATION OF RESERVOIR STORAGE THROUGH HOLDOVER CONTRACTS**

A.     **The Corps' Issuance of Water Supply Contracts**

30.    As discussed in greater detail below, the administrative record provides copies of all of the holdover contracts with each of the water suppliers, as well as correspondence and supplemental agreements pertaining to each contract. The following table summarizes both the history and the current status of the holdover contracts. Following the table, the status of the contracts with each water supplier is set forth in greater detail.

| Water Supplier | History of Contracts with Corps | | | Current Status | |
|---|---|---|---|---|---|
| | Relocation Contract | Initial "Interim" Water Supply Contract | Supplemental Agreements Extending Initial Contract | "Holdover" Amount[2] (based on expired contract) | Actual Withdrawals (2006 annual average)[3] |
| **Gwinnett County** | No | 7/2/1973 - 2003<br><br>40 MGD<br><br>DACW01-9-73-624 (ACF004024) | • **No. 1:** 4/29/1974 (ACF004022)<br>• **No. 2:** 8/10/1983 (ACF004019)<br>• **No. 3:** 7/17/1985 (ACF004016)<br>• **No. 4:** 12/15/1988 (increasing contract amount to 53 MGD) (ACF014424)<br>• **No. 5:** 7/24/1989 –**1/1/1990** (extending contract for 6 months) (ACF004004) | **53** MGD | **92.91** MGD |
| **City of Cumming** | No | 6/27/1978–6/27/1983<br><br>2.5 MGD<br><br>DACW01-9-77-1096 (ACF006171) | • **No. 1:** 7/6/1985 (extending contract and increasing withdrawal amount to 5 MGD) (ACF006168)<br>• **No. 2:** 11/16/1986 (extending contract and increasing withdrawal amount to 10 MGD) (ACF014399)<br>• **No. 3:** 7/5/1989 – **1/1/1990** (extending contract for 6 months) (ACF017004) | **10** MGD | **18.79** MGD |
| **ARC** | No | 6/17/1986–7/1/1989<br><br>377 MGD (50 MGD)<br>DACW01-9-86-145 (ACF011978) | • **No. 1**: 6/22/1989 –**1/1/1990** (extending contract for 6 months) (ACF0011978) | **50** MGD<br><br>(377 minus 327 MGD "incidental benefit") | **315.78** MGD[4] |
| **City of Gainesville** | 8 MGD 1953 (ACF014457) | 5/28/1987–7/1/1989<br><br>20 MGD<br><br>DACW01-9-85-224 (ACF014382) | • **No. 1**: 7/18/1989 – **1/1/1990** (extending contract for 6 months) (ACF014382) | 20 MGD | **18.99** MGD |
| **Buford** | 2 MGD 1955 (ACF014450 ) | None | Not applicable | 2 MGD | **1.65** MGD |

---

[2]    *See* ACF044236-46.

[3]    *See* ACF044236-46.

[4]    Although below the 377 MGD allocated to ARC, 315.78 MGD represents the *annual average* withdrawn by ARC in 2006.  When viewed on a monthly basis, during any given year, there are several months when ARC withdraws in excess of the 327 MGD incidental benefit and even some months when it withdraws greater than its not-to-exceed 377 MGD total.  For example, in 2006, ARC exceeded the 327 MGD June –August, and exceeded the 377 MGD amount in June (withdrawing a monthly average of 381 MGD).  ACF044244.

### 1.      Gwinnett County

31.      In 1955, Gwinnett County requested permission from the Corps to withdraw water from Lake Lanier for water supply purposes.  SUPPAR005459.  The Corps met with representatives of Gwinnett County and then prepared a memorandum with the subject "Report on Withdrawal of Domestic Water Supply from Buford Reservoir."  *Id.*  This memorandum stated that "Gwinnett County representatives in a visit to [Corps' offices] were advised that the primary authorized purposes of the Buford project were flood control, power and low-flow regulation for navigation and other purposes, and that diversion of flows from the reservoir would, in some degree, adversely affect one or more of these purposes.  They were advised that additional legislation would be necessary" to authorize the withdrawals.  *Id.*

32.      Gwinnett County initially withdrew water from the Chattahoochee River to a filtration plant on the Chattahoochee with a capacity of 16.3 MGD.  ACF003746.

33.      By the early 1970s, Gwinnett's demand needs indicated that the 16.3 MGD capacity would be inadequate by the year 1980.  ACF003746.  Gwinnett County began corresponding with the Corps of Engineers in 1971 regarding water withdrawals. ACF003745.

34.      In a March 21, 1972 correspondence with Gwinnett County regarding their water needs, the Mobile District Engineer stated that "[p]revious discussions and correspondence with the County's engineers had indicated that water supply needs in accordance with the Water Supply Act of 1958 could be met from the existing Buford project if it can be shown that it is a higher type of use that now authorized for the project." ACF003745.

35.     The Corps believed that the "major effect [of the Gwinnett contract to withdraw water from Lake Lanier] would be on the generation of hydropower due to the initial loss of 62 cfs of stream flow."  ACF003746.  However, because the project operates in an interconnected system, "there would be little if any loss in dependable revenue" due to the resulting annual energy loss of 5,400,000 kwh.  ACF003746.

36.     The Corps also concluded that the water supply use would "not materially affect the authorized Buford project purposes."  ACF003746.  The Corps did not indicate that there would be no significant effects if the cumulative effects of other withdrawals to support water supply were considered as well.

37.     The Corps recommended that "water supply storage in accordance with the Water Supply Act of 1958 be allotted to Gwinnett County from the Buford Reservoir as derived in inclosure [sic] 4 and that the draft of the contract in inclosure [sic] 5 be approved as a basis for further negotiations."  ACF003747.

38.     In discussing the Gwinnett water supply contract, the Corps indicated that the contract should include "storage for both present and future use."  ACF003751.

39.     The Corps also noted that the cost allocation, assurances and time schedules relating to the contract for water with Gwinnett County will "be subject to all provisions of the 1958 water supply act, as amended, including the 10 year interest free period."  ACF003751.

40.     The Corps noted numerous other times that the Water Supply Act applied to the proposed withdrawals by Gwinnett.  ACF003747; ACF003754; ACF003900.

41.      Specifically, in a March 30, 1973 letter responding to the Gwinnett County

Board of Commissioners' inquiry regarding diversion of water from Lake Lanier, the Corps

stated that:

> Your request to withdraw water can be met through a contractual agreement
> under the terms of the Water Supply Act of l958.  This act permits storage to
> be included in Federal reservoir projects for present and future water supply
> needs.  In the case of a completed project such as Lake Sidney Lanier, the
> effects of the water supply withdrawals on the other project purposes must be
> determined prior to contractual execution.

ACF003900.

42.      While negotiating the initial contract in 1972 with Gwinnett County, the

Corps recognized the need to modify the project purposes of Buford Dam to include water

supply.  ACF003751.

43.      The Corps recognized at that time that a study was required and that it would

be possible to undertake the work in accordance with Section 216 or to incorporate it in the

presently authorized and funded Metropolitan Atlanta Urban Study.  ACF003756.

44.      The Corps recognized that Gwinnett County would utilize storage in Lake

Lanier even if withdrew water from the Chattahoochee.  ACF003755 ("It should be noted

that if [Gwinnett] County locates an intake downstream from Buford Dam, most water

withdrawals would have to be made up from project storage as there is a requirement that a

650 cfs flow is to be maintained in the river at Atlanta.")

45.      On March 30, 1973, after receipt of Gwinnett County's request for water

supply from water storage at Lake Lanier, the Corps recognized that other water supply

needs may exist and that it would "be necessary to modify the operating and economic

conditions of the project to satisfy these needs."  ACF003900.

46. The Corps believed a basin wide review of the "ultimate demands on the lake must be performed" and that such a study would be complete by 1975 allowing sufficient time to provide Gwinnett with its water supply needs by 1979. ACF003900.

47. The Corps assured Gwinnett County: "If in the interim, however, your needs for water become acute, it may be possible to purchase water on a temporary basis through a service contract. Under this arrangement, there is no permanent right to the water storage space and the cost is based on the value of services rendered but must not be less than project revenues foregone as a result of the withdrawals. The arrangement would be proposed only as a stop gap measure." ACF003900.

48. The Corps noted that this more detailed approach utilizing a basin-wide review was necessary in order to ascertain correct repayment obligations of Gwinnett for a "permanent right to a predetermined block of storage." ACF003901.

49. On June 15, 1973, the Corps wrote to the Southeastern Power Administration ("SEPA") inviting SEPA to comment on the Gwinnett County water supply request and the basis for payment. ACF019937. The Corps stated that Gwinnett's 40 MGD request was "being considered on an interim basis due to local insistence that financing and planning [was] urgently needed [ ]." ACF019937. The urgency was due to the fact that it would take "several years for the County to construct a water intake, filtration plan and distribution lines." ACF019937. The Corps further indicated that "[f]inal determinations on water supply based on a reallocation of purposes at Buford will be made when the needs of the area are established a distribution to sources is made . . ." ACF019937.

50.     On June 20, 1973 SEPA responded noting that "the water loss [from Gwinnett removing 40 MGD and discharging in another basin] would directly affect the three Government power projects now in operation:  Buford, Walter F. George, and Jim Woodruff, and the West Point Project, which is scheduled to go into operation in 1975. Additionally the water would be lost to power projects operated by private companies located downstream from Buford."  ACF004002; ACF019938.

51.     SEPA noted that the 40MGD request from Gwinnett County represented a flow of 62 cfs, which is approximately 3 percent of the average flow at Buford, approximately 0.6 percent at Walter F. George, and approximately 0.3 percent at Jim Woodruff.  ACF004002-03; ACF019938.

52.     In 1975, the Corps informed Senator Nunn that it would have preferred not to enter into an agreement with Gwinnett until after the Atlanta Urban Study, "but Gwinnett County's water requirements would not tolerate the delay."  ACF019944.

53.     Gwinnett County, Georgia entered into Contract Number DACW01-9-73-624 on July 2, 1973 with the U.S. Government.  ACF004024-34; ACF014439-49; ACF016473-83.

54.     The contract provided the "privilege" to withdraw water for municipal and industrial purposes from Buford Dam and Reservoir not to exceed 40 MGD.  ACF004025.

55.     In the contract, the Government "reserve[d] the right to take such measures as may be necessary in the operation of the Project . . . to satisfy project purposes." ACF004025-26.

17

56.     Such withdrawals would cease when "the Government's study of the area's water supply needs" was completed.  ACF004025, ACF004028.  Alternatively, the contract would expire 30 years from the date of its approval.  ACF004028.

57.     The referenced Government study was a study of "the municipal and industrial water supply needs of the Atlanta Metropolitan area including that of [Gwinnett County] to develop the quantities of water and storage that can be feasibly provided by [Buford Dam and Reservoir] at future times.  ACF004024-25.  This study was expected to establish a new basis for determination of Gwinnett County's costs and would "permit[ ] entry into a new contract providing for water storage space" in Buford Dam.  ACF004028.

58.     DACW01-9-73-624 invokes The River and Harbor Act of 1946, Public Law 525, 79th Congress, 2nd Session, approved 24 July 1946 and the provisions of the Independent Offices Appropriations Act, Title 31, United States Code, Section 483a.  ACF004024.

59.     The contract stated that the contract did not provide Gwinnett County with any "rights to have the water level maintained at any elevation" or "right to the use of water storage space."  ACF004026.

60.     Under the contract, Gwinnett County was to "furnish . . . an advance estimate of each week's need" and "monthly records of the quantity of daily water withdrawals."  ACF004026.

61.     Gwinnett County was to pay the Government $5.40 per million gallons on a quarterly basis.  ACF004027.  This rate of payment could be revised at intervals of not less than 5 years.  ACF004028.

62.     Exhibit A to the contract recognizes that there is a dependable power capacity loss of 0.32 kilowatts per million gallons and a total energy loss of 0.65 megawatts per million gallons.  ACF004033.

63.     The agreement was signed by the District Engineer, Contracting Officer and approved by the Secretary of the Army.  ACF004031.

64.     In correspondence on July 31, 1973, shortly after signing the contract, the Corps described the contract as "an interim water withdrawal contract which will permit the County to proceed with preparation for and withdrawal of water from the lake pending consummation of the proposed water storage space contract."  ACF004057.

65.     Gwinnett County entered into Supplemental Agreement No. 1 on April 29, 1974.  ACF004022-23; ACF014437-38; ACF016471-72.

66.     Supplemental Agreement No. 1 modified the contract "in order to facilitate the sale of bonds to finance [Gwinnett County's] proposed water works facilities."  ACF004022.

67.     Supplemental Agreement No. 1 modified the termination provisions in the contract allowing the Government to terminate on 90 days written notice as opposed to 5 days written notice.  ACF004022.

68.     Supplemental Agreement No. 1 inserted a new Article 9 in the contract which invoked the WSA and provided an "option to acquire storage space" at the expiration or termination by the Government of the contract.  ACF004022.

69.     Article 9 states that Gwinnett County "shall have the right to acquire from the Government, under the provisions of the Water Supply Act of 1958, Public Law No. 85-

500, the right to utilize storage space in the project containing at least 38,100 acre feet (which is estimated to be adequate to yield approximately 40 MGD of water)."  ACF004022.

70.      Supplemental Agreement No. 1 was signed by the District Engineer Contracting Officer and approved by the Secretary of the Army.

71.      The Corps granted Gwinnett County a 50-year easement beginning June 13, 1975 for the installation of a raw water intake.  ACF004035-46.  The Corps also granted Gwinnett County a 50-year easement beginning April 1, 2000 to construct, operate and maintain a public road.  ACF004047-52.

72.      The Metropolitan Atlanta Area Water Resources Management Study ("MAAWRMS") used "the procedure" followed to secure the original Gwinnett County contract as the basis for the short-term water supply plan:  "Costs are based on revenues foregone and are currently estimated at $5.87 per million gallons of additional water withdrawn directly from Lake Lanier and $1.01 per million gallons for offpeak water released from Buford Dam for downstream water users."  SUPPAR000099.

73.      Gwinnett County entered into Supplemental Agreement No. 2 on August 10, 1983.  ACF004019-4020; ACF014434-36; ACF16468-70.

74.      In Supplemental Agreement No. 2, the Corps "administratively determined that modification of the said contract will not have a significant effect on other authorized purposes of the project."  ACF004019.  The Supplemental Agreement did not indicate that there would be no significant effects if the cumulative effects of other withdrawals to support water supply were considered as well.

75.     Supplemental Agreement No. 2 modifies the contract to include a provision allowing for the "privilege" of withdrawing water for municipal and industrial ("M&I") uses until "such time as the Government's study of the area's water supply needs is complete and a final plan resulting from the said study is implemented."  ACF004019.  This changes the prior language of the contract which allowed Gwinnett to have the privilege of withdrawing water " such time as the Government's study of the area's water supply needs is completed." ACF019932.  Supplemental Agreement No. 2 also modified the agreement so that withdrawals which were based on a maximum rate that would not exceed 40 MGD would now be permitted at a monthly average rate of 40 MGD.  ACF019932; SUPPAR029143; ACF019942; ACF019943.  Gwinnett County's request to modify its contract with Supplemental Agreement No. 2 recognized that a contract covering the cost sharing responsibilities would need to be executed.  ACF019932; SUPPAR029143.

76.     The Acting District Engineer signed Supplemental Agreement No. 2 and the Corps concluded that approval was not required by the Assistant Secretary of the Army. ACF004020.

77.     A memorandum for the district engineer regarding Supplemental Agreement No. 2 concluded that execution of the agreement would result in Gwinnett County being able to meet its M&I water needs and that execution would be in the public interest.  ACF014426; ACF016491.

78.     On February 8, 1985, the Corps met with Gwinnett County to discuss additional Lake Lanier withdrawals.  ACF0103044.

21

79.     Gwinnett County sent the Corps of Engineers a letter on February 13, 1985 requesting the Corps to modify the contract to allow it to withdraw water at an annual average rate of 40 MGD as opposed to a monthly average rate of 40 MGD.  SUPPAR029144.

80.     The Corps granted Gwinnett County's request and entered into Supplemental Agreement No. 3 on July 17, 1985.  ACF004016-4018; ACF014431-33; ACF016464-67.

81.     In Supplemental Agreement No. 3, the Corps "administratively determined that modification of said contract will not have a significant effect on other authorized purposes."  ACF004016.  The Supplemental Agreement did not indicate that there would be no significant effects if the cumulative effects of other withdrawals to support water supply were considered as well.  ACF004016-18; ACF014431-33; ACF016464-67.

82.     The Corps amended the agreement to allow for the privilege of withdrawing water until "such time as other contractual arrangements are made providing for water storage space."  ACF004016.

83.     On June 27, 1985 the Corps of Engineers sent a letter to Gwinnett revising the rate of payment to the Corps per million gallons and replacing Exhibit A.  See also ACF014428-30; ACF016493-94.

84.     The June 27, 1985 letter states:  "Because of the present uncertainties concerning the contemplated re-regulation dam below Buford Dam, it has been determined that we should proceed with plans to convert all Lanier withdrawal contracts to storage space contracts within a reasonable period of time.  Therefore, we are planning to have all of the withdrawal contracts terminate on July 1, 1989 to be replaced by storage space contracts.  Unless substantial progress has been made toward construction of the re-regulation dam

22

before July 1, 1989, the repayment amounts for the storage space contracts will be based on

Corps' guidelines for selling reservoir storage space based on Lake Sidney Lanier data only.

They may later be adjusted, if appropriate, to consider the costs and benefits of the re-

regulation dam if it is eventually constructed."  ACF004013-14.

85.     Gwinnett County accepted the new rate of $9.74 per MGD (from $5.40 per

MGD) in a letter dated July 19, 1985.  ACF004012; ACF014427; ACF016492.

86.     Gwinnett County, by letter dated January 12, 1988, requested the Corps to

modify the contract DACW01-9-73-624 to authorize withdrawal of the water for M&I uses

at an annual average rate of 60 MGD.  SUPPAR029148.  The letter noted that in September

of 1987 Gwinnett County had requested an increase from 40 MGD to 50 MGD, but that the

new population projection figures from the ARC indicated that 50 MGD would only support

the population for two years.  SUPPAR029148.

87.     Gwinnett County entered into Supplemental Agreement No. 4 on December

15, 1988 to increase its rate of withdrawal to 53 MGD.  See ACF014424-25; ACF016489-90.

88.     The Corps considered such request and determined, based on the submission

of a regional water supply plan by ARC which demonstrated Gwinnett County would need

an annual average of 52.8 MGD in 1990 and the fact that the contracts were to expire in July

of 1989, that the contract should be increased to 53 MGD.  ACF004011.

89.     In Supplemental Agreement No. 4, the Corps administratively determined

that modification of the contract to increase withdrawals would not "have a significant effect

on authorized purposes of the project."  ACF004016.  The Supplemental Agreement did not

indicate that there would be no significant effects if the cumulative effects of other withdrawals to support water supply were considered as well.

90.     A Colonel, Corps of Engineers, District Engineer signed Supplemental Agreement No. 4.  ACF004010.  No other approvals were included.  ACF004010.

91.     Gwinnett County entered into Supplemental Agreement No. 5 on July 24, 1989.  ACF004004-4008; ACF014419-23; ACF016484-88.

92.     "EXPIRED CONTRACT (GWINNETT  COUNTY) is handwritten on Supplemental Agreement No. 5.  ACF004004.

93.     According to Supplemental Agreement No. 5, Gwinnett County requested an extension of the contract on February 28, 1989.  ACF004006.

94.     Supplemental Agreement No. 5 notes that the Corps received guidance to extend all water withdrawal contracts at Buford for 6 months.  ACF004006.

95.     The Corps modified the termination date of the contract in Supplemental Agreement No. 5 until January 1, 1990 or until "such time as the Government establishes a basis for the determination of cost of water storage space contract in the Project and is prepared to enter into a water storage contract with Gwinnett County."  ACF004006.

96.     Gwinnett County's interim water supply contract expired on January 1, 1990. As described in detail below, the Corps has continued to allow Gwinnett County to withdraw water pursuant to the expired contract.

97.     The not-to-exceed amount of Gwinnett County's expired contract was 53 MGD.  In 2006, Gwinnett County's average annual withdrawals from Lake Lanier totaled

92.91 MGD.  ACF044236-37.  As described in detail below, this is calculated to constitute approximately 104,928 acre-feet or 9.65% of conservation storage in Lake Lanier.

### 2. The City of Cumming, Georgia

98.     The City of Cumming began discussions regarding withdrawals of water from Lake Lanier as early as March 24, 1977.  SUPPAR029141.

99.     On July 21, 1977, the City of Cumming wrote to the Corps explaining that it had an urgent need due to the continuing dry weather to establish a water intake at Lake Lanier.  SUPPAR029141.  The City of Cumming claimed that businesses had to close for a day due to the lack of water.  *Id.*  The City of Cumming requested 2.5 MGD to meet its immediate needs, but indicated that its long range needs were 10 MGD.  *Id.*.

100.     On August 3, 1977, the Corps granted by letter the City of Cumming's request for 2.5 MGD effective immediately.  SUPPAR29140.

101.     On November 16, 1977, the Corps informed SEPA that the City of Cumming was "authorized to withdraw water (up to 2.5 mgd) from Lake Lanier on an emergency basis" and that "[a]n interim contract similar to the Gwinnett County contract [was] being prepared."  SUPPAR029139.

102.     On January 6, 1978 the Georgia Environmental Protection Division acknowledged the Corps' decision to grant an interim contract to the City of Cumming for withdrawal of 2.5 MGD from Lake Lanier.  ACF006645.  The State noted that no withdrawal permit had been applied for and that Cumming's water treatment plant had a capacity of 1.25 MGD – they can only grant a permit consistent with the rated capacity of the plant. ACF006645.  Georgia did concur with the Corps reserving 8-10 MGD for the needs of

Cumming and Forsyth by the year 2000.  The State of Georgia Department of Natural Resources stated that: "A contract for 'storage space' between the Corps and the City of Cumming should not be executed until the differences between the City and County are resolved and it is determined whether some of the future water supply needs should be allocated to the County instead of all to the City."  ACF006645.

103.    On March 10, 1978 the State of Georgia reviewed the proposal and presented no objections.  ACF005988.

104.    In a March 24, 1978 letter to the Corps from SEPA, SEPA indicated that the request to withdraw 2.5 MGD represents a flow of approximately 4 cfs and it was assumed that 80 percent of the water would be returned to the Chattahoochee River.  ACF006161.  In the letter, SEPA indicated that they were agreeable to the price on the water withdrawal for the City of Cumming.  ACF006161.

105.    The City of Cumming, Georgia entered into Water Supply Contract DACW01-9-77-1096 on June 27, 1978.  ACF006171-181; ACF011306-316; ACF014408-18; ACF016419-29; ACF016501-11; SUPPAR035550.

106.    The contract provided the "privilege" to withdraw water from Buford Dam and Reservoir not to exceed 2.5 MGD.  ACF006172.

107.    Such withdrawals would cease when "the Government's study of the area's water supply needs" was completed.  ACF006175.  Alternatively, the contract would expire 5 years from the date of its execution, but upon expiration could "be extended by mutual agreement for additional periods of not to exceed five (5) years each.  ACF006175.

108.     The referenced Government study was a study of "the municipal and industrial water supply needs of the Atlanta Metropolitan area including that of [the City of Cumming] to develop the quantities of water and storage that can be feasibly provided by [Buford Dam and Reservoir] at future times."  ACF006171.  This study was expected to establish a new basis for determination of the City of Cumming's costs and would "permit[ ] entry into a new contract providing for water storage space" in Buford Dam.  ACF006175.

109.     The contract invokes The River and Harbor Act of 1946, Public Law 525, 79th Congress, 2nd Session, approved 24 July 1946 and the provisions of the Independent Offices Appropriations Act, Title 31, United States Code, Section 483a.  ACF006171.

110.     The contract stated that it did not provide the City of Cumming with any "rights to have the water level maintained at any elevation" or "right to the use of water storage space."  ACF006173.

111.     Under the contract, the City of Cumming was to "furnish . . . an advance estimate of each week's need" and "monthly[] records of the quantity of daily water withdrawals."  ACF006173.

112.     The City of Cumming was to pay the Government $5.15 per million gallons on a quarterly basis.  ACF006174.  This rate of payment could be revised at intervals of not less than 5 years.  ACF006175.

113.     Exhibit A to the contract recognizes that there is a dependable power capacity loss of 0.32 kilowatts per million gallons and a total energy loss of 0.52 megawatts per million gallons.  ACF006179.

114.     The agreement was signed by the District Engineer, Contracting Officer and approved by the Director of Civil Works.  ACF006178.

115.     The Corps granted the City of Cumming a 50-year easement for the installation, operation, and maintenance of a raw water intake and pumping station on May 31, 1979.  ACF006186-93.  This easement was amended on January 31, 1991 to include additional lands in the easement.  ACF006182-85.

116.     The contract expired on June 27, 1983.  ACF006175.

117.     On June 27, 1985 the Corps of Engineers sent a letter to the City of Cumming revising the rate of payment to the Corps per million gallons and replacing Exhibit A.  ACF006165-66.  The Corps increased the rate to $7.88 per million gallons effective July 1, 1985.  ACF006165; SUPPAR029373; SUPPAR035563.

118.     Revised Exhibit A recognizes that there is a dependable power capacity loss of 0.31 kilowatts per million gallons and a total energy loss of 0.52 megawatts per million gallons.  ACF006166.

119.     The City of Cumming by letter dated July 22, 1985 acknowledged receipt of the Corps letter increasing the rates and indicated its acceptance of the new rate structure.  ACF006167; ACF011302; ACF014404; ACF016415.

120.     The City of Cumming entered into Supplemental Agreement No. 1 on or about August 19, 1985.  ACF006168-70; ACF011303-05; ACF014405-07; ACF016416-18; ACF016498-500.

121.    Supplemental Agreement No. 1 retroactively extended the basic contract from June 27, 1983 through June 30, 1985 at the rate of 2.5 MGD and then through July 1, 1989 at the rate of 5 MGD.  ACF006168.

122.    In Supplemental Agreement No. 1, the Corps "administratively determined that modification of said contract as aforesaid will not have a significant effect on other authorized purposes."  ACF006168.  The Supplemental Agreement did not indicate that there would be no significant effects if the cumulative effects of other withdrawals to support water supply were considered as well.

123.    Supplemental Agreement No. 1 also clarified the interest rate and how charges will be applied for late payments.  ACF006169.

124.    The District Engineer Contracting Officer signed Supplemental Agreement No. 1.  ACF006170.  There is no approving signature.  ACF006170.

125.    The Corps noted in correspondence to Forsyth County that the Corps had entered into a contract with the City of Cumming for withdrawal of 5 MGD until July 1, 1989, "at which time we propose to enter into a contract with the City for the purchase of storage space in the lake."  ACF013627.

126.    The City of Cumming entered into Supplemental Agreement No. 2 on or about November 16, 1988.  ACF014399-401; ACF016355-57; ACF016410-12; ACF016495-97.

127.    The City of Cumming, by letter dated December 16, 1987, requested the Corps to modify the contract to authorize withdrawal of water for M&I uses at the daily average withdrawal rate of 10 MGD.  SUPPAR029147.  In its request, the City of Cumming

noted that it had passed a local option sales tax to fund a County-wide water distribution system and that the City also planned to expand its filter plant capacity. *Id.* The letter also recognized that the Corps "is going to change the current withdrawal type contracts to storage contracts" and that the City of Cumming would need storage adequate to support their anticipated future demand needs of 20 MGD. *Id.*

128.    Supplemental Agreement No. 2 amended the contract to allow for withdrawals at the rate of 10 MGD. ACF016410-12; ACF6168; SUPPAR029370.

129.    In Supplemental Agreement No. 2, the Corps "administratively determined that amendment" of the contract would not have a significant effect on "other authorized purposes of the Project" and would "not be contrary to the public interest." ACF006164; SUPPAR029370. The Supplemental Agreement did not indicate that there would be no significant effects if the cumulative effects of other withdrawals to support water supply were considered as well.

130.    The Acting Commander, District Engineer signed Supplemental Contract No. 2. ACF014401; SUPPAR029371.

131.    The City of Cumming entered into Supplemental Agreement No. 3 on or about July 5, 1989. ACF017004-06; SUPPAR005802-05; SUPPAR035543.

132.    Supplemental Agreement No. 3 extended the contract through January 1, 1990.

133.    The interim water supply contracts expired on January 1, 1990. As described in detail below, the Corps has continued to allow the City of Cumming to withdraw water pursuant to the expired contract.

134.     The not-to-exceed amount of the expired contract was 10 MGD.  In 2006, the

City of Cumming's average annual withdrawals from Lake Lanier totaled 18.79 MGD.  As

described in detail below, this constitutes approximately 21,220 acre-feet or 1.96% of

conservation storage in Lake Lanier.

### 3.     The Atlanta Regional Commission

135.     The Atlanta Regional Commission (ARC) entered into Contract DACW01-

9-86-145 on June 17, 1986.  ACF011980-89; ACF014466-75; ACF016446-55; ACF017009-

18.

136.     The contract provided the "privilege" of having water "released" (or

"discharged") from the Buford Dam and Reservoir.  ACF011980.

137.     ARC executed the contract acting as an agent for the City of Atlanta and

Cobb, DeKalb, Fulton and Gwinnett Counties.  ACF011980.

138.     The contract notes that "various municipalities have constructed or planned

withdrawal facilities along the Chattahoochee River downstream from Buford Dam to

Peachtree Creek."  ACF011980.

139.     The contract notes that "the Government through its operation of water

release facilities at Buford Dam controls to varying degrees the flow in the River."

ACF011980.

140.     The contract was prepared in accordance with Metropolitan Atlanta Area

Water Resources Management Study ("MAAWRMS") completed in February 1981.

ACF011980.

141.    The contract provided for the Corps' release of 377 MGD ("total assured supply") from Lake Lanier for the benefit of the ARC for the subsequent downstream withdrawal from the Chattahoochee River and that the contract only provides for "discharges of the water."  ACF011981; ACF011985.

142.    A Corps memorandum dated March 2, 1990, states: "[t]he contract limits peak day withdrawals to 377 MGD whether or not deliberate releases for water supply are required."  ACF017664.

143.    The contract noted that certain amounts, specifically 327 MGD, of the total discharges for withdrawal guaranteed by the contract would be available from normal operations at Buford Dam.  Therefore the ARC would be charged for only those amounts above and beyond those discharged under normal operations.  ACF011981.  The Government would provide both for withdrawals and minimum flows at Peachtree Creek (750 cfs) required for water quality.  ACF011981.

144.    The contract reserved to the Government the right to take such measures as may be necessary "to satisfy project purposes" and required that the withdrawn water be used in a manner consistent with federal laws.  ACF011981; ACF011982.

145.    The contract noted that it was an "interim Contract to provide water for withdrawal along the River until such time as (1) a different contractual arrangement related to the Federal or non-Federal construction of a re-regulation dam is developed or, (2) a contract for permanent *storage space* in Lake Lanier is executed."   ACF011982-83 (emphasis added).  Otherwise the contract would terminate on July 9, 1989.  ACF011983.

The Government had the option to terminate on 90 days written notice if the ARC defaulted in performance of any obligation.  ACF011983.

146.     The contract invokes The River and Harbor Act of 1946, Public Law 525, 79th Congress, 2nd Session, approved 24 July 1946 and the provisions of the Independent Offices Appropriations Act, Title 31, United States Code, Section 483a.  ACF011980.

147.     The contract did not provide the ARC with any "right to the use of water storage space."  ACF011981.

148.     Under the contract, the ARC was to develop means to measure or estimate river withdrawals which were satisfactory to the Government.  ACF011981-82.

149.     The ARC was to pay the Government $5.79 per million gallons on a quarterly basis.  ACF011982.

150.     The agreement was signed by the District Engineer, Contracting Officer. ACF011984.

151.     Exhibit B to the agreement was the "Chattahoochee Water Management System."  ACF011986-88.

152.     The Chattahoochee Water Management System is an "administrative arrangement for gathering data and making water control decisions," administered by the ARC.  ACF011986.

153.     ARC provides estimates of water withdrawal for weekends and weeks and is responsible for "the actual methodology and accuracy of the projections" whereas "[t]he Corps will make releases for water supply when such releases are required."  ACF011986.

154.     The Corps also will develop and improve methodologies for assessing the quantity of water available for withdrawal.  ACF011986.

155.     The Corps does not monitor the gages in Atlanta.  ACF013635.  As described in a letter to Law Environmental Services, the Corps states:

> Basically, the [ARC] contacts the Corps in Mobile at least once a week and provides the Corps with a desired outflow from Buford. . . . It is not the responsibility of the Corps to monitor flows in the Atlanta area for compliance of minimum low flows. . . . For this reason the Corps has not monitored the gages in the Atlanta area on a real-time basis, but has relied on information from ARC.

*Id.*

156.     The goal of the system is to provide releases only when needed and to schedule releases during peak power demand periods.  ACF011986.

157.     The Georgia Power company under the management system agreed to insure that the predicted withdrawals could be taken from the river below Morgan Falls and that a continuous 750 cfs flow would be maintained.  ACF011986.

158.     "The local water systems are and will continue to be accountable to EPD that their withdrawals do not exceed the limits of their State withdrawal permits."  ACF011987. There is nothing requiring the Corps to monitor the withdrawals in regards to the contract between the Corps and ARC.

159.     The payment mechanism bases charges on hydropower revenue foregone. ACF011987.  The Chattahoochee Water Management System explains: "Charges are assessed on withdrawals predicted which exceed the amounts generally available without special releases for water supply."  ACF011988.

160.     On July 11, 1986, the Corps wrote a letter to the Oglethorpe Power Corporation regarding the ACF water supply contract.  ACF012133-34.  The letter stated that the Corps' policy "is that storage may be reallocated to water supply when doing so results in greater public benefits.  The amount reallocated may not cause a significant impact on the project.  Changes resulting in significant impacts require approval by Congress." ACF012133.

161.     The letter specifically references the ARC contract and notes that it will be replaced with a permanent storage contract or the construction of a reregulation dam.  "The storage contract would be based on the water user paying the higher of project benefits foregone or the allocated cost of storage at current values."  ACF012133.

162.     The Corps noted that the current policy was to credit the power account with only the revenues foregone, relieving "the marketing administration of paying for the block of storage no longer allocated to power.  The use of replacement cost of power as the credit would imply that water supply users are paying to maintain power benefits at current market prices, which is not the case.  The power production lost which, as stated above, must be an insignificant amount, is simply given up in order to use the storage for a greater public benefit."  ACF012134.

163.     In a July 31, 1986 letter, the ARC noted that the current water supply demands were approximately 340 MGD.  ACF012237.  The ARC also noted that if the drought continued that the demands on the Chattahoochee would increase as several communities in the Atlanta Region will lose smaller sources and will need to depend on communities connected to the Chattahoochee River.  ACF012237.  This includes Douglas

County (through Cobb County) and Clayton County (through Atlanta and possibly DeKalb County).  ACF012237.

164.    On September 12, 1986, the ARC requested that releases for water quality be reduced to 650 cfs.  ACF013625.  This was in conjunction with the drought water management strategy during the drought occurring at that time.  ACF013626.  The State of Georgia was in agreement that 650 cfs releases were to continue during September and October and then be reduced to 350 cfs in November and December.  ACF013626.  The State also requested occasional additional releases for a trout hatchery below Buford Dam (an average daily flow of 1500 cfs may be necessary).  ACF013626, *see also* ACF016303 (in discussing possible drought management measures to take, the Corps suggested to "eliminate the special Buford Trout Hatchery releases in the fall.").  Releases of about 1000-1100 cfs would be needed by the Buford Trout hatchery on a daily basis for several weeks beginning sometime in late September or early October.  ACF016328.

165.    The ARC entered into Supplemental Agreement No. 1 on June 22, 1989.  ACF011978-79; ACF014464-65; ACF016444-45 ("EXPIRED CONTRACT" hand-written on document in the administrative record); ACF017007 ("EXPIRED CONTRACT" hand-written on document in the administrative record).

166.    The supplemental agreement noted that the "Government has not completed its study to determine the cost of water storage space in the Project and is not prepared to enter into a water storage contract with the User."  ACF011978.  This is because the terms of the original contract would expire on July 1, 1989 or at the time when the Government "is prepared to enter into a contract with the User for permanent storage in the Project."

167.   On January 20, 1989, the ARC requested an extension and a modification of the Contract No. DACW01-9-86-145.  ACF016949l; ACF019325.  The ARC made its request for an extension and modification on the basis that when the contract was initially entered into, the parties believed "that by July 1, 1989 substantial progress would have been made on contracts to build a reregulation dam and that the extension of this short term plan would be handled concurrently.  Since the reregulation dam is no longer our course of action, additional time beyond July 1, 1989 will be needed to implement reallocation."  ACF016949; ACF019325.  The ARC requested the extension "until such time as reallocation contracts are finalized."  ACF016949; ACF019325.  The ARC further requested "to increase the total water supply assured by the contract to 397.1 MGD" as such an increase was "necessary to provide for the 1990 peak needs of our area as identified by the ARC Water Supply Plan."  ACF016949; ACF019325.

168.   The interim water supply contracts expired on January 1, 1990.  As described in detail below, the Corps has continued to allow the ARC to withdraw water pursuant to the expired contract.

169.   In 2006, ARC's average annual withdrawals from Lake Lanier totaled 315.78 MGD.  ACF044244.  Although below the 377 MGD allocated to ARC, 315.78 represents the *annual average* withdrawn by ARC in 2006.  When viewed on a monthly basis, during any given year, there are several months when ARC withdraws in excess of the 327 MGD incidental benefit and even some months when it withdraws greater than its not-to-exceed 377 MGD total.  For example, in 2006, ARC exceeded the 327 MGD June –August,

and exceeded the 377 MGD amount in June (withdrawing a monthly average of 381 MGD). ACF044244.

170.     The not-to-exceed amount of ARC's expired contract was 377 MGD, of which 327 MGD are considered by the Corps to be "free of charge" as the incidental benefit of "normal releases."  Consequently, the Corps needs to allocate storage to support an amount of 50 MGD for ARC's withdrawals.  As described in detail below, the 50 MGD constitutes approximately 56,467 acre-feet or 5.2% of conservation storage in Lake Lanier.

### 4.     The City of Gainesville, Georgia

171.     Prior to the construction of Buford Dam, the City of Gainesville, withdrew water for municipal water supply purposes from the Chattahoochee River.  ACF034622-23; SUPPAR017785.

172.     On June 22, 1953 the Corps entered into a contract with the City of Gainesville.  ACF001543-49; ACF014457-63; ACF016437-43.

173.     The contract provided that the Government would pay the City of Gainesville $300,000.  ACF001546-47.

174.     Under the contract, the City of Gainesville would relocate their water treatment facilities and be allowed to use 8 MGD of water from Buford Reservoir. ACF001543-49.

175.     The contract was signed by the District Engineer Contracting Officer. ACF001549.

176.    A Corps memorandum dated March 2, 1990, states: "[w]hen the City of Gainesville began to exceed its no-charge limitation, an interim contract was entered into with that user to allow additional withdrawals from storage."  ACF017662.

177.    On July 26, 1982, Georgia sent a letter to the Corps asking for comment on the City of Gainesville's request to increase its State permitted water withdrawal from 12 MGD to 15 MGD  average monthly withdrawal.  It had been Georgia's understanding that the 8 MGD limit was a daily limit on water not returned to the lake.  ACF008253.

178.    The Corps responded on September 20, 1982 stating that their contract with the City of Gainesville was that the City will not remove more than 8 MGD from the lake without prior written authorization.  The Corps noted that Gainesville was "regularly exceeding the allotted amount" and a new agreement was never consummated.  ACF008255.

179.    The Corps requested that Georgia not proceed with the permit as the Corps "will contact the City in the near future concerning a new agreement for storage space in the project."  ACF008255.

180.    Attorneys from the City of Gainesville contact the Corps on October 10, 1984 and October 17, 1984 concerning an increase in the authorized rate of withdrawal from Lake Lanier.  ACF010303.  The Corps agreed to an increase to 15 MGD.  ACF010303.  "We still need the long-range projection, of course, before we can begin work on a water 'storage space' contract."  ACF010303.

181.    The City of Gainesville, Georgia entered into Water Supply Contract DACW01-9-85-224 on May 28, 1987.  ACF014226-33; ACF014382-89;ACF014391-98; ACF016456-63.

182.     The contract noted that "pending further developments with regard to the possible construction of a re-regulation dam on the Chattahoochee River downstream from the Project which would affect the cost of the purchase by the User of a water "storage space" in the Project pursuant to Section 301(a) of the Water Supply Act of 1958, as amended, (43 U.S.C. 390b) it is the desire of the parties hereto that an interim water 'withdrawal' contract be consummated."  ACF014226.  The contract further noted that it had "been determined that withdrawal of additional quantities of water from the Project as requested by the User will not have a significant effect on other authorized purposes of the Project."  ACF014226.  The contract did not indicate that there would be no significant effects if the cumulative effects of other withdrawals to support water supply were considered as well.

183.     The contract provided the "privilege" to withdraw water from Buford Dam and Reservoir for M&I uses not to exceed 20 MGD.  ACF014227.

184.     The contract was to be in effect until July 1, 1989 and could "be extended by mutual agreement for additional periods of not to exceed five (5) years each.  ACF014229.  Otherwise, the contract could be terminated by either party on 6 months notice and the Government could terminate it on 90 days written notice if Gainesville defaulted in performance of any obligation under the contract.  ACF014229.

185.     The contract invokes the River and Harbor Act of 1946, Public Law 525, 79th Congress, 2nd Session, approved 24 July 1946 and the provisions of the Independent Offices Appropriations Act, Title 31, United States Code, Section 483a.  ACF014226-27.

186.    The contract stated that it only provided for withdrawals of water and that the contract did not provide the City of Gainesville with any "rights to have the water level maintained at any elevation."  ACF014227.

187.    Under the contract, the City of Gainesville was to install metering devices which were satisfactory to the Government.  ACF014227.

188.    Under the contract, the City of Gainesville was to "furnish . . . an advance estimate of each week's need" and "monthly[] records of the quantity of daily water withdrawals."  ACF014227-8.

189.    The City of Gainesville was to pay the Government $12.44 per million gallons on a quarterly basis for all net amounts of water removed from the Project (metered withdrawals less metered returns) in excess of 8 MGD.  ACF006174.  This rate of payment could be revised at intervals of not less than 5 years.  ACF014229.

190.    Exhibit A to the contract recognizes that there is a dependable power capacity loss of 0.49 kilowatts per million gallons and a total energy loss of 0.82 megawatts per million gallons.  ACF014233.

191.    The agreement was signed by the District Engineer, Contracting Officer.  ACF014231.

192.    The City of Gainesville and the Corps entered into Supplemental Agreement No.1 on August 3, 1989.  SUPPAR029368.  Supplemental Agreement No. 1 extended the water withdrawal contract for a period of six months, until January 1, 1990.  *Id.*

193.     The City of Gainesville's interim water supply contract expired on January 1, 1990.  As described in detail below, the Corps has continued to allow the City of Gainesville to withdraw water pursuant to the expired contract.

194.     In 2006, the City of Gainesville's average annual withdrawals from Lake Lanier totaled 18.99 MGD.

195.     The not-to-exceed amount of Gainesville's expired contract was 20 MGD. When reduced by the amount allocated under the City's relocation contract (8 MGD), the Corps must allocate storage to support 12 MGD average annual withdrawals for the City of Gainesville.  As described in detail below, this constitutes approximately 13,552 acre-feet or 1.25% of conservation storage in Lake Lanier.

196.     Historically, the City of Gainesville was given credit for metered return flows and therefore the reduction allowed for under the relocation contract amount of 8 MGD was based on "net" withdrawals.  SUPPAR017762 (summary); ACF044240 (pricing calculations based on withdrawal data); *see also* Status Reports (e.g., SUPPAR018030).

197.     This practice continues to date, despite efforts of the parties to the Settlement Agreement ("Agreement") to negotiate a higher withdrawal amount for Gainesville by conceding to a "gross" rather than "net" interpretation.   ACF044240.

198.     Internal Corps' correspondence indicate that the "net" withdrawal approach was utilized by the Corps without question until late 2001.  SUPPAR000822; SUPPAR000830; SUPPAR000888; SUPPAR000916.

199.     In December 2001 the issue of "gross" versus "net" withdrawals surfaced as part of the Agreement negotiations.  SUPPAR000585; SUPPAR000667-73; SUPPAR000558.

200.     A December 18, 2001 draft "Conceptual Framework" negotiation document proposes that Gainesville only be charged for the new "gross" amounts over 21.3 mgd in any 24 hour period.  "This provision regarding 21.3 mgd gross withdrawals at no cost will supersede any 8 mgd net use interpretation of the 1953 relocation contract." SUPPAR000668.  The redlined version indicates that the previous draft still had Gainesville paying for "net withdrawal amounts over and above 8 mgd."  SUPPAR000672.

201.     Indeed, Steve Cone's December 18, 2001 cover email transmitting the Conceptual Framework document states, "yes there is a bit of surprise in the 1953 relocation contract for Gainesville, which I can explain at some point."  SUPPAR000667.

202.     A January 16, 2002 draft of the Conceptual Framework document contains the following "gross" interpretation with regard to Gainesville: no charge for gross withdrawal amounts up to annual 21.3 MGD; Gainesville will contract for average annual 18 MGD (or 20,675 acre-feet storage); this 18 MGD is in addition to the 21.3 MGD associated with the 1953 relocation contract.  SUPPAR000558.

203.     A Supplemental Agreement to Relocation Contract between the Government and the City of Gainesville, entered into as part of the Settlement Agreement and attached thereto as Exhibit D, reiterated that although historically the term "remove" was interpreted as creating a limitation on "net" as opposed to "gross" withdrawals, withdrawals pursuant to the Gainesville relocation contract "will be measured as gross withdrawals."  ACF042854-55.

204.     It was also agreed that the Relocation Contract would be construed "to allow [Gainesville] to withdraw 18 MGD from [Lake Lanier] on an annual average basis."

ACF042855.  Gainesville agreed that it would make good faith efforts to return withdrawals

to Lake Lanier "to the extent reasonable and practicable."  ACF042855.

205.     The withdrawal amount of 18 MGD was to be increased to 21.3 MGD upon

execution of the interim 10-year contract included as part of the settlement agreement

allowing Gainesville to utilize storage in Lake Lanier.  ACF042855.

### 5.     The City of Buford, Georgia

206.     On December 19, 1955 the U.S. Government and the City of Buford entered

into Relocation Contract No. DA-01-076-CIVENG-56-419.  ACF018763-77.

207.     The contract provided that the Government would pay the City of

Gainesville $85,000.  ACF0018767.

208.     Under the contract, the City of Buford would relocate their water treatment

facilities and be allowed to use 2 MGD of water from Buford Reservoir.  ACF0018764-67.

209.     The contract was signed by the District Engineer Contracting Officer.

ACF0018770.

210.     The Buford relocation contract recognizes that the construction of Buford

Dam was for the purposes of "flood control, hydroelectric and navigation."  ACF001633;

ACF018763.

### B.     Provision of Water Supply Following Expiration of the Contracts

211.     Despite their expiration on January 1, 1990, the Corps continues to operate, to

date, under the terms of the water supply contracts discussed above.  SUPPAR005801;

SUPPAR029115; SUPPAR029116; SUPPAR029118; SUPPAR029119; SUPPAR018085.

212.    A March 15, 1995 internal Corps email from Margaret Boykin (Real Estate Division), stated:  "request the following water contracts, which expired 1/1/90, remain on active shelf in main files, since we are continuing to operate under the terms of these contracts until such time as they are replaced . . ."  and lists 5 Lake Sidney Lanier Contracts. SUPPAR005801.

213.    As elaborated on below, the Corps has attempted to renew or replace the expired water supply contracts several times since their expiration.  The following subsections detail some of those efforts.  Further efforts to secure a permanent source of water supply for and issue new water storage contracts to the Georgia water suppliers are detailed below in Section IV.

**1.    Attempted Provisional 1990 Water Storage Contracts**

214.    In a March 2, 1990 Corps memorandum regarding the water supply withdrawals, the Corps stated: "Interim Water Supply Contracts have been drafted to replace both the lake and downstream interim withdrawal contracts to modify the payment provisions to that which would be required under storage space contracts and to identify a storage space necessary to yield the quantities previously authorized to be withdrawn."  ACF017664.

215.    The March 2, 1990 memorandum also states: "These proposed interim water supply contracts, with the exception of the proposed ARC contract, are for the same quantities authorized in the interim withdrawal contracts.  They do not include the additional quantities projected in the PAC Report to meet 2010 demands [because ARC withdrawals were increased from 377 to 397 MGD]…Information as to proposed additional storage space allocations to meet 2010 demands is contained in the PAC Report."  ACF017664-65.

216.    In addition, the memorandum stated:  "The interim storage space allocations and average annual MGD allocations for lake and downstream withdrawals are as follows:

| User | Interim Storage Allocation (acre feet) | Annual Average Withdrawal Allowance (MGD) | % of Yield/ Conservation Storage |
|---|---|---|---|
| **City of Cumming** | 9,381 | 10.0 | 0.89 |
| **City of Gainesville** | 11,257 | 20.0 | 1.07 |
| **Atlanta Regional Commission** | 74,679 | 79.6 | 7.12 |
| **Lake Withdrawals (Gwinnett)** | (49,719) | (53.0) | (4.74) |
| **Downstream Withdrawals (ARC)** | (24,960) | (26.6) | (2.38) |
| | | | |
| **Total Interim Allocations** | **95,317** | **109.6** | **9.08** |

ACF017664.

217.    The withdrawals under the 1990 proposed interim contracts for water supply totaled 95,317 acre-feet or 9.08% of conservation storage.  ACF017664; ACF017961; SUPPAR017824; SUPPAR017835; SUPPAR017857.

218.    On January 20, 1989, the ARC requested by letter extension and modification of Contract No. DACW01-9-86-145.  ACF016949-50.  The letter noted that the contract was due to expire on July 1, 1989 and that the belief when the contract was initially entered into was that "substantial progress would have been made on contracts to build a reregulation dam."  ACF016949.  The letter further noted that the reregulation dam was "no longer our course of action" and that additional time was "needed to implement reallocation."  ACF016949.

219.   ARC additionally requested that the total water supply assured by the contract be increased from 377 MGD to 397.1 MGD "to provide for the 1990 peak needs of our area as identified by the ARC Water Supply Plan."  ACF016949.

220.   On February 8, 1989 the Mobile District requested the approval from the South Atlantic Division of extensions of the four water withdrawal agreements at Lake Lanier (including the ARC, the City of Gainesville, the City of Cumming, and Gwinnett County) "for a period of five years, or until such time as the Corps is prepared to enter into water storage contracts."  ACF016946.  The Corps also requested an increase by 20.1 MGD in the ARC allowable withdrawal to 397.1 MGD.  ACF016945.

221.   In the February 9, 1989 request the Corps noted that the withdrawal contracts "were coordinated to expire on 1 July 1989 in anticipation of the Corps being prepared to convert them to water storage contracts by that date."  ACF016945.  This intent was supported by a June 27, 1985 letter from the District Engineer to Gwinnett County which increased the rate under their water withdrawal contract and stated:

> Because of the present uncertainties concerning the contemplated re-regulation dam below Buford Dam, it has been determined that we should proceed with plans to convert all Lanier withdrawal contracts to storage space contracts within a reasonable period of time.  Therefore, we are planning to have all of the withdrawal contracts terminate on July 1, 1989 to be replaced by storage space contracts.  Unless substantial progress has been made toward construction of the re-regulation dam before July 1, 1989, the repayment amounts will be based on Corps' guidelines for selling reservoir storage space based on Lake Sidney Lanier data only.  They may later be adjusted, if appropriate, to consider the costs and benefits of the re-regulation dam if it is eventually constructed.

ACF016947-48.

222.    The Corps' February 8 request for approval of extension also noted that the Mobile District was preparing the Post Authorization Change report for Lake Lanier which needed to be approved "by the Assistant Secretary of the Army for Civil Works, and possibly Congress, before final contract negotiations with the users for water storage space can begin."  ACF016495.

223.    In its February 8 request, the Mobile District forewarned the South Atlantic Division that "[t]he only apparent alternative to a formal extension [of the current contracts for 5 years or until the Corps is prepared to enter into water storage contracts] would be to consider the users in a holdover tenancy until the storage space contracts are completed." ACF016946.

224.    In its February 8, 1989 request, the Mobile District noted that: "Use of the term surplus water as defined in EC 1105-2-181 is not applicable to this situation since the sale of permanent storage will be the ultimate product of the PAC."  ACF016946.

225.    The renewal of the four Lake Lanier water withdrawal contracts was discussed with the Office of the Assistant Secretary of the Army (Civil Works) which concluded that the "appropriate procedure would be to convert them to interim surplus water contracts."  ACF016591.  The Office of the Assistant of the Army (Civil Works) had also been informed that costs for surplus water contracts, meaning the updated cost of storage, "would not be possible until approval of the draft of the Lake Lanier reallocation report at the issue resolution conference" scheduled for mid-July.  ACF016951.  Because of this impediment to the contracts, the Corps gave approval for a six month extension (until January 1, 1990).  ACF016951.

48

226.    The Office of the Assistant of the Army (Civil Works) advised that if it was not possible to have storage contracts in place within the six month period, then "the district should be prepared to have surplus water contracts negotiated as to terms and price and ready for signature" and further advised on the level of approval needed for the different amounts of acre storage.  ACF016951.

227.    On April 17, 1989, the Corps South Atlantic division approved the Mobile District's request for authority to extend the contracts, however only for the period of 6 months.  ACF016943.

228.    In December 1989, the Corps transmitted to the ARC a proposed contract "for interim use of storage space in Lake Sidney Lanier."  ACF016970.  The interim contract merged the needs for both Gwinnett County and the ARC, providing for storage in both lake Lanier and for downstream releases.  ACF016970.

229.    The interim contract based payment on "the permanent right to use storage space, rather than on the quantity of water withdrawn" which would then be credited towards the purchase of storage space.  ACF016970.

230.    The draft "Interim Water Supply Contract" ("Draft Interim Contract") continued to recognize the prior contracts for the ARC (DACW01-9-86-145) and Gwinnett County (DACW01-9-73-624) and sought to increase the maximum daily withdrawals for ARC to 397 MGD.  ACF016953-69.

231.    The Draft Interim Contract invokes the River and Harbor Act of 1946, Public Law 525, 79th Congress, 2nd Session, approved 24 July 1946 and Section 6 of the Flood Control Act of 1944 as amended.  ACF016953-54.

232.    The Corps, the ARC and Gwinnett County entered into the Draft Interim Contract "pending Congressional approval of a proposed reallocation of [Buford] Project water storage space from 'hydropower' to 'municipal and industrial water supply' purposes, which would enable the Commission to purchase storage space in the project."  ACF016953-54.

233.    The Draft Interim Contract would have reserved a total of 74,679 acre feet of storage space in the project for the ARC and Gwinnett County's M&I withdrawals. ACF016954.

234.    24,960 acre feet of the total storage space would be reserved to provide for discharges from the water to permit the ARC an average annual withdrawal of 268 MGD (not to exceed 397 MGD in any 24 hour period).  ACF016954.

235.    The average annual yield associated with the 24,960 acre-feet of storage space was 268 MGD and it was estimated that with the usage patterns that "average annual yield would provide for peak day withdrawal allocations totaling 397MGD.  This storage would be used to provide off-peak releases of water as needed for water supply."  ACF016964.

236.    The remaining 49,719 of storage space was reserved for Gwinnett County's withdrawals from Lake Lanier which were not to exceed an annual average of 53 MGD. ACF016954.

237.    The Government also agreed in the Draft Interim Contract to provide for a flow of 750 cfs at the junction of Peachtree Creek with the Chattahoochee River as well as "insure that the required withdrawals from the River [could] be made."  ACF016954.

238.    So that the Corps could provide river flows to support in order to meet the terms of the interim water supply contract and in order to provide the "most efficient utilization of the water storage space," the ARC and the Corps agreed to continue the Chattahoochee Water Management System which had been in place under the holdover contracts.  ACF016594.

239.    "In consideration for the right to withdraw water from the Project and to have water released from the Project and to have water released from the Project from the storage space reserved for the Commission . . ., the Commission shall pay to the Government the amount of $1,609,901.04."  ACF016956.

240.    The payment to be made by the ARC was based upon "joint use construction costs updated to October 1988 price levels using appropriate indices and the Fiscal Year 1990 water supply interest rate of 8.25 percent."  ACF016956.  A portion of the payment would be considered investment and used the same calculation methods "that would be employed if the user were purchasing water storage space."  ACF016956.

241.    The proposed interim contract was to exist for the period of a year:  From January 1, 1990 to December 31, 1990 and could be extended for additional periods of one year each.  ACF016957.

242.    Alternatively, either party could terminate the contract upon 90 days written notice.  ACF016597.

243.    The draft interim contract was subject "to the written approval of the Secretary of the Army or his duly authorized representative" and would not be binding "until so approved."  ACF016958.

244. Exhibit A attached to the proposed draft agreement describing The Chattahoochee Water Management System, is substantially similar to the Chattahoochee Water Management System provided in the ARC holdover contract.  Compare ACF016960-62 with ACF011986-88.

245. Exhibit C attached to the proposed draft interim contract described lake storage.  ACF016964.

246. Interim storage allocations for water supply were listed at 207,000 acre feet. ACF016964.

247. The Corps equated this to 19.73% of conservation storage, 12.27% of total usable storage; and 8.10% of total project storage.  ACF016964.

248. In addition Exhibit C noted:  "Permanent reallocation of the 207,000 acre feet of dropper storage to water supply storage is subject to pending congressional approval." ACF016964.

249. According to notes to a memorandum dated October 19, 1989 the South Atlantic Division to the Mobile District, the title of the Draft Interim Contract was to originally be "Interim Storage Contract" and not its eventual title of "Interim Water Supply Contract."  ACF016978.

250. The South Atlantic Division also recommended that "Negotiations for the amount of storage to be included in the interim contracts should be directed toward meeting immediate requirements of the users."  ACF016978.

251.    In addition the South Atlantic Division stated that: "These interim contracts will be for storage and charges must be based on the storage space identified in the contracts."  ACF016979.

252.    In a September 25, 1989 letter from the ARC to the Corps, the "withdrawal contract will be changed to a surplus water storage contract."  ACF016981.

253.    In a December 7, 1989 memorandum to the Commander of the Corp's South Atlantic Division regarding interim water supply contracts at Lake Lanier between the Corps and the City of Gainesville, the City of Cumming, and the Atlanta Regional Commission, Donald L. Burchett, Chief of the Corps' Mobile District Real Estate Division, stated, "As provided for in CECW-PS Memorandum dated 11 April 1989, Subject:  Delegation of Authority to Approve Water Supply Contracts, all of the enclosed drafts will require approval by ASA (CW), and all of the final contracts will require approval in HQUSACE." SUPPAR017864-65.

## 2.    The Short-Term Water Supply Plan

254.    ARC first adopted the Atlanta Regional Water Supply Plan, developed through the Metropolitan Atlanta Water Resources Management Study (MAAWRMS), in 1973.  The Regional Water Supply Plan was revised in 1983 and amended in 1984 and 1985, then updated again in 1988.  ACF015493-4.  The Regional Water Supply Plan was intended to provide a forecast of water demands and a framework for allocation of water supplies made available by plans developed under the MAAWRMS.  ACF015495.

255.    The Atlanta Regional Water Supply Plan noted the limitations of Buford Dam during droughts:  "…in a drought the release pattern at Buford Dam can be modified to

specifically meet the requirements caused by the drought.  These factors are identified not to

suggest that they serve as justification for the prior relaxation of standards, but merely to

point out that in extreme water shortage situations, temporary emergency measures for

dealing with such situations are potentially available.  However, since the Lake Lanier

project was not authorized to operate as a drought contingency supply, local officials should

not depend on this."  ACF015498.

257.    Under the MAAWRMS, three temporary short-term plans had been developed

to meet water supply demands until a long-range plan (i.e., a re-regulation dam) could be

implemented.  ACF015500; ACF014476; ACF014965; ACF016159.  The three plans

included an Interim Plan (1975), a Modified Interim Plan (1979), and a Short-Term Plan

(1986).  ACF015500-01.

257.    In a March 4, 1985, letter from Harry West, Executive Director, Atlanta

Regional Commission, to Col. Patrick Kelly, District Engineer, Mobile District, ARC

informed the Corps that it had approved a short term water supply plan which was developed

with the Corps and regional water managers, and that ARC was ready  "to negotiate and

execute contracts with the Corps of Engineers, local jurisdictions and the Georgia Power

Company to implement the Short-Term Plan."  SUPPAR036887.

258.    The Short-Term Plan was implemented in June 1986 through agreements

negotiated between ARC, the Corps of Engineers, the Georgia Power Company, the

Gwinnett County Water and Sewerage Authority, Fulton County, DeKalb County, the Cobb

County-Marietta Water Authority and the City of Atlanta.  ACF015501; ACF014476;

ACF014965; ACF016159.  The Short-Term Plan agreements created the "River Management

System," under which the Corps "would endeavor to make only those releases specifically required for the water supply and instream flow."  ACF018480.  Under the Short Term Plan and the River Management System, ARC coordinated daily water supply and water quality needs from the Chattahoochee River with the Corps' operation of Buford Dam and the Georgia Power Company's operation of Morgan Falls Dam.  ACF015501.

259.    The Chattahoochee River Management System, with ARC as the coordinator, continues to function in the same way to date.  SUPPAR08996.

260.    According to ARC, the Short-Term Plan was "an integral component of the Region's Water Supply Plan which allows additional withdrawals until such time as the recommended long-range plan, which consists of a new regulation dam six miles downstream from Buford Dam, can be implemented."  ACF015502.  See discussion of re-regulation dam ("Plan A") below in Section IV.B.  The new regulation dam had been selected under MAAWRMS as the best tool for controlling releases from Buford Dam for more efficient use by the Atlanta Region. ACF015503.

261.    Water resources conditions on the Chattahoochee River between April 1987 and June 1988 were described in several Short-Term Water Supply Plan Reports.  ACF013678; ACF014476; ACF014965; ACF016159.  The July 1987-June 1988 report highlighted the importance of ARC receiving accurate water supply forecasts from the water withdrawers to ensure proper functioning of the water management system under the Short Term Plan.  ACF016168.  The report noted: "Forecasts need to be as accurate as possible.  This has been particularly important during the '87/'88 drought because the Corps of

Engineers suspended navigation and hydropower releases from Lake Lanier and have been making releases only to match the water supply/water quality forecasts."  ACF016168.

### 3.  The Conceptual Water Supply Plan

262.  In response to a letter request from Alabama Congressman Tom Bevill, the Army Corps of Engineers provided a "conceptual plan" on February 23, 1990, that addressed both the short-term water supply needs of the Atlanta Metropolitan Area and the long-term water resources management requirements for Alabama, Georgia, and Florida. SUPPAR005877-83.  Congressman Bevill had sent the letter on November 21, 1989, after learning that the Corps had been studying proposals to reallocate water supplies in the Coosa River Basin (part of the ACT, not the ACF) for use within Georgia. SUPPAR005877.

263.  The short-term water supply plan outlined in the conceptual plan was to consist of limited reallocations of storage at Lake Allatoona and Carters Lake (part of the ACT), which would be made under the discretionary authority of the Assistant Secretary of the Army for Civil Works pursuant to the Water Supply Act of 1958.  SUPPAR005881; ACF018044-45.  The short-term water supply plan also would entail reallocation of storage at Lake Lanier, which would require Congressional authorization.  SUPPAR005881; ACF018045-46.  Because the final Post Authorization Change ("PAC") Notification Report had not been completed, reallocation to address the immediate short-term needs of Atlanta was instead accomplished through interim water supply contracts with ARC and the Cities of Cumming and Gainesville.  ACF018046.

264.  The long-term "comprehensive water supply management plan" contemplated by the conceptual plan was to be a detailed framework for both the Alabama-Coosa (ACT)

and ACF River Basins, and was to be based on discussion and intense coordination between the diverse interests in both basins.  SUPPAR005881-82.

### 4.      The Memorandum of Agreement and "Live and Let Live"

265.     On January 3, 1992, Alabama, Florida, Georgia, and the U.S. Department of the Army entered into a Memorandum of Agreement ("MOA") to develop a comprehensive basin-wide study of the ACT Basin and the ACF Basin ("Comprehensive Study"). ACF019317.

266.     The Comprehensive Study was to provide a conceptual plan for water resource management of all water resources in the ACF Basin and ACT Basin; an assessment of existing and future water resource needs as well as the availability of resources to meet those needs; and an appropriate mechanism or mechanisms to implement the findings or recommendations of the Comprehensive Study.  ACF019322.  The Comprehensive Study was to be completed within three years after completion of a final plan of study, and a report on the Comprehensive Study was to be published at the end of that three-year period. ACF019322.

267.     The MOA contained a "live and let live" provision whereby persons who were currently withdrawing, diverting, or consuming water resources within the ACT Basin or ACF Basin could continue to do so.  ACF019320.

268.     Pursuant to the "live and let live" provision any person currently withdrawing, diverting, or consuming water resources could "increase the amount of water resources withdrawn, diverted or consumed to satisfy reasonable increases in the demand of such person for water during the Comprehensive Study as permitted by applicable law" provided

that written notice was given for increases of more than 10 million gallons per day on an average annual daily basis.  ACF019320.

269.    Under the terms of the "live and let live" provision, written notice also was required for requests by persons not currently withdrawing, diverting, or consuming water who sought to withdraw, divert, or consume more than 1 million gallons per day on an average annual daily basis.  ACF019320.

270.    The MOA also provided that "[t]his Agreement shall not be construed as granting any permanent, vested or perpetual rights to the amounts of water used during the Comprehensive Study nor shall it be construed as changing the status quo as to the Army's authorization of water withdrawals." ACF019320-21.

271.    Pursuant to the MOA, the parties agreed to continue informal negotiations among themselves to address water resource issues.  ACF019319.

272.    Pursuant to the MOA, the parties agreed that the Army would withdraw its draft Post Authorization Change Notification Report, Lake Lanier, Georgia, dated October 1989. ACF019319-20.

273.    Pursuant to the MOA, the parties agreed that the Army would provide the parties with copies of all reports of withdrawals of water pursuant to a contract or agreement with the Army by any person from, or downstream of, a federally owned and operated reservoir.  ACF019321.

274.    Pursuant to the MOA, the parties agreed that the Army would operate the federally owned and operated reservoirs in the ACF Basin and ACT Basin to maximize water resource benefits to the basins as a whole.  ACF019321-22.

275.    Pursuant to the MOA, the parties agreed to develop a system for dispute resolution regarding the Comprehensive Study, which would include negotiation and non-binding mediation as elements.  ACF019323.

276.    Pursuant to the MOA, the parties agreed that Alabama and the Army would file a motion requesting assignment of their pending litigation in the Northern District of Alabama to an inactive docket until the Comprehensive Study was completed. ACF019323.

277.    Although the three States and the Corps originally contemplated that the Comprehensive Study would result in a water sharing agreement among the States, it did not. Instead, the Comprehensive Study recommended that an interstate compact be developed to apportion the water of the basins.  ACF030011-24.  As discussed further below, the Compact carried forward the "live and let live" provisions of the MOA in virtually intact language. ACF030015-16.

278.    The Comprehensive Study process was truncated before finalization and supplanted by the ACF Basin Compact.  *Id.*  As discussed below, the ACF Basin Compact terminated on August 31, 2003 without the approval of any allocation formula.  Accordingly, the authority for persons to continue and increase withdrawals, diversions and consumption of water pursuant to the "live and let live" provision terminated no later than August 31, 2003 and conditions reverted to the pre-"live and let live" status.

### a.    1994 Supplemental Memorandum of Agreement

279.    On January 18, 1994, Alabama, Florida, Georgia, and the U.S. Department of the Army entered into a Supplemental Memorandum of Agreement.  ACF020504.

280.     The 1994 Supplemental Memorandum of Agreement modified the original MOA by delaying the dates for completion of the Comprehensive Study and release of the final report to September 30, 1995.  ACF020507.

### b.        1995 Supplemental Memorandum of Agreement

281.     On April 7, 1995, Alabama, Florida, Georgia, and the U.S. Department of the Army entered into a second Supplemental Memorandum of Agreement.  ACF023411.

282.     The 1995 Supplemental Memorandum of Agreement modified the original MOA and the January 18, 1994, Supplemental Memorandum of Agreement by extending the dates for completion of the Comprehensive Study and release of the final report to September 30, 1996.  ACF023414.

### c.        1996 Supplemental Memorandum of Agreement

283.     On September 24, 1996, Alabama, Florida, Georgia, and the U.S. Department of the Army entered into a third Supplemental Memorandum of Agreement.  ACF027443.

284.     The 1996 Supplemental Memorandum of Agreement modified the MOA, as supplemented by the Supplemental Memoranda of Agreement dated January 18, 1994, and April 7, 1995, by committing the parties to attempt to develop two interstate compacts: an interstate compact between Alabama and Georgia establishing a basin-wide commission to allocate waters within the ACT Basin, and an interstate compact among Georgia, Alabama, and Florida establishing a basin-wide commission to allocate waters within the ACF Basin. ACF027446.

285.     Pursuant to the 1996 Supplemental Memorandum of Agreement, the parties agreed to remain bound by the MOA until the interstate compacts were enacted into law by

the states and Congress, at which time the MOA would terminate and any remaining work on the Comprehensive Study would be completed in accordance with the compacts. ACF027446.

286.    In the event the compacts were not ratified by the states and Congress by December 31, 1997, the MOA would automatically terminate and all remaining work under the Comprehensive Study would cease.  ACF027446.

287.    The 1996 Supplemental Memorandum of Agreement was not to be construed "as granting any permanent, vested, or perpetual rights to the amounts of water used during the Comprehensive Study or the term of the Memorandum of Agreement."  ACF027446.

### d.    1997 Supplemental Memorandum of Agreement

288.    On November 20, 1997, Alabama, Florida, Georgia, and the U.S. Department of the Army entered into a fourth Supplemental Memorandum of Agreement.  ACF030025.

289.    The 1997 Supplemental Memorandum of Agreement described the enactment into state and Federal law of two interstate compacts that established basin-wide commissions to allocate water supply within the ACF Basin and the ACT Basin, respectively. ACF030028.

290.    The 1997 Supplemental Memorandum of Agreement extended the time for completion of the Comprehensive Study to September 30, 1998, with the parties agreeing to either complete or close out the Comprehensive Study by that date.  ACF030028.

291.    The parties agreed to remain bound by the MOA, as supplemented, until completion or close out of the Comprehensive Study or September 30, 1998, whichever first occurred.  ACF030028.

292.    The 1997 Supplemental Memorandum of Agreement was not to be construed "as granting any permanent, vested, or perpetual rights to the amounts of water used during the Comprehensive Study or the term of the Memorandum of Agreement."   ACF030028.

293.    Pursuant to the 1997 Supplemental Memorandum of Agreement, the parties also agreed that the provisions of the interstate compacts would prevail in the event of any conflict between the provisions of the MOA, as supplemented, and the interstate compacts. ACF030029.

### e.    1998 Supplemental Memorandum of Agreement

294.    On September 30, 1998, Alabama, Florida, Georgia, and the U.S. Department of the Army entered into a fifth Supplemental Memorandum of Agreement. SUPPAR007448.

295.    The 1998 Supplemental Memorandum of Agreement modified the MOA, as modified by the four prior Supplemental Memoranda of Agreement.  SUPPAR007449.

296.    The 1998 Supplemental Memorandum of Agreement extended the time for completion of the Comprehensive Study to December 31, 1998, with the parties agreeing to either complete or close out the Comprehensive Study by that date.  SUPPAR007451.

297.    The parties agreed to remain bound by the MOA, as supplemented, until completion or close out of the Comprehensive Study or December 31, 1998, whichever first occurred.  SUPPAR007451.

298.    The 1998 Supplemental Memorandum of Agreement was not to be construed "as granting any permanent, vested, or perpetual rights to the amounts of water used during

the Comprehensive Study or the term of the Memorandum of Agreement, as supplemented." SUPPAR007451.

299.    The parties also agreed that the provisions of the interstate compacts would prevail in the event of any conflict between the provisions of the MOA, as supplemented, and the interstate compacts.  SUPPAR007452.

### f.    1998 Draft EIS

300.    The Army Corps of Engineers and 10 cooperating federal agencies published a Draft Environmental Impact Statement ("DEIS") in September 1998 on the development of a water allocation formula for the ACF River Basin.  SUPPAR013019.

301.    The DEIS was prepared to assist the Federal Commissioner in deciding whether or not to concur in the allocation formula that would eventually be proposed by the State Commissioners under the ACF Compact (as discussed below).  SUPPAR013019.

302.    Because timing constraints required that the DEIS be prepared well before the allocation formula was actually proposed, the DEIS did not identify any preferred action or alternative.  SUPPAR013043.

303.    Rather, the DEIS provided an evaluation framework to assess the impacts from a range of possible flow conditions that would be expected to "bracket" the future allocation formula and to serve as a baseline to assess future actions and decisions under the Compact.  SUPPAR013043; SUPPAR013015.

304.    The impact analyses and a final EIS was to be prepared upon completion of the allocation formula.  SUPPAR013043.

305.     The DEIS included an Appendix D, which provided the results of modeling done by the Corps in order to develop a baseline from which to measure environmental impacts from water supply withdrawals in the ACF Basin.  ACF032226.

306.     The Corps modeled impacts based on both "existing conditions" and 1977 conditions, but ultimately decided to use the existing conditions as the baseline.  ACF032315; ACF032688; ACF032691; ACF032693; ACF032705; ACF032722.

307.     This decision was met with resounding criticism because it overlooked significant impacts that had already taken place since 1977.  SUPPAR018246; SUPPAR018141; ACF033380.

308.     Specifically, the SEPA objected to the use of then-existing conditions as a baseline and suggested that the U.S. Department of Justice agreed.  SUPPAR018244.

309.     An email from Mark Crisp, a consultant for the Southeastern Federal Power Customers, Inc. ("SeFPC"), to the Corps dated July 9, 1999 notes that "many comments to the DEIS took specific exception to the models and techniques used in the draft EIS for formulating a baseline or using the Existing Conditions HEC-5 Model as a baseline." SUPPAR000702.  Specifically, Mr. Crisp states:

> I would like to, once again, state that the 'baseline' chosen by the Corps-Mobile does not reflect an appropriate baseline for measuring impacts associated with the DEIS process. Specifically, the Existing Conditions HEC-5 Model used by the Corps-Mobile incorporates many embedded impacts currently under scrutinization in the ACF & ACT Negotiations.  Example: Water Supply withdrawals from Lake Lanier have been exceeding Corps 'discretionary authority' since the mid to late 1980s, these withdrawals are included in the Existing Conditions Model as if they are a part of the baseline.

*Id.*

### 5.    The ACF Compact and Allocation Formula Negotiations

310.    On November 20, 1997, Congress created the Apalachicola-Chattahoochee-Flint River Basin Compact ("ACF Compact") among Alabama, Florida, Georgia, and the United States.  Pub. L. No. 105-104, 111 Stat. 2219.  ACF030011.

311.    The ACF Compact created an ACF Basin Commission with specified general powers, including the power "to establish and modify an allocation formula for apportioning the surface waters of the ACF Basin among the states of Alabama, Florida and Georgia." ACF030013-14.  The allocation formula was to be developed for the purpose of "equitably apportioning the surface waters of the ACF Basin among the states while protecting the water quality, ecology and biodiversity of the ACF."  ACF030014-15.  Adoption of an allocation formula required unanimous approval of the three State Commissioners and a letter of concurrence from the Federal Commissioner. ACF030015.

312.    The ACF Compact provided that "[t]his Article shall not be construed as granting any permanent, vested or perpetual rights to the amounts of water used between January 3, 1992 and the date on which the Commission adopts an allocation formula." ACF030016.

313.    The ACF Compact carried forward the "live and let live" provisions of the MOA in virtually intact language.

> The parties to the Compact further agree that any such person may increase the amount of water resources withdrawn, diverted or consumed to satisfy reasonable increases in the demand of such person for water between the effective date of this Compact and the date on which an allocation formula is approved by the ACF Basin Commission as permitted by applicable law. . . . This Article shall not be construed as granting any permanent, vested or perpetual rights to the amounts of water used between January 3, 1992 [the

date of the MOA] and the date on which the Commission adopts an allocation
formula.

ACF030015-16.

314.    As in the MOA, the ACF Compact required written notice for increases of
more than 10 million gallons per day on an average annual daily basis, as well as for requests
by persons not currently withdrawing, diverting, or consuming water who sought to withdraw,
divert, or consume more than 1 million gallons per day on an average annual daily basis.
ACF030016.

315.    The ACF Compact contained several termination provisions, including
automatic termination if the states failed to agree on an equitable apportionment by
December 31, 1998, unless the ACF Basin Commission unanimously agreed to extend this
deadline.  ACF030016.  The ACF Compact further stated that if terminated, "no party shall
be deemed to have acquired a specific right to any quantity of water because it has become a
signatory to this Compact."  ACF030017.

316.    On August 31, 2003, without any further extensions, the ACF Compact
expired pursuant to its terms.  ACF039636.

317.    The "live and let live" provision expired with the expiration of the ACF
Compact, pursuant to the plain terms of the Compact and conditions reverted to the pre-"live
and let live" status.  ACF030017.

### 6.    The Corps' Recognition of the Limits of "Live and Let Live"

318.    In a March 14, 2005 letter, the Corps denied a request from Forsyth County
"for an easement to construct a new intake structure."  The Corps concluded that the
injunction in the Northern District of Alabama (referring to the Northern District of

66

Alabama's October 15, 2003 Order in *State of Alabama v. U.S. Army Corps of Engineers*, Case No. CV-90-BE-1331-E, MDL Case No. 07-cv-249) and the lack of a "holdover water supply contract" prevented them from considering Forsyth County's request. SUPPAR005769.

319.    In the March 14, 2005 letter the Corps further stated that the "term 'holdover water supply contract' refers to the expired water supply contracts that were given affect by the 1992 [MOA] to allow continued water withdrawals and reasonable increases. The contracts covered by this agreement were those held by water supply providers existing at the time the MOA was negotiated and included Gwinnett County, the Cities of Cumming, Gainesville and Buford, and the Atlanta Regional Commission."  ACF039698.

320.    On numerous occasions, Florida and Alabama objected to the Corps' continuation of the "holdover" contracts under the expired "live and let live" provisions.

321.    For example, after outlining how the ACF compact negotiations failed due to the Corp's unilateral agreement with Georgia, the congressional delegation of Alabama in an April 14, 2005 letter to the Corps stated:

> [W]e have recently become aware of a Notice of Proposed Actions issued by the COE to amend the manuals and plans governing operation of those projects in the ACF and ACT basins.  The proposed process of amending manuals seems to run counter to the provisions surrounding  the "live and let live" agreement between COE, Alabama, Florida, and Georgia.  This agreement allowed existing operation of the federal projects in the two river basins to continue during the compact negotiation process.  The COE and the states agreed, however, that, if the compacts failed, then the "live and let live" provision would become void and the operation of the projects during the "live and let live" period would establish no baseline for future operations.
>
> The COE has stated its intent to amend the manuals to "reflect current operations as they have evolved due to changing conditions in the basins."

> This is the very thing that the agreement surrounding the "live and let live"
> attempted to prevent.

ACF043112.

322.    In response to an October 11, 2006 request from Florida for correspondence

with Forsyth County, Roger A. Burke, signing for Curtis M. Flakes, Chief of the Corps'

Mobile District Planning and Environmental Division, stated in a letter dated April 17, 2007:

> In response to this request a copy of the City's expired withdrawal contract is
> enclosed (Enclosure 20).  As you may recall, this contract and other similar
> contracts with Lake Lanier Water Supply Providers expired on January 1,
> 1990, and withdrawals continued on the basis of the "live and let live"
> provisions of the 1992 Memorandum of Agreement and the ACF Compact.

SUPPAR035368-69.

323.    Responding the Corps' April 17, 2007 letter, Michael W. Sole, Secretary of

the Florida Department of Environmental Protection, wrote in a May 29, 2007 letter, "The

Corps is in error.  Confirming the letters of Florida's Governor and FDEP Secretary, 'live

and let live' ended on August 31, 2003."  SUPPAR026248.  Furthermore Florida stated,

"Both the MOA (which terminated in 1998) and the ACF Compact (which terminated on

August 31, 2003) explicitly designed the "live and let live" provisions to be temporary, and

neither agreement provided for the vestiges of the "live and let live" provisions to survive the

agreements' expirations…The Corps has no authority to continue to allow withdrawal of

water under the guise of these provisions."  *Id*.

324.    In a response to Florida's May 29, 2007 letter, the Corps acknowledged in a

letter dated August 7, 2007 "that the 'live and let live' provisions of the [MOA] and [ACF

Compact] have expired."  SUPPAR026245.

325.     Moreover, in the Corps' August 7, 2007 letter to Florida Department of
Environmental Protection Secretary Sole, the Corps acknowledged that "[n]ow that these
provisions are no longer operative and while various lawsuits work their way through the
courts, the communities are continuing to withdraw water to satisfy their needs consistent
with surface water withdrawal permits issued by the State of Georgia **and make payment to
the Corps on the basis of these expired contracts**."  SUPPAR026245 (emphasis added).

### 7.     The Corps' Correspondence During Compact Negotiations

326.     In an August 9, 1999 letter to Brigadier General J. Richard Capka, Division
Engineer—South Atlantic Division of the Corps, Lindsay Thomas, Federal Commissioner of
the ACT/ACF River Basin Commissions, related that the SEPA and the SeFPC felt that the
Corps was using improper baselines during the ACF Compact negotiations process and for
its EISs for the ACF River Basins.  Thomas stated, "SEPA and SeFPC believe that for both
the negotiations and the EIS, the benchmark should be set from before 1985 to properly
account for a variety of changes the COE have made in water management plans in both
basins, and for water withdrawal out of Lake Lanier.  The current benchmark, 1993, does not
account for losses that power interests have incurred since the last EIS in 1977."
SUPPAR000748.  According to Thomas, "the benchmark is an important issue because of its
effect on how compensation is determined and I believe this dispute must be resolved.
Compensation will have to be part of the final allocation formula agreed to by the states
requiring my concurrence, and it should be addressed fairly."  *Id.*

327.     In response, General Capka sent a letter to the Federal Commissioner Thomas
dated September 8, 1999 in which he disagreed with the Commissioner's opinion that

compensation must be a factor in the ACF Compact, stating, "While the ACF Compact language does not prevent compensation from being included by the states in a water allocation formula, it does not require the states to include compensation or any other specific issue in a water allocation formula." SUPPAR000743. Furthermore, General Capka claimed that despite SEPA's and SeFPC's insistence that the Corps was using improper baselines during negotiations and in their EISs, the term "baseline" as defined in the ACF Compact was ambiguous and that "a particular baseline has not been an issue discussed by the states in the water allocation formula negotiation process nor have water pricing and water withdrawals at Lake Lanier been topics included in the negotiations." SUPPAR000742. General Capka also emphasized that the Corps' EISs are accurate because they "are structured in a programmatic fashion in order to address basin-wide impacts of a variety of future allocation scenarios" and that "[t]hese basin-wide impacts should be sufficient information to support the Federal Commissioner decision to concur or non-concur with a proposed allocation formula." SUPPAR000743.

328.     Responding to the Federal Commissioner's request for information regarding M&I water withdrawals from Lake Lanier, Jim B. Lloyd, Assistant Administrator for Power Resources at SEPA, wrote a letter to Thomas on August 10, 1999. Using three different case scenarios that assumed prime flow rates of 1500 cfs, 1700 cfs, and 1400 cfs, respectively, Lloyd calculated that Corps' withdrawal rates under each scenario "have been in excess of the Corps authority since 1986." SUPPAR000740.

329.     In response to SEPA's finding that the Corps was in violation of its statutory authority, J. David Norwood, Colonel and District Engineer for the Corps, sent a letter to

Federal Commissioner Thomas on October 5, 1999.  In this letter, Norwood claimed that, the

Corps was "not in violation of the 1958 Water Supply Act" because "[t]here is no storage

space permanently allocated to water supply in Lake Lanier and the Water Supply Act of

1958 does not apply to the existing M&I water withdrawals occurring at the project."

SUPPAR000735.  The Corps calculated the "storage amounts for a critical drought period"

as follows:

> 1 MGD = 1.542 cfs
> Average 13-month(July 1998-July 1999) average daily withdrawals = 107
> MGD x 1.542 cfs per MGD = 165 cfs
>
> <u>Critical period yield (prime flow) estimates:</u>          <u>Needed storage:</u>
>
> 1600 cfs per acre-foot (project design)
> (165 cfs/1600 cfs) x 1,087,600 ac-ft          =          112,000 ac-ft
>
> 1485 cfs per acre-foot (1986-1988 drought)
> (165 cfs/1485 cfs) x 1,087,600 ac-ft          =          120,000 ac-ft

ACF034653-54; SUPPAR000735-36.

330.    In a letter to Roger Burke, of the Corps' Mobile District dated October 7,

1999, Jim B. Lloyd of SEPA reiterated his disagreement with the fact that the Corps

continued to use "current [1998-1999] operating rules as the baseline for analysis" of the

Corps' studies and models for the EIS.  SUPPAR000738.  He stated that "only by comparing

proposed reservoir operation criteria to that prior to 1985 can a true picture of the impacts to

hydropower be shown" because "[s]ince 1985, water supply withdrawals have exceeded the

15%/50,000 AF that is within the Corps' discretionary authority to allocate."  *Id*.  Thus,

SEPA insisted "that any impacts to the hydropower purpose be evaluated against pre-1985

reservoir operating criteria and pre-1985 water supply withdrawal conditions."  *Id*.

331.    On October 12, 1999 J. David Norwood, Colonel and District Engineer in the Corps, sent a letter to Federal Commissioner Thomas addressing SeFPC's complaints concerning "the inequity that exists in the repayment of the hydropower account to the U.S. Treasury as a result of increased water withdrawals from Lake Lanier since 1989 and the prices the M&I water users were still paying." SUPPAR000752; SUPPAR000920.  To address these concerns, Norwood stated that "the Mobile District is beginning the process of implementing interim water withdrawal contracts with the M&I water users at Lake Lanier" and that "no contracts will be implemented prior to December 31, 1999, the scheduled date for the states to compete negotiations on a water allocation formula for the ACF Basin." SUPPAR000753.

332.    In a letter dated October 14, 1999 from Stephen I. Lingenfelter, Division Counsel for the Corps, to J. Perry Odom, Florida's Department of Environmental Protection, the Corps responded to Florida's concerns that "Georgia representatives recently met in Washington, D.C. with the Assistant Secretary of the Army for Civil Works, Dr. Joseph Westphal," who would "establish the Corps' official position" regarding "Georgia's September 22, 1999 legal opinion on the water supply issue at Lake Lanier." SUPPAR000757.  Lingenfelter commented that while Georgia's legal opinion was interesting, "it has always been the Corps which determines the manner in which federal statutes and regulations apply to Corps of Engineers projects and programs, not other federal or state entities."  *Id*.

333.    On October 15, 1999, a letter from Federal Commissioner Thomas to James M. Campbell of Campbell & Hopkins in Alabama, David B. Struhs of the Florida

Department of Environmental Protection, and G. Robert Kerr of Georgia's Department of

Natural Resources Pollution Prevention Assistance Division transmitted the Corps'

explanation letter of "their calculations of the water withdrawals out of Lake Lanier"

contained in the Corps' October 5, 1999 letter above.  SUPPAR000759.

334.     In a letter from Curtis Flakes, Chief, Planning and Environmental Division,

Corps of Engineers, in response to James M. Campbell, who requested "certain information

pertaining to water withdrawals and reservoir releases for municipal and industrial (M&I)

water supply within the ACT and ACF River Basins," the Corps provided, among other

things, water withdrawal records for Lake Lanier, and described the existing contracts at

Lake Lanier for M&I water supply. ACF034619-51 ("the 1999 Letter to Campbell").  The

administrative record dates this letter as October 1, 1999.  ACF034619.

335.     In the 1999 Letter to Campbell the Corps explained that "[t]he ***water***

***withdrawal contracts have continued to be honored in a holdover tenancy status*** pending

agreement on a water allocation formula." ACF034620 (emphasis added).

336.     The Corps described the Lake Lanier contracts as follows:

City of Gainesville, Georgia, Relocation Contract Agreement dated June 22,
1953: With relocation of the City's water works facilities, necessitated by the
impounding of Lake Lanier, the Corps recognized the City's prior riparian
rights to the free flow of the river at that time and agreed that the City could
continue to withdraw up to 8 mgd of water per day (apparently the pumping
capacity of the City's intake at the time of the relocation) with no charge for
use of the new, dependable storage provided with construction of Buford Dam.
This agreement was replaced with the Contract No. DACW-01-9-85-224
when the City began to exceed its 8 mgd free withdrawal allowance.

City of Buford, Georgia Relocation Contract No. DA-CW-076-CIVENG-56-
419 dated December 19, 1955: With relocation of the City's water works
facilities, necessitated by the impounding of Lake Lanier, the Corps
recognized the City's prior riparian rights to the free flow of the river at that

time and agreed that the City could continue to withdraw up to 2 mgd of water per day (apparently the pumping capacity of the City's intake at the time of the relocation) with no charge for use of the new, dependable storage provided with construction of Buford Dam.  The City has not exceeded its 2 mgd free withdrawal limitation and this agreement has not been replaced. Its average daily withdrawal during 1998 was 1.18 million gallons.

Gwinnet County, Georgia, Water Withdrawal Contract No. DACW01-9-73-624 dated July 1, 1973, as amended: This contract allows the County to withdraw up to an average of 53 mgd per annum from the lake. The withdrawal contracts were entered into as service contracts to satisfy the fair value charge requirements of the Independent Offices Appropriation Act (31 U.S.C. 9701) until the storage reallocations could occur. The County continues to withdraw water and pay the Government on a per million gallon basis under the provisions of the interim withdrawal contract. They have continued to increase withdrawals as provided for in the MOA and Compact pending final resolution of the reallocation issue. The County's average daily withdrawal during 1998 was 83.18 million gallons.

City of Cumming, Georgia, Water Withdrawal Contract No. DACW01-9-77-1096 dated June 27, 1978, as amended: This contract allows the City to withdraw up to an average annual amount of 10 mgd. The City's average daily withdrawal rate during 1998 was 10.51 million gallons.  The City of Cumming supplies the water supply needs of Forsyth County, Georgia. Presently, Forsyth County has no contract with the U.S. Army Corps of Engineers to make water supply withdrawals from Lake Lanier.

City of Gainesville, Georgia, Water Withdrawal Contract No. DACW01-9-85-224, dated May 28, 1987, as amended: This contract replaces the relocation contract agreement dated June 2, 1953, and allows the City to withdraw up to 20 mgd per annum. It has been allowed to deduct metered return flows from its waste treatment systems. In 1998, gross withdrawals were 15.84 mgd and metered returns were 9.13 mgd, leaving a net withdrawal of 6.71 mgd.

Atlanta Regional Commission, Water Withdrawal Contract No. DACW01-9-86-145: In the contract, ARC is the agent for the City of Atlanta, and for Cobb, Dekalb, Fulton and Gwinnett Counties (the principals).  This contract acknowledges that special releases, over those made for hydropower generation, from Lake Lanier might be necessary to meet the downstream water withdrawal needs of the ARC principals. . . As previously stated, the needs are usually met with water released through normal project operation releases through the hydropower generators, and additional releases are sometimes made from project storage to meet these needs. It was estimated that normal peak power releases would, on average, provide for 327 mgd river

> withdrawals, but the contract provided for a peak withdrawal of 377 mgd. Charges are assessed on a per mgd basis for withdrawals which exceed 327 mgd. During 1998, the average daily withdrawal from the river was 273.63 million gallons and the peak day withdrawal was 393.54 million gallons.

ACF034622-24.

337.    In a letter from John W. Bailey, Deputy Commander of the Mobile District of the Corps of Engineers, to Federal Commissioner Thomas on November 4, 1999, Bailey presented the Corp's "computations of storage space required within Lake Lanier to accommodate the projected 2030 Georgia water withdrawal demands above Peachtree Creek." SUPPAR000722. The Corps' computations were "based on the project design critical period yield estimates and the 1986-1988 drought. The resulting storage space requirements are 523,000 acre-feet and 564,000 acre-feet, respectively." *Id*. The Corps' computation methodology was as follows:

> 1 MGD = 1.542 cfs
> Average daily withdrawals = 499 mgd x 1.542 cfs per mgd = 769 cfs
>
> Critical period yield estimates:                     Needed storage:
>
> 1600 cfs per acre-foot (project design)
> (769 cfs/1600cfs) x 1,087,600 acre-feet      =      523,000 acre-feet
>
> 1485 cfs per acre-foot (1986-1988 drought)
> 769 cfs/1485 cfs) x 1,087,600 acre-feet      =      564,000 acre-feet

SUPPAR000723.

338.    Responding to questions from an April 2, 1999 SeFPC letter concerning "the water supply authorities and policies of the U.S. Army Corps of Engineers," Stephen I. Lingenfelter, Division Counsel for the Corps' South Atlantic Division, sent a letter to James G. Manville, Chairman of the Water Storage Reallocation Committee at SeFPC, on

December 2, 1999 outlining the Corps' authority under Section 6 of the Flood Control Act of

1944 and the Water Supply Act of 1958 to reallocate storage to water supply.

SUPPAR000750.

339.    In a December 20, 1999 letter from Jim B. Lloyd, Assistant Administrator for

Power Resources at SEPA to Federal Commissioner Thomas, Lloyd expressed concern that

the "Georgia proposal for the ACF and both the Georgia and Alabama Power proposals for

the ACT will have significant negative impacts on the generation from the Federal projects."

SUPPAR000765-66.  Lloyd also stated, "In order to appropriately evaluate any impact to the

Federal Power Program, a comparison of the average annual energy and hours-use of

capacity must be made with the energy and capacity associated with any proposed

operational changes to the projects.  The timing and use of the energy are as important as the

quantity and must be considered in evaluating the overall impacts to a project's generating

capability."  *Id*.

340.    In an undated letter mailed December 20, 1999, Elaine H. Baxter, Acting

Chief of the Corps' Mobile District Plan Formulation Branch, responded to SeFPC's October

7, 1999 concerns.  SUPPAR000732.  The Corps stated that "both the 1977 (historic)

operating conditions and the 1995 (current) operating conditions" were incorporated into the

draft EISs, and that "[t]his information will be sufficient to perform comparisons of reservoir

operations changes from 1977 to 1995."  *Id*.  Furthermore, the Corps states, "The changes in

[post-1985] reservoir operations were made within our broad discretionary authorities to best

serve the multiple purposes at each reservoir."  SUPPAR000732-33.

341.    On January 4, 2000, James Manville, Chairman of the Water Storage Reallocation Committee at SeFPC, sent a letter to Stephen I. Lingenfelter, Division Counsel for the Corps' South Atlantic Division, expressing disagreement and frustration with the Corps over the "lack of responsiveness" in their December 2, 1999 letter."  SUPPAR000728-29.  Specifically, SeFPC objected that the Corps misinterpreted the issue by conflating its policies about "water storage reallocations from the flood control pool of a reservoir" with "the reallocation of water storage from the conservation pool" and that the Corps, in their December 2, 1999 letter, referenced "laws and authorities, some of which are not even applicable to our case."  *Id*.  Furthermore, SeFPC indicated concern that the Corps had acted "unilaterally in developing [new policy] guidance" on the Corps' treatment of water storage reallocation.  Another significant SeFPC concern was that the Corps failed to recognize the limits to its authority in the Water Supply Act, which "specifically limits the Corps' authority to allocate reservoir storage for the purpose of water supply to those amounts that do not seriously affect specifically authorized purposes."  SUPPAR000729.  Finally, SeFPC stated that the Corps had a "legal obligation to compensate hydropower users for potential losses of energy and capacity as a result of water storage reallocations," but had not met its obligation.  SUPPAR000730.

C.    **The Corps' Attempts to Develop Interim Surplus Water Agreements in 1999-2001**

342.    The administrative record indicates that, as far back as the early 1990s, the Corps was developing a plan to contractually allow municipal water withdrawals following expiration of the water supply contracts at Lake Lanier.  According to the Corps, in the early 1990s "action was initiated to either extend the expired contracts or replace them with new

interim contracts citing Section 6 [of the Flood Control Act of 1944] as the authorizing authority."  SUPPAR017774.  This action was stalled for several years due to Georgia's refusal to consider increased water withdrawal prices, *see id*, so that by the Fall of 1999 the Corps planned to either "allow the current rates to be continued . . . ." or to "updat[e] . . . rates . . . under extended or new interim contracts.  SUPPAR017782.

343.    A July 14, 1992 "Memorandum for Commander, South Atlantic Division" proposes new supplemental water supply agreements for the use of water from Lake Lanier by Gwinnett County and ARC under a new pricing arrangement.  SUPPAR000934-47.  The Memorandum states that, in 1989, the Corps' Mobile District was "instructed not to extend the withdrawal contracts with payments based on power revenues foregone, but to replace them with 'surplus water' contracts with payments based upon the same principle as payments for use of storage space," and explains that "the proposed surplus water contracts were also to be on an interim basis until storage space reallocation could be accomplished."  SUPPAR000934.  The Memorandum indicates that because the Corps' plan for storage space reallocation was stalled due to opposition by Alabama and Florida, a decision was made to "include a provision in the interim surplus water contracts that the users could be given credit for any investment principal payments made (with charges computed under the storage space basis) against the anticipated future purchase of permanent storage space."  SUPPAR000934-35.

344.    The July 14, 1992 Memorandum goes on to explain that Georgia and the ARC (representing Gwinnett County) objected to the higher prices based upon purchase of storage space, and instead requested that the Corps do three things:  (a) allow the expired withdrawal

contracts, which were being honored "as implied or 'holdover' contracts," to be extended such that the users would pay only for water actually withdrawn; (b) maintain the same rates that were being paid when the old contracts expired in 1989-90; and (c) impose no limits on withdrawal amounts under these extended holdover contracts.  SUPPAR000935-36.  The Mobile District recommended approval of these requests, and attached draft agreements to implement them.  Those agreements were never implemented.

345.    As part of the Corps' action in the early 1990s to pursue interim withdrawal contracts, there was "extensive correspondence between the [Mobile] District, higher elements within the Corps, and the users, concerning the appropriate method for charging for *interim reallocation of storage* and whether the users would be given credit for payments toward the ultimate *purchase of storage*."  SUPPAR017774 (emphasis added).  The document explains that the interim contracts were not completed at that time because "there was concern that temporary specific reallocations of storage, even though couched as temporary, could evoke reopening the litigation which had been put on hold pending completion of efforts at resolving the issues through the MOA"  *Id*.

346.    By the late 1990s, and simultaneous to the Compact negotiations and "live and let live" agreement, the Corps was again making efforts to negotiate interim surplus water agreements with the water suppliers in order to update the prices being charged for water withdrawals and correct for the lack of lawful contracts with the suppliers.  A series of internal email correspondence and Corps memoranda discussed below details these efforts.

347.    A memorandum prepared by Deborah Shoemake (Mobile District), hand-dated September 10, 1999 and summarizing a September 3, 1999 meeting with the State of

Georgia, the Corps, and the Department of Justice to discuss water supply options at Lake Lanier, explains that "[n]ow after ten years, a comprehensive study, and two interstate compacts, the issue of reallocation at Lake Lanier has resurfaced." SUPPAR000798-801. It was at this meeting that Georgia suggested "a hybrid arrangement of a water withdrawal contract and a storage space contract," which "seems to have [the] purpose of avoiding Congressional approval of a reallocation and avoiding the current method of costs computation for a reallocation." SUPPAR000800. In the memorandum, Ms. Shoemake speculates that Georgia will want to discuss with the Secretary of the Army water supply reallocations beyond the Corps' authority but "below the need for Congressional approval."

348.    The memorandum further states that "it was very clear that for Georgia the bottom line is cost and thus a vigorous assault on the applicability of present cost calculation methods should be expected, with a particular focus on updated costs of storage." SUPPAR000800.

349.    As described in greater detail below, the Corps worked with the water suppliers to develop new interim water withdrawal contracts, with the aim of implementing them at the end of 1999. On September 8, 1999, the Division Engineer for the Corps' South Atlantic Division wrote to the Federal Commissioner for the ACF Compact negotiations, enclosing a document titled "Implementation of Water Withdrawal Contracts, Lake Lanier, Georgia." SUPPAR000742-47. The document explains that "a course of action to reinstate water withdrawal contracts at Lake Lanier has been developed by the Mobile District," and that the Corps was drafting such contracts, coordinating with interested parties and preparing

environmental documentation, all of which would result in formal action following the close of calendar year 1999.  SUPPAR000746.

350.    The Corps was unsuccessful in implementing the proposed interim contracts prior to SeFPC filing its complaint in the D.C. District Court in December 2000.  Mediation in that case, however, ultimately led to the D.C. Settlement Agreement, discussed below, which included new interim contracts with the water suppliers.

### 1.    The Corps' Attempts to Enter Into New Interim Withdrawal Contracts

351.    An October 17, 2000 email transmitted 8:38 am from Gary Mauldin to Rodney (HQ) explains the history of the proposed interim surplus water agreements:  "We should have been updating the price being charged to the Lanier water withdrawal contracts about ever 5-years; but we haven't...Still don't want to jump in and recommend 'permanent' storage-based contracts, but we feel we MUST get prices more in line with current requirements (*Power customers are demanding this because their 'credit' for water supply use is being 'short-changed' (their argument which we concur with)*."  SUPPAR000865 (emphasis added).

352.    Email correspondence within the Corps dating from October through December 1999 indicate that the Corps was attempting to negotiate a means to increase the water supply cost rates, most likely in response to power customers complaints. SUPPAR000884-87.

353.    The November 30, 1999 email from William Lawrence, Assistant Chief, Real Estate Division, Corps Mobile District, to Edmund Burkett, Mobile District, copying Roger

Burke, Mobile District and Steve Cone, Headquarters, summarizes the status of the holdover

contracts:

> [T]he contracts were extended by six months to January 1, 1990. … Although
> they wouldn't have expired until later, they were made to expire on that date
> in contemplation that we would have storage space contracts in place by that
> time.  As you recall, we drafted new interim contracts based on updated cost
> of storage, but that got complicated and, in essence, killed by the live and let
> live at the rates in the expired contracts.

SUPPAR000884-85.

354.    An October 8, 1999 email from Norwood to General Capka (Commander of

SAD) written in preparation for a meeting with hydropower representatives, summarizes the

issues and advises caution in publicly announcing a plan to change rates before the allocation

formula is agreed upon. "The 'live and let live' provision allowed us to change the quantity

without actually modifying the contract. Once we announce the rate change, it will mean that

we intend to modify the contract. We will be very specific in our announcement that this

modification does not affect quantities or the Compact process. ***However, if either Alabama***

***or Florida misconstrue [sic] our action as an attempt to contractually modify the quantities,***

***we could have a problem***."  SUPPAR000887 (emphasis added).

355.    Email exchanges from early 2000 indicate the difficulty of the Corps'

situation of not having lawful contracts with the water suppliers.  SUPPAR000898-912.

356.    Specifically, a January 20, 2000 email from John Graham summarizes the

Corps' dilemma: "Had the contracts not been made to expire, they would have continued on

renewable at five-year intervals.  They were terminated by supplemental agreements in

contemplation that we would have storage space contracts in place by the created termination

dates.  Then we couldn't extend because of the prohibition against use of the 9701

[Independent Offices Appropriations Act, 31 U.S.C. § 9701] as the authority."
SUPPAR000911.  In the original email from Steve Cone to Graham *et al*., Cone
acknowledges limits on FCA authority: "Need some rationale for using Sec. 6 surplus water
authority.  Get counsel involved as Sec. 6 [of the Flood Control Act of 1944] says things like
'what [sic] that is surplus to project needs' and 'no adverse impact on authorized project
purposes.' This later [sic] is a bit of a hurdle." SUPPAR000912.

357.     Emails to/from Steve Cone, Economist – Team Leader, Policy Compliance
Support Branch, Planning and Policy Division, Directorate of Civil Works for the Corps,
dated February 4, 2000, indicate that a request for policy exception is needed in order to
correct the Corps' legal deficiency and enter into contracts with the water suppliers that
provide for updated pricing but do not charge the highest of four values pursuant to Corps
regulations:  ". . . at this point I don't think that we have any choice but to use Sec 6. ***Don't
believe we can (or even should have) let the 'non-memorialized gentleman's agreement'
continue.  Don't believe there is legal basis to do that***."  SUPPAR000900 (emphasis added).

358.     In response to Mr. Cone's email, on February 4, 2000 John Graham (Mobile
District) emailed a "draft writeup" to include in a letter request for policy exception that
"attempts to describe the rational for using Sec. 6 as the authority for the proposed interim
water withdrawal contracts."  SUPPAR000903 (the "draft writeup" attachment is not
included in the administrative record)  In response, Steve Lingenfelter (SAD counsel), states
"then assume that the letter/memo is being rewritten to specifically state that the exception
for costing will only be until the compact issue is resolved after which we will (regardless of
which way the compact goes—allocation formula or it dies), re-allocate reservoir storage for

these withdrawls (sic), and enter into long term contracts applying the higher of the cost procedures per our regulations?" *Id.*  The response to Mr. Lingenfelter's concerns was "[t]hat has been our intent all along.  These are proposed interim withdrawal contracts that will serve until we are able to implement permanent storage space contracts at Lanier.  The letter is being revised to make that point clear."  SUPPAR000902.

359.    A March 8, 2000 memorandum to headquarters from General Capka (SAD Commander) explains that the policy exception and proposed withdrawal contracts are "interim in nature solely to make us legally sufficient."  SUPPAR000880.  An accompanying memorandum for the record ("MFR") states "***This policy exception request, if granted, will resolve our legal deficiency in not having M&I water use contracts in place at Lake Lanier***."  SUPPAR000881 (emphasis added).

360.    In addition to correcting a legal deficiency, the Corps wanted to use the interim contracts to update pricing values.  Georgia was particularly sensitive to the pricing amounts required for storage under the Corps' regulations.  A September 9, 1999 email from Gary Mauldin (SAD) to Steven Cone (Headquarters) regarding an upcoming meeting with Georgia representatives summarizes Georgia's arguments: "Their position is since storage is authorized they shouldn't have to pay for the building of the storage again (updated costs of storage methodology).  I guess they are going to argue they shouldn't have to pay as much as our regulations will require."  SUPPAR009575.

361.    An October 6, 1999 email from Gary Mauldin (SAD) to Roger Burke (Mobile District) describes a discussion with General Capka and others who inquired about "the status of updating the costs of water withdrawals at Lanier and why has the strategy

agreed to in July not been revised?  I explained our rationale for waiting until after October

to not allow a target for any of the States looking for an excuse of negotiation breakdown."

SUPPAR000933.

362.    The July 1999 "strategy" referred to in Mauldin's October 1999 email is

summarized in the administrative record document entitled, "A Strategy to Implement

Interim Water Withdrawal Contracts, Lake Lanier, Georgia."  SUPPAR000929.  This

Strategy references SeFPC's concerns about "the inequity that exists in the repayment of the

hydropower account to the U.S. treasury as a result of increased water withdrawals from lake

Lanier since 1989 and the rates the M&I water users are paying."  SUPPAR000930.  The

Strategy notes SeFPC's contention that the water users' rates "should be updated to current

hydropower revenues foregone ***so that the M&I water users will pay an equitable share of

the project costs***."  *Id*. (emphasis added).  The Strategy document acknowledges that

"***Currently, the preference power customers pay a disproportionate share of these costs***.

Additionally, the SeFPC believes that the Corps is not operating in accordance with its own

regulations by allowing M&I water withdrawals to occur without contracts."  *Id*. (emphasis

added); *see also* SUPPAR000922.

363.    The July 1999 Strategy document further acknowledges that "the Corps does

not argue these points with the SeFPC."  SUPPAR000930.  A later version of a similar

summary document, entitled "Implementation of Water Withdrawal Contracts, Lake Lanier

Georgia" specified that the "Corps does not argue that the current prices are too low."

SUPPAR000922.

364.     The July 1999 Strategy document includes ARC in the analysis even though ARC's withdrawals occur downstream of Buford Dam because "***storage releases from Lake Lanier are made to accommodate withdrawals greater than 327 mgd***."  SUPPAR000929 (emphasis added).  Later versions of the Strategy document contained in the administrative record also make similar references to ARC.  SUPPAR000921; SUPPAR000927.

365.     The July 1999 Strategy document continues that "[d]ue to the potential threat of legal action by the hydropower interests, [SAD] staff has recommended that water supply contracts reflecting updated costs be implemented at Lake Lanier no later than December 1999."  SUPPAR000931.  Regarding this proposal, the Mobile District further recommended not taking any "formal action" to implement the proposed interim contracts during 1999 to allow the States the opportunity to complete allocation formula negotiations:

> While there are existing inequities with regard to repayment of the hydropower account due to the rates currently paid by the M&I water users, any immediate action to implement interim contracts would likely be disruptive to the States' water allocation formula negotiation process.  The Corps should not position itself to be implicated on the possible failure of the negotiation process.

*Id*.

366.     The administrative record contains an "Information Release" dated October 12, 1999 entitled, "U.S. Army Corps of Engineers to Begin Process for Interim Water Withdrawal Contracts for Lake Lanier Municipal and Industrial Water Users." SUPPAR000927.  The Information Release acknowledges that the water withdrawal contracts had expired, and that the prices the water suppliers paid for water were based on the hydropower revenues foregone "computed at the time the [expired] contracts were originally executed."  *Id*.  Consequently, according to the Release:

[T]he Mobile District has begun the process of preparing to implement interim withdrawal contracts with the M&I users.  These interim contracts will then remain in effect until such time as storage supply contracts can be implemented.  They will not grant any permanent, vested or perpetual rights to the increases in water the M&I users have been withdrawing since January 3, 1992. . . A preliminary estimate of the updated prices for water withdrawals would affect the consumer from 0.1 cent to 0.9 cent per 1000 gallons, or 0.7 cents to 6.3 cents per month based on the typical residential use of 7,000 gallons per month.

SUPPAR000928.

367.    A later version of the Strategy document, entitled "Implementation of Water Withdrawal Contracts, Lake Lanier, Georgia," with a handwritten date of October 7, 1999, sets forth the following table "displaying the prices the M&I water users are currently paying and a preliminary estimate of the updated prices which would be contained in the new water withdrawal contracts," both based on hydropower revenues foregone:

Water Withdrawal Prices.  The following table displays the prices the M&I water users are currently paying and a preliminary estimate of the updated prices which would be contained in the new water withdrawal contracts.  Both the existing and approximate updated prices are based on power revenues foregone.

Lake Lanier Water Withdrawal Prices

| Water User | Current Price per MGD | Updated Price per MGD |
|---|---|---|
| City of Gainesville | 12.44 | 21.61 |
| City of Cumming | 7.88 | 13.99 |
| Gwinnett County | 9.74 | 17.21 |
| Atlanta Regional Commission | 1.73/5.75[2] | 2.83/6.85[2] |

---

[2] The Atlanta Regional Commission currently pays $5.75 per mgd for river withdrawals exceeding 327 mgd.  A portion of the total price - $1.73 – represents power revenues foregone.  The balance of the price - $4.02 – is charged to repay the cost of stream gage installation and maintenance.  The updated portion of the price based on power revenues foregone will be $2.83, which will increase the total price to $6.85 ($2.83 + $4.02).

SUPPAR000922.

368.     A "Public Affairs Plan for the Implementation of Water Withdrawal

Contracts for Municipal and Industrial Water Supply Users, Lake Sydney Lanier, Georgia,"

summarizes a program to provide information to Congressional and State delegations and a

number of other interested parties on the proposed new interim contracts.  Specifically, the

Public Affairs Plan describes its "Objectives" as:

> To project the interim contract action as a fair and equitable action for the taxpayer and various water users at Lake Sidney Lanier.
>
> To achieve understanding among the various publics of the necessity for the contracts.
>
> To ensure there is no misunderstanding that these contracts in any way provide any permanent, vested or perpetual rights to the M&I users.

SUPPAR000925.

369.     On October 6, 1999, Corps officials exchanged email communications

indicating that the Corps was pursuing "ongoing activities" pursuant to its strategy for

implementing water withdrawal agreements.  These activities included "developing pricing"

and "drafting contracts."   SUPPAR000933.

370.     On December 16, 1999, Corps officials discussed by email a meeting that had

been held the previous day with water supply interests who withdraw water from Lake Lanier.

SUPPAR000909-10.  At the meeting, the Corps explained that it "will be preparing new

interim contracts under the authority of the Flood Control Act of 1944 as suggested by

HQUSACE."  SUPPAR000909.  The Corps indicated that it "will develop the contract

language and submit it to SAD/HQUSACE/ASA (CW) for approval and prepare the
necessary environmental documentation." SUPPAR000910.

371.    A January 10, 2000 email from Steve Cone, Economist – Team Leader,
Policy Compliance Support Branch, Planning and Policy Division, Directorate of Civil
Works, to staff from the Mobile District and SAD, regarding "Additional Info – SeFPC
meeting with ASA/CW," provided two excel spreadsheets as attachments. Mr. Cone
describes one of the attachments, at SUPPAR000907, as containing "information Ed Burkett
worked up to show the revenues the power interests have lost at Lanier due to the 'frozen'
rates the M&I users have paid since the 'live and let live" provisions of the MOA and
compacts were implemented." SUPPAR000905.

372.    The Corps also was coordinating its plan with the hydropower interests,
represented by SeFPC. On January 20, 2000, Steve Cone sent an email to numerous other
Corps officials reporting on a January 13, 2000 meeting with SeFPC. SUPPAR000796-97.
He indicated that "the plan should be to proceed with attempts to get new WS agreements in
place as quickly as possible." SUPPAR000796.

373.    In a January 21, 2000 email from Pat Stevens (ARC) to Ed Burkett (Corps
Mobile District) regarding the negotiation of interim contracts, Stevens objects to the Corps
notifying Florida and Alabama of their efforts to negotiate new contracts with the water
suppliers: "***Why do you have to cc Florida and Alabama at this point***. The [MOA] calls for
reporting water withdrawals not financial arrangements. Until we are done negotiating our
contract and the financial costs we are not comfortable involving extraneous parties in our
contract negotiations." SUPPAR000898 (emphasis added).

374.     A February 8, 2000 email from Ed Burkett to various staff from the Corps

Mobile District, regarding "Meeting with Stevens," describes ARC's potential concerns with

a new pricing contract.

> Their big concern is the principal of paying for downstream power loss at
> West Point and George.  They believe as riparian users this would set a bad
> precedent. (and, in a way, this is what Al is trying to extract in its ACT
> proposal).  I said I understood their concern but this would be the way we
> credited the power account and this was the way that payments were
> structured in the '85 ARC withdrawal contract.  I suggested perhaps if we
> found a way for the charge to them to be sufficient to cover our revenue
> credits to the power customers then maybe ARC would not need to 'know'
> what the Feds were doing with the money.  This may be a way around their
> problem. . . I think we may can find a way ***to estimate storage needs in excess
> of normal releases and convert to a storage***.  This is not as easy as was done
> in PAC since power contract has changed.

SUPPAR000895 (emphasis added).

375.     On February 3, 2000, Edmund B. Burkett of the Corps' Mobile District

circulated by email a draft letter requesting permission to utilize a certain pricing mechanism

for "proposed interim water withdrawal contracts at Lake Lanier, Georgia."

SUPPAR000785-90.  The draft letter indicates that one of its enclosures was "[a] draft water

withdrawal contract."  SUPPAR000788.

376.     A February 4, 2000 letter from the Corps Mobile District to the City of

Cumming acknowledges the need to update costs for water withdrawals:

> Reference is made to the meeting on December 15, 1999, in [ARC's] office to
> discuss the need to update prices being paid for water being withdrawn from
> lake Lanier by your agency.  As indicated in the meeting, your agency has
> been allowed to continue making withdrawals from lake Lanier in accordance
> with the 'live and let live' provisions . . . The prices being paid for the water,
> however, are those in effect when your withdrawal contract was made to
> expire in January 1990.

SUPPAR000896.

377.   In the letter to Cumming, the Corps details its efforts to obtain a policy

exception in order to prepare new interim contracts for the water suppliers based on the

lowest payment method:

> We are preparing a new interim withdrawal contract.  This contract is
> intended to be an interim measure until the States reach agreement on an
> allocation formula . . . and more permanent arrangements may be made.
> ***Existing U.S. Army Corps of Engineers policy requires that the prices of
> water withdrawals be determined by one of five methods***: updated cost of
> storage, hydropower benefits foregone, replacement cost of hydropower,
> hydropower revenues foregone and credit to power marketing agency.  Our
> experience has been that ***hydropower revenues foregone normally results in
> the lowest payments of the five methods***.  Since your previous withdrawal
> contract was based on that method, ***we are asking the Office of the Assistant
> Secretary of the Army (Civil Works) for an exception to policy to allow
> water withdrawals under the new interim withdrawal contract to be priced
> using hydropower revenues foregone***.

SUPPAR000896 (emphases added).

378.   A March 31, 2000 email from Gary Mauldin to Stephen Lingenfelter

reiterates the need for both the interim contracts and the policy exception for the pricing of

those contracts lower than the values specified by Corps regulation: "***Remember; INTERIM***

***measure solely to get us legally compliant***.  Permanent storage based contracts, with correct

charges for water, will be put in place but are several years down the road..."

SUPPAR000878 (emphasis added).   "Price increases of 73-93% seem to me to be much

more palatable to the water suppliers than 330-555% increases.  ***Sure, they have been getting***

***a good deal for awhile now, but that's not their fault***."  *Id*. (emphasis added).

379.   An April 3, 2000 email from Robert Watson to Gary Mauldin summarizes a

discussion with General Capka on why the Corps should not charge the water suppliers the

"highest of 4" values pursuant to Corps regulations, and should instead seek a policy

exception to use lower pricing values.  SUPPAR000877.  Specifically, some individuals

within the Corps were apparently concerned that charging the water suppliers the higher

price, required by Corps regulation, would provide the "final straw on the camel's back" for

the Georgia parties and put an end to the Compact allocation formula negotiations.  *Id.*

380.    An April 5, 2000 email from Roger Burke to Gary Mauldin states that "The

request for an exception to the price based on revenues foregone is as much for the benefit of

the Georgia communities as it is for not being the 'final straw....'"  SUPPAR000876.

381.    In a March 27, 2000 email from Stephen Lingenfelter (SAD Counsel) to

Gary Mauldin, Leingenfelter objects to the Policy Exception memo on the basis of "inherent

unfairness" to the taxpayer.  "***Taxpayers are entitled to a fair return on their investment,***

***not a lesser return based upon our trying not to upset the allocation negotiation process***."

SUPPAR000879 (emphasis added).

382.    On October 27, 2000, William Lawrence, Assistant Chief, Real Estate

Division, Corps Mobile District, sent an email message to David Vaughn of the Georgia

Department of Natural Resources, with copies to numerous other officials.  SUPPAR000861-

63.  The email discusses various pricing methods for water withdrawals, and states:  "[w]e

are considering new 'interim' contracts, but a decision has not been made by our higher

authorities as to how charges will be established."  SUPPAR000862.

383.    By August 4, 2000, Corps officials were exchanging emails regarding the

"Lanier Water pricing deal."  SUPPAR000852-58.  Steven R. Cone, Economist – Team

Leader, Policy Compliance Support Branch, Planning and Policy Division, Directorate of

Civil Works for the Corps, sent an email to Gary V. Mauldin, asking about changes from the

prior plan to establish a contract price "based on storage, not use."  SUPPAR000854.

Mauldin responded that the Corps was trying "to avoid any appearance of providing any type

of 'storage' which might be construed as violating the compacts…."  He added that "[f]rom a

compact negotiating standpoint, an 'interim right to storage' doesn't sound as good as an

'interim right to withdrawals.'"  *Id*.

## 2.  The Corps' Request for Policy Exception to Use Lower Pricing Method

384.    The Corps Mobile District's September 3, 1999 response to questions

propounded by SeFPC affirms that the Corps' regulations require that water users be charged

the highest rate computed by four alternative methods.  SUPPAR0017771-94.  This

regulation is ER 1105-2-100.  *Id*.  Chapter 3.8.b(5)(a) of the regulation specifies that the four

methods are:  (1) Updated Cost of Storage; (2) Benefits Forgone; (3) Revenues Foregone;

and (4) Replacement Cost.

385.    As described above, by November, 1999, the Corps was engaged in a serious

internal debate about whether the RF Method could be employed to increase rates charged to

the water users, as promised in the September 8 letter to the Federal Commissioner.  In

preparation for a meeting with the water users scheduled for December 15, 1999, William L.

Lawrence of the Mobile District sent an email to Edmund B. Burkett and other Corps

officials on November 30 explaining that "we drafted new interim contracts based on

updated costs of storage, but that got complicated and, in essence, killed by the live and let

live at the rates in the expired contracts."  SUPPAR000884-85.  He recommended either

extending the expired withdrawal contracts "with updated revenues foregone charges," as

indicated in the September 8 letter, or "leasing rather than selling the storage space," which

would allow the Corps to charge based on the higher updated cost of storage method, but only for the amount of water actually withdrawn. *Id*. In response, Steven H. Cone, a Corps headquarters official, told Lawrence in an email that headquarters could not approve use of the revenues foregone method because it was "not in conformance with current policy," but suggested that "[t]his is not to say we could not make a case for interim measures/agreement that the district seems to be exploring…." *Id*. Lawrence replied that the headquarters position left but three options: (a) execute "new interim contracts with payments based somehow on storage space purchase value" (i.e., the updated storage costs method); (b) increase the rates (using the revenues foregone method) and allow withdrawals "on the basis that the expired contracts are still alive as a holdover tenancy situation…."; or (c) do nothing. *Id*.

386. Following the meeting with water users, Roger Burke reported to Colonel David Norwood on the results of the meeting in an email dated December 16, 1999 with a copy to Mauldin and others. SUPPAR000909-10. He stated that "[w]e also explained that we will be preparing new interim contracts under the authority of the Flood Control Act of 1944 as suggested by HQUSACE that would update the prices being paid for the water withdrawn….. based on hydropower revenues foregone." *Id*. Mauldin forwarded that email to Cone and others; Cone responded that the "submittal to HQ should include request for exceptions, rationale, etc. as agreed to in prior telecoms." *Id*.

387. On January 19, 2000, Mauldin sent an email to others in the Corps' Mobile District. SUPPAR000596. He reported on progress toward implementing the "strategy we put together last summer" for interim withdrawal contracts, and informed the recipients that a

letter to the Assistant Secretary of the Army (Civil Works) was being prepared to request an exception, on an expedited basis, that would allow use of the revenues foregone method rather than the highest of the four methods, as required by Corps regulations.  *Id.*

388.    By February 3, 2000, Mobile District officials were sharing an early draft of the letter requesting an exception to the Corps' regulation requiring use of the highest of the four pricing methods.  SUPPAR000785-90.  The exception would allow the Corps "to utilize hydropower revenues foregone as pricing method for proposed interim water withdrawal contracts at Lake Lanier, Georgia."  *Id.*  The draft contains a table setting forth the prices that would be charged in the year 2000 under each of the four methods, and indicates that the updated storage costs method would result in the highest cost, while the RF Method would result in the lowest cost.

389.    The February 3, 2000 draft exception also sets forth in detail the Corps' rationale for requesting the pricing exception and pursuing interim water withdrawal contracts with the water users.  Among other things, the letter advocates that:  (1) the contract should be issued under the authority of the Flood Control Act of 1944 (FCA) because this is "the only authorization available" since other authorities are inappropriate; (2) the FCA's requirement that water supply contracts must not affect authorized purposes can be met because credits to hydropower users will have the effect of "ameliorating financial impacts on the hydropower interests"; and (3) use of the lowest pricing approach (revenues foregone) rather than the highest approach (updated storage costs) would avoid suspicions by Alabama, provide enough money to satisfy SeFPC's demands for increased hydropower credits, and

satisfy Georgia's demand for low water prices.  *Id*.  Finally, the draft exception states that the Corps expects to complete its NEPA process in 90-120 days.  *Id*.

390.    On August 16, 2000, SeFPC requested from the Corps an update on the water supply contracts at Lake Lanier; General Capka responded to that request.  SUPPAR000859. He indicated that, "[o]n July 6, 2000, I endorsed the Mobile District's request for water supply policy exceptions to our headquarters for their approval."  *Id*.  He also stated:  "I have asked for their concurrence with executing interim water withdrawal contracts in lieu of permanent water storage contracts and that the pricing of the water be based on hydropower revenues foregone for the first two years.  After two years, the highest of our four methods normally considered, will be charged."  *Id*.

391.    The latest draft of the policy exception in the administrative record is a March 8, 2001 Policy Exception memorandum, entitled "Request for Policy Exception to Establish Interim Surplus Water Supply Agreements."  SUPPAR000828.  The Policy Exception memorandum from Mobile District requests from headquarters (Assistant Secretary of Army for Civil Works) the ability to develop interim surplus water agreements under the FCA for the purpose of charging the water suppliers current hydropower revenues foregone, a value which would have constituted an exception to Corps policy requiring pricing according to the highest of four different methods.  SUPPAR000828-51.

392.    The Policy Exception memorandum presents a summary of estimated annual water charges compared to various methods for calculating appropriate charges for storage pursuant to the Corps' regulations.  SUPPAR000830.  While the numbers are projected

estimates, the conclusion is clear:  the current prices being paid by the water suppliers under

the "holdover" contracts were lower than the other values.

     b.    The following table presents a summary of estimated annual water charges in accordance with the alternative methods outlined in ER 1105-2-100, along with the current charges for the three users, which withdraw water directly from Lake Lanier.  For purposes of the estimates shown herein, expected withdrawals have been projected over a five-year period (2001-2005) based on historical trends.  No estimate has yet been made for Atlanta Regional Commission as they withdraw water downstream and have historically been charged only for withdrawals greater than 327MDG.  The principal differences in the rates shown for hydropower revenues foregone and benefits foregone are due to the amount of flows returned to the system. When determining hydropower revenues and benefits foregone, return flows are factored in the estimation of power loses.

| Entity | MGD | Storage Ac/Ft | Current User Charges[1] | Revenues Foregone[2] Recommended | Update Cost Of Storage | Benefits Foregone |
|---|---|---|---|---|---|---|
| Gwinnett Co. | 114.5 | 132,820 | $406,670 | **$800,740** | $1,433,130 | $1,998,100 |
| Gainesville | 16.0[3] | 18,560 | 4,240 | **63,130** | 200,260 | 157,620 |
| Cumming | 15.6 | 18,096 | 44,860 | **74,140** | 195,260 | 185,970 |
| **Totals:** | 146.1 | 169,476 | $ 455,770 | **$ 938,010** | $ 1,828,650 | $2,341,690 |

     c.    The projected water supply withdrawals at Lake Lanier will result in an approximate 12% reduction in hydropower production at the project.  The average annual hydropower production at Lake Lanier is 162,372 MWH/yr. Hydropower losses resulting from the total water supply withdrawals are estimated to be 19,636 MWH/yr.  The SEPA energy rate is currently $7.21/MWH; therefore, the energy losses are estimated to total approximately $141,600.

---

[1] Current user charges are based on actual water usage and old power rates.  Values shown are based on maximum projected average annual daily withdrawal amounts.

[2] For the purposes of this memorandum, the credit to power marketing agency is assumed to be equal to hydropower revenues foregone.

[3] Actual total withdrawal amount is projected to be 24.0 MGD.  A grand fathered amount of 8.0 MGD is provided free of charge due to real estate relocations during project construction.

SUPPAR000830.

393.    The Policy Exception memorandum does not contain estimates for ARC.  A February 15, 2000 email from Edmund Burkett to Pat Stevens raises potential methods of addressing ARC's price for updated costs of storage.  SUPPAR000894.  A February 7, 2001 email to Steve Cone from John Graham notes the decision that ARC would be left out of the Policy Exception request and addressed "subsequent to the decision on the requested exception to policy and . . . consistent with that decision."  SUPPAR000832.

394.    The Policy Exception memorandum states that "The use of pricing methods other than hydropower revenues foregone could create the perception that this proposed action would grant perpetual rights to the State of Georgia for the water withdrawn under these contracts.  This has been a particularly sensitive issue with the State of Alabama."  SUPPAR000830.

395.    The Policy Exception memorandum further indicates that "Georgia is sensitive to the issue of pricing for water withdrawals and any other method to establish payment rates would be objectionable to Georgia thereby protracting the contract negotiations."  SUPPAR000831.

396.    An earlier, February 3, 2000 draft of the exception request lays out SeFPC's contention that prices charged to the water users must be updated from the levels established pursuant to the expired water withdrawal contracts, as well as SeFPC's belief that the Corps was violating its own regulations by continuing the allow water supply withdrawals in the absence of contracts.  The February 3, 2000 draft states: "The SeFPC's position is that the Corps should take immediate corrective action on this issue."  SUPPAR000787.  Among the

justifications offered for granting the exception request, the Corps notes that increasing the water users' rates by updating prices charged pursuant to the revenues foregone method "would cure the issue raised by SeFPC…."  SUPPAR000789.

397.    It is unclear from the record whether Corps headquarters ever responded to the request for Policy Exception.  In any event, interim water surplus agreements with the water suppliers were never entered into pursuant to such an exception.

398.    An April 25, 2001 email from Steve Cone (Headquarters) to various Corps staff in the Mobile District, SAD and headquarters, indicates that the above estimates on updated pricing values were utilized in the mediation discussions that ultimately led to the Settlement Agreement.  SUPPAR000825.  Specifically, Mr. Cone indicates that "[m]ediators meet again on May 1st, and the above 'technical' committee needs to have a better understanding of the numbers.  Success of Mediation efforts depends on this.  If I told you anymore, I would have to kill you."  *Id*.

### 3.    The Corps' Apparent Update of Contract Pricing in 2000

399.    A January 31, 2000 email exchange between Edmund Burke (Mobile District) and Pa Stevens (ARC) refers to negotiations between the Corps and the water suppliers regarding updating the price of the water withdrawals.  After expressing concerns with the Corps' proposed cost calculations, Ms. Stevens stated: "I suggest we go back to the previous method of determining the per MG cost attached to our last contract and just update the power values.  I think everything else will need to be thoroughly discussed when we negotiate a final contract."  SUPPAR000904.

400.     On February 4, 2000, Colonel J. David Norwood, District Engineer of the Corps' Mobile District, sent letters to the water suppliers indicating that the Corps intended to raise the price for withdrawals of water from Lake Lanier, and informing the suppliers that "[w]e are preparing a new interim withdrawal contract."  ACF034982 (ARC); ACF034984 (Cumming); ACF034987 (Gainesville); ACF034990 (Gwinnett).  The letters stated that "[w]e expect to have the new contract prepared for signature within the next few months," and directed the suppliers to begin paying the higher rates as of March 1, 2000: ARC at $6.85 per million gallons (ACF034983); Cumming at $13.65 per million gallons (ACF034985); Gainesville at $21.55 per million gallons (ACF034988); and Gwinnett at $18.80 per million gallons (ACF034991).

401.     The Corps water withdrawal summary tables state for each water supplier "payment rate updated 8/1/1999" and indicate the above rates per the February 4, 2000 letters.

402.     On March 21, 2000, Gwinnett County responded to the February 4, 2000, Norwood letter, agreeing to reserve funds for payment of the new rates, effective April 1, 2000, and to make payments once "the interim contract is finalized."  SUPPAR000864.

403.     The Federal Defendants' Answer (Doc. 230 in MDL 3:08-cv-00640) to SeFPC's complaint (Doc. 234) admits that the "Corps is at present charging M&I users from $1.73 to $21.55 per million gallons for withdrawals of water supplied from the Buford Project."  *See* Answer at ¶ 99.

### D. The Corps' Treatment of the Water Supply Contracts as Storage Contracts

#### 1. Corps' Memoranda and Correspondence

404.    A December 29, 1959 letter from the Assistant Chief of Engineers from Civil Works to General Frank M. Albrecht of the South Atlantic U.S. Army Engineer Division, addressing water supply policies under the Water Supply Act of 1958, explained that the Corps "will approve requests for relatively small amounts of storage in completed projects" as "there would be no serious affect on authorized project purposes."  ACF003445; SUPPAR008608.  However, "if a multiplicity of such requests is in prospect it would be desirable to consider the overall affect of such conversion of storage use on other authorized project purposes…" and provide "a reasonably firm determination of whether or not additional approval of Congress is required."  ACF003445-46; SUPPAR008608-09.

405.    A 1960 memorandum describes the Corps' policies regarding "the withdrawal of water from storage reservoirs," which implicitly means any withdrawal at a storage reservoir is a withdrawal of storage.  ACF003442.

406.    In a November 9, 1982 letter, the Corps explained that "the usual type of contract for permanent water supply "storage space" was not consummated" due to the fact that a study was in progress of present and future water supply needs.  ACF019942.  The Corps further explained that "because of the urgent need of the [Gwinnett] county to obtain a commitment for a source of water prior to completion of the study, an interim contract was entered into allowing withdrawal of a maximum of 40 million gallons per day (MGD) with the understanding that a storage space contract would be consummated upon approval of the study at Washington level."  ACF019942.

101

407.    In 1975, the Corps informed Senator Nunn that "[a]fter completion of the Atlanta Urban Study, this contract will be supplanted with a water storage space contract pursuant to the Water Supply Act of 1958."  ACF019944.

408.    The Corps' Mobile District Regulation No. 1165-2-2 dated July 12, 1967 entitled Water Resource Policies and Authorities – District Procedure for Preparing and Administering Water Supply Contracts states: "[t]echnically, water is not 'sold' by the Corps."  ACF003133.

409.    In a meeting on February 8, 1985 including the Corps and Gwinnett County, where Gwinnett County indicated that they were contemplating a request for 50 MGD average withdrawal and a peak day withdrawal of 75 MGD, the Corps admitted that any additional withdrawal should be "in the form of a storage contract."  ACF010344.

410.    The Corps informed Gwinnett County that "the preliminary costing of the storage contract revealed a price approximately ten times the present, 'revenues foregone' price."  ACF010344.

411.    A Corps' Short-Term Plan Meeting Summary dated February 2, 1984, prepared by Trafton Fletwood and Joe Goode, summarizing a meeting attended by the Corps states: "Corps sells storage not water; concerned about benefits costs, and revenues foregone due to loss of storage."  ACF010365.

412.    A Corps' Short-Term Plan Meeting Summary dated February 8, 1984, which summarizes a meeting with Clint Stewart of DeKalb County, states:  "We do not want to pay for what we do not use and would prefer a joint approach rather than paying for storage."

ARC Memorandum from Short-Term Plan Meeting with Clint Stewart, DeKalb County. ACF010367.

413.    A Corps' Short-Term Plan Meeting Summary dated February 23, 1984 prepared by Ed Burkett (Chief, Water Management Section) and Glen Coffee, summarizing a meeting attended by the Corps states:  "Ed had never heard of a contract where users only paid for water that was used rather than storage guarantees."  ACF010378.

414.    In a June 21, 1984 letter from the Corps to the ARC, the Corps agrees that it can implement the water supply contracts under the Short-Term Water Supply Plan, but that "[s]hould the long range solution (re-reg dam) not be implemented we believe that we would have to convert to a storage contract and recomputed charges based upon Corps of Engineers regulations for allocating storage space for water supply in existing projects."  ACF010353.

415.    In an October 20, 1989 memo from Ed Burkett of the Corps of Engineers to Pat Stevens of the ARC, Burkett stated that he "would like to see us push the concept that with (sic) PAC locals are buying storage space instead of withdrawal rates. Besides the obvious reason that that is what we are selling there are several advantages to thinking in terms of storage."  Burkett explained that those advantages included:

> (1) The possibility of more sophisticated withdrawal/conservation plans may make more yield available than formulation process indicates. . .
> (2) The concept of storage will allow for an integration of use of Lake Lanier with other (less firm) sources such as regional reservoirs and might provide more efficient use of all water storage systems.
> (3) Storage-use accounting systems can be devised so that locals can make informed decisions about when it is appropriate to conserve from a supply point of view.
> (4) If a more severe drought occurs than the design drought, the locals might be more ready to accept shortages if we can demonstrate how they have used their storage allocations.

SUPPAR036723.

416.    A February 26, 1990 letter from the Corps to the Cobb County/Marietta Water Authority states that "Water supply contracts will also be based on the storage required to provide the total amount of water withdrawal required during a critical drought period." SUPPAR001530.

417.    In a February 8, 1989 memorandum regarding a letter received from the ARC dated January 20, 1989 requesting the renewal of the water withdrawal contracts, the Corps stated that "[u]se of the term surplus water as defined in EC 1105-2-181 is not applicable to this situation since the sale of permanent storage will be the ultimate product of the PAC."  ACF016946.

418.    The February 8, 1989 memorandum noted that: "The four water withdrawal contracts at Lake Lanier were coordinated to expire on 1 July 1989 in anticipation of the Corps being prepared to convert them to water storage contracts by that date."  ACF016945.

419.    In a September 25, 1990 memorandum to the three Districts of the Corps' South Atlantic Division (SAD), the Commander of the Corps' SAD requested that these SAD Districts "develop accounting procedures for multipurpose projects with contracted conservation storage."  SUPPAR017651.

420.    Frederick H. Thompson, Acting Chief of the Engineering Division in the SAD responded to the September 25, 1990 request, sending a memorandum dated October 3, 1990 to the Commander of SAD.  With regard to storage-accounting at Buford, the Corps stated:

> We would propose to calculate the storage utilization bi-monthly until storage used is equivalent to 50% of contracted storage.  We would compute utilization every month when storage space used is greater than 50% of contracted. We propose to consider releases for hydropower/navigation and

continuous flow (small-turbine release) to be derived from "uncommitted" storage.  Withdrawals for Buford (2MGD) and 8MGD for Gainesville under relocation agreements would be considered "water rights" withdrawals taken directly from inflows.

***The obvious question related to keeping tally of storage space utilization is what will the Corps do in the event that a user exceeds his allocated storage space***.  Most of the users of Corps lakes would probably not have reasonable alternatives but to continue to withdraw using "uncommitted" storage.  Corps-wide guidance for this situation is sorely needed.

SUPPAR017650 (emphasis added).

421.    The administrative record contains one partial "water storage accounting report" for Lake Lanier, which includes several months from 1993.  SUPPAR026224-26.  No other water storage accounting reports are included in the administrative record.[5]  According to the partial 1993 water storage accounting report, the Corps calculated that the "contract storage users"—Gwinnett County, City of Cummings, City of Gainesville and the Atlanta Regional Commission—used storage totaling 95,317 acre-feet.  *Id.*

422.    The administrative record contains a document that sets forth water withdrawal amounts and equates them to three different storage amounts:  "Alabama Peak Equivalent Storage"; "Corps Peak Equivalent Storage"; and "Corp Avg Annual Equivalent Storage."  ACF044016.  The withdrawal amounts provided in the document (in MGD) for the "1999 Avg. Annual Daily" and "1999 Peak Daily" in MGD are taken directly from the Corps' "Water Withdrawals" summaries for Lake Lanier, contained at ACF044236-46, and are indisputable.  The total average annual daily withdrawals in MGD for Gwinnett County,

---

[5]       In e-mail correspondence dated December 22, 2008, counsel for the DOJ confirmed that the record does not include any other water storage accounting reports and indicated an understanding that such reports would have only been maintained for as long as the withdrawal contract status reports, discussed above, which appears to be only until 1994.

City of Buford, City of Cummings, City of Gainesville and the Atlanta Regional Commission equaled 429.73 MGD.6  ACF044016; ACF044236-46.  The "Corps Avg. Annual Equivalent Storage" in acre-feet for these withdrawals totaled 175,800 acre-feet of storage or approximately 16% "of conservation storage."  ACF044016.

423.    The administrative record contains another document that tallies withdrawal amounts in MGD and provides "equivalent storage" in acre-feet for "Existing Conditions" in 2001 and 2002, and for "Interim Contracts" using "projected withdrawals" in MGD. ACF044015.  The amounts listed for 2001 and 2002 withdrawals under the "Existing Conditions" are taken directly from the Corps' "Water Withdrawals" summaries for Lake Lanier, contained at ACF044236-46, and are indisputable.  This document calculates that the withdrawals in MGD for Gwinnett County, City of Buford, City of Cummings, City of Gainesville and the Atlanta Regional Commission for 2001 equaled 413.45 MGD and for 2002 equaled 393.33 MGD.7  ACF044014; ACF044236-46.  The total amount of equivalent storage in acre-feet for these withdrawals for 2001 totaled 170,245.30 acre-feet of storage or approximately 16% "of conservation storage," and for 2002 165,595.74 acre-feet of storage or approximately 15% "of conservation storage."   ACF044014; SUPPAR000439.

424.    A Corps fact sheet entitled "How the ACF River Systems are Managed," states that "as our cities and industries have grown, they have become more dependent on the use of stored waters to assure a dependable water supply.  Whether water is withdrawn from

---

6    Note that this document includes the full withdrawal amounts and does not recognize the relocation contracts for the Cities of Buford (2 MGD- ACF014450) and Gainesville (8 MGD-ACF014457).

7    Note that this document includes the full withdrawal amounts and does not recognize the relocation contracts for the Cities of Buford (2 MGD- ACF014450) and Gainesville (8 MGD-ACF014457).

rivers below dams or withdrawn from lakes directly, today's uses depend on stored water – water that has been held back by dams when conditions are wetter." SUPPAR005749. The fact sheet is available on the Corps' ACF website at numerous locations, including in the background material of the recent Water Control Manual Scoping process at http://www.acf-wcm.com/docfile/ACF%20River%20System%20Management.pdf.

## 2.      Status Reports for Water Withdrawal Contracts

425.    The Corps prepared status reports for all of the water suppliers from 1977 through 1994. *See e.g.*, SUPPAR029083. The administrative record contains reports for the City of Cumming from 1979-1994; Gwinnett County from 1977-1994; the City of Gainesville 1988-1994; the City of Buford from 1987-1994; and for ARC from 1987-1994. In addition to containing basic information about a user and the user's contract, these reports track the amount of water withdrawn by a user during a specified time period and note any payments that the user made for the water withdrawals. *Id*.

426.    Many of the status reports also contain narrative descriptions about the contracts. These narrative descriptions reveal that the Corps has known since the 1970s that permanent water storage contracts were required to authorize the water withdrawals that it was allowing at Lake Lanier and that the Corps knew that these withdrawals were affecting hydropower production.

427.    In the first year for which water supply status reports appear in the administrative record, 1976, the status report for Gwinnett County acknowledges that the withdrawals are under an interim contract, that a storage space contract would be processed once the Atlanta Metropolitan Area Urban Study was completed, and that the charges under

the interim contract were based on power losses at Lake Lanier and Walter F. George resulting from water supply withdrawals.  SUPPAR029035.

428.    Consistent with this first status report, statements that the withdrawal contracts were interim in nature, that the Corps planned on entering into permanent storage space contracts in the future, and that the charges under the interim contracts were based on revenues lost as a result of the water withdrawals, appear throughout the water supply status reports as shown in the following charts (the presence of a bates number in a cell indicates that the status report for that user and year contains the charted statement):

**Statements that the Contracts are Interim in Nature**

| Year | ARC | City of Cumming | Gwinnett County |
|------|------|-----------------|-----------------|
| 1976 | N/A | N/A | SUPPAR029035 |
| 1977 | N/A | N/A | SUPPAR029045 |
| 1978 | N/A | N/A | SUPPAR029046 |
| 1979 | N/A | SUPPAR029040 | ACF019957 |
| 1980 | N/A | SUPPAR018081 | SUPPAR029052 |
| 1981 | N/A | SUPPAR029055 | SUPPAR029057 |
| 1982 | N/A | | SUPPAR029067 |
| 1983 | N/A | Not in Record | Not in Record |
| 1984 | N/A | SUPPAR029075 | SUPPAR029079 |
| 1985 | N/A | SUPPAR029089 | SUPPAR029081 |
| 1986 | SUPPAR029083 | SUPPAR029086 | SUPPAR029092 |
| 1987 | SUPPAR029094 | | SUPPAR029098 |

**Statements that Rates Charged for Withdrawals are Based on Revenues or Power Lost**

| Year | ARC | City of Cumming | Gwinnett County | City of Gainesville |
|------|------|-----------------|-----------------|---------------------|
| 1976 | N/A | N/A | SUPPAR029035 | |
| 1977 | N/A | N/A | SUPPAR029045 | |
| 1978 | N/A | N/A | SUPPAR029046 | |

| Year | ARC | City of Cumming | Gwinnett County | City of Gainesville |
|------|-----|------|------|------|
| 1979 | N/A | SUPPAR029040 | ACF019957 | |
| 1980 | N/A | SUPPAR018081 | SUPPAR029052 | |
| 1981 | N/A | SUPPAR018079 | SUPPAR029057 | |
| 1982 | N/A | SUPPAR029063 | SUPPAR029067 | |
| 1983 | N/A | Not in Record | Not in Record | |
| 1984 | N/A | SUPPAR029075 | SUPPAR029079 | |
| 1985 | N/A | SUPPAR029089 | SUPPAR029081 | |
| 1986 | SUPPAR029083 | SUPPAR029086 | SUPPAR029092 | |
| 1987 | SUPPAR029094 | SUPPAR029097 | SUPPAR029098 | |
| 1988 | SUPPAR029101 | SUPPAR029104 | SUPPAR029105 | SUPPAR029102 |
| 1989 | SUPPAR029107 | SUPPAR029113 | SUPPAR029111 | SUPPAR029109 |
| 1990 | SUPPAR029119 | SUPPAR029116 | SUPPAR029115 | SUPPAR029118 |

**Statements that Corps Plans on Entering Into Permanent Storage Contracts**

| Year | ARC | City of Cumming | Gwinnett County | City of Gainesville |
|------|-----|------|------|------|
| 1976 | N/A | N/A | SUPPAR029035 | |
| 1977 | N/A | N/A | SUPPAR029045 | |
| 1978 | N/A | N/A | SUPPAR029046 | |
| 1979 | N/A | SUPPAR029040 | ACF019957 | |
| 1980 | N/A | SUPPAR018081 | SUPPAR029052 | |
| 1981 | N/A | SUPPAR018079 | SUPPAR029057 | |
| 1982 | N/A | | SUPPAR029067 | |
| 1983 | N/A | Not in Record | Not in Record | |
| 1984 | N/A | SUPPAR029075 | SUPPAR029079 | |
| 1985 | N/A | | | |
| 1986 | | | | |
| 1987 | | | | |
| 1988 | | SUPPAR029104 | SUPPAR029105 | SUPPAR029102 |

109

| Year | ARC | City of Cumming | Gwinnett County | City of Gainesville |
|------|-----|-----------------|-----------------|---------------------|
| 1989 | SUPPAR029107 | SUPPAR029113 | SUPPAR029111 | SUPPAR029109 |
| 1990 | SUPPAR029119 | SUPPAR029116 | SUPPAR029115 | SUPPAR029118 |
| 1991 | SUPPAR029120 | SUPPAR029125 | SUPPAR029126 | SUPPAR029122 |
| 1992 | SUPPAR009141 | SUPPAR009138 | SUPPAR009137 | SUPPAR009140 |
| 1993 | SUPPAR029131 | SUPPAR029130 | SUPPAR029128 | SUPPAR029143 |
| 1994 | SUPPAR029136 | SUPPAR029138 | SUPPAR029137 | SUPPAR029134 |

429.    In the water supply status report for ARC in 1989 and 1990, the Corps admitted that it had granted water storage to ARC: "In effect, ARC has obtained the right to have up to 50 MGD (377 MGD – 327 MGD) released from the project storage, if needed, for water supply storage."  SUPPAR029107; SUPPAR029119.

430.    In the 1981 and 1990 Status Reports regarding water supply agreements with Gwinnett County and the City of Cumming prepared by the Corps, the Corps described the compensation mechanism under the contracts as "based on revenues lost to the Government at Buford, West Point, and Walter F. George."  ACF019920; ACF019922.

431.    According to the 1981 status report, Gwinnett County's total payment for 1981 was $38,157.42.  ACF019950.  The status report noted that the charges were based on power losses and that the contract was interim until completion of the Atlanta Metropolitan Area Urban Study and that a storage space contract would be processed at that time.  *Id*.

432.    The Corps filed a status report for the City of Gainesville for 1981. ACF019951.  The status report noted that Gainesville was allowed to withdraw 8 MG without charge, that Gainesville returned water to the lake, and that maximum withdrawal limitation was construed to pertain to net withdrawals.  *Id*.  The 1981 status report noted that

Gainesville had been exceeding 8 MGD of withdrawals for 53 days out of the year and that

the Corps would be contacting Gainesville regarding the overage and that the Corps would

begin negotiations for a new contract.  ACF019951.  For the quarter ending June 30, 1981,

Gainesville withdrew 14.40, returned 5.26 and retained 9.24 maximum daily use and

withdrew 11.13, returned 4.89, and retained 6.25 average daily use.  *Id*.

433.    According to status reports, Gwinnett County made payments for water on a

quarterly basis and the payment for the quarter ending December 31, 1989 was $38,238.48

for average daily use of 41.59 MGD reported on January 2, 1990 and maximum daily use of

71.40 MGD.  ACF019920.  The status report also remarked that the contract terminated on

December 31, 1989, but that "Gwinnett County ha[d] requested that their allocation for water

be included in the ARC Interim Water Supply Contract which [was] being reviewed by SAD

and OCE to replace the present storage contract until the [PAC] Report has been completed

and a Water Storage Contract can be prepared and approved."  *Id*.

434.    Gwinnett County's 1991 Status Report indicated that the amended contract

expired on 1 Jan 1990, however that Gwinnett would continue to withdraw and pay for water

pursuant to the expired contract until such time as the Comprehensive ACT and ACF Basin

Study is complete.  ACF019918.  For use of 47.24 MGD on average and maximum of 69.18

MGD, Gwinnett County paid $157,063.66 for the entire year of 1991.  *Id*.  The Status Report

also indicated that the contract was pending settlement of the lawsuit filed by Alabama.  *Id*.

435.    According to status reports, the City of Cumming made payments for water

supply on a quarterly basis and the payment for the quarter ending December 31, 1981 was

$706.58 for average daily use of 1.67 and maximum daily use of 3.43 MGD.  ACF019948.

In October 1981, the City of Cumming paid $4,302.08 for the 5 quarters beginning July 1, 1980. *Id.* The 1981 status report indicated that the contract was "an interim storage agreement pending completion of the Atlanta Metropolitan Area Urban Study" and "that a storage space contract [was] to be processed after completion of the study." *Id.*

436.    According to status reports, the City of Cumming made payments for water supply on a quarterly basis and the payment December 31, 1989 was $1,662.65 for average daily use of 3.37 MGD reported on December 30, 1989 and maximum daily use of 4.89 MGD.  ACF019920.  The status report also remarked that the contract terminated on December 31, 1989, but that "[a] three year interim water supply contract [was] being reviewed by SAD and OCE to replace the present storage contract until the [PAC] Report has been completed and a Water Storage Contract can be prepared and approved." *Id.*

437.    In every water supply status report from 1990-1994,[8] for every water supply user, except the City of Buford, the Corps noted that the contracts authorizing the withdrawals had expired but, despite this expiration, withdrawals were still taking place under the terms of the expired contracts.  The following chart documents the bates numbers of these water supply status reports:

| Year | ARC | City of Cumming | Gwinnett County | City of Gainesville |
|------|-----|-----------------|-----------------|---------------------|
| 1990 | SUPPAR018131 | SUPPAR029116 | SUPPAR029115 | SUPPAR029118 |
| 1991 | SUPPAR029120 | SUPPAR029125 | SUPPAR029124 | SUPPAR029122 |
| 1992 | SUPPAR009141 | SUPPAR009138 | SUPPAR009137 | SUPPAR009140 |
| 1993 | SUPPAR029131 | SUPPAR029130 | SUPPAR029128 | SUPPAR029132 |
| 1994 | SUPPAR029136 | SUPPAR029138 | SUPPAR029137 | SUPPAR029134 |

---

[8]    1994 is the last year for which status reports appear in the record.

438.    The water supply status reports clearly demonstrate that the Corps has allowed water supply withdrawals without any valid legal authority for decades.  Further, the reports also show that the Corps understood that it lacked legal authority and needed to enter into permanent water storage contracts for the water supply withdrawals to be in accordance with law.

**3.    Renunciation of the Independent Offices Appropriations Act and Recognition of the Need for Contracts Under the WSA**

439.    The Independent Offices Appropriations Act (IOAA) provides:

(a) It is the sense of Congress that each service or thing of value provided by an agency (except a mixed-ownership Government corporation) to a person (except a person on official business of the United States Government) is to be self-sustaining to the extent possible.
(b) The head of each agency (except a mixed-ownership Government corporation) may prescribe regulations establishing the charge for a service or thing of value provided by the agency.   Regulations prescribed by the heads of executive agencies are subject to the policies prescribed by the President and shall be as uniform as practicable.  Each charge shall be—
        (1) fair; and
        (2) based on—
                (A) the costs to the Government;
                (B) the value of the service or thing to the recipient;
                (C) public policy or interest served; and
                (D) other relevant facts.
(c) This section does not affect a law of the United States—
        (1) prohibiting the determination and collection of charges and
the disposition of those charges; and
        (2) prescribing bases for determining charges, but a charge may
be redetermined under this section consistent with the prescribed bases.

31 U.S.C. § 9701.

440.    In a 1983 opinion regarding the issue of whether the U.S. Customs Service could charge user fees to recover the cost of instructing travel agents, the Comptroller General stated:

> While 31 U.S.C. § 9701 authorizes agencies to charge for services provided to the public, it does not in and of itself provide the authority for agencies to provide the services.  Independent authority, either express or implied, must be relied upon to provide the legal basis for an agency undertaking the activity in the first place.  Otherwise, the law would provide a facile means for agencies to circumvent congressional or judicial oversight and control over the limits of authorized agency activity.

62 Comp. Gen. 262, 263 (1983) (internal footnote omitted).

441.    In a May 23, 1986 Memorandum from Susan J. Crawford, General Counsel, to the Assistant Secretary of the Army, Civil Works, regarding a proposal to withdraw water from Dworshak Dam for use by the City of Orofino (Idaho),  the Corps' General Counsel determined that "the Corps should refrain from using § 9701 [of the Independent Offices Appropriation Act of 1952] to obtain reimbursement for water withdrawals."  The General Counsel opinion further stated that "[a]lthough the language of § 9701 implies that the statute applies to services or things of value provided by any agency, including the Corps of Engineers, it is questionable whether Congress really intended the act to serve as a water marketing statute."  SUPPAR036971-72.  The opinion further concluded that water withdrawal contracts pursuant to the IOAA be replaced with storage contracts under the authority of the Water Supply Act of 1958 or Surplus Water Agreements under Section 6 of the Flood Control Act of 1944.  *Id.*

442.    Corps of Engineers Circular 1105-2-174, dated October 30, 1987, directs the Corps "to refrain from using Section 501 of the Independent Offices Appropriations Act of 1952 (31 U.S.C. 9701) to obtain reimbursement for water supply withdrawals."  ACF014644. The Corps was further directed to allow the contracts existing under this authority to expire under their terms and that such contracts "are not to be extended."  ACF014644.

443.    Circular 1105-2-174 further provided that "[p]ermanent storage reallocations would be performed under the authority of the 1958 Water Supply act, as amended.  Surplus water declarations will only be made when related withdrawals or storage reallocations would not significantly affect authorized purposes."  ACF014645.

444.    In April of 1989, one year and a half after the release of the Circular and the 1986 General Counsel Opinion, the Corps extended the contracts for a period of six months.  ACF016943.

445.    Corps of Engineers Circular 1105-2-181, that the Corps "is to refrain from using Section 501 of the Independent Offices Appropriations Act of 1952 (31 U.S.C. 9701) to obtain reimbursement for water supply withdrawals.  Existing contracts under this authority should be allowed to expire under the terms of the contract.  These contracts are not to be extended." ACF016175; SUPPAR022580-81.

446.    Circular 1105-2-181 further provided that "[s]urplus water withdrawal/storage contracts will normally be for small amounts of water and/or for temporary use as opposed to storage reallocations which are normally for larger blocks of storage and a permanent right to that storage."  ACF016176.  "Surplus water declarations will only be made when related withdrawals or storage reallocations would not significantly affect authorized purposes." ACF016179.

447.    "The view of the affected state(s) will be obtained, as appropriate, prior to consummating any contract under Section 6 [of the Flood Contract Act of 1944]." ACF016176.

448.    An August 11, 1989 memorandum regarding processing water supply requests reiterates that the IOAA was not to be used as authority and that reallocation of storage was the appropriate course of action to support water supply.  "A recent Army General Counsel opinion negated use of water withdrawal contracts prepared under Section 501 of the Independent Offices Appropriations Act of 1952 (31 USC 9701).  ER 1105-2-100 directs that existing contracts under this authority should be allowed to expire under the terms of the contracts.  If further water supply is required by the user, a new contract is to be executed for reallocation of storage under the Water Supply Act of 1958, as amended.  This applies to new requests for water supply as well."  SUPPAR014546.

449.    On December 12-13, 1990 the Corps held the "2nd Meeting of the Water Supply Policies and Procedures Task Force" in Atlanta, Georgia to discuss 25 topics. SUPPAR017595.  In the handout for Topic 23, "Conversion of existing water withdrawal contracts to storage contracts," the Corps stated, "[c]urrent regulations instruct the Corps to refrain from using Section 501 of the Independent Offices Appropriations Act of 1952 (31 U.S.C. 9701) to obtain reimbursement for water withdrawals."  SUPPAR017630.

450.    In a letter dated Oct. 1, 1999 to James Campbell, counsel for Alabama, the Corps stated:

> The following Georgia entities currently are supplied M&I water from Lake Lanier:  Gwinnett County, City of Buford, City of Cumming, City of Gainesville, and [ARC].  The [ARC] acts as an agent for several entities that withdraws water downstream from Lake Lanier.  Under certain circumstances, special releases are made for them from the lake for M&I water supply purposes.  Until 1989, these entities withdrew under then existing interim water withdrawal contracts issued under the authority of Section 501 of the [IOAA].  These contracts expired on January 1, 1990 and the Mobile District had been instructed by Headquarters, U.S. Army Corps of Engineers to convert these withdrawal contracts to storage space contracts, which

necessitated a permanent reallocation of storage to water supply.  In October 1989, the Corps issued a draft water supply reallocation report, known as the [PAC Report], for Lake Lanier to comply with Headquarters guidance.  It was intended at that time to submit the PAC Report to Congress for authorization of the proposed water supply reallocations.  However, the State of Alabama filed a lawsuit in June 1990 against the Corps over these proposed water supply reallocations and all actions to implement the storage space contracts ceased.

ACF034619-20.

### 4.    Further Recognition of the Need for New Storage Contracts Under the WSA

451.    As described in further detail below, the Corps has, on numerous occasions, acknowledged that the appropriate and necessary course of action would be to replace water withdrawal contracts with storage contracts and execute a reallocation of storage in Lake Lanier to water supply under the Water Supply Act of 1958.  *See* discussion of status reports *supra*; *see also, e.g.*, ACF041152 (PAC Report), SUPPAR000903 (Corps' correspondence), SUPPAR017773 (1999 Response to SeFPC).

452.    In a January 10, 1990 memorandum to the Corps' Civil Works Division regarding the interim water supply contracts at Lake Lanier, Major General R. M. Bunker, Commander of the Corp's South Atlantic Division, stated, "the City of Cumming knew their withdrawal contract would be replaced by a storage contract.  They also knew that charges under the storage contract would be significantly higher than charges under the withdrawal contract."  SUPPAR017810.  Furthermore, General Bunker stated

We propose to continue charging Lake Lanier water users under the terms of their "withdrawal" contracts pending approval of the interim contracts now in your office.  Appropriate credits will be made for these payments when the interim contracts are approved and distributed.

117

> Should any user at Lake Lanier refuse to accept the interim contract as approved, we propose to deny them further withdrawal privileges from Lake Lanier.  Your concurrence in this position is solicited.

*Id.*

453.    In an April 17, 1992 letter to Harry West, Executive Director of the Atlanta Regional Commission, Dennis W. Heuer, Deputy District Engineer for the Corps, responded to two previous letters sent by ARC to the Corps.  Heuer provided clarification on several topics.  First, Heuer stated:

> Your [West's] letter reflects that you have a concept of the term "surplus water" that differs from that used in the U.S. Army Corps of Engineers contracting regulations.  Section 6 of the 1944 Flood Control Act refers to water at a "reservoir" (which we interpret as meaning stored water), and it provides that no contracts for such water shall adversely affect the existing lawful uses of such water.  Enclosed are copies of pages 4-52 and 4-53 of Engineer Regulation 1105-2-100 which deals with the concept of surplus water in the context of an Army General Counsel opinion dated March 13, 1986.  As you can see, this opinion is really dealing with storage space (or water in storage) which is not presently needed for an authorized project purpose.  Unless a formal reallocation occurs, the present lawful use of the water in the conservation storage pool, between elevations 1035 and 1070 MGVD is for hydropower production and downstream flow augmentation.  Under this concept, there can be no surplus water except that which has served its purpose for power generation and water which must be released from the flood storage pool during heavy rainfall periods.

SUPPAR018092-93.

454.    Heuer also clarified the term "interim supply contract":

The interim water supply contract we previously sent to you was not intended to be a "storage space contract" which in essence is the sale/purchase of storage space.  To avoid confusion, we chose not to call it a "Surplus Water Contract" because of the indication that water is surplus.  We chose the title "Interim Water Supply Contract" to separate the agreement from the concept that we were selling storage or water.  Although the charge was based on the storage space principle, and the storage space needed to supply the average daily quantity needed, there was nothing in that proposed agreement which made a commitment to the eventual sale of storage space.

SUPPAR018093.

455. Furthermore, Heuer expressed a concern about Georgia's desire for more

water:

> I am concerned about increasing the maximum daily withdrawal limit to 432 million gallons at this time, as set forth in the draft contract furnished with your February 15, 1992, letter, without further justification.  I have, therefore, changed the figure back to 397 as you had previously discussed with COL Thuss.  We are afraid that Alabama and Florida could take exception to this amount of increase without notice to them in the spirit and intent of the Memorandum of Agreement signed by the principals thereto on January 3, 1992.

SUPPAR018093.

456. A memorandum from Lieutenant Colonel Robert H. Griffin (Mobile District)

to the Commander of the Corps' South Atlantic Division regarding proposed supplemental

agreements to extend expired water withdrawal contracts at Lake Lanier describes Corps

guidance from 1989 regarding "surplus" versus "storage" contracts:

> [W]e were instructed not to extend the withdrawal contracts with payments based on power revenues foregone, but to replace them with 'surplus water' contracts with payments based upon the same principle as payments for use of storage space.  ***The basis of that decision was to remove the implication that we were selling water, which the Federal Government does not own, and replace that with the concept that we are making storage space available*** and charging for that availability.  ***As the withdrawal contracts were interim in nature until they could be replaced with storage space contracts, the proposed surplus water contracts were also to be on an interim basis until storage space reallocation could be accomplished***.
> Consideration of the proposed reallocation of storage space in Lake Sidney Lanier from power to municipal and industrial water supply, has been delayed as a result of opposition by the States of Alabama and Florida, and other interests, until studies can be made of river basins in Alabama, Georgia and Florida to serve as a basis for decisions regarding the sharing of the available water resources in the basins.

SUPPAR018114 (emphasis added).

457.    The memorandum continues to describe a concern over utilizing storage space

pricing methods for the interim surplus water agreements:

> Because reallocation cannot be accomplished on a timely basis (at no fault of
> the users), we were advised by CESAD-RE-M letter of 3 November 1989 that
> we could include a provision in the interim surplus water contracts that the
> users could be given credit for any investment principal payments made (with
> charges computed under the storage space basis) against the anticipated future
> purchase of permanent storage space.  The ARC, which now also represents
> Gwinnett County in water supply negotiations, and the Georgia Department of
> Natural Resources (DNR), in support of the users, have objected to use of the
> storage space payment computation method at this time.  ***A major concern is
> that the other parties to the MOA could view this process, with credit being
> provided for payments, as a defacto reallocation in opposition to the spirit of
> the MOA*** which is structured on a 'live and let live' philosophy until
> completion of the comprehensive study.

SUPPAR018114-15 (emphasis added).

458.    With regard to a request from ARC to extend the expired contracts, made at a

meeting with the Corps on November 22, 1991 and then reiterated in a letter from ARC dated

December 16, 1991, Griffin's memorandum made the following recommendation:

> <u>That the expired interim withdrawal contracts, which we have been operating
> under as implied or "holdover" contracts, be extended to allow payments to
> the Government to continue on a "withdrawal" basis:  We concur.</u>  Under the
> circumstances, and the provisions of the MOA, we believe this would be the
> best approach at this time.  This approach is much easier for all to understand
> and provides a basis for meeting water supply needs for the interim period
> until the study establishes the extent of any long term storage requirements.

SUPPAR018115 (emphasis in original).

459.    In a July 20, 1992 memorandum to the Corps Commander of the South

Atlantic Division regarding the proposed supplemental agreements to extend expired water

withdrawal contracts at Lake Lanier, E. A. Sousa, Director of Real Estate for the Corps'

South Atlantic Division stated, "The situation existing with the municipal and industrial

water users at Lake Lanier is of major concern to us.  ***Water withdrawal contracts expired 1 January 1990, however, nothing has changed in actual operations by the users nor in their payments to the Government***.”  SUPPAR018085 (emphasis added).

460.    The July 20, 1992 memorandum concluded that the subject proposed supplemental agreements to extend expired water withdrawal contracts “reflect a reasonable solution to our dilemma” and recommended that the District Engineer be authorized to execute them.  SUPPAR018085.

461.    The administrative record contains a memorandum dated September 3, 1999, and prepared by William L. Lawrence, Assistant Chief of the Management Disposal Branch in the Real Estate Division of the Corps’ Mobile District, entitled “Mobile District’s Response (September 3, 1999) to Follow-Up Questions for the U.S. Army Corps of Engineers from the Southeast Federal Power Customers, Inc.”  SUPPAR017771.  The memorandum responds to several questions submitted to the Corps by SeFPC, on March 29, 1999; the administrative record does not appear to contain a copy of SeFPC’s submission.

462.    The Corps’ 1999 Response to SeFPC contains a number of concessions with regard to the Corps’ authority.  SUPPAR017771-94.

463.    First, in response to questions about the Corps’ authority to honor the Lake Lanier contracts under the Flood Control Act of 1944, the Corps conceded that the Act was not applicable to the Lake Lanier contracts and was not the authority relied on for those transactions. SUPPAR017771.  Rather, according to the 1999 Response, “[s]pecial permission was granted to use interim contacts [sic] as a bridge between no contracts and proposed storage space contracts,” and the Corps relied in part on a June 20, 1973 letter from

the Department of the Interior, Southeastern Power Administration, that calculated the amount the federal government should be reimbursed for lost power due to Gwinnett County's diversion of 40 MGD from Lake Lanier.  *Id*.; *see also* ACF004002.

464.    Second, the Corps acknowledged that the Lake Lanier contracts amounted to a reallocation of storage.  Specifically, the Corps discussed its regulatory limitations on storage reallocation under the WSA, and concluded that the "storage required to supply the withdrawal amounts authorized in the interim contracts was within these prescribed limits." SUPPAR017771-72. The memorandum does not specify, however, that this analysis was based on a cumulative review of the total withdrawal amounts from all interim contracts combined.

465.    Third, the Corps acknowledged that it had made "commitments to reallocate storage" to the water supply providers, under the authority of the Water Supply Act of 1958. SUPPAR017773.  The Corps' Lake Lanier contracts were considered an "interim" mechanism to ensure that M&I withdrawals could continue until the Corps could deliver on its commitment by entering into a "new contract providing for water storage in that project." *Id*.

466.    Fourth, the Corps explained how its plan to convert the expired contracts to new interim "water supply" contracts under the Flood Control Act of 1944 had been thwarted. The Corps had intended to charge "for interim reallocation of storage," under these contracts, and to credit the users' payments toward the "ultimate purchase of storage" once it completed the official reallocation.  SUPPAR017774.  These higher costs were vetoed by Georgia at a meeting in the early 1990s:

This action came to a halt when Mr. Joe Tanner, then Commissioner of the Georgia Department of Natural [sic]   <u>informed</u> Col. Michael F. Thuss, our then current District Engineer, and Mr. Skeeter McClure, our Planning Division Chief at that time, that he expected the rates to remain static as a part of the live-and-let-live philosophy of the MOA.  While I have not located a written decision in this regard, I was present at the meeting in Atlanta and remember very vividly Mr. Tanner's demeanor.  We put further processing on hold at that point.

*Id.* (emphasis in original).

467.   Finally, the Corps conceded that its contracts at Lake Lanier rely for authority on the Water Supply Act of 1958, and that those contracts effect a *de facto* storage reallocation.  In response to SeFPC's question about the Corps' authority to allow "interim" withdrawals, the Corps said:

The 'interim authority' to enter into the water withdrawal contracts at Lake Lanier was established via correspondence and telephone conversations between the Mobile District Office, The South Atlantic Division Office and the Office of the Chief of Engineers within the Corps, and with the Southeastern Power Administration.  This authority is articulated in a letter dated 30 March 1973 from Frederick F. Irving, Assistant Director of Civil Works for South Atlantic Divisions, to Mr. Bill Atkins, Chairman, Gwinnett County Board of Commissioners.  A copy of that letter was furnished the attendees at the March 17, 1999, meeting in Atlanta.  The letter stated that '***Your request to withdraw water can be met through a contractual agreement under the terms of the Water Supply Act of 1958***.'

SUPPAR017776-77 (emphasis added); *see also* ACF003900-01 (1973 Irving Letter).  The Corps continued:  "The…[Water Supply Act of 1958] was the basis for the withdrawal contracts.  The interim contracts at Lanier ***committed to storage space contracts to yield the withdrawal amounts provided for in those contracts and could, therefore, be considered <u>de facto reallocation</u>***."  SUPPAR017778-79 (emphasis added).

468.   The Corps further acknowledged that this was a "temporary" measure under authority granted to itself in the 1973 correspondence from Assistant Director Irving, and that

the authority was but a "management decision" designed to buy time until it could "proceed with such reallocations as are considered warranted and approved by congress." SUPPAR017782.

469.    A series of internal Corps email correspondence from August 2000 regarding potential interim surplus water supply agreements with the water suppliers indicates the Corps awareness that the water withdrawal contracts are inappropriate.  SUPPAR000852-57.

470.    An August 4, 2000, 8:55 am email from Gary Mauldin (SAD) to Steve Cone, Economist – Team Leader, Policy Compliance Support Branch, Planning and Policy Division, Directorate of Civil Works for the Corps, regarding avoiding the appearance of providing storage provides:  "Not being a water supply expert, I guess I was under the impression that a 'Section 6 interim water withdrawal contract' would be based on 'withdrawals,' not 'storage.'  *If we can only charge one price regardless of use, that sure smells like their [sic] buying storage to me*.  SUPPAR000852 (emphasis added).  Cone had objected to the draft memo on the basis that it did "price to charge" based on "storage" regardless of use.  *Id*.

471.    In a follow-on email on August 4, 2000 at 9:11 am from Lingenfelter (SAD Counsel) to Gary Mauldin, copies to several others including Steve Cone, Lingenfelter expresses unease with the proposed surplus water agreements: "the problem is that *the Corps policy is NOT to sell water anymore under Section 6* -- policy is provide storage, and storage contracts.  However, all understand the compact implications, but trying to get an exception to the 'storage' policy was always going to be tricky, *especially considering the magnitude of current withdrawals from Lanier*..."  SUPPAR000852 (emphasis added).

472.     In an August 4, 2000 9:35 am email to G. Mauldin, Steve Cone, Economist –

Team Leader, Policy Compliance Support Branch, Planning and Policy Division, Directorate

of Civil Works for the Corps, attempts to explain what he is looking for in the policy

exception request, and how it differs from a true storage contract: "if one follows the model

surplus WS agreement, it begins to make sense...Key things are article 1.a where in Govt'

reserves xx acre-ft or storage space from which User can withdraw water at a rate not to

exceed Y acre-ft (or MGD) and article 4 wherein User pays Z in consideration for the right to

withdraw Y.  So, we are reserving storage for them to withdraw a limited amount of water.

[in a storage contract, we don't place a withdrawal limit, they get whatever the storage

provides, i.e. share of inflows]."  SUPPAR000857 (emphasis added).

473.     In an August 4, 2000 email at 11:04 am to Steve Cone, Lingenfelter

reiterates the concern that pricing based on lowest price rather than replacement cost of

storage or whatever the highest of four methodology is, "***is not fair to the taxpayer***."

SUPPAR000856 (emphasis added).

474.     In an email dated June 14, 2006, Joanne Brandt, Corps Mobile District,

referred to the interim contracts proposed pursuant to the Settlement Agreement as "several

interim water supply contracts that will be considered for implementation at Lake Lanier."

SUPPAR026594.

## IV.     ATTEMPTS TO SECURE A PERMANENT SOURCE OF WATER SUPPLY FROM THE ACF SYSTEM

### A.     The Metropolitan Interim Water Supply Plan

475.     As far back as the early 1970's, the Corps and other interested Georgia

parties began engaging in efforts to assess the water supply problems and needs of the

Atlanta region and to identify potential alternatives to address such future needs.
ACF041167.

476.     These efforts were initially spurred by a resolution adopted by the U.S.
Senate Public Works Committee on March 2, 1972, directing the Board of Engineers, in
conjunction with the State of Georgia, local government entities (including the Atlanta
Regional Commission), and other interested Federal agencies, to determine whether any
modification to the ACF projects was desirable, and to provide "a plan for the development,
utilization and conservation of water and related land resources for Atlanta, Georgia, and
contiguous areas." [MAAWRMS at I-1]  SUPPAR001963.

477.     As part of the study process, the Corps formed the following four groups to
work collaboratively to develop a plan for the best use and protection of the water and land
resources in the Atlanta area:  **Executive Group** (comprised of the head officials from the
Corps Savannah District, the Atlanta Regional Commission (ARC), Environmental
Protection Division of the Georgia Department of Natural Resources, U.S. Environmental
Protection Agency (EPA), and the Georgia Mountains Area Planning and Development
Commission, and tasked with providing policy guidance and developing a consensus on
plans and recommendations);  **Operations Group** (comprised of staff personnel from the
above-listed five participating Executive Group agencies, plus other appropriate Federal and
State agencies, and tasked with daily study activities and evaluation of planning alternatives);
**Citizens' Task Force** (comprised of 32 individuals representing various regional
organizations, and tasked with providing comments, criticism, and support for various
alternatives); and **Lake Lanier Task Force** (comprised of representatives from Federal,

State, and regional agencies and private citizens, and tasked with reviewing data and studies on present uses and future operations of Lake Lanier as a regional water resource). [MAAWRMS at I-2 to I-3].  SUPPAR001964-65.

478.     Collaborative efforts included, among other things, 26 Executive Group meetings, 55 Operations Group meetings, 21 Public Works Officials meetings, 8 Lake Lanier Task Force meetings, 3 Four-County Coordinating Committee meetings, 19 public meetings, 59 staff presentations, and 65 staff workshops. [MAAWRMS at I-4]  SUPPAR001966.

479.     From November 1973 to December 1979, the Corps of Engineers published 52 newsletters describing the various study activities, summarizing relevant meetings, and examining major issues.  [MAAWRMS at I-4].  ACF006006; SUPPAR001966.

480.     Prior to completion of the MAAWRM Study, in a July 21, 1975 letter from Edwin C. Keiser, Colonel, Corps of Engineers, to Leonard Ledbetter, Director, Georgia Department of Natural Resources, the Corps described a proposed interim solution to meet the projected short-term water supply needs of the Metro-Atlanta Area, and described how "[t]he authorized purposes of Buford would not be affected and the [releases described in the letter to maintain a minimum flow of 750 cfs at Atlanta] could be provided immediately from Buford for re-regulation by Morgan Falls."  SUPPAR036976-77.

481.     During 1977 and pursuant to the MAAWRMS process, the Corps and others considered six potential long-range alternatives that were developed to meet water demands in 2000 and to maintain minimum flows of 750 cfs in the Chattahoochee River for water quality. [MAAWRMS at III-9].  SUPPAR002081.

482.    These alternatives included the following: Alternative 1A (construct an 8,400 acre-foot reregulation dam below Buford); Alternative 1B (increase low-flow releases from Buford); Alternative 2A (steady releases from Buford); Alternative 2B (modify slight peak power releases from Buford); Alternative 3 (new outside water supply sources); and Alternative 4A (raise the pool level of Lake Lanier and dredge Morgan Falls).  [MAAWRMS at III-10 to III-11].  SUPPAR002082-83.

483.    The Corps described these alternatives in a March 1977 Corps of Engineers Progress Report and presented these alternatives at public meetings in May 1977. [[MAAWRMS at III-11]  SUPPAR002083.

484.    The Corps and the Executive Group ultimately decided that Alternatives 1B, 2B, and 3 were not viable and should be eliminated from further study, but recommended further study of the alternatives of constructing a reregulation dam, decreasing power production at Buford, raising Lake Lanier, and increasing the storage capacity at Morgan Falls Reservoir. [MAAWRMS at III-15].  SUPPAR002087.

485.    These alternatives to be further studied generally corresponded to alternatives 1A, 2A, and 4A. [MAAWRMS at III-16].  SUPPAR002088.

486.    In September 1978, the Corps published a 12-volume interim report on the Metropolitan Atlanta Area Water Resources Management Study, which did not yet select a preferred long-range water supply plan, but which contained two recommendations by the Corps and the Executive Group:  first, that recreation, water supply, and water quality control be acknowledged as full project purposes; and second, that a short-term operational plan for

Lake Lanier be implemented pending completion of the studies and implementation of a long-range water supply plan.  [MAAWRMS at I-4 to I-5]. SUPPAR001966-67.

487.     In July 1979, the Corps published a Documentation Report on the Continuing Studies, which included results from the initial efforts of the continued studies of alternatives. [MAAWRMS at IV-1] SUPPAR002103.

488.     The ultimate result was the September 1981 Metropolitan Atlanta Area Water Resources Management Study ("MAAWRMS"), Final Report and Final Environmental Impact Statement which provided detailed evaluation of the alternatives. SUPPAR001951-4053.

489.     Specifically, the 1981 MAAWRMS narrowed the alternatives to the following three:

> Plan A: construction of a 4,100 acre-foot reregulation reservoir;
>
> Plan B: reallocation of storage at Lake Lanier; and
>
> Plan C: dredge Morgan Falls Reservoir and reallocate storage at Lake Lanier.

[MAAWRMS at IV-3, III-17].  SUPPAR002089; SUPPAR002105.

490.     In considering the various alternatives, the MAAWRMS noted that "[a]ny proposed change in the operation of Buford Dam which would significantly impact on authorized project purposes would require Congressional approval."  [MAAWRMS at III-1 to III-2].  SUPPAR002073-74.

491.     The Corps ultimately selected Plan A as the preferred alternative and recommended the construction of a reregulation dam with 4,100 acre-feet of storage 6.3

miles below Buford Dam.  "Plan A has been selected…since it would provide the greatest net annual benefits…".  SUPPAR002261.

492.     In the 1981 MAAWRMS, the Corps' analysis of Plan B (reallocation of storage at Lake Lanier) recognized that Congressional authorization would be required to reallocate storage to water supply as contemplated. [MAAWRMS at IV-97]. SUPPAR002199.

493.     Under Plan B, "[w]ater supply storage would be specifically allocated in Lake Lanier for weekend peak releases from Buford Dam for downstream water supply needs."  [MAAWRMS at IV-86].  SUPPAR002188.

494.     Plan B contemplated the following acre-feet of storage in Lake Lanier for water supply: 1980 (10,512 ac-ft); 1990 (50,466 ac-ft); 2000 (94,935 ac-ft); 2010 (141,685 ac-ft). [MAAWRMS at IV-87, Table IV-19].  SUPPAR002189.

495.     The Plan B alternative contemplated a water supply of 431 mgd by the year 2010, and further indicated that "there would be a gain in water supply benefits due to the additional 223 mgd available for water supply from the river." [MAAWRMS at IV-92]. SUPPAR002194.

496.     The MAAWRMS also indicates that "[t]he magnitude of the weekday peak releases, which are about 8,300 cfs average under the base condition, would be reduced to about 5,000 cfs in order to provide for the required weekend releases." [MAAWRMS at IV-92].  SUPPAR002194.

497.     The 1981 MAAWRMS also included an analysis of Plan C (dredging Morgan Falls Reservoir and reallocating storage at Lake Lanier).  The 1981 MAAWRMS

indicates that for Plan C, "Congressional authorization would be required for reallocation of storage to water supply." SUPPAR002221.  In Appendix D, Attachment 9 to the 1981 MAAWRMS, the Corps further recognized that under alternative Plan C, "Congressional authorization would be required in order to reallocate the storage to water supply." SUPPAR003161.

498.    Plan C contemplated the following acre-feet of storage in Lake Lanier for water supply: 1980 (0 ac-ft); 1990 (4,652 ac-ft); 2000 (23,711 ac-ft); 2010 (48,550 ac-ft). SUPPAR002202.

499.    The 1981 MAAWRMS ultimately recommended construction of the reregulation dam under Plan A, and identified the plan as the National Economic Development Plan ("NED"), as it had the maximum net benefits.   SUPPAR002261.

**B.    Reregulation Dam (Plan A v. Plan B)**

500.    In 1982, Congress held hearings on the proposed Corps' water resources development projects, including the reregulation dam for the Metropolitan Atlanta Area (i.e., "Plan A" of the 1981 MAAWRMS).  SUPPAR001436-94.

501.    Of particular importance was the requirement that beneficiaries of water supply provided by the reregulation dam share in the costs of the project's development.  *See* Proposed Water Resources Development Projects of the U.S. Army Corps of Engineers (97-76), Hearings Before the Subcommittee on Water Resources of the Committee on Public Works and Transportation, House of Representatives, 97th Congress, 2d Session (1982).

502.    Specifically, Colonel Kleb, then Assistant Director of Civil Works, described how the cost of the reregulation dam was estimated at $22,392,000 and that "[a]ll

implementation costs are reimbursable by power and water supply beneficiaries."
SUPPAR001440.  This project contemplated that water supply beneficiaries would cover the
costs of the project in return for receiving water supply benefits.

503.   A summary of the Corps' feasibility report indicated that "[t]he State of
Georgia and local municipalities have furnished Letters of Assurances acknowledging their
support of the project and intent to fulfill cost sharing/financing requirements."
SUPPAR001441.  The summary also lists "direct beneficiaries" as "[c]onsumers of water
supply, primarily within the Metropolitan Atlanta area, and power customers of the Buford
Dam project," and calculates a monetary value for water supply benefits and the estimated
annual financing/cost sharing for water supply interests.  SUPPAR001442.

504.   During the hearings, Rep. Edgar and Col. Kleb discussed the uniqueness of
the reregulation project:

> Mr. EDGAR. Mr. Chairman. This is the first project that we have really talked
> about water supply up front. I recognize that water supply agencies will
> reimburse the Federal Government for the water supply aspects of this. Can
> you tell me when the corps got involved in providing local water supplies?
> Colonel KLEB. We are not involved in the local supply and distribution of
> water.
> Mr. EDGAR. Do you know of any urban area of the Northeast, mid-
> Atlantic, or Midwestern area where you have come in and, at the corps'
> discretion, created a water supply for a local urban area the size of Atlanta
> or slightly smaller?
> Colonel KLEB. No, sir.

SUPPAR001443.

505.   Michael Lomax, Chairman Fulton County Commission, and Member, ARC,
testified in support of the reregulation dam and indicated that "the State of Georgia and local

governments have expressed their willingness to cost-share in the project in a cooperative and timely fashion."  SUPPAR001451.

506.     Atlanta Mayor Young indicated that "[t]he City of Atlanta has already made preparations to fulfill our cost-sharing responsibilities for the reregulation dam." SUPPAR001451.

507.     A letter from various entities including, among others, Cobb County Marietta Water Authority, Gwinnett County Water and Sewage Authority, and Atlanta Chamber of Commerce, supported the proposed reregulation dam.  SUPPAR001452-57.

508.     A letter from Georgia Governor Busbee indicated support for reregulation dam, and stating:

> The need for this project is paramount in the Chattahoochee Valley but it is adaptable to blending with other uses of the River.  Principal beneficiaries are power and water supply customers. I support authorization of the Reregulation Dam. Authorization as a modification of original authorization of Buford Dam would be appropriate. We have identified concerns that need to be addressed during design studies. The required analyses were beyond the level of detail of the authorization report. With regard to cost apportionment for this project it should be noted that power and water customers will repay the entire cost.

SUPPAR001458-59.

509.     Despite the assurances of cost sharing from various Georgia entities, the Corps continued to remain concerned about the costs of the reregulation dam project.

510.     On November 7, 1984, OMB informed the Corps that it concluded that "[g]iven the current budgetary situation and the policy of th[e] Administration to encourage non-Federal development of water resources, we conclude that the Metropolitan Atlanta [reregulation dam] project should not be authorized as a Federal project.  SUPPAR036642.

511.    In a January 8, 1985, letter to Robert Stafford, Chairman of the Committee

on Environment and Public Works, the Corps commented on the water resource development

feasibility report for the reregulation dam:

> The review found the construction of a reregulation dam for water supply and
> hydropower purposes on the Chattahoochee River would be feasible. However,
> the Office of Management and Budget in its review noted non-Federal
> development of the same reregulation dam is the most likely alternative to a
> Federal project for water supply.

ACF010340.

512.    The Corps concluded that "the Metropolitan Atlanta project should not be

authorized as a Federal project.  Accordingly, the Administration opposes authorization of

this project."  ACF010340.

513.    In a February 25, 1985 letter from the Corps to the Governor of Georgia, the

Corps indicated that it concurred with the conclusion and recommendation of OMB that the

reregulation dam should not be authorized as a federal project because of budgetary

constraints. SUPPAR036645.

514.    Thereafter, in 1986, Congress authorized construction of the reregulation

dam as part of the Water Resources Development Act of 1986.  *See* WRDA 1986, Title VI,

Sec. 601, P.L. 99-662, 10 Stat. 4137, 4140-41.

515.    This Congressional authorization was subject to a number of conditions and

follow-up environmental studies.

516.    Specifically, the reregulation project for the Metropolitan Atlanta Area,

Georgia, was described in Section 601 of WRDA 1986 as follows:

> The project for construction of a reregulating dam for water supply purposes
> on the Chattahoochee River downstream of Buford Dam, Georgia: Report of

the Chief of Engineers, dated June 1982, at a total cost of $28,000,000, with an estimated first Federal cost of $7,000,000 and an estimated first non-Federal cost of $21,000,000, including such additional measures as may be recommended or warranted by the General Design Memorandum and supplemental environmental impact statement approved under this paragraph. Before construction of the reregulation dam is initiated, the results of the Corps of Engineers' General Design Memorandum and supplemental environmental impact statement resulting from the continued planning and engineering studies must show that—

(1) the quality and quantity of water delivery to the State trout hatchery is maintained or improved and the hatchery can continue to operate satisfactorily;

(2) all water quality standards under the Federal Water Pollution Control Act and corresponding State law for the Chattahoochee River will be met or, if such standards are not currently being met, neither the degree nor the frequency of violation will be increased;

(3) the design, construction, and operation of the reregulation project will facilitate and be compatible with downstream recreation, fisheries, and fisheries management and will include such measures as may be necessary to mitigate adverse effects of the project on turbidity, water temperature, and other water quality parameters, and water flow regimes;

(4) the project analysis evaluated the impact of the reregulation dam on—

(A) instream flows below the proposed dam for the current situation and proposed dam operation plans, under various hydrologic conditions and several demand rates;

(B) recreational use within the Chattahoochee River National Recreation Area, within the river corridor, and on the river itself; and

(C) economic issues.

Before construction of the reregulation dam is initiated, a general design memorandum and a supplemental environmental impact statement based on the continued planning and engineering studies shall be prepared and jointly approved by the Secretary and the Governor of Georgia. The authorization, design, construction, and operation of the reregulation dam by the Secretary or any other Federal or State body or agency must be in compliance with all applicable existing laws and with this paragraph without waiver of any conditions, requirements, or provisions contained therein. The reregulation dam may be constructed by the State of Georgia or its subdivisions at local cost.

WRDA 1986, Title VI, Sec. 601, P.L. 99-662, 10 Stat. 4137, 4140-41.

517.    A March 25, 1988 memorandum from CESAD-PD entitled "Additional Information Lake Lanier Reregulation Dam" and addressing the economic analysis of "Plan A" the reregulation dam, acknowledges that although Plan A was recommended over reallocation of storage, "Plan B," in the 1981 survey, "several factors since that time have greatly reduced the economic advantage of Plan A over Plan B."  SUPPAR016864.

518.    The March 25, 1988 memorandum concludes with a section entitled "Revised Recommendation," which reads:

> If state and local government should decide to support reallocation over the reregulation dam due to the small financial difference, the GDM could be submitted to OCE with a significant post authorization change report (PAC). The PAC could then be submitted to ASA(CW) and if necessary to Congressional committees for approval. *The storage to be reallocated under Plan B is beyond the approval authority of the Chief of Engineers*. A change from Plan A to Plan B will be strongly opposed by power interests and they need a full opportunity to express their views before the PAC and GDM are submitted to Washington.

SUPPAR016865 (emphasis added).

519.    Responding to a question regarding the Corps' authority to reallocate storage at Lake Lanier posed by Harry West, Executive Director of the Atlanta Regional Commission, at a meeting with the Corps on March 28, 1988, the Corps sent West its answer on April 14, 1988.  The Corps stated:

> Plan B would require the reallocation of 202,000 acre-feet of storage to meet the year 2010 peak demand of 103 mgd from the lake and 510 mgd from the river.  The reallocation of 202,000 acre-feet is much greater than the criteria of 50,000 acre-feet.  Therefore, the required reallocation is not within the discretionary authority of the Chief of Engineers to approve.  It can only be approved by the ASA(CW) if impacts are determined to be insignificant.  *We believe the power losses are significant and expect that Congressional approval would be required for the reallocation*.  This could be accomplished by submitting a post authorization change report to the House and Senate Public Works Committees.

SUPPAR017108; SUPPAR017113 (emphasis added).

520.    In an April 15, 1988, letter the Corps conveyed to ARC answers to a set of questions that ARC posed at a meeting with the Corps on March 28, 1988 regarding the re-regulation dam. In response to ARC's question as to whether Plan B could be accomplished within the Corps' discretion or would require Congressional authorization, the Corps responded, among other things, that "[w]e believe the power losses are significant and expect that Congressional approval would be required for the reallocation [under Plan B]." SUPPAR036652; SUPPAR036657.

521.    In a Corps "Fact Sheet for Congressional Briefing to House Subcommittee," dated July 20, 1988, the Corps stated that for Lake Lanier only "54.4 MGD (50,000 acre-feet) can be reallocated without Congressional approval."  SUPPAR014869.

522.    In handwritten comments for the Corps' Planning Division, Ken Sims of the Corps, commented on an August 30, 1988 letter from Steve Leitman, Apalachicola Coordinator, to Governor Bob Martinez of Florida discussing the outcome of an August 25, 1988 meeting "concerning a proposed revision of water storage and release schedules on Lake Sidney Lanier."  SUPPAR017265-66.  Sims concurred with Leitman's concern that the proposed revisions do not adequately consider "the effects on downstream users" by stating, "Steve is right in that the downstream impacts aren't fully considered.  MDO [Mobile District Office] needs to supply input through the ICC.  Maybe it's time for an ICC meeting. Maybe it's also time for the reallocation of Lake Lanier to be brought back into the MDO!" *Id.*

523.     Handouts to the August 25, 1988 meeting "concerning a proposed revision of water storage and release schedules on Lake Sidney Lanier" state that, "Lake Lanier fell to a lower elevation in 1981 than 1986, although 1986 conditions were more severe.  This shows that Drought Management Actions helped reduce drought impacts on lake levels." SUPPAR017266; SUPPAR017270.  The handouts also note that, "[l]ake levels are more stable with reallocation."  SUPPAR017271.

524.     In a September 1, 1988 letter from the Corps to Commissioner Ledbetter of GDNR, the Corps states that although the difference in value is small, "the reallocation alternative has the maximum net benefit and therefore will be the National Economic Development (NED) plan.  Accordingly, the recommendation of our design memorandum will be that the water supply needs be provided through reallocation of storage in Lake Sidney Lanier."  SUPPAR016870.

525.     In the September 1988 letter the Corps further provides that due to "the high sensitivity of this decision, we are refining our analysis during the coming four to six weeks and will continue to coordinate our efforts with your office.  The final recommendation will be formally coordinated with the state and ARC and the necessary public review opportunity will be provided."  SUPPAR016870.

526.     Neither the State of Florida nor the State of Alabama were copied on the Corps' September 1988 letter regarding the new recommendation for reallocation. SUPPAR016870.

527.     In a September 6, 1988 Corps "Memorandum for District Engineer" discussing "Mobile District's Role in Water Supply Reallocation of Lake Lanier, James R.

138

Covey, Chief of the Corps' Engineering Division stated, "Although these values and other factors now may make the re-regulation dam economically feasible, *a political decision has now been made to promote storage reallocation*.  In fact, I understand that the Division Engineer has written a letter to Georgia DNR saying that storage reallocation will be the NED (cost economic) plan."  SUPPAR017083 (emphasis added).

528.    In anticipation of the Corps' NED plan for reallocation over reregulation, the State of Georgia worked with its Congressional delegation to garner support for reauthorization legislation for Lake Lanier.  SUPPAR014842.

529.    In a letter dated September 23, 1988 from Georgia Governor Joe Frank Harris to Senator Sam Nunn re: Lake Lanier reauthorization, Governor Harris explained how Georgia sponsored meetings with interest groups potentially affected by the proposed reallocation of storage from hydropower to water supply, and stated that "[i]t is now appropriate to proceed with the introduction of the reauthorization legislation."  The letter attached two pages of draft proposed reauthorization legislation from Georgia.  The letter and its attached proposed legislation demonstrate that Georgia recognized that legislation would be needed to reallocate storage from hydropower to water supply, and that Georgia actually submitted proposed legislation to one of its Senators to get the legislative process rolling. SUPPAR014842.

530.    After Congress authorized the reregulation dam as part of the Water Resources Development Act of 1986, the Corps published a Lake Lanier Reregulation Dam Design Memorandum in 1988.  SUPPAR035865.  In the Corps' October 13, 1988 transmittal letter, the Corps explained that "[w]hile the Design Memorandum is written as a reregulation

dam document as called for in the Water Resources Development Act of 1986 (Public Law 99-662), recent studies conducted by the North Pacific Division revised the hydropower benefits to an extent that, combined with increased real estate costs, the National Economic Development (NED) plan is now reallocation of storage in Lake Lanier." SUPPAR035867. The Corps therefore recommended "the implementation of reallocation of storage in Lake Lanier as the best means of meeting Atlanta's water supply needs subject to the concurrence of the local sponsors," and further recommended preparation of a  PAC report recommending reallocation of storage in Lake Lanier.  *Id*.

531.    In the Design Memorandum, the Corps recognized that the Buford Project "is normally operated as a peaking plant for the production of hydropower with minimum releases during daily and weekend off-peak periods." SUPPAR035865; SUPPAR035931. The Corps also described the "base case" as peaking being scheduled for "weekdays only, but with minimum continuous releases of about 600 cfs to meet downstream requirements." SUPPAR035887.  However, the Corps further recognized that "[d]ownstream water supply demands have exceeded the authorized minimum flow of 600 cfs," and that "off-peak releases of the magnitude required represent a deviation from project authorized operation and a loss in hydropower revenues."  SUPPAR035931.

532.    The General Design Memorandum recognized that "Buford Dam is a multi-purpose project with principal purposes of flood-control, navigation, and power." SUPPAR035929.

533.    The General Design Memorandum described the "Plan B" reallocation alternative as one that "provides for the operation of Buford Dam for flood control,

recreation, navigation, and low-flow augmentation," and described how "[w]ater supply storage is allocated in Lake Lanier for weekend peak releases from Buford Dam for downstream water supply needs."  SUPPAR035955.

534.    In Appendix V of Volume II of the Reregulation Dam General Design Memorandum ("GDM"), the Corps included an economic analysis of the three alternative plans for water supply discussed in the MAAWRMS.  Among other things, the Corps' analysis indicated that "[r]eallocating storage from hydropower to water supply results in an annual loss of $2,873,000 in power benefits." SUPPAR036511.

535.    The GDM also described how the Plan B reallocation "would result in estimated hydropower losses of 11 mw of capacity and 16,588 mwh of energy at Buford Dam." SUPPAR036518.

536.    Thus, after conducting a reevaluation of the comparative net benefits of the reregulation dam versus reallocation of storage, considering revised costs of the reregulation dam and the lack of Federal funds, the Corps concluded in October 1988 that reallocation of storage, rather than construction of the reregulation dam, would be the most economical alternative for meeting future water supply needs of the Atlanta region, and recommended to the Governor of Georgia that reallocation should be the new NED plan.  ACF041170.

537.    In November 1988, the Georgia Governor concurred, and the ARC, Georgia DNR, and other local governments in the region indicated their support for the plan to reallocate storage.  ACF041170.

538.     On November 25, 1998, the Division Engineer submitted a final GDM to the

Chief of Engineers, and a draft FEIS on the reregulation dam was also submitted.

ACF041170.

539.     In a January 23, 1989, document entitled "INITIAL HQUSACE POSITIONS

AND COMMENTS ON DRAFT PAC," Corps Headquarters explicitly recognized the need

to obtain specific Congressional authorization for reallocation of storage, stating as follows:

> NEED FOR SPECIFIC CONGRESSIONAL AUTHORIZATION. We concur
> that the proposed reallocation of 202,000 acre-feet of storage at Lake Lanier
> from hydropower to municipal and industrial water supply should at this time
> proceed as if it will require specific Congressional authorization.  We also
> believe that a PAC report recommending the reallocation would be the
> appropriate vehicle for obtaining the authorization.  Whether or not the PAC
> has to go to Congress depends if there are 'significant' impacts on the
> authorized project.  The question of significant impacts with respect to
> hydropower is related to coordination with Southeastern Power
> Administration (SEPA) and the proposal for credit to be provided to SEPA. . . .

SUPPAR014766.

540.     In an April 11, 1989, Memorandum for Record from Corps Study Manager

Kenneth R. Sims on the subject of "Meeting with Georgia Department of Natural Resources,

Atlanta Regional Commission, Georgia Mountains Area Development and Planning

Commission, and South Atlantic Division Regarding Post Authorization Change Report for

Reallocation of Storage at Lake Lanier From Hydropower to Water Supply," the Corps stated

that Georgia had indicated its plan to have Georgia Senator Nunn introduce legislation to

authorize the proposed reallocation of storage to water supply:

> Copies of the PAC schedule were distributed to the attendees.  All parties
> were pleased with the schedule and expressed their desires for the completion
> of the study as scheduled.  DNR stated that as soon as the total yield of the
> reservoir that can be allocated to water supply and the dollars needed to offset
> the hydropower losses are known, they plan to have Senator Nunn introduce

legislation authorizing the reallocation project.  This approach may result in an authorized project prior to the PAC report being approved/acted upon by the ASA or Congress.

SUPPAR014686-87.

541.    A May 24, 1989 letter from the Acting District Engineer for the Corps'

Mobile District, to Senator Bob Graham, regarding the PAC Report stated:

> [a]bout a year ago, the Savannah District of the Corps determined the reallocation of water from Lake Lanier was a more cost-effective solution to the water supply than the reregulation dam.  Therefore we were asked to prepare a Post Authorization Change (PAC) Report for the Lake Lanier project.  This report would deauthorize the reregulation dam and seek authorization for the reallocation of water from hydropower production to water supply.  We are in the process of evaluating the impacts of this reallocation and considering other alternatives.

SUPPAR011808.

542.    A May 30, 1989 Corps memorandum regarding the PAC Report addressed

the impacts of reallocation on lake levels, according to preliminary evaluations:

> [T]he preliminary results of the evaluations indicate that lake levels at each of the projects would be higher, under the with-reallocation condition during the late summer and fall months, over what the levels have been on a historical average.  Even though the preliminary assessment of the next impacts of reallocation would be minor, *it will probably be perceived by the downstream interest that the lakes are being held higher to benefit recreation at the expense of navigation, hydropower, and Apalachicola Bay. We can show the differences attributable to reallocation*, but when the impacts of the RRP are included, the explanation becomes very complex from a layman's point of view.

SUPPAR014652 (emphasis added).

543.    In a June 5, 1989, Corps Outline of a Meeting with the Columbus, Georgia

Chamber of Commerce Regarding the Post Authorization Change Report for Lake Lanier,

the Corps indicated, among other things, that Congressional approval would be necessary for

reallocation of storage in Lake Lanier:

> I.      What is the purpose of a Post Authorization Change (PAC) Report?
> The PAC is a report that is used to change the design or operation of a project
> that has already been authorized by Congress. In this case, we need to get
> Congressional approval for possibly two things: (1) the deauthorization of the
> Reregulation Dam, and (2) the authority to reallocate storage in Lake Lanier
> from hydropower to water supply.
>
> II.     Why is a PAC needed for the reallocation of storage at Lake Lanier for
> water supply when all Corps reservoirs can be operated for water supply?
>
> The Water Supply Act of 1958 made water supply an operational
> purpose at all Corps reservoirs provided the water supply does not cause a
> significant adverse effect upon the authorized project purposes. The term
> significant has been defined in Corps policy to mean 15 percent of the total
> storage or 50,000 acre-feet of storage, whichever is less. Anything above this
> requires approval at the Washington level and possibly even Congressional
> approval. . . .

SUPPAR020726-27.

544.    Because Congress had already authorized the reregulation dam, but the

Corps had subsequently identified reallocation of storage as the new NED plan, the Corps

prepared the 1989 Draft PAC Report to address these changes in the recommended plan and

to evaluate the Atlanta region's future water supply demands and assess the impacts of

reallocating storage to water supply.  ACF041170.

## C.      Draft PAC Report

545.    In September of 1989 the Corps released the Draft Post Authorization

Change Notification Report for the Reallocation of Storage From Hydropower to Water

Supply at Lake Lanier, Georgia ("1989 Draft PAC Report").  ACF041152-620.

546.    The purposes of the Draft PAC Report were to:

(a) To recommend for approval a specific amount of storage in Lake Lanier that should be reallocation from hydropower to water supply to meet the future domestic, municipal and industrial water supply requirements of the Atlanta Metropolitan region, and
(b) To identify the cost of the reallocation along with the economic and environmental impacts.

ACF041165.

547.     The 1989 Draft PAC Report ultimately recommended that 207,000 acre-feet of storage be reallocated from hydropower to water supply to satisfy the water supply needs of the Atlanta region to the year 2010.  ACF041191.

548.     The Draft PAC Report concluded that "[s]ince this action would effectively eliminate the need for the previously authorized Reregulation Dam, it is also recommended that the Reregulation Dam be deauthorized."  ACF041191.

549.     Thus, the Draft PAC Report reveals that despite originally selecting Plan A in the 1981 MAAWRMS and subsequently receiving Congressional authorization to construct the reregulation dam, the Corps ultimately rejected construction of the reregulation dam and reverted back to Plan B in the 1981 MAAWRMS—a plan for reallocation of storage in Lake Lanier which the Corps had previously and explicitly recognized would require Congressional authorization. [MAAWRMS at IV-97].

550.     The Feasibility Review Conference (FRC) for the PAC Report project was held in Atlanta, Georgia on October 17, 1989.  ACF017660.

551.     In a September 11, 1989 James M. Barkuloo, Project Leader for the Fish and Wildlife Service ("FWS") Panama City Field Office, sent a draft planning aid report for the Lake Lanier PAC report to N.D. McClure IV, the Corps Chief of the Planning Division in the Mobile District.  In this draft report, FWS noted that Lake Lanier was not originally intended

to provide water supply.  He wrote, "[c]onstruction of this project [Buford Dam] was

completed in 1958 for the specifically authorized purposes of flood control, navigation and

hydropower.  Other purposes for which the project is operated included recreation, municipal

and industrial water supply and water quality via low flow augmentation."  SUPPAR011884.

552.    In its Planning Aid Report for the draft PAC Report and draft Water Control

Plan, FWS recommended that "Post authorization changes should include making freshwater

flows to the Apalachicola estuary to maintain seafood production an authorized project

purpose."  ACF017871.  Such action was also requested by the public during the public

meeting process.  ACF017874-75.  FWS also recommended long-term basin wide planning

and that an EIS should be prepared.  ACF017871.

553.    In a draft memorandum concerning Lake Lanier storage pricing for the PAC

Report, John W. Rushing, Corps Chief of the Planning Division in the South Atlantic

Division, stated, "EP 1105-2-45, Appendix A, gives the procedure for determining the cost of

storage reallocated to water supply.  While this procedure is for insignificant reallocation,

**which would not be the case at Lake Lanier**, the method is acceptable for the draft report."

SUPPAR011876 (emphasis added).

554.    The draft memorandum concerning Lake Lanier storage pricing for the PAC

Report was accompanied by an internal transmittal cover letter dated September 15, 1989

from Joe Goode, a Civil Engineer of the Corps' South Atlantic Division Planning Division to

Steve Cone, Economist – Team Leader, Policy Compliance Support Branch, Planning and

Policy Division, Directorate of Civil Works for the Corps.  Goode, writing about the draft

memorandum in this cover letter, stated, "Steve – This is the memo we will now be unable to

send.  As a way out of this mess, what would be [the] reaction to using a different allocation method than use-of-facilities method in ER?  Everything I see on the use of the quickie method pertains to "insignificant reallocations."  SUPPAR011875.

555.     In a September 29, 1989, Draft Issue Paper on the Post Authorization Change Notification Report for the Reallocation of Storage From Hydropower to Water Supply at Lake Lanier, Georgia, the Corps recognized that some parties might view the Corps' water control plan as a "defacto reallocation" from power storage, noting that: "The Water Control Plan, the future without reallocation condition against which the effects of reallocation have been measured, does not commit to provide generation as planned or expected by the Southeastern Power Administration. There could be a challenge from the power customers group alleging defacto reallocation for 'unauthorized purposes.'" SUPPAR014553.

556.     An October 20, 1989 Memorandum For Record (MFR) prepared by Kenneth R. Sims, Study Manager for the PAC Report, and entitled "Issue Resolution Conference (IRC) – Post Authorization Change (PAC) Notification Report for the Reallocation of Storage at Lake Lanier, Georgia," stated:

> SEPA believes that the WCP would impact hydropower production in the basin and the WCP results in a defacto reallocation away from hydropower to recreation.  It was stated by SAD that the WCP is not a reallocation but a formalization of project operations.  The Secretary of the Army has the authority to revise project operations so long as the revisions do not alter the project purposes.  The WCP does not result in a storage reallocation for a purpose, but by modifying the way the project is operated, optimum water management for all purposes can be achieved.  SEPA stated that it does not agree with the Corps, and maintained that the WCP is a defacto reallocation since power production would be adversely affected.

SUPPAR011821.

557.    With regard to the treatment of return flows in the PAC Report, the October

20, 1989 MFR stated:

> The PAC Report does not include a credit to return flows in the pricing of the
> storage, but the return flows are counted as inflows to the project in the
> evaluation of impacts to lake levels and flows.  OCE stated that guidance is
> forthcoming and that the guidance will support that approach used in the
> preliminary draft report.  It was reiterated by OCE that the Corps sells storage
> not water; therefore, any waters returned to the project are considered in
> calculating a new critical yield for the reservoir.  These waters are then
> available to all the project purposes.

SUPPAR011822.

558.    A November 14, 1989 memorandum regarding water supply reallocations

from Jimmy F. Bates, Chief of the Policy and Planning Division at the Directorate for Civil

Works, to Robert W. Page, Assistant Secretary of the Army for Civil Works, stated, "[i]t

should be noted that the potential contracts for Lake Sidney Lanier cannot be prepared until

the post authorization change report is completed and approved by your office and possibly

Congress, if deemed appropriate, or other enabling legislation is enacted by Congress."

SUPPAR017661-2.

559.    In a December 29, 1989 letter to Senator Sam Nunn, the Corps reiterated that

the reallocation contemplated by the PAC Report was beyond the Corps' authority and

required authorization from Congress.  SUPPAR011718.

560.    Responding to letters from Senator Sam Nunn "regarding the reallocation of

water from hydropower to water supply at Lake Lanier," Lieutenant Colonel Louis J.

Martinez, Acting District Engineer, sent Senator Nunn a letter dated December 29, 1989.

SUPPAR011717.  In his letter Martinez stated, "The recommendation outlined in that report

was that 207,000 acre feet of storage be reallocated from hydropower to water supply at a

cost to water supply users of $49,400,000.  That amount was the estimated value of the

reallocated storage."  *Id*.  Considering the Corps' authority with respect to this change,

Martinez wrote:

> I have not reached a decision on a course of action at this time.  I should
> emphasize that the Post Authorization Change Notification Report is
> considered to be beyond the authority of the Corps of Engineers to implement.
> Thus, any recommendation to proceed must go through the Washington level
> review process and ultimately be authorized by Congress.

SUPPAR011718.

561.    A March 1990 document entitled,  "Summary of Water Withdrawal

Agreements, Water Withdrawal Contracts and Water Storage Space Contracts" and prepared

by the Corps, stated that in "1981, the Corps concluded and recommended to Congress that

the construction of a re-regulation dam was the best alternative to meet future water needs.

The re-regulation dam was authorized, with certain stipulations, by the Water Resources

Development Act of 1986."  ACF017662; SUPPAR005832.

562.    In the Summary document, the Corps concluded that although "[s]ubsequent

studies revealed that reallocation of storage was a better alternative, but to effect the

reallocation, Congressional approval must be obtained."  ACF017662; SUPPAR005832.

563.    Testimony to the Subcommittee on Water Resources of the Committee on

Public Works and Transportation by Col. Michael F. Thuss, U.S. Army Corps of Engineers,

Mobile District on September 26, 1990 indicated that the reallocation proposed in the PAC

Report required Congressional approval.  ACF018321.

564.    At a September 28, 1990 hearing before the House Subcommittee on Water

Resources on Long-Term Water Supply Needs of the Atlanta Region from the Apalachicola-

Chattahoochee-Flint River Basin and the Operation of Buford Dam and Lake Sidney Lanier

in Meeting Those Needs, the Mayor of Atlanta recognized that Congress would need to

reauthorize the Buford project to include water supply as a primary purpose, noting that:

> Studies have been conducted to evaluate alternatives to meet future water
> supply needs, and it is currently proposed to modify operation of the Buford
> Dam through Congressional re-authorization so that the primary purposes of
> the dam and reservoir project will be for recreation, flood control and water
> supply. This proposed re-authorization has been made in recognition of the
> shift in the priority of needs for the citizens of Georgia and if approved, would
> permit the U.S. Army Corps of Engineers to operate the project in such a way
> as to meet the needs for recreation and flood control and to meet the projected
> water supply needs for the metropolitan Atlanta area through 2010.

SUPPAR005316-17.

565.    At the same September 28, 1990 hearing before the House Subcommittee on

Water Resources, Manuel Maloof, the CEO of DeKalb County, Georgia and Vice

Chairperson of the Atlanta Regional Commission, recognized that Congress would need to

authorize reallocation of storage in Lake Lanier, explaining that:

> Reallocation is a proposal to change or 'reallocate' a portion (20 percent) of
> the water storage in Lake Lanier that is currently reserved for hydropower
> generation – and earmark it for water supply. . .The Atlanta Region has been
> working in good faith for nearly twenty years with the appropriate federal
> agencies to secure a long-term water supply for the Atlanta Region. Many
> options have been examined.   Out of these options—reallocation of Lake
> Lanier has been chosen as the next alternative by the Corps—because it will
> supply   Atlanta's   water   through   2010   in   the   most   cost-efficient,
> environmentally sound manner and without detrimentally impacting other
> users of this resource.   Atlanta Region leaders feel enough study has been
> done, enough money spent. If the economic engine of the Southeast is to
> continue to run—it must have a reliable water source, and soon. We see
> absolutely no reason for further delay and ask you to move ahead to approve
> reallocation of Lake Lanier with swift action.

SUPPAR005329-36.

566.    A fact sheet drafted by the Corps and attached to a letter from Lieutenant Colonel Louis J. Martinez to Dr. Wayne C. Curtis, Chairman, Water Resources Study Commission, dated June 4, 1990, stated that the "Chief of Engineers, in implementing the Water Supply Act of 1958…has discretionary authority to reallocate up to 50,000 acre-feet (AF) or 15% of usable storage, whichever is less, to other purposes….The proposed 207,000 AF reallocation at Lake Lanier exceeded the discretionary authority of the Chief of Engineers and, therefore, required the preparation of a Post Authorization Change report to be submitted to the Congress for approval."  ACF018043; ACF018040-42.

567.    The fact sheets also states:  "[t]the final element of the management plan for meeting the short-term water supply needs of the basin involves the proposed reallocation of 207,000 acre-feet at Lake Lanier to provide an annual average withdrawal of 529.36 MGD for the Atlanta region.  Reallocation to satisfy these identified needs would require Congressional authorization."  ACF018045.

568.    The fact sheet further states:  "[c]ompletion of the final PAC Report would allow the short-term needs of the Atlanta region to be addressed…In the meantime, draft proposed interim water supply contracts have been forwarded to the [ARC], and Cumming and Gainesville, Georgia, for withdrawals of 321, 10, and 12 MGD, respectively, on an average annual basis for a one-year period.  These contracts address the immediate water supply needs of these entities and have an option to extend for two one-year periods. However, it is anticipated that storage contracts for the reallocated storage would come into effect before the contracts expire."  ACF018046.

569.     The Corps' 1990 proposed interim water supply contracts calculated that interim storage allocations for water supply would total 95,317 acre-feet or 9.08% of conservation storage: City of Cumming equaled 9,381 acre-feet or 0.89% (SUPPAR017835); City of Gainesville equaled to 11,257 acre-feet or 1.07% conservation storage (SUPPAR017824); and the Atlanta Regional Commission equaled to 74,679 acre-feet or 7.11% of conservation storage (SUPPAR017857).

570.     As discussed above, the proposed storage contracts referred to in the 1990 Fact Sheet and that would have accompanied the reallocation requested in the PAC Report never materialized.

571.     On February 12, 1992, the Corps formally withdrew the draft PAC Report, dated October 1989.  SUPPAR036663.

### D.     Georgia Water Supply Request

572.      In anticipation of submitting a request for water supply storage reallocation at Lake Lanier, the State of Georgia met with the Corps Mobile District on September 3, 1999 to discuss legal issues pertaining to the reallocation of storage to water supply. SUPPAR009603; SUPPAR009575-77.

573.     In a September 8, 1999 email to General Capka describing the September 3rd meeting, Colonel Norwood indicated Georgia's desire to meet with Corps Headquarters and the ASA to attempt to overturn the Mobile District's position that Congressional authorization would be required for reallocation of storage to water supply:

> It is the position of the Mobile District that any reallocation of water supply from Lake Lanier to provide more municipal and industrial water to the metropolitan Atlanta area requires an appropriate authorization from Congress. . . The Georgia delegation was in Mobile last week to argue that

> USACE does not need Congressional authorization to reallocate.  Though their arguments were well formulated and presented, my office of counsel did not concur with their position.  We explained the District's position on the requirement for Congressional action.

SUPPAR009576-77.

574.    Following the September 1999 meetings with the State of Georgia, the Corps prepared a White Paper entitled "White Paper, Municipal and Industrial Water Supply Reallocation Issues at Lake Allatoona and Lake Lanier, Georgia," which included enclosures entitled "White Paper Milestones," and "Appendix A" to the White Paper.  SUPPAR009603; SUPPAR009606; SUPPAR009614.  The White Papers and related enclosures were transmitted from Brigadier General Capka to Headquarters on March 16, 2000. SUPPAR009617.  A March 27, 2000 email from Edmund B. Burkett to Joanne U. Brandt indicates that the whitepaper addressed "issues that Gov. Barnes brought up with Sec. Westphal…."  SUPPAR000779.  In a separate email to Colonel Norwood of the same date, Roger A. Burke indicated that the whitepaper was being reviewed by staff in the Assistant Secretary's office.  SUPPAR000778.

575.    The memorandum from General Capka transmitting the White Paper to Corps Headquarters concluded: "It is our position that Congressional approval will be required for the quantities of reallocated storage envisioned by the State of Georgia from both Lake Lanier and Allatoona."  SUPPAR009617.

576.    In the March 2000 White Paper the Corps recognized that "no portion of the conservation storage space or project costs in [Lake Lanier] was allocated to water supply at the time of construction."  SUPPAR009604.

577.    The White Paper further states:

There are differing legal interpretations on the authorizing language as to whether or not water supply is an original authorized project purpose at these reservoirs. However, ***it is clear that the expected magnitude of these anticipated storage space reallocations and their potential impacts on other authorized project purposes will require Congressional approval*** in accordance with the Water Supply Act of 1958.

SUPPAR009604 (emphasis added).

578.    The White Paper also notes that "The largest M&I water supply reallocation approved by the ASA(CW) [Assistant Secretary of the Army / Corps Headquarters] was 75,000 acre-feet in Lake Texoma, Denison Dam, Texas and Oklahoma, in 1985." SUPPAR009605; *see also* SUPPAR005091 (Stockdale Memorandum).

579.    A working draft of the White Paper states that "Congressional approval is required for water supply reallocations determined to result in serious impacts to other authorized project purposes or involve major structural or operational changes. Specifically for Lakes Lanier and Allatoona the water reallocation quantities envisioned by the State of Georgia will have serious effects on other authorized purposes and could involve major operational changes."  SUPPAR009620.

580.    A March 7, 2000 email from Stephen Lingenfelter to Earl Stockdale addresses Georgia's concern about the Congressional approval issue:

If water supply storage due to reallocation is significant, it is unquestionable that it will impact on other authorized project purposes, specifically hydropower and navigation.  58 Act says this requires Congressional approval....Georgia is very concerned about the 'Congressional issue.'  They know that if Congress gets involved Alabama can either hold up the process or possibly kill the proposal.  They really want us to support their legal argument that we can reallocate for water supply storage without involving Congress.  I told them that I had serious reservations on our being able to agree with that position.

SUPPAR009581.

581.     By letter dated May 16, 2000, from Georgia Governor Roy Barnes to Joseph Westphal, Assistant Secretary of the Army for Civil Works, the State of Georgia requested Final Agency Action from the Corps regarding Lake Lanier.  Specifically, Georgia asked the Corps to enter into "long-term contracts with the State of Georgia or municipal and industrial water users" to gradually increase the M&I withdrawals from Lake Lanier and Buford Dam from their 1999 annual averages to projected 2030 annual averages.  SUPPAR009674.

582.     In response to Governor Barnes' May 16, 2000 letter, SEPA Administrator Charles A. Borchardt sent a letter on June 19, 2000 to Westphal, urging him to "deny Governor Barnes' request" because the Corps "has already exceeded" their authority by reallocating over 50,000 acre-feet in Lake Lanier, and "[w]ater supply is not, and never has been, a primary purpose at Lake Lanier."  SUPPAR009731-32.

583.     Internal Corps email correspondence dated October 17, 2000 regarding Georgia's legal argument that meeting water supply needs does not require Congressional approval concludes that "[*o*]*ur position is that Congressional approval is required*.  ASA is hesitant to make a decision.  If decision favored GA, they would probably walk away from negotiations and get their water from COE."  SUPPAR000867 (emphasis added).

### E.     Stockdale Memorandum

584.     On April 16, 2002, Acting Assistant Secretary of the Corps (Civil Works), R.L. Brownlee, wrote to Georgia Governor Roy Barnes responding to the Governor's May 16, 2000 letter to Joseph Westphal, Assistant Secretary of the Army for Civil Works, requesting Final Agency Action from the Corps regarding Lake Lanier Georgia's water

supply request.  Mr. Brownlee's letter stated: [T]he request…cannot be accommodated without additional Congressional authorization…I must deny your request."  ACF036354.

585.    Attached to Mr. Brownlee's letter response, was a memorandum issued by the Office of the Army General Counsel on April 15, 2002 and signed by Earl Stockdale, Deputy General Counsel (Civil Works & Environment) ("Stockdale Memorandum").  ACF036355-67; SUPPAR005079-91.  The Stockdale Memorandum concluded that the Army did not have legal authority to approve Georgia's request for increased storage in Lake Lanier without additional Congressional authorization.  ACF036355; SUPPAR005079.

586.    The administrative record contains several copies of the Stockdale Memorandum.  ACF036355; SUPPAR001401; SUPPAR005079.  One version includes a cover memorandum dated June 6, 2002 and signed by Joanne Brandt, ACF EIS Project Manager, transmitting the Stockdale Memorandum to several Mobile District and SAD staff, as well as outside consultants for the Corps: Flakes/PD; Conlon/PD; Burke/PD-F; Eubanks/Seckinger/PD-EI; Claseman/PD-FE; Vaughan/Allen/EN-HW; Otto/Hathorn/EN-HH; Graham/PD-FA; Shoemake/OC; Bradley/CESAD-OP; Dyess/OP-M; Sanchez/OP-TN; Baughman/CH2M Hill; and Tom Simpson/CH2M Hill for their information.  ACF036353.  Ms. Brandt's transmittal memorandum includes the following remarks:

> SUBJECT:  ACT and ACF Allocation Negotiations and Related Water Supply Issues
>
> Attached is letter dated 15 April 02 from the Acting ASA (CW) R.L. Brownlee to Georgia Governor Roy Barnes noting that the Georgia Request that the Secretary of the Army approve their request for reallocation of storage in Lake Lanier to water supply has been denied.  Per the enclosed legal opinion it has been determined that the quantity of water supply storage requested by the State of Georgia exceeds the authority of the Army to approve, and must be specifically authorized by the U.S. Congress.

ACF036353.

587.    The Stockdale Memorandum determined that the Congressional authorization

for the Army to construct and operate the Lake Lanier reservoir incorporated by reference

several Army Corps of Engineers reports.  SUPPAR005081.  Specifically, "[w]hen Congress

passed legislation approving Buford Dam, its authorization was based on the justifications

for construction of the project contained in the Corps reports incorporated by the 1946 Act.

The reports justified the reservoir's construction based on its specifically authorized

purposes—those purposes which render the project economically feasible and which govern

the operation of the reservoir."  SUPPAR005084.

588.    One of these incorporated Corps reports, was the 1946 Chief of Engineers

Report that describes the authorized purposes of Lake Lanier as providing, "navigation to

Columbus and to Bainbridge, development of hydroelectric power, some flood control and

improvement of low-water flows in Chattahoochee River in the vicinity of Atlanta…[w]hile

navigation, hydropower generation and flood control were to be the authorized project

purposes, the "improvement of low-water flows" downstream of the dam was considered an

incidental benefit of the project."  SUPPAR005082.

589.    Furthermore, the Chief of Engineer stated, "[t]his discussion indicates that

navigation, hydropower and flood control were the specifically authorized purposes—those

purposes which render the project economically feasible and which govern the operation of

the reservoir.  On the other hand, water supply was clearly one of the project's incidental

benefits—those benefits that accrue to the project as a byproduct of its operation for its

specifically authorized purposes."  SUPPAR005082.

590.    A second incorporated Corps report, the 1946 Division Engineer's Report, "discussed how Buford Dam increased the ability of other projects in the system to facilitate navigation and hydropower."  SUPPAR005083.  This report explained that the Buford Dam reservoir would benefit Atlanta because, "[i]ncidentally, it would ensure an adequate municipal and industrial water supply for the Atlanta area."  *Id.*

591.    Thus, according to the Stockdale Memorandum, these two 1946 Corps of Engineers Reports "described flood control, navigation, and generation of hydropower as the project's authorized purposes and identified water supply as an incidental benefit." SUPPAR005080.

592.    The Stockdale Memorandum concluded, "[b]ecause the reservoir was located north of Atlanta, the city's water supply would benefit from releases that would have to be made anyway for hydropower generation and navigation purposes.  Water supply's status as an incidental benefit is underscored by the fact that storage space at the project was specifically allocated to flood control and hydropower needs, while none was allocated to water supply."  SUPPAR005085.

593.    Additionally, the Stockdale Memorandum relates,

[p]rior to the 1958 Act, if local municipalities wanted water supply storage in federal projects, they had to request that existing plans for projects be modified and pay the extra costs of accommodating water supply at the projects.  33 U.SC. §701h (2001).  In this case, the municipalities did not expend funds to include water supply in the project, and no storage was allocated for water supply.  That fact, coupled with the discussions contained in the Corps reports incorporated with the 1946 Act, indicates that water supply was not an authorized purpose of the project.

SUPPAR005085.

594.     According to the Stockdale Memorandum, "[t]he Water Supply Act of 1958 provides authority for the Army to make storage in the reservoir available to Georgia for M&I water supply.  However, the Act requires the Army to obtain Congressional approval if the additional storage seriously affects the purposes for which the project was authorized or involves major operational changes in the project."  SUPPAR005080; SUPPAR005085-86.

595.     Concerning the Corps' limited discretionary authority under the 1958 Water Supply Act, the Stockdale Memorandum states,

> [n]otwithstanding the fact that water supply is an incidental benefit of the reservoir, the Army can reallocate storage in the project for water supply under other law.  The Water Supply Act of 1958 (the "1958 Act"), 42 U.S.C. §390b, provides authority separate from the project authorization for the Corps of Engineers to include municipal and industrial water storage in planned reservoir projects for water supply purposes.  Such a modification may include operational changes such as reallocation of existing storage space from another purpose to a water supply purpose.  However, the Corps' authority to modify any existing project is subject to important limitations contained in the Act.

SUPPAR005085.

596.     Georgia's request, however, "would represent an almost threefold increase in storage used for water supply and would have substantial effects on hydropower as well as a material effect on recreation….The request would seriously affect the purposes from which Lake Lanier is authorized, and would involve a major change in the project's operation."  SUPPAR005086.

597.     According to a 1969 legal memorandum by the Army General Counsel quoted in the Stockdale Memorandum, and discussed above, such a request was beyond the scope of the Corps authority.  It stated, "[t]he discretionary authority is not considered to include matters which materially alter the nature of the project, such as the deletion or addition of

project purposes where not otherwise authorized by law, or *substantial changes in the relative sizes of project purposes*." SUPPAR005089 (emphasis in original).

598.    The Stockdale Memorandum also notes that limitations on the Corps discretionary authority have also been recognized by the courts, often citing to "[t]he seminal case dealing with the Army's discretionary authority [being] EDF v. Alexander, 467 F. Supp. 885." SUPPAR005090.

599.    The court in *Environmental Defense Fund, Inc. v. Alexander*, 467 F. Supp. 885 (N.D. Miss. 1979) ("*EDF*") held that "[b]oth Congress and the Corps have traditionally interpreted the discretionary authority to make post-authorization changes of waterway projects without seeking further congressional authority to be subject to certain restrictions." *EDF*, 467 F. Supp. at 899.

600.    The court in *EDF* also held that

> [i]n summary, it was deemed necessary to bring a project change to the attention of Congress and secure its approval for the modification, if further study after the initial authorization revealed that (1) the scope of the project, *i.e.*, the territorial area to be served, would be materially changed; (2) the purpose or function of the project, *i.e.*, navigation, flood control, etc., would be materially changed; (3) the plan of improvement as originally authorized by Congress would be materially changed; or (4) there existed such circumstances not known to the Chief of Engineers or recognized by Congress when the project was first authorized.

*Id.* at 909 (citing 1951 Chief of Engineers' TTW report).

601.    Referencing the *EDF* case, the Stockdale Memorandum states, "[t]he court's holding made clear that 'absent extraordinary or unusual language which would vary the authority of the Corps officials to make changes in design over and beyond the foregoing limitations [moderate changes in project scope]' the Army would have to seek Congressional

approval before modifying projects.  *Id.* at 909.  No such language is present in the 1945 or 1946 Acts authorizing the project; therefore, [Georgia's] request exceeds the Army's discretionary authority."  SUPPAR005090.

602.    Despite finding that Georgia's request would require Congressional approval, the Stockdale Memorandum noted in a footnote that, "[w]hile the Army does not have the authority to allocate the storage amounts contemplated in Georgia's request, the agency does have the discretionary authority to meet the current water supply needs of the municipalities surrounding the reservoir."  SUPPAR005086.  As noted below, the D.C. Circuit disagreed with and cast doubt on this unfounded, broad view of the Corps' discretionary authority, stating, "The Corps' legal defense of then-existing water withdrawals was limited to a footnote, without citation to authority…." *Southeastern Federal Power Customers, Inc. v. Geren*, 514 F.3d 1316, 1323 (D.C. Cir. 2008), *cert. denied, --- S. Ct. ---, 2009 WL 56204 ( Jan. 12, 2009)(No. 08-199)).*

603.    The Stockdale Memorandum also determined that the Army would require Congressional approval to grant Georgia's request even if Georgia's argument that water supply was an authorized purpose was correct and that the 1958 Water Supply Act did not apply, because "[l]egislative and agency understandings regarding the Army's discretionary authority, as well as relevant case law, indicate that you do not have the authority to reorder specifically authorized project purposes without additional Congressional authorization. Because approving the state's request would result in serious impacts on other project purposes, the Army does not have the authority to grant Georgia's request absent legislative authority."  SUPPAR005080; SUPPAR005088; SUPPAR005091.

604.     Attached to the Stockdale Memorandum was a "Summary of 'Technical Data' on Impacts of GA Request for WS at Lake Lanier" memorandum dated March 27, 2002 and prepared by Steve R. Cone, Economist – Team Leader, Policy Compliance Support Branch, Planning and Policy Division, Directorate of Civil Works for the Corps (the "S. Cone Technical Memorandum").  SUPPAR005092-93.

605.     The S. Cone Technical Memorandum attached to the Stockdale Memorandum contains a section entitled "Prior Reallocations" that noted that the "largest reallocation to date made by the Assistant Secretary of the Army (Civil Works) under the discretionary authority of the Water Supply Act of 1958 was 75.000 acre-feet of storage at Lake Texoma on the Texas-Oklahoma border in the mid 1980s.  The second largest reallocation was 50,000 acre-feet at Stockton Lake in Missouri in the mid 1990s."  SUPPAR005093.

606.     The Assistant Secretary of the Army's approval of the reallocation at Denison Dam (Lake Texoma) occurred in 1985, while legislation authorizing a reallocation at Lake Texoma, introduced on January 3, 1985, was still pending Congress.  *See* H.R. 6, 99th Cong., 1st Sess. (Jan. 3, 1985); *see also Final Environmental Assessment, Lake Texoma Storage Reallocation Study, Lake Texoma, Oklahoma and Texas, May 2006*, at http://www.swt.usace.army.mil/library/Lake%20Texoma%20Reallocation%20Study/2006/FINAL%20LAKE%20TEXOMA%20EA%20060106.pdf.

607.     Ultimately, through the passage of WRDA 1986, Congress authorized the reallocation at Lake Texoma in "in increments as needed" for municipal, industrial, and agricultural water users in the State of Texas.  Section 838(a) of WRDA 1986, P.L. 662, H.R. 6, 99th Cong., 2d Sess. (Nov. 17, 1986).

**F.      D.C. Settlement Agreement**

608.     The Settlement Agreement ("Agreement") was entered into by Southeastern Federal Power Customers, Inc.; The United States Army Corps of Engineers; The Atlanta Regional Commission; the City of Atlanta, Georgia; Gwinnett County, Georgia; the City of Gainesville, Georgia; the Atlanta-Fulton County Water Resources Commission; DeKalb County, Georgia; the Cobb County-Marietta Water Authority; The State of Georgia; and the Southeastern Power Administration.  SUPPAR035443-46.

609.     The Agreement indicates that it was executed by the Acting Assistant Secretary of the Army (Civil Works) and his counsel on or about January 9, 2003. SUPPAR035463.

610.     Under the Agreement, the Corps would enter into "Interim Contracts" lasting up to twenty years:  the initial contract period being for a period of 10 years, which could then be extended for a second term of 10 years.  SUPPAR035452.

611.     The Agreement committed the Corps to entering into water supply and storage contracts with Gwinnett County, Georgia (§ 3.1.1(a)) for 175,000 acre-feet of storage providing 152.4 MGD of gross water withdrawals; the City of Gainesville, Georgia (§ 3.1.1(b)) for 20,675 acre-feet of storage providing 18 MGD of gross withdrawals; and the ARC (§ 3.1.1(c)) for 45,183 acre-feet of storage providing 367 MGD of gross withdrawals. SUPPAR035447.

612.     Those contracts obliged the Corps to reallocate for water supply 240,858 acre-feet of storage in Lake Lanier, slightly less than one-fourth of the Lake's total storage capacity.  SUPPAR035447.

613.    The contracts would have converted to permanent storage contracts if Congress had authorized that action or a court had ruled that congressional authorization was not required, and the Corps agreed to seek that congressional authorization. SUPPAR035452-53.

614.    The Agreement committed the Corps to allow the then-current withdrawals from Lake Lanier at the then-current prices (§ 3.1.3(e)), and then allowed withdrawals of water from Lake Lanier pursuant to the long-term contracts totaling at least 537 MGD. (§ 3.1.1).  SUPPAR035447; SUPPAR035451.

615.    The Agreement conveyed a right to purchase additional storage needed to guarantee the amounts (§ 3.1.2(b)), authorized additional storage contracts with other entities (§ 2(i)) and committed that all return flows to the Lake will be reserved for water supply uses (§ 3.4).  SUPPAR035443; SUPPAR035448; SUPPAR035455.

616.    The Corps agreed to operate the Lake to ensure the availability of stored water for water supply uses.  SUPPAR035480.

617.    The interim contracts proposed by the Agreement would have reallocated 210,858-240,858 acre-feet (range of allocation in SA), or approximately 23%, of Lake Lanier conservation storage to water supply.  SUPPAR005820.

618.    A March 2000 summary of NEPA considerations on the Settlement Agreement interim contracts prepared by Joanne Brandt, likens the interim contracts of the Settlement Agreement to updated versions of the holdover contracts:  "In effect, the proposed interim water supply contracts at Lake Lanier would represent a renewal or revision of previous water supply contracts that technically expired due to the extended timeframe for

completion of the Comprehensive Study and ongoing negotiations for new water allocations within the ACF Basin."  SUPPAR000565.

619.    The Brandt summary continues by noting that under the "live and let live" policy, "these withdrawals from Lake Lanier have continued under the rates negotiated in the previous, now expired water supply contracts.  This situation has resulted in underpayment to the treasury for hydropower benefits (revenues) foregone.  The proposed interim water supply contracts would not grant a ***permanent right*** to water supply storage, but would provide for an updated cost for ***the storage used for water supply***."  SUPPAR000565 (emphases added).

620.    The record contains earlier drafts of the Brandt summary.  SUPPAR000594.

### G.    D.C. Circuit Opinion

621.    Southeastern Federal Power Customers, Inc. filed suit in the United States District Court for the District of Columbia claiming, among other things, that the Federal Defendants had undertaken major operational change at Buford Dam without seeking congressional approval as required by the Water Supply Act.  *See* Complaint, *Southeastern Federal Power Customers, Inc. v. Caldera, et. al.*, Civ. Act. No. 1:00-cv-02975-JR (D.C. Dist. Ct.) ("D.C. District Action"), Doc. No. 1.  The D.C. district court referred the parties to mediation, and they negotiated a Settlement Agreement.  D.C. District Action, Doc. No. 23, SUPPAR02405.

622.    As noted above, the Agreement provided for a reallocation of more than 241,000 acre-feet of the 1,049,000 acre-feet of Lake Lanier's storage capacity to water supply.

623.     Alabama and Florida intervened in the D.C. District Court to challenge the Agreement's legality.  D.C. District Action, Doc. No. 61, 62.  Alabama and Florida asked the D.C. District Court to find that the Agreement was unlawful because, among other reasons, the Agreement violated the Water Supply Act.  *See* Florida's Complaint in the D.C. District Action, attached as an Exhibit to Doc. 61; Transcript of January 20, 2004 Motions Hearing in District Court Action, Doc. No. 161 at 25-26, 34, 45-46, 125, 127-29.

624.     In their arguments submitted to the district court, Alabama and Florida contended that the reallocation of storage required by the Settlement Agreement amounted to major operational change under the Water Supply Act and thus required congressional approval.  *Id*. at 25-26, 34, 45-46, 125, 127-29.

625.     In its principal brief in the district court, Florida quoted the language of the Water Supply Act, underlining the words "major operational changes," D.C. District Action, Doc. 85 at 18, and then discussed the fact that the Settlement Agreement would involve a major operational change, *id*. at 18-22.  Florida returned to the topic in its supplemental memorandum to the district court.  D.C. District Action, Doc. 149 at 23-27.  Alabama expressly incorporated the arguments made by its co-party Florida.  D.C. District Action, Doc. 147 at 1, n.1.

626.     The parties also discussed the major-operational-change issue at oral argument in the district court.  Transcript of January 20, 2004 Motions Hearing in District Court Action, at Doc. No. 161 at 25-26, 34, 45-46, 125, 127-29.  At the hearing conducted by the district court, Alabama and Florida repeatedly addressed the issue of major operational change and the effect of the Settlement Agreement on reservoir operations.  *Id.* at 25-26, 34,

45-46, 125, 127-29.  Counsel for the Federal Defendants also participated, arguing that the Settlement Agreement did not involve major operational change only because water supply was an existing use.  *Id*. at 68.  Additionally, counsel for the water supply providers told the district court that it needed to decide whether "the interim contracts involve major structural or operational changes."  *Id*. at 86.

627.    Alabama and Florida also submitted evidence to the district court that supported their argument that the Settlement Agreement would involve major operational change.  This evidence included two key documents prepared by the Federal Government:  (1) the 1989 Post Authorization Change Notification Report for the Reallocation of Storage from Hydropower to Water Supply at Lake Lanier, Georgia ("1989 PAC Report") and (2) a 2002 legal memorandum prepared by the Office of the Army General Counsel (Stockdale Memorandum).  ACF041152; SUPPAR005079.

628.    After the D.C. District Court overruled Alabama and Florida's challenges to the Agreement, Alabama and Florida appealed to the United States Court of Appeals for the D.C. Circuit.  *See* D.C. District Court Action Doc. No. 215, 216.  In the D.C. Circuit, Alabama and Florida squarely raised the major-operational-change issue in their opening appellate brief, (*see* Opening Brief of Appellants State of Florida and State of Alabama ("Opening Brief") in *Southeastern Federal Power Customers Inc. v. Harvey*, No. 06-5080 (D.C. Circuit Court of Appeals) ("the D.C. Circuit Action") at pp. 37-39), and reply brief. *See* Reply Brief of Appellants State of Florida and State of Alabama in the D.C. Circuit Action at pp. 14-20.

629.    Alabama and Florida's appellate briefs raised the point that the Settlement Agreement reallocated slightly less than 25 percent of Lake Lanier's conservation storage to water supply.  *See* Opening Brief at 36.  The slightly less than 25 percent reallocation figure presented to the court is premised upon calculating the baseline to be zero acre-feet and the total amount of conservation storage to be 1,049,000 acre-feet.  9/  *Southeastern*, 514 F. 3d at 1319-26.

630.    Oral argument in the D.C. Circuit focused principally on the question of whether the Settlement Agreement involved a major operational change.  *See* Exh. 1 to Doc. No. 148, at 13-23, 30-75.  Alabama and Florida argued that a reallocation of approximately 241,000 acre-feet of storage from a total conservation storage space of 1,049,000 acre-feet constituted a major operational change under the Water Supply Act.  *Id*. at 22.  Notably, the Settlement Agreement states that the total conservation storage space is 1,049,000 acre-feet and the Federal Defendants conceded at oral argument that this number is the proper denominator to use to calculate the actual percentage of reallocation.  Exh. 1 to Doc. No. 148, at 37; *Southeastern*, 514 F. 3d at 1319.

631.    The Federal Defendants and Georgia Parties suggested that the change brought about by the Settlement Agreement was not a reallocation of 241,000 acre-feet, but instead the change was the difference between the Settlement Agreement's allocation of 241,000 acre-feet and the "status quo" figure of 145,000 acre-feet, resulting in a net change of 96,000 acre-feet.  Exh. 1 to Doc. No. 148, at 36-37.

---

9/      The D.C. Circuit referred to the total conservation storage space utilized by the Settlement Agreement, which was 1,049,400 acre-feet.  SUPPAR035448; *Southeastern*, 514 F. 3d at 1319.  As described in previous sections above, several Corps documents refer to the value as 1,049,000 acre-feet.

632.    During oral argument, the State of Georgia conceded that Alabama and Florida have standing "to assert a claim to their injury at the [Alabama-Florida] State Line relating to water flows.  *Id*. at 49.

633.    The Federal Defendants made several important concessions during the oral argument before the D.C. Circuit.  First, the Federal Defendants conceded that the Settlement Agreement would increase the amount of reservoir space allocated to water supply storage by 10 percent (or approximately 100,000 acre-feet of the 1,049,000 acre-feet of total reservoir capacity), compared to the status quo prior to the Agreement.  *Id*. at 36-37; *Southeastern*, 514 F. 3d at 1328.  Federal Defendants also conceded that the amount of change under the Settlement Agreement, when compared to a baseline of zero, is 23 percent.  Exh. 1 to Doc. No. 148 at 35.

634.    Second, the Federal Defendants conceded that the Settlement Agreement would involve major operational change if the 10 percent storage reallocation was *permanent*. *Id.* at 41, 44**;** *Southeastern,* 514 F. 3d at 1328.

635.    Third, the Federal Defendants conceded that a reallocation of 96,000 acre-feet has never been undertaken by the Corps without prior Congressional approval.  *See* Exh. 1 to Doc. No. 148, at 38**;** *Southeastern,* 514 F. 3d at 1324.  Counsel for the Federal Defendants further suggested that obtaining Congressional approval would be difficult: "[Y]ou know, this is a very difficult situation that the Corps is trying to come up with a creative solution to, you know getting Congress to act is a dicey proposition and so to go to Congress I think it has, the two have to be coupled together."  Exh. 1 to Doc. No. 148, at 45.

636.    Fourth, the Federal Defendants conceded that originally no storage in Lake Lanier was allocated to water supply.  *See id.* at 35.

637.    The D.C. Circuit concluded that the reallocation of water storage contemplated by the Settlement Agreement amounted to a major operational change for which congressional approval was required.  Because no water storage at Lake Lanier had ever been allocated by Congress to water supply, the court determined that the appropriate baseline for measuring the impact of the reallocation was zero.  *Southeastern*, 514 F. 3d at 1324.  Accordingly, the change that had to be judged under the Water Supply Act was more than 240,000 acre-feet, or more than 22 percent of Lake Lanier's storage capacity.  *Id.* Consistent with the Federal Defendants' concession that a 10 percent change would be a major operational change if it were permanent, the court concluded that a reallocation of 22 percent was major operational change "[o]n its face."  *Id.*

638.    Based on the D.C. Circuit's conclusion that the reallocation contemplated by the Settlement Agreement would result in major operational change for which congressional approval would be required under the Water Supply Act, the court reversed the district court's approval of the Settlement Agreement.  *Id.* at 1325.

639.    The D.C. Circuit court found that "[b]eginning in the 1970s, the Corps entered into a series of five-year renewable contracts that allowed some of Lake Lanier to be used for storage of local water supply."  *Southeastern*, 514 F.3d at 1318; *See also Southeastern Federal Power Customers, Inc. v. Harvey et al.,* 400 F.3d 1, 2 (D.C. Cir. 2005).

640.    Furthermore, the D.C. Circuit described these contracts as "temporary local water storage contract[s]."  *Southeastern*, 514 F.3d at 1318.  And it noted that it had no

occasion to decide whether the "previous storage reallocations" effected through these contracts "were unlawful." *Id.* at 1324 n. 4.

641.     In their analysis of the Settlement Agreement, the D.C. Circuit stated, "[i]f, under the Agreement, all of the storage space that may be officially dedicated to local consumption is, then the reallocation constitutes more than twenty-two percent (22%) of the total storage space in Lake Lanier and approximately nine percent (9%) more of the total storage space than was being allocated for local use in 2002." *Id*. at 1319-20.

642.     The D.C. Circuit also observed that "[t]he Corps' legal defense of then-existing water withdrawals was limited to a footnote, without citation to authority…." *Id*. at 1323.

643.     Moreover, the D.C. Circuit, concluding that the ultimate determination as to whether or not a reallocation to water supply constituted major operational change should be made by evaluating the percentage of Lake Lanier's storage capacity that was being reallocated to water supply, stated, "[o]n its face, then, reallocating more than twenty-two percent (22%, approximately 241,000 acre feet) of Lake Lanier's storage capacity to local consumptive uses…constitutes the type of major operational change referenced by the WSA…" *Id*. at 1324.

644.     The D.C. Circuit also rejected the contention of the Corp and Georgia that the baseline should take into account "the status quo of gradual water storage reallocation" reflected in existing water supply consumption levels at Lake Lanier, holding that this approach constituted a "chain of logic that would effectively bypass section 301(d) of the WSA." *Id*.

645.    Indeed, the D.C. Circuit found that a 95,000 acre foot reallocation (approximately 9%) "would be the largest acre-foot reallocation ever undertaken by the Corps without prior Congressional approval." *Id.*

646.    The D.C. Circuit also concluded that "[t]he appropriate baseline for measuring the impact of the [Settlement] Agreement's reallocation of water storage is zero, which was the amount allocated to storage space for water supply when the lake began operation." *Id.*

647.    Furthermore, the D.C. Circuit found that "[t]he Agreement's reallocation of over twenty-two percent (22%) of Lake Lanier's storage space…is large enough to unambiguously constitute the type of major operational change for which section 301(d) of the WSA, 43 U.S.C. 390b(d), requires prior Congressional approval." *Id.* at 1325.

648.    And in response to the argument that the "holdover contracts" were a *de facto* base for the allocation of water under the Settlement Agreement (ignoring live and let live and that no water had been allocated to storage) from which the Settlement Agreement would only be a 9% change, the D.C. Circuit found that "[t]he same conclusion [major operational change] applies to a reallocation of approximately nine percent (9%) of Lake Lanier's storage space, for it too presents no ambiguity." *Id.*

649.    Moreover, the D.C. Circuit majority found that, a change is a change, and in rejecting the Corps' argument "that the absence of a permanent reallocation under the Agreement removes the need for prior congressional approval," the D.C. Circuit stated, "[b]ut it is unreasonable to believe that Congress intended to deny the Corps authority to make major operational changes without its assent, yet meant for the Corps to be able to use

a loophole to allow these changes as long as they are limited to specific time frames, which could theoretically span an infinite period." *Id*. at 1324-25.

650.    The concurring opinion in *Southeastern* reaffirms this position when it states that, "[t]he Corps argued, however, that even if a *permanent* reallocation of 10% of the reservoir would deemed 'major,' the Settlement Agreement does not require Congressional approval because it is only an *interim* measure.  That is not persuasive.  The requirements of the Water Supply Act apply to 'major structural or operational changes' – the text of that statute draws no distinctions between the interim and permanent changes." *Id*. at 1328.

651.    The State of Georgia filed a petition for panel rehearing of the D.C. Circuit's decision in *Southeastern*.  In that petition, Georgia argued that Alabama and Florida had miscalculated the extent of the reallocation at 23 percent of Lake Lanier's conservation storage pool and that Alabama and Florida had misinterpreted the meaning of "major operational change."  *See* D.C. District Action, Exh. 1 to Doc. No. 218 at 1-2.  Georgia, however, admitted that it failed to raise these arguments in its merits brief in the circuit court.  *See id.* at 7.  The court denied Georgia's rehearing petition and this case was transferred shortly thereafter to this Court.

652.    In their unsuccessful Joint Petition for Panel Rehearing, Georgia and the water suppliers stated:  "[t]he Court's decision equates a 'reallocation of storage' with an 'operational change' *per se*, such that the only question is whether the reallocation of storage, and hence the operational change, is 'major.'" *Id.* at 8-9.

653.    In the Corps' Response to that Petition for Panel Rehearing, the Corps characterized the D.C. Circuit's decision in this manner:  "[t]he Court's opinion incorrectly

concludes that the Settlement Agreement would work a major operational change based on nothing more than the percentage of storage proposed for reallocation." *See* Resp. to Pet. for Panel Reh'g at 2, D.C. Circuit Action, No. 06-5080 (filed April 18, 2008).  The Corps also referred to "the Court's approach of using only percentages of reallocation to determine whether the proposed reallocation involves a major operational change" *Id*. at 3.

654.    In an August 12, 2008 Order, this Court referred to the D.C. Circuit opinion as having "ruled that some of the water-supply contracts at issue in some of the pending cases constitute a major operational change for which the parties are required to seek congressional approval." Doc. 142 at 1.

655.    On January 12, 2009, the Supreme Court denied Georgia's petition for certiorari review.  *See* Doc. 187.

**H.    Accounting of Reservoir Storage Utilized for Water Supply**

656.    In addressing the amounts of water required by the various water suppliers under the withdrawal contracts, the Corps has routinely equated the annual average withdrawals from Lake Lanier, in MGD, to the annual average of storage, both in acre-feet and as a percentage of conservation storage.

657.    The administrative record contains numerous documents that equate MGD withdrawal amounts to acre-feet storage amounts, including the PAC Report (ACF041152-620), the Georgia Water Supply Request (SUPPAR009674-75), the Stockdale Memorandum (SUPPAR005079-93), and the Settlement Agreement (SUPPAR035439-503), among others.

658.    Many of these documents do not provide the factors or equations utilized to convert MGD to acre-feet.  However, in some cases, the application of basic math properties

reveals the calculations utilized to achieve the conversion.  In all cases, the conversion is dependent on the number that is used as the critical yield (which is based on the worst drought of record).  Therefore, the formula for converting MGD to acre-feet will vary depending on the year and whatever has been the worst drought of record (critical yield) up to that point.  Consequently, the storage accounting numbers contained in the record appear scattered and divergent; in some cases rising sharply and in others dipping below previous years.  Nevertheless, the trend, as demonstrated in the following chart, is clear:  storage utilized for water supply in Lake Lanier is increasing over time.

659.    The following chart summarizes the record evidence of storage conversions:



### 1.    PAC Report Storage Conversion

660.    The 1989 Draft PAC Report concluded that the water supply needs for the Atlanta region in the year 2010 would be approximately 150.96 MGD from Lake Lanier and 378.40 MGD from the Chattahoochee River.  ACF041190.  Subtracting out the 327 MGD that the Corps assumes is available downstream as "incidental benefit," this results in a total of approximately 202 MGD withdrawals requested for 2010.

661.    The PAC Report calculated that the amount of storage required to provide the requested 2010 water withdrawal amount (i.e., 202 MGD) was 207,000 acre-feet, (ACF041175-76), and ultimately recommended that this amount of storage be reallocated from hydropower storage to water supply storage to satisfy the water supply needs of the Atlanta region to the year 2010.  ACF041191.

662.    Appendix C to the PAC Report explains the derivation of storage amounts required for both the Lake and the downstream withdrawals.  ACF041299-302.  In converting the downstream withdrawals to acre-feet, the PAC Report, in Appendix C, assumed that on average only 200 MGD would be available downstream through normal releases, ACF041301, despite a previous recognition of 327 MGD incidental benefit in the 1986 contract with ARC.

### 2.    Storage Conversion of Then-Existing Uses Per Stockdale Memorandum

663.    In the Stockdale Memorandum, dated April 15, 2002, the Corps calculated that the storage associated with then-existing direct withdrawals and releases from Lake

Lanier for water supply utilized 145,460 acre-feet of storage, approximately 13% of total

conservation storage.  SUPPAR005086.

664.    The Stockdale Memorandum was responding to Georgia's May 2000 water

supply request, which stated that the then-existing withdrawals, based on 1999 values, totaled

131 MGD.  SUPPAR009674.

### 3.    D.C. Settlement Storage Conversion

665.    The interim contracts proposed by the D.C. Settlement Agreement would have

provided a total of 240,858 acre-feet of storage to accommodate the needs of Gwinnett

County (175,00 acre-feet estimated to provide for an average annual use of 152.4 MGD),

City of Gainesville (20,675 acre-feet estimated to provide for an average annual use of 18

MGD), and ARC (45,183 acre-feet estimated to provide for an average annual use of 367

MGD, or 40 MGD discounting the 327 MGD incidental benefit).  SUPPAR035447.  Thus,

240,858 acre-feet of storage to accommodate 210.4 MGD total water supply withdrawals.

The D.C. Settlement did not include the City of Cumming, and the withdrawals associated

with that document, therefore, are lower than the total need for the Atlanta region.

### 4.    Georgia Water Supply Request Storage Conversion

666.     Georgia's May 16, 2000 Water Supply Request sought long term contracts

with the Corps to gradually increase the M&I withdrawals from Lake Lanier from their 1999

annual averages to projected 2030 annual averages.  SUPPAR009674.  Specifically, Georgia

requested that the Corps allow an increase in M&I water withdrawals from lake Lanier from

131 MGD (then-existing withdrawals) to 297 MGD (projected 2030 annual average).  *Id*.

Georgia also requested an increase in releases to 408 MGD to support downstream M&I

water withdrawals projected for 2030 (SUPPAR009674); this represents an 81 MGD increase from the 327 MGD that the Corps provides free of charge per "normal releases." ACF044244.  Accordingly, Georgia's Water Supply Request was for annual average withdrawals totaling 378 MGD, which the Corps, in the April 15, 2002 Stockdale Memorandum, stated would require 370,930 acre-feet of storage or approximately 34% of the Lake's conservation storage.  SUPPAR005087; SUPPAR005092.

### 5.   Alabama and Florida's Estimates of 2006 Allocated Storage

667.   As detailed below in Table 1, Florida and Alabama have summarized the total storage allocated to support current (2006) water supply withdrawals, which totaled approximately 174 MGD.  Specifically, the storage allocated to support 2006 withdrawals totaled approximately 196,168 acre-feet.  As described in detail below, this is based on the highest of actual withdrawals or not-to-exceed contract amounts to calculate withdrawals in MGD, a conservation storage pool of 1,087,600 to calculate acre-feet and the Corps' 1999 formula to convert MGD to acre-feet.

## V.   THE 1989 DRAFT WATER CONTROL PLAN

### A.   The Corps' Requirements to Maintain Water Control Plans

668.   Section 709 of the Flood Control Act of 1944 provides:

On and after December 22, 1944, it shall be the duty of the Secretary of the Army to prescribe regulations for the use of storage allocated for flood control or navigation at all reservoirs constructed wholly or in part with Federal funds provided on the basis of such purposes, and the operation of any such project shall be in accordance with such regulations . . . .

33 U.S.C. § 709.

669.    The Corps promulgated 33 C.F.R § 222.5, which "prescribes policies and procedures to be followed by the U.S. Army Corps of Engineers in carrying out water control management activities, including establishment of water control plans for Corps and non-Corps projects, as required by Federal laws and directives."  33 C.F.R § 222.5(a).  This set of regulations applies to "all field operating activities having civil works responsibilities," 33 C.F.R. § 222.5(b), including the Corps' projects on the ACF System identified above.  33 C.F.R. § 222.5(o) & App. E, South Atlantic Div.

670.    The Corps must prepare a "water control plan" for "reservoirs, locks and dams, reregulation and major control structures and interrelated systems to conform with objectives and specific provisions of authorizing legislation and applicable Corps of Engineers reports."  33 C.F.R. § 222.5(f)(1).  "Water control plans include coordinated regulation schedules for project/system regulation and such additional provisions as may be required to collect, analyze and disseminate basic data, prepare detailed operating instructions, assure project safety and carry out regulation of projects in an appropriate manner." 33 C.F.R. § 222.5(e)(1). The Corps regulations provide:

> The term "reservoir regulation schedule" refers to a compilation of operating criteria, guidelines, rule curves and specifications that govern basically the storage and release functions of a reservoir. In general, schedules indicate limiting rates of reservoir releases required during various seasons of the year to meet all functional objectives of the particular project, acting separately or in combination with other projects in a system.

33 C.F.R. § 222.5(e)(2).

671.    The Corps regulations provide: "There cannot be a continuing or recurring deviation from approved water control plans.  In the case of a continuing or recurring change, the water control plan must be changed and the required approval obtained from

HQUSACE."  Paragraph 18-2(f) of the Corps' engineer pamphlet EP 1165-2-1 (at 18-4)

(July 30, 1999).

672.    The Corps must develop water control plans "in concert with all basin

interests which are or could be impacted by or have an influence on project regulation.  Close

coordination will be maintained with all appropriate international, Federal, State, regional

and local agencies in the development and execution of water control plans."  33 C.F.R.

§ 222.5(f)(9); *see also* EM 1110-2-3600 at 2-1 (Nov. 30, 1987).  SUPPAR025275.

673.    Water control plans must be "clearly documented in appropriate water control

manuals."  33 C.F.R. § 222.5(f)(3).  The Corps must prepare a "water control manual" for all

reservoirs under its supervision regardless of the purpose or size of the project, and for all

lock and dam, reregulation and major control structure projects that are physically regulated

by the Corps.  33 C.F.R § 222.5(i)(2).  A "water control manual" refers to "manuals that

relate primarily to the functional regulation of an individual project or system of projects."

33 C.F.R. § 222.5(i)(1).  Each water control manual must contain "a section on special

regulations to be conducted during emergency situations, including droughts."  33 C.F.R.

§ 222.5(i)(5).  The regulations further provide that

> Water control plans . . . documented in . . . water control manuals . . . will be
> revised as necessary to conform with changing requirements resulting from
> developments in the project area and downstream, improvements in
> technology, new legislation and other relevant factors, provided such revisions
> comply with existing Federal regulations and established Corps of Engineers
> policy.

33 C.F.R. § 222.5(f)(3).

674.    Where there are several projects in a drainage basin with interrelated purposes,

a "Master Manual" must be prepared.  33 C.F.R. § 222.5(i)(2).  Corps requirements further

provide that "[n]ormally, the control of a multiproject system requires an integrated water control plan whereby projects are regulated jointly in order to achieve the overall river basin management objectives.  In such cases a master water control manual is prepared to define system regulation."  EM 1110-2-3600 at 2-3 (Nov. 30, 1987).  SUPPAR025277.  The Corps projects on the ACF System have interrelated purposes.

675.    The last final master water control manual for the ACF Basin was prepared in 1958.  ACF001676.  The last final Reservoir Regulation Manual for the Apalachicola River Basin, Appendix B to the 1958 Manual, was prepared in 1959.  ACF001789.  The Corps has not finalized an up-to-date integrated water control plan for the ACF System.

**B.      The 1989 Draft Water Control Plan for the ACF Represents De Facto Reallocation**

676.    The 1989 Draft Water Control Plan (WCP) was originally released as Appendix A to the PAC Report.  ACF041193.  A stand alone version of the WCP, dated October, 1989, is contained in the administrative record at ACF017553.

677.   The draft WCP recognized that

Traditionally, the [ACF] projects have been operated in such a manner that hydropower requirements are the controlling factors during the summer months when energy demands are high, while navigation needs dominate during the fall, low-flow months.  Whenever rain causes water levels to rise excessively, flood control regulation overrides all other project functions. During extreme drought conditions, water supply and water quality are the major operating concerns. This water management approach has tended to produce an "either-or" situation under which project functions are nearly fully met or operations are directed only at water supply/water quality and other purposes are essentially sacrificed or restricted.

ACF017556.

678.   The Corps elaborated that "[i]n addition to providing at least minimum hydropower generation and a more predictable navigation flow on the Apalachicola, operations under the [1989 Draft WCP] will meet specified minimum water quality/water supply releases while keeping the reservoir levels as near the guide curve elevation as practicable for water conservation and in-pool interests."  ACF017556.  The "guide curves" are depicted in Figure 2 of the draft WCP as a set of four "action zones" that divide Lake Lanier's conservation storage vertically into areas that dictate the Corps' operations. ACF017568.

679.   The Draft WCP establishes, among other things, the "action zones" that drive the Corps' management of the ACF Basin reservoirs, ACF017567, and the minimum flow "requirement" of 5,000 cfs to the Apalachicola River.  ACF017566.

680.   The Corps' website provides a summary of the operations pursuant to the "action zones," at http://water.sam.usace.army.mil/zones.htm, which is reproduced in the administrative record at SUPPAR035783.

681.   The operating rules change as the reservoir's elevation descends from Zone 1 toward Zone 4 during dry conditions. SUPPAR035783.  When Lake Lanier is in Zone 1 – i.e., relatively full – the Corps operates Buford Dam to serve the authorized purposes of hydropower and navigation, as well as for water supply and water quality flows at Atlanta. *Id.*

682.   The "action zones" apply to each of the major storage projects in the ACF Basin (Buford, West Point and George). According to the Corps:

> These zones are used to manage the lakes at the highest level possible for recreation and other purposes that benefit from high lake levels.  The actions

zones also provide guidance on meeting minimum hydropower needs at each project as well as determine the amount of storage available for downstream purposes such as navigation, water supply, water quality.  These zones were derived based on the past operation of the projects which considered time-of-year, historical pool level/release relationships, operational limits for conservation and recreational resource impact levels.  The action zones are basic guidelines for operating the river system, however there may be other factors and activities that may cause the lakes to operate differently than the zones shown on the graphs.  Some of these factors range from flood control actions, fish spawn operations, maintenance and repair of turbines, emergency situations such as drownings and chemical spills, drawdowns due to shoreline maintenance, releases made to free stuck barges, and other circumstances.

SUPPAR035783.

683.   Operations pursuant to the "action zones" are summarized as follows:

Zone 1 indicates that releases can be made in support of seasonal navigation (when the channel has been adequately maintained), hydropower releases, and water supply, and water quality releases.  If all the lakes are in Zone 1 or above, the river system would operate in a fairly normal manner.

Zone 2 indicates that water to support seasonal navigation may be limited. Hydropower generation is supported at a reduced level. Water supply and water quality releases are met. Minimum flow targets are met.

Zone 3 indicates that water to support seasonal navigation may be significantly limited.  Hydropower generation is supported at a reduced level. Water supply and water quality releases are met.  Minimum flow targets are met.

Zone 4 indicates that navigation is not supported.  Hydropower demands will be met at minimum level and may only occur for concurrent uses. Water supply and water quality releases are met. Minimum flow targets are met.

SUPPAR035783.

684.   A summary of the 1989 Draft WCP contained in the administrative record and with "6 May 1992" handwritten at the top of the first page, provides a history and summary of the Plan:

Prior to 1989 the Corps' operating guidelines for the ACF system of projects consisted of an outdated basin manual and individual project manuals that said little to document the interconnected—system approach to water management that had evolved over the years. The drought, of the eighties plus the looming reallocation of project storage for water supply necessitated the documentation of our procedures so that interests would know what to expect in future droughts and so that there would be a baseline to measure changes in project operation such as increased water supply usage.

The Water Control Plan document was linked with the Post Authorization Change report. Because that report and its environmental documentation was never finalized and because the lawsuit challenges the Water Control Plan, *the Plan is legally in limbo*. *However, the Division has conditionally approved the Plan for use until NEPA documentation and Division Engineer approval are attained*.

The Plan is based upon zoning reservoirs into action levels to the Apalachicola River. In brief, if reservoirs are full, releases for full-depth navigation are made. *As reservoirs decline to lower action zones navigation support is reduced. Hydropower is similarly reduced. At lowest reservoir zone only minimum hydropower and streamflows for water quality and water supply are maintained*.

ACF041701 (emphases added); *see also* ACF017288-330 (draft EA for the 1989 draft WCP and PAC Report).

685.    The Corps' 1989 Draft WCP met with much resistance from various parties, and was included among the claims in the original complaint filed in the Northern District of Alabama in 1990.

686.    In a letter to Colonel Larry Bonine of the Corps dated August 23, 1989 Harry C. Geisinger, Administrator for SEPA, expressed disagreement with the outcome of the Corps' proposed ACF Water Control Plan. Geisinger stated that the "result of the proposed changes in operational procedures at the projects" would "unquestionably adversely affect the economic benefits to the power and navigation purposes and increase the recreational benefits." SUPPAR010371-72.

687.    In a letter to N. D. McClure, IV, Planning Division Chief for the Mobile

District Corps of Engineers dated November 15, 1989, Jim B. Lloyd, Director of SEPA's

Power Resources Division, indicated that the Corps' "water control Plan represents a

fundamental change in operation from past practices."  SUPPAR016735.  Lloyd further

stated that the implementation of the Corps' plans "will result in both factual and de facto

reallocation of water from the hydropower purpose to the water supply and recreation

functions."  SUPPAR016737.

688.    A June 2, 1989 memorandum from Ed Burkett (Mobile District) to the

Commander of SAD regarding preparation of the "Draft of ACF Reservoir Regulation

Manual" proposes to focus first on the water control plan, which would ultimately be a stand-

alone document as well as a portion of the Reservoir Regulation Manual.  ACF018641.

689.    With regard to the acceptability of the water control plan, Burkett's June 2,

1989 memorandum states:

> The analysis of model results at present seems to show that the pool levels in
> the plan are held much higher all year than historically has occurred. One
> measure we anticipate of our plans acceptability by upstream and downstream
> interests is how much and what impacts result from changes in pool and flow
> frequency that occur under the plan as compared to what has occurred
> historically. ***Not only would significant changes perhaps require an EIS
> evaluation and possibly represent defacto reallocation***, but it could also
> confound Georgia's attempt at storage reallocation in which state
> representatives have told upstream and downstream interests not to expect
> significant changes in pool frequencies and outflows. We believe we can
> create a win-win approach to the lakeshore and in-stream interests to show we
> can hold pools slightly (1'-3') higher in the summer (recreation) months and
> that this water would more beneficially be released in the typically dryer fall
> for downstream interests.

ACF018641 (emphasis added).

690.     Regarding the difficulty of the short-term and long-term plan approach,

Burkett's June 2, 1989 memorandum further provides:

> When we discuss this plan with the various interests throughout the basin; it will destroy our credibility to have an approved plan for the rest of the basin and with an exception for Lake Lanier for the present situation. Various interests will question if we have the courage to follow a plan in the future if we cannot for the present follow it. ***We need to get our actions to agree with our words. We have been saying we treat the basin as a system, considering all project purposes at all lakes in an equitable fashion. It is hard to be convincing to the other interests in the basin that this is so, unless we can delineate under what circumstances we would use Lake Lanier for anything but recreation and water supply and then be willing to apply these guidelines when the circumstances exist***.

ACF018642 (emphasis added).

691.     The Corps, in its description of the proposed action modification to the

Interim Operations Plan at Jim Woodruff Dam, stated that since 1989 "operations have been

conducted in accordance with the draft Water Control Plan" and described the proposed

operations as "a definition of discretionary operations within the limits and rule curves

established by the *existing water control plan*."  SUPPAR1594, SUPPAR001591 (emphasis

added).

692.     In a letter to General R. M. Bunker, Commander to the Corps' South Atlantic

Division dated April 19, 1990, Colonel Larry S. Bonine, District Engineer for the Corps'

Mobile District stated, "The proposed reallocations in the Alabama-Coosa [ACT] and ACF

have been and continue to be quite a challenge.  Your guidance on being 'even-handed' and

maintaining a 'level playing field' is well taken…Obviously, the various interests just want

me to give them their fair advantage.  We are a convenient intermediary but really need to get

the States in dialogue with one another with us out of the middle."  SUPPAR018135.  Bonine

also stated, the "WCP would be our system operation plan with or without reallocation." SUPPAR018136.

### C.    Navigation Windows Under the 1989 Draft Plan

693.    The Corps maintains the Apalachicola River as a navigation corridor for shipping and other stream traffic.  ACF023803.  Congress authorized a 9-foot deep, 100-foot wide navigation channel from Apalachicola, Florida to Lake Seminole and beyond. ACF023803.

694.    The Corps developed "navigation windows" for the ACF System as a means for improving navigability during low-flow periods.  ACF023803-16.  In a report describing navigation windows on the ACF System, the Corps described how the windows are made possible "through water storage and a concentrated ten day water release for a navigation window."  ACF023803.

695.    The "navigation window" concept originated during the 1986-1988 drought. ACF023806.  "Navigation windows" are special releases to support navigation when flows are inadequate to maintain full navigation.  ACF032341.  They are a tool used by the Corps to assist dependability of the waterway for a definite and specified period of time.  *Id.*

696.    The 1989 Draft WCP contains water management guidelines for navigation, and sets desired target flow releases from Woodruff Dam into the Apalachicola River. ACF023807-08.  The Draft WCP characterized these as an "extreme management option." ACF017223.

697.     Nevertheless, during the 1990s, "navigation windows" were regularly used to assist navigation in the Apalachicola River during low water periods.  ACF001330.  The Corps suspended the use of regular navigation windows in December 2000.  *Id.*

698.     The following is a chart of the "navigation windows" that occurred between 1990 and 2000:

| Year | Navigation Window(s) | Record Cite |
|------|----------------------|-------------|
| 1990 | October 15-October 23<br>November 11-November 26<br>December 13-December 26 | ACF030698 |
| 1991 | November 19-January 13 | ACF030698 |
| 1992 | August 18-August 28 | ACF030698 |
| 1993 | July 6-July 15<br>August 9-August 19<br>September 10-September 24<br>October 12-October 23<br>November 30-December 10 | ACF030698 |
| 1994 | June 2-June 12 | ACF030698 |
| 1995 | June 1-June 13<br>July 7-July 18<br>August 9-August 23<br>September 12-September 21 | ACF030698 |
| 1996 | June 3-June 13<br>July 9-July 19<br>August 14-August 24<br>September 16-September 26<br><br>October 15-November 1<br>November 22-December 2 | ACF030698 |

| Year | Navigation Window(s) | Record Cite |
|------|---------------------|-------------|
| 1997 | June 3-June 13<br>July 9-July 21<br>August 14-August 25<br>September 16-September 27<br>October 15-November 1<br>November 22-December 31 | ACF030698 |
| 1998 | July 1-July 18<br>August 12-August 21<br>October 1-October 12<br>November 12-November 24<br>December 25-January 10 | ACF000741 |
| 1999 | December 26-January 8<br>March 26-April 6<br>June 9-June 18<br>August 4-August 12 | ACF000740 |
| 2000 | February 11-22<br>April 25-May 5 | ACF000740 |

699.    The administrative record contains correspondence received by the Corps regarding "potential impacts to fish spawning activities as a result of drawdowns to support the 26 April - 5 May navigation window.  Georgia DNR and USFWS both recommend changes be considered to the current SAD Regulation (DR 1130-2-16, 1 Apr 93) and the Mobile implementing SOP (SAM  SOP 1130-2-9, 23 Feb 95)."  ACF035516.

700.    In an April 28, 2000, letter from the U.S. Fish & Wildlife Service to the Corps, the Service wrote to "express [its] concern over the navigation window that the Mobile District [was] implementing in the Apalachicola-Chattahoochee-Flint (ACF) system." ACF035517.  The Service explained that the drawdown of reservoir levels to implement the navigation window was "detrimental to fish spawning in the affected

190

reservoirs, and the drawdown of river levels following the window [would] be detrimental to fish spawning in the river reaches downstream of the reservoirs." ACF035517.  The Service also expressed its disappointment that the Corps did not consult with or notify the Service of the navigation window.  ACF035517.

701.    There were no navigation windows in 2001-2004.  ACF000741; ACF036654; ACF039223; ACF039759.

### D.    Recreation at Lake Lanier Under the 1989 Draft Water Control Plan

702.    The 1982 Drought Contingency Plan included a discussion of the "acceptable" drawdown level for Lake Lanier.  Despite the Congressionally authorized conservation pool extending down to 1035 ft., the Corps stated that "[c]ertainly providing all project functions by drawing the pool to elevation 1035 ft. will not be desirable."  ACF008217.  Also undesirable would be "ceasing to meet essential water supply and instream needs whenever the pool reached "minimum level" whether that be at 1061 or 1035.  *Id.*  The Corps noted that the "ideal" level for recreation is "no drawdown," and that severe impacts to recreation begin to occur between a 10 and 15 foot drawdown.  *Id.*  As a foreshadowing of the Corps' later implementation of action zones, the Corps noted that future studies "will seek to establish lake levels below which only reduced levels of service will be maintained."  *Id.*

703.    In the Corps 1987-88 Annual report on Reservoir Regulation Activities, it admitted that "it was necessary once again to make special weekend releases for the trout hatchery."  ACF016369.

704.    The Corps performed a study of the special water supply releases for the Buford Trout Hatchery published May 1987.  ACF014355-61.

705.    During the 1986 drought the Corps released an average of 10 billion gallons for the trout hatchery.  ACF014358.  The Corps in addressing its legal authority for such releases stated "water supply authority is available, but user should be paying for water. Special releases began as an emergency measure with no formal agreement on cost, and have evolved into a routine procedure." ACF014357.

706.    The Corps further noted that the "Value of water supply storage to provide special releases is $289,000 per year" and that the hydropower losses due to these special releases were $194,000 per year.  ACF014359.  A letter from SEPA further documents the losses to elevations in the lake and the limitation this imposes regarding the most effective use of the generation at Buford in its contribution to meeting regional peaking power needs. ACF014374-75.

707.    In revising the JWLD manual to allow for more constant discharge during the weekdays, the Corps noted that "The requirements for pool level maintenance during fish spawn will not be violated under the revised plan."  ACF011318.

708.    The Corps established Water Level Management Guidelines in February 1988 for recreation impacts to address what steps they should take during low water. SUPPAR005806-07.  The Corps established three levels:  Initial Impact Line, Recreation Impact Line and Water Access Limited Line.  *Id.*

709.    In draft responses to questions regarding the project purposes of the Corps' projects in the "Georgia-Alabama" system, the Corps responded to a number of questions (*see* SUPPAR011774; SUPPAR016900) related to the Corps' authority with regard to recreation operations within this system.  SUPPAR011773-87; SUPPAR016880-91.

710.    The response document acknowledged the limitations on Corps' authority

where no storage space was originally allocated to recreation, such as the case in Lake Lanier:

> [I]t is our view that the Corps has the authority – where recreation is a project
> purpose – to exercise its discretion to give recreation equal consideration with
> other purposes.  Congress has not, in our view dictated a hierarchy of project
> purposes.  Rather, it has vested considerable discretion in the Secretary of the
> Army and the Chief of Engineers to operate the Corps water resources
> development projects to achieve the greatest public benefits consistent with
> broad Congressional authorization.   Inherent in this is a responsibility to
> adjust operating methods to meet changing physical conditions or public
> needs.  ***Should the exercise of this discretion lead to a decision to operate for
> recreation in a manner which significantly and adversely impacts other
> purposes, a reallocation of storage space to reflect this decision would likely
> be required***.

SUPPAR016881; SUPPAR011777 (emphasis added).

711.    Consistent with the Congressionally-authorized purposes of Lake Lanier, no

storage has been allocated in Lake Lanier for recreational purposes.  SUPPAR005459;

SUPPAR005082; SUPPAR001358.  The 1989 draft Water Control Plan, nonetheless,

purports to protect storage for the benefit of recreation at the expense of the project purposes

for which storage was allocated.  The draft WCP states:

> <u>Water Management for Recreation.</u>  Recreation interests desire that pools
> remain as close to the top of conservation pool as possible.  When pool levels
> must be lowered in response to other demands, then the rate at which these
> drawdowns occur should be as steady as possible.  There may be times when
> water releases are reduced to levels which satisfy only water supply/water
> quality requirements.  This conservation of storage will generally allow the
> pools to be maintained at a higher level throughout the prime recreation
> season.
>
> Management for recreation interests is incorporated into the plan in the
> manner in which the action zones were defined.  The line separating Zone 2
> from Zone 3 lies near or above the Initial Impact Level, (IIL), at the beginning
> of the recreation season.  At the end of the season, the upper limit of Zone 3
> lies generally between the IIL and the Recreation Impact Level.  If lake levels
> fall to Zone 3 then releases will normally be limited to 2-hour-a-day

generation and minimal navigation support, which will tend to stabilize the lake levels until the end of the season.

ACF041211.

712.    On February 27, 1990, the Corps issued a Memorandum entitled "Responses to Concerns on the Post Authorization Change Notification Report for the Reallocation of Storage at Lake Lanier, Georgia." ACF017954.  As part of its responses, the Corps stated that "dedicating a portion of storage in the lake for water supply would necessarily imply that there would be less water available for the other project purposes, especially during droughts. Even during average water years, there would be some differences in lake levels compared to past operating conditions due primarily to the increased water supply withdrawals directly from the lake." ACF017955.

713.    The Corps' Planning Guidance Notebook, ER 1105-2-100, at Appendix E, contains specific policies related to recreation benefits at Corps projects and the reallocation of storage for recreation.

714.    Subsection E-47 of ER 1105-2-100 suggests that while the Corps is generally authorized to include recreation as a project purpose, "[r]ecreation is a low priority output and thus the Corps will not plan for (formulate for) single purpose recreation unless a sponsor is willing to pay one hundred percent of the associated implementation costs." ER 1105-2-100 E-47.

715.    The Corps' regulations require the Corps to obtain Congressional authorization if the Corps' reallocation of storage for recreation involves major operational change or significantly affects other project purposes.  Subsection E-49 of ER 1105-2-100 specifically provides that:

Storage reallocations for recreation which significantly affect other authorized purposes, or involve major structural or operational changes, require Congressional approval. Costs reallocated to recreation and subject to cost sharing will be set to the highest of: benefits foregone; revenues foregone; replacement costs; updated cost of storage. Cost sharing of facilities is 50/50.

ER 1105-2-100 E-49(a)(4).

716.     On March 30, 2001, the Corps adopted division regulation DR 1130-2-16 (Lake Regulation and Coordination for Fish Management Purposes), which superseded DR 1130-2-16 (April 1, 1993).  ACF035903-06.  The regulation "provides policy for administration of a water management program to balance the multiple resource management responsibilities of water resource projects during the fish-spawning season."  ACF035903. The regulation applies to, among other reservoirs, Lakes Lanier, Seminole, Walter F. George, and West Point. The policy "establish[es] priority for water level management to aid fish spawning for the purpose of maintaining balanced fish populations on Corps water resources projects within the South Atlantic Division."  ACF035903.  The policy calls for the retention of water in Lake Lanier and Lake Seminole, among other reservoirs, to maintain stable lake levels for approximately 4 to 6 weeks during the spring spawn of reservoir sport-fish.  The policy of "[m]aintaining stable water levels during the spring fish-spawning season is primarily targeted at largemouth bass."  ACF035904.

717.     On February 23, 1995, the Corps' Mobile District adopted standing operating procedure (SOP) 1130-2-9 (Lake Regulation and Coordination for Fish Management Purposes), which superseded SAM SOP 1130-2-9 (February 1, 1989).  ACF023298.  This policy was designed to implement South Atlantic Division DR 1130-2-16, dated April 1, 1993 (superseded by DR 1130-2-16, March 30, 2001).  The SAM SOP 1130-2-9 indicates

that although "this SOP targets largemouth and spotted bass, other fish species with similar spawning habits should also benefit from increased successful spawns." ACF023298. The SOP applies to, among other reservoirs, Lake Lanier, Lake Seminole, Walter F. George Lake, and West Point Lake. The SOP further states that "[d]uring the reproduction period, the lake water level should not be lowered more than six inches in elevation, if doing so does not conflict with authorized project purposes, to prevent stranding or exposing fish eggs." ACF023298.

718.     The Corps' February 1991 draft of Reservoir Regulation Manual, Appendix B, also describes the Corps' regulation of Lake Lanier for recreation. This document identifies a number of recreation-related issues that may arise due to the use of conservation storage during the recreation season. These issues include: inoperable boat ramps and docks; exposed hazards to boaters; and dry swimming areas. ACF018478-79. The Corps takes these impacts into account in its management of Lake Lanier. ACF018479.

719.     In September 2001, the Marine Trade Association of Metropolitan Atlanta released a Study of the Economic Impact of Recreation for Lake Lanier. ACF036003. The Study states that the Corps has a resource manager with 43 rangers and administrators who manage Lake Lanier. ACF036027-28. The Corps' resource manager stated that he and his staff devote 67 percent of their time and resources to recreation. ACF036028.

## VI.    OPERATIONS AT BUFORD

### A.    Baseline Operations

720.    The December 1959 Appendix B to the Corps' Reservoir Regulation Manual described the baseline operational parameters for Buford Reservoir and Lake Lanier. ACF001776.

721.    Appendix B of the Reservoir Regulation Manual provided the following baseline operational figures related to storage and elevations at Lake Lanier: total storage of 2,554,000 acre-feet (elev. 1085); flood control storage of 637,000 acre-feet (elev. 1085 to 1070); power storage of 1,049,000 acre-feet (elev. 1070 to 1035); and dead storage of 867,600 acre-feet (below elev. 1035).  ACF001784.

722.    Appendix B of the Reservoir Regulation Manual indicated that the Buford reservoir had a dependable power capacity of 73,000 kw, and an average annual energy production of 170,000,000 kwh. ACF001786.  The "drawdown" for storage built into the reservoir's conservation storage pool was 35 feet.  ACF001786.

723.    The Reservoir Regulation Manual described how the 1946 River and Harbor Act provided for, among other things, construction of the Buford reservoir to provide a 9-foot channel depth in the Apalachicola River from the Gulf Intracoastal waterway to Columbus, Georgia.  ACF001675.  To maintain these navigable depths, Appendix B of the Reservoir Regulation Manual indicated that "[c]onsideration must also be given during low-flow periods to the release of water from Buford (up to an average weekly release of 1,600 cfs-prime flow) to help maintain navigable depths in the Apalachicola River below Jim Woodruff Dam."  ACF001802.

197

724.     Appendix B of the Reservoir Regulation Manual indicated that the Corps would operate the Buford project to supply Atlanta with minimum flows of 600 cfs, explaining that:

> Normally, the Buford project will be operated as a peaking plant for the production of hydroelectric power with minimum releases during the daily and week-end off-peak periods which will be sufficient, with local inflows added, to supply the Atlanta area with not less than 600 cfs. During low-water periods such regulation will provide increased flow downstream for navigation, water supply, pollution abatement, and other purposes. A storage of 1,049,000 acre-feet between elevations 1,035 and 1,070 has been allocated for power and low-water flow regulation. However, the primary purpose of the project is flood control, and a storage of 637,000 acre-feet between elevations 1,070 and 1,085 has been reserved exclusively for the detention storage of flood waters. A feature of the project is that the storage above 1,070 and up to elevation 1,100, 1,416,000 acre-feet, is essentially a substitute for spillway capacity and is required to control the spillway design flood series. The flood-control operation of the reservoir is planned for the alleviation of floods along the Chattahoochee River below the dam. The reduction of flood peaks may be reflected as far downstream as West Point, Georgia. . . .

ACF001796.

725.     Appendix B further indicated that "[i]n order to meet the water requirements of the City of Atlanta and other downstream users, the Corps of Engineers is committed to maintain a minimum flow from Buford which, when combined with the local inflows from the 410 square-mile area between the dam and Atlanta (Vinings gage) assuming no withdrawals, will total not less than 600 cfs."  ACF001801-02.

726.     Appendix A to the Reservoir Regulation Manual described the normal operations at Jim Woodruff Dam for power and navigation. ACF001740.  To maintain navigation depths of nine feet in the Apalachicola River, the Corps described the operations as follows:

The extent of peaking operations at Jim Woodruff will be subject to the requirements of maintaining a 9-foot depth for downstream navigation. (In case of plant outage the navigation requirements must be satisfied by spillway releases). The open-river channel below the dam has been designed to provide the 9-foot project depth at a minimum flow of 9,300 cfs (this inflow or greater will occur in Jim Woodruff Reservoir 95 percent of the time).  A flow of 7,350 cfs will provide 9-foot depth between Jim Woodruff and Blountstown, but only about 7-foot depth below Blountstown.  When the inflow is less than 9,300 cfs the total inflow must be passed (except that the full amount of any special release made from Buford Reservoir for the purpose of generating peaking power at Jim Woodruff may be ponded for that purpose).  When the inflow is between the full plant capacity, 18,600 cfs, and 9,300 cfs, off-peak releases may be reduced to as low as 7,350 cfs but only for such periods that subsequent peaking operations will prevent stages dropping below the 9-foot navigable depth at Blountstown and below. Details of the permissible peaking operations will be worked out on the basis of additional studies and filed investigations under operation conditions.

ACF001740.

## B.    Summaries of Operational Data

727.    As described in detail below, the administrative record contains numerical data from the Corps on operational parameters at Lake Lanier, including water supply withdrawals, inflows and discharges, hydropower generation, and elevation.  In many cases, the record contains data dating back to the start of operations at the Lake Lanier reservoir.

728.    Of particular importance to this court's analysis is the data on Lake Lanier operations during drought periods.

729.    The last three recent drought periods of 1981; 1986-88; and 1999-2001 are particularly important.[10] The duration of the drought periods has been described by the

---

[10]    The current drought, which began in 2006, is not included in the analysis set forth below. Because the drought and its effects on the Basin's hydrology are ongoing, data are not yet available to support any examination of the trends exhibited by earlier droughts.

Corps in a variety of ways, but is recognized in the administrative record as 1981[11], 1986-88[12] and 1999-2001.[13]

730.    The following **Table I – *Summary of Operations at Lanier During Drought Periods***, summarizes various operations at Lake Lanier for the three drought periods 1981, 1986-1988, and 1999-2001.

**Table I – *Summary of Operations at Lanier During Drought Periods***

| Drought Period | Average Monthly Inflow (cfs) | Average Monthly Discharge (cfs) | Average Monthly Amount of Discharge Comprised of Releases from Storage (cfs) | Percent of Discharge Coming from Storage (%) | Average Monthly Energy Generated (MWh) | Average Monthly Elevation (ft-msl) | Average Actual Annual Withdrawals (mgd) |
|---|---|---|---|---|---|---|---|
| **1981** | 918 | 1,327 | 409 | 31% | 10,687 | 1062.13 | 24 |
| **1986 - 1988** | 984 | 1,111 | 127 | 11% | 8,882 | 1062.32 | 47 |
| **1999 - 2001** | 1,015 | 1,070 | 55 | 5% | 7,134 | 1062.80 | 108 |

731.    The data utilized to derive the values in **Table I – *Summary of Operations at Lanier During Drought Periods*** come directly from the administrative record or the Corps

---

[11]    *See* ACF012340, ACF012343; *see also Biological Assessment, Temporary Modifications to the Interim Operating Plan* (Nov. 1, 2007) at 8, http://www.sam.usace.army.mil/ACF%20Water%20Resources%20Management/ACFDrought_Consultation2007/FinalBiologicalAssessment_1_Nov_2007.pdf.

[12]    *See* ACF008219-24; ACF023806; ACF012340.

[13]    *See Environmental Assessment, Temporary Exceptional Drought Operations Modifications to the Interim Operations Plan* (Nov. 15, 2007) at 12 http://www.sam.usace.army.mil/ACF%20Water%20Resources%20Management/ACFDrought_Consultation2007/ENVIRONMENTAL_ASSESSMENT_TempModtoIOP.pdf; *see also Environmental Assessment, Georgia Environmental Protection Division Proposal for a Temporary Reduced Minimum Water Quality Flow Requirement in the Chattahoochee River* (March 4, 2008) at EA-10 http://www.sam.usace.army.mil/ACF%20Water%20Resources%20Management/BufordTempDeviation/Final_PeachtreeCk_Flow_Reduction_EA_2008_no_Appendices.pdf; *see also Biological Opinion and Conference Report on the U.S. Army Corps of Engineers, Mobile District, Interim Operating Plan* (Sept. 22, 2006) at 37 http://www.sam.usace.army.mil/ACF%20Water%20Resources%20Management/JWDSect7/JWDIOP_BO_FINAL_corrected9-22-06.pdf.

website, which include information on inflows (SUPPAR026353-405), discharges

(SUPPAR026300-52), hydropower generation (SUPPAR026249-99), Lake elevation

(SUPPAR026406-58), and water supply withdrawals (ACF044236-46).  Each of the values

and the calculations required to compute the values in Table I are explained in detail below.

### 1.        Water Supply Withdrawals

732.    The administrative record contains several copies of tables setting forth the

water suppliers' withdrawals under the holdover contracts from 1973 to 2006.  The most

comprehensive and recent set of withdrawal data is at ACF044236.  Despite several requests

from various parties, the Corps has only provided comprehensive data through 2006, and not

through the present.

733.    Storage allocated in Lake Lanier to support municipal and industrial water

supply withdrawals is summarized in the following **Table 1 - *M&I Storage Allocation***

***Necessary to Support Withdrawals Pursuant to the Holdover Contracts* (based on**

**1,087,600 and Corps' 1999 Formula)**, and **Table 1a - *M&I Storage Allocation Necessary***

***to Support Withdrawals Pursuant to the Holdover Contracts* (based on 1,087,600 and 947**

**yield method)**.  Both of these tables are based on a conservation storage pool of 1,087,600

acre-feet.  As discussed above, the original conservation storage pool at Lake Lanier was

1,049,000 acre-feet.  Since that time, however, the Corps has changed the top of the

conservation storage pool at Lake Lanier from 1070 to 1071 ft-msl during certain months; as

discussed in detail below, this has changed the conservation storage pool to 1,087,600 acre-

feet.

734.    Table 1 and Table 1a set forth the same allocated withdrawal data (in MGD) but provide different conversion methods to convert MGD to storage (in acre-feet). Specifically, Table 1 is based on a conversion formula provided by the Corps in a 1999 letter from Colonel Norwood to Federal Commissioner Thomas at ACF034654, in which the Corps calculated the "storage amounts for a critical drought period" as follows:

> 1 MGD = 1.542 cfs
> Average daily withdrawals MGD x 1.542 cfs per MGD = XXX cfs
>
> Critical period yield (prime flow) estimates:               Needed storage:
>
> 1600 cfs per acre-foot (project design)
> (XXX cfs/1600 cfs) x 1,087,600 ac-ft          =          YYY ac-ft
>
> 1485 cfs per acre-foot (1986-1988 drought)
> (XXX cfs/1485 cfs) x 1,087,600 ac-ft          =          ZZZ ac-ft

ACF034654; SUPPAR000736; *see also* ACF041302 (PAC Report Appendix D applying a similar formula).  In Table 1, this basic formula is applied to the allocated withdrawal data for Lake Lanier (in MGD) to convert them to storage amounts (in acre-feet).  The formula provides a bracketed result of two different amounts for storage: one based on the "project design" and one based on the drought yield (in this case for the 1986-1988 drought).  The "Total Challenged Storage" resulting from the 1986-1988 drought yield analysis represents the amount of storage needed to support the allocated water supply withdrawal amounts during a drought period.  As depicted in Table 1, the storage needed to support 2006 allocated withdrawals totaled over 196,100 acre-feet or 18% of conservation storage at Lake Lanier.

**Table 1 - *M&I Storage Allocation Necessary to Support Withdrawals Pursuant to the Holdover Contracts* (based on 1,087,600 and Corps' 1999 Formula)**

| YEAR | GWINNETT COUNTY, GA[1] | | CITY OF CUMMING, GA[1] | | CITY OF GAINESVILLE[1] | | ATLANTA REGIONAL COMMISSION[1] | | TOTAL CHALLENGED WITHDRAWALS (Max NTE or ACTUAL) | Total Challenged Storage (based on project design ((MGDx1.542)/1600) x 1087600*) | % of conservation storage of 1,087,600 | Total Challenged Storage (based on 1986-88 drought ((MGDx1.542)/1485) x 1087600*) | % of conservation storage of 1,087,600 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | MGD | NTE MGD[3] | MGD | NTE MGD[3] | MGD | Reduced MGD[2] | MGD | NTE MGD[3] | MGD | Acre-Feet | | Acre-Feet | |
| 1977 | 6.79 | 40.00 | | | 8.03 | 0.03 | | | 40.03 | 41,958.43 | 3.86% | 45,207.73 | 4.16% |
| 1978 | 13.49 | 40.00 | | | 9.60 | 1.60 | | | 41.60 | 43,604.06 | 4.01% | 46,980.80 | 4.32% |
| 1979 | 14.34 | 40.00 | | | 10.78 | 2.78 | | | 42.78 | 44,840.91 | 4.12% | 48,313.43 | 4.44% |
| 1980 | 18.35 | 40.00 | 1.88 | 2.50 | 10.41 | 2.41 | | | 44.91 | 47,073.52 | 4.33% | 50,718.94 | 4.66% |
| 1981 | 19.36 | 40.00 | 1.67 | 2.50 | 10.94 | 2.94 | | | 45.44 | 47,629.05 | 4.38% | 51,317.49 | 4.72% |
| 1982 | 20.71 | 40.00 | 2.03 | 2.50 | 10.45 | 2.45 | | | 44.95 | 47,115.44 | 4.33% | 50,764.11 | 4.67% |
| 1983 | 24.44 | 40.00 | 2.40 | 2.50 | 10.31 | 2.31 | | | 44.81 | 46,968.70 | 4.32% | 50,606.01 | 4.65% |
| 1984 | 28.14 | 40.00 | 2.44 | 2.50 | 10.12 | 2.12 | | | 44.62 | 46,769.55 | 4.30% | 50,391.43 | 4.63% |
| 1985 | 32.93 | 40.00 | 2.73 | 5.00 | 10.96 | 2.96 | | | 47.96 | 50,270.45 | 4.62% | 54,163.45 | 4.98% |
| 1986 | 38.61 | 40.00 | 3.22 | 5.00 | 10.34 | 2.34 | | | 47.34 | 49,620.58 | 4.56% | 53,463.25 | 4.92% |
| 1987 | 42.33 | 42.33 | 3.29 | 5.00 | 10.81 | 12.00 | 241.52 | 50.00 | 109.33 | 114,596.92 | 10.54% | 123,471.43 | 11.35% |
| 1988 | 43.14 | 53.00 | 3.47 | 10.00 | 10.71 | 12.00 | 235.18 | 50.00 | 125.00 | 131,021.81 | 12.05% | 141,168.28 | 12.98% |
| 1989 | 41.59 | 53.00 | 3.38 | 10.00 | 10.53 | 12.00 | 231.35 | 50.00 | 125.00 | 131,021.81 | 12.05% | 141,168.28 | 12.98% |
| 1990 | 48.26 | 53.00 | 4.38 | 10.00 | 11.30 | 12.00 | 241.32 | 50.00 | 125.00 | 131,021.81 | 12.05% | 141,168.28 | 12.98% |
| 1991 | 47.24 | 53.00 | 4.41 | 10.00 | 11.63 | 12.00 | 237.82 | 50.00 | 125.00 | 131,021.81 | 12.05% | 141,168.28 | 12.98% |
| 1992 | 50.58 | 53.00 | 4.33 | 10.00 | 12.22 | 12.00 | 239.93 | 50.00 | 125.00 | 131,021.81 | 12.05% | 141,168.28 | 12.98% |
| 1993 | 56.43 | 56.43 | 5.17 | 10.00 | 11.90 | 12.00 | 256.26 | 50.00 | 128.43 | 134,617.05 | 12.38% | 145,041.94 | 13.34% |
| 1994 | 58.49 | 58.49 | 5.45 | 10.00 | 12.93 | 12.00 | 269.57 | 50.00 | 130.49 | 136,776.29 | 12.58% | 147,368.39 | 13.55% |
| 1995 | 66.15 | 66.15 | 7.05 | 10.00 | 13.54 | 12.00 | 279.51 | 50.00 | 138.15 | 144,805.31 | 13.31% | 156,019.19 | 14.35% |
| 1996 | 68.59 | 68.59 | 8.86 | 10.00 | 13.80 | 12.00 | 277.15 | 50.00 | 140.59 | 147,362.85 | 13.55% | 158,774.79 | 14.60% |
| 1997 | 66.85 | 66.85 | 10.04 | 10.04 | 14.08 | 12.00 | 278.41 | 50.00 | 138.89 | 145,580.96 | 13.39% | 156,854.90 | 14.42% |

| YEAR | Withdrawals | | | | | | | | TOTAL CHALLENGED WITHDRAWALS (Max NTE or ACTUAL) | Based on Corps Formula from 1999 Letter in Record | | | |
| | GWINNETT COUNTY, GA[1] | | CITY OF CUMMING, GA[1] | | CITY OF GAINESVILLE[1] | | ATLANTA REGIONAL COMMISSION[1] | | | Total Challenged Storage (based on project design ((MGDx1.542)/1600) x 1087600*) | % of conservation storage of 1,087,600 | Total Challenged Storage (based on 1986-88 drought ((MGDx1.542)/1485) x 1087600*) | % of conservation storage of 1,087,600 |
| | MGD | NTE MGD[3] | MGD | NTE MGD[3] | MGD | Reduced MGD[2] | MGD | NTE MGD[3] | MGD | Acre-Feet | | Acre-Feet | |
| 1998 | 80.77 | 80.77 | 10.51 | 10.51 | 15.84 | 12.00 | 307.68 | 50.00 | 153.28 | 160,664.19 | 14.77% | 173,106.20 | 15.92% |
| 1999 | 88.38 | 88.38 | 12.99 | 12.99 | 16.98 | 12.00 | 321.37 | 50.00 | 163.37 | 171,240.27 | 15.74% | 184,501.30 | 16.96% |
| 2000 | 85.33 | 85.33 | 11.60 | 11.60 | 17.85 | 12.00 | 318.40 | 50.00 | 158.93 | 166,586.37 | 15.32% | 179,487.00 | 16.50% |
| 2001 | 85.77 | 85.77 | 12.37 | 12.37 | 17.05 | 12.00 | 307.97 | 50.00 | 160.14 | 167,854.66 | 15.43% | 180,853.51 | 16.63% |
| 2002 | 83.80 | 83.80 | 11.05 | 11.05 | 17.29 | 12.00 | 221.79 | 50.00 | 156.85 | 164,406.17 | 15.12% | 177,137.96 | 16.29% |
| 2003 | 71.28 | 71.28 | 11.95 | 11.95 | 16.83 | 12.00 | 289.40 | 50.00 | 145.23 | 152,226.38 | 14.00% | 164,014.96 | 15.08% |
| 2004 | 84.97 | 84.97 | 11.27 | 11.27 | 17.91 | 12.00 | 302.79 | 50.00 | 158.24 | 165,863.13 | 15.25% | 178,707.75 | 16.43% |
| 2005 | 84.74 | 84.74 | 10.53 | 10.53 | 17.89 | 12.00 | 303.47 | 50.00 | 157.27 | 164,846.40 | 15.16% | 177,612.29 | 16.33% |
| 2006 | 92.91 | 92.91 | 18.79 | 18.79 | 18.99 | 12.00 | 315.78 | 50.00 | 173.70 | 182,067.91 | 16.74% | 196,167.45 | 18.04% |

_____

**1**  Data can be found in the record at ACF044236 (Gwinnett County); ACF044239 (City of Cumming); ACF044241 (City of Gainesville); and ACF044244 (Atlanta Regional Commission).

**2**   Reduced withdrawals reflect the highest of actual total pumped or not-to-exceed amount (20 MGD) less 8 MGD related to the City of Gainesville's relocation contract.  ACF044244.

**3**  Not-to-exceed ("NTE") amounts are equal to the higher of the contracted amount or actual withdrawals.  For example, ARC contract's NTE = 50 MGD (ACF014466), which is higher than ARC's actual annual average withdrawals after they are reduced by the 327 MGD provided free of charge by the Corps.  *See* ACF044244.

**\***  The Corps formula can be found in a 1999 letter from Col. Norwood to Hon. Lindsay Thomas at ACF034654.

**Table 1a -** *M&I Storage Allocation Necessary to Support Withdrawals Pursuant to the Holdover Contracts* **(based on 1,087,600 and 947 yield method)**

| YEAR | Withdrawals | | | | | | | | | Critical Yield 947 Formula | | |
| | GWINNETT COUNTY, GA[1] | | CITY OF CUMMING, GA[1] | | CITY OF GAINESVILLE[1] | | ATLANTA REGIONAL COMMISSION[1] | | TOTAL CHALLENGED WITHDRAWALS (Max NTE or ACTUAL) | Total Challenged Storage* (based on MGD/947 x 1,087,600) | % of conservation storage of 1,087,600 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | MGD | NTE MGD[3] | MGD | NTE MGD[3] | MGD | Reduced MGD[2] | MGD | NTE MGD[3] | MGD | Acre-Feet | |
| 1977 | 6.79 | 40.00 | | | 8.03 | 0.03 | | | 40.03 | 45,954.77 | 4.23% |
| 1978 | 13.49 | 40.00 | | | 9.60 | 1.60 | | | 41.60 | 47,757.14 | 4.39% |
| 1979 | 14.34 | 40.00 | | | 10.78 | 2.78 | | | 42.78 | 49,111.79 | 4.52% |
| 1980 | 18.35 | 40.00 | 1.88 | 2.50 | 10.41 | 2.41 | | | 44.91 | 51,557.05 | 4.74% |
| 1981 | 19.36 | 40.00 | 1.67 | 2.50 | 10.94 | 2.94 | | | 45.44 | 52,165.49 | 4.80% |
| 1982 | 20.71 | 40.00 | 2.03 | 2.50 | 10.45 | 2.45 | | | 44.95 | 51,602.97 | 4.74% |
| 1983 | 24.44 | 40.00 | 2.40 | 2.50 | 10.31 | 2.31 | | | 44.81 | 51,442.25 | 4.73% |
| 1984 | 28.14 | 40.00 | 2.44 | 2.50 | 10.12 | 2.12 | | | 44.62 | 51,224.13 | 4.71% |
| 1985 | 32.93 | 40.00 | 2.73 | 5.00 | 10.96 | 2.96 | | | 47.96 | 55,058.47 | 5.06% |
| 1986 | 38.61 | 40.00 | 3.22 | 5.00 | 10.34 | 2.34 | | | 47.34 | 54,346.71 | 5.00% |
| 1987 | 42.33 | 42.33 | 3.29 | 5.00 | 10.81 | 12.00 | 241.52 | 50.00 | 109.33 | 125,511.74 | 11.54% |
| 1988 | 43.14 | 53.00 | 3.47 | 10.00 | 10.71 | 12.00 | 235.18 | 50.00 | 125.00 | 143,501.02 | 13.19% |
| 1989 | 41.59 | 53.00 | 3.38 | 10.00 | 10.53 | 12.00 | 231.35 | 50.00 | 125.00 | 143,501.02 | 13.19% |
| 1990 | 48.26 | 53.00 | 4.38 | 10.00 | 11.30 | 12.00 | 241.32 | 50.00 | 125.00 | 143,501.02 | 13.19% |
| 1991 | 47.24 | 53.00 | 4.41 | 10.00 | 11.63 | 12.00 | 237.82 | 50.00 | 125.00 | 143,501.02 | 13.19% |
| 1992 | 50.58 | 53.00 | 4.33 | 10.00 | 12.22 | 12.00 | 239.93 | 50.00 | 125.00 | 143,501.02 | 13.19% |
| 1993 | 56.43 | 56.43 | 5.17 | 10.00 | 11.90 | 12.00 | 256.26 | 50.00 | 128.43 | 147,438.69 | 13.56% |
| 1994 | 58.49 | 58.49 | 5.45 | 10.00 | 12.93 | 12.00 | 269.57 | 50.00 | 130.49 | 149,803.59 | 13.77% |
| 1995 | 66.15 | 66.15 | 7.05 | 10.00 | 13.54 | 12.00 | 279.51 | 50.00 | 138.15 | 158,597.33 | 14.58% |
| 1996 | 68.59 | 68.59 | 8.86 | 10.00 | 13.80 | 12.00 | 277.15 | 50.00 | 140.59 | 161,398.47 | 14.84% |
| 1997 | 66.85 | 66.85 | 10.04 | 10.04 | 14.08 | 12.00 | 278.41 | 50.00 | 138.89 | 159,446.86 | 14.66% |
| 1998 | 80.77 | 80.77 | 10.51 | 10.51 | 15.84 | 12.00 | 307.68 | 50.00 | 153.28 | 175,966.70 | 16.18% |
| 1999 | 88.38 | 88.38 | 12.99 | 12.99 | 16.98 | 12.00 | 321.37 | 50.00 | 163.37 | 187,550.10 | 17.24% |
| 2000 | 85.33 | 85.33 | 11.60 | 11.60 | 17.85 | 12.00 | 318.40 | 50.00 | 158.93 | 182,452.94 | 16.78% |
| 2001 | 85.77 | 85.77 | 12.37 | 12.37 | 17.05 | 12.00 | 307.97 | 50.00 | 160.14 | 183,842.03 | 16.90% |
| 2002 | 83.80 | 83.80 | 11.05 | 11.05 | 17.29 | 12.00 | 221.79 | 50.00 | 156.85 | 180,065.08 | 16.56% |
| 2003 | 71.28 | 71.28 | 11.95 | 11.95 | 16.83 | 12.00 | 289.40 | 50.00 | 145.23 | 166,725.23 | 15.33% |
| 2004 | 84.97 | 84.97 | 11.27 | 11.27 | 17.91 | 12.00 | 302.79 | 50.00 | 158.24 | 181,660.82 | 16.70% |
| 2005 | 84.74 | 84.74 | 10.53 | 10.53 | 17.89 | 12.00 | 303.47 | 50.00 | 157.27 | 180,547.25 | 16.60% |
| 2006 | 92.91 | 92.91 | 18.79 | 18.79 | 18.99 | 12.00 | 315.78 | 50.00 | 173.70 | 199,409.02 | 18.33% |

**1**  Data can be found in the record at ACF044236 (Gwinnett); ACF044239 (Cumming); ACF044241 (Gainesville); and ACF044244 (ARC).

**2**  Reduced withdrawals reflect the highest of actual total pumped or not-to-exceed amount (20 MGD) less 8 MGD related to the City of Gainesville's relocation contract.  ACF014226.

**3**  Not-to-exceed ("NTE") amounts are equal to the higher of the contract amount or actual withdrawals.  ARC

contract's NTE = 50 MGD (ACF014466), which is higher than ARC's actual annual average withdrawals after they are reduced by the 327 MGD provided free of charge by the Corps.  *See* ACF044244.

\*   Equation based on yield used in Settlement Agreement (MGD * 1,087,600) / 947 = ac-ft.  SUPPAR035448.

735.     Table 1a also provides storage amounts necessary for the allocated M&I

withdrawals but is based on a different conversion of MGD to acre-feet than the Corps' 1999

Formula from Table 1.  Table 1a simply uses the critical yield for Lake Lanier utilized by the

parties in the Settlement Agreement of 947 MGD, SUPPAR035448, to divide the total

challenged withdrawals and calculate a basic percentage of MGD, and to then multiply that

percentage by the amount of conservation storage space (either 1,087,600 acre-feet in Table

1a or 1,049,000 in Table 2a) to achieve an amount of storage in acre-feet.  As depicted in

Table 1a, the "Total Challenged Storage" needed to support 2006 allocated withdrawals,

based on the D.C. Settlement critical yield of 947 MGD, totaled over 199,400 acre-feet or

approximately 18% of conservation storage at Lake Lanier.

736.     For the court's convenience, the following tables set forth the exact same data,

using the original conservation storage pool of 1,049,000 acre-feet.  It is plain that virtually

no difference results from using 1,049,000 acre-feet or 1,087,600 acre-feet as the base

conservation storage pool.  Using either 1,049,000 or 1,087,600 acre-feet as the conservation

storage pool results in approximately 18% of the conservation storage in Lake Lanier being

allocated to water supply in 2006.  The storage allocated in Lake Lanier to support municipal

and industrial water supply withdrawals, using a base of 1,049,000 acre-feet as the

conservation storage pool, is summarized in the following **Table 2 - *M&I Storage Allocation***

***Necessary to Support Withdrawals Pursuant to the Holdover Contracts* (based on Corps'**

**1999 Formula and 1,049,000)** and **Table 2a - *M&I Storage Allocation Necessary to***

***Support Withdrawals Pursuant to the Holdover Contracts*** **(based on 947 MGD yield and 1,049,000)**:

**Table 2 -** *M&I Storage Allocation Necessary to Support Withdrawals Pursuant to the Holdover Contracts* **(based on Corps' 1999 Formula and 1,049,000)**

| YEAR | GWINNETT COUNTY, GA[1] | | CITY OF CUMMING, GA[1] | | CITY OF GAINESVILLE[1] | | ATLANTA REGIONAL COMMISSION[1] | | TOTAL CHALLENGED WITHDRAWALS (Max NTE or ACTUAL) | Total Challenged Storage (based on project design ((MGDx1.542)/1600) x 1049000*) | % of conservation storage of 1,049,000 | Total Challenged Storage (based on 1986-88 drought ((MGDx1.542)/1485) x 1049000*) | % of conservation storage of 1,049,000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | MGD | NTE MGD[3] | MGD | NTE MGD[3] | MGD | Reduced MGD[2] | MGD | NTE MGD[3] | MGD | Acre-Feet | | Acre-Feet | |
| 1977 | 6.79 | 40.00 | | | 8.03 | 0.03 | | | 40.03 | 40,469.28 | 3.86% | 43,603.26 | 4.16% |
| 1978 | 13.49 | 40.00 | | | 9.60 | 1.60 | | | 41.60 | 42,056.51 | 4.01% | 45,313.41 | 4.32% |
| 1979 | 14.34 | 40.00 | | | 10.78 | 2.78 | | | 42.78 | 43,249.46 | 4.12% | 46,598.74 | 4.44% |
| 1980 | 18.35 | 40.00 | 1.88 | 2.50 | 10.41 | 2.41 | | | 44.91 | 45,402.83 | 4.33% | 48,918.88 | 4.66% |
| 1981 | 19.36 | 40.00 | 1.67 | 2.50 | 10.94 | 2.94 | | | 45.44 | 45,938.65 | 4.38% | 49,496.19 | 4.72% |
| 1982 | 20.71 | 40.00 | 2.03 | 2.50 | 10.45 | 2.45 | | | 44.95 | 45,443.27 | 4.33% | 48,962.45 | 4.67% |
| 1983 | 24.44 | 40.00 | 2.40 | 2.50 | 10.31 | 2.31 | | | 44.81 | 45,301.73 | 4.32% | 48,809.95 | 4.65% |
| 1984 | 28.14 | 40.00 | 2.44 | 2.50 | 10.12 | 2.12 | | | 44.62 | 45,109.65 | 4.30% | 48,602.99 | 4.63% |
| 1985 | 32.93 | 40.00 | 2.73 | 5.00 | 10.96 | 2.96 | | | 47.96 | 48,486.30 | 4.62% | 52,241.13 | 4.98% |
| 1986 | 38.61 | 40.00 | 3.22 | 5.00 | 10.34 | 2.34 | | | 47.34 | 47,859.50 | 4.56% | 51,565.79 | 4.92% |
| 1987 | 42.33 | 42.33 | 3.29 | 5.00 | 10.81 | 12.00 | 241.52 | 50.00 | 109.33 | 110,529.76 | 10.54% | 119,089.30 | 11.35% |
| 1988 | 43.14 | 43.14 | 3.47 | 10.00 | 10.71 | 12.00 | 235.18 | 50.00 | 125.00 | 126,371.72 | 12.05% | 136,158.08 | 12.98% |
| 1989 | 41.59 | 53.00 | 3.38 | 10.00 | 10.53 | 12.00 | 231.35 | 50.00 | 125.00 | 126,371.72 | 12.05% | 136,158.08 | 12.98% |
| 1990 | 48.26 | 53.00 | 4.38 | 10.00 | 11.30 | 12.00 | 241.32 | 50.00 | 125.00 | 126,371.72 | 12.05% | 136,158.08 | 12.98% |
| 1991 | 47.24 | 53.00 | 4.41 | 10.00 | 11.63 | 12.00 | 237.82 | 50.00 | 125.00 | 126,371.72 | 12.05% | 136,158.08 | 12.98% |
| 1992 | 50.58 | 53.00 | 4.33 | 10.00 | 12.22 | 12.00 | 239.93 | 50.00 | 125.00 | 126,371.72 | 12.05% | 136,158.08 | 12.98% |
| 1993 | 56.43 | 56.43 | 5.17 | 10.00 | 11.90 | 12.00 | 256.26 | 50.00 | 128.43 | 129,839.36 | 12.38% | 139,894.26 | 13.34% |
| 1994 | 58.49 | 58.49 | 5.45 | 10.00 | 12.93 | 12.00 | 269.57 | 50.00 | 130.49 | 131,921.96 | 12.58% | 142,138.14 | 13.55% |
| 1995 | 66.15 | 66.15 | 7.05 | 10.00 | 13.54 | 12.00 | 279.51 | 50.00 | 138.15 | 139,666.02 | 13.31% | 150,481.91 | 14.35% |
| 1996 | 68.59 | 68.59 | 8.86 | 10.00 | 13.80 | 12.00 | 277.15 | 50.00 | 140.59 | 142,132.80 | 13.55% | 153,139.72 | 14.60% |
| 1997 | 66.85 | 66.85 | 10.04 | 10.04 | 14.08 | 12.00 | 278.41 | 50.00 | 138.89 | 140,414.14 | 13.39% | 151,287.97 | 14.42% |
| 1998 | 80.77 | 80.77 | 10.51 | 10.51 | 15.84 | 12.00 | 307.68 | 50.00 | 153.28 | 154,962.06 | 14.77% | 166,962.49 | 15.92% |

| YEAR | Withdrawals | | | | | | | | TOTAL CHALLENGED WITHDRAWALS (Max NTE or ACTUAL) | Based on Corps Formula from 1999 Letter in Record | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | GWINNETT COUNTY, GA[1] | | CITY OF CUMMING, GA[1] | | CITY OF GAINESVILLE[1] | | ATLANTA REGIONAL COMMISSION[1] | | | Total Challenged Storage (based on project design ((MGDx1.542)/1600) x 1049000*) | % of conservation storage of 1,049,000 | Total Challenged Storage (based on 1986-88 drought ((MGDx1.542)/1485) x 1049000*) | % of conservation storage of 1,049,000 |
| | MGD | NTE MGD[3] | MGD | NTE MGD[3] | MGD | Reduced MGD[2] | MGD | NTE MGD[3] | MGD | Acre-Feet | | Acre-Feet | |
| 1999 | 88.38 | 88.38 | 12.99 | 12.99 | 16.98 | 12.00 | 321.37 | 50.00 | 163.37 | 165,162.78 | 15.74% | 177,953.17 | 16.96% |
| 2000 | 85.33 | 85.33 | 11.60 | 11.60 | 17.85 | 12.00 | 318.40 | 50.00 | 158.93 | 160,674.06 | 15.32% | 173,116.83 | 16.50% |
| 2001 | 85.77 | 85.77 | 12.37 | 12.37 | 17.05 | 12.00 | 307.97 | 50.00 | 160.14 | 161,897.34 | 15.43% | 174,434.84 | 16.63% |
| 2002 | 83.80 | 83.80 | 11.05 | 11.05 | 17.29 | 12.00 | 221.79 | 50.00 | 156.85 | 158,571.23 | 15.12% | 170,851.16 | 16.29% |
| 2003 | 71.28 | 71.28 | 11.95 | 11.95 | 16.83 | 12.00 | 289.40 | 50.00 | 145.23 | 146,823.72 | 14.00% | 158,193.90 | 15.08% |
| 2004 | 84.97 | 84.97 | 11.27 | 11.27 | 17.91 | 12.00 | 302.79 | 50.00 | 158.24 | 159,976.49 | 15.25% | 172,365.24 | 16.43% |
| 2005 | 84.74 | 84.74 | 10.53 | 10.53 | 17.89 | 12.00 | 303.47 | 50.00 | 157.27 | 158,995.84 | 15.16% | 171,308.65 | 16.33% |
| 2006 | 92.91 | 92.91 | 18.79 | 18.79 | 18.99 | 12.00 | 315.78 | 50.00 | 173.70 | 175,606.14 | 16.74% | 189,205.27 | 18.04% |

---

**1**  Data can be found in the record at ACF044236 (Gwinnett County); ACF044239 (City of Cumming); ACF044241 (City of Gainesville); and ACF044244 (Atlanta Regional Commission).

**2**   Reduced withdrawals reflect the highest of actual total pumped or not-to-exceed amount (20 MGD) less 8 MGD related to the City of Gainesville's relocation contract.  ACF014226.

**3**  Not-to-exceed ("NTE") amounts are equal to the higher of the contracted amount or actual withdrawals.  ARC contract's NTE = 50 MGD (ACF014466).

**∗**  The Corps formula can be found in a 1999 letter from Col. Norwood to Hon. Lindsay Thomas at ACF034654.

**Table 2a -** *M&I Storage Allocation Necessary to Support Withdrawals Pursuant to the Holdover Contracts* **(based on 947 MGD yield and 1,049,000)**

| YEAR | GWINNETT COUNTY, GA[1] | | CITY OF CUMMING, GA[1] | | CITY OF GAINESVILLE[1] | | ATLANTA REGIONAL COMMISSION[1] | | TOTAL CHALLENGED ALLOCATED WITHDRAWALS | Total Challenged Storage* (based on MGD/947 x 1,049,000) | % of conservation storage of 1,049,000 |
|------|-----|--------|-----|--------|-----|--------|-----|--------|--------|--------|--------|
| | MGD | NTE MGD[3] | MGD | NTE MGD[3] | MGD | Reduced MGD[2] | MGD | NTE MGD[3] | MGD | Acre-Feet | |
| 1977 | 6.79 | 40.00 | | | 8.03 | 0.03 | | | 40.03 | 44,323.79 | 4.23% |
| 1978 | 13.49 | 40.00 | | | 9.60 | 1.60 | | | 41.60 | 46,062.19 | 4.39% |
| 1979 | 14.34 | 40.00 | | | 10.78 | 2.78 | | | 42.78 | 47,368.76 | 4.52% |
| 1980 | 18.35 | 40.00 | 1.88 | 2.50 | 10.41 | 2.41 | | | 44.91 | 49,727.24 | 4.74% |
| 1981 | 19.36 | 40.00 | 1.67 | 2.50 | 10.94 | 2.94 | | | 45.44 | 50,314.09 | 4.80% |
| 1982 | 20.71 | 40.00 | 2.03 | 2.50 | 10.45 | 2.45 | | | 44.95 | 49,771.53 | 4.74% |
| 1983 | 24.44 | 40.00 | 2.40 | 2.50 | 10.31 | 2.31 | | | 44.81 | 49,616.51 | 4.73% |
| 1984 | 28.14 | 40.00 | 2.44 | 2.50 | 10.12 | 2.12 | | | 44.62 | 49,406.13 | 4.71% |
| 1985 | 32.93 | 40.00 | 2.73 | 5.00 | 10.96 | 2.96 | | | 47.96 | 53,104.39 | 5.06% |
| 1986 | 38.61 | 40.00 | 3.22 | 5.00 | 10.34 | 2.34 | | | 47.34 | 52,417.89 | 5.00% |
| 1987 | 42.33 | 42.33 | 3.29 | 5.00 | 10.81 | 12.00 | 241.52 | 50.00 | 109.33 | 121,057.20 | 11.54% |
| 1988 | 43.14 | 53.00 | 3.47 | 10.00 | 10.71 | 12.00 | 235.18 | 50.00 | 125.00 | 138,408.03 | 13.19% |
| 1989 | 41.59 | 53.00 | 3.38 | 10.00 | 10.53 | 12.00 | 231.35 | 50.00 | 125.00 | 138,408.03 | 13.19% |
| 1990 | 48.26 | 53.00 | 4.38 | 10.00 | 11.30 | 12.00 | 241.32 | 50.00 | 125.00 | 138,408.03 | 13.19% |
| 1991 | 47.24 | 53.00 | 4.41 | 10.00 | 11.63 | 12.00 | 237.82 | 50.00 | 125.00 | 138,408.03 | 13.19% |
| 1992 | 50.58 | 53.00 | 4.33 | 10.00 | 12.22 | 12.00 | 239.93 | 50.00 | 125.00 | 138,408.03 | 13.19% |
| 1993 | 56.43 | 56.43 | 5.17 | 10.00 | 11.90 | 12.00 | 256.26 | 50.00 | 128.43 | 142,205.95 | 13.56% |
| 1994 | 58.49 | 58.49 | 5.45 | 10.00 | 12.93 | 12.00 | 269.57 | 50.00 | 130.49 | 144,486.91 | 13.77% |
| 1995 | 66.15 | 66.15 | 7.05 | 10.00 | 13.54 | 12.00 | 279.51 | 50.00 | 138.15 | 152,968.56 | 14.58% |
| 1996 | 68.59 | 68.59 | 8.86 | 10.00 | 13.80 | 12.00 | 277.15 | 50.00 | 140.59 | 155,670.28 | 14.84% |
| 1997 | 66.85 | 66.85 | 10.04 | 10.04 | 14.08 | 12.00 | 278.41 | 50.00 | 138.89 | 153,787.93 | 14.66% |
| 1998 | 80.77 | 80.77 | 10.51 | 10.51 | 15.84 | 12.00 | 307.68 | 50.00 | 153.28 | 169,721.46 | 16.18% |
| 1999 | 88.38 | 88.38 | 12.99 | 12.99 | 16.98 | 12.00 | 321.37 | 50.00 | 163.37 | 180,893.76 | 17.24% |
| 2000 | 85.33 | 85.33 | 11.60 | 11.60 | 17.85 | 12.00 | 318.40 | 50.00 | 158.93 | 175,977.51 | 16.78% |
| 2001 | 85.77 | 85.77 | 12.37 | 12.37 | 17.05 | 12.00 | 307.97 | 50.00 | 160.14 | 177,317.30 | 16.90% |
| 2002 | 83.80 | 83.80 | 11.05 | 11.05 | 17.29 | 12.00 | 221.79 | 50.00 | 156.85 | 173,674.40 | 16.56% |
| 2003 | 71.28 | 71.28 | 11.95 | 11.95 | 16.83 | 12.00 | 289.40 | 50.00 | 145.23 | 160,807.99 | 15.33% |
| 2004 | 84.97 | 84.97 | 11.27 | 11.27 | 17.91 | 12.00 | 302.79 | 50.00 | 158.24 | 175,213.49 | 16.70% |
| 2005 | 84.74 | 84.74 | 10.53 | 10.53 | 17.89 | 12.00 | 303.47 | 50.00 | 157.27 | 174,139.45 | 16.60% |
| 2006 | 92.91 | 92.91 | 18.79 | 18.79 | 18.99 | 12.00 | 315.78 | 50.00 | 173.70 | 192,331.80 | 18.33% |

**1**   Data can be found in the record at ACF044236 (Gwinnett); ACF044239 (Cumming); ACF044241 (Gainesville); ACF044244 (ARC).

**2**   Reduced withdrawals reflect the highest of actual total pumped or not-to-exceed amount (20 MGD) less 8 MGD related to the City of Gainesville's relocation contract.  ACF014226.

**3**   Not-to-exceed ("NTE") amounts are equal to the higher of the contract or actual withdrawal amounts (e.g.,

50 MGD for ARC (ACF014466)).

\* Equation based on yield used in Settlement Agreement (MGD \* 1,049,000) / 947 = ac-ft.  SUPPAR035448.

737.    The following **Figure 1 – *M&I Storage Allocation*** is based on the storage

necessary to support the holdover contracts, as set forth above in **Tables 1 and 1a**.14

**Figure 1 – *M&I Storage Allocation***



738.    Actual withdrawals for water supply at Lake Lanier and the storage necessary

to support those withdrawals are summarized in the following tables, entitled **Table 3 -**

***Actual M&I Use of Storage* (based on 1999 Formula and 1,087,600)** and **Table 3a -**

***Actual M&I Use of Storage* (based on 947 MGD yield and 1,087,600)**.

---

14    Figure 1 is based on a conservation storage pool of 1,087,600 acre-feet.  As noted above, use of 1,049,000 as the conservation storage pool yields only negligible difference in the acre-feet and percentage of conservation storage necessary to support the holdover contracts for water supply withdrawals.

**Table 3 -** *Actual M&I Use of Storage* **(based on 1999 Formula and 1,087,600)**

| YEARS | Withdrawals | | | | | | | Based on Corps Formula in 1999 Letter from Record | | | |
| | GWINNETT COUNTY* | CITY OF CUMMING[1] | CITY OF GAINESVILLE[1] | | ATLANTA REGIONAL COMMISSION[1] | | TOTAL CHALLENGED | Total Challenged Storage (based on project design ((MGDx1.542)/1600) x 1087600*) | % of conservation storage of 1,087,600 | Total Challenged Storage (based on 1986-88 drought ((MGDx1.542)/1485) x 1087600*) | % of conservation storage of 1,087,600 |
| | MGD | MGD | MGD | Reduced MGD[2] | MGD | Reduced MGD[3] | MGD | Acre-Feet | | Acre-Feet | |
| 1977 | 6.79 | | 8.03 | 0.03 | | | 6.82 | 7,148.55 | 0.66% | 7,702.14 | 0.71% |
| 1978 | 13.49 | | 9.60 | 1.60 | | | 15.09 | 15,816.95 | 1.45% | 17,041.84 | 1.57% |
| 1979 | 14.34 | | 10.78 | 2.78 | | | 17.12 | 17,944.75 | 1.65% | 19,334.41 | 1.78% |
| 1980 | 18.35 | 1.88 | 10.41 | 2.41 | | | 22.64 | 23,730.67 | 2.18% | 25,568.40 | 2.35% |
| 1981 | 19.36 | 1.67 | 10.94 | 2.94 | | | 23.97 | 25,124.74 | 2.31% | 27,070.43 | 2.49% |
| 1982 | 20.71 | 2.03 | 10.45 | 2.45 | | | 25.19 | 26,403.52 | 2.43% | 28,448.23 | 2.62% |
| 1983 | 24.44 | 2.40 | 10.31 | 2.31 | | | 29.15 | 30,554.29 | 2.81% | 32,920.44 | 3.03% |
| 1984 | 28.14 | 2.44 | 10.12 | 2.12 | | | 32.70 | 34,275.31 | 3.15% | 36,929.62 | 3.40% |
| 1985 | 32.93 | 2.73 | 10.96 | 2.96 | | | 38.62 | 40,480.50 | 3.72% | 43,615.35 | 4.01% |
| 1986 | 38.61 | 3.22 | 10.34 | 2.34 | | | 44.17 | 46,297.87 | 4.26% | 49,883.22 | 4.59% |
| 1987 | 42.33 | 3.29 | 10.81 | 2.81 | 241.52 | | 48.43 | 50,763.09 | 4.67% | 54,694.24 | 5.03% |
| 1988 | 43.14 | 3.47 | 10.71 | 2.71 | 235.18 | | 49.32 | 51,695.97 | 4.75% | 55,699.36 | 5.12% |
| 1989 | 41.59 | 3.38 | 10.53 | 2.53 | 231.35 | | 47.50 | 49,788.29 | 4.58% | 53,643.95 | 4.93% |
| 1990 | 48.26 | 4.38 | 11.30 | 3.30 | 241.32 | | 55.94 | 58,634.88 | 5.39% | 63,175.63 | 5.81% |
| 1991 | 47.24 | 4.41 | 11.63 | 3.63 | 237.82 | | 55.28 | 57,943.09 | 5.33% | 62,430.26 | 5.74% |
| 1992 | 50.58 | 4.33 | 12.22 | 4.22 | 239.93 | | 59.13 | 61,978.56 | 5.70% | 66,778.24 | 6.14% |
| 1993 | 56.43 | 5.17 | 11.90 | 3.90 | 256.26 | | 65.50 | 68,655.43 | 6.31% | 73,972.18 | 6.80% |
| 1994 | 58.49 | 5.45 | 12.93 | 4.93 | 269.57 | | 68.87 | 72,187.78 | 6.64% | 77,778.08 | 7.15% |
| 1995 | 66.15 | 7.05 | 13.54 | 5.54 | 279.51 | 3.07 | 81.81 | 85,751.16 | 7.88% | 92,391.82 | 8.50% |
| 1996 | 68.59 | 8.86 | 13.80 | 5.80 | 277.15 | 2.82 | 86.07 | 90,216.38 | 8.29% | 97,202.83 | 8.94% |
| 1997 | 66.85 | 10.04 | 14.08 | 6.08 | 278.41 | 1.29 | 84.26 | 88,319.18 | 8.12% | 95,158.72 | 8.75% |
| 1998 | 80.77 | 10.51 | 15.84 | 7.84 | 307.68 | 0.00 | 99.12 | 103,895.06 | 9.55% | 111,940.80 | 10.29% |

212

| YEARS | Withdrawals | | | | | | | Based on Corps Formula in 1999 Letter from Record | | | |
| | GWINNETT COUNTY* | CITY OF CUMMING[1] | CITY OF GAINESVILLE[1] | | ATLANTA REGIONAL COMMISSION[1] | | TOTAL CHALLENGED | Total Challenged Storage (based on project design ((MGDx1.542)/1600) x 1087600*) | % of conservation storage of 1,087,600 | Total Challenged Storage (based on 1986-88 drought ((MGDx1.542)/1485) x 1087600*) | % of conservation storage of 1,087,600 |
| | MGD | MGD | MGD | Reduced MGD[2] | MGD | Reduced MGD[3] | MGD | Acre-Feet | | Acre-Feet | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1999 | 88.38 | 12.99 | 16.98 | 8.98 | 321.37 | 17.85 | 128.20 | 134,375.97 | 12.36% | 144,782.19 | 13.31% |
| 2000 | 85.33 | 11.60 | 17.85 | 9.85 | 318.40 | 0.10 | 106.88 | 112,028.89 | 10.30% | 120,704.53 | 11.10% |
| 2001 | 85.77 | 12.37 | 17.05 | 9.05 | 307.97 | 0.00 | 107.19 | 112,353.82 | 10.33% | 121,054.63 | 11.13% |
| 2002 | 83.80 | 11.05 | 17.29 | 9.29 | 221.79 | 0.00 | 104.14 | 109,156.89 | 10.04% | 117,610.12 | 10.81% |
| 2003 | 71.28 | 11.95 | 16.83 | 8.83 | 289.40 | 0.46 | 92.52 | 96,977.10 | 8.92% | 104,487.12 | 9.61% |
| 2004 | 84.97 | 11.27 | 17.91 | 9.91 | 302.79 | 2.59 | 108.74 | 113,978.50 | 10.48% | 122,805.11 | 11.29% |
| 2005 | 84.74 | 10.53 | 17.89 | 9.89 | 303.47 | 6.57 | 111.73 | 117,112.54 | 10.77% | 126,181.86 | 11.60% |
| 2006 | 92.91 | 18.79 | 18.99 | 10.99 | 315.78 | 9.85 | 132.54 | 138,925.05 | 12.77% | 149,683.55 | 13.76% |

———

**1** Data can be found in the record at ACF044236 (Gwinnett County); ACF044239 (City of Cumming); ACF044241 (City of Gainesville); and ACF044244 (Atlanta Regional Commission).

**2** Reduced withdrawals reflect the highest of actual total pumped or not-to-exceed amount (20 MGD) less 8 MGD related to the City of Gainesville's relocation contract.  ACF014226.

**3** Reduced withdrawals reflect average withdrawals over 327 MGD, the flow allows for withdrawals incidental to hydropower operations.

**\*** The Corps formula can be found in a 1999 letter from Col. Norwood to Hon. Lindsay Thomas at ACF034654.

**Table 3a - *Actual M&I Use of Storage* (based on 947 MGD yield and 1,087,600)**

| YEARS | Withdrawals | | | | | | | Critical Yield 947 MGD | |
|---|---|---|---|---|---|---|---|---|---|
| | GWINNETT COUNTY[1] | CITY OF CUMMING[1] | CITY OF GAINESVILLE[1] | | ATLANTA REGIONAL COMMISSION[1] | | TOTAL CHALLENGED WITHDRAWALS | Total Challenged Converted Acre-feet** (MGD/947) | % of conservation storage of 1,087,600 |
| | MGD | MGD | MGD | Reduced MGD[2] | MGD | Reduced MGD[3] | MGD | Acre-Feet | |
| 1977 | 6.79 | | 8.03 | 0.03 | | | 6.82 | 7,829.42 | 0.72% |
| 1978 | 13.49 | | 9.60 | 1.60 | | | 15.09 | 17,323.44 | 1.59% |
| 1979 | 14.34 | | 10.78 | 2.78 | | | 17.12 | 19,653.90 | 1.81% |
| 1980 | 18.35 | 1.88 | 10.41 | 2.41 | | | 22.64 | 25,990.91 | 2.39% |
| 1981 | 19.36 | 1.67 | 10.94 | 2.94 | | | 23.97 | 27,517.76 | 2.53% |
| 1982 | 20.71 | 2.03 | 10.45 | 2.45 | | | 25.19 | 28,918.33 | 2.66% |
| 1983 | 24.44 | 2.40 | 10.31 | 2.31 | | | 29.15 | 33,464.44 | 3.08% |
| 1984 | 28.14 | 2.44 | 10.12 | 2.12 | | | 32.70 | 37,539.87 | 3.45% |
| 1985 | 32.93 | 2.73 | 10.96 | 2.96 | | | 38.62 | 44,336.08 | 4.08% |
| 1986 | 38.61 | 3.22 | 10.34 | 2.34 | | | 44.17 | 50,707.52 | 4.66% |
| 1987 | 42.33 | 3.29 | 10.81 | 2.81 | 241.52 | | 48.43 | 55,598.04 | 5.11% |
| 1988 | 43.14 | 3.47 | 10.71 | 2.71 | 235.18 | | 49.32 | 56,619.76 | 5.21% |
| 1989 | 41.59 | 3.38 | 10.53 | 2.53 | 231.35 | | 47.50 | 54,530.39 | 5.01% |
| 1990 | 48.26 | 4.38 | 11.30 | 3.30 | 241.32 | | 55.94 | 64,219.58 | 5.90% |
| 1991 | 47.24 | 4.41 | 11.63 | 3.63 | 237.82 | | 55.28 | 63,461.89 | 5.84% |
| 1992 | 50.58 | 4.33 | 12.22 | 4.22 | 239.93 | | 59.13 | 67,881.72 | 6.24% |
| 1993 | 56.43 | 5.17 | 11.90 | 3.90 | 256.26 | | 65.50 | 75,194.54 | 6.91% |
| 1994 | 58.49 | 5.45 | 12.93 | 4.93 | 269.57 | | 68.87 | 79,063.32 | 7.27% |
| 1995 | 66.15 | 7.05 | 13.54 | 5.54 | 279.51 | 3.07 | 81.81 | 93,918.55 | 8.64% |
| 1996 | 68.59 | 8.86 | 13.80 | 5.80 | 277.15 | 2.82 | 86.07 | 98,809.07 | 9.09% |
| 1997 | 66.85 | 10.04 | 14.08 | 6.08 | 278.41 | 1.29 | 84.26 | 96,731.17 | 8.89% |
| 1998 | 80.77 | 10.51 | 15.84 | 7.84 | 307.68 | 0.00 | 99.12 | 113,790.57 | 10.46% |
| 1999 | 88.38 | 12.99 | 16.98 | 8.98 | 321.37 | 17.85 | 128.20 | 147,174.65 | 13.53% |
| 2000 | 85.33 | 11.60 | 17.85 | 9.85 | 318.40 | 0.10 | 106.88 | 122,699.12 | 11.28% |
| 2001 | 85.77 | 12.37 | 17.05 | 9.05 | 307.97 | 0.00 | 107.19 | 123,055.00 | 11.31% |
| 2002 | 83.80 | 11.05 | 17.29 | 9.29 | 221.79 | 0.00 | 104.14 | 119,553.57 | 10.99% |
| 2003 | 71.28 | 11.95 | 16.83 | 8.83 | 289.40 | 0.46 | 92.52 | 106,213.72 | 9.77% |
| 2004 | 84.97 | 11.27 | 17.91 | 9.91 | 302.79 | 2.59 | 108.74 | 124,834.41 | 11.48% |
| 2005 | 84.74 | 10.53 | 17.89 | 9.89 | 303.47 | 6.57 | 111.73 | 128,266.96 | 11.79% |
| 2006 | 92.91 | 18.79 | 18.99 | 10.99 | 315.78 | 9.85 | 132.54 | 152,157.01 | 13.99% |

**1**   Data can be found in the record at ACF044236 (Gwinnett); ACF044239 (Cumming); ACF044241 (Gainesville); and ACF044244 (ARC).

**2**   Reduced withdrawals reflect the highest of actual total pumped or not-to-exceed amount (20 MGD) less 8 MGD related to the City of Gainesville's relocation contract.  ACF014226.

**3**   Reduced withdrawals reflect average withdrawals over 327 MGD, the flow allows for withdrawals incidental to

hydropower operations.

** Equation based on yield used in Settlement Agreement (MGD * 1,087,600) / 947 = ac-ft.  SUPPAR035448.

739.   The following **Figure 1a – *M&I Use of Storage*** is based on the actual annual

average withdrawals of the water suppliers, converted to acre-feet using the Corps' 1999

formula for the 1986-1988 drought, as set forth above in **Table 3 - *Actual M&I Use of***

***Storage***.

**Figure 1a – *M&I Use of Storage***



## 2.   Historical Inflows and Discharges at Lake Lanier

740.   As detailed in **Table 4 – *Inflows and Discharges During Drought Periods***,

inflows, discharges and discharges from storage at Lake Lanier during the three drought

periods of 1981; 1986-88; and 1999-2001 were as follows:

## Table 4 – *Inflows and Discharges During Drought Periods*

| Date | Average Monthly Inflow (cfs) | Inflow Record Cite | Average Monthly Discharge (cfs) | Discharge Record Cite | Average Amount of Discharge Comprised of Releases from Storage (cfs) | Percent of Discharge Coming from Storage (%) |
|---|---|---|---|---|---|---|
| **1981** | | | | | | |
| Jan-81 | 638 | SUPPAR026378 | 928 | SUPPAR026235 | 290 | 31.25% |
| Feb-81 | 2355 | SUPPAR026378 | 918 | SUPPAR026235 | -1437 | -156.54% |
| Mar-81 | 1305 | SUPPAR026378 | 976 | SUPPAR026235 | -329 | -33.71% |
| Apr-81 | 1150 | SUPPAR026378 | 793 | SUPPAR026235 | -357 | -45.02% |
| May-81 | 1226 | SUPPAR026378 | 815 | SUPPAR026235 | -411 | -50.43% |
| Jun-81 | 1173 | SUPPAR026378 | 954 | SUPPAR026235 | -219 | -22.96% |
| Jul-81 | 374 | SUPPAR026378 | 1400 | SUPPAR026235 | 1026 | 73.29% |
| Aug-81 | 333 | SUPPAR026378 | 2013 | SUPPAR026235 | 1680 | 83.46% |
| Sep-81 | 350 | SUPPAR026378 | 2004 | SUPPAR026235 | 1654 | 82.53% |
| Oct-81 | 355 | SUPPAR026379 | 2036 | SUPPAR026236 | 1681 | 82.56% |
| Nov-81 | 487 | SUPPAR026379 | 1968 | SUPPAR026236 | 1481 | 75.25% |
| Dec-81 | 1272 | SUPPAR026379 | 1115 | SUPPAR026236 | -157 | -14.08% |
| **Total:** | **918.17** | | **1326.67** | | **408.5** | **30.79%** |
| | | | | | | |
| **1981 Average** | **918** | | **1327** | | **409** | **31%** |
| | | | | | | |
| **1986** | | | | | | |
| Jan-86 | 800 | SUPPAR026383 | 1005 | SUPPAR026330 | 205 | 20.40% |
| Feb-86 | 901 | SUPPAR026383 | 851 | SUPPAR026330 | -50 | -5.88% |
| Mar-86 | 1140 | SUPPAR026383 | 929 | SUPPAR026330 | -211 | -22.71% |
| Apr-86 | 598 | SUPPAR026383 | 947 | SUPPAR026330 | 349 | 36.85% |
| May-86 | 619 | SUPPAR026383 | 957 | SUPPAR026330 | 338 | 35.32% |
| Jun-86 | 163 | SUPPAR026383 | 1070 | SUPPAR026330 | 907 | 84.77% |
| Jul-86 | -97 | SUPPAR026383 | 2174 | SUPPAR026330 | 2271 | 104.46% |
| Aug-86 | 132 | SUPPAR026383 | 1210 | SUPPAR026330 | 1078 | 89.09% |
| Sep-86 | 587 | SUPPAR026383 | 1005 | SUPPAR026330 | 418 | 41.59% |
| Oct-86 | 1655 | SUPPAR026384 | 936 | SUPPAR026331 | -719 | -76.82% |
| Nov-86 | 1834 | SUPPAR026384 | 961 | SUPPAR026331 | -873 | -90.84% |
| Dec-86 | 2032 | SUPPAR026384 | 946 | SUPPAR026331 | -1086 | -114.80% |

| Date | Average Monthly Inflow (cfs) | Inflow Record Cite | Average Monthly Discharge (cfs) | Discharge Record Cite | Average Amount of Discharge Comprised of Releases from Storage (cfs) | Percent of Discharge Coming from Storage (%) |
|---|---|---|---|---|---|---|
| **Total:** | **863.67** | | **1082.58** | | **218.92** | **20.22%** |
| | | | | | | |
| **1987** | | | | | | |
| Jan-87 | 2355 | SUPPAR026384 | 793 | SUPPAR026331 | -1562 | -196.97% |
| Feb-87 | 2840 | SUPPAR026384 | 640 | SUPPAR026331 | -2200 | -343.75% |
| Mar-87 | 2883 | SUPPAR026384 | 612 | SUPPAR026331 | -2271 | -371.08% |
| Apr-87 | 1911 | SUPPAR026384 | 1418 | SUPPAR026331 | -493 | -34.77% |
| May-87 | 1143 | SUPPAR026384 | 973 | SUPPAR026331 | -170 | -17.47% |
| Jun-87 | 1059 | SUPPAR026384 | 1092 | SUPPAR026331 | 33 | 3.02% |
| Jul-87 | 597 | SUPPAR026384 | 1565 | SUPPAR026331 | 968 | 61.85% |
| Aug-87 | 276 | SUPPAR026384 | 2609 | SUPPAR026331 | 2333 | 89.42% |
| Sep-87 | 269 | SUPPAR026384 | 2393 | SUPPAR026331 | 2124 | 88.76% |
| Oct-87 | 87 | SUPPAR026385 | 1688 | SUPPAR026332 | 1601 | 94.85% |
| Nov-87 | 547 | SUPPAR026385 | 1217 | SUPPAR026332 | 670 | 55.05% |
| Dec-87 | 1027 | SUPPAR026385 | 932 | SUPPAR026332 | -95 | -10.19% |
| **Total:** | **1249.50** | | **1327.67** | | **78.17** | **5.89%** |
| | | | | | | |
| **1988** | | | | | | |
| Jan-88 | 2173 | SUPPAR026385 | 756 | SUPPAR026332 | -1417 | -187.43% |
| Feb-88 | 1277 | SUPPAR026385 | 721 | SUPPAR026332 | -556 | -77.12% |
| Mar-88 | 925 | SUPPAR026385 | 824 | SUPPAR026332 | -101 | -12.26% |
| Apr-88 | 1645 | SUPPAR026385 | 806 | SUPPAR026332 | -839 | -104.09% |
| May-88 | 489 | SUPPAR026385 | 893 | SUPPAR026332 | 404 | 45.24% |
| Jun-88 | 133 | SUPPAR026385 | 1064 | SUPPAR026332 | 931 | 87.50% |
| Jul-88 | 438 | SUPPAR026385 | 1171 | SUPPAR026332 | 733 | 62.60% |
| Aug-88 | 266 | SUPPAR026385 | 1124 | SUPPAR026332 | 858 | 76.33% |
| Sep-88 | 663 | SUPPAR026385 | 1035 | SUPPAR026332 | 372 | 35.94% |
| Oct-88 | 804 | SUPPAR026386 | 917 | SUPPAR026333 | 113 | 12.32% |
| Nov-88 | 649 | SUPPAR026386 | 916 | SUPPAR026333 | 267 | 29.15% |
| Dec-88 | 611 | SUPPAR026386 | 861 | SUPPAR026333 | 250 | 29.04% |
| **Total:** | **839.42** | | **924.00** | | **854.05** | **92.43%** |
| | | | | | | |

| Date | Average Monthly Inflow (cfs) | Inflow Record Cite | Average Monthly Discharge (cfs) | Discharge Record Cite | Average Amount of Discharge Comprised of Releases from Storage (cfs) | Percent of Discharge Coming from Storage (%) |
|---|---|---|---|---|---|---|
| **1986-88 Average** | **984** | | **1111** | | **127** | **11%** |
| | | | | | | |
| **1999** | | | | | | |
| Jan-99 | 1902 | SUPPAR026396 | 861 | SUPPAR026343 | -1041 | -120.91% |
| Feb-99 | 2236 | SUPPAR026396 | 845 | SUPPAR026343 | -1391 | -164.62% |
| Mar-99 | 1379 | SUPPAR026396 | 936 | SUPPAR026343 | -443 | -47.33% |
| Apr-99 | 1290 | SUPPAR026396 | 989 | SUPPAR026343 | -301 | -30.43% |
| May-99 | 1192 | SUPPAR026396 | 1042 | SUPPAR026343 | -150 | -14.40% |
| Jun-99 | 982 | SUPPAR026396 | 1608 | SUPPAR026343 | 626 | 38.93% |
| Jul-99 | 758 | SUPPAR026396 | 985 | SUPPAR026343 | 227 | 23.05% |
| Aug-99 | 160 | SUPPAR026396 | 1389 | SUPPAR026343 | 1229 | 88.48% |
| Sep-99 | 105 | SUPPAR026396 | 1504 | SUPPAR026343 | 1399 | 93.02% |
| Oct-99 | 1441 | SUPPAR026397 | 1153 | SUPPAR026344 | -288 | -24.98% |
| Nov-99 | 1093 | SUPPAR026397 | 1047 | SUPPAR026344 | -46 | -4.39% |
| Dec-99 | 944 | SUPPAR026397 | 1111 | SUPPAR026344 | 167 | 15.03% |
| **Total:** | **1123.50** | | **1122.50** | | **-1.00** | **-0.09%** |
| | | | | | | |
| **2000** | | | | | | |
| Jan-00 | 1665 | SUPPAR026397 | 878 | SUPPAR026344 | -787 | -89.64% |
| Feb-00 | 1282 | SUPPAR026397 | 928 | SUPPAR026344 | -354 | -38.15% |
| Mar-00 | 1853 | SUPPAR026397 | 933 | SUPPAR026344 | -920 | -98.61% |
| Apr-00 | 2141 | SUPPAR026397 | 915 | SUPPAR026344 | -1226 | -133.99% |
| May-00 | 811 | SUPPAR026397 | 1117 | SUPPAR026344 | 306 | 27.39% |
| Jun-00 | 534 | SUPPAR026397 | 1975 | SUPPAR026344 | 1441 | 72.96% |
| Jul-00 | 265 | SUPPAR026397 | 1919 | SUPPAR026344 | 1654 | 86.19% |
| Aug-00 | 565 | SUPPAR026397 | 2060 | SUPPAR026344 | 1495 | 72.57% |
| Sep-00 | 617 | SUPPAR026397 | 1102 | SUPPAR026344 | 485 | 44.01% |
| Oct-00 | 40 | SUPPAR026398 | 1112 | SUPPAR026345 | 1072 | 96.40% |
| Nov-00 | 795 | SUPPAR026398 | 924 | SUPPAR026345 | 129 | 13.96% |
| Dec-00 | 695 | SUPPAR026398 | 986 | SUPPAR026345 | 291 | 29.51% |
| **Total:** | **938.58** | | **1237.42** | | **298.83** | **24.15%** |

| Date | Average Monthly Inflow (cfs) | Inflow Record Cite | Average Monthly Discharge (cfs) | Discharge Record Cite | Average Amount of Discharge Comprised of Releases from Storage (cfs) | Percent of Discharge Coming from Storage (%) |
|---|---|---|---|---|---|---|
| | | | | | | |
| **2001** | | | | | | |
| Jan-01 | 1499 | SUPPAR026398 | 938 | SUPPAR026345 | -561 | -59.81% |
| Feb-01 | 1286 | SUPPAR026398 | 819 | SUPPAR026345 | -467 | -57.02% |
| Mar-01 | 2245 | SUPPAR026398 | 618 | SUPPAR026345 | -1627 | -263.27% |
| Apr-01 | 1275 | SUPPAR026398 | 640 | SUPPAR026345 | -635 | -99.22% |
| May-01 | 793 | SUPPAR026398 | 805 | SUPPAR026345 | 12 | 1.49% |
| Jun-01 | 1125 | SUPPAR026398 | 693 | SUPPAR026345 | -432 | -62.34% |
| Jul-01 | 994 | SUPPAR026398 | 1028 | SUPPAR026345 | 34 | 3.31% |
| Aug-01 | 658 | SUPPAR026398 | 1162 | SUPPAR026345 | 504 | 43.37% |
| Sep-01 | 416 | SUPPAR026398 | 980 | SUPPAR026345 | 564 | 57.55% |
| Oct-01 | 317 | SUPPAR026399 | 908 | SUPPAR026346 | 591 | 65.09% |
| Nov-01 | 409 | SUPPAR026399 | 827 | SUPPAR026346 | 418 | 50.54% |
| Dec-01 | 775 | SUPPAR026399 | 791 | SUPPAR026346 | 16 | 2.02% |
| **Total:** | **982.67** | | **850.75** | | **-131.92** | **-15.51%** |
| | | | | | | |
| **1999-2001 Average** | **1015** | | **1070** | | **55** | **5%** |

741.     In **Table 4 – *Inflows and Discharges During Drought Periods***, the monthly

average values for inflows and discharges are taken directly from the record, as noted.  Table

5 examines the inflow versus the outflow (outflow = discharge) at Lake Lanier.  The

"Average Amount of Discharge Comprised of Releases from Storage" column simply takes

the difference between the inflows and the outflows (or discharges).  If the inflow was

greater than the outflow, then there was no discharge from storage on that day (more water is

coming into the reservoir than out).  If the outflow (discharge) is greater than the inflow, that

means that on that particular day, because the Corps released more water than what came into

219

the reservoir; therefore, the Corps utilized storage in order to make that discharge.  The chart summarizes monthly averages of these daily calculations.

 742. **Figure 2 -** *Comparison of Inflow, Discharge and Discharge from Storage* sets forth the average inflow (in blue), the average discharge (in maroon), and the average discharge from storage (yellow) for the three drought periods.

**FIGURE 2 – Comparison of Inflow, Discharge and Discharge from Storage (in cfs)**



  a. **Disposition of Inflows with Regard to Water Suppliers**

 743. Official Corps policy regarding the disposition of inflows is not to grant credit for return flows in connection with water supply contracts.  SUPPAR001530-40; SUPPAR017627.

744.     A February 26, 1990 letter from the Corps to the Cobb County/Marietta Water Authority sets forth the Corps' official policy regarding the disposition of inflows with regard to water supply contracts at Lake Lanier.

> During our meeting on February 15, 1990, with Mr. Ken Sims, concerning the Lake Lanier reallocation and Water Control Plan model, you requested information on the Corps' policy for the disposition of inflows to Corps reservoirs that are returned from a user of storage. We have reviewed our files on this subject and the attached chain of correspondence on this policy is provided. Based on this guidance, all interim withdrawal or storage contracts will be made for the full amount of withdrawal regardless of return flows.

SUPPAR001530.

### 3.     Historical Lake Withdrawals for Water Supply

745.     As detailed in **Table 5 – *Average Annual Actual Withdrawals from Lake Lanier During Drought Periods***, average annual actual withdrawals from Lake Lanier for water supply during the three drought periods calculated by using the Corps' formula (MGD * 1.542/1485 * 1087600, found at ACF034654) based on the 1986-88 drought and 1,087,600 acre-feet of storage are as follows:

**Table 5 – *Average Annual Actual Withdrawals from Lake Lanier During Drought Periods***

| YEARS | GWINNETT COUNTY[1] | CITY OF CUMMING[1] | CITY OF GAINESVILLE[1] | | TOTAL | TOTAL CHALLENGED WITHDRAWALS (MGD) |
|---|---|---|---|---|---|---|
| | | | | Reduced Amount[2] | | |
| 1981 | 19.36 | 1.67 | 10.94 | 2.94 | 31.97 | 23.97 |
| 1981 Average | | | | | | 24 |
| 1986 | 38.61 | 3.22 | 10.34 | 2.34 | 52.17 | 44.17 |
| 1987 | 42.33 | 3.29 | 10.81 | 2.81 | 56.43 | 48.43 |
| 1988 | 43.14 | 3.47 | 10.71 | 2.71 | 57.32 | 49.32 |

| YEARS | GWINNETT COUNTY[1] | CITY OF CUMMING[1] | CITY OF GAINESVILLE[1] | | TOTAL | TOTAL CHALLENGED WITHDRAWALS (MGD) |
|---|---|---|---|---|---|---|
| 1986-88 Average | | | | | | 47 |
| 1999 | 88.38 | 12.99 | 16.98 | 8.98 | 118.35 | 110.35 |
| 2000 | 85.33 | 11.60 | 17.85 | 9.85 | 114.78 | 106.78 |
| 2001 | 85.77 | 12.37 | 17.05 | 9.05 | 115.19 | 107.19 |
| 1999-2001 Average | | | | | | 108 |

1 Data can be found at the following locations in the record:  Gwinnett (ACF044236); Cumming (ACF044239); City of Gainesville (ACF0044241); and Atlanta Regional Commission (ACF044244).
2  Reduced withdrawals reflect the total pumped less 8 MGD related to the City of Gainesville's relocation contract.

746.    **Figure 3 –** *Average Actual Withdrawals from Lake Lanier for Water Supply During Droughts*, sets forth the average annual actual withdrawals from Lake Lanier for water supply using the "Total Challenged Withdrawals" average for each three drought periods.

**FIGURE 3 – Average Actual Withdrawals from Lake Lanier for Water Supply During Droughts (in MGD)**



747.    As shown in Figure 3, withdrawals from Lake Lanier for water supply increased from 24 MGD in the 1981 drought to 108 MGD on average during the 1999-2001 drought.

### 4.    Historical Lake Lanier Hydropower Generation

748.    Historical hydropower generation at Lake Lanier during the three drought periods of 1981; 1986-88; and 1999-2001 was as follows[15]:

| Date | Generation (Mwh) | Administrative Record |
|------|------------------|----------------------|
| **1981 Drought** | | |
| January 1981 | 7804 | SUPPAR026272 |
| February 1981 | 6988 | SUPPAR026272 |
| March 1981 | 7818 | SUPPAR026272 |
| April 1981 | 6421 | SUPPAR026272 |

---

[15]    The record figures for December 1999 hydropower generation are missing the hydropower generation data for the date of the 24th.  We have taken the average of the day before and after and used that figure to complete the information.

| Date | Generation (Mwh) | Administrative Record |
|---|---|---|
| May 1981 | 6836 | SUPPAR026272 |
| June 1981 | 7888 | SUPPAR026272 |
| July 1981 | 11986 | SUPPAR026272 |
| August 1981 | 16826 | SUPPAR026272 |
| September 1981 | 15949 | SUPPAR026272 |
| October 1981 | 16310 | SUPPAR026273 |
| November 1981 | 14802 | SUPPAR026273 |
| December 1981 | 8617 | SUPPAR026273 |
| **MEAN** | **10687.08** | |
| **1986 – 88 Drought** | | |
| January 1986 | 8430 | SUPPAR026277 |
| February 1986 | 5443 | SUPPAR026277 |
| March 1986 | 7781 | SUPPAR026277 |
| April 1986 | 7677 | SUPPAR026277 |
| May 1986 | 8015 | SUPPAR026277 |
| June 1986 | 8600 | SUPPAR026277 |
| July 1986 | 17664 | SUPPAR026277 |
| August 1986 | 9631 | SUPPAR026277 |
| September 1986 | 7558 | SUPPAR026277 |
| October 1986 | 7205 | SUPPAR026278 |
| November 1986 | 7254 | SUPPAR026278 |
| December 1986 | 7502 | SUPPAR026278 |
| January 1987 | 6295 | SUPPAR026278 |
| February 1987 | 4319 | SUPPAR026278 |
| March 1987 | 5059 | SUPPAR026278 |
| April 1987 | 11732 | SUPPAR026278 |
| May 1987 | 8490 | SUPPAR026278 |
| June 1987 | 9268 | SUPPAR026278 |
| July 1987 | 13696 | SUPPAR026278 |
| August 1987 | 22597 | SUPPAR026278 |
| September 1987 | 19368 | SUPPAR026278 |
| October 1987 | 13698 | SUPPAR026279 |
| November 1987 | 9239 | SUPPAR026279 |
| December 1987 | 7304 | SUPPAR026279 |
| January 1988 | 5417 | SUPPAR026279 |
| February 1988 | 5187 | SUPPAR026279 |
| March 1988 | 6820 | SUPPAR026279 |
| April 1988 | 6269 | SUPPAR026279 |

| Date | Generation (Mwh) | Administrative Record |
|---|---|---|
| May 1988 | 7233 | SUPPAR026279 |
| June 1988 | 8352 | SUPPAR026279 |
| July 1988 | 9215 | SUPPAR026279 |
| August 1988 | 8778 | SUPPAR026279 |
| September 1988 | 7802 | SUPPAR026279 |
| October 1988 | 7245 | SUPPAR026280 |
| November 1988 | 6947 | SUPPAR026280 |
| December 1988 | 6671 | SUPPAR026280 |
| **MEAN** | **8882.25** | |
| **1999-2001 Drought** | | |
| January 1999 | 6222 | SUPPAR026290 |
| February 1999 | 5486 | SUPPAR026290 |
| March 1999 | 6973 | SUPPAR026290 |
| April 1999 | 7186 | SUPPAR026290 |
| May 1999 | 7895 | SUPPAR026290 |
| June 1999 | 11921 | SUPPAR026290 |
| July 1999 | 4892 | SUPPAR026290 |
| August 1999 | 10279 | SUPPAR026290 |
| September 1999 | 10815 | SUPPAR026290 |
| October 1999 | 8079 | SUPPAR026291 |
| November 1999 | 6218 | SUPPAR026291 |
| December 1999 | 6968 | SUPPAR026291 |
| January 2000 | 5548 | SUPPAR026291 |
| February 2000 | 6346 | SUPPAR026291 |
| March 2000 | 6847 | SUPPAR026291 |
| April 2000 | 6444 | SUPPAR026291 |
| May 2000 | 8398 | SUPPAR026291 |
| June 2000 | 14585 | SUPPAR026291 |
| July 2000 | 14342 | SUPPAR026291 |
| August 2000 | 14699 | SUPPAR026291 |
| September 2000 | 4126 | SUPPAR026291 |
| October 2000 | 6820 | SUPPAR026292 |
| November 2000 | 5179 | SUPPAR026292 |
| December 2000 | 6218 | SUPPAR026292 |
| January 2001 | 6510 | SUPPAR026292 |
| February 2001 | 5626 | SUPPAR026292 |
| March 2001 | 3835 | SUPPAR026292 |
| April 2001 | 4268 | SUPPAR026292 |

| Date | Generation (Mwh) | Administrative Record |
|---|---|---|
| May 2001 | 5686 | SUPPAR026292 |
| June 2001 | 4668 | SUPPAR026292 |
| July 2001 | 7393 | SUPPAR026292 |
| August 2001 | 8402 | SUPPAR026292 |
| September 2001 | 5992 | SUPPAR026292 |
| October 2001 | 4631 | SUPPAR026293 |
| November 2001 | 3836 | SUPPAR026293 |
| December 2001 | 3494 | SUPPAR026293 |
| **MEAN** | **7134.11** | |

749.    **Figure 4 – *Mean Hydropower Generation***, sets forth a summary of the

monthly mean hydropower generation, in mwh, for the three drought periods 1981, 1986-88,

and 1999-2001.  For each period, the mean was established simply by summing the average

monthly generations for those periods and then taking the average of the sum for each period.

The average monthly hydropower generation for Lake Lanier is provided in the

administrative record (SUPPAR026249-99) and set forth in the above table.

**Figure 4 – *Mean Hydropower Generation* (mwh)**



## 5.      Historical Weekend Releases

750.    The amount of hydropower produced at Lake Lanier on Saturdays and Sundays since 1989 has been taken from the daily hydropower generation figures (SUPPAR026249-299) and is summarized as follows:

| Year | Total Energy Generated in the Year (MWh) | Total Energy Generated on Saturday and Sunday for the Year (MWh) | Percent of Energy Generated on Saturday and Sunday (%) |
|---|---|---|---|
| 1989 | 130,156 | 11,787 | 9% |
| 1990 | 272,687 | 27,857 | 10% |
| 1991 | 190,433 | 19,403 | 10% |
| 1992 | 188,064 | 24,516 | 13% |
| 1993 | 287,420 | 36,777 | 13% |
| 1994 | 150,508 | 23,934 | 16% |
| 1995 | 199,203 | 26,709 | 13% |
| 1996 | 242,472 | 41,119 | 17% |
| 1997 | 177,879 | 23,239 | 13% |
| 1998 | 250,999 | 52,564 | 21% |

227

| Year | Total Energy Generated in the Year (MWh) | Total Energy Generated on Saturday and Sunday for the Year (MWh) | Percent of Energy Generated on Saturday and Sunday (%) |
|---|---|---|---|
| 1999 | 94,144 | 22,659 | 24% |
| 2000 | 98,988 | 20,724 | 21% |
| 2001 | 64,352 | 17,405 | 27% |
| 2002 | 62,503 | 15,739 | 25% |
| 2003 | 205,332 | 47,317 | 23% |
| 2004 | 106,966 | 24,520 | 23% |
| 2005 | 213,623 | 38,565 | 18% |
| 2006 | 141,843 | 28,430 | 20% |
| 2007 | 120,809 | 22,966 | 19% |

751.     **Figure 5 –** *Percentage of Power Produced on Saturdays and Sunday from 1989 to 2007*, sets forth the annual percentage of total energy generated on Saturdays and Sundays.  For each year, the daily Saturday and Sunday generation figures were taken from the administrative record (SUPPAR026249-99), totaled, and compared against the total generation for the year.  A summary of those calculations is set forth in the table above.

**Figure 5 – Percentage of Power Produced on Saturdays and Sunday (1989 to 2007)**



752.     As shown in Figure 5, the percentage of power produced at Lake Lanier on Saturdays and Sundays rose from 9 percent in the 1989 to 19 percent in 2007 with a peak of 27 percent occurring in 2001.

### 6.     Historical Lake Lanier Elevations

753.     In the history of operation at Lake Lanier, lake levels have never gone below 1050 elevation. *See* SUPPAR026406-58.

754.     The Corps' maintenance of Lake Lanier at levels above 1050 elevation has the practical effect of reducing the reservoir's conservation storage pool (originally designated as 1035 – 1070 elevation) by 383,300 acre-feet (the difference between the storage at elevation 1051 (1,250,900 acre-feet) and elevation 1035 (867,600 acre-feet).  ACF018454.

755.    Elevations at Lake Lanier during the three drought periods of 1981; 1986-88; and 1999-2001 were as follows:

| Date | Elevation (Ft-msl) | Administrative Record |
|------|--------------------|-----------------------|
| **1981 Drought** | | |
| January 1981 | 1062.63 | SUPPAR026431 |
| February 1981 | 1063.43 | SUPPAR026431 |
| March 1981 | 1064.87 | SUPPAR026431 |
| April 1981 | 1065.79 | SUPPAR026431 |
| May 1981 | 1065.9 | SUPPAR026431 |
| June 1981 | 1067.25 | SUPPAR026431 |
| July 1981 | 1066.15 | SUPPAR026431 |
| August 1981 | 1063.67 | SUPPAR026431 |
| September 1981 | 1061.16 | SUPPAR026431 |
| October 1981 | 1057.4 | SUPPAR026432 |
| November 1981 | 1054.48 | SUPPAR026432 |
| December 1981 | 1052.88 | SUPPAR026432 |
| **MEAN** | **1062.13** | |
| | | |
| **1986-88 Drought** | | |
| January 1986 | 1064.71 | SUPPAR026436 |
| February 1986 | 1064.6 | SUPPAR026436 |
| March 1986 | 1064.81 | SUPPAR026436 |
| April 1986 | 1064.81 | SUPPAR026436 |
| May 1986 | 1064.01 | SUPPAR026436 |
| June 1986 | 1063.17 | SUPPAR026436 |
| July 1986 | 1060.48 | SUPPAR026436 |
| August 1986 | 1056.95 | SUPPAR026436 |
| September 1986 | 1055.86 | SUPPAR026436 |
| October 1986 | 1055.41 | SUPPAR026437 |
| November 1986 | 1056.83 | SUPPAR026437 |
| December 1986 | 1059.42 | SUPPAR026437 |
| January 1987 | 1061.35 | SUPPAR026437 |
| February 1987 | 1064.11 | SUPPAR026437 |
| March 1987 | 1068.84 | SUPPAR026437 |
| April 1987 | 1071.22 | SUPPAR026437 |
| May 1987 | 1071.39 | SUPPAR026437 |
| June 1987 | 1071.40 | SUPPAR026437 |
| July 1987 | 1071.12 | SUPPAR026437 |

| Date | Elevation (Ft-msl) | Administrative Record |
|---|---|---|
| August 1987 | 1068.05 | SUPPAR026437 |
| September 1987 | 1064.1 | SUPPAR026437 |
| October 1987 | 1060.81 | SUPPAR026438 |
| November 1987 | 1058.76 | SUPPAR026438 |
| December 1987 | 1058.08 | SUPPAR026438 |
| January 1988 | 1059.63 | SUPPAR026438 |
| February 1988 | 1061.92 | SUPPAR026438 |
| March 1988 | 1062.22 | SUPPAR026438 |
| April 1988 | 1063.16 | SUPPAR026438 |
| May 1988 | 1063.45 | SUPPAR026438 |
| June 1988 | 1062.2 | SUPPAR026438 |
| July 1988 | 1060.68 | SUPPAR026438 |
| August 1988 | 1059.23 | SUPPAR026438 |
| September 1988 | 1058.38 | SUPPAR026438 |
| October 1988 | 1058.17 | SUPPAR026439 |
| November 1988 | 1057.43 | SUPPAR026439 |
| December 1988 | 1056.92 | SUPPAR026439 |
| **MEAN** | **1062.32** | |
| | | |
| | **1999-2001 Drought** | |
| January 1999 | 1063.44 | SUPPAR026449 |
| February 1999 | 1066.32 | SUPPAR026449 |
| March 1999 | 1067.27 | SUPPAR026449 |
| April 1999 | 1068.04 | SUPPAR026449 |
| May 1999 | 1068.46 | SUPPAR026449 |
| June 1999 | 1067.51 | SUPPAR026449 |
| July 1999 | 1067.23 | SUPPAR026449 |
| August 1999 | 1065.8 | SUPPAR026449 |
| September 1999 | 1063.5 | SUPPAR026449 |
| October 1999 | 1063 | SUPPAR026450 |
| November 1999 | 1062.8 | SUPPAR026450 |
| December 1999 | 1062.85 | SUPPAR026450 |
| January 2000 | 1063.37 | SUPPAR026450 |
| February 2000 | 1064.37 | SUPPAR026450 |
| March 2000 | 1065.36 | SUPPAR026450 |
| April 2000 | 1067.86 | SUPPAR026450 |
| May 2000 | 1068.18 | SUPPAR026450 |
| June 2000 | 1066.62 | SUPPAR026450 |

| Date | Elevation (Ft-msl) | Administrative Record |
|---|---|---|
| July 2000 | 1063.9 | SUPPAR026450 |
| August 2000 | 1061.33 | SUPPAR026450 |
| September 2000 | 1059.15 | SUPPAR026450 |
| October 2000 | 1057.74 | SUPPAR026451 |
| November 2000 | 1056.63 | SUPPAR026451 |
| December 2000 | 1056.19 | SUPPAR026451 |
| January 2001 | 1056.21 | SUPPAR026451 |
| February 2001 | 1057.19 | SUPPAR026451 |
| March 2001 | 1059.33 | SUPPAR026451 |
| April 2001 | 1061.78 | SUPPAR026451 |
| May 2001 | 1061.82 | SUPPAR026451 |
| June 2001 | 1062.66 | SUPPAR026451 |
| July 2001 | 1062.68 | SUPPAR026451 |
| August 2001 | 1062.42 | SUPPAR026451 |
| September 2001 | 1061.31 | SUPPAR026451 |
| October 2001 | 1060.25 | SUPPAR026452 |
| November 2001 | 1059.19 | SUPPAR026452 |
| December 2001 | 1058.89 | SUPPAR026452 |
| **MEAN** | **1062.80** | |

756.    **Figure 6 – *Mean Drought Elevation***, sets forth a summary of the monthly

mean elevations of Lake Lanier, in ft, for the three drought periods through 2001.  For each

period, the mean was established simply by summing the average monthly elevations for

those periods and then taking the average of the sum for each period.  The average monthly

elevations for Lake Lanier are provided in the administrative record (SUPPAR026406-58)

and set forth in the above table on *Historical Lake Lanier Elevations*.

**Figure 6 – *Mean Drought Elevation***



757.    The mean, or average, for all three drought periods is an elevation of 1062.42 ft-msl.

**C.    Inflow and Outflow of Corps' Reservoirs in the ACF System**

**1.    West Point Inflow and Outflow Data During Drought Periods**

758.    As discussed above, three drought periods occurred on the ACF system between 1980 and 2005: 1981, 1986-1988 and 1999-2001.  Using data obtained from the Corps' website, the following **Table 6 - *West Point Lake Data During Drought Periods*** shows average daily inflow, average daily discharge, average daily amount of discharge comprised of releases from storage, and percent of discharge coming from storage for West Point Lake:

**Table 6 - West Point Lake Data During Drought Periods**

| Drought Period[16] | Average Daily Inflow (cfs) | Average Daily Discharge (cfs) | Average Daily Amount of Discharge Comprised of Releases from Storage (cfs) | Percent of Discharge Coming from Storage (%) |
|---|---|---|---|---|
| 1981 | 3,090 | 3,038 | -52 | -2% |
| 1986 - 1988 | 3,078 | 3,071 | -7 | -1% |
| 1999 - 2001 | 2,747 | 2,733 | -14 | -1% |

759.    The raw data for the values reflected in Table 6 can be found on the Corps' website at http://water.sam.usace.army.mil/gage/acfhist.htm.  The data was obtained on January 5, 2009 by clicking on the "Entire West Point Record" link and downloading that data, which is incorporated herein by reference.  The data gives daily numbers for many categories, including inflows and discharges, from West Point.

760.    The values in the "Average Daily Inflow" column above derive from adding together the inflow for every day of the noted year and then dividing that total by the number of days in the year.  The values in the "Average Daily Discharge" column derive from adding together the discharge for every day of the year and then dividing that total by the number of days in the year.  The values in the "Average Daily Amount of Discharge Comprised of Releases from Storage" derive from subtracting the value in the "Average Daily Inflow" column from the value in the "Average Daily Discharge" column.  The values in the "Percent of Discharge Coming from Storage" column are derived from dividing the value in the "Average Daily Amount of Discharge Comprised of Releases from Storage" column by the

---

16      The years referenced are calendar years.

value in the "Average Daily Discharge" column and rounding to the nearest non-zero whole number.

761.     The data in the table shows that discharges from West Point closely mirror inflows during drought periods.  In other words, the vast majority of the water that flows into West Point Lake is discharged from the reservoir.

## 2.     Walter F. George Inflow and Outflow Data During Drought Periods

762.     As discussed above, three drought periods occurred on the ACF system between 1980 and 2005: 1981, 1986-1988 and 1999-2001.  Using data derived from the Corps' website, the following **Table 7 - *Walter F. George Data During Drought Periods*** Table shows average daily inflow, average daily discharge, average daily amount of discharge comprised of releases from storage, and percent of discharge coming from storage for Lake Walter F. George:

### Table 7 - Walter F. George Data During Drought Periods

| Drought Period[17] | Average Daily Inflow (cfs) | Average Daily Discharge (cfs) | Average Daily Amount of Discharge Comprised of Releases from Storage (cfs) | Percent of Discharge Coming from Storage (%) |
|---|---|---|---|---|
| 1981 | 5,700 | 5,441 | -258 | -5% |
| 1986 - 1988 | 5,909 | 5,983 | 74 | 1% |
| 1999 - 2001 | 5,264 | 5,254 | -10 | 0% |

763.     The raw data for the values reflected in Table 7 can be found on the Corps' website at http://water.sam.usace.army.mil/gage/acfhist.htm.  The data was obtained on

---

17     The years referenced are calendar years.

January 12, 2009 by clicking on the "Entire George Record" link and downloading that data, which is incorporated herein by reference.  The data gives daily numbers for many categories, including inflows and discharges, from Walter F. George.

764.    The values in the "Average Daily Inflow" column derive from adding together the inflow for every day of the year and then dividing that total by the number of days in the year.  The values in the "Average Daily Discharge" column derive from adding together the discharge for every day of the year and then dividing that total by the number of days in the year.  The values in the "Average Daily Amount of Discharge Comprised of Releases from Storage" derive from subtracting the value in the "Average Daily Inflow" column from the value in the "Average Daily Discharge" column.  The values in the "Percent of Discharge Coming from Storage" column are derived from dividing the value in the "Average Daily Amount of Discharge Comprised of Releases from Storage" column by the value in the "Average Daily Discharge" column and rounding to the nearest non-zero whole number.

765.    The data in the table show that discharges from Walter F. George closely mirror inflows during drought periods.  In other words, the vast majority of the water that flows into West Point Lake is discharged from the reservoir.

### D.    The Corps' References to Drought Operations

#### 1.    Historical Drought Operations

766.    The Corps has consistently prioritized water supply during droughts.  In a May 13, 1982 Drought Contingency Plan Fact Sheet, the Corps stated:  "Water Supply, a principal function of the ACF System, must always have a high priority during drought operations."  ACF008216.

767.    In providing edits to the Drought Contingency Report, the South Atlantic Division stated "There is no benefit to making power, flood control, and navigation superior to other purposes.  The project was built to perform certain functions, and all beneficial uses resulting therefrom should be protected within the constraints of meeting committed project services."  ACF008234.

768.    The Corps noted in the 1981 Drought Contingency Plan that water supply withdrawals were 86 cfs from Lanier, 204 between Buford and Morgan Falls and 302 cfs between Morgan and Peachtree in 1980.  ACF008243.

769.    In its 1981 Drought Contingency Plan drafted during the 1981 drought, the Corps placed water supply needs above those of both hydropower and navigation as those needs which will not be interrupted during a drought.  ACF008247.

770.    In the 1981 Drought Contingency Plan, the Corps stated that "[p]roviding water supply for the City of Atlanta and maintaining water quality on the Chattahoochee River is essential to human needs and should not be sacrificed for other purposes."  ACF008249.

771.    During the 1981 drought, there was no reduction in water supply use, although there were reduced flows at Atlanta and hydropower users were forced to purchase power to supplement the hydropower contract.  ACF008222.

772.    In a summary of comments received on the Draft Contingency Plan prepared by the Corps, the Corps noted that a commentator had highlighted that the plan did not address the environmental needs of the Apalachicola River and Bay and that, "[i]n the 1981 drought the power consumption at Lake Lanier was reduced.  Recreation and navigation were

also impacted.  However, no reductions in water supply were made.  The plan should consider reductions in water supply so that the burden of the drought would be shared by all water users."  ACF008228.

773.    Under a "Policy for Drought Emergency Water Management" drafted by the Corps, the Corps explained its drought policy:  "During the present drought emergency it will be the policy of the South Atlantic Division to provide essential [M&I] water supply and flow for water quality at and below projects in the Mobile, Savannah, and Wilmington Districts.  Water control operations for other project purposes will proceed only insofar as they do not conflict with these goals."  ACF011787.

774.    The policy explicitly favored releases from downstream projects before upstream projects – use of downstream dead storage as a "last resort to protect upstream water storage."  ACF11787.

775.    The Corps recognized in a letter dated September 26, 1986 to the Save the Lake Association that the drought operations under which they were functioning at that point prioritized water supply over the authorized project purposes including navigation and hydropower.  ACF013641 ("It should also be noted that the restrictive reservoir releases proposed by the strategy represent a conscious attempt to conserve the available reservoir storage at Lake Lanier while discharging only the amount of water necessary to meet downstream water supply and water quality needs.  Reservoir releases for other authorized project purposes, such as navigation and hydropower, have either been abandoned or severely reduced until conditions within the basin improve.").

776.    In a Corps Memorandum for the record, the Corps reduced releases under the operations for the drought, and those "reduced releases will be directed at satisfying downstream water supply and water quality needs only.  Under this approach, navigation releases will be abandoned and hydropower generation will occur incidental to the water supply and water quality release."  ACF013631.

777.    During the 1986-1988 drought, M&I use increased.  ACF013665 ("[T]he extremely dry weather conditions also increased water use demands and withdrawals from the Chattahoochee River.  Demands in DeKalb, Cobb and the City of Atlanta rapidly reached the limits of their withdrawal permits.  In early July, DeKalb County and the City of Atlanta were issued increased withdrawal permits.  The new permits were issued by the State according to the Short Term Plan and contingent upon participation in the ARC water management system.  Cobb County operated under a temporary arrangement with the State to increase their withdrawal.  An increased water withdrawal permit for Cobb under the Short Term Plan is pending approval by EPD.").

778.    A quarterly report for the Short Term Water Supply Plan for June-December 1986 stated that "[i]n effect, the Corps began operating the dam for water supply and water quality needs only" and "[s]tarting in early August, however, the Corps eliminated releases for navigation and maintained only minimum contracted releases for hydropower."  ACF013664; ACF013669.

779.    During the 1988 drought, the Corps operated and made releases "sufficient to meet water supply and water quality requirements."  ACF016186 (ACF Drought

Management Committee Press Release); *see also* ACF016198 ("results in only minimum

hydropower generation."), *Id*. at ACF016120; ACF016204; ACF016222.

780.    The Corps' 1987-88 Annual Report on Reservoir Regulation Activities

supports that the Corps has been operating Buford in times of drought to maintain water

levels in the Lake and for water supply rather than for the authorized purposes.  ACF016369

("The power house [of Buford] was not operated for system energy production at all during

1988, or the last 2 months of 1987.  This pattern is expected to continue until either the

drought subsides or there are situations downstream which require greater releases.").

781.    On or around November 3, 1989, the Corps prepared draft responses to nine

questions regarding the project purposes of the Corps' projects in the "Georgia-Alabama"

system and the scope of the Corps' discretionary authority within this system.

SUPPAR011774-75; SUPPAR016900.  In response to a question on how the Corps justified

allocating resources to recreation while SEPA continued to pay "80% of the projects' costs,"

the Corps stated:

> [a] key decision in this process was one made by the Corps in November 1987
> to operate in a water conservation mode, making releases only to meet the
> minimum downstream water supply and water quality requirements.  ***If there
> was a preference given to any project purpose in making this decision, it
> was clearly one protecting a viable water supply***.

SUPPAR011779; SUPPAR016883 (emphasis added).

782.    In response to a question on whether the Corps would develop "a plan to

charge recreation interests…in a manner that takes recreation into account," the Corps noted

that, "The manner in which we operate our projects for hydropower has changed

considerably since many of these projects were authorized, … using Lake Sidney Lanier as

an example, it is apparent from a review of the authorizing document and early technical memoranda that the "authorized" plan is remarkably different from that in place today." SUPPAR011780-02; SUPPAR016885-86.

### 2.      Current Drought Operations

783.    As part of its management of the ACF system during the drought of 2007, the Corps instituted ACF Drought Teleconferences beginning in September 2007.  *See* SUPPAR035688.  The purpose of these calls was threefold: to provide stakeholders information on conditions in the ACF system; to give the Corps opportunity to get stakeholder feedback and technical advice to insure that the Corps has accurate information on system conditions; and to provide an opportunity for ACF stakeholders to make adjustments to their systems in response to system conditions.  SUPPAR035688.  As is shown below, the Corps' statements on these calls show its continued favoritism of Atlanta's water supply over Lanier's authorized purposes of navigation and hydropower.

784.    Between September 20, 2007 and November 20, 2008, the Corps conducted thirty-two Drought Teleconferences.  The dates of these teleconferences along with the elevation of Lake Lanier stated by the Corps during each teleconference are shown in the following chart:

| Date of Teleconference | Lanier Elevation (in feet) | Action Zone | Administrative Record |
|---|---|---|---|
| September 20, 2007 | 1060.1 | 4 | SUPPAR035774 |
| October 4, 2007 | 1058.7 | 4 | SUPPAR035795 |
| October 18, 2007 | 1056.9 | 4 | SUPPAR035757 |
| November 8, 2007 | 1054.8 | 4 | SUPPAR035742 |

| Date of Teleconference | Lanier Elevation (in feet) | Action Zone | Administrative Record |
|---|---|---|---|
| November 15, 2007 | 1053.52 | 4 | SUPPAR035752 |
| November 29, 2007 | 1051.97 | 4 | SUPPAR035790 |
| December 13, 2007 | 1051.2 | 4 | SUPPAR035746 |
| January 3, 2008 | 1051.3 | 4 | SUPPAR035738 |
| January 17, 2008 | 1051.2 | 4 | SUPPAR035754 |
| January 31, 2008 | 1051.4 | 4 | SUPPAR035733 |
| February 14, 2008 | 1052.4 | 4 | SUPPAR035750 |
| February 28, 2008 | 1053.4 | 4 | SUPPAR035788 |
| March 13, 2008 | 1054.70 | 4 | SUPPAR035748 |
| March 27, 2008 | 1056.3 | 4 | SUPPAR035786 |
| April 10, 2008 | 1057.2 | 4 | SUPPAR035744 |
| April 24, 2008 | 1057.5 | 4 | SUPPAR035784 |
| May 8, 2008 | 1057.5 | 4 | SUPPAR035816 |
| May 22, 2008 | 1057.7 | 4 | SUPPAR035637 |
| June 5, 2008 | 1057.6 | 4 | SUPPAR035812 |
| June 19, 2008 | 1057.0 | 4 | SUPPAR035826 |
| July 3, 2008 | 1056.2 | 4 | SUPPAR035676 |
| July 17, 2008 | 1055.9 | 4 | SUPPAR035630 |
| July 31, 2008 | 1055.2 | 4 | SUPPAR035836 |
| August 14, 2008 | 1054.2 | 4 | SUPPAR035626 |
| August 28, 2008 | 1055.6 | 4 | SUPPAR035649 |
| September 11, 2008 | 1055.3 | 4 | SUPPAR035820 |
| September 25, 2008 | 1054.5 | 4 | SUPPAR035643 |
| October 9, 2008 | 1053.6 | 4 | SUPPAR035664 |

| Date of Teleconference | Lanier Elevation (in feet) | Action Zone | Administrative Record |
|---|---|---|---|
| October 23, 2008 | 1053.12 | 4 | SUPPAR035643 |
| November 6, 2008 | 1052.2 | 4 | SUPPAR035814 |
| November 15, 2008 | Not in Record | Not in Record | |
| November 20, 2008 | 1051.5 | 4 | SUPPAR035635 |

785.    The lowest level to which Lake Lanier dropped was 1050.79 on December 26, 2007.  SUPPAR026458.  Therefore, even at its lowest level during the 2007 drought, there was still 16.2 feet—nearly half of the Congressionally authorized 35 feet—of conservation storage in Lanier.

786.    Despite this plentiful amount of usable water, the Corps classified Lanier as being in action zone 4.  *See* Chart of Teleconference Dates and Elevations above.  According to Corps' regulations, action zone 4 "indicates that navigation is not supported.  Hydropower generation is supported at a reduced level.  Water supply and water quality releases are met.  Minimum flow targets are met."  SUPPAR035783.

787.    The Corps confirmed on every Drought Teleconference, with the possible exception of the November 15, 2008 teleconference (a full script from that call does not appear to be in the record), that the only releases being made from Lanier were either to support Atlanta water supply and water quality or to meet minimum flow requirements.  *See* SUPPAR035689; SUPPAR035796; SUPPAR035797; SUPPAR035758; SUPPAR035743; SUPPAR035752; SUPPAR035791; SUPPAR035747; SUPPAR035739; SUPPAR035755; SUPPAR035733; SUPPAR035750; SUPPAR035788; SUPPAR035748; SUPPAR035786;

SUPPAR035744; SUPPAR035784; SUPPAR035637; SUPPAR035656-57; SUPPAR035826;

SUPPAR035676; SUPPAR035630; SUPPAR035836; SUPPAR035626; SUPPAR035649;

SUPPAR035820; SUPPAR035645; SUPPAR035665; SUPPAR035643; SUPPAR035814;

SUPPAR035635.

788.    During certain of these Drought Teleconferences, the Corps and other

participants in the teleconferences made certain other important statements describing its

operations of the ACF system during this drought as chronicled in the following paragraphs.

789.    On the September 20, 2007 Teleconference, the Corps explained that the

amount of ARC's water withdrawals downstream of Buford Dam are part of the minimum

flow calculation, thereby affecting how much water must be released in order to meet the

minimum flow requirement.  SUPPAR035774.  The Corps also confirmed during this

teleconference that the "1989 Manual and the IOP" guided its management of the ACF

system during this teleconference.  SUPPAR035689.

790.    The U.S. Coast Guard in Eufaula, Alabama noted that the Corps was not

supporting navigation on October 4, 2007.  SUPPAR035692.

791.    The Corps reported an improvement in basin conditions due to rainfall on

November 29, 2007.  SUPPAR035791.  The rain added additional storage to Walter F.

George and West Point.  *Id*.  This meant that, while Buford releases were previously being

used to support minimum flows throughout the ACF system, the Corps was now able to

reduce Buford releases "to only meet the metro Atlanta water supply and water quality

needs."  *Id*; *see* SUPPAR035797 for Buford releases being used to meet minimum flows

throughout ACF system.  Buford's elevation at the time was 1051.97, meaning that nearly 17

feet of storage remained in the conservation storage pool when this reduction in releases occurred.  SUPPAR035790.

792.   On July 17, 2008, a Southeastern Federal Power Customers ("SeFPC") representative observed that there had "been no specific releases from Lanier for some time specifically for hydropower."  SUPPAR035631.  On the same Drought Teleconference that this complaint about a prolonged absence of hydropower releases was made, Lanier's elevation was stated as 1055.9, meaning over 20 ft (1055 minus 1035) of the Congressionally authorized 35 ft of conservation pool storage was available for such releases. SUPPAR035630.

793.   Over the next few months, the Corps made further reductions to hydropower generation.  On August 28, 2008, the Corps noted that it had "been able to cut main unit generation from Buford for the last four days due to inflows downstream, keeping over a billion more gallons of water in Lake Lanier."  SUPPAR035649.  On October 9, 2008, the Corps stated, "Due to recent rain, we've been able to cut some hydropower generation." SUPPAR035665.

794.   As the above discussion of the ACF Drought Teleconferences shows, the Corps never failed to make water available for Atlanta's water supply or water quality needs. At the same time it was meeting Atlanta's requirements and giving these assurances, it had ceased making releases to support navigation and only generated hydropower in connection with water supply or water quality releases despite the fact that Lanier's conservation storage pool had over 15 feet of storage remaining at even its lowest elevation during the teleconferences.

E.      **Changes from Baseline Operations**

1.      **Minimum Releases in the Chattahoochee**

795.    In 1975, the Corps and Georgia Power Company discussed the guarantee that sufficient water would be released from Buford.  An amount of 1750 cfs was proposed as the Corps figures show that average weekly releases from Buford since 1960 that only a few weeks during June, July and August were less than 1600.  ACF004658-59.

796.    In 1975, SEPA objected to the draft Memorandum of Cooperation pertaining to minimum flows in the Chattahoochee River from the Buford Project to Atlanta for the anticipated water supply needs for 1980 as it "attempted to prescribe procedures for providing water in the Chattahoochee and it would "in effect allow the Georgia Environmental Protection Division to tell the Government how to operate Buford." ACF004664-65.

797.    Pursuant to the agreement forming it, the Chattahoochee River Management System is "an administrative arrangement for gathering data and making water control decisions to insure [sic] that the allocated withdrawals from the Chattahoochee River can be made when required and that sufficient remaining flow is available to fulfill the requirement for River flow downstream from the junction of Peachtree Creek for water quality purposes." SUPPAR000402.

798.    The parties to this "administrative arrangement" include ARC, the Corps, Georgia Power Company, and Georgia Environmental Protection Division ("EPD"). SUPPAR000402-03.

799.     Pursuant to their responsibilities under the agreement with ARC forming the
Chattahoochee River Management System, the Mobile District of the Corps "will be
responsible for gathering real-time, hydrologic data in the Chattahoochee River basin and
developing and improving methodologies for assessing the quantity of water available for
withdrawal and for meeting water quality requirements below Atlanta.  *The Corps of
Engineers will make releases for water supply when such releases are required*."
SUPPAR000402 (emphasis added).

800.     The 1993 annual report on the Chattahoochee River Management System
references the agreement between ARC and the Corps as part of ARC's June 1986 contract:

> The River Management System was initially implemented in June 1986
> through contracts negotiated between ARC, the Corps of Engineers, the
> Georgia Power Company, the Gwinnett County Water and Sewerage
> Authority, Fulton County, DeKalb County, the Cobb County-Marietta Water
> Authority and the City of Atlanta. The Corps continues to participate in the
> system and current agreements are in place among ARC, Georgia Power
> Company, the City of Atlanta and Cobb, DeKalb, Fulton, and Gwinnett
> counties. The contracts include provisions for water management procedures,
> administrative fees, and charges for raw water.

ACF037382; *see also* 1991 report at ACF019642.

801.     "The water management procedures match water demands with water supplies
in the Chattahoochee River to provide for additional withdrawals for water supply while
minimizing special water supply releases from Lake Lanier and Morgan Falls Dam. It is an
arrangement that enables withdrawals to be made from the Chattahoochee River through near
real time coordination of supply and demand."  ACF037382; *see also* ACF019642 (1991
report).

802.   The 1993 annual report for the River Management System describes the

process of coordinating with the Corps to result in releases from Buford Dam as the

following:

> ARC then calculates the minimum weekend and weekday releases required from Buford Dam and Morgan Falls Dam for water supply and water quality. The peak weekend and weekday water supply forecasts are added to the water quality flow requirement, and the local inflows are subtracted off. Adjustments are made to account for some flow reregulation at Morgan Falls. ARC reports this information each Thursday to the Corps of Engineers. The Corps of Engineers uses the information as one of many factors in scheduling releases from Buford Dam.

ACF037383; *see also* ACF019643 (1991 report).

803.   The Corps' 1999 Letter to Campbell acknowledged that:

> The following Georgia entities currently are supplied M&I water from Lake Lanier: Gwinnett County, City of Buford, City of Cumming, City of Gainesville, and [ARC].  The [ARC] acts as an agent for several entities that withdraws water downstream from Lake Lanier.  Under certain circumstances, special releases are made for them from the lake for M&I water supply purposes.

ACF034619.

804.   The Corps' 1999 Letter to Campbell further acknowledged that the

> "[Corps] has been making special releases from Buford Dam to serve M&I withdrawals since at least the late 1970s. . . .These releases were made under several agreements.   The latest of these is the Chattahoochee River Management System, which was incorporated as Exhibit B of the water withdrawal contract dated 1986 with the [ARC] to serve stream withdrawals in the Atlanta area.  The Chattahoochee River Management System allows the Corps to monitor Morgan Falls and downstream conditions and minimize special releases for water supply and water quality.  Generally, the water supply and water quality needs set a minimum hydropower generation. Depending on the hydrology, one to three unit-hours of generation from the large hydropower units are required for water supply and water quality.

ACF034621.

805.    A table detailing special releases from Buford Dam for 1999, thus far, was enclosed as Enclosure 2 to the Corps' Oct. 1, 1999 Letter to Campbell, at record cite ACF034646-51.  As admitted by the Corps in that letter, records of special releases, which date back to the 1970s, "have not been compiled as have the 1999 records."  ACF034621.

### 2.    Special Releases for Water Supply

806.    "Weekends are a particular problem at Morgan Falls because the inflow may be as low as 600 cfs for 62 to 72 hours, since Buford normally generates at a minimum on weekends.  It is often necessary to schedule weekend non peak generation at Buford to insure that the Morgan Falls reservoir has sufficient water volume to meet the minimum release of 1052 cfs."  ACF010374.

807.    "If it were possible to satisfy the River Users' water supply needs through releases for normal project operations, the River Users would have no obligation to contract with the Corps.  Contracts are required because the River Users do rely on the Corps to make special releases from Buford Dam to satisfy some of their needs."  Joint Brief of Appellees, *SeFPC v. Caldera*, Nos. 04-5143 & 04-5148 (Nov. 24, 2004) at 15-16.

### 3.    Hydropower Effects

808.    Buford Dam was originally intended to operate as a peak power producing hydroelectric facility.  ACF001796.  Appendix B of the Reservoir Regulation Manual indicated that the Buford reservoir had a dependable power capacity of 73,000 kw, and an average annual energy production of 170,000,000 kwh.  ACF001786.

809.    A summary paper by Joe Goode, Civil Engineer, Planning Division, on "Storage Reallocation in Hydropower Projects of North Georgia" acknowledged that as a

result of Atlanta's growth placing a strain on Corps' storage projects, "optimum operations for peaking power production have, to a limited extent, yielded to water supply." SUPPAR014621.

810.    In connection with the Georgia water supply request from May 2000, internal Corps' correspondence indicates a preliminary conclusion that the amounts requested by Georgia to be reallocated to water supply would likely produce "serious impacts" on hydropower and navigation.  An email from Robert Watson, Corps engineer responsible for reservoir water management for SAD, forward by Steve Lingenfelter to Earl Stockdale on May 31, 2000, provides:

> Your bigger question is the effect of this on SEPA and/or navigation. Buford is a rather small part of the entity that SEPA markets as the GA-AL-SC system. There are 10 projects in this and Buford is one of the smaller ones, The 3 on the Savannah River plus Carters are probably 70 percent of the value to hydropower, IN MY OPINION.   Having said that, would such a reallocation of storage have a 'serious impact' on hydropower.  It would certainly affect the way (number of hours per year) that Buford's hydropower units were operated each year, and by my definition that would be serious. (emphasis added by Steve)

> Concerning navigation, it depends on where the water is returned (which basin) and what percentage.  Typically, about 70% of the water is returned and in the Greater Atlanta area it is quite often returned to a different basin ... particularly the water that is removed from the lake by Gwinett [sic] County. So, yes there would be a 'serious impact' on navigation. (emphasis added by Steve).

SUPPAR009724.

#### 4.    Other Operational Changes

811.    The Corps recognized in its 1987-88 Annual Report on Reservoir Regulation Activities that operation for water supply could have grievous consequences.  ACF016362 ("A permanent and categorical operation of Lake Lanier for water supply and instream flow

at Atlanta could place great jeopardy on downstream water quality and the integrity of functions at downstream projects.  Moreover, the lakeshore and recreational viewpoints seem to be influencing political leadership more than the viewpoints of other interests which have a stake in water management.")

812.    The Corps, at times, completely shuts off the flow from Buford Dam. ACF004085.  The periods of zero discharge from Buford are limited to no more than 6 hours because of the requirement to maintain a 650 cfs minimum flow at Atlanta.  *Id.*; *see also* ACF004088.

### 5.    Change in Elevation at Lake Lanier

813.    In 1976, the Corps raised the maximum operational level of Lake Lanier from 1070 to 1071 to benefit navigation on the Apalachicola River.  Specifically, in a public notice published on May 24, 1976, the Corps established the new maximum operational level of Lake Lanier at 1071 for May through October.  ACF005458.  The Corps' public notice indicated that "[t]he water stored above elevation 1070 at the end of each flood season will be withdrawn from the lake in October and November for the benefit of navigation on the Apalachicola River."  *Id.*

814.    Thereafter, on September 24, 1976, the Corps published an "Environmental Assessment: Proposed Modification of Reservoir Regulation Procedures By Raising of the Lake Lanier Water Elevation for the Benefit of Downstream Navigation, a Federally Authorized Project, Gwinnett, Hall, Dawson, and Forsyth Counties, Georgia (the "Elevation Change EA")"  ACF044025-29.  The Elevation Change Environmental Assessment described the proposed action as a "modification of reservoir regulation procedures by

raising the maximum operational level of Lake Lanier from elevation 1070 feet msl to 1071

feet msl for the months of May through September."  ACF044025.  The Corps explained that

the water stored above 1070 will be withdrawn at the end of each flood season in October

"for the benefit of navigation on the Apalachicola River."  *Id*.  In the event that Lake Lanier's

level were to exceed 1071 due to excessive rainfall from May through October, the Corps

indicated that it would lower the lake level to 1071 "in a manner consistent with the flood

control regulation of the lake."  *Id*.

815.    The Elevation Change EA further explained that raising the maximum

operational pool level would not insure that 1071 would be held on a daily basis, but rather

1071 would "be a guide whereby the lake's level will fluctuate both above and below this

new guide, depending on rainfall, as it now fluctuates around elevation 1070."  *Id*.

816.    The Elevation Change EA also indicated that despite the need for the

proposed action to benefit navigation during low-flow periods, the Corps was examining

alternatives to maintaining year-round navigability.  The Corps stated that "[i]f an agreeable

alternative method is found for maintaining year-round navigability of the Apalachicola

River, the proposed action could be terminated or the water stored between elevations 1070

and 1071 could be used for other needs, such as additional water supply or enhanced

recreation."  *Id*.

817.    This increase from 1070 to 1071 during the May through October period

appears to remain the Corps' practice, as these elevations are reflected in the 1989 draft water

control plan (Figure 2, Lanier Water Control Action Zones) (ACF017568), and the 1991

draft Reservoir Regulation Manual.18 ACF018464; ACF018456.  The 1991 draft Reservoir

Regulation Manual, Appendix B, notes that the top of the conservation pool varies during the

year from 1070 to 1071, and explains that "[w]henever surplus water is available the criteria

is to hold the pool at elevation 1071 from 1 May through 1 October, then decrease to 1070

feet by 1 December, then hold 1070 feet until 15 April, and then increase to 1071 feet by 1

May." ACF018464.  The Corps also described how until 1976 it maintained the top of the

conservation pool at 1070, but in "February 1976 the extra storage was approved by the

Division Engineer and is intended to supplement the lower Apalachicola River navigation

during the drier part of the year." *Id.*

818.     Appendix B of the Manual generally explains the seasonal variation of

conservation storage due to the fluctuations from 1070 to 1071.  Specifically, the Manual

states:

> Conservation storage varies seasonally from 1,049,000 acre-feet to 1,087,600
> acre-feet between a minimum elevation of 1035 feet and a top of conservation
> pool elevation varying from 1070 to 1071 feet.  However, another purpose of
> the project is flood control and a storage of 637,000 acre-feet between
> elevation 1070 and elevation 1085 feet has been reserved for the detention of
> storage of flood water.

ACF018475.

### 6.     Navigation Effects

819.     The federal interest in navigation on the ACF waterway dates to at least 1828

when Congress appropriated $13,000 for the removal of obstructions in the Apalachicola and

lower Chipola Rivers.  ACF001674.

---

18     This Manual changed the total conservation pool from 1,049,000 acre-feet to 1,087,600 acre-feet.

820.     In 1874, Congress authorized three separate navigation improvement projects on the Apalachicola, Chattahoochee and Flint Rivers.  ACF000123.

821.     As detailed below in Section VII.A, the first comprehensive plan for improving the ACF system was passed as part of the River and Harbor Act of 1945 and was set forth in House Document 342.  Navigation was one of the authorized purposes under this plan.

822.     Congress modified the comprehensive plan for the ACF in the River and Harbor Act of 1946, as set forth in House Document 300.  *See* Section VII.B below.  This modified plan also included navigation as an authorized purpose.  *See id*.

823.     The Congressionally authorized plan for the ACF includes a Corps-maintained navigation channel.  ACF0014683. This channel is 9-feet deep by 100-feet wide and runs from the Gulf Intracoastal Waterway near Apalachicola, Florida, up the Apalachicola River to Lake Seminole.  *Id.*  From this point, the channel continues up the Flint River to Bainbridge, Georgia, and up the Chattahoochee River to Phenix City, Alabama, and Columbus, Georgia.  *Id.*

824.     The Corps' goal in managing this navigation channel is to maintain a 9-foot channel for 95 % of the year, with the remaining 5 % of the year to be used for routine maintenance and emergency situations.  ACF010305.  Navigation is essentially precluded when less than a 7-foot channel is provided.  ACF000738.

825.     The percent of time different depths were available in the ACF navigation channel during the three drought periods of 1981, 1986-1988, and 1999-2001 are as follows:

| Year | 9-Foot | 8.5-Foot | 8-Foot | 7.5-Foot | 7.0-Foot | Record |
|------|--------|----------|--------|----------|----------|--------|
| 1981 | 12.1 | 12.1 | 21.6 | 24.9 | 39.5 | ACF028829 |
| 1986 | 37.3 | 38.1 | 42.7 | 43.0 | 43.0 | ACF028829 |
| 1987 | 62.2 | 74.2 | 80.5 | 86.3 | 94.2 | ACF028829 |
| 1988 | 38.0 | 38.0 | 47.8 | 57.7 | 74.6 | ACF028829 |
| 1999 | 5 |  | 22 |  | 23 | ACF039848 |
| 2000 | 6 |  | 12 |  | 17 | ACF039848 |
| 2001 | 17.5 |  | 20.8 |  | 26.8 | ACF000738 |

826.     The Corps must provide sufficient flows for the navigation channel. ACF028826.  Furthermore, flow is the primary factor influencing the degree to which authorized project depths are available in the Apalachicola River.  ACF013093.

827.     As detailed above, in 1976, the Corps raised the top of Lake Lanier's conservation pool from 1070 ft. to 1071 ft. from May to September.  ACF005481.

828.     Despite raising Lanier's storage pool in 1976 to supposedly support navigation, the Corps consistently sacrificed navigation to benefit water supply during the droughts that occurred in the 1980s as detailed below.

829.     During the 1981 drought, navigation and hydropower were not fully provided.  ACF008213.  Navigation was essentially closed for 13 weeks due to low flows.  *Id.*

830.     During 1986, navigation similarly suffered while water supply and water quality requirements were fully met.  The initial drought bulletin in 1986 was issued on May 20, 1986.  ACF016332.  On June 17, 1986, less than one month after issuing this drought bulletin, the Corps entered into a contract with ARC "for the privilege of having water

released" from Lake Lanier for municipal and industrial uses.  ACF011980-01.  Normal

operations of Lake Lanier would provide for withdrawals of 327 mgd from the

Chattahoochee below Buford Dam and therefore ARC would only be charged for

withdrawals in excess of this amount.  ACF011981.  During the very first week of operations

under this contract, June 21-27, 1986, ARC withdrawals exceeded 327 mgd by 56 mg.

ACF013671.  Between July 5 and August 1, 1986, ARC exceeded 327 mgd by a combined

224 mg.  *Id.*  As detailed above, ARC's withdrawals from the Chattahoochee consistently

exceed the minimum 327 mgd during the drier months of the year.

831.    Despite committing itself to making special releases to support the new ARC

contract, the Corps continued to limit releases for other purposes during the 1986-1988

drought.  The minutes of the September 17, 1986 ACF Basin Drought Committee meeting

provide that "every effort would be made to reduce the flows [from the ACF projects]

whenever possible, while continuing to meet water quality and water supply requirements."

ACF016328.  On October 22, 1986, almost a month to the day that this meeting occurred, the

Corps issued a Drought Alert stating that navigation "was essentially halted."  ACF016325.

832.    At an October 26, 1987 meeting of the ACF Basin Drought Management

Committee, the Corps proposed "to cease supporting navigation on the Apalachicola River

after November 11, 1987 as well as ceasing to meet the hydropower contract amounts."

ACF016298.  A representative of the Georgia Ports Authority called this proposal

"premature" and stated "that the economic impacts to the barge industry would be severe."

ACF016299.  He was "very concerned that navigation interests were being ignored in favor

of recreation."  *Id.*  An Alabama Department of Economics and Community Affairs

representative made this same point.  *Id.*  A Southeastern Power Administration representative thought the Corps "was making a bad decision" and stated that "there was some question of the legality of the Corps foregoing congressionally authorized purposes to meet other purposes."  *Id.*

833.    A Draft News Release dated December 4, 1987 records that power production and navigation "were reduced in order to conserve water" in the ACF projects.  ACF016289.  No related reductions in water supply or water quality releases were mentioned or proposed in this release.  *See* ACF016289-90.

834.    On March 29, 1988, the District Engineer sent a letter to Alabama Governor Guy Hunt concerning the management of the ACF system.  SUPPAR017336.  That letter stated that the Corps was "continuing to make only minimum releases from Lanier" based on downstream water supply and water quality requirements.  *Id*.  The District Engineer contended his management decisions were "in the best interest of the overall public" and explained that the reason for making only minimum releases was "to save the water for the summer months when state water quality standards … will become harder to meet."  *Id*.  He did not mention navigation or explain why he decided that navigation releases should be sacrificed first in his letter.  *See id*.

835.    In an April 12, 1988 press release concerning the issuance of a Drought Alert, Lake Lanier's elevation was recorded as 1062.8.  ACF016256.  This is less than 10 feet below full pool of 1070 and nearly 30 feet above the bottom of the conservation storage pool.  *See* ACF001796 (conservation storage pool is 1035-1070).  Despite the availability of this

abundant amount of usable water, the Corps planned "to continue minimum releases" from Lanier. ACF016256.

836.     An April 1988 Fact Sheet issued by the Corps states that only minimum releases for water supply and water quality were being made from Lanier. ACF016254. Furthermore, the Corps was "foregoing some hydropower production and [would] stringently reduce downstream navigation depths to conserve water for water supply and water quality for the long summer ahead." *Id.*

837.     In a May 12, 1988 press release announcing that an earlier issued Drought Alert remained in effect, Lanier's elevation was stated to be 1063.6 ft. with only minimum releases being made for water supply and water quality. ACF016222. The press release also noted that navigation was near normal because of rainfall in the lower basin but that the Corps planned to reduce navigable depths on May 18 and further reductions would follow in May and June unless more rain fell. ACF016223. No mention was made of making releases to support navigation if the rain did not fall, despite the fact that Lanier was only six feet below full pool at the time of the press release. *See id.*

838.     On the same day this press release was issued, the ACF Basin Drought Management Committee held a meeting. *See* ACF016217. At that meeting, a Corps' representative was asked about the priority of project purposes. ACF016219. The Corps' representative responded "that each project purpose is considered to be equal but when it comes down to the final analysis in a critical situation, human welfare is paramount and this means municipal and industrial water supply would be protected as a last resort. Water quality would also be considered as very important to protect." *Id.*

839.    A press release on June 9, 1988 announced the expansion of the Drought Alert for the ACF Basin.  *See* ACF016197.  At the time of the press release, Lanier's elevation was 1062.6 ft.  *Id.*  At this point, Lanier was less than 10 feet below full pool of 1070 and had nearly 30 feet of conservation storage remaining.  *See* ACF001796 (conservation storage pool is 1035-1070).  In spite of this large amount of water that Congress authorized to be released to support Lanier's authorized purposes, the Corps stated that it planned to continue making minimum releases from Lanier for only water supply and water quality requirements.  ACF016198.

840.    At a June 8-9, 1988 ACF Drought Management Committee Meeting, an Alabama representative noted that two Alabama industries had decided to use alternative means of transportation to ship their goods instead of using the ACF system.  ACF016195. On August 31, 1988, a press release was issued noting that the ACF Drought Alert continued in effect.  ACF016182.  Lanier's elevation was stated to be 1058.5 ft. and the Corps planned to continue releasing water from Lanier for water supply and water quality requirements. ACF016183.  The press release also noted that the Corps planned a two-week navigation window starting on September 7 on the ACF "which has been virtually closed to commercial navigation since the end of June."  ACF016184.

841.    On January 5, 1989, the Corps issued a press release announcing that Lanier outflows in 1988 were the lowest ever recorded.  ACF016818.  The explanation for these record low outflows "was attributed partially to drought reduced inflows into the lakes and to "fine tuning" of releases to more closely meet the critical downstream requirements for water supply and water quality...."  *Id.*  The Corps acknowledged that these reduced flows

259

"markedly cut into generation of hydroelectric power … and impacted downstream barge navigation…." *Id.*

842.    The Corps provided a description of its drought management strategy, including its strategy of sacrificing navigation releases in favor of water supply and water quality, in the September 1987 Plan of Study for the ACF Comprehensive Study. ACF014794.  The Corps stated that during "extreme low flow periods," it is possible to "curtail" navigation releases.  *Id.*  However, during "less extreme low flow situations, navigation releases are often reduced in the interest of providing other upstream purposes such as water supply, recreation, and the timing of hydropower generation."  *Id.*  The Corps summarized that "in many years it is not possible to provide optimum navigation releases because of considerations placed on the other project purposes."  *Id.*

843.    The effects of the 1986-1988 drought and the Corps management of the ACF system during that drought have been long lasting.  In 1985, 1,332 kilotons were shipped on the ACF system, which was the highest amount ever shipped in a single year.  ACF016285. Since 1985, the amount of tons shipped on the ACF system has steadily declined, falling to a low of zero tons being shipped in 2002, as can be seen in the following chart:

| Year | Quantity Shipped (1000's of tons) | Administrative Record |
|------|-----------------------------------|-----------------------|
| 1964 | 381.5 | ACF007278 |
| 1965 | 415.5 | ACF007278 |
| 1966 | 387.3 | ACF007278 |
| 1967 | 452.1 | ACF007278 |
| 1968 | 489.3 | ACF007278 |

| Year | Quantity Shipped (1000's of tons) | Administrative Record |
|---|---|---|
| 1969 | 677.3 | ACF007278 |
| 1970 | 913.9 | ACF007278 |
| 1971 | 898.1 | ACF007278 |
| 1972 | 1025.3 | ACF007278 |
| 1973 | 1024.9 | ACF007278 |
| 1974 | 951.0 | ACF007278 |
| 1975 | 811.9 | ACF007278 |
| 1976 | 1030.3 | ACF007278 |
| 1977 | 1070.0 | ACF007278 |
| 1978 | 874.0 | ACF007278 |
| 1979-1984* | | |
| 1985 | 1332 | ACF016285 |
| 1986 | 968 | ACF014291 |
| 1987 | 853 | ACF015559 |
| 1988 | 821 | ACF019665 |
| 1989 | 652 | ACF019665 |
| 1990 | 636 | ACF031343 |
| 1991 | 632 | ACF031343 |
| 1992 | 620 | ACF031343 |
| 1993 | 558 | ACF031343 |
| 1994 | 636 | ACF031343 |
| 1995 | 588 | ACF031343 |
| 1996 | 567 | ACF031343 |
| 1997 | 598 | ACF000742 |

| Year | Quantity Shipped (1000's of tons) | Administrative Record |
|---|---|---|
| 1998 | 445 | ACF000742 |
| 1999 | 338 | ACF000742 |
| 2000 | 272 | ACF000742 |
| 2001 | 219 | ACF000742 |
| 2002 | 0 | ACF036656 |
| 2003 | 15 | ACF039326 |
| 2004 | 3.1 | ACF039850 |

* Information for these years does not appear to be included in the record.

844.    As this table shows, navigation has steadily declined since 1985.  In contrast, as shown above, water supply withdrawals in Lanier and below Buford Dam have markedly increased during this same time period.

845.    The Corps summarized the effects of the 1986-1988 drought in a 1995 study: "Shipment on the ACF continued to decline after the drought subsided as the channel was considered not sufficiently reliable to warrant switching back to barge delivery.  The river system has not been able to recover fully to its previous tonnage partially due to insufficient water and navigable depth."  ACF023806.

846.    In 1989, the Corps propounded a Draft Water Control Plan for the ACF basin. *See* ACF041193.  Although this Plan was never finalized, it currently guides the Corps' operation of the ACF system.  SUPPAR035689.

847.    As discussed above, the 1989 Draft Water Control Plan created action zones to guide the operations of ACF reservoirs.  These action zones limit the amount of water that

will be released to support navigation. *See* ACF041209. The conservation storage pool at

Lanier is from 1035 ft. to 1070 ft., with the exception of May-September when the top of

Lanier's storage pool is increased to 1071 ft. *See* ACF005481.

848.    These action zones led the Southeastern Power Administration to complain

to the Corps in an August 23, 1989 letter that the 1989 Draft Water Control Plan relegates the

Congressionally authorized purposes of power and navigation to "secondary positions" and

reduces the conservation storage pool from 35 feet to 15 feet of storage. SUPPAR010371.

849.    In an attempt to facilitate navigation, the Corps implemented "navigation

windows" in the 1990's. The navigation window concept originated during the 1986-1988

drought. ACF023806. Navigation windows are special releases to support navigation when

flows are inadequate to maintain full navigation. ACF032341. They are a tool used by the

Corps to assist dependability of the waterway for a definite and specified period of time. *Id.*

850.    The 1989 Draft Water Control Plan characterized these as an "extreme

management option." ACF041211. Nevertheless, during the 1990s, they were regularly

used to assist navigation in the Apalachicola River during low water periods. ACF001330.

The Corps suspended the use of regular navigation windows in December 2000. *Id.*

851.    As detailed above in Section V.C, several navigation windows occurred

between 1990 and 2000, when the Corps was regularly using them.

852.    There were no navigation windows in 2001-2004. ACF000741; ACF036654;

ACF039223; ACF039759. The absence of navigation windows or other Corps support of

navigation dramatically affected navigation during these years. *See* Chart of Tons Shipped

above. As shown on that chart, during each of these four years, less goods were shipped on

the ACF than in any other year dating back to at least 1964. The situation was so dire in 2002 that *no* tons were shipped on the ACF. ACF000742.

853.     Because of the uncertainty surrounding navigation on the ACF and the limited availability of a navigable channel, navigational facilities have closed and some businesses have chosen not to locate on the ACF. Alabama owns three sets of docks on the ACF: Phenix City Docks, Columbia Docks, and Eufaula Docks. ACF021753. Since 2001 there have been no shipments of materials by barge through the Columbia and Eufaula facilities and only a single light-load barge shipment at Phenix City. *See* ¶1219 below.

854.     In fall 2001, Steward Machine Co. Inc. requested a navigation window in November 2001 from the Corps to facilitate movements of bridge component parts to their assembly plant in Bainbridge, Georgia. ACF000739. Steward stated that additional releases would be required in May and July 2002 to ship assembled parts. *Id.* However, the Corps could not guarantee that adequate flows and reservoir storage would be available within the ACF basin to support these barge movements. *Id.* As a result, Steward withdrew its request for a navigation window and relocated the assembly plants to an alternate location. ACF000740.

855.     On October 26, 2005, the Corps put forward a proposal to release water from upstream ACF reservoirs for a barge shipment of two reactor pressure vessel heads to Farley Nuclear Power Plant ("Farley"). ACF040063. The shipment was originally scheduled to occur in mid-November 2005 when water releases occur in connection with the seasonal drawdown of ACF reservoirs for flood control. ACF040058. The Corps envisioned these flows being used to support the Farley shipment so no special releases would be required for

navigation.  *Id*.  Subsequent to the proposal, Southern Nuclear Operating Company ("SNOC"), the company that owns and manages Farley, notified the Corps that the barge shipment would be delayed until mid-December.  *Id*.  The Corps allowed the shipment to go forward because the flows from the seasonal drawdown period last through mid-December and would still support the shipment then.  *Id*.  However, consistent with its past refusal to support navigation through reservoir releases, the Corps noted that "any further delays in the SNOC shipment schedule, beyond the mid-December completion of seasonal drawdown for flood control purposes, may require deferral until seasonal high water conditions return to the basin."  *Id*.

856.    The Corps continued to favor water supply and water quality over navigation during the most recent drought that occurred in 2007-2008, as evidenced by its statements in ACF Drought Teleconferences.

857.    In an ACF Drought Teleconference on October 4, 2007, the U.S. Coast Guard in Eufaula, Alabama noted that the Corps is not supporting navigation.  ACF035692.

858.    In an ACF Drought Teleconference on October 18, 2007, the Corps stated that it was making releases from Lake Lanier to meet minimum flow requirements on the ACF system.  SUPPAR035727.  These flow requirements include releases for Atlanta water supply and water quality, required flows below West Point dam and Jim Woodruff dam, and minimum flows for downstream power plants.  *Id*.  No releases were being made for navigation.  *Id.*  However, the Corps assured Atlanta that it would not run out of drinking water because there was "[m]uch drinking water left below the bottom of the conservation

pool, 40% of the lake's capacity and it is unlikely that Atlanta will run out of water."
SUPPAR035724.  Lanier's elevation was 1056.9 ft.  SUPPAR035726.

859.    In an ACF Drought Teleconference on November 29, 2007, the Corps stated
that Lanier releases were only being made for Atlanta water supply and water quality
purposes.  SUPPAR035791.  Lanier's elevation at the time was 1051.97 ft.  SUPPAR035790.

860.    The Corps again stated on an ACF Drought Teleconference on December 13,
2007, that Lanier releases were only being made for Atlanta water supply and water quality
purposes.  SUPPAR035746.  Lanier's elevation at the time was 1051.2 ft.  *Id.*

861.    On an ACF Drought Teleconference on January 3, 2008, after noting that
Buford's releases were only for Atlanta water supply and water quality, the Corps stated that
Lanier releases will have to be 1,100-1,500 cfs, no matter what the inflow, for Atlanta water
supply.  SUPPAR035700.  On the same teleconference, the Coast Guard noted that
conditions were not safe at any level at the Alabama State Docks due to sediments.
SUPPAR035701.  Lanier's elevation at the time was 1051.3 ft.  SUPPAR035738.

862.    As discussed above in Section VI.B.5 and the chart of elevations provided
during the ACF Drought Teleconferences, the Corps repeatedly confirmed on the
Teleconferences that the only releases being made from Lanier were for Atlanta water supply
and water quality, despite the fact that the lowest stated Lanier elevation was 1051.2.

863.    As is evident in the administrative record and the data provided above
relating to historical elevations, Lake Lanier's average elevation has not fallen below 1050
since its impoundment.  This means that even at its lowest level, there was still 383,300 acre-
feet of storage remaining in its conservation pool.  ACF018454.  Despite this fact, the Corps'

support of navigation has steadily declined over the years, as shown in the Chart of Tonnages Shipped above.  In stark contrast to this navigational decline, water supply withdrawals have steadily increased over this same time period.

### 7.    The Corps' Video

864.    The Corps has created a video entitled "ACF Table Top Demonstration" ("ACF Video") to illustrate the factors that influence its management of the ACF system. Video link available at http://rsc/usace.army.mil/teeca/media/ACF/ACF_flash.swf. The ACF Video lists Lake Lanier's storage space as 1,087,600 acre-feet.  ACF Video at 0:00:42.00.

865.    The ACF Video states that Lake Lanier "contains about 65 percent of the total basin storage in the ACF System" which equals "about a million acre-feet."  *Id*. at 0:01:15-21.

866.    The ACF Video also illustrates how Atlanta's water supply withdrawals impact the amount of water the Corps releases from Lanier.  It explains that the Corps must release water to meet the minimum flow requirement at Peachtree Creek

> [P]lus the metro Atlanta water supply requirements.  Now there are several withdrawals that take place before the 750 minimum flow requirement is measured so we release the City of Atlanta's water supply plus the minimum flow requirement.  Currently the Corps of Engineers must release a ***significant*** amount of water each week from Buford Dam *just* to meet the Metro Atlanta water needs.  The releases have ranged from 1,000 to 1,500 cubic feet per second.  This is because approximately 70 percent of Metro Atlanta's water is withdrawn downstream of Lake Lanier.  Plus, after all of their gross withdrawals are made, the Corps must ensure that there remains 750 cfs or 485 MGD in the Chattahoochee River to meet state water quality standards.

*Id*. at 0:08:12-9:08 (emphasis added).

867.    The ACF Video also makes it clear that the Corps will not curtail water supply releases, regardless of conditions at Lake Lanier, and that water supply requirements will be met even when releases for all other purposes are sacrificed: "If the inflows to Lake Lanier are less than the required release to meet the Metro Atlanta water needs the lake level will fall.  Since January of 2008, Buford releases have been only to meet the Metro Atlanta water supply and water quality requirements."  *Id.* at 0:10:27-45.

## VII.   THE AUTHORIZED PURPOSES OF THE BUFORD DAM THAT ARE SERIOUSLY AFFECTED BY THE CORPS' *DE FACTO* REALLOCATION TO SUPPORT WATER SUPPLY

### A.    The River and Harbor Act of 1945

868.    Congress first authorized the project that would ultimately become Buford Dam and Lake Lanier as part of the River and Harbor Act of 1945, PL 79-14, 59 Stat. 10. SUPPAR004054.

869.    The Corps of Engineers, as far back as the late 1920's and early 1930's, considered estimates of the costs of making examinations, surveys, or other investigations for power developments on navigable streams in the United States, including, among others, the Apalachicola and its tributaries.  ACF001787.

870.    In the River and Harbor Act of 1945, Congress adopted and authorized a number of "works of improvement of rivers, harbors, and other waterways. . . in the interest of national security and the stabilization of employment" and directed that such works "shall be prosecuted as speedily as may be consistent with budgetary requirements, under the direction of the Secretary of War and supervision of the Chief of Engineers, in accordance

with the plans in the respective reports hereinafter designated and subject to the conditions set forth therein." River and Harbor Act of 1945, PL 79-14.  SUPPAR004055.

871.     Among the authorized projects was the "Apalachicola, Chattahoochee, and Flint Rivers, Georgia and Florida; House Document Numbered 342, Seventy-sixth Congress." *Id.* SUPPAR004056.

872.     The River and Harbor Act of 1945 itself did not identify the specific authorized purposes of each project, but instead authorized each project based on plans and reports submitted by the Corps.  *Id.* SUPPAR004056.  The 1946 Annual Report of the Chief of Engineers characterized the River and Harbor Act of 1945 as approving "the general plan provided in House Document No. 342. . . for the full development of the [ACF] system in the combined interest of navigation and power. . . ." ACF000569.

873.     The introduction to the 1945 Act contained the following statement of general Congressional policy:

> In connection with the exercise of jurisdiction over the rivers of the Nation through the construction of works of improvement, for navigation or flood control, as herein authorized, it is hereby declared to be the policy of the Congress to recognize the interests and rights of the States in determining the development of the watersheds within their borders and likewise their interests and rights in water utilization and control, as herein authorized to preserve and protect to the fullest possible extent established and potential uses, for all purposes, of the waters of the Nation's rivers; to facilitate the consideration of projects on a basis of comprehensive and coordinated development; and to limit the authorization and construction of navigation works to those in which a substantial benefit to navigation will be realized therefrom and which can be operated consistently with appropriate and economic use of the waters of such rivers by other users.

River and Harbor Act of 1945, PL 79-14.  SUPPAR004054.

874.     When Congress authorized the Buford Dam and in the years leading to its construction, the Corps had the authority to provide a permanent right to water supply from Lake Lanier, if local leaders paid a portion of the cost, pursuant to a 1937 provision of the Flood Control Act as follows:

> The Secretary of the Army is authorized to receive from States and political subdivisions thereof, such funds as may be contributed by them to be expended in connection with funds appropriated by the United States for any authorized flood control work whenever such work and expenditure may be considered by the Secretary of War, on recommendation of the Chief of Engineers, as advantageous in the public interest, and the plans for any reservoir project may, in the discretion of the Secretary of War, on recommendation of the Chief of Engineers, *be modified to provide additional storage capacity for domestic water supply* or other conservation storage, *on condition that the cost of such increased storage capacity is contributed by local agencies* and that the local agencies agree to utilize such additional storage capacity in a manner consistent with Federal uses and purposes. . . . Pub. L. No. 75-208, 50 Stat. 515, 518 (1937) (emphases added) (codified as subsequently amended at 33 U.S.C. § 701h).

### 1.     District Engineer's Report (Dec. 6, 1938)

875.     The District Engineer's Report of December 6, 1938 (the "1938 Report") described the general plan for the development of the ACF river system, purposes of the proposed projects, and benefits, and began with an extensive description of the ACF river system, its surrounding geographic area, and the proposed plan for improvements on the system.  ACF000151.

876.     The 1938 Report described the overall plan as being for "the coordinated improvement of navigation and the development of power facilities on the Apalachicola, Chattahoochee, and Flint Rivers."  ACF000151.

877.     In particular, the 1938 Report discussed the following proposed locks and dams on the Apalachicola and Chattahoochee Rivers: Junction (now known as Jim Woodruff

Lock and Dam); Paramore Landing; Columbia (now known as George Andrews Lock and Dam); Fort Gaines (now known as Walter F. George Lock and Dam); Florence; Fort Benning; and Roswell.  ACF000152-53; ACF000162.

878.    The 1938 Report identified the following twelve proposed and existing hydroelectric power developments on the Chattahoochee above Columbus, Ga.: Roswell; Morgan Falls; Vinings; Cedar Creek; Franklin; Lanier; Riverview; Bartlett's Ferry; Goat Rock; Clapp's Factory; North Highlands; and Columbus.  ACF000154.  The 1938 Report also indicated that the "section of the river [above Gainesville] is naturally adaptable to power development and, it is believed, will be utilized to the greatest public benefit by the plan of improvement that will best develop its power resources."  *Id*.

879.    The 1938 Report conducted a cost-benefit analysis of the proposed development, first examining the expected direct and indirect benefits of the development plan. ACF000160-63.  The Report described "direct benefits" as those "derived from actual or potential use of some part of the river system," and described "indirect benefits" as those "result[ing] from the existence of the improvement without actual use of its facilities." ACF000160.  The two primary indirect benefits described in the Report were "indirect savings in the tributary area due to railroad rate reductions, and the improvement of social and economic conditions in the tributary area. . . ." ACF000162.

880.    The 1938 Report identified the following as the six principal direct benefits:

(a) <u>Savings to the public in transportation charges:</u>  The 1938 Report indicated that annual savings in switching to water transportation of goods based on estimated traffic anticipated in 1945 was as follows:   Apalachicola, Chattahoochee, and Flint Rivers, 9-foot

channel: $1,100,000;  Apalachicola and Chattahoochee Rivers, 9-foot channel: $935,801;

Apalachicola and Flint Rivers, 9-foot channel: $390,364; Apalachicola and Chattahoochee,

9-foot channel; Flint River, 7-foot channel to Bainbridge, 5-foot channel to Albany:

$985,801.  ACF000160.

(b) Value of hydroelectric power developed:  The 1938 Report indicated that

the total annual value of all hydroelectric power developed would be $6,556,600 (based on

the estimated annual power output of the Chattahoochee and Flint River projects listed in

Table 5 at ¶ 218 of the 1938 Report, including Woodbury No.2, Potato Creek, Auchumpkee

Creek, Roswell, Cedar Creek, and Lanier) and $1,254,400 (if storage-power plants were built

only at Roswell on the Chattahoochee River and Woodbury No. 2 on the Flint River and a

power installation were made at Fort Benning Lock and Dam).  ACF000160-161.

(c) Value as a facility for national defense:  The 1938 Report indicated that the

value as a facility for national defense had an estimated average annual benefit of $25,000.

ACF000161.

(d) Increased commercial value of riparian lands:  The 1938 Report indicated

that the increased commercial value of riparian lands had an estimated annual benefit from

increased value of riparian land of $50,000.  The 1938 Report estimated that during the

useful life of the proposed navigation project the average value of riparian property would

increase $1,000,000.  The 1938 Report explained that the increased property values would

likely be greater in communities located by the rivers by affording potential terminal and

industrial sites, and that cheap water transportation of raw materials and manufactured

products would be an advantage to industries with properties that could utilize such waterways.  ACF000161.

(e) <u>Recreational value:</u>  The 1938 Report indicated that there would be an estimated annual recreational value of  $75,000 (for a system with the following six reservoirs: Woodbury No.2, Potato Creek, Auchumpkee Creek, Roswell, Cedar Creek, and Lanier) and $50,000 ( for a system with only two reservoirs. i.e., if storage-power plants were built only at Roswell on the Chattahoochee River and Woodbury No. 2 on the Flint River and a power installation were made at Fort Benning Lock and Dam).  ACF000161-62.  The 1938 Report explained that such recreational benefits from the creation of artificial lakes would derive from the development of private residences, resort hotels, and summer camps, as well as opportunities for hunting waterfowl, fishing, and boating.  *Id.*

(f) <u>Value as a source of industrial and municipal water supply:</u>  The 1938 Report characterized water supply as being a "potential asset" and explained that no monetary value was assigned to water supply.  The 1938 Report explained that "[t]here is apparently no immediate necessity for increased water supply in this area though the prospect of a future demand is not improbable."  ACF000162.

881.    The 1938 Report assigned estimated monetary values to each of the first five direct benefits listed above, estimating the total annual direct benefits (assuming saving to the public in transportation charges in 1945 on a channel 9 feet deep to Columbus, 7 feet to Bainbridge, and 5 feet to Albany, Ga.) as $7,692,401 (with six reservoirs) and $2,365,201 (with two reservoirs).  ACF000162.

882.    The 1938 report explicitly declined to assign a monetary value for industrial

and municipal water supply, stating:

> There is apparently no immediate necessity for increased water supply in this
> area though the prospect of a future demand is not improbable. The city of
> Atlanta obtains its supply for domestic and industrial use from the
> Chattahoochee at the present time. With the continued rapid growth of
> population and industry in this area the storage capacity of a large reservoir
> might be of benefit for an assured continuous water supply. ***This potential
> asset is given no monetary value in this report***.

ACF000162 (emphasis added).

883.    The Corps is required to examine the benefits and costs of any new projects or

improvements to existing projects, and there must be a positive benefit/cost ratio.  *See* 33

U.S.C. § 541, 33 U.S.C. § 701.

884.    In analyzing the costs and benefits of the proposed plan, the 1938 Report

concluded that the plan for full development (six reservoirs) had a cost-benefit ratio of 1 to

2.14, and the plan for initial development (two reservoirs) had a cost-benefit ratio of 1 to 1.18.

ACF000164.

885.    The 1938 Report observed that "it is seen that the development of these rivers

under either plan would be justifiable."  ACF000164.  The 1938 Report concluded that "[i]t

is believed that the plan selected and recommended herein for initial improvement with the

opportunity for expansion to include the plan for full development with an increased demand

for additional power, is the plan that will best suit the needs of all sections of this area."

ACF000165.

### 2.      Division Engineer's Report (February 8, 1939)

886.      The Division Engineer's Report of February 8, 1939 ("1939 Report"), generally concurred with the district engineer "that the Apalachicola, Chattahoochee, and Flint Rivers, Fla. and Ga., are worthy of progressive development for navigation, hydroelectric power, and flood control."  ACF000165.

887.      The Division Engineer recommended "modification of the projects on the Apalachicola, Chattahoochee, and Flint Rivers to provide for development of these three rivers in the interest of navigation and power according to the general plan of improvement outlined in the district engineer's report. . . ." ACF000165-66.

888.      The Division Engineer's Report did not mention water supply.  *Id.*

### 3.      Report of the Board of Engineers for Rivers and Harbors (April 10, 1939)

889.      The Report of the Board of Engineers for Rivers and Harbors (the "1939 Board Report") indicated that after reviewing the above reports, it "concurs generally in the view that comprehensive development of the Apalachicola and of its major tributaries, the Chattahoochee and the Flint, is justified in the combined interest of low-cost transportation and of hydroelectric power generation."  ACF000124.

890.      The 1939 Board Report recommended that the general plan presented in the district engineer's report "for the full development of the Apalachicola, Chattahoochee, and Flint River system in the combined interest of navigation and power be approved . . . ." ACF000125.

891.      The 1939 Board Report justified the costs of the plan by indicating that "[t]he cost of the initial development would be $36,524,000, but savings in transportation costs,

sale of power, and nominal amounts credited to the improvement for value to national

defense, to recreational use, and to enhancement of land values, would exceed the annual

carrying charges."  ACF000125.

892.    The 1939 Board Report did not mention water supply.  *Id*.

### 4.    Report of the Chief of Engineers (April 20, 1939)

893.    After considering the reports of the district and division engineers and the

recommendations of the Board, the Chief of Engineers concurred in the Board's

recommendations.  ACF000122.  In a recommendation from J.L. Schley, Major General,

Chief of Engineers to Chairman, Committee on Rivers and Harbors, the Chief of Engineers

concluded that "[a]fter full consideration of the reports secured from the district and division

engineers, and after affording local interests full opportunity to be heard, the Board

recommends that the general plan presented herein for the full development of the

Apalachicola, Chattahoochee, and Flint River system in the combined interest of navigation

and power be approved. . . ."  *Id*.

894.    The Chief of Engineers did not mention water supply.  *Id*.

### B.    The River and Harbor Act of 1946

895.     In the River and Harbor Act of 1946, PL 79-525, 60 Stat. 634-35, Congress

again authorized a number of "works of improvement of rivers, harbors, and other

waterways" and directed that such works "be prosecuted under the direction of the Secretary

of War and supervision of the Chief of Engineers, in accordance with the plans and subject to

the conditions recommended by the Chief of Engineers in the respective reports hereinafter

designated."  SUPPAR004113.

896.     The 1946 Act noted that "the provisions of section 1 of the River and Harbor Act [of 1945]. . . shall govern with respect to projects herein authorized; and the procedures therein set forth with respect to plans, proposals, or reports for works of improvement for navigation or flood control and for irrigation and purposes incidental thereto shall apply as if herein set forth in full."   *Id.*

897.     Among the authorized projects was the "Apalachicola, Chattahoochee and Flint Rivers, Georgia and Florida; in accordance with the report of the Chief of Engineers, dated May 13, 1946: *Provided*, That the proposed dam referred to in such report as Junction Dam shall, upon its completion, be known and designated on the public records as the Jim Woodruff Dam."  SUPPAR004114 (emphasis in original).

898.     The 1946 Act reauthorized the ACF projects authorized in the 1945 Act, with the modifications as set forth in reports submitted by the Corps to Congress in the Report of the Division Engineer (March 20, 1946).  SUPPAR004113.

### 1.     Report of the Division Engineer (March 20, 1946)

899.     The Report of the Division Engineer on March 20, 1946 ("1946 Report"), proposed modifications to the existing project that Congress approved in the River and Harbor Act of 1945, and specifically described the Buford project.  ACF000657.

900.     Among other proposals, the 1946 Report recommended that a storage-power dam at the Buford site be substituted for the approved Roswell storage-power dam above Atlanta, reserving 15 feet of top storage for flood control.  *Id.*

901.     The 1946 Report explained how the existing project provided for the construction of three reservoirs for "flood control, power, and navigation at the Roswell,

Cedar Creek, and Lanier sites," but that the city of Atlanta and other local interests "have strongly urged that the Roswell development. . . or one or more other reservoirs above Atlanta, be provided first, in order to meet a threatened shortage of water, during low-flow periods, for municipal and industrial purposes." ACF000661.

902.    The 1946 Report further explained that if the regulating storage reservoir required for the proposed developments below Columbus could be relocated above Atlanta, "it would greatly increase the minimum flow in the river at Atlanta, thereby producing considerable *incidental benefits* by reinforcing and safeguarding the water supply of the metropolitan area." ACF000661 (emphasis added).

903.    The 1946 Report concluded that "a multiple-purpose storage reservoir at the Buford site. . . will best combine with existing downstream plants and those proposed herein, as well as with other plants required for complete development of the river, to create an integrated economical system." ACF000661-62.

904.    In analyzing the proposed ACF system as a whole, including the proposed developments at Junction (Jim Woodruff Lock and Dam), Columbia (George W. Andrews Lock and Dam), and Buford, the 1946 Report observed that the system would contribute to power production, navigation, flood control, and "would ensure an adequate water supply for the rapidly growing Atlanta metropolitan area." ACF000662-63.

905.    The 1946 Report discussed how operations at the Buford site for hydropower generation should be coordinated so as to provide for the water needs of the Atlanta area, and cautioned that complete shutdowns during the daily and weekend off-peak periods would be

insufficient to meet the "estimated present needs of the city" and would result in "damage to fish, riparian owners, and other interests."  ACF000668.

906.    The Report discussed how minimum releases from Buford would benefit Atlanta by resulting in "an assured water supply for the city. . . ."  *Id*.

907.    The 1946 Report concluded with a discussion of the benefit/cost ratio of the proposed modifications, explaining that although the proposed modifications to include Buford "would cost considerably more than that now approved, it would produce a much greater proportional increase in benefits, so that its benefit/cost ratio, indicative of its economy, would be considerably better than that of the approved plan."  ACF000673.  The 1946 Report listed the total estimated annual benefits as $4,460,000, comprised of $3,377,000 (total system power benefits);  $983,000 (navigation benefits); and $100,000 (benefits from flood control).  ACF000672.

908.    To achieve a higher benefit/cost ratio, the 1946 Report explained that considerable storage must be provided upstream to increase the minimum regulated flow and the firm capacity at the downstream (hydropower) plants.  ACF000673.

909.    The 1946 Report summarized that construction of Buford would: increase the minimum monthly flows at the Columbia and Junction sites; simplify the reregulation of flows at Junction to provide for more continuous flows in the Apalachicola for navigation; and "*[i]incidentally*, it would ensure an adequate municipal and industrial water supply for the Atlanta area, would produce large benefits in the way of recreation, fish and wildlife conservation, and similar matters, and would, with the added flood-control storage proposed

herein, contribute to the reduction of floods and flood damages in the basin below."
ACF000673 (emphasis added).

### 2.   Report of the Board of Engineers for Rivers and Harbors (April 29, 1946)

910.   The Report of the Board of Engineers for Rivers and Harbors (the "1946 Board Report") indicated that after reviewing the division engineer's report, it "concurs generally in the views of the division engineer."  ACF000642.

911.   The 1946 Board Report concluded that "improvement in general accordance with the present plan of the division engineer is economically justified" and that the plan should be revised to include the "multiple-purpose reservoir" at Buford.  ACF000643.

### 3.   Report of the Chief of Engineers (May 13, 1946)

912.   After considering the division engineer's report and the recommendations of the Board, the Chief of Engineers concurred in the Board's recommendations, and recommend that the approved general plan for modifications to the ACF system include, among other things, construction of the Buford multiple-purpose reservoir.  ACF000641.

913.   The Chief of Engineers described the division engineer's plan as "providing 9-foot depths for navigation to Columbus and to Bainbridge, development of hydroelectric power, some flood control and improvement of low water flows in [the] Chattahoochee River in the vicinity of Atlanta."  ACF000638.

914.   The Chief's Report explained that the division engineer's report described how construction of Buford, among other things, "would assure an adequate supply of water for municipal and industrial purposes in the Atlanta metropolitan area."  ACF000639.

915.    The Chief of Engineers did not discuss water supply benefits in the context of his benefits/cost analysis, which included a discussion of the monetary benefits achieved from the proposed plan for power, transportation savings, increased land values, and flood control.  ACF000640.

916.    After finding that the proposed plan would afford a favorable benefit/cost ratio, the Chief of Engineers indicated that "*[i]n addition* the improvements would afford recreational opportunities, benefit fish and wildlife conservation and make available an adequate water supply for the Atlanta area."  *Id.* (emphasis added).

917.    None of the reports from the Division Engineer, Board of Engineers, or Chief of Engineers included water supply in the benefit/cost analysis for the project.

> **4.    Letter of Federal Power Commission to Chief of Engineers (Sept. 19, 1946), and Letter of Chief of Engineers to Federal Power Commission (Feb. 6, 1947)**

918.    In a September 19, 1946 letter from the Federal Power Commission responding to an earlier request from the Chief of Engineers to review the proposed plan, the Federal Power Commission indicated its support for the proposed modifications to the plan stating that it "is desirable and in the public interest."  ACF000634.

919.    The Federal Power Commission recognized that the proposed modifications would improve navigation, increase energy production, and result in better coordination of recreation, power, navigation, and flow regulation in the Apalachicola-Chattahoochee basin.  ACF000633.

920.    In a February 6, 1947 letter from the Chief of Engineers to the Chairman of the Federal Power Commission, the Chief concurred with the Federal Power Commission's

suggestion that Buford "should be designed to provide a power installation greater than 28,900 kilowatts." ACF000628.

921. The Chief of Engineers indicated that "[o]ne of the desirable objects to be secured at this site is the regulation of the discharge so as to maintain at Atlanta a minimum flow of about 600 second-feet, for water-supply, sanitation, and industrial purposes." *Id.*

922. The Chief also explained how "[e]conomical development of power at the dams below Columbus requires improvement of low flows by upstream storage, which is provided in the authorized plan by the inclusion of the Buford Reservoir, which also provides 28,900 kilowatts of power at the site, some flood control, and improvement in water supply and sanitation at Atlanta, Ga." ACF000627.

## C. Post-Authorization Congressional Testimony on Appropriations Bills

923. Although Congress originally authorized what would ultimately become the Buford project in the River and Harbor Acts of 1945 and 1946, construction on the Buford project did not begin until 1950, with ultimate completion of the project in 1960 at a total cost of over $44 million. ACF003968; *see also* Robert David Coughlin, *Lake Sidney Lanier, "A Storybook Site", The Early History and Construction of Buford Dam*, 1998, at 13.

924. Congress appropriated funds for the project yearly, and as part of that appropriations process the House and Senate appropriation subcommittees held hearings on appropriations for the project. *Id.* at 48-56; SUPPAR026598-608 (1948); SUPPAR009115-22 and SUPPAR026604-22 (1949); SUPPAR009123-27 and SUPPAR026628-37 (1950); SUPPAR026647-52 (1951); SUPPAR026653-62 and SUPPAR026663-76 (1952); SUPPAR026677-82 (1953); SUPPAR026683-85 and SUPPAR026686-95 (1954);

SUPPAR026696-99 and SUPPAR026700-07 (1955); SUPPAR026708-10 and

SUPPAR026711-18 (1956); SUPPAR026719-26 (1957).

### 1.        Hearings on Appropriations for 1948

925.    At the hearings on the appropriations bill for 1948, H.R. 4002, Representative

James C. Davis of Georgia expressed the importance of Buford dam for the city of Atlanta's

water supply:

> It is a multipurpose dam and it is for the purpose of generating power, flood
> control, and water supply for the city of Atlanta, as well as a regulated flow of
> water of the Chattahoochee River. . . .Now, I do not want to be unduly lengthy
> about it, but it is contemplated that this dam would provide 2,280,000 acre-
> feet of storage. Of that amount, 578,000 acre-feet are for flood control, and
> approximately 1,033,000 acre-feet are for hydroelectric power and that will
> leave then the remainder of that 2,280,000 acre-feet for a reservoir for water
> supply for the city of Atlanta. . . . but the necessity of this Buford Dam as we
> see it, rests to a large extent in the need of an increased water supply for the
> city of Atlanta. The city of Atlanta has many military installations there which
> Mayor Hartsfield will give you and I will not take the time to do that. . . Now
> we feel that by reason of the strategic military importance, the security of this
> Nation depends and requires that at Atlanta we have an adequate water supply.

War Department Civil Functions Appropriation Bill, 1948, Hearings Before the

Subcommittee of the Committee on Appropriations, United States Senate, 80th Cong. 1st

Sess. on H.R. 4002, at 697-98.  SUPPAR026599-600.

926.    Atlanta Mayor William B. Hartsfield reiterated the importance of Buford Dam

in assuring adequate flows for water supply in the Atlanta metropolitan area:

> We regard the Buford Dam as being essential and necessary to development
> of the river as a whole, and speaking of the Buford Dam, the Army engineers
> in their report to the War Department said: Flow regulations by such a
> reservoir is necessary to the economical development of hydroelectric power
> at the upper Columbia and Junction sites and would materially reduce the
> amount of dredging required to provide a 9-foot channel to navigation in the
> Apalachicola River and would assure an adequate supply of water to
> municipal and industrial purposes in the Atlanta metropolitan area. . . .A

> reservoir above Atlanta having a useful capacity of 1,000,000 acre-feet would provide a regulated flow of 1900 cubic feet per second. This would be in excess of present predictable water supply needs for the metropolitan area and in addition to create power and navigation and flood-control benefits to the entire Chattahoochee Valley region.

*Id.* at 700.  SUPPAR026602.

## 2.   Hearings on Appropriations for 1949

927.   The House Report to accompany H.R. 5524, the Army Appropriation Bill for 1949, emphasized that the city of Atlanta was not contributing at all to the costs of constructing Buford dam:

> While the Buford Dam may be an important part of the comprehensive river system plan for the Apalachicola, Chattahoochee, and Flint Rivers its construction will provide a source of water for the city of Atlanta that witnesses from that part of the country indicate is greatly needed.  ***The city of Atlanta is not, however, providing any contribution toward the construction of this dam and inasmuch as it stands to benefit to a great extent it appears that some substantial contribution should be made toward the ultimate cost of the dam, and in future planning it is suggested that this feature be given careful consideration and an opportunity afforded the city of Atlanta to make a contribution comparable to the benefits to be received.***

House Report No. 1420, Civil Functions, Department of the Army, Appropriation Bill, Fiscal Year 1949, 80th Congress, 2d Session at 8 (1948).  SUPPAR026627 (emphasis added).

928.   At the hearings on the appropriation bill for 1949, H.R. 5524, Representative Stephen Pace of Georgia recognized that the three purposes of the Buford project were navigation, power, and flood control, but noted that providing water for the city of Atlanta was an additional purpose:

> The entire project is three-purpose. First and foremost is navigation. Second, and of equal importance, is power. Third, and also of great importance, is flood control. In addition, with the Buford Dam, it has two additional purposes to the three which I have mentioned. First, it will serve as a great reservoir for the entire system in the event of dry spells and floods. That

assures the navigability of the entire project. In addition, as the other men will later tell you, it is of the utmost importance in order to meet the very critical shortage of water in the city of Atlanta.

Civil Functions, Department of the Army Appropriation Bill for 1949, Hearings Before the

Subcommittee of the Committee on Appropriations, House of Representatives, 80th

Congress, 2nd Sess. (1948), at 723.  SUPPAR026606.

929.    Representative John S. Wood of Georgia also reiterated the importance of

Buford for the citizens of Atlanta, noting that water supply was a benefit "in addition to"

flood control and navigation:

> [T]he dam is proposed to be a storage dam, so that these waters in the flood season can be impounded and released in the dry season to make possible the navigation facilities that have been presented to you gentlemen so ably by those who have preceded me. In addition to the control of the flood waters, the impounding of the water during the flood period and the aid to navigation, this dam will of course serve a very valuable purpose for the citizens of the city of Atlanta.

*Id.* at 777.  SUPPAR026615.

930.    Representative James Davis of Georgia, in hearings before the House, stressed

the importance of Buford as a source of water supply for the city of Atlanta:

> This is a multiple-purpose dam and, in addition to the low-water supply, will provide an installed capacity of 29,800 kilowatts of electricity, which will mean through the year a capacity of 253,000,000 kilowatt-hours. . . .This dam will also provide for pollution control and provide power and, above all, a water supply for the city of Atlanta, which will be dealt with by the mayor.

*Id.* at 778.  SUPPAR026616.

931.    And in hearings before the Senate, Rep. Davis described water supply as an

"incidental benefit":

> The Buford Dam, which you see at the top, has been said to be the key dam of the entire project from the standpoint of flood control and navigation. . . So,

> from the standpoint of navigation on down where the navigation dams are being built, in the dry months we need the storage reservoir up at Buford Dam in order to release water to keep the 9-foot channel depth on down where the river navigation is to be carried on. Then, in the winter and spring months, it catches the water and holds it and prevents the disastrous floods to which I referred. It also has a great advantage from the standpoint of controlling pollution and also from the standpoint of power generation. It has quite a power capacity to some several million kilowatt-hours per year. There is also incidental benefit there to the cities up and down the river in their water supply. By storing the water, it protects their water supply. . . .Without the Buford Dam we cannot operate this river for navigation. The Buford Dam is truly a multiple-purpose dam.

Civil Functions, Department of the Army Appropriation Bill, 1949, Hearings Before the

Subcommittee of the Committee on Appropriations United States Senate, 80th Cong. 2nd

Sess. on H.R. 5524 (1948), at 639-643.  SUPPAR009115-17.

932.    Mayor Hartsfield emphasized in the hearings before the House, that the

metropolitan area of Atlanta needed Buford for its water supply:

> Something has been said about the water supply. Our sole and only water supply is the Chattahoochee River. Here is a great metropolitan area of 575,000 people. Incidentally, it is the Washington of the South. . . .We are dependent on the river. With the villages in suburban areas, we need it for our water supply.

Civil Functions, Department of the Army Appropriation Bill for 1949, Hearings Before the

Subcommittee of the Committee on Appropriations, House of Representatives, 80th

Congress, 2nd Sess. (1948), at 783-784.  SUPPAR026621.

933.    And Mayor Hartsfield reiterated his concerns before the Senate:

> Without question, Atlanta needs additional water storage in the river. We have in the past and still have under tentative consideration the obtaining of water from several different sources in north Georgia. We would like to get our additional water from the river. But we do get water from Coosa River. The point I make to you is that we would like to get the water from this source. We want it from this source. It is very necessary, but we are not to be put in the category with such cities as are in arid places in the West or flat plain cities

where there is one sole source of water which is the only source they could obtain water from. . .I would not hesitate to say to you that we would prefer to get our water out of the Chattahoochee River. We use the Chattahoochee River just as practically all cities on rivers use the river for their water supply. . .We are highly interested in a regular flow of water there for a number of reasons, Senator. The Buford Dam was recommended by the engineers in 1946 and will be some 30 or 40 miles above Atlanta. As I said, it is of tremendous importance to Atlanta metropolitan area. . . Since Congress is now committed to the development of the Chattahoochee River system and the work is now under way on the Woodruff Dam at the Georgia-Florida line, the Buford Dam is all the more important. It is in the rainfall area of the State. Its principal purpose will be water storage, so as to provide for navigation on the lower reaches of the river in the low-water season. . .As well as for flood control in the metropolitan district of Atlanta and all the way down the river system. . . I have referred to the water supply previously. Not only do we need it from the standpoint of water supply but we have no water-using industries along the Chattahoochee River with the single exception of the generating plant of the Georgia Power Co., and they have trouble using the water on the river on account of the irregular flow. This dam would make possible some water-using industries along the Chattahoochee. . .Mr. Chairman, the metropolitan area of Atlanta now consists of some 575,000 people. Our city is growing by leaps and bounds. This is a multiple-purpose dam, and we need every benefit that this dam will produce. We need flood control; we need the increased power; we need badly some sort of water recreation in that section. We need, of course, the promotion of navigation, because someday we hope that this river will be developed in future years so as to provide navigation to Atlanta. . .We need the promotion of the regular flow not only for Atlanta's water supply but to enable others, as I said, to use the river, industries to use it, which they are not now able to do.

Civil Functions, Department of the Army Appropriation Bill, 1949, Hearings Before the

Subcommittee of the Committee on Appropriations United States Senate, 80th Cong. 2nd

Sess. on H.R. 5524 (1948) at 644-646.  SUPPAR009118-19.

934.    The report of the hearings on the appropriation bill for 1949 also indicated

that the following information was supplied for the record:

The project is a multiple-purpose project including navigation, flood control, power, and water supply. . . Located on the Chattahoochee River at mile 348.5 near Buford, and approximately 35 miles northeast of Atlanta. The dam is a concrete gravity type including a hydroelectric power plant with installed

capacity of 45,000 kilowatts, and also providing flood-control storage of 582,000 acre-feet. . . the Buford Reservoir will provide flood protection to the valley below it; provide a large block of power in an area where there is a power shortage; provide an increased flow which is essential to provision of a 9-foot depth for navigation in the Apalachicola River; assure an adequate water supply for municipal and industrial purposes in the Atlanta metropolitan area; and provide recreational facilities for the area surrounding the reservoir.

*Id.* at 647-648.  SUPPAR009119-20.

### 3.    Hearings on Appropriations for 1950

935.    At the hearings on the appropriation bill for 1950, H.R. 3734, there was no

direct mention of water supply. Representative James Davis did not discuss water supply:

The Buford Dam is the only flood-control dam in the project. The Buford Dam is a multiple-purpose dam, having for its purpose, flood control, the generation of power, pollution abatement, and the Army engineers have testified every time this project has been under consideration each year that the Buford Dam is essential and necessary in order to maintain the 9-foot navigation channel from Columbus to the Gulf. . .Gentlemen, the Buford Dam is located in what could be termed the rainfall area, because in northern Georgia is where the heaviest rainfall comes, and this dam would provide for a storage capacity of 2,280,000 acre-feet. Of that amount 580,000 acre-feet are for flood control; approximately 1,033,000 acre-feet of that storage capacity is for power, current generation, and the remainder of it, of course, is for recreation and the various other purposes that dams are ordinarily used for.

Civil Functions, Department of the Army Appropriation Bill for 1950, Hearings Before the

Subcommittee of the Committee on Appropriations, House of Representatives, 81st Cong.

1st Session (1949), at 479-80.  SUPPAR026630-31.

936.    Representative Stephen Pace of Georgia focused on flood control and

navigation:

The importance of Buford Dam is that it is the great water reservoir for the entire system; there is a natural formation and there will be an enormous reservoir. That reservoir is important for two reasons: First, when the floods come down, it will hold back the flood waters, and in dry season it will release the waters so they can be used to maintain the 9-foot depth for navigation.

*Id.* at 483.  SUPPAR026634.

937.    And Representative George Andrews of Alabama discussed power, flood

control, navigation, and recreation, with no mention of water supply:

> I think it has been very clearly pointed out to you that the project we are
> discussing now known as the Chattahoochee-Apalachicola-Flint Rivers
> project, was authorized by the Congress in 1946 and provides for the
> development of the Chattahoochee Valley. It is a multi-purpose project. I do
> not know whether hydroelectricity is the first or primary purpose, or
> navigation, flood control, or recreation; but all four of those essential purposes
> are included in this project. . .The Buford Dam, the Columbia Dam, and the
> Jim Woodruff Dam are to be hydro-electric dams.

*Id.* at 486.  SUPPAR026637.

### 4.    Hearings on Appropriations for 1951

938.    The hearings on the appropriations bill for 1951, included the following

statements from Representative James Davis of Georgia, which included references to flood

control, power, and navigation purposes, but no reference to water supply:

> Now, gentlemen, the reason this dam is essential to the project, and why the
> project cannot be efficiently operated without it, is this: The Buford Dam is to
> be constructed up in the northern part of the State, which is the rainfall area. It
> drains an area there of 1,046 square miles, and it holds that water that flows
> down the river, and it holds the water there for the dry seasons of the year,
> when the river diminishes down to a point where this 9-foot navigation
> channel from Fort Benning to the Gulf of Mexico absolutely cannot be
> efficiently operated without some water being released up the river to give it
> the 9 foot depth.  The engineers have testified to that time and time again. It is
> needed for that purpose, and it is also needed to firm up the power production
> down the river.  At these two power dams it needs this water to be released in
> the dry seasons to aid in the production of power at these two power dams
> down the river. They are the upper Columbia and the Jim Woodruff Dams,
> both of which are multiple-purpose dams, power dams. . . .

Civil Functions, Department of the Army Appropriation Bill for 1950, Hearings Before the

Subcommittee of the Committee on Appropriations, House of Representatives, 81st Cong. 2d

Session (1950) at 891.  SUPPAR026650.

### 5.      Hearings on Appropriations for 1952

939.      The Senate Report to accompany H.R. 4386, the Army Appropriation Bill

for 1952, emphasized the importance of the power and flood control benefits of the project:

> Funds in the full budget amount of $900,000 are included in the bill for the
> Buford Dam to carry the project forward at a minimum rate.  It is considered
> that deletion of all funds, as proposed in the House bill, will seriously delay
> the production and delivery of power to an area in which power is in
> increasingly short supply.  Flood protection to important industries and to
> food-producing areas now subject to flooding will also be delayed about 1
> year. . . .

Senate Report No. 631, Civil Functions, Department of the Army, Appropriation Bill, Fiscal

Year 1952, 82d Congress, 1st  Session at 6 (1951).  SUPPAR026642.

940.      The hearings on the appropriations bill for 1952, H.R. 4386, included the

following exchange between Colonel Potter of the Corps and Representatives Davis and Ford,

in which Colonel Potter indicated that water supply benefits to Atlanta were due to changes

in regulating releases from the dam, and that no storage was allocated to water supply

because Atlanta was not paying for the project or for water supply storage:

> Colonel POTTER. . . .The purpose of the project is flood control, water supply
> for the city of Atlanta, which is growing by leaps and bounds, and the
> production of power. The city of Atlanta is vitally interested in the provision
> of this water supply and has many letters on record requesting that we
> expedite it to the greatest possible extent. . .The flood control on this structure
> is important downstream. I would say in view of the importance of the city of
> Atlanta, the water supply is of equal importance. Atlanta is a rapidly growing
> city. There are large defense industries there, but we are not predicating this
> on defense, except that electricity has been requested by the Southeast Power
> Administration. . .The river goes right by Atlanta. You notice the position of

Buford Dam with respect to Atlanta. The fact that it does furnish important flood control, and water from Buford will give a regular supply and makes it important to the city of Atlanta. . .

Mr. DAVIS. Is Atlanta cooperating in this project in any way?

Colonel POTTER. *No sir; because this is not a problem of furnishing water directly or furnishing storage for that purpose; it is the regulation of the river that gives them a constant supply over the up-and-down supply now existing during the year.* The river gets very low in the summertime, and then they have rather to scramble for water. With this dam letting out a constant supply of water every day their water-supply problem is reduced immensely, to the point where the project is of importance to them for water supply more than for any other reason. . .

Mr. FORD. Where you have a project such as this particular project and water supply is part of the justification for a community, does not the community make any contribution to the project?

Colonel POTTER. Yes, sir, normally, but not in this case . . .This dam furnishes Atlanta with water due to the fact that it regulates the discharge of floods. . .Then, in the production of electricity, we can discharge somewhere in the neighborhood of 4,000 or 5,000 second-feet constantly. That 4,000 or 5,000 second-feet is a rather large amount of water, and it will always be flowing by Atlanta; so that now they won't have the river partially dry or full of mud in the summer, but they will have a more or less constant flow of the river past their door and will always be able to pull water out of it. *It did not cost the Federal Government 1 cent to supply that service, because it was an adjunct to the power supply and flood control. Had we put in some storage purely for water supply, which they would tell us to release at certain intervals, we would then charge them for it, and they would have to pay for the difference of that construction cost.*

Mr. FORD. Is it not conceivable in the future, though, when this particular project is completed, that the city of Atlanta will make demands on the Corps of Engineers for certain water at certain times because of the needs of the community, when at the same time it will be for the best interests of the over-all picture—power, navigation, and flood control—to retain water in the reservoir? Now, what is the attitude or what will be the attitude of the Corps of Engineers under those circumstances?

Colonel POTTER. We have a case in point where a community is requesting that we make a water supply available to them out of a completed structure. That water can be used and is being used to produce power; therefore, it would have to be diverted to the water supply for this community. *The first thing we do is to decide, after a study, whether or not the water supply is more valuable to use for the production of electricity. If it is, then we would have to come back, I believe, to*

> ***Congress to alter the authorization of that project, were it a major
> diversion of the water.***
> Mr. FORD. When that particular project was authorized and funds were
> appropriated, was the water supply figured in the economic justification?
> Colonel POTTER. It was not, because this particular little community has
> grown due to some rather large close-by defense plants, and consequently
> the workers and laborers live in that area, and the town has expanded its
> area of distribution of water. They have gone out into the county to
> distribute water. That study is not yet completed, Mr. Ford, ***but it is very
> important, and we take a very dim view of changing a project to the
> subsequent needs without Congress having a hand in it.***

Civil Functions, Department of the Army Appropriations for 1952, Hearings Before the

Subcommittee of the Committee on Appropriations, House of Representatives, 82d Cong. 1st

Session (1951), at 118-122.  SUPPAR026654-58 (emphasis added).

941.    At the same hearings on the appropriations bill for 1952, Representative

Davis, and Mayor Hartsfield stated that the dam had the purposes of power, flood control,

recreation, and navigation, but also reiterated that the city of Atlanta and its metropolitan area,

including De Kalb, Fulton, and Cobb counties were interested in Buford as a source of a

more regular water supply:

> Mr. JAMES DAVIS. This dam is a multipurpose dam, power, flooded control,
> recreation and navigation, and as I see it I think it is the key dam of the entire
> project. . .Mr. HARTSFIELD . . .The city of Atlanta, and its metropolitan area,
> comprising the counties of De Kalb, Fulton, and Cobb, are particularly
> interested in the Buford Dam as a source of more power and regular water
> supply for the many industrial and defense plants now being built in the
> Atlanta metropolitan area.

*Id.* at 616-617.  SUPPAR026671-72.

### 6.  Hearings on Appropriations for 1953

942.    At the hearings on the appropriations bill for 1953, H.R. 7268,

Representative Davis again focused on the "threefold purpose[s]" of flood control, navigation,

and power, and did not discuss water supply as an authorized purpose:

> The Buford Dam, being the northernmost dam of the series, is located in the
> rainfall area. We have wet spells, wet seasons during the winter and spring
> and we have dry spells or dry seasons during the summer and during the fall.
> The reservoir of the Buford Dam catch and hold rainfall during the wet
> seasons.  This water can be released then during the dry seasons of the
> summer and fall.  It will serve the threefold purpose of preventing disastrous
> floods during the rainy season, firming up power all the way down the river,
> not only the power to be generated at the Jim Woodruff Dam and the upper
> Columbia Dam, which are two dams in this Federal project, but will also serve
> to firm up the power generated by some private power facilities located on the
> Chattahoochee River below the Buford Dam. . .  In addition to that, it will
> serve to maintain a 9-foot navigation channel from Columbus, Ga., to the Gulf
> of Mexico. . . .

Civil Functions, Department of the Army Appropriations, 1953, Hearings Before the

Subcommittee of the Committee on Appropriations United States Senate, 82d Cong. 2d  Sess.

on H.R. 7268, at 1196.  SUPPAR026679.

### 7.  Hearings on Appropriations for 1954

943.    The House Report to accompany H.R. 5376, the Army Appropriation Bill for

1954, described Buford Dam as being primarily a power project, noting as follows: "This is

primarily a power project located in the vicinity of Atlanta, Georgia. The committee believes

that the scheduled completion date on this project can well be delayed until projects more

essential to the defense effort can be completed."  House Report No. 450, Civil Functions,

Department of the Army, Appropriation Bill, Fiscal Year 1954, 83d Congress, 1st Session at

8 (1953).  SUPPAR026646.

944.    At the hearings on the appropriations bill for 1954, H.R. 5376, Colonel

Paules of the Corps testified before the Senate that the Buford project would assist with flood

control, power, and navigation, and that the controlled releases of floodwater from the Dam

and releases for power purposes flowing downstream would "incidentally" benefit the city of

Atlanta:

> The Buford project, the uppermost of the four projects on the Chattahoochee
> River, is a combination flood control-power project which will assist
> navigation downstream by the regulation of the river flows.

Civil Functions, Department of the Army Appropriations, 1954, Hearings Before the

Subcommittee of the Committee on Appropriations United States Senate, 83rd Cong. 1st

Sess. on H.R. 5376, at 480.  SUPPAR026685.

945.    Colonel Paules also testified before the House that Atlanta "incidentally"

benefits from releases at Buford while not contributing to the project:

> The project has a total capacity of some 2 million acre-feet for flood control
> and power, and incidentally would supply additional water downstream for
> the benefit of the municipalities along the river, as far as Atlanta, and would
> benefit downstream power developments of the Georgia Power Co. . .While
> the city of Atlanta is not contributing to this, they get benefits from it,
> incidentally, as the result of the controlled release of floodwaters, and as the
> water is released through the powerplant.

Civil Functions, Department of the Army Appropriations for 1954, Hearings Before the

Subcommittee of the Committee on Appropriations, House of Representatives, 83rd Cong.

1st Session (1953), at 503.  SUPPAR026688.

946.    In response to a question as to whether the city of Atlanta would be expected

to pay for some of the water that would be made available to them as the result of the Buford

project, General Chorpening confirmed that no costs were allocated to the project for water

supply, stating:

> No; there would be no legal way to collect payment from the city of Atlanta, since, as was just stated, there is no additional cost being included for the construction of this project to provide the more uniform flow of water which will pass the city of Atlanta. In other words, the building of the project, with its power production and flood control and navigation benefits will not make available any more water than is now going past Atlanta. It is only going to make it flow by at a more uniform rate.

*Id.* at 503.  SUPPAR026688.

### 8.   Hearings on Appropriations for 1955

947.     At the hearings on the appropriations bill for 1955, H.R. 8367, Colonel

Whipple of the Corps testified that the project provided for flood control, but that the main

purpose was power, and he referred to information, contained in the committee report at page

342, listing "project purposes" as flood control, power, navigation, irrigation, and recreation:

> The project provides a considerable amount of flood control, but its main purpose is the output of power to the area. . .There are some additional benefits to this project—they have not been evaluated—that would increase the flow of water downstream which improves the water supply at Atlanta, and the project is unusually well situated for recreational use. . .

Civil Functions, Department of the Army Appropriations, 1955, Hearings Before the

Subcommittee of the Committee on Appropriations, United States Senate, 83rd Cong. 2nd

Sess. on H.R. 8367 (1954), at 324-325.  SUPPAR026698-99.

948.     Colonel Whipple also had the following exchange with Senator Ellender, in

which Colonel Whipple confirmed that water supply was an "incidental benefit" and that no

costs were allocated to the project for water supply storage:

> Senator ELLENDER. When you say this will improve the water supply at Atlanta, it does not mean that Atlanta is going to participate in the payment of any of these improvements?
>
> Colonel WHIPPLE. We understand not, sir, from the history of the authorization. ***There are no additional costs for that reason. It is purely an incidental benefit on account of the power releases which does not require any storage to be devoted to that purpose.***

*Id.* (emphasis added).  SUPPAR026699.

949.     At the House hearings on the appropriations bill for 1955, Representative Davis of Georgia again continued to reiterate the power, navigation, and flood control purposes of the Buford project without discussing water supply as a purpose:

> This is a multiple-purpose dam.  It is in the rainfall section of our State.  It is the key dam of the entire project on the Chattahoochee, Flint, Apalachicola River project.  Its construction is essential so that water may be released from its great reservoir to firm up power all down the river below Buford Dam, to maintain a 9-foot navigation channel from Columbus, Ga., where Fort Benning is, to the Gulf of Mexico.  It will also furnish much-needed flood control, and relieve the danger from floods which have caused heavy damage to the towns and cities and the agricultural lands up and down the Chattahoochee River below the Buford Dam.

Civil Functions, Department of the Army Appropriations for 1955, Hearings Before the Subcommittee of the Committee on Appropriations, House of Representatives, 83rd Cong. 2nd Sess. on H.R. 8367 (1954) at 191.  SUPPAR026702.

### 9.     Hearings on Appropriations for 1956

950.     At the hearings on the appropriations bill for 1956, Representative James Davis again emphasized the importance of the Buford project for flood control, navigation, and power purposes.   Public Works Appropriations, 1956, Hearings Before the Subcommittee of the Committee on Appropriations, United States Senate, 84th Cong. 1st Sess. on H.R. 6766 (1955) at 1461.  SUPPAR026709.

951.    Rep. Davis stressed how the multipurpose uses of the project will impact the

lives of most people in "the great 700,000 population of the district which I represent,"

noting:

> It will provide flood protection to the valley of the Chattahoochee as far
> downstream as West Point, Ga., 150 miles below the dam. . . . It will augment
> the low-water flow of the river, which is necessary in providing a 9-foot deep
> channel for navigation from Columbus, Ga., to the Gulf of Mexico, as well as
> being beneficial for downstream water supplies required to operate electrical
> current generation plants at various locations downstream.  Finally, it will
> have an installed power-generating capacity of 86,000 kilowatts. . . .

Public Works Appropriations for 1956, Hearings Before the Subcommittee of the Committee

on Appropriations, House of Representatives, 84th Cong. 1st Sess. on H.R. 6766  (1955) at

307.  SUPPAR026713.

952.    Towards the end of Rep. Davis' statement he mentioned that the project

would provide the additional benefit of water supply for Atlanta, explaining that:

> The Buford Dam is designed to get the maximum benefits from the water
> resources available.  Its 810 million kilowatt-hours of electrical energy
> annually and the benefits of additional water supply for the growing
> metropolis of Atlanta are the obvious advantages which will accrue from it.

*Id.* at 308-09.  SUPPAR026714-15.

### 10.    Hearings on Appropriations for 1957

953.    At the hearings on the appropriations bill for 1957, Rep. Davis again reiterated

that the multiple purposes of Buford Dam included flood control, navigation, and

hydropower, as well as recreation, summarizing that:

> In testimony given here in previous years, it has been pointed out that the
> Buford project is a multipurpose dam. The principal purposes are providing,
> during the dry season of the year, for an increased flow of water for
> navigation from Columbus, Ga., to the Gulf of Mexico, flood control below
> the Buford Dam, production of hydroelectric power, and recreational facilities.

Public Works Appropriations for 1957, Hearings Before the Subcommittee of the Committee on Appropriations, House of Representatives, 84th Cong. 2d Sess. (1956) at 356. SUPPAR026721.

954.   Rep. Davis elaborated on the recreational benefits, explaining that "[a]s the water backs up behind Buford Dam, a lake extending into five counties will be formed."  *Id.* at 357.  SUPPAR026722.

955.   He further explained how the lake would provide for boating, swimming, fishing and other water sports.  Rep. Davis did not discuss municipal or industrial water supply for the city of Atlanta.  *Id.*   SUPPAR026722.

> **D.   Relevant Correspondence From Mayor Hartsfield, Representative Davis, and the Corps Related to Water Supply**

956.   In a February 27, 1948 letter, Rep. Davis conveyed to Mayor Hartsfield Congress's desire that Atlanta contribute to the costs of the Buford project, noting that several Congressmen on the Civil Functions Appropriations Sub-committee cited other projects in which cities had made contributions and did not want "to set a new precedent insofar as the Buford Dam is concerned." *See* February 27, 1948 letter from Rep. James Davis to Mayor Hartsfield.  SUPPAR000420.

957.   In a March 1, 1948 letter, Mayor Hartsfield responded to Rep. Davis, indicating his concern that "[f]rankly, in our zeal I think we have just laid too much emphasis on the Chattahoochee as a water supply."  *See* March 1, 1948 letter from Mayor Hartsfield to Rep. Davis.  SUPPAR001063.

958.     Mayor Hartsfield distinguished the examples of other cities such as Dallas

and Los Angeles, suggesting that their interests in water supply were much more significant,

and contrasted Atlanta's interest, stating that "[i]n our case the benefit so far as water supply

is only *incidental* and in case of a prolonged drought." *Id.* (emphasis added).

959.     In addition to describing water supply as only an "incidental" benefit, Mayor

Hartsfield emphasized that there were a number of other sources of water supply aside from

Buford, stating:

> The City of Atlanta has many sources of potential water supply in north
> Georgia. Certainly a city which is only one hundred miles below one of the
> greatest rainfall areas in the nation will never find itself in the position of a
> city like Los Angeles. . .Certainly in view of other possible sources of
> Atlanta's future water we should not be asked to contribute to a dam which
> the Army Engineers have said is vitally necessary for navigation and flood
> control on the balance of the river.  North Georgia is full of water from many
> sources and our situation ought never to be confused with that of western
> cities located either in arid deserts or on flat plains where a source of pure
> water is a desperate necessity outweighing all other considerations.

*Id.* SUPPAR0010603-04.

960.     On March 5, 1948, Rep. Davis responded to Mayor Hartsfield, agreeing with

Mayor Hartsfield's conclusions, and indicating "I shall do all within my power to convince

the Civil Functions Committee of the correctness of this view."  March 5, 1948 letter from

Rep. Davis to Mayor Hartsfield.  SUPPAR001065.

961.     In October 1955, Representative James Davis of Georgia forwarded to the

Corps an October 7, 1955 request from the Chairman of the Water Committee for

Walnutgrove, Georgia for water from the Buford Dam project.  SUPPAR001358-59.

962.     In a letter dated October 25, 1955 from the Lt. Colonel of the Corps to the

Chairman of the Water Committee for Walnutgrove, Georgia, the Corps responded and

indicated that no storage in the reservoir had been allocated to water supply and further

Congressional authorization would be necessary before water withdrawals could be permitted.

Specifically the Corps explained:

> Buford Dam was authorized and is now under construction to provide flood control, hydropower and flow regulation essential for navigation on the Apalachicola River.  Storage in the reservoir has been allocated for these purposes, thereby leaving no surplus for water supply withdrawals above the dam.  ***Any modification in allocation of storages will have an affect on the presently authorized purposes.  For these reasons, it is believed that further Congressional authorization will be necessary before water withdrawals from the reservoir can be allowed.***
> .

Letter from Lt. Colonel, Corps of Engineers to Chairman, Water Committee Walnutgrove,

Ga. (Oct. 25, 1955).  SUPPAR001358 (emphasis added).

### E.      Corps' Definite Project Report (December, 1949)

963.      In December, 1949, the Corps' District Engineer prepared a *Definite Project*

*Report on Buford Dam, Chattahoochee River, Georgia* ("Definite Project Report"), to

present "plans showing the location and type of structures proposed and [to give] a general

description of the various features which comprise the overall plan of development for the

Buford project."  ACF001446.

964.      Among other things, the Definite Project Report referenced the project's

operating purposes and discussed project benefits.  ACF001459.  Similar to the legislative

history discussed above, the Definite Project Report did not assign a monetary value to water

supply.  *See* ACF001490.

965.      The Definite Project Report indicated that "[i]n addition to flood control. . .

the primary purposes of the Buford project are production of hydroelectric power, increased

flow for navigation in the Apalachicola River and an increased water supply for Atlanta." ACF001459.

966.     In its discussion on hydroelectric power, the Definite Project Report indicated that "the installation for Buford should consist of two large units of about 40,000 kw each, and one small unit to utilize minimum releases from the reservoir required for water supply." ACF001460.

967.     In explaining how this small unit would operate, the Definite Project Report explained that "during off-peak periods when the large units are not operating, the small unit will be operated as necessary to provide flow to meet municipal and industrial requirements at Atlanta." ACF001487.

968.     The Definite Project Report described that "primary benefits" would be from flood control and hydropower, estimating that flood control benefits would be about $163,000 annually, and power benefits would be about $2,314,000 or $3,236,000 per year, depending on modification of hydroelectric plants downstream. ACF001489-90.

969.     The Definite Project Report also estimated that the downstream benefits of navigation would be about $1,391,000 in annual savings in transportation costs. ACF001490.

970.     Although the Definite Project Report indicated that "[a] real benefit will also result from assurance of sufficient water for municipal and industrial requirements at Atlanta. . .," the Definite Project Report's description of project benefits did not assign a monetary value to water supply. *Id.*

971.     In further describing the hydropower purposes of the Buford project, Appendix I to the Definite Project Report notes that "[t]he project will have a relatively high head and a large storage for stream-flow regulation."  ACF001501.

972.     The Definite Project Report also explained that "[i]n addition to increasing the low flows at the site, the storage at Buford will assure a sufficient water supply for Atlanta, increase considerably the prime power and energy at several existing downstream developments, and will benefit open-river navigation in the Apalachicola River."  *Id.*

973.     In discussing the factors that would influence Buford operations, the Definite Project Report indicated that the most important factors would be "at-site benefits, effect on downstream plants, maintenance of an adequate flow at Atlanta for municipal and industrial purposes. . .and an increased flow for navigation in the Apalachicola River."  ACF001509.

974.     Additionally, the Report contained in the appendix a U.S. Public Health Service study on flow requirements for pollution abatement below Atlanta, which concluded that a minimum flow of 200 cfs is needed at Atlanta to adequately serve the public water supply needs.  ACF001520.

975.     The Public Health Service study observed that both the City of Atlanta and the DeKalb County Water Works use the Chattahoochee River as a water supply source.  ACF001524.  The study stated that "[n]either system includes any large amount of storage," and further recognized that "a flow of almost 200 c.f.s. will be required to meet future water needs."  ACF001524.

976.     The Public Health Service concluded that "[i]n view of the absolute

necessity of an adequate water supply for this area, releases from Buford Reservoir should be

provided which will be ample to meet future public water supply demands."  *Id*.

977.     Although the Definite Project Report described water supply as a "primary

purpose" and "real benefit"—a somewhat slight departure from the 1946 Division Engineer's

Report which described water supply as an "incidental" benefit—the Definite Project Report

did not assign a monetary value to water supply or allocate costs to the project for water

supply.  ACF001490.

### F.     Corps' 1958 Apalachicola River Basin Reservoir Regulation Manual, and 1959 Appendix B on Buford Reservoir

978.     Among other things, the Corps' 1958 Apalachicola River Basin Reservoir

Regulation Manual, described the overall plan of development in the Apalachicola River

Basin, including completed projects, authorized projects, and additional approved projects.

ACF001676.

979.     The Corps explained generally that "[c]hanges in dam sites, in storage

allocations for flood control and power, and in methods of operation may be found to be

more practical than the approved projects upon further study prior to authorization."  *Id*..

980.     The Corps noted that "full consideration will be given to all water uses, such

as flood control, navigation, power, and water supply."  *Id*.

981.     The 1958 Reservoir Regulation Manual described Buford as a "multiple-

purpose project with major uses of flood control, flow regulation for navigation, and power."

ACF001677.

982.    The 1958 Reservoir Regulation Manual further described how the reservoir would have a usable power storage of 1,049,000 acre-feet and flood storage of 637,000 acre-feet.  ACF001784.

983.    Appendix B to the Corps' Apalachicola River Basin Reservoir Regulation Manual indicated that "Buford is a multiple-purpose project with principal purposes of flood-control, navigation and power."  ACF001789.

984.    Specifically, the Corps explained that Buford "reduces flood stages in the Chattahoochee River as far downstream as West Point, Georgia, 150 miles below the dam; provides an increased flow for navigation in the Apalachicola River below Jim Woodruff Dam during low-flow seasons; and produces hydroelectric energy, operating as a peaking power plant."  *Id*.

985.    In discussing the regulation plan for the project, the Corps explained that "[n]ormally, the Buford project will be operated as a peaking plant for the production of hydroelectric power with minimum releases during the daily and week-end off-peak periods which will be sufficient, with local inflows added, to supply the Atlanta area with not less than 600 cfs."  ACF001796.

986.    The Corps further discussed how "[d]uring low-water periods such regulation will provide increased flow downstream for navigation, water supply, pollution abatement, and other purposes."  *Id*.

987.    However, the Corps emphasized that "the primary purpose of the project is flood control, and a storage of 637,000 acre-feet between elevations 1,070 and 1,085 has been reserved exclusively for the detention storage of flood waters."  *Id*.

988.    As to other allocated storage, the Corps explained that "[a] storage of

1,049,400 acre-feet between elevations 1,035 and 1,070 has been allocated for power and

low-water flow regulation." *Id*.

989.    The Corps further elaborated on the concept of "low-water flow regulation",

explaining that "[i]n order to meet the water requirements of the City of Atlanta and other

downstream users, the Corps of Engineers is committed to maintain a minimum flow from

Buford which, when combined with the local inflows from the 410 square-mile area between

the dam and Atlanta (Vinings gage) assuming no withdrawals, will total not less than 600

cfs." ACF001801-02.

990.    Appendix B to the Regulation Manual did not specifically allocate storage to

water supply. ACF001796.

### G.    Corps' Cost Allocation Studies (May 1959)

991.     In an effort "to present current information on the costs of the [Buford,

Walter F. George, Columbia, Jim Woodruff and Apalachicola River] projects and an

equitable distribution of the costs to the functions being served," the Corps prepared the *Cost

Allocation Studies, Apalachicola, Chattahoochee and Flint Rivers Project, Basis of All

Allocations of Costs for Buford and Jim Woodruff Projects Adopted by the Chief of

Engineers* in May 1959 ("Cost Allocation Studies"). ACF002086.

992.    The Corps explained that the purpose of the cost allocation studies and

analyses was "to determine an equitable distribution of costs for the primary purposes

served." ACF002115.

993.     The Corps further explained how it obtained an equitable distribution of

costs:

> An equitable distribution may be obtained by: (a) preventing costs allocated to
> any purpose from exceeding corresponding benefits (maximum); (b) by
> requiring each purpose to carry at least its separable costs (minimum); (c)
> within these maximum and minimum limits, by providing for proportional
> sharing of the savings resulting from the multiple-purpose development.

ACF002115-116.

994.     The Cost Allocation Studies calculated the average annual benefits of the

Buford project as follows: navigation ($75,900); flood control ($193,000); and power

($2,476,200).  ACF002127.

995.     The Corps indicated that "[t]he primary benefits provided by the ACF

project are flood control, navigation, and hydroelectric power," (ACF002086), and further

stated that "[t]he primary purposes for which the ACF project will be operated are navigation,

flood control, and power."  ACF002090.

996.     The Corps described water supply as one of the incidental benefits, stating

that "[t]he *incidental benefits* are low-water regulation for water supply and pollution

abatement at Atlanta, Georgia and public use with facilities for recreation available at the

Buford, Walter F. George, Columbia and Jim Woodruff reservoirs."  ACF002086 (emphasis

added).

997.     After describing in detail the project benefits for navigation, flood control,

and power, (ACF002097-2101), the Cost Allocation Studies briefly referenced "other

benefits" including water supply, for which it did not assign a monetary value:

> Other *incidental benefits* are realized from the operation of the ACF project in
> addition to the primary purposes.  These benefits include water supply and

> pollution abatement in the Atlanta area due to the operation of the Buford project and recreation provided by Lake Sidney Lanier, Lake Seminole, and the Walter F. George and Columbia reservoir areas. The value of these benefits are indeterminate to a large extent and have not been evaluated for use in the allocation studies.

ACF002102 (emphasis added).

998.    The Cost Allocation Studies described the operational requirements of the authorized project as follows:

> The ACF project will be operated for the primary purposes of flood control, power, and navigation. ***The available storage at Buford will be utilized to attain the maximum sustained public benefits in the ACF system from these purposes.*** In addition, the small unit at Buford will be operated when required for the maintenance of a minimum flow for water supply and sanitation requirements in the Atlanta area. Buford will be required to produce its share of the minimum monthly energy declarations for the Allatoona-Buford combination stipulated in the SEPA-Georgia Power Company contracts.

ACF002089 (emphasis added).

999.    Appendix A to the Cost Allocation Studies indicated that "[t]he primary purposes of the Buford project are flood control and the generation of hydroelectric power. Incidental uses attributable to the operation of the project for power include flow regulation for navigation in the Apalachicola River and water supply and pollution abatement in the Atlanta area." ACF002108. Appendix A also indicated that costs for the project were divided among primary purposes including navigation, flood control, and power." ACF002116.

## H.    The Parties Have Continually Recognized the Authorized Purposes

### 1.    Corps Documents Recognizing the Authorized Purposes

1000.    In 1955, Gwinnett County requested permission from the Corps to withdraw water from Lake Lanier for water supply purposes. SUPPAR005459. The Corps met with representatives of Gwinnett County and then prepared a memorandum with the subject

"Report on Withdrawal of Domestic Water Supply from Buford Reservoir." *Id*. This memorandum stated that "Gwinnett County representatives in a visit to [Corps' offices] were advised that the primary authorized purposes of the Buford project were flood control, power and low-flow regulation for navigation and other purposes, and that diversion of flows from the reservoir would, in some degree, adversely affect one or more of these purposes. They were advised that additional legislation would be necessary" to authorize the withdrawals. *Id*.

1001.    The 1958 Apalachicola River Basin Regulation Manual listed the "major uses" of Lake Lanier as flood control, flow regulation for navigation, and power. ACF001677.

1002.    The 1959 Cost Allocation Studies for the ACF Project: Basis of all Allocations of Costs for Buford and Jim Woodruff Projects, discussed "incidental benefits" realized from the operation of the ACF system. ACF002102. These incidental benefits include "water supply and pollution abatement in the Atlanta area [which] are due to the operation of the Buford project and recreation provided by Lake Sidney Lanier, Lake Seminole, and the Walter F. George and Columbia reservoir areas." *Id*.

1003.    The Corps' 1974 Final Environmental Impact Statement ("FEIS") for the continued operation and maintenance of Lake Lanier described Buford Dam as "a multiple-purpose project with principle purposes of flood control, navigation and power." ACF004342.

1004.    The 1974 FEIS describes recreation and water supply as additional benefits of the Buford Dam project, (ACF004339), and acknowledges that recreation was not a primary purpose. ACF004353.

1005.    The Corps stated that lake levels "are subject to some fluctuation during the recreational season in order to meet the primary purposes (navigation, flood control, power) for which the project was authorized." ACF004360.  The Corps further warned that an "extremely dry season of several years could result in the lake being drawn down to such an extent that boat docks would be out of the water and large areas of shoreline would be exposed." ACF004360.

1006.    The FEIS recognized that municipal and industrial uses below Buford Dam benefit from the low-flow augmentation necessary to provide water for navigation. ACF004339.  "Wastes treatment plants in the Atlanta metropolitan area have failed to keep pace with the expanding population, and the increased low flows with a 650 cfs minimum flow at Atlanta have provided some relief in improving stream water quality below Atlanta." ACF004358.

1007.    In the 1974 FEIS, the Corps further stated that "[s]torage in Lake Lanier has increased the dependability of a source of water for Gainesville, Gwinnett County, and Buford, Georgia." *Id*.

1008.    In 1974, the Corps issued a "Report on Consolidation of Existing Program Documents: Lake Sidney Lanier (Buford Dam) Georgia." ACF004096.  This Report discussed the benefits that accrued by virtue of Lanier's flow regulation.  ACF004100-01. After discussing increases in downstream power production and navigation, the report states that "[i]ncidently (sic), it would insure (sic) an adequate municipal and industrial water supply for the Atlanta area." ACF004101.

1009.    A Preliminary Environmental Impact Assessment of Water Supply Alternatives for the Atlanta Metropolitan Area, prepared in May 1979 for the Corps by a Georgia State University Team, recognized the purposes of the Buford project as power generation, flood control and navigation.  The report described Lake Lanier as "a 37,000 acre Lake (Lanier), intensively used for recreation, which was impounded by an earth dam (Buford) constructed in 1957 for power generation, flood control, and navigation purposes. . . ."  ACF006921.

1010.    In a Drought Contingency Report prepared in the early 1980's, the Corps referred to Lanier's "three legislatively authorized purposes" as hydropower, flood control and navigation.  ACF008241.  In contrast to these authorized purposes, the Report notes that prior to May 1979, recreation, water supply and water quality were "always … considered to be functions of the Buford project and were accommodated as much as possible."  ACF08242.

1011.    The Corps listed Lanier's principal purposes as flood control, navigation and power generation in a 1984 Water Assessment for the ACF River Basin Main Report.  ACF009845.

1012.    On November 18, 1987, the Corps released a data sheet on the purposes of reservoirs within the Alabama-Georgia System in the Mobile District.  SUPPAR010272.  The data sheet reflected Lanier's three original authorized purposes from the Rivers and Harbors Act of 1946 as navigation, power and flood control.  *Id.*

1013.    The 1988 Atlanta Region Water Supply Plan stated that Lanier's Congressionally authorized purposes were power generation, flood control, navigation and

maintenance of a minimum flow in the Chattahoochee River at the City of Atlanta of not less than 650 cubic feet per second.  ACF015505.  Water supply, recreation and water quality became major uses of Lanier after its authorization.  *Id*.

1014.    In its Annual Report on Reservoir Regulation Activities for Water Year October 1987-September 1988, the Corps included a chart on the purposes of reservoirs located in the ACF system.  ACF016372.  The chart contained symbols indicating whether a reservoir was authorized for hydropower, navigation, flood control and/or water supply.  *Id*. The chart listed Lanier's purposes as navigation, hydropower and flood control, but did not include water supply as one of its purposes.  *Id*.

1015.    The 1989 Atlanta Regional Water Supply Plan indicated that "[t]he congressional authorization for the project identified the purposes for its construction; power generation, flood control, navigation and maintenance of a minimum flow in the Chattahoochee River at the City of Atlanta of not less than 650 cubic feet per second (cfs). Since the initial project authorization, water supply, recreation, and water quality control have become major uses of Lake Lanier.  These additional uses are now considered as project purposes by the Corps of Engineers."  ACF016596.

1016.    In an April 11, 1989 letter from Rep. Ben Jones, 4th District, Georgia, to the Hon. Henry Nowak, Chairman, Subcommittee on Water Resources, Congressman Jones of Georgia recognized that although over time Lake Lanier has become a popular recreating lake and source of drinking water, "Lake Lanier was originally authorized by Congress for the purposes of hydroelectric power generation, flood control and navigation."  ACF018064.

1017.    The 1989 Draft PAC Report describes Lanier as a multipurpose facility with specifically authorized purposes of flood control, navigation and hydropower.  ACF017293. The report lists recreation, municipal and industrial water supply, and water quality via flow augmentation as "other purposes" of Lanier.  *Id*.  The Draft Planning Aid Report for the PAC Report and Water Control Plan contained the same lists of "specifically authorized purposes" and "other purposes."  ACF017528.

1018.    A white paper on water supply reallocation issues at Lake Lanier ultimately transmitted from Brigadier General Capka to Headquarters on March 16, 2000 concludes that water supply was not an original authorized project purpose at Lanier:

> M&I water supply is not an originally authorized project purpose for. . .Lake Lanier.  Lake Allatoona and Lanier were authorized by Section 10 of the Flood Control Act of December 22, 1944, and Section 2 of the Rivers and Harbor Act of March 2, 1945, respectively.  The reports of the Chief of Engineers referenced in the respective authorizing legislation generally discuss the primary project purposes as well as other potential beneficial uses that may result from the construction of these reservoirs.  For Lake Lanier, water supply is included in those discussions.  However, the reports are clear that the primary purposes for which Lake Allatoona and Lake Lanier were constructed were for hydropower generation, flood control and navigation. Additionally, no portion of the conservation storage space or project costs in either reservoir was allocated to water supply at the time of construction.

SUPPAR009591-92.

1019.    The Corps' November 2003 "Final Environmental Impact Statement for the Operation and Maintenance of Lake Sidney Lanier, Georgia" states that the Corps manages Lake Lanier "to ensure compliance with the ***specific Congressionally authorized hydropower generation, navigation, and flood control purposes***, as well as to provide water supply, fish and wildlife conservation, and recreational benefits to the public." SUPPAR004651 (emphasis added); *see also* SUPPAR004645.

312

1020.    The Corps described the proposed action of the 2003 FEIS as:

[T]o continue the activities necessary for the sustained O&M of Lake Lanier. In addition to the activities related to the congressionally authorized purposes, the USACE is responsible for preserving and protecting resources at water resources development projects under its jurisdiction. Since the 1974 EIS was written, the greater Atlanta metropolis and the five counties surrounding Lake Lanier have experienced tremendous growth and land use changes. Lake Lanier's popularity has grown accordingly as the public continues to recognize the value of the recreational opportunities the lake offers. To address the increased pressures on the lake's resources, the Corps has identified the need to modify some of the O&M activities to improve the management of recreational resources, the shoreline, and natural resources.

SUPPAR004668-69.

## 2.    Court Orders and Pleadings Recognizing the Authorized Purposes

1021.    In its Memorandum in Opposition to Brief of State of Georgia on the Merits and in Support of Federal Defendants' Cross-Motion for Summary Judgment in *Georgia v. U.S. Army Corps of Engineers et al.,* 01-cv-0026-RWS (N.D. Ga.) (MDL case no. 07-cv-252) ("Georgia I"), the Corps explicitly recognized that Congress did not allocate storage to water supply in the original authorization for the Buford Project.  Specifically, the Corps stated in its brief that "*in the original project authorization, there was no storage allocated for water supply*. If the Corps were to reallocate storage capacity for water supply, storage would have to be created for that purpose."  Corps' Memorandum at 36 (emphasis added).

1022.    The Corps also recognized that water supply is an incidental benefit of the Buford project, stating that "[t]he weight of the evidence. . .argues for the conclusion that water supply was, at most, an incidental purpose of the authorized project."  Corps' Memorandum at 36.  Additionally, the Corps recognized that "the levels of storage requested in [Georgia's] Water Supply request on their face would argue that other authorized purposes

of the project such as hydropower generation, flood control and navigation would be seriously affected. Therefore, the trigger for Congressional approval has been met."  Corps' Memorandum at 37.

1023.    In its answer to the SeFPC's Complaint and Application for Declaratory Judgment and Permanent Injunction (Doc. 1) in *Southeastern Federal Power Customers, Inc. v. Caldera*, *et al.*, Case No. 1:00cv2975 (D.C. Dist. Ct.) (MDL case no. 08-cv-640), the Corps admitted to SeFPC's assertion that "[t]here has been no Congressional allocation or reallocation of any of the storage capacity in Lake Lanier to M&I uses of water."  Federal Defendant's Answer at ¶ 67 (Doc. 7).

1024.    In its answer to SeFPC's Amended Complaint (Doc. 230 in MDL 3:08-cv-00640), the Corps admitted to SeFPC's assertion that "No portion of the capital costs of the Buford Project *was ever allocated to water supply* by the Corps.  Consequently, M&I users have not been allocated any portion of the capital costs associated with the Buford Dam and Reservoir since the project's inception."  *See* Federal Defendant's Answer at ¶ 79, Doc. 234, dated Sept. 15, 2008 (emphasis added).

1025.    The Eleventh Circuit concluded that "Lake Lanier was created for the explicitly authorized purposes of flood control, navigation, and electric power generation," and water supply was "not explicitly authorized by Congress."  *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1122 (11th Cir. 2005).

1026.   In an August 13, 2007 Order, this Court recognized that "Congress authorized the creation of Lake Lanier for three purposes:  flood control, navigation, and electric power generation."  Doc. 41 at 1.

1027.   In the same August 13, 2007 Order, the Court recognized that the three congressionally authorized purposes of flood control, navigation, and power "do not reduce the amount of water available downstream from Lake Lanier.  Although not expressly authorized by Congress, the Corps has maintained that water supply use is an incidental benefit from the creation of Lake Lanier and therefore has allowed some water to be used for municipal and industrial water supply use.  *Unlike the congressionally authorized uses, the water supply use may diminish the water quantity flowing downstream from Lake Lanier*." Doc. 41 at 1-2 (emphasis added).

1028.   In an August 12, 2008 Order, this Court referred to the D.C. Circuit opinion as having "ruled that some of the water-supply contracts at issue in some of the pending cases constitute a major operational change for which the parties are required to seek congressional approval."  Doc. 142 at 1.

## VIII.   THE CORPS' ACTIONS ARE INCONSISTENT WITH NEPA AND OTHER FEDERAL LAWS

### A.   The Corps' Requirements Pursuant to NEPA

1029.   NEPA "is our basic national charter for protection of the environment."  40 C.F.R. § 1500.1.

1030.   Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), requires every Federal agency to consider the environmental impact of any "major Federal actions significantly affecting the quality of the human environment . . . ."  "Major Federal action" includes actions with effects that may be major and that are potentially subject to Federal control and responsibility.  40 C.F.R. § 1508.18.

1031.   The Council on Environmental Quality ("CEQ") has promulgated NEPA regulations at 40 C.F.R. Parts 1500-1508.  These regulations are "applicable to and binding on all Federal agencies" including the Corps.  40 C.F.R. § 1500.3.  In addition, the Corps has promulgated its own regulations implementing NEPA, which are published at 33 C.F.R. Part 230 (generally applicable to Corps operations) and 33 C.F.R. Part 325, Appendix B (applicable to Corps regulatory programs).  The Corps' NEPA regulations supplement and are intended to be used in conjunction with CEQ's NEPA regulations.  33 C.F.R. § 230.1.

1032.   CEQ's regulations require agencies to "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts."  40 C.F.R. § 1501.2.

1033.   Under the CEQ regulations, a Federal agency is required to prepare an environmental assessment ("EA") of actions not categorically excluded from NEPA compliance, providing sufficient evidence and analysis for determining whether the agency must prepare an environmental impact statement.  See 40 C.F.R. § 1508.9(a)(1); 33 C.F.R. § 230.10.  Unless the EA results in a finding of no significant impact ("FONSI"), the agency must prepare an environmental impact statement ("EIS").  33 C.F.R. § 230.11.

1034.   An EA is a public document which "shall include brief discussions of the need for the proposal, of alternatives as required by Section 102(2)(E), of the environmental impacts of the proposed action and alternatives."  40 C.F.R. § 1508.9.  A FONSI is a document "presenting the reasons why an action, not otherwise excluded (§ 1508.4), will not have a significant effect on the human environment."  40 C.F.R. § 1508.13.

1035.   When assessing whether an action will have significant environmental impacts, an agency must consider both context and intensity.  40 C.F.R. § 1508.27.  In evaluating intensity, the agency should consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts."  40 C.F.R. § 1508.27(b)(7).  "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment."  40 C.F.R. § 1508.27(b)(7). "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7.

1036.   According to the Corps:  "Actions normally requiring an EIS are: . . . (b) Proposed changes in projects which increase size substantially or add additional purposes; and (c) Proposed major changes in the operation and/or maintenance of completed projects." 33 C.F.R. § 230.6.

1037.   As part of the NEPA process for preparation of an EIS, the Corps is required to engage in a process called "scoping."  The CEQ regulations require scoping to be "an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action."  40 C.F.R. § 1501.7.

1038.   "As soon as practicable" after its decision to prepare an EIS and before the scoping process begins the Corps must publish a notice of intent in the Federal Register.  40 C.F.R. § 1501.7; 33 C.F.R. § 230.12.  As part of the scoping process the Corps must invite

the participation of affected Federal, State and local agencies and other interested persons, determine the scope and significant issues to be analyzed in depth, and indicate the relationship between the timing of the preparation of environmental analyses and the Corps' tentative planning and decisionmaking schedule.  40 C.F.R. § 1501.7(a).  The Corps regulations further provide that during the scoping process, "public concerns on issues, studies needed, alternatives to be examined, procedures and other related matters will be addressed during scoping."  33 C.F.R. § 230.12.  Pursuant to CEQ and Corps regulations implementing NEPA, the Corps may not predetermine its preferred alternative prior to the scoping process, in part because such predetermination unlawfully precludes the required evaluation of alternatives to a proposed action.

1039.   Agencies shall commence preparation of an EIS "as close as possible to the time the agency is developing or is presented with a proposal."  40 C.F.R. § 1502.5.  CEQ regulations require that an EIS "shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made."  40 C.F.R. § 1502.5.

1040.   Section 102(2)(E) of NEPA, 42 U.S.C. § 4332(2)(E), also requires a Federal agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  *See also* 40 C.F.R. § 1501.2(c).

1041.   Until an agency completes its NEPA process and issues a record of decision, "no action . . . shall be taken which would:  (1) Have an adverse environmental impact; or (2) Limit the choice of reasonable alternatives."  40 C.F.R. § 1506.1(a); 33 C.F.R. § 230.22.

### B.      Requirements of the Water Resources Development Act

1042.   Congress provided in the Water Resources Development Act of 1988:

Before the Secretary [of the Army] may make changes in the operation of any reservoir which will result in or require a reallocation of storage space in such reservoir or will significantly affect any project purpose, the Secretary shall provide an opportunity for public review and comment.

33 U.S.C. § 2312.

1043.   Congress declared in 33 U.S.C. § 2316, enacted as part of the Water Resources Development Act of 1990, Pub. L. No. 101-640, 104 Stat. 4604, 4635, Title III, § 306:

The Secretary [of the Army] shall include environmental protection as one of the primary missions of the Corps of Engineers in planning, designing, constructing, operating, and maintaining water resources projects.

## IX.   THE CORPS' ACTIONS VIOLATE THE CZMA WITH REGARD TO FLORIDA'S COASTAL MANAGEMENT PROGRAM[19]

### A.      Corps' Requirements Pursuant to the CZMA

1044.   The CZMA is the national policy "to preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations."  16 U.S.C. § 1452(1).

1045.   In enacting the CZMA, Congress acknowledged that the "coastal zone, and the fish, shellfish, other living marine resources, and wildlife therein, are ecologically fragile and consequently extremely vulnerable to destruction by man's alterations."  16 U.S.C. § 1451(d).

---

[19]      Alabama does not bring a claim under the CZMA and therefore does not join in this fact section.

1046.   A state seeking to benefit from the provisions of the CZMA must adopt a state management program for its coastal zone that complies with the federally-required program elements, and submit the program to the federal government for approval.  15 U.S.C. § 1555.

1047.   Section 302(i) of the CZMA further recognizes that:

> The key to more effective protection and use of the land and water resources of the coastal zone is to encourage the states to exercise their full authority over the lands and waters in the coastal zone by assisting the states, in cooperation with federal and local governments and other vitally affected interests, in developing land and water use programs for the coastal zone, including unified policies, criteria, standards, methods, and processes for dealing with land and water use decisions of more than local significance.

16 U.S.C. § 1451(i).

1048.   To further these purposes, Section 307(c) of the CZMA requires that Federal agency activities that affect the resources of a State's coastal zone, including those that take place outside of the coastal zone, be carried out in a manner that is "consistent to the maximum extent practicable with the enforceable policies" of the State's coastal management program.  16 U.S.C. § 1456(c)(1)(A).

1049.   Enforceable policies include the state policies "'which are legally binding through constitutional provisions, laws, regulations, land use plans, ordinances, or judicial or administrative decisions, by which a State exerts control over private and public land and water uses and natural resources in the coastal zone' and which are incorporated in an [approved] management program."  15 C.F.R. § 930.10(h) (quoting 16 U.S.C. § 1453(6a)).

1050.   For purposes of the CZMA, a "Federal agency activity" is defined as "any functions performed by or on behalf of a Federal agency in the exercise of its statutory

responsibilities" and includes a wide range of activities that initiate an event or series of events where coastal effects are reasonably foreseeable.  15 C.F.R. § 930.31(a).

1051.   Section 307(c) further requires Federal agencies to submit a "consistency determination" to an affected State before final approval of proposed agency activities that will affect any land or water use or natural resource of the coastal zone.  16 U.S.C. § 1456(c)(1)(C).

1052.   The Corps of Engineers, is a Federal agency within the definitions of the CZMA.  *See* 15 C.F.R. § 930.11(j).

1053.   Florida's federally approved management program, the Florida Coastal Management Program ("FCMP"), was approved by NOAA in 1981, and the most recent approval of amendments occurred in 2005.  46 F.R. 48742-01; 53 F.R. 50069-01; 70 F.R. 29260.  Florida's coastal zone is the entire State, including Apalachicola River and Bay. Therefore, Federal agency actions which affect Apalachicola River and Bay must be consistent to the maximum extent practicable with the FCMP.

1054.   Among the enforceable policies of the State's approved coastal management program, Chapter 373, Florida Statutes authorizes the Department of Environmental Protection ("DEP") and the Northwest Florida Water Management District ("NWFWMD") to regulate the withdrawal, diversion, storage, and consumption of water in the Apalachicola River and its tributaries.  Accordingly, all actions affecting the withdrawal, diversion, storage, and consumption of water in the ACF System within Florida, must comply with the enforceable policies of the water resources statutes as administered by the DEP and the NWFWMD.

1055.   One such policy requires State regulators to "take into account cumulative impacts on water resources and manage those resources in a manner to ensure their sustainability."  Fla. Stat. § 373.016(2).  Other policies require promotion of the availability of sufficient water for all existing and future reasonable-beneficial uses and natural systems, and preservation of natural resources, fish and wildlife.  Fla. Stat. §§ 373.016(3)(d), (g).

1056.   The State's general water policy implements these statutes by, among other things, requiring the maintenance of water quality and decisions that "[r]eserve from use that water necessary to support essential non-withdrawal demands, including navigation, recreation, and the protection of fish and wildlife."  Fla. Admin. Code r. 62-40.310(1).

1057.   In addition to these policies, if a proposed activity entails a consumptive use of water, the DEP and NWFWMD must apply three standards.  *See* Fla. Stat. §§ 373.223(1), 373.239(3); Fla. Admin. Code r. 40A-2.301.  First, the proposed activity must be a "reasonable beneficial use" of water, including whether water can be withdrawn without causing harm to the resource and whether the proposed use would significantly affect natural systems.  See Fla. Admin. Code r. 62-40.410(2).  A reasonable beneficial use means "in such quantity as is necessary for economic and efficient utilization for a purpose and in a manner which is both reasonable and consistent with the public interest."  Fla. Stat. § 373.019(5).  Second, the use must not interfere with any presently existing legal use of water.  Third, the use must be consistent with the public interest.  Fla. Stat. § 373.223(1).

1058.   Under Chapter 373, Part IV, Florida Statutes, the NWFWMD may impose reasonable conditions that are necessary to assure that the operation or maintenance of any dam, impoundment, reservoir, appurtenant work, or works is consistent with the provisions

of the water resources statute and applicable rules, is not inconsistent with the overall objectives of the district, and will not be harmful to the water resources of the district.  Fla. Stat. §§ 373.171(a), 373.416(1).

1059.   If an activity involving the management and storage of surface waters is proposed for State-owned lands, such as aquatic preserves, then DEP and NWFWMD's approval is further conditioned upon the authorizations required under Chapters 253 and 258. Fla. Stat. § 373.422.  Submerged lands must be managed primarily for maintenance of essentially natural conditions, the propagation of fish and wildlife, and public recreation.  Fla. Stat. § 253.034(2)(b); see also Fla. Stat. § 370.25 (charging the Florida Fish and Wildlife Conservation Commission with protecting marine fisheries).  Aquatic preserves are set aside to be maintained essentially in a natural condition.  Fla. Stat. § 258.36.

1060.   Florida's water resources statutes also prohibit activities that cause "pollution."  Fla. Stat. § 373.430(1)(a); see also Fla. Stat. § 403.161.  Florida's environmental statutes define "pollution" broadly to include the presence in state waters of any human-induced impairment of waters, or alteration of the chemical, physical, or biological integrity of water in quantities or at levels which are or may be potentially harmful or injurious to animal or plant life.  Fla. Stat. § 403.031(7).  Pursuant to this definition, activities that result in flow reductions that harm aquatic life would constitute "pollution" prohibited by Florida's water resource statutes and environmental statutes.

1061.   The State of Florida has designated the Apalachicola River as "Outstanding Florida Waters" and "Special Waters."  *See* Fla. Admin. Code r. 62-302.70; ACF040047; ACF010306.  Once the designation has been made, the state of Florida does not allow the

degradation of water except for specifically-identified instances.  *Id.*; Fla. Admin. Code r. 62-4.242(2).

1062.   Florida has statutes and policies in place to protect species which are endangered, threatened, or of special concern. *See* Fla. Stat. §§ 372.072, 372.0725.  The laws "provide for research and management to conserve and protect these species as a natural resource."  Fla. Stat. § 372.072.

**B.      The Corps' Non-Compliance with Florida's Coastal Management Program (FCMP)**

1063.   On December 15, 1989 (SUPPAR000414-15), January 30, 1990 (SUPPAR000412-13), and February 5, 1990 (SUPPAR000410-11), Florida notified the Corps that the activities proposed in the PAC Report were inconsistent with enforceable policies of the FCMP.

1064.   On January 6, 2005 (ACF039690-95)], May 19, 2005 (SUPPAR001111), October 19, 2006 (ACF040679), and June 12, 2007 (SUPPAR000405-09), Florida again notified the Corps that its reservoir operations were affecting Florida's coastal resources, requiring a determination that these activities were consistent to the maximum extent practicable with enforceable policies of the FCMP.

**X.     THE CORPS' OPERATIONAL CHANGES AT BUFORD HAVE A MAJOR NEGATIVE IMPACT ON FLORIDA AND ALABAMA**

**A.      Description of the Apalachicola River and Bay**

1065.   The Apalachicola River is the largest river in Florida in terms of flow. ACF014550; ACF014556; ACF036797; *see also*, *Biological Opinion for Woodruff Dam Revised IOP*, June 1, 2008 ("BiOp") at 48-49,

http://www.sam.usace.army.mil/ACF%20Water%20Resources%20Management/May_2008_consultation/Final%20BO%20for%20RIOP%206-1-2008.pdf.

1066.   There are no impoundments on the Apalachicola River.  ACF015811; ACF036796.

1067.   The ecosystems of the Apalachicola River and floodplain developed based on the historical flow regime of the Apalachicola.  ACF015808; ACF036789; BiOp at 49.

1068.   These flows historically inundated the Apalachicola River floodplain, on which multiple riverine species rely to support one or more biological processes, such as reproduction, foraging and feeding.  ACF036789.

1069.   The historical flow regime also regulated the salinity of the Apalachicola Bay, which is one of the Nation's most productive oyster fisheries and integral to the economic welfare of the Florida panhandle.  *See Environmental Assessment, Georgia Environmental Protection Division Proposal for a Temporary Reduced Minimum Water Quality Flow Requirement in the Chattahoochee River at Peachtree Creek for Drought Contingency Water Management Operation in the ACF River Basin and Temporary Waiver from ACF Water Control Plan, November 10, 2008* at 21, http://www.sam.usace.army.mil/ACF.htm#Buford_Dam-Request_for_Temporary_Deviation.

1070.   Because "the upstream impoundments on the Chattahoochee River influence the Apalachicola River flows during both high and low flow periods . . . a system approach is used to balance the needs of the various water users on the Apalachicola River as well as in other parts of the basin."  ACF015811.

1071.   The Corps recognizes that "[t]he Apalachicola Basin is a complex system of considerable value as a natural environmental asset" and has "high environmental value." ACF006902.

1072.   The U.S. Fish and Wildlife Service ("FWS" or "Service") has noted that the Apalachicola Basin is renowned for its unique biota that results from its continuity with the southern Appalachians and its diverse physical environments.  ACF017860-61.  Also have stated that the areas including and along the River and Bay "provide valuable wildlife habitat."  ACF017861.

1073.   The submerged lands within Apalachicola River and Bay are state-owned and held in trust for the people of Florida under the State Constitution.  Fla. Const. Art. X, § 11.

1074.   The Apalachicola River Basin is encompassed in the Northwest Florida Water Management District, which is one of Florida's five water management districts which develops and regulates Florida's water resources.  *See* Declaration of Douglas E. Barr ("Barr Decl."), Exhibit 3 to Florida's Notice of Filing Declarations in Support of Florida and Alabama's Joint Motion for Partial Summary Judgment on all Phase 1 Claims ("Florida's Notice of Filing Declarations"), ¶ 6.

1075.   The ACF River Basin is one of the most biologically diverse in North America with at least 131 species of fish, 33 species of mussels, and 30 species of crayfish. SUPPAR006886.  The ACF Basin contains the highest density of reptiles and amphibians in the United States.  SUPPAR001602; ACF014558; ACF036797.

1076.   More than 70 tree species and hundreds of other plant species populate the Apalachicola River floodplain.  ACF014550.

1077.    The Apalachicola River is bordered by the Apalachicola National Forest, Torreya State Park, The Nature Conservancy Apalachicola Bluffs and Ravines Preserve, Tates Hell State Forest and Apalachicola Wildlife and Environmental Area, as well as the Northwest Florida Water Management District-owned Apalachicola River Water Management Area.  *See* Declaration of Michael W. Sole ("Sole Decl."), Exhibit 1 to Florida's Notice of Filing Declarations, ¶ 9.

1078.    The Northwest Florida Water Management District acquired 35,509 acres of the Apalachicola River to management preservation.  ACF017533.

1079.    Apalachicola Bay is one of the most productive estuarine systems bordering the Gulf of Mexico.  SUPPAR001602; *see also* Barr Decl., ¶ 11; Declaration of H. Lee Edmiston ("Edmiston Decl."), Exhibit 4 to Florida's Notice of Filing Declarations, ¶ 12.

1080.    Apalachicola Bay is one of the most productive bays in Florida for seafood production.  ACF015815; ACF017862, *see also* Edmiston Decl., ¶¶ 11-12.

1081.    In 1989, the FWS valued the various fisheries in the Apalachicola Bay and adjacent estuaries "to exceed $23 million in 1984 and could be as high as $67 million if direct and indirect effects to the State and region are included."  ACF017862.

1082.    Apalachicola Bay provides approximately 90% of the oysters harvested in Florida (approximately 10% of the nation's total), and it supports substantial harvests of shrimp, finfish and crabs.  ACF014573; ACF014578; ACF036815, *see also* Edmiston Decl., ¶ 12.

1083.    Apalachicola Bay "is dependent on freshwater inflows to maintain its characteristic and highly productive nature."  ACF015830.

1084.    The Service has described Apalachicola Bay as an ideal environment for the growth and culture of the American oyster, with diverse and substantial fisheries connected to the Bay system.  ACF014570.

1085.    Florida discussed with the Corps the effects of low levels of freshwater during periods of drought as early as 1988.  ACF016219.

1086.    Apalachicola River is an important contributor to the health and continued sustainability of the Apalachicola Bay.  Edmiston Decl., ¶ 12.

1087.    The State of Florida, the United States, and The Nature Conservancy have made substantial investments to protect this resource.   ACF036801-04.

1088.    The State of Florida purchased 280,000 acres in order to preserve and protect Apalachicola River and Bay.  Of the 280,000 acres purchased by the State, 104,000 acres have been purchased since January of 1999, at a cost of nearly $100 million.  ACF036801-04.

1089.    The Nature Conservancy has purchased an additional 8,843 acres to preserve the Apalachicola River and Bay.  ACF014579-80; ACF038049.

1090.    The federal government has purchased another 260,000 acres to preserve Apalachicola River and Bay.  *See* Declaration of Helen M. Light ("Light Decl."), Exhibit 2 to Florida's Notice of Filing Declarations, ¶ 10.

1091.    "The Apalachicola River flood plain has been described as one of the largest, contiguous tracts of bottomland hardwoods in the United States today.  This flood plain has been targeted by the Northwest Florida Water Management District under Florida's "Save Our Rivers" program for acquisition, management preservation and, where compatible with

intended land us, for varied recreational purposes.  Currently, about 35,509 acres have been

acquired on the Apalachicola River by the [NWFWD] for these purposes."  ACF017861.

1092.   Under the authority of the Coastal Zone Management Act, Florida established

the Apalachicola National Estuarine Research Reserve ("ANERR"), as a cooperative

program between (among others) Florida and National Oceanic and Atmospheric

Administration, in 1979 "for the purpose of creating a natural field laboratory in which to

gather data and make studies of the natural and human processes occurring within the coastal

zone to contribute to science and education and to provide management information essential

for the protection of estuarine systems."  ACF013978.

1093.   ANERR encompasses 193,758 acres of land and water and was established to

"protect, manage and preserve the ecological productivity of this important area."

ACF017861; ACF017865; ACF033405.  Included in ANERR are two barrier islands and a

portion of a third, the lower 20 miles of the Apalachicola River and its floodplain, adjoining

uplands, and the Apalachicola Bay system.  ACF018436.

1094.   The ANERR has received international designation as a Biosphere Reserve

through the United Nations Educational, Scientific and Cultural Organization.  ACF014581.

1095.   On October 17, 1984 the Apalachicola River was designated as an

Outstanding Florida Water.  Fla. Admin. Code Ann. r. 62-302.700(9)(i); ACF040047;

ACF010306.  In so doing, the Environmental Regulation Commission made a finding that

"the waters are of exceptional recreational or ecological significance and a finding that the

environmental, social, and economic benefits of the designation outweigh the environmental,

social, and economic costs.  Fla. Admin. Code Ann. r. 62-302.700(5), 9(i).

1096.   Florida also designated the Apalachicola Bay as a Florida Outstanding Water. Fla. Admin. Code Ann. r. 62-302.700(9)(f).

1097.   The purpose of such a designation is to "afford the highest protection" to these waters by not permitting the degradation of water quality in the outstanding water designated areas.  Fla. Admin. Code Ann. r. 62-302.700(1).

1098.   The Apalachicola River and Bay is a priority of the Surface Water Improvement and Management (SWIM) program, legislated in 1987 to reduce watershed degradation, as well as protect and preserve natural resources.  Fla. Stat. § 373.453.

1099.   The Apalachicola Bay is designated as an Aquatic Preserve.  Fla. Stat. § 258.39(18).  This designation is reserved for state-owned submerged lands which "have exceptional biological, aesthetic, and scientific value" and are set aside "for the benefit of future generations."  Fla. Stat. § 258.36.

1100.   In 1985, Florida passed the Apalachicola Bay Area Protection Act to protect the water quality and natural and economic resources through the implementation and enforcement of "comprehensive plans and land development regulations."  Fla. Stat. § 380.0555(2).

1101.   In addition, federally-protected species live in the Apalachicola River and Bay. In 1991, the U.S. Fish & Wildlife Service listed the Gulf sturgeon, an anadromous fish, as "threatened" under the Endangered Species Act.  56 Fed. Reg. 49,653, 655 (Sept. 30, 1991). The Service observed that the "Federal actions most likely to affect the Gulf sturgeon are the permitting programs and Federal water resource projects of the U.S. Army Corps of Engineers."  56 Fed. Reg. at 49,656.

1102.    The Service later designated the Apalachicola River and Bay, including the estuary as these anadromous fish spend a portion of their life cycle in the Bay, as critical habitat for the Gulf sturgeon.  68 Fed. Reg. 13,370, 13,393, 13,937 (March 19, 2003).

1103.    The Service identified water diversion as being among "Activities That May Destroy or Adversely Modify Gulf Sturgeon Critical Habitat."  68 Fed. Reg. at 13,399-400.

1104.    The Service listed as endangered the fat threeridge and as threatened the purple bankclimber and Chipola slabshell, three species of freshwater mussel, under the ESA. 63 Fed. Reg. 12,664 (March 16, 1998).  Both species occupy the Apalachicola River.  63 Fed. Reg. at 12,666, 12,669.

1105.    The Service found that Federal actions impacting water quantity were among the factors that may affect these species and their habitat.  63 Fed. Reg. at 12,684.

1106.   The Service did not designate critical habitat for these mussels when the species were listed.  However, as a result of a lawsuit filed March 15, 2004, the Service has designated critical habitat for the three mussels throughout the Apalachicola River mainstem and many of the key distributaries of the River including Swift Slough.  72 Fed. Reg. 64,285 (Nov. 15, 2007).

1107.   The Service has recognized that the mussels depend on fish hosts to support larval stages of life and that maintaining threshold density of those host fish is integral to the mussel populations.  BiOp at 81.

1108.   According to FWS, "[t]he construction and operation of dams, water withdrawals, and water diversions may alter features of the flow regime important to the mussels and their host fishes."  72 Fed. Reg. at 64,302.

### B.      Description of the Chattahoochee River System

1109.   The Chattahoochee River is regulated by several dams, the principal five being Corps of Engineers' dams.  ACF015808-09.

### 1.      Jim Woodruff Lock and Dam

1110.   Located at the confluence of the Chattahoochee and Flint Rivers, Jim Woodruff Lock and Dam ("JWLD"), originally known as "Junction Dam," was the first Corps of Engineers' dam constructed in the ACF basin.  ACF001919; ACF008206-07; ACF040749. It was authorized for navigation and hydropower.  ACF004678.  Additionally, JWLD "augments low-flow conditions downstream which increase the waste assimilation capacity of the Apalachicola River, benefits fish and wildlife in the reservoir and provides recreational opportunities for millions of people to enjoy each year."  *Id.*

1111.   JWLD impounds Lake Seminole which is "essentially [a] run-of-the-river project[], which depend[s] largely upon inflows controlled by the upstream impoundments." ACF015809.   Lake Seminole contains limited storage for "short duration flow augmentation in the downstream Apalachicola River for navigation purposes."  *Id.*

1112.    JWLD is "a multi-purpose project created primarily to aid navigation in the Apalachicola River below the dam and in the Chattahoochee and Flint Rivers above the dam and to generate electric power."  ACF003809.  The project "consists of a dam with its axis about normal to the river channel; an 82 by 450-foot single-lift lock; a 30,000-kw power plant and appurtenances; and a reservoir extending up the Chattahoochee River to George W. Andrews Lock and Dam."  *Id.*  The reservoir created by the dam is intended to "provide[] a

9-foot depth for navigation from Jim Woodruff to the George W. Andrews Lock and Dam." *Id*.

### 2. George W. Andrews Lock and Dam

1113. Immediately upstream from JWLD is the George W. Andrews Lock & Dam ("GALD"), "a single purpose project designed to aid navigation by providing a 9-foot navigation channel and by maintaining a more uniform downstream flow." ACF005930.

1114. GALD impounds Lake George W. Andrews. ACF015809. This lake is located entirely with the banks of the river and "is essentially [a] run of the river project[], which depend[s] largely upon flows controlled by the upstream impoundments." *Id*.

1115. The plan of operation for the project is "to reregulate the erratic inflows caused by peaking power operations at the Walter F. George powerhouse," and to "provide project depths of 9 feet for navigation to the Walter F. George Lock and Dam, 28.6 miles upstream." ACF005930. It is a run-of-river project designed to be maintained at a normal pool elevation of 102', the normal pool elevation required to maintain the nine-foot navigation channel from the Andrews Dam upstream to Walter F. George. ACF005931; ACF005949-50.

1116. To facilitate normal hydropower peaking operations, the reservoir may be drawn down temporarily to elevation 96' to accommodate increased generation flows released out of Walter F. George. ACF005949-50. During off-peak periods and on weekends, the reservoir is maintained at a constant elevation of 102'. ACF005249. Likewise, during periods of low-flow, Andrews must remain at elevation 102', and the Andrews spillway will be operated to pass inflow. ACF005951. The Walter F. George tailwater

"must not, at any time, be allowed to fall below elevation 102', when the headwater is at summer pool."  ACF005950.  Likewise, the Andrews tailwater is to be maintained at all times at elevation 77' to maintain the 9-foot navigation channel between Andrews and Woodruff.  ACF005951.

1117.   "If it is impossible to maintain the Andrews tailwater at elevation 77 or higher" during extended shutdowns, "arrangements may have to be made for limited operation of the Walter F. George power plant, or for equivalent spillway discharges. Without these supporting inflows, operation of the Andrews spillway . . . will result in a temporary drawdown of the Andrews pool and below-minimum navigation depths at Walter F. George." *Id.*

1118.   If the Jim Woodruff pool is below elevation 77 and the local inflow to Andrews is small, it may become necessary to raise the tailwater by increasing the gate openings . . . .  This will result in a drawdown below elevation 102 in the Andrews pool. When such a drawdown is required, the operator at Andrews Dam will immediately inform the Power Project Superintendent or operator in charge at Walter F. George powerhouse, who will evaluate the situation and decide if emergency releases from the power plant or spillway are necessary.  ACF005953.

### 3.  Walter F. George Lock and Dam

1119.   The next reservoir up the Chattahoochee from Andrews, and the first with storage capacity, is Walter F. George Lock & Dam ("WF George"), whose purposes are navigation and hydropower production.  ACF020187.

1120.   The WF George project "consists of powerhouse gated spillway lock in and adjacent to the original river channel and earth dikes extending to high ground on both banks. The project has a 130,000 kW power plant with appurtenances, and a reservoir extending up the Chattahoochee River 85 miles to Columbus Georgia and Phenix City Alabama." ACF020187.  The reservoir created by the dam "provides a 9-foot minimum depth for navigation from the dam to Columbus, Georgia and Phenix City, Alabama"—the northern terminus of the ACF navigation channel.  *Id.*  The reservoir, at its maximum summer operating elevation of 190', has a total power storage volume of 244,400 acre-feet. ACF019140.

1121.   The 1993 WF George regulation plan states that "[n]avigation and hydroelectric power were [the] original project purposes" of the reservoir, but that "additional purposes"—such as fish and wildlife and recreation—"are now served in response to nation-wide authorizing legislation."  ACF020207.  The George reservoir is to be operated between the minimum pool elevation 184' and 190'.  *Id.*  With adequate channel maintenance, the minimum pool elevation of 184' is sufficient to provide a 9-foot depth upstream to Columbus, Georgia.  ACF020208.

1122.   Reservoir operations—particularly during dry periods—are to be coordinated with elevations at downstream reservoirs to maintain the navigation channel.  Jim Woodruff Lock and Dam is required to maintain minimum navigation depths in the river below the dam. The minimum depths will vary according to shoaling and dredging operations in the downstream reach.  During periods of low flow, the navigation requirement may result in excessive drawdown of the Jim Woodruff pool.  When this condition exists, the Walter F.

George project will be operated to supply as much additional flow as practicable.  During the summer months when natural flows are adequate throughout the basin, the Walter F. George pool will be maintained as near the top of conservation pool as practicable in anticipation of downstream flow deficiencies.  *Id*.  "The storage in Lake Walter George and the other upstream projects is used to augment the flows required to provide the stage at Blountstown." ACF020209.

1123.    Similar operations are required to maintain the elevation of Andrews Lock & Dam.  A tailwater elevation of 102 is required at Walter F. George Dam to provide the 9-foot navigation depth in the upper reaches of the George Andrews reservoir.  Normally the George Andrews Dam will be operated to assure the minimum tailwater of 102 at Walter George Dam but conditions may occasionally arise in the operation of George Andrews Dam which cause temporary drawdown below elevation 102.  Shoaling in the upper reaches may also reduce depths in the navigation channel to less than 9 feet.  If it is necessary to raise the upstream portion of the Andrews pool for navigation it may be accomplished by making special releases from the Walter F. George Dam.  ACF020209.  Because Andrews Dam, the next project downstream, "acts as a reregulation dam to reregulate the effects of the Walter George peak power release entering the Jim Woodruff pool it is necessary that the operators at Andrews be kept fully informed of all release schedules at Walter F. George." ACF020211.  Lastly, hydropower operations may continue during low flow periods, but "downstream water requirements for navigation will be carefully considered in preparing weekly power declarations."  ACF020209.

### 4.    West Point Dam

1124.   North of Walter F. George Dam lies West Point Dam.  West Point is "a multi-purpose project with major project purposes including flood control, hydroelectric power, recreation, fish and wildlife development, and stream flow regulation for downstream navigation."  ACF004524.

1125.   The reservoir formed by the dam, at maximum pool elevation of 635', extends from the dam site up the Chattahoochee River approximately 34 miles to Franklin, Georgia. ACF004526.  At full summer pool elevation 635', the reservoir has a total power storage capacity of 306,100 acre-feet.  ACF004518.  At winter pool elevation 625', West Point has a power storage volume of 85,100 acre-feet.  *Id*.  West Point, along with Buford, is one of two Corps reservoirs in the ACF that does not contain a navigation lock, although the West Point project was planned and constructed so that a navigation lock could be installed in the future if authorized.  ACF004526.

1126.   Ordinarily, "the West Point project will be operated as a peaking plant for the production of hydroelectric power and during off-peak periods will maintain a continuous flow of 675 cfs."  ACF004532.  During periods of low water flow, "such regulation will provide increased flow downstream for navigation, water supply, water quality requirements and other purposes."  *Id*.  However, "the primary purpose of the project is flood control," and the reservoir will be drawn down seasonally to elevation 625 to provide a flood storage capacity of 221,000 acre-feet during the flood season of December through mid-April. ACF004532-33.

1127.   Operation of the West Point project as prescribed by its operations manual "is expected to increase the average monthly flows below the site during the minimum flow period of September through December."  ACF004538.  The West Point manual recognizes that "[e]xisting authorizations call for a nine-foot navigation channel extending up the Apalachicola and Chattahoochee Rivers to Columbus, Georgia.  Above Jim Woodruff on the Chattahoochee River this channel is provided by the Woodruff, George W. Andrews and Walter F. George pools."  *Id*.  While studies originally concluded that a flow of 9,300 cfs (expected 95% of the time) would provide a nine-foot channel, more recent experience showed that "flow requirements to maintain a 9-foot channel [in the Apalachicola] vary from about 10,500 to 15,000 cfs."  *Id*.  Consequently, In order to provide a sound water management program which would assure maximum releases from storage at Buford and Walter F. George for benefit of navigation without jeopardizing the projects' capability to meet power contract requirements a plan was developed for system operation of the Apalachicola River basin projects.  The West Point project will be included in this system operation plan.

1128.   This system operating plan establishes zones within the storage prisms at Buford, Walter F. George and West Point which indicate the maximum flow that can be maintained in the Apalachicola River by storage withdrawals for any given level in the storage reservoirs.  The first pondage used is that in the Woodruff Reservoir.  Withdrawals from the Woodruff pondage are replaced as required from the storage in Walter F. George.  Withdrawals from Walter F. George are replaced by releases from West Point and withdrawals from West Point are replaced wholly or in part by releases from Buford.

ACF004539.  The "zones" referenced in this section of the West Point reservoir are nowhere

defined in the manual.  The manual notes elsewhere that studies made during the preparation

of the West Point manual show that "an average discharge of 3,000 cfs is needed from

Walter F. George during May in order to maintain minimum flows below Jim Woodruff."

ACF004523.

### 5.    Buford Dam

1129.    Buford Dam is the uppermost of the Corps' ACF reservoirs and by far the

largest of the storage reservoirs.  It represents 65 percent of the storage space in the ACF

reservoirs.  ACF001958; ACF018475.  The Corps began construction on Buford Dam in

1950.  ACF008206.  The dam was completed and filled to full elevation of 1070 in 1959.  *Id.*

1130.    Buford Dam impounds Lake Sidney Lanier which is located "approximately

50 miles northeast of Atlanta, Georgia."  ACF015809.  Lake Lanier's authorized purposes

and operations have been discussed in detail above.

### 6.    Non-Corps of Engineers Dams

1131.   Georgia Power Company operates Morgan Falls Dam which "reregulates

Buford Dam releases and assists in maintaining a flow of 750 cfs below Peachtree Creek in

the Atlanta area in accordance with a Georgia Power contract with the City of Atlanta."

ACF015810.

C.       **Harm to Florida and Alabama**

1.       **Specific Impacts to Florida**

a.       **The Corps Operations**

1132.    There is consensus that the Corps operations to ensure water supply in Lake Lanier have had a direct impact on the average annual flows at the Florida border. ACF004002-03; ACF0199938 (recognizing that Gwinnett County's 40MGD request for water supply from Lake Lanier would directly impact average flow by 0.3 percent at Jim Woodruff); Joint Notice of Intention to Call Expert Pursuant to Scheduling Order ¶ C(4) at 7 (Doc. 154 in MDL 3:07-md-1) (acknowledging that withdrawals from Lake Lanier for Metropolitan Atlanta have an impact at the Florida border on average annual flows of 1 to 2%).

1133.    Damage to Florida is not material in terms of average annual flows, but rather in periods of reduced flow and drought. Barr Decl., ¶¶ 30-31.

1134.    The Corps basically makes two kinds of decisions with respect to Buford Dam and its reservoir, Lake Lanier:  (i) to allow withdrawals from the reservoir; and (ii) to release water through the turbines.  The Corps also can implement the converse of these two actions by limiting or disallowing municipal and industrial ("M&I") withdrawals, and by storing water in the reservoir rather than releasing it.  Barr Decl., ¶ 34.

1135.    The Corps has progressively made these decisions to support water supply by retaining water in storage that should be released downstream, particularly in periods of drought during 1981, 1986-88, and 1999-2001.  For example, from 1977 to 2008, there has been a four-fold increase in the amount of storage in Lake Lanier allocated to water supply.

Concurrently, during the major drought periods between 1977 and 2008, hydropower has decreased by 33% and Lake Lanier elevation levels have remained constant, demonstrating that water is being held during droughts to support water supply needs.  Barr Decl., ¶¶ 16, 35-40.

1136.    The Corps has also chosen to operate under a *De Facto* Water Control Plan which has never been adopted which establishes "action zones" that prioritize operations for water supply and establishes a minimum flow requirement of 5,000 cfs.  Barr Decl., ¶¶ 19-27.

1137.    As a result, at least in significant part, of the Corps' reservoir operations (particularly of the Lake Lanier reservoir, which has 65 percent of the overall storage capacity of the entire Corps dam system on the Chattahoochee River), including implementation of both the consumptive water supply withdrawals and of the1989 draft Water Control Plan and action zones which prioritize water supply, Florida has experienced a marked shift in the timing of flows in the Apalachicola River during the drier than normal years.  As a general rule, flows during the spring and summer months have decreased, while flows in the late fall and early winter have increased.  BiOp at 56-57.  The consequences to Florida's riverine and estuarine species, as described below, has been seriously deleterious, because the spring and summer months are the most biologically productive months of the year.  Sole Decl., ¶ 15.

1138.    Most sloughs in the riverine reach (upper 85 miles) of the Apalachicola River are disconnected from the main channel at 5,000 cfs minimum flow; the number of connected sloughs increases as flows increase.  Barr Decl., ¶ 27.  Even at higher flows, significant sloughs become disconnected from the main channel.  Barr Decl., ¶ 42;  s*ee also*

Declaration of Gregory F. Zimmerman ("Zimmerman Decl."), Exhibit 6 to Florida's Notice of Filing Declarations, ¶ 9.

1139.    The ecological significance of the Apalachicola Bay is evidenced by the designation of the Apalachicola National Estuarine Research Reserve ("ANERR") by the federal government.  [Section 315 CZMA of 1972 as amended, 15 CFR Part 921; EA at 17; http://www.dep.state.fl.us/coastal/sites/apalachicola/info.htm.]  ANERR covers over 246,000 acres and was dedicated to protect, preserve and study the unique ecosystem created by the estuary.  *Id.*; ACF017865; ACF033405.  ANERR is one of only 27 such reserves and has received international designation as a Biosphere Reserve through the United Nations Educational, Scientific, and Cultural Organization.  ACF014582; Sole Decl., ¶ 21.

### b.        Riparian Rights of the State of Florida

1140.    The State of Florida has acquired approximately 320,000 acres of conservation land in the Apalachicola River Basin at a cost of over $242 million to protect and preserve the historical ecosystem.  In addition, Florida has spent millions more to manage and restore conservation lands throughout the Basin.  Sole Decl., ¶ 19.

1141.    The State of Florida owns approximately 77,000 acres along the main channel of the Apalachicola River and in the annually flooded portions of its floodplain corridor, creating riparian rights extending to, or ownership of, about 75 miles of major river channels and more than 300 miles of off-channel floodplain sloughs, streams and lakes, all of which are directly influenced by Apalachicola River flows less than 30,000 cfs.  These sloughs, streams, and lakes are flowing through a matrix of swamps and bottomland hardwood forests, and freshwater and brackish-water marshes.  The Corps does not routinely

alter the flow through its operations until flows are less than 30,000 cfs, causing the Corps

operational decisions to affect Florida's riparian lands and the flora and fauna dependent

upon those lands as more specifically described below.  Light Decl., ¶ 11.

c.      ACF Species

1142.    Reductions in river stage, which is due in at least significant part to storage

for water supply in Lake Lanier and alteration of the flow regime, have further adversely

affected at least four species (the Gulf sturgeon and three species of mussels – the fat

threeridge, the purple bankclimber, and the Chipola slabshell) which are listed as threatened

or endangered under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq.

SUPPAR001549.  Inflows from the Chattahoochee and Flint Rivers contribute to

maintenance of habitats supporting these species, which have been designated as "critical

habitat" under the ESA.  68 Fed. Reg. 13,370, 13,393, 13,937, March 19, 2003; 72 Fed. Reg.

64285, November 15, 2007; BiOp at 41-42.  Critical habitat has been designated in and along

the Apalachicola River for the Gulf Sturgeon and all three mussel species.  *Id.*  Critical

habitat for Gulf sturgeon also extends into Apalachicola Bay, as these anadromous fish spend

a portion of their life cycle in the Bay.  68 Fed. Reg. 13,370, 13,393, 13,937, March 19, 2003;

BiOp at 16-17; Sole Decl., ¶ 16.

1143.    Fat threeridge and purple bankclimber cannot tolerate dessication.  Moreover,

even when inundated in small amounts of water, these species can be extremely vulnerable to

heat and predation.  Zimmerman Decl., ¶ 7.  For example, in the summer of 2006, when the

Corps made operating decisions to discharge water from Jim Woodruff Lock and Dam at a

rate of between 5,400 and 5,600 cubic feet per second (cfs), numerous dead and dying

mussels were located at various locations on the Apalachicola River.  At Navigation Mile ~44 on both river banks, mussels, including fat threeridge and purple bankclimber, were stranded and many were dead.  Zimmerman Decl., ¶ 8.

1144.    Swift Slough is a "loop stream," where populations of endangered and threatened mussels had been identified.  In a loop stream water enters at the top of the Slough from the Apalachicola River and proceeds through the Slough until it exits back into the Apalachicola River at the bottom.  In the summer of 2006, when the Corps made operating decisions to release flows of approximately 5,400 cfs, Swift Slough was barely connected to the main stem of the River (~0.3ft) at the inflow, and was disconnected at various locations downstream.  Many mussels were found stranded in piles in pools and above the water on river banks.  A relatively small purple bankclimber was found fresh dead (i.e., with tissue) in Swift Slough, stranded behind a log.  It was estimated that approximately 30,000 protected mussels (18% of the population) perished at that single location.  The U.S. Fish and Wildlife Service later estimated that 18,500 mussels died and that the mortality due to the low flows during that time period represented 10% of the endangered fat threeridge population in the Apalachicola River.  Zimmerman Decl., ¶ 9.

1145.    Since 2006, the U.S. Fish and Wildlife Service estimates that approximately 19% of all fat threeridge in the Apalachicola River have died.  This dramatic die-off coincides with prolonged low flows in the Apalachicola River.  Zimmerman Decl., ¶ 11.

1146.    The foregoing dieoff has been caused, at least in significant part, by storage of water for water supply in Lake Lanier and application of the Corps' draft Water Control Plan and its action zones.  Barr Decl., ¶¶ 19-27.

1147.    Flows in the Apalachicola River allow the ACF Basin to support a rich biological diversity of fish, birds, flora and both terrestrial and aquatic animal species. SUPPAR001601-03; ACF014558-62.  For example, more than 70 tree species and hundreds of other plant species populate the Apalachicola River floodplain.  ACF014550.  The ACF Basin also contains the highest density of reptiles and amphibians in the United States. SUPPAR001602; ACF014558; Sole Decl., ¶ 17.

1148.    The Florida Fish and Wildlife Conservation Commission ("FWCC") has documented a direct correlation between Apalachicola River flows and the relative size and abundance of fish utilizing the floodplain.  BiOp at 55.  Some of these fish act as "host fish" for the three threatened or endangered mussels, which rely on their hosts in the reproductive process.  *Id.*; BiOp at 92-95.  Because fish production in the River is substantially higher in wet years, when the floodplain becomes and remains inundated for long durations, and year class strength for animals hatched in wet years is consistently higher than animals hatched during drier years, the retention of water by the Corps in the upstream reservoirs, and particularly the Lake Lanier reservoir, artificially constrains that flow during periods of drought and negatively impacts the host fish, thereby harming the threatened and endangered mussels, and, if sufficiently intensive, stranding the mussels themselves.  Sole Decl., ¶ 18.

1149.    Fish & Wildlife recently recognized the potential adverse impact of upstream M&I storage and uses, and encouraged the Corps, under its authority in ESA Section 7(a)(1), to "[w]ork in consultation with the states and other stakeholders to assist in identifying ways to reduce overall depletions in the ACF basin… ."  BiOp at 186; Sole Decl., ¶ 22.

### d.       Threatened and Endangered Plant Species

1150.      Florida has designated several plants which occupy tidal freshwater swamps of the Apalachicola River as species which are endangered, threatened, or commercially exploited.  Cole and Garland, 2003, at http://www.virtualherbarium.org/EPAC/refs.html. Florida has designated Thorne's buckthorn (*Sideroxylon thornei*) as an endangered shrub and the cardinal flower (*Lobelia cardinalis*) and corkwood (*Leitneria floridana*) as threatened species.  All of these threatened and endangered species occur in swamps and low bottomland hardwood forests of the Apalachicola River floodplain, and their preservation and the possibility of their recovery is dependent on sufficient fresh water flows in the Apalachicola River.  Light Decl., ¶ 13.

1151.      In addition, the royal fern (*Osmunda regalis L.*), a commercially exploited species, is found in swamps and low bottomland hardwood forests of the Apalachicola River floodplain, in both riverine and tidal reaches.  It, also, is dependent on sufficient fresh water flows in the Apalachicola River.  Light Decl., ¶ 14.

### e.       Floodplain Species

1152.   During drier than normal years, and due, at least in significant part to the storage of water supply in Lake Lanier and the application of the Corps' draft Water Control Plan and actions zones, Florida has experienced a marked shift in the timing of flows in the Apalachicola River.  When dry years prior to Federal dam construction in 1955 are compared to dry years since 1975, it is evident that flows during the spring and summer months have decreased, while flows in the late fall and early winter have increased.  The consequences to the Apalachicola River ecosystem have been seriously deleterious because spring and

summer are the most biologically productive seasons.  Reproductive activity, early life stages, and growth of most floodplain organisms are concentrated in the spring and summer months.  Light Decl., ¶ 15; Sole Decl., ¶ 15.

1153.   Fish utilization of these floodplain habitats is extensive.  More than 80% of the freshwater and anadromous fish species found in the Apalachicola River spend a portion of their lifecycle in the floodplain.  Light Decl., ¶ 16.

1154.   There are over 400 miles of off-channel floodplain sloughs, streams, and lakes (75% of which flow through state-owned lands) that are utilized by riverine and estuarine fishes and are directly influenced by Apalachicola River flows.  In addition, many species of fishes depend upon seasonally inundated forests and marshes of the floodplain covering about 124,000 acres (62% State-owned) for spawning, feeding, and nursery grounds.  Light Decl., ¶ 17.

1155.   Longer and more frequent periods of low flow in spring and summer months during recent decades have reduced or adversely affected fish habitat in floodplain sloughs, streams, and lakes:

    a.   When floodplain sloughs of the riverine reach become disconnected during low flows, water either disappears completely or forms shallow, isolated pools that become stagnant and severely deficient in oxygen.  Many fishes and aquatic invertebrates die when trapped in disconnected pools.  Prolonged periods of low flow, especially if they occur in critical primary spawning months of March through June, are known to decrease fish productivity with effects lasting for several years.

    b.   In floodplain streams  that are permanently connected, low flow in the river can have adverse effects on fishes because connections to the main channel may be too shallow for passage of larger individuals.  Gulf striped bass, for example, seek refuge in shaded or spring-fed floodplain streams to survive the hot summer months, but during low flows these critical cool-water habitats cannot be accessed by adult fish.

    c.   Vegetation and woody debris along sloping banks of floodplain sloughs and major river channels provides protective cover for fishes and serves as habitat for aquatic invertebrates that are food sources for fishes.  When flows are too low to cover woody structure along banks, an important habitat for providing food and shelter for fishes is lost or greatly reduced.

    d.   Distributary sloughs and streams in the lower tidal reach are normally fresh water, but extended periods of low flows cause elevated salinity levels, with adverse effects on many organisms that are intolerant of salinity including wetland plants, submerged freshwater aquatic plants, aquatic invertebrates, and fishes.

Light Decl., ¶ 18.

1156.   At 5,000 cfs, the Apalachicola River is confined to its main channel, with most of the sloughs in the riverine reach being disconnected from the main channel.  At 5,000 cfs, at least 80% of the Apalachicola River fish species that regularly utilize riverine floodplain habitats for one or more life cycle functions are unable to access those vital habitats, severely hindering reproduction and survival of young fish.  Prolonged low flows

which are, in significant part caused by the actions of the Corps storing water for water supply in Lake Lanier and operating under the draft Water Control Plan, translate to a significant loss of riverine fishes, a number of which are hosts to Federally listed threatened and endangered freshwater mussels.  Stated alternatively, the abundance of host fish – a "primary constituent element" of mussel critical habitat – is altered by extended low flows, and the value of that element for survival and recovery is  appreciably reduced.  Light Decl., ¶ 19.

1157.   There are about 55,000 acres of swamp forests in riverine and tidal floodplains of the Apalachicola River, all of which are inundated by flows of 30,000 cfs or less.  Approximately 81% (44,800 acres) of these swamps are on state-owned land, which was purchased for the purpose of wetlands preservation and ecosystem protection.  In all reaches of the river, swamp forests grow in the lowest elevations of the floodplain, and they need long and frequent periods of inundation to survive in their present state.  In the riverine reach, harmful effects on swamps have occurred in recent decades because of drier conditions resulting from  longer and more frequent periods of low flows, due in significant part, to the operations of the Corps in storing water for water supply in Lake Lanier and the application of the draft Water Control Plan.  In the lower tidal reach, swamp forests are vulnerable to the elevated salinities occurring during extended periods of low flow caused in significant part by the Corps' operations.  In addition to forested wetlands, there are about 8,000 acres of fresh and brackish-water marshes (90% on state-owned lands) in the lower tidal reach that are also adversely affected by elevated salinity at low flow.  Light Decl., ¶ 20.

1158.   Documented impacts of water-level declines on swamp forests in the last 30 years have been extensive.  In riverine swamps, tree density has declined 37%, and there has been an estimated loss of more than 3 million trees.  Drier conditions in swamps have been especially damaging to species that must have wet conditions to survive, such as water tupelo and Ogeechee tupelo (the source of tupelo honey).  Flow declines, caused in significant part by the actions of the Corps in storing water for water supply in Lake Lanier and the Corps' application of the draft Water Supply Plan, operations in the spring of dry years since the 1970s have been the primary cause of drier conditions in swamps.  Additional harm to swamps will occur over the next several decades if these seasonal flow patterns continue. Light Decl., ¶ 21.

### f.        Commercial Fisheries

1159.   A number of commercially viable aquatic species exist within Apalachicola Bay.  These species include the American oyster, three species of shrimp, blue crabs, and several varieties of finfish.  Apalachicola Bay produces about 90% of Florida's oysters, which constitute 10% of the national oyster harvest.  Apalachicola Bay also accounts for Florida's third largest shrimp harvest.  Much of the oyster, shrimp and fish harvest is exported for consumption throughout the United States.  The health of these commercial fisheries is directly dependent on sufficient flows of fresh water from the Apalachicola River, which flows affect the salinity of the Bay.  Reduction of fresh water flow, due, at least in significant part, to the Corps' actions storing water for water supply and application of the draft Water Control Plan including the action zones, has increased the salinity of the Bay and thereby damaged such commercial fisheries.  Edmiston Decl., ¶ 11.

1160.   The Apalachicola River flows also represent the lifeblood of Apalachicola Bay, among the most productive estuaries in the Northern Hemisphere.  The estuary produces 85-90% of Florida's total oyster harvest and significant harvests of shrimp, crabs and fin fish.  The high productivity of the Apalachicola Bay is, in large part, a function of the freshwater inflows to the Bay from the Apalachicola River.  These freshwater inflows provide essential nutrients and moderate the salinity of the Bay to create conditions highly favorable for estuarine life.  There is a direct correlation between Apalachicola River flows and salinity levels in Apalachicola Bay.  Recorded salinity levels over the past 30 years show a direct inverse relationship to River flow.  The higher the flow, the lower the salinity, and vice versa.  The historical rate, timing and duration of freshwater inflows to the Bay is key to the ecological productivity and diversity of the Bay.  The more frequent and prolonged periods of low flow that have occurred in recent years due, in significant part to the actions of the Corps storing water for water supply in Lake Lanier and applying the draft Water Control Plan, have been a significant factor in the increase in salinity in Apalachicola Bay and disease and death of the oyster population, to the direct damage of the Florida's economy.  Edmiston Decl., ¶ 12.

1161.   Prolonged low flows, caused in significant part by the action of the Corps in storing water for water supply in Lake Lanier and applying the draft Water Control Plan, adversely affect Apalachicola Bay and its salinity levels, particularly at times of extended serious drought.  When the amount of fresh water flowing out of the Apalachicola River is reduced for an extended period during droughts, oysters experience higher salinity levels than they are able to tolerate and become more susceptible to disease and predation.  A

salinity regime that includes variations in salinity with limited periods of high salinity levels provides higher oyster production in that oysters suffer increased predation and disease rates as salinity rises, particularly for extended periods.  Generally, oysters in the Bay grow and survive better in moderate and variable salinity ranges.  During 2007, when the Corps maintained Apalachicola River flows at just 5,000 cfs for an unprecedented duration, the salinity in the bay increased significantly.  Salinities at the primary oyster bars in the Bay, in the most part, ranged from 25 ppt to 35 ppt for extended periods of time during the summer of 2007 when normally we have a moderation of those salinities due to freshets that flow into the Bay.  Edmiston Decl., ¶ 13.

1162.   A significant increase in oyster mortality, started in the eastern part of the bay and moved to the western areas.  This increase in mortality, which is related to increased salinity (due to the lack of freshwater inflow which is due, in significant part, to the Corps action in storing water for water supply in Lake Lanier and applying the draft Water Control Plan and action zones) and temperature during the summer of 2007, lowered the expected harvest potential on the major oyster bars.  In addition it has decreased the number of large, harvestable oysters.  Edmiston Decl., ¶ 14.

### g.    Coastal Zone Management

1163.    The Apalachicola River and Bay—and indeed, the entire State of Florida—are protected by the enforceable policies of the federally-approved FCMP.  *See* 46 Fed. Reg. 48,742 (1981) (initial approval of the FCMP); 53 Fed. Reg. 50,069 (1988) (approval of FCMP amendments).  Therefore, pursuant to the CZMA, the Corps' actions which affect the Apalachicola River and Bay must be consistent to the maximum extent practicable with the

FCMP.  *See* 16 U.S.C. § 1456(c)(1)(A), and 15 CFR 930.32(a)(1).  *See* Declaration of Lynn

Griffin ("Griffin Decl."), Exhibit 5 to Florida's Notice of Filing Declarations, ¶ 8.

1164.    The FCMP includes enforceable policies of 23 Florida statutes administered

by eight State agencies and five water management districts designed to ensure the wise use

and protection of the State's water and cultural, historic, and biological resources; to

minimize the State's vulnerability to coastal hazards; to ensure compliance with the State's

growth management laws; to protect the State's transportation system, and to protect the

State's proprietary interest as the owner of sovereign submerged lands.  Enforceable policies

of the FCMP which the Corps should consider include, but are not limited to, the following

statutes:  Fla. Stat. §§ 373.016, 373.019(5), 373.171, 373.223, 373.233, 373.239(3)

(regulating consumptive uses of water) (implemented by Fla. Admin. Code R. 62-40.410,

40A-2.301, 40A-2.311, 40A-2.381); Fla. Stat. §§ 373.413, 373.414, 373.416 (regulating

water storage and management of reservoirs) (implemented by Fla. Admin. Code R. 40A-

4.011, 40A-4.301); Fla. Stat. § 373.430(1)(a), Fla. Stat. §§ 403.021, 403.031(7), 403.061,

403.161 (prohibiting pollution, which is broadly defined as any human-induced impairment

of water); Fla. Stat. §§ 258.36, 258.37, 258.39 (protecting Apalachicola Bay as an aquatic

preserve); Fla. Stat.  §§ 253.034, 259.032 (protecting submerged lands and lands purchased

for conservation) (implemented by Fla. Admin. Code R. 62-302.700 (protecting Outstanding

Florida Waters, including Apalachicola River and Bay)); Fla. Stat. § 379.2401 (formerly §

370.025) (protecting marine fisheries); Fla. Stat. § 379.2291 (formerly § 372.072); and Fla.

Stat. § 379.411 (formerly § 372.0725) (protecting species which are endangered, threatened,

or of special concern) (implemented by Fla. Admin. Code Rule 68A-1.004(31),(82),(86)).

1165.   The CZMA further obligates the Corps to provide Florida with a consistency determination before undertaking activities affecting Florida's coastal resources, including the implementation of the new master manual.  *See* 16 U.S.C. § 1456(c)(1)(C).  On December 15, 1989 (SUPPAR000414-15), January 30, 1990 (SUPPAR000412-13), and February 5, 1990 (SUPPAR000410-11), Florida notified the Corps that the activities proposed in the PAC Report were inconsistent with enforceable policies of the FCMP.  On January 6, 2005 (ACF039690-95), May 19, 2005 (SUPPAR001111), and June 12, 2007 (SUPPAR000405-09), Florida again notified the Corps that its reservoir operations were affecting Florida's coastal resources, requiring a determination that these activities were consistent to the maximum extent practicable with enforceable policies of the FCMP.  The Corps has declined to take any action to comply with the FCMP.  Griffin Decl., ¶ 10.

### 2.   Alabama's Interests

1166.    The Chattahoochee River basin occupies 19,800 square miles with 2,800 square miles in Alabama.  ACF011992.  Approximately 160 miles of the Chattahoochee River is located along the state line between Alabama and Georgia.  SUPPAR020914.  There are eight Alabama counties in the ACF River basin: Barbour, Bullock, Chambers, Henry, Houston, Lee, Randolph, and Russell counties.  ACF011995.  Phenix City, Eufaula and Dothan are among the Alabama cities located on the Chattahoochee River.  ACF010831.

1167.    In 1995, an estimated 314,000 people lived in the Alabama portions of the ACF Basin.  SUPPAR010947.  The region of southeast Alabama within the ACF Basin has utilized the Chattahoochee River and its impoundments for navigation, irrigation, M&I water supply, recreation, and other uses.  SUPPAR020948.

### a.    Navigation

1168.    The primary navigation channel on the ACF Waterway system consists of a continuous 9-foot by 100-foot channel in the Apalachicola River beginning at its intersection with the Gulf Intracoastal Waterway, and then proceeding north for 107 miles, to the confluence of the Chattahoochee and Flint Rivers at Lake Seminole, then 164 miles to Phenix City, Alabama, on the Chattahoochee River.  ACF021714.

1169.    The State of Alabama owns and maintains three state dock facilities on the ACF waterway.  ACF021753.  These public facilities are generally used by private companies that lease certain areas of the dock / terminal for their specific cargo handling needs.  *Id.*

1170.    The Columbia Inland Dock, located at Mile 49.1 on the Chattahoochee River, is 15 miles east of Dothan, Alabama.  ACF021757.  That facility includes a 572,160-bushel grain elevator, truck and rail loading stations, a piping system for transferring material from barges to storage tanks, and associated office buildings.  *Id.*

1171.    The Eufaula Inland Dock, located at mile 91 on the Chattahoochee River, includes a 24,000 square foot warehouse, rail and road access, and associated office space. ACF021758.

1172.    The Phenix City Inland Dock is located at Mile 153 on the Chattahoochee River and is the uppermost terminal on the Chattahoochee River.  ACF021758.  This facility includes 426,160-bushel grain elevator capacity, a 24,000 square foot warehouse, rail and road service, and associated office space.  *Id.*

b.       Recreation

1173.    The Corps' impoundments at Lake G.W. Andrews, Walter F. George, and West Point Lake on the ACF System inundate land within the historical borders of the State of Alabama and the waters of those impoundments adjoin and are riparian to the territory of the State of Alabama.  ACF021855.

1174.    Those impoundments provide significant recreation opportunities to the citizens of Alabama and other states.  In 1992, the Corps reported 359,602 visitor days at Lake G.W. Andrews, 6,863,658 visitor days at W. F. George, and 8,295,821 visitor days at West Point Lake.  ACF021865.

1175.    Recreation at Corps' reservoirs in the ACF Basin has a significant economic impact in the regions surrounding those impoundments, including significant impacts within the State of Alabama.  The Corps has estimated that an average of $16,564,169 is spent within 30 miles of West Point Lake per year in association with recreational activities on that reservoir.  ACF031405.  Using the same analysis, recreational expenditures of $25,495,702 were estimated per year within 30 miles of Walter F. George reservoir.  *Id*.

1176.    Alabama's Lakepoint Resort State Park is located adjacent to Lake Walter F. George.  ACF040075.  Lakepoint is a state-owned facility that provides a number of large berths for vessels that routinely travel to the Gulf of Mexico and back via the Chattahoochee and Apalachicola rivers.  *Id*.  Lower pool levels in that reservoir could have a negative impact on tourism at that facility.  SUPPAR020936.

1177.    Tourism in the Chattahoochee Valley of Alabama and Georgia was a $608 million dollar industry in 1989.  SUPPAR021008.

1178.    Recreation impacts in Walter F. George Lake begin to occur when the lake is one foot below normal pool elevation.  SUPPAR010954.  A four-foot drawdown results in 80% of boat ramps being unusable, and a decrease in residential user access to the lake.  *Id.*

1179.    ACF reservoirs, including West Point Lake and Walter F. George, support popular sport fisheries, some of which have achieved national acclaim for trophy-sized catches of largemouth bass.  SUPPAR010892.  Water level fluctuations substantially changing the area of shallow-water habitats and shoreline vegetation inundated can significantly influence the reproductive success of resident fish populations. SUPPAR010904.  Low or declining water levels can adversely affect reproductive success for largemouth bass, spotted bass, bluegill, crappie, and other littoral species by reducing the area of available spawning and rearing habitats.  *Id.*

1180.    The Eufaula National Wildlife Refuge (ENWR) was established in 1964 on Walter F. George Lake.  SUPPAR010926.  ENWR provides habitat for migratory waterfowl and other birds, provides habitat and protection for endangered species, and provides recreation and environmental education to the public.  SUPPAR010926-27.  The refuge lies on the upper reaches of the reservoir from river mile 104 to mile 116 and includes areas within Barbour and Russell Counties, Alabama.  SUPPAR010927.  The refuge contains 4,260 acres of open water and 3,025 acres of wetlands.  *Id.*  The refuge has 281 documented bird species, 36 mammal species, 95 reptile species, and roughly 30 fish species.  Federally listed species that use the refuge are bald eagle, peregrine falcon, American alligator, and wood stork.  *Id.*

### c. Municipal and Industrial Water Supply

1181.    A number of industries located in the region of Alabama adjacent to the ACF

Basin require a sufficient quantity of water in the Chattahoochee River.  SUPPAR021019.

1182.    In 1985, self-supplied industrial water consumption in the six Alabama

counties abutting the ACF Basin was approximately 51.25 MGD.  SUPPAR020933.

1183.    In 1998, the Corps calculated existing M&I water demand in the Alabama

portion of the ACF Basin to be 106.29 MGD.  ACF031312.

1184.    Domestic water supply in the area of southeast Alabama adjacent to the ACF

Basin will continue to be a growing water resource demand.  SUPPAR020932.  That region

has seen the groundwater table drop significantly in the past few decades.  *Id*.  Projections

indicate that some water supply systems in that region will have to transition to the use of

surface water as a source of supply in the future.  *Id*.

1185.    Between 2002 and 2006, the following Alabama based entities and/or

persons withdrew water from the Chattahoochee basin: Auburn University/Wiregrass

Substation, Chattahoochee Valley Water Supply District; Circle W Farms; Mitch Danford,

DCNR-Lakepoint Resort State Park; Dothan National Golf Club and Hotel; Frog Pond Turf;

Gulledge & Sons; Heritage Turf, Inc.; J.T. Cattle Co.; Johnston Industries, Inc.-Langdale

Complex; Lester Killebrew; Marshall Rushing-Rushing Farms; McCallister Farms; Hasten

McCardle; Mead Westvaco Corporation; Opelika Water Works Board; Phenix City Utilities;

Red Eagle Golf Course; Riverbend Plantation; Riverside Turf Farms; Robert L. Robinson;

Valley Nursery/Jimmy Rollo; Smiths Station Water System; Southern Nuclear Company-

Farley Nuclear Plant; and Westpoint Stevens Inc.-Fairfax Finishing Plant.  SUPPAR001705.

1186.    Barbour, Chambers, Henry, Houston, Lee and Russell Counties also withdrew water from the ACF system during the 2002-2006 time period.  SUPPAR001727.

### d.    Agricultural Water Demand

1187.    Alabama's agricultural water demand in the ACF Basin was 18.6 MGD in 1992 for crop irrigation of all types.  SUPPAR007641.  In 1995, agricultural water usage in the Alabama portion of the ACF Basin was estimated at 22.5 MGD.  SUPPAR010799.  That usage has been projected to increase to 74.8 MGD by the year 2050.  *Id*.  Agricultural water use in the ACF Basin is expected to steadily increase throughout the basin, but is expected to increase most rapidly in the Alabama portion of the ACF Basin.  SUPPAR007653.

### e.    Water Quality

1188.    The State of Alabama is, and has been, concerned with the impacts of reduced flows in the Chattahoochee River on water quality.  SUPPAR020929.  This concern is particularly acute at West Point Lake, where minimum water quality standards have often been violated.  *Id*.  However, water quality impacts are not limited to West Point Lake:  water quality is also stressed further downstream at Walter F. George.  SUPPAR021000.

1189.    By the time the Chattahoochee River reaches the Alabama border, its capacity for assimilation of treated wastewater is fully diminished, meaning that no additional wastewater can be discharged to this segment of the river during low flow periods without a high probability of violating Alabama water quality standards.  SUPPAR021000.  Only local inflows enable additional discharges in Alabama.  Reduced flow volume adversely impacts Alabama's industrial potential due to the lack of wastewater assimilation capacity.  SUPPAR020933.

1190.    There is the potential of requiring downstream dischargers to meet higher

water quality discharge standards because of the water quality impacts of upstream

discharges and low flows.  SUPPAR020937.  Downstream users will be forced to incur

higher treatment costs to treat pollutant laden water before it is used, as well as higher costs

to treat used water before it can be returned to a stream with reduced assimilative capacity.

*Id*.

### f.    Industry

### i.    Farley Nuclear Power Plant

1191.    Farley Nuclear Plant ("Farley") is owned by Alabama Power and is located

near Columbia, Alabama on the west bank of the Chattahoochee River.  ACF040098.  As of

2005, Farley provided 1,776 megawatts of baseload generation to Southern Company

customers.  *Id*.

1192.    Farley "regularly depends on the availability of the federally authorized

navigation channel in the ACF River Basin … for delivery and shipment offsite of large

pieces of equipment vital to the operation of the facility."  *Id*.  Most of the large equipment

for the original plant construction was delivered by barge.  *Id*.  In 2000, Plant Farley received

replacement steam generators by barge to complete a $360 million replacement project "to

ensure the availability of Plant Farley long into the future."  *Id*.  As discussed in Paragraph

855 above, in 2005, barges shipped two reactor pressure vessel heads to Farley.

1193.    Farley "must have waterborne transport for their large and usually oversized

shipments which cannot use other modes of transportation." ACF043138.  In addition to the

substantial cost savings when compared to shipment by rail, the waterway, when operated

and maintained for navigation, provides the safest way to ship sensitive nuclear components. *Id.* In addition to the shipments noted above, Farley planned to move $100 million worth of reactor vessels that weigh approximately 200 tons along that same waterway in 2006. *Id.*

1194.   As recognized by the Corps, the "[l]oss of Plant Farley's generating capacity would be a major blow to the Southern services grid, and could result in significant power outages and disruptions." ACF012391.

1195.   The Corps did not adequately address the potential consequences of reduced flows in the ACF Basin on Plant Farley before its implementation of the 1989 Draft Water Control Plan. SUPPAR021657. As Alabama Power Company advised the Corps in 1989, "[o]peration of the Farley Nuclear Plant could be impacted significantly by implementation of any plan which would possibly reduce either the elevation or the flow rates of the River adjacent to the Plant." SUPPAR021658.

1196.   Upon Alabama Power's review of the PAC Report, issued in October 1989, Bill Guthrie, EVP of Alabama Power, wrote: "Of most immediate concern to Alabama Power is the impact which the proposal may have on the Company's Joseph M. Farley Nuclear Plant….[T]he consumptive use of water by the Farley Nuclear Plant was not considered in the models used by the Corps to develop the proposed plan or to evaluate the results that would flow from the implementation of the plan." SUPPAR021657.

1197.   He continued: "Farley Nuclear Plant, located on the west bank of the Chattahoochee River at mile 44.3, utilizes the Chattahoochee River for cooling and make-up water and is dependent in its operations on the availability of water of acceptable quality and quantity. Operation of the Farley Nuclear Plan could be impacted significantly by

implementation of any plan which would possibly reduce either the elevation or the flow

rates of the River adjacent to the Plant…[S]uch limitations on the Plant's operation could

impose significant costs in terms of replacement electric power, and could cause

environmental concerns."  SUPPAR021658.

ii.      <strong>Mead-Westvaco Corporation' Mahrt Mill</strong>

1198.    Mead-Westvaco is one of the major producers of liner board in the world.

ACF040099.  It operates the Mahrt Mill located south of Phenix City, Alabama on the west

bank of the Chattahoochee River.  ACF040099-100.  This mill is located within Lake Walter

F. George.  ACF040100.  Flow past the mill is controlled primarily by releases from Walter

F. George.  *Id*.  The mill depends heavily on the ACF channel for delivery of fuel oil for the

plant and the ACF channel provides the only feasible option for transporting certain types of

equipment.  *Id*.

<strong>3.      Alabama's Injuries from Challenged Corps Actions</strong>

1199.    As referenced above in paragraphs 740 through 742, releases from Buford

Dam have declined during the three drought periods experienced in the ACF Basin between

1981 and 2001.

1200.    As reference above in paragraphs 758 through 765, during those three

drought periods, the discharges from West Point Lake and Lake Walter F. George were

approximately equal to the inflows to those projects.

1201.    As referenced above in paragraphs 748 through 749, hydropower generation

at Buford Dam has declined during the three drought periods experienced in the ACF Basin

between 1981 and 2001.

1202.    Portions of West Point Lake and Lake Walter F. George are located within the State of Alabama.  Decl. of O. Glenn, Exhibit A to State of Alabama's Notice of Filing of Evidentiary Materials in Support of State of Alabama's and State of Florida's Joint Motion and Memorandum in Support of Joint Motion for Partial Judgment on All Phase I Claims ("State of Alabama's Notice of Filing"), ¶ 7.

1203.    The State of Alabama, acting through its Department of Conservation and Natural Resources, owns or leases real property on which five boat ramps for free public access are located on the Chattahoochee River.  Decl. of D. Abernethy, Exhibit B to State of Alabama's Notice of Filing, ¶ 3.  Three of the boat ramps are located in or near Valley, Alabama, and the other two are located at Gordon, Alabama and near Eufaula, Alabama.  *Id.* The State of Alabama has a riparian interest in these lands.

1204.    The State of Alabama also has a state park located adjacent to Lake Walter F. George.  Decl. of Jim Royal, Exhibit C to State of Alabama's Notice of Filing, ¶¶ 2-3.  The State also has a riparian interest in this property.

### a.    Water Quality and Economic Development

1205.    Decreased releases from Buford Dam necessarily mean that there will be less flow in the Chattahoochee River downstream from the dam.  Decl. of O. Glenn, Exhibit A to State of Alabama's Notice of Filing, ¶ 4.  All other things being equal, especially during times of drought, less flow in the Chattahoochee River below Buford Dam means that there will be lower water quality downstream, including in the stretch of the river that borders Alabama as well as in West Point Lake and Lake Walter F. George, both of which also border Alabama.  *Id.*

1206.    During past droughts, including those that have occurred since 1994, there have been a number of adverse consequences in the Chattahoochee River, West Point Lake, and Lake Walter F. George relating to diminished water quality. *Id*. at ¶ 5. These consequences include reduced levels of dissolved oxygen and increased algal blooms. *Id.* Anytime that water quality worsens during a drought and these adverse consequences are worsened, many organisms in and around the river and lakes are stressed or injured, and some can die, and have died, as a result of the worsened water quality. *Id.* The diminished water quality also makes industries in Alabama that discharge into the river face a greater challenge in meeting the conditions of their discharge permits and complying with State and Federal water quality standards. *Id.* Diminished water quality also has adverse impacts on municipal drinking water treatment costs. *Id.*

1207.    If releases from Buford Dam are increased during times of drought, then there will be more flow in the river downstream from the dam. *Id*. at ¶ 6. This will improve water quality and thus ameliorate the adverse consequences caused by diminished water quality. *Id.* The increased flows will also raise the level of the river and the downstream lakes. *Id.*

1208.    The State of Alabama, acting through the Alabama Department of Environmental Management (ADEM), has issued waste water discharge permits to several entities for discharges into the Chattahoochee River and into Lake Walter F. George. *Id*. at ¶ 8.

1209.    Decreased water quantity and quality in the Chattahoochee River restricts the terms of the permits that ADEM can issue for discharges into that river. *Id*. at ¶ 9. If water

quantity increases and water quality improves, then the scope of the permits that can be issued expands.  *Id.*  The ability to issue discharge permits is a key component of certain industrial recruitment efforts by the State of Alabama.  *Id.*  As ADEM is limited with the permits that it can issue for discharges into the Chattahoochee River, then the ability to attract certain tax-revenue generating industrial developments is correspondingly limited.  *Id.*

### b.  Marine Police Patrols

1210.    The Alabama Marine Police patrols the portion of West Point Lake located within the State of Alabama.  Decl. of R. Harris, Exhibit D to State of Alabama's Notice of Filing, ¶ 2.

1211.    During past droughts, low water levels at West Point Lake have prevented Marine Police officials from patrolling areas of the lake that they ordinarily patrol.  *Id*. at ¶ 3. Everything else being equal, had more water been released from Lake Lanier and flowed into West Point Lake during those times periods, the level of West Point Lake would have risen, and Marine Police officials would have been able to patrol a greater portion of the lake.  *Id.*

### c.  Boat Ramp Access

1212.    During periods of drought, at least three of the boat ramps operated by the State of Alabama on the Chattahoochee River (one in Valley, one in Gordon, and one near Eufaula) are adversely affected by declining river flows.  Decl. of D. Abernethy, Exhibit B to Alabama's Notice of Filing, ¶ 4.  As the flow in the river drops, the ramps become unusable by more and more varieties of boats.  *Id.*  This adverse effect due to low flows occurred in 2007.  *Id.*  Some of the boats that are affected in this manner are owned by the State of

Alabama.  *Id.*  If the flows during droughts were higher, then this adverse effect would be lessened because more boats would be able to use the ramps.  *Id.*

1213.    If releases from Buford Dam are increased during time of drought, then there will be more flow in river downstream from the dam.  The increased flow will raise the level of the river and the downstream lakes.  Decl. of O. Glenn, Exhibit A to Alabama's Notice of Filing, ¶ 6.

### d.      State Park Impacts

1214.    Lakepoint State Park (Park) was created in 1968 adjacent to Lake Walter F. George.  It currently consists of 1,220 acres.  Decl. of J. Royal, Exhibit C to Alabama's Notice of Filing, ¶ 3.  The Park includes the following: a full-service marina with seven docks with 220 rental slips, fuel and boating supply sales, and a snack bar; three boat launches or ramps; a 102-unit lodge with a full-service restaurant that seats 140 and meeting facilities for up to 700; a 288-site campground; a swimming beach; an 18-hole championship golf course; a picnic area with four pavilions; 39 cabins; boat rentals, and tennis courts.  The State derives revenue from usage of the facilities at the Park.  *Id.*

1215.    During times of drought, revenues derived from the Park decline in correlation to the level of the reservoir.  The lower the level of Lake Walter F. George falls, the lower revenues fall.  *Id.* at ¶ 4.

1216.    As flows increase during a drought and the level of the reservoir rises, the revenues derived from the Park by the State increase.  *Id.* at ¶ 5.

1217.    During the drought of 2007, the Corps of Engineers recommended that all of the launches and ramps at the Park be closed due to the hazards (for example, stumps and

trees at shallow depths) created to boaters by the low lake elevation.  *Id*. at ¶ 6.  This closure

of the ramps and launches certainly caused decreased revenue at the Park, both in the form of

lost fees from boats launched as well as lost sales of fuel, boat rentals and other items that

many boaters typically purchase from Park facilities.  *Id.*  Due to the hazards associated with

low elevations, the Park also decided not to rent boats during the 2007 drought for safety

reasons, which caused a decline in revenues.  *Id.*  Had there been greater flows in the

Chattahoochee River, the lake's elevation would likely have increased and thus made at least

some of these measures unnecessary.  *Id.*

**e.       State Docks Impacts**

1218.    As noted above, The State of Alabama, acting through the Authority, owns

state docks at three locations on the Chattahoochee River:  Phenix City, Alabama; Eufaula,

Alabama; and Columbia, Alabama.  Decl. of J. Lyons, Exhibit E to Alabama's Notice of

Filing, ¶ 3.  Each of these facilities was constructed prior to 1975.  Id.  The State, acting

through the authority, generates revenue when private entities use the facilities to ship

materials by barge on the Chattahoochee River.  *Id*.

1219.    Although the three facilities were regularly utilized in the 1980s for

shipments by barge, the absence of reliable navigation flows on the Chattahoochee River

beginning in the 1990s has caused some reduction in shipments through the three facilities

and some reduction in the resulting revenues from such shipments.  *Id*. at ¶ 4.  In fact, there

have been no shipments of materials by barge through the facilities at Columbia and Eufaula

since at least 2001.  *Id.*  There has only been a single light-load shipment by barge through

the facility at Phenix City in that same period.  *Id.*

1220.    If reliable navigation flows were restored, based upon usage of the facilities when there were reliable navigation flows, it is expected that shipments through the three State docks would increase.  *Id.* at ¶ 5.  Transportation by barge is more environmentally friendly and cost effective than transportation by rail or truck.  *Id.*

### f.    Electricity Costs

1221.    The members of the Alabama Municipal Electric Authority (AMEA) include the City of Alexander City, City of Dothan, City of Fairhope, City of Foley, City of LaFayette, City of Lanett, City of Luverne, City of Opelika, City of Piedmont, City of Sylacauga, and City of Tuskegee.  Decl. of F. Clark, Exhibit F to State of Alabama's Notice of Filing, ¶ 3.

1222.    AMEA serves as agent for its members' contracts with the Southeastern Power Administration (SEPA).  *Id.* at ¶ 4.  AMEA's members purchase and receive power from SEPA's Georgia-Alabama-South Carolina system, which includes Buford Dam.  *Id.* AMEA is a member of the Southeastern Federal Power Customers, Inc.  *Id.*

1223.    If SEPA charges higher costs for power sold to AMEA's members, then those members charge higher costs to their customers.  *Id.* at ¶ 5.[20]  If SEPA's costs were to decline, then the costs charged to customers by AMEA members would decline.  *Id.*

1224.    ADEM operates an ozone monitoring station in Dothan, Alabama.  Decl. of O. Glenn, Exhibit A to State of Alabama's Notice of Filing, ¶ 10.  The State of Alabama, acting through ADEM, purchases electric power for that station from the City of Dothan.  *Id.*

---

[20]    Alabama and Florida adopt and incorporate by reference any evidence submitted by SEFPC showing that the customers of SEPA who purchase power generated in the Georgia-Alabama-South Carolina system have paid more for that power as a result of the challenged actions of the Corps with regard to operation of Lake Lanier.

1225.    The State of Alabama, acting through ADEM, administers the Alabama Underground and Aboveground Storage Tank Trust Fund (Fund).  Decl. of D. Malaier, Exhibit G to State of Alabama's Notice of Filing, ¶ 3.  The Fund reimburses tank owners and/or consultants for electric power bills associated with underground storage tank cleanups at various sites in Alabama.  *Id.*  The Fund has in the past reimbursed and is currently reimbursing parties for electric power purchased from the City of Alexander City, the City of Dothan, the City of Fairhope, the City of Foley, the City of Opelika, and the City of Tuskeegee.  *Id.* ¶ 4.

1226.    The State of Alabama has purchased electricity since at least 1999 from the City of Alexander City, City of Dothan, City of Foley, City of LaFayette, City of Luverne, City of Opelika, City of Piedmont, and City of Sylacauga.  Decl. of R. Childree, Exhibit H to Alabama's Notice of Filing, ¶ 3-4.

Respectfully submitted this 23rd day of January, 2009.

**COUNSEL FOR THE STATE OF FLORIDA:**

Bill McCollum
ATTORNEY GENERAL
Jonathan A. Glogau
Chief, Complex Litigation
The Capitol, Suite PL-01
Tallahassee, FL  32399
(850) 414-3300
jon.glogau@myfloridalegal.com

Thomas R. Wilmoth
Donald G. Blankenau
Husch Blackwell Sanders LLP
206 S. 13th Street, suite 1400
Lincoln, NE  68508
(402) 458-1500
tom.wilmoth@huschblackwell.com
don.blankenau@huschblackwell.com

/s/ James T. Banks
James T. Banks
HOGAN & HARTSON, LLP
555 13th Street, N.W.
Washington, D.C.  20004
(202) 637-5802
jtbanks@hhlaw.com

Parker D. Thomson
HOGAN & HARTSON, LLP
1111 Brickell Avenue, Suite 1900
Miami, FL  33139
(305) 459-6678
pdthomson@hhlaw.com

Christopher M. Kise
Foley & Lardner LLP
106 East College Avenue
Tallahassee, FL  32301
(850) 513-3367
ckise@foley.com

**COUNSEL FOR THE STATE OF ALABAMA:**

William D. Little, III
Assistant Attorney General for the State of Alabama
ATTORNEY GENERAL'S OFFICE
11 South Union Street
Montgomery, AL  36130

William S. Cox, III
W. Larkin Radney, IV
Lightfoot, Franklin & White, L.L.C.
400 North 20th Street
Birmingham, AL  35203
(205) 581-0700
wcox@lfwlaw.com
lradney@lfwlaw.com

/s/ Matthew H. Lembke
Matthew H. Lembke
Joel M. Kuehnert
Bradley Arant Boult Cummings, LLP
1819 5th Avenue North
Birmingham, AL  35203
(205) 521-8560
mlembke@ba-boult.com
jkuehnert@ba-boult.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing Factual Appendix in Support of the States of Florida and Alabama's Joint Motion and Memorandum in Support of Joint for Partial Summary Judgment on Phase 1 Claims was filed with the Clerk of the Court using the CM/ECF system, and was served upon counsel of record and all parties to this proceeding registered with the federal court system by electronic means on January 23, 2009.

/s/ James T. Banks