IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| THE CITY OF COLUMBUS, GEORGIA and THE BOARD OF WATER COMMISSIONERS OF COLUMBUS, GEORGIA, d/b/a COLUMBUS WATER WORKS, | : : : : : : |
| Plaintiffs, | : CASE NUMBER: : 07-CV-1033 (PAM/JRK) : 07-MD-0001 (PAM/JRK) |
| VS. | : : |
| THE UNITED STATES ARMY CORPS OF ENGINEERS, et al., | : : : |
| Defendants. | : |

## AMICUS CURIAE BRIEF OF THE CITY OF LAGRANGE AND TROUP COUNTY, GEORGIA

**INTRODUCTION**

The City of LaGrange, Georgia, the county seat of Troup County, is located on West Point Lake, one of the federally owned and operated reservoirs on the Chattahoochee River. The West Point Lake Dam is located in Troup County approximately 41.5 river miles upstream of Columbus, Georgia, and 146.92 river miles downstream of Buford Dam. Although not parties to any of the several court cases currently before this Court, LaGrange and Troup County, among other stakeholders, sought leave to file an amicus brief in Southeastern Federal Power Customers, Inc. v. Caldera, et al. in 2004. (3:08-CV-00640-PAM-JRK, Document 157). Moreover, LaGrange and Troup County have monitored the multidistrict litigation with interest and are in consistent contact with the Corps of Engineers, as well as many other parties to the various member cases, regarding the operation of the West Point project and the basin as a whole.

Recent filings by the City of Columbus and Columbus Water Works (hereafter sometimes "Columbus") associated with its Motion for Summary Judgment have the potential to damage the interests of LaGrange, Troup County and the ACF basin. Due to the failure of

EXHIBIT A

either the State of Georgia or the United States to respond to the Columbus motion, Columbus asserts that no issues of fact preclude judgment in its favor as a matter of law. Because certain of the allegations of Columbus are not supported in the record, and in fact are incorrect, LaGrange and Troup County file this brief in order to outline the inaccuracies included within the Columbus motion.

The initial demand of Columbus that the Corps formulate a new and lawful water control plan is universally accepted by all parties, the United States included. However, straying outside of its initial complaint, Columbus now demands a Court mandate that particular components of the water control plan increase waste assimilation flows from West Point Dam for the benefit of Columbus. Such micromanagement is not only well outside the posture of this case as an APA review, it is also based upon assumptions of Columbus which are simply incorrect. First, the flow targets referred to by Columbus as being mandated by its FERC license are not guaranteed. Second, the argument of Columbus is devoid of any rule, regulation or other mandate which requires the Corps to increase flow out of West Point for Columbus water quality. Third, Columbus has failed to establish that water quality *for Columbus* is an authorized purpose of the West Point Project.

Columbus admits that water quality issues which might result from less than ideal flows may also be cured by capital expenditures to improve its wastewater treatment facilities. It is not the role of the Corps of Engineers or this Court to increase flows to the detriment of LaGrange and Troup County in order that Columbus might escape increased spending on wastewater treatment.

1. **FERC License Flows Not Guaranteed**

While Columbus seeks from this Court guaranteed flows out of West Point Dam, it has been provided no such guarantee from the regulatory body governing the flows at issue, the Federal Energy Regulatory Commission. Columbus accurately states that the FERC license for the Middle Chattahoochee Project (a series of three Georgia Power hydroelectric dams between West Point Lake and Columbus) requires Georgia Power to operate the project dams to provide

EXHIBIT A

daily and weekly average outflow. (Columbus Brief, Page 7). Importantly, however, such flows are *not guaranteed*. In fact, the FERC license expressly recognizes that which Columbus refuses to acknowledge, which is that basin inflow is a natural limiting factor of the flow available for Columbus. The Middle Chattahoochee Project FERC license at issue expressly provides for Georgia Power to either meet target flows or *intervening inflow*, whichever is less, as follows:

> "The Middle Chattahoochee Project would be operated to provide:
> 1) An instantaneous target minimum flow release of 800 CFS, or inflow, whichever is less, downstream of each project dam;
> 2) A daily average target minimum flow of 1350 CFS, or inflow, whichever is less, downstream of the Project; and
> 3) A weekly average target minimum flow of 1850 CFS, or inflow, whichever is less, downstream of the Project."
> (FERC Order Issuing New License December 27, 2004, 109 FERC 62, 246 @ 62, 247; Columbus Brief in Support of Partial Motion for Summary Judgment (hereafter "Columbus Brief"), p 128).

As stated in Paragraph 10 of the December 27, 2004 Order Issuing New License, FERC will not "issue a license for a hydroelectric project unless the State certifying agency has either issued water quality certification for the project or has waived certification by failing to act on a request for certification within a reasonable time, not to exceed one year." 109 FERC 62, 246 @ 62, 248. Thus, in order for the FERC license at issue to have been approved, the State of Georgia is required to review and approve the results of the project on water quality. As evidenced in Paragraph 7 of the Order, Columbus Water Works intervened in the FERC proceeding, but did not oppose Georgia Power's application for license. Thus, the existing flow regime supporting water quality in Columbus, including minimum scheduled hydropower releases from West Point, have been approved by FERC and the State of Georgia. For

EXHIBIT A

Columbus to seek an independent finding by this Court to the contrary is outside of the scope of the APA review. While Columbus would no doubt prefer to see an increase in guaranteed flows out of West Point Dam, it has provided no authority for such a request. The FERC license at issue recognizes what Columbus will not, which is that inflow places a natural limit on all projects, including Georgia Power and federal projects, and that there are no guarantees for waste assimilation flows for Columbus.

2.      **Corps Lacks Mandate to Support Additional Assimilative Flows for Columbus**

Columbus attempts to seize upon the failure of the United States to respond to its motion as constituting proof that the federal government agrees with its assertion that the Corps is required to protect a certain assimilative flow for Columbus. Even though the United States did not contradict the assertion within a response brief, it has consistently evidenced its opinion that it *does not* possess the authority to mandate additional flows from West Point Lake for Columbus water quality. Columbus' own brief is replete with examples of the position of the Untied States as to this question. Within the November, 2007 Environmental Assessment, the Corps of Engineers expressed its opinion that "there is no Corps requirement to maintain minimum flows for assimilative capacity at Columbus." (Columbus Brief, p 18; Nov. 2007 E.A. at EA-18). Neither does the 1989 draft water control plan contain specific flow requirements (see 1989 draft plan at 11-12, 21-22 (GAII000307-GAII000308, GAII000317-GAII000318)). As admitted by Columbus, the Corps even "more aggressively" disclaimed responsibility for supporting Columbus' water quality in its Environmental Assessment for temporary reduction of minimum flows at Peachtree Creek, issued on November 10, 2008. (Columbus Brief, Page 19). Within the Environmental Assessment the Corps correctly points out that such water quality flows for Columbus "are ultimately the responsibility of Georgia Power." (Id.)

Despite its opinion that it is under no mandate to provide assimilative flows for Columbus, the Corps has consistently reviewed the continuous flow releases of the West Point Project and determined that such are sufficient for the "assimilative capacity needs on the

Chattahoochee near Columbus." (Id.) While the Corps has made this determination as to the flow regime, it has consistently held that it is "under no . . . requirement to maintain minimum flows for assimilative capacity in Columbus." Columbus, having provided no legal authority to the contrary, cannot depend on the Corps' failure to respond to its brief to create a court mandate that the Corps provide the assimilative flows sought by Columbus.

3. **Columbus Water Quality is not an Authorized Purpose of the West Point Lake Project**

Columbus also contends that its water quality is an authorized purpose of the West Point Project, primarily because it stated such in its brief and certain other parties have agreed. Fortunately, the burden to be carried by Columbus requires more.

Columbus sites 33 C.F.R. Section 222.5, Appendix E, as its support that Columbus water quality is an authorized purpose of the West Point Project, yet nothing therein provided evidence of such a purpose. Similarly unpersuasive is Columbus' citation to the recommendation of the Chief Engineers in House Document 570, 87th Congress. While Columbus points to this document as proof of water quality as an authorized purpose, the report itself merely recognizes that the stream regulation associated with the West Point Project would provide assistance in diluting Columbus' pollution "to some degree." The Corps determined then, and has recently endorsed, that the flow from regular releases from West Point Dam for hydropower purposes is adequate for the water quality needs of Columbus. In the face of such a finding, Columbus can hardly demand summary judgment on its claim for unspecified increased flows.

In fact, the authorized purposes of West Point Lake, as established in the May 5, 1962 Board of Engineering for Rivers and Harbors Report, are five-fold, and include hydroelectric power, flood control, fish and wildlife recreation, general recreation, and navigation. While the stream flow from hydropower generation at West Point Dam certainly augments downstream water quality, the water quality of Columbus is not a per se authorized purpose of the West Point Project.

EXHIBIT A

**CONCLUSION**

No interested party in this litigation is opposed to the creation by the Corps of a studied and appropriate water control plan for the basin. The involvement in this process of Columbus, as a stakeholder, is well protected under current Corps practice and regulation. Indeed, the water control plan which results from this process will no doubt be monitored as closely by stakeholders as any before it. However, Columbus does not have the right to compel the Corps, through this Court, to have one particular component of the water control plan decided in advance. Columbus has presented neither fact nor legal argument which demands such relief, particularly in the context of an APA review.

Respectfully submitted this 1st day of May, 2009.

    /s/ Jeffrey M. Todd
JEFFREY M. TODD
Attorney for City of LaGrange
Georgia Bar No.: 713738

LEWIS, TAYLOR & TODD, P.C.
205 N. Lewis Street, Suite 3
P.O. Box 1027
LaGrange, Georgia 30241
PHONE: 706-882-2501
FAX: 706-882-4905

    /s/ Mark L. Degennaro
MARK L. DEGENNARO
Attorney for Troup County
Georgia Bar No.: 216020

WILLIS, MCKENZIE, DEGENNARO & ALFORD
300 Smith Street
LaGrange, Georgia 30240
PHONE: 706-882-2942
FAX: 706-883-8947

EXHIBIT A

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2009, the within and foregoing **MOTION OF CITY OF LAGRANGE AND TROUP COUNTY, GEORGIA TO FILE AMICUS CURIAE BRIEF** and supporting documents were filed with the Clerk of Court using the CM/ECF system, and were served upon counsel of record to all parties in this proceeding by electronic notification.

    /s/  Jeffrey M. Todd
JEFFREY M. TODD
Attorney for City of LaGrange
Georgia Bar No.: 713738

LEWIS, TAYLOR & TODD, P.C.
205 N. Lewis Street, Suite 3
P.O. Box 1027
LaGrange, Georgia 30241
PHONE: 706-882-2501
FAX: 706-882-4905