UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| *IN RE* TRI-STATE WATER | : | Civil Action File No. |
| RIGHTS LITIGATION | : | 3:07-MD-1-PAM |
| | : | |

**STATE OF ALABAMA'S MOTION FOR
PARTIAL JUDGMENT ON ALL PHASE 2 CLAIMS
AND SUPPORTING MEMORANDUM**

## **TABLE OF CONTENTS**

GLOSSARY ........................................................................................................................ i

I.   INTRODUCTION AND SUMMARY STATEMENT OF FACTS...................................... 2

II.   LEGAL STANDARD IN APA CASES ................................................................. 9

III.   THE CORPS' ENVIRONMENTAL ASSESSMENT AND FINDING OF NO
        SIGNIFICANT IMPACT REGARDING THE RIOP VIOLATE NEPA. ...................... 11

        A.   NEPA Procedural Requirements........................................................ 12

        B.   The Corps' Failure to Comply with NEPA........................................ 14

IV.   THE SERVICE'S BIOLOGICAL OPINION VIOLATES THE ENDANGERED
        SPECIES ACT......................................................................................... 17

V.   THE RIOP IS DUE TO BE SET ASIDE BECAUSE IT FACILITATES WATER
       SUPPLY OPERATIONS THAT THIS COURT HAS ALREADY DEEMED TO BE
       ILLEGAL.................................................................................................. 24

VI.   ALABAMA HAS STANDING TO ASSERT ITS PHASE 2 CLAIMS............................ 25

        A.   Standing to Assert NEPA Procedural Injury Claim............................. 26

        B.   Standing to Assert ESA Procedural Injury Claim................................ 28

        C.   Standing to Assert Substantive Claim That RIOP Violates Applicable Federal
              Law ................................................................................................. 29

VII.   CONCLUSION............................................................................................. 29

### GLOSSARY

| | |
|---|---|
| ACF | Apalachicola-Chattahoochee-Flint |
| ACF Basin | Apalachicola-Chattahoochee-Flint River Basin |
| Alabama | State of Alabama |
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| cfs | Cubic Feet Per Second |
| Corps or USACE | United States Army Corps of Engineers |
| 1989 Draft Plan | 1989 Apalachicola-Chattahoochee-Flint River Basin Draft Water Control Plan |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| Florida | State of Florida |
| FONSI | Finding of No Significant Impact |
| Georgia | State of Georgia |
| IOP | Interim Operations Plan |
| NEPA | National Environmental Policy Act, 42 U.S.C. 4321 *et seq.* |
| RIOP | Revised Interim Operating Plan |
| WSA | Water Supply Act of 1958, 43 U.S.C. 390b |

The State of Alabama ("Alabama") respectfully moves this Court to enter a partial judgment in its favor on all Phase 2 claims asserted by Alabama in this litigation.[1]  Pursuant to the Administrative Procedure Act ("APA"), Alabama seeks a partial judgment from this Court that certain final agency actions taken by the United States Army Corps of Engineers ("Corps"), the United States Fish and Wildlife Service ("Service"), and the individual Federal official defendants (collectively, the "Federal Defendants") are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or in excess of the Corps' and the Service's statutory jurisdiction or authority.  As will be described in greater detail below, Alabama asks the Court to enter judgment as follows:

1.  The Corps' June 2008 Supplemental Environmental Assessment ("June 2008 Supplemental EA") and June 2008 Finding of No Significant Impact ("June 2008 FONSI") concerning the Revised Interim Operations Plan ("RIOP") are due to be set aside as arbitrary and capricious and not in accordance with the requirements of the National Environmental Policy Act ("NEPA");

2.  The Service's June 2008 Biological Opinion ("June 2008 BiOp") concerning the RIOP is due to be set aside as arbitrary and capricious and not in accordance with the requirements of the Endangered Species Act ("ESA");

---

[1]In light of this Court's indication that it would take up the issue of the appropriate remedy with respect to any claim on which a party prevails after deciding the merits of the parties' claims, this motion seeks a partial judgment from this Court on the merits of Alabama's claims, and Alabama will address the appropriate remedies in accordance with this Court's future directives on the subject.

3. The RIOP is due to be set aside as arbitrary and capricious and not in accordance with law due to the failures of the Corps and the Service to comply with the requirements of NEPA and the ESA;

4. The RIOP is due to be set aside as arbitrary and capricious and not in accordance with law on the grounds that the RIOP facilitates the water supply provisions that this Court previously found to be illegal.

As demonstrated below, Alabama is entitled to a partial judgment in its favor for all of its Phase 2 claims.   A partial judgment in favor of Alabama is supported by the administrative record, the factual appendix and evidentiary materials filed by Alabama contemporaneously herewith, the pleadings in this action and the arguments set forth herein.

## I.     INTRODUCTION AND SUMMARY STATEMENT OF FACTS

The Apalachicola-Chattahoochee-Flint ("ACF") Basin drains portions of Alabama, Georgia, and Florida.  FA ¶ 1.[2]  The basin's main tributaries are the Chattahoochee and Flint Rivers which join to form the Apalachicola River.   FA ¶ 1.   The ACF Basin spans ten counties in Alabama, fifty counties in Georgia, and eight counties in Florida.   FA ¶ 1.   For about half its length, the Chattahoochee River flows along the Georgia-Alabama border.   FA ¶ 1.

The Corps operates five dams in the ACF Basin: Buford, West Point, Walter F. George, George W. Andrews, and Jim Woodruff (in downstream order).  FA ¶ 2.   Each of

---

[2] References to the Factual Appendix being filed contemporaneously with this Motion will be as follows: FA ¶ __ (paragraph).   Citations to the Administrative Record will be in accordance with the agreed upon citation formats in Doc. 297.  All other citations will adhere to bluebook standards.

these dams is located on the Chattahoochee River except for Jim Woodruff Dam, which is located at the confluence of the Chattahoochee and Flint Rivers and marks the upstream most extent of the Apalachicola River.  FA ¶ 2.   Lakes Lanier (formed by Buford Dam), West Point, and Walter F. George are storage reservoirs with a combined 1.6 million acre-feet of storage in their conservation storage pools, which is available for water management operations.  FA ¶ 3.  Lakes George W. Andrews and Seminole (formed by Jim Woodruff Dam) have little storage capacity and are operated as run-of-river projects.  FA ¶ 3.

As this Court has already found, the last finalized water control plan for the ACF Basin is dated 1958.  FA ¶ 30; July 17, 2009 Order, Doc. 264, at 22 ("The Corps has never updated the 1958 [Apalachicola River Basin Reservoir Regulation] Manual or the Buford Reservoir Regulation Manual …, and thus these manuals are the current regulation manuals for the ACF basin and Buford dam.").  As also found by this Court, the last NEPA analysis for the operation of Buford Dam and Lake Lanier, the basin's largest storage reservoir, was completed in 1974.  FA ¶ 30; July 17, 2009 Order, Doc. 264, at 29 (stating that, with respect to the operation of Lake Lanier and Buford Dam, "[n]o new EIS has been completed since 1974").

The Corps produced a draft water control plan for the ACF Basin in 1989 (the "1989 Draft Plan").  FA ¶ 4.  The 1989 Draft Plan has never been subjected to NEPA evaluation or ESA consultation.  FA ¶ 4.  In fact, the Corps formally withdrew the 1989 Draft Plan in 1992.  FA ¶ 4.  Nevertheless, for two decades, the Corps has operated the ACF system pursuant to the purportedly withdrawn 1989 Draft Plan.  FA ¶ 4.

The Corps slightly modified the 1989 Draft Plan in response to the drought experienced in 2006 and 2007 through a series of interim operations plans ("IOPs"). FA ¶ 6. Between March 2006 and April 2008, the Corps put forth several versions of these IOPs with each new plan augmenting or replacing the prior plan. FA ¶¶ 6-9. In connection with these IOPs, the Corps issued a series of environmental assessments ("EAs") and findings of no significant impact ("FONSIs"). FA ¶¶ 6-9. The Service analyzed operations under them pursuant to Section 7 of the ESA via one letter and a series of biological opinions ("BiOps"). FA ¶¶ 6-9.

The Corps released the version of the IOP, the RIOP, that currently guides its ACF operations in April 2008. FA ¶ 9. The Corps purported to evaluate the RIOP pursuant to NEPA in June 2008 through the June 2008 Supplemental EA and the June 2008 FONSI. FA ¶ 9. The Service purported to analyze the RIOP pursuant to Section 7 of the ESA in the June 2008 BiOp. FA ¶ 9.

The RIOP currently guides the Corps' ACF operations and will continue to guide these operations until a new ACF water control plan is finalized. FA ¶¶ 10, 13, 28, 31, 36, 38. As the Corps stated in its letter to the Service requesting Section-7 consultation on the RIOP, "[o]perations under the [RIOP] will be implemented and continued until such time as additional formal consultation may again be initiated and completed, either in association with the update and revision of water control plans for the ACF system, or sooner if conditions change or additional information is developed to justify a possible revision to operations." FA ¶ 10; *see also* FA ¶¶ 31, 36.

Although the RIOP's provisions are focused primarily on flows in the Apalachicola River, its provisions guide the Corps' operation of the entire ACF system.   The RIOP contains three primary operational protocols: 1) it prescribes a minimum discharge or flow requirement below Jim Woodruff Dam; 2) it prescribes a maximum fall rate or drop in river stage below Jim Woodruff Dam; and 3) it creates a drought plan to conserve storage in the ACF reservoirs while meeting a minimum flow requirement in the Apalachicola River when total ACF storage falls below a certain threshold.   FA ¶¶ 14-20.   In order to meet these operational protocols, the RIOP requires the use of storage in the ACF reservoirs upstream of Jim Woodruff Dam.   FA ¶¶ 13, 28.   In describing the RIOP to the Service, the Corps summarized that the five federal reservoirs in the ACF Basin are operated "as a system, and the releases made from Jim Woodruff Dam under the [RIOP] reflect the downstream end-result for system-wide operations measured by daily releases from Jim Woodruff Dam into the Apalachicola River."  FA ¶ 13; *see also* FA ¶ 28 (in the June 2008 Supplemental EA, the Corps stated that "[t]he [R]IOP directly impacts flows in the Apalachicola River and utilizes the composite storage of the reservoirs within the ACF system").

The RIOP is a functional affirmation of the 1989 Draft Plan with specific directives added detailing how storage in the ACF reservoirs will be used to meet minimum flow requirements in the Apalachicola River.   As the Corp emphasized in describing the RIOP to the Service and in analyzing the RIOP pursuant to NEPA, the RIOP "does not represent a new water control plan," but is instead "a definition of temporary discretionary operations within the limits and rule curves established by the existing water control plan (1989)."  FA ¶¶ 12, 29; *see also* FA ¶ 37.   There are only three RIOP provisions that fall outside of the

5

limits and rule curves of the 1989 Draft Plan: 1) it allows minimum flows below 5,000 cfs in the Apalachicola River; 2) it allows for storage above the winter rule curves at Lake Walter F. George and West Point Lake; and 3) it allows spring refill operations to begin earlier at the Corps' ACF reservoirs than allowed in the 1989 Draft Plan. FA ¶ 12. As summarized in the June 2008 BiOp, except for these three limited provisions, the RIOP was structured so as to not "change the top of the flood control pools, conservation pools, or the rule curves of the upstream projects." FA ¶ 37.

The RIOP cannot be fully understood or implemented without reference to the 1989 Draft Plan. As this Court has already found, one of the innovations introduced under the 1989 Draft Plan were action zones that described how each of the ACF reservoirs would be operated as lake levels declined. *See* July 17, 2009 Order, Doc. 264, at 47-49. The action zones divide the ACF reservoirs into four zones that have different operational directives. *See id*. at 48. As lake levels decline and reservoirs move into lower action zones, the Corps curtails or eliminates water releases for navigation and hydropower in favor of retaining water to meet water supply and water quality needs. *See id*. As found by this Court, these action zones "highlight the shift in operations at Buford from hydropower, flood control, and navigation to water supply and recreation." *Id*. at 49; *see also* FA ¶¶15-16.

The Corps must look to the 1989 Draft Plan and the actions zones contained therein to implement the RIOP. One of the factors the RIOP uses to determine the required minimum discharge, and the "trigger" determining when the RIOP's drought plan is activated, is "composite storage." FA ¶¶ 14-15, 17, 19-20. Composite storage creates new basin-wide action zones by combining the storage in the action zones defined in the 1989

Draft Plan for each of the three ACF storage reservoirs: Lakes Lanier, West Point, and Walter F. George. FA ¶ 15. For example, composite storage zone 1 equals the combined storage of zone 1 in each of the three storage reservoirs. FA ¶ 15. Because composite storage is based upon the action zones contained in the 1989 Draft Plan, it would be impossible to understand or implement the composite storage zones contained in the RIOP without reference to the action zones contained in the 1989 Draft Plan.

While the Corps purported to evaluate the RIOP pursuant to NEPA through the June 2008 Supplemental EA and June 2008 FONSI, FA ¶¶ 9, 26, the analysis contained in these documents fails to address the full scope of the RIOP, which would include the 1989 Draft Plan. The June 2008 Supplemental EA recognizes that the RIOP's provisions require the use of storage in the ACF reservoirs upstream of Jim Woodruff Dam, that the RIOP was designed within the parameters of the 1989 Draft Plan, and that the 1989 Draft Plan had never been finalized. FA ¶¶ 28-30. Even though provisions of the RIOP are meaningless without reference to the 1989 Draft Plan, the Corps did not analyze the 1989 Draft Plan in the June 2008 Supplemental EA and June 2008 FONSI. FA ¶¶ 29-31.

Not only does it not analyze the 1989 Draft Plan, but the June 2008 Supplemental EA also signals that the 1989 Draft Plan will never be subjected to NEPA analysis. The June 2008 Supplemental EA states that the RIOP would be implemented "until such time as the existing water control plan is revised or updated and a new Water Control Plan is completed. At that time, additional public coordination, consultation, and NEPA documentation would be prepared for the new water control manual...." FA ¶ 31. The end result is that the Corps will never analyze the 1989 Draft Plan under NEPA because the next water control plan it

plans to analyze is some yet-to-be created water control plan that will replace the RIOP and the 1989 Draft Plan.

The Service purported to analyze the RIOP pursuant to Section 7 of the ESA in its June 2008 BiOp. FA ¶¶ 9, 34. The June 2008 BiOp analyzes the effects that the RIOP will have upon four species and their designated critical habitat in the Apalachicola River that the federal government classifies as either threatened or endangered. FA ¶ 34. These species are the Gulf sturgeon, the purple bankclimber mussel, the Chipola slabshell mussel, and the fat threeridge mussel. FA ¶ 34.

The Service's June 2008 BiOp suffers from the same basic flaws as the June 2008 Supplemental EA and the June 2008 FONSI. The June 2008 BiOp recognizes that the RIOP's provisions require the use of storage in the upstream ACF reservoirs, that the RIOP was designed within the limits of the 1989 Draft Plan, and that the 1989 Draft Plan has not been finalized. FA ¶¶ 37-38, 42-43. However, just like the June 2008 Supplemental EA, the June 2008 BiOp does not subject the 1989 Draft Plan's provisions to ESA scrutiny even though provisions of the RIOP are meaningless without reference to the 1989 Draft Plan. FA ¶ 35.

Also like the June 2008 Supplemental EA, the June 2008 BiOp indicates that the 1989 Draft Plan will never be the subject of Section-7 consultation under the ESA. FA ¶¶ 36, 43. The June 2008 BiOp states that the RIOP is "applicable until revised or until a new Water Control Plan is adopted" and that "[t]he Corps' time frame for the applicability of the RIOP is five years pending a future update to the [water control plan]." FA ¶ 36. The end result is the same as with the Corps' NEPA analysis: the 1989 Draft Plan will never be

subjected to Section-7 consultation under the ESA because the next action the Service plans to analyze under Section 7 is the yet-to-be formulated water control plan that will replace the RIOP and the 1989 Draft Plan.

In crafting the RIOP, the Corps expressly undertook to facilitate water supply operations at Lake Lanier and the other ACF projects. FA ¶¶ 21-25. As the Corps stated in its June 2008 Supplemental EA approving the RIOP, not only does the RIOP "not result in reservoir levels or river levels that limit the ability to support water supply," but it also "includes provisions to conserve storage as much as possible during drought conditions <u>in order to support water supply</u>, water quality, and fish and wildlife needs." FA ¶ 21 (emphasis added). In addition, the June 2008 Supplemental EA estimated that water supply withdrawals would increase 25 percent by 2017, and acknowledged that during dry or drought conditions that "this increase in M&I water use could result in lower reservoir elevations and reduced flows on the Apalachicola River." FA ¶ 22. However, it added that the RIOP "ameliorates these impacts … by incorporating a drought plan that conserves storage to support a minimum flow of at least 4,500 cfs in the Apalachicola River even when basin inflow is much less." FA ¶ 22.

## II.    LEGAL STANDARD IN APA CASES

With this motion, Alabama seeks the entry of partial judgment on claims challenging certain final agency actions by the Corps and the Service under the Administrative Procedures Act ("APA"). The APA provides that courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of [the agency's] statutory

jurisdiction [or] authority," or "without observance of procedure required by law . . . ."  5 U.S.C. § 706 (2) (A), (C), (D).

The final agency actions at issue in this motion fall squarely within the parameters of the APA.  First, Alabama contends that the Corps' June 2008 Supplemental EA and June 2008 FONSI regarding the RIOP are in violation of NEPA.  Second, Alabama claims that the Service's June 2008 BiOp violates Section 7 of the ESA.  Third, Alabama claims that the RIOP is due to be set aside due to the Federal Defendants' failure to conduct a proper analysis under NEPA and the ESA.  Finally, Alabama claims that the RIOP is due to be set aside on the grounds that the very water supply operations it facilitates have already been found to be illegal by this Court.

In deciding whether or not to set aside these agency actions under the APA, this Court applies "the generally applicable standards of § 706," which require "a thorough, probing, in-depth review."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 104-107 (1977).  First, this Court determines whether the Corps and the Service acted within the scope of their authority.  *See Overton Park*, 401 U.S. at 415; 5 U.S.C. § 706(2)(C).  Second, if this Court determines that the Corps and the Service acted within their scope of authority, "[§] 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Overton Park*, 401 U.S. at 416 (quoting 5 U.S.C. § 706(2)(A)).  Under the APA, "[q]uestions of law unlike questions of fact are freely reviewable by the courts."  *Pollgreen v. Morris*, 770 F.2d 1536, 1544 (11th Cir. 1985) (stating that "the reviewing court shall decide all relevant questions of law…") (citing 5

U.S.C. § 706). Simply put, "[a]n administrative decision based upon incorrect legal principles cannot stand." *Pollgreen*, 770 F.2d at 1545 n.20.

In APA cases involving challenges under NEPA and the ESA, a reviewing court "must … look beyond the scope of the decision itself to the relevant factors that the agency considered." *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002) (citing *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (hereinafter "*Sierra Club*"). The Court has a duty "to ensure that the agency took a 'hard look' at the environmental consequences of the proposed action." *Sierra Club*, 295 F.3d at 1216 (citing *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1541 (11th Cir. 1990)).

## III. THE CORPS' ENVIRONMENTAL ASSESSMENT AND FINDING OF NO SIGNIFICANT IMPACT REGARDING THE RIOP VIOLATE NEPA.

The Corps' June 2008 Supplemental EA and June 2008 FONSI regarding the RIOP are due to be set aside based on the Corps' failure to comply with the requirements of NEPA. As discussed above, through the RIOP, the Corps modified the 1989 Draft Plan, but when the Corps conducted its NEPA analysis, it limited the analysis to the modifications. In other words, the Corps conducted an analysis of modifications to the 1989 Draft Plan, but it did not—and never has—conducted an analysis of the 1989 Draft Plan. NEPA requires the Corps to evaluate the entirety of its applicable federal action, not just part of it. Accordingly, as demonstrated below, the June 2008 Supplemental EA and the June 2008 FONSI regarding the RIOP are due to be set aside.

## A.     NEPA Procedural Requirements

"NEPA establishes procedures that a federal agency *must* follow before taking *any* action." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (emphasis added) (hereinafter, "*Van Antwerp*").   The agency first must determine whether its proposed action constitutes a "major Federal action," i.e., "an action 'significantly affecting the quality of the human environment.'" *Id.* (*citing* 42 U.S.C. § 4332(2)(C).   This "Congressional mandate" is an "'action-forcing' provision designed to prevent agencies from acting on incomplete information and to 'ensure that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.'" *Sierra Club*, 295 F.3d at 1214 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)).

The determination of whether a proposed action constitutes a "major Federal action" requires the preparation of an EA.  *Sierra Club*, 295 F.3d at 1214-15 (citing *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998); 40 C.F.R. § 1501.3).  "The EA should provide enough evidence and analysis to guide the agency to one of two conclusions: (1) a finding that the project will have a significant effect, or (2) a finding of no significant impact ('FONSI')." *Sierra Club*, 295 F.3d at 1215.   In its analysis, the agency must assess "the cumulative impacts of a proposed project in conjunction with any other, related actions." *City of Oxford, GA v. Fed. Aviation Admin.*, 428 F.3d 1346, 1353 (11th Cir. 2005) (citing 40 C.F.R. §1508.27).   "This requirement prevents a proponent from breaking a proposal into small pieces that, when viewed individually, appear insignificant but that are significant when viewed as a whole."  *Id.* (citing 40 C.F.R. § 1508.27(b)(7)).   In other words, "[s]ignificance

cannot be avoided by terming an action temporary or breaking it down into small component parts."   40 C.F.R.  § 1508.27(b)(7).   The agency's analysis, therefore, must assess the proposed action's "cumulative impact"— that is, "the impact on the environment from 'the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions….'"   *City of Oxford*, 428 F.3d at 1353 (quoting 40 C.F.R. § 1508.7).

If the agency determines that the proposed action *is* a "major Federal action," then the agency must study specific issues in a detailed Environmental Impact Statement ("EIS"). *Van Antwerp*, 526 F.3d at 1360.   "The EIS must provide 'full and fair discussion of significant environmental impacts.'" *Sierra Club*, 295 F.3d at 1215 (quoting 40 C.F.R. §1502.1).  This discussion "should include any potential impact on endangered or threatened species." *Sierra Club*, 295 F.3d at 1215.   As part of the EIS process, the agency must determine the appropriate scope of the analysis required. *Id.*   In doing so, the agency must "consider[] exactly what type of action is involved, its direct and indirect impacts, and potential alternatives." *Id.*

As discussed above, a reviewing court "must … look beyond the scope of the decision itself to the relevant factors that the agency considered." *Sierra Club*, 295 F.3d at 1216 (citing *Motor Vehicle Mfrs.*, 463 U.S. at 43).  And, the Court has a duty "to ensure that the agency took a 'hard look' at the environmental consequences of the proposed action." *Sierra Club*, 295 F.3d at 1216 (citing *North Buckhead*, 903 F.2d at 1541).

13

### B.    The Corps' Failure to Comply with NEPA

In an effort to comply with the foregoing requirements of NEPA, the Corps prepared the June 2008 Supplemental EA for the RIOP and made a finding of no significant impact in the June 2008 FONSI.  FA ¶ 9, 26.  The analysis of the RIOP undertaken by the Corps in this NEPA process, however, was wholly inadequate.  Rather than evaluate the entire scope of the proposed federal action as required by NEPA, the Corps impermissibly limited its evaluation to part of the proposed federal action.

As discussed in detail above, the RIOP serves as a modification of the 1989 Draft Plan.  FA ¶¶ 12, 29, 37.  In the words of the Corps, the RIOP "does not represent a new water control plan" but is instead "a definition of temporary discretionary operations **within the limits and rule curves established by the existing water control plan (1989)**."  FA ¶¶ 12, 29 (emphasis added).  Likewise, the Service recognized that the RIOP was structured so as to not "change the top of the flood control pools, conservation pools, or the rule curves of the upstream projects."  FA ¶ 37.  These parameters are established by the 1989 Draft Plan.  FA ¶ 12-13, 29.

Indeed, the RIOP cannot be fully understood or implemented without reference to the 1989 Draft Plan.  Under the RIOP, the Corps bases operational decisions on the level of "composite storage" in the ACF reservoirs.  FA ¶¶ 14-15, 17, 19-20.  Composite storage is based upon the action zones contained in the 1989 Draft Plan.  FA ¶ 15.  Despite the need to look to the 1989 Draft Plan to understand and implement the RIOP, the Corps did not consider the 1989 Draft Plan (or the action zones contained therein) as part of its NEPA

analysis even though the NEPA analysis admitted the 1989 Draft Plan had not been finalized. FA ¶ 30.

What the Corps has done here is take the 1989 Draft Plan and apply some modifications to it to create the RIOP. With its NEPA analysis, the Corps does not evaluate the 1989 Draft Plan along with the modifications. Instead, the Corps limits its evaluation to just the modifications and suggests that it will undertake a NEPA analysis of a different water control plan at some point in the future. FA ¶ 31. NEPA does not allow the Corps to segment its analysis in this manner.

As discussed above, the Corps' NEPA analysis must assess "the cumulative impacts of [the] proposed project along with any other, related actions." The Corps cannot avoid a finding that its proposed action is "significant" "by terming an action temporary or breaking it down into small component parts." 40 C.F.R. § 1508.27(b)(7). This "anti-segmentation" rule "is intended to prevent 'agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact but which collectively have a substantial impact." *Florida Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp. 2d 1298, 1313 (S.D. Fla. 2005) (quoting *Natural Resources Def. Council Inc. v. Hodel*, 865 F.2d 288, 297-98 (D.C. Cir. 1988)) (internal quotation marks and citation omitted).

Though a federal agency has some discretion regarding the *substantive* outcome of its NEPA analysis, the *procedural* requirements of NEPA are mandatory. The Corps has failed to fully comply with those requirements in connection with its exclusion of the 1989 Draft

Plan from its evaluation of the RIOP.[3]  The Corps has indicated that rather than subject the 1989 Draft Plan to analysis under NEPA, it will prepare a new water control plan, and that plan will be subjected to the requisite NEPA analysis.  This proposal, however, does not remedy the Corps' failure to comply with NEPA.  All it does is ensure that the 1989 Draft Plan will never be subjected to NEPA analysis.  And, in the meantime, the Corps will continue to operate the ACF system under the RIOP, which itself cannot be fully understood or implemented without reference to the 1989 Draft Plan.

This Court should not allow the Corps to shield an integral aspect of the proposed agency action from the mandatory analysis required by NEPA.  An agency cannot "'evade [its] responsibilities' under the National Environmental Policy Act by 'artificially dividing a major federal action into small components . . . .'"  *PEACH v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1247 (11th Cir. 1996) (quoting *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 68 (D.C. Cir. 1987)).  "Although the impact of a particular project may be inconsequential when considered in isolation, if the cumulative impact of a given project and other planned projects is significant, an applicant cannot simply prepare an EA for its project, issue a FONSI, and ignore the overall impact of the project . . . ."  *See Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 180 (3rd Cir. 2000).

---

[3] In the Corps' recent public notice of its intent to update the ACF water control manuals, the Corps has stated that "a Draft Environmental Impact Statement (EIS) will be prepared, as required by the National Environmental Policy Act (NEPA).  The Draft EIS will address updated operating criteria and guidelines for managing the water storage and release actions of agency water managers and associated environmental impacts."  *See* Intent to Prepare Draft Environmental Impact Statement for Updated Water Control Manuals for the Apalachicola-Chattahoochee-Flint River Basin, 73 Fed. Reg. 9,780-9,781 (Feb. 22, 2008).  Yet, despite the Corps' recognition that NEPA requires it to prepare an EIS as part of the process for updating the ACF water control manuals, the Corps is attempting to avoid any NEPA analysis whatsoever of the 1989 Draft Plan.

By excluding a portion of the RIOP from NEPA review, the Corps is engaging in precisely the kind of segmenting of a federal action that NEPA forbids.  Because the Corps has excluded the 1989 Draft Plan from its NEPA analysis, the Corps' June 2008 Supplemental EA and June 2008 FONSI with respect to the RIOP are arbitrary and capricious and not in accordance with law and must be set aside.  As such, the RIOP must also be set aside as arbitrary and capricious and not in accordance with law on the grounds that it has not been subjected to the evaluation required by NEPA.[4]

## IV.    THE SERVICE'S BIOLOGICAL OPINION VIOLATES THE ENDANGERED SPECIES ACT.

The Service's BiOp is due to be set aside based on the Service's violation of the ESA.  The Service's analysis of the RIOP under the Endangered Species Act mirrors the Corps' improper analysis of the RIOP under NEPA.  Like the Corps, the Service has arbitrarily limited its analysis to part of the proposed federal action.   The RIOP is a functional affirmation of the 1989 Draft Plan, adding specific directives detailing how storage in the ACF reservoirs will be used to meet minimum flow requirements in the Apalachicola River.  Yet, the Service excluded the 1989 Draft Plan from its evaluation, choosing instead to evaluate only the modifications to the 1989 Draft Plan found in the RIOP.   The Service cannot perform an adequate evaluation of a modification to the 1989 Draft Plan without first evaluating the 1989 Draft Plan.  Because it has not done so, the Service's BiOp is due to be set aside on the grounds that it is arbitrary and capricious and not in accordance with law.

---

[4] In accordance with this Court's instructions and in further support of Alabama's Phase 2 claims, Alabama adopts and incorporates by reference Section IV of Plaintiff-Intervenor Alabama Power Company's Motion for Judgment on Phase II Claims in which Alabama Power Company argues that the RIOP is in violation of NEPA's procedural requirements.

The ESA "outlaws the 'take' of any endangered species", defining "take" to include harm to the species or significant habitat modification or degradation. *See Miccosukee Tribe of Indians of Florida v. United States*, 566 F.3d 1257, 1262 (11th Cir. 2009). Section 7(a)(2) of the ESA "requires every federal agency to ensure that its actions will not jeopardize the continued existence of any endangered species or threatened species or result in the destruction of adverse modification of the habitat of such species which is determined by the Secretary … to be critical…." *Id.*; 16 U.S.C. § 1536(a)(2). "Under Section 7 of the ESA, when a federal agency undertakes or permits actions that may affect listed species, the agency must consult with [the Service] to 'insure' that their activities are 'not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species.'" *Defenders of Wildlife v. Babbit*, 130 F. Supp. 2d 121, 125 (D.D.C. 2001) (quoting 16 U.S.C. § 1536(a)(2)). "When a proposed agency action may adversely affect an endangered species or its critical habitat, the [Service] creates a 'biological opinion'" determining whether the action would jeopardize the species. *Miccosukee Tribe*, 566 F.3d at 1263. The ESA requires the Service, "in preparing its biological opinions, to use 'the best scientific and commercial data available.'" *Id.* at 1265 (quoting 16 U.S.C. § 1536(a)(2)).

The Service acknowledges that it must analyze the effects of the RIOP (the proposed agency action) on listed species in order to fulfill its duties under the ESA. *See* FA ¶¶ 34-35. Remarkably, however, the Service does not analyze the full scope of the proposed agency action, but instead, the Service chose to only analyze part of the proposed action. As spelled out in detail above, the RIOP is an affirmation of the 1989 Draft Plan. *See* Section I, *supra*,

18

at 5-6.  That is, under the RIOP, the Corps continues to operate the ACF system "within the limits and rule curves established by the existing water control plan (1989)", FA ¶¶ 12, 29, and the Corps also follows some additional operational parameters that are not part of the 1989 Draft Plan.  FA ¶¶ 14-20.  A complete analysis of the RIOP, then, should include both the 1989 Draft Plan and these additional parameters.  That, however, was not the analysis undertaken by the Service.

Even though the RIOP serves as an affirmation of (and limited modification to) the 1989 Draft Plan, the Service's analysis excludes the 1989 Draft Plan from consideration.  FA ¶¶ 35, 40, 42-43.  The ESA imposes a statutory duty on the Service to "insure that [the Corps'] action . . . is not likely to jeopardize the continued existence of" listed species and "to use the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).  On its face, the Service's segmentation of the Corps' proposed action violates this duty.

Both applicable regulations and relevant case law demonstrate that the Service must analyze all impacts of the proposed agency action, and it must analyze the total scope of the proposed agency action.  The Section-7 consultation process must include an evaluation of "the effects of the action and cumulative effects on the listed species or critical habitat."  50 C.F.R. § 402.14(g)(3).  *See also Miccosukee Tribe*, 566 F.3d at 1268.  The "effects of the action" are defined as "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action[.]"  50 C.F.R. § 402.02 (definition of "effects of the action").  The regulations further define precisely what effects must be considered as part of the action: "Indirect effects are those that are caused by the proposed action and are later in time, but still are

reasonably certain to occur.  Interrelated actions are those that are part of a larger action and depend on the larger action for their justification.  Interdependent actions are those that have no independent utility apart from the action under consideration."  *Id*.  This evaluation of the effects of the agency action must be based upon "the best scientific and commercial data available."  50 C.F.R. § 402.14(g)(8).

Federal courts have repeatedly recognized that it is improper for the Service to undertake segmented or incremental Section-7 consultations that fail to adequately address the true scope and impact of the agency actions.  *See, e.g., Pacific Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1036 (9th Cir. 2001) (criticizing failure to aggregate "the effects of individual projects . . . to ensure that their cumulative effects are perceived and measured in future ESA consultations"); *Conner v. Burford*, 848 F.2d 1441, 1457-58 (9th Cir. 1988) ("We conclude that the ESA does not permit the incremental-step approach. . . .  The biological opinions must be coextensive with the agency action."); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. CV 01-640-RE, CV 05-23-RE, 2005 WL 1278878, *14 (D. Ore. May 26, 2005) ("Only a comprehensive approach to jeopardy analysis will meet the statutory mandate.") (citations omitted); *Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1150 (W.D. Wash. 2000) ("A biological opinion which is not coextensive in scope with the identified agency action necessarily fails to consider important aspects of the problem and is, therefore, arbitrary and capricious.").

As one District Court has explained:

> [T]here are significant reasons to reject the segmentation [the Service] has utilized in this case.  If [the Service] were allowed to apply such a limited

> scope of consultation to all agency activities, any course of agency action could ultimately be divided into multiple small actions, none of which, in and of themselves, would cause jeopardy. Moreover, such impermissible segmentation would allow agencies to engage in a series of limited consultations without ever undertaking a comprehensive assessment of the impacts of their overall activity on protected species. **The ESA requires more; it requires that the consulting agency scrutinize the *total scope* of agency action**.

*American Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 255 (D.D.C. 2003) (citation and internal quotation marks omitted) (emphasis added) (italics added in *American Rivers*).

The Service is plainly violating its statutory duty to "scrutinize the *total scope* of agency action." *Id*. The fact that the Service has indicated that one day in the future it will comply with its duty to evaluate a new water control plan that the Corps indicates it will prepare does not relieve the Service of its current obligation to analyze the current proposed agency action. As discussed above, the RIOP cannot be fully understood or implemented without reference to the 1989 Draft Plan. To be sure, the RIOP contains modifications to the 1989 Draft Plan, and those modifications must be analyzed under the ESA. But, the Service cannot satisfy the requirements of the ESA by analyzing the modifications and excluding from consideration the very thing that is being modified, the 1989 Draft Plan. *Greenpeace*, 80 F. Supp. 2d at 1150.[5]

---

[5] As referenced above, applicable regulations require that a Section-7 consultation must "evaluate 'the effects of other activities that are interrelated or interdependent' with the action under consideration, including 'those that are part of a larger action and depend on the larger action for their justification." *American Rivers*, 271 F. Supp. 2d at 255 (quoting 50 C.F.R. § 402.02). By narrowly focusing its analysis on the impacts of only part of the proposed federal action, the BiOp ignores this requirement. *American Rivers*, 271 F. Supp. 2d at 255. Indeed, the Service appears to recognize this problem, noting the following in the BiOp: "**At this time, the Service is unaware of actions that satisfy the definitions of**

Indeed, the process that the Service has followed will effectively insulate the 1989 Draft Plan from ever undergoing the requisite ESA analysis.  As this Court has already recognized, "[t]he Corps has never updated the 1958 Manual or the Buford Reservoir Regulation Manual ("Buford Manual"), and thus these manuals are the current regulation manuals for the ACF basin and Buford dam."  July 17, 2009 Order, Doc. 264, at 22.  Thus, the 1989 Draft Plan has never been subjected to meaningful analysis, and, by segregating the 1989 Draft Plan from its ESA analysis of the RIOP, the Service is ensuring that the 1989 Draft Plan will never be subjected to ESA analysis.  Rather than evaluate the 1989 Draft Plan as an integral part of the RIOP, the Service is excluding the 1989 Draft Plan from consideration and instead will evaluate the Corps' promised updated water control plan at some unspecified future date.  In the meantime, however, the Service would allow the Corps to operate the ACF system pursuant to the RIOP, which, as discussed above is an affirmation of the 1989 Draft Plan.

This Court cannot allow the Service to improperly segment the proposed action of the Corps by limiting its analysis to part of the proposed agency action.  The failure of the Service to evaluate the total scope of the proposed agency action renders the BiOp arbitrary and capricious.  "A biological opinion which is not coextensive in scope with the identified

---

**interrelated and interdependent actions that will not themselves undergo section 7 in the future**, or that are not already included in the Baseline or in our representations of flows under the RIOP and RoR."  Doc. 510, FWS AR Page 013632 (emphasis added).  The ESA, however, does not allow the Service to satisfy its obligation to evaluate the effects of a proposed action on the species by evaluating some effects now and some effects in the future.  *See American Rivers*, 271 F. Supp. 2d at 255.

agency action necessarily fails to consider important aspects of the problem and is, therefore, arbitrary and capricious." *See Greenpeace*, 80 F. Supp. 2d at 1150.[6]

The Service's refusal to analyze the effects of the 1989 Draft Plan also violates the ESA's requirement that the Service "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); *Conner*, 848 F.2d at 1454.  If the Service has purposely excluded part of the proposed agency action from consideration, it cannot possibly have used "the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).

For the foregoing reasons, the June 2008 BiOp is due to be set aside as arbitrary and capricious and not in accordance with law.

---

[6] The Service cannot dodge its obligation to analyze the full scope of the RIOP by claiming that the 1989 Draft Plan is part of the "environmental baseline."  As the Service has recognized, an environmental baseline is "a 'snapshot' of a species' health at a specified point in time."  FA ¶ 39.  It "is an analysis of the effects of past and ongoing human and natural factors leading to the current status of the species, its habitat (including designated critical habitat), and ecosystem, within the action area."  FA ¶ 39. "In the case of an ongoing water project, such as Woodruff Dam, the total effects of all past activities, including the effects of its construction and past operation, current non-federal activities, and federal projects with completed section 7 consultations, form the environmental baseline."  FA ¶ 41. As discussed above, the effects of the 1989 Draft Plan have not been analyzed by the Service, and no Section 7 consultation has been conducted analyzing the 1989 Draft Plan.  The failure of the Service to evaluate the effects of the 1989 Draft Plan—either as part of the proposed action or as part of the impacts that constitute the environmental baseline—renders the BiOp arbitrary and capricious and not in accordance with law.  *See Defenders of Wildlife*, 130 F. Supp. 2d at 126-28 (defining "environmental baseline" and finding that a proper Biological Opinion "must also include an analysis of the effects of the [proposed] action on the species when 'added to' the environmental baseline—in other words, an analysis of the *total* impact on the species") (quoting 50 C.F.R. § 402.02) (emphasis in original).

V.   **THE RIOP IS DUE TO BE SET ASIDE BECAUSE IT FACILITATES WATER SUPPLY OPERATIONS THAT THIS COURT HAS ALREADY DEEMED TO BE ILLEGAL.**

In addition to the violations of NEPA and the ESA detailed above, the RIOP is also due to be set aside on the grounds that it facilitates water supply operations that this Court has already found to be illegal.  The Corps has stated that the RIOP "includes provisions to conserve storage as much as possible during drought conditions in order to support water supply, water quality, and fish and wildlife needs" and that the RIOP does "not result in reservoir levels or river levels that limit the ability to support water supply."  FA ¶ 21.

In this Court's July 17, 2009, Memorandum and Order, after finding that "without any Congressional authorization, the Corps has reallocated nearly a quarter of Lake Lanier's conservation storage to support water supply", July 17, 2009 Order, Doc. 264, at 83-84, the Court concluded that this reallocation constituted a major operational change in violation of the Water Supply Act.  *Id*. at 84.   Likewise, this Court concluded that the "Corps's decision to support water supply has seriously affected the purposes for which the Buford project was originally authorized.  The Corps is therefore in violation of the [Water Supply Act]."  *Id*. at 91-92.  Given that the RIOP was written to protect the very water supply operations at Lake Lanier that this Court has already found to be illegal, the RIOP is due to be set aside as arbitrary and capricious and not in accordance with law.

## VI.   ALABAMA HAS STANDING TO ASSERT ITS PHASE 2 CLAIMS.

By virtue of its environmental and economic interests related to the flows in the Chattahoochee River, Alabama plainly has standing to assert its Phase 2 claims.[7]

In order to establish standing, it is well settled that a party must show (1) a concrete and particularized injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable ruling. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1130 (11th Cir. 2005).  Furthermore, in cases such as this involving States, "the states' quasi-sovereign interests entitle[] them to 'special solicitude' in standing analysis." *Southeastern Fed. Power Customers, Inc. v. Geren*, 514 F.3d 1316, 1322 (D.C. Cir. 2008) (quoting *Massachusetts v. EPA*, 549 U.S. 497 (2007)).  Finally, to satisfy the prudential requirements for standing, a party must establish that "the interest sought to be protected by the complainant [is] arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970).  These principles of standing apply to the procedural injury claims at issue in this case, although the predominant factor to be evaluated for such claims is whether a plaintiff has established an injury in fact.  *See Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170 (11th Cir. 2006).

---

[7] Alabama inquired of the Federal Defendants, Georgia, and the Water Supply Providers whether they disputed Alabama's standing to assert its Phase 2 claims.  The Federal Defendants responded that they had not yet determined their position on the matter.  Georgia and the Water Supply Providers never responded.

### A.       Standing to Assert NEPA Procedural Injury Claim

Alabama easily satisfies the standing requirements for its APA claim based upon the Corps' failure to comply with the procedural requirements of NEPA.  "It is well settled that, in a NEPA suit, 'a cognizable procedural injury exists when a plaintiff alleges that a proper EIS has not been prepared . . . when the plaintiff also alleges a 'concrete' interest – such as an aesthetic or recreational interest – that is threatened by the proposed actions."  *Id.* at 1171 (quoting *Sierra Club v. Johnson*, 436 F.3d 1269, 1278-79 (11th Cir. 2006)).  Here, of course, Alabama alleges that the Corps has evaded a complete review of the RIOP by failing to undertake a proper NEPA evaluation of the 1989 Draft Plan, which the RIOP incorporates almost in full.  There also can be little doubt that this failure threatens concrete interests of Alabama, which has riparian interests along the Chattahoochee River.  *See Lujan*, 504 U.S. at 572 n.7 ("[U]nder our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement.");  FA ¶¶ 45, 51, 62-64, 71, 73, 75, 79, 88.   Diminished releases from the federal projects on the Chattahoochee that result from the RIOP (and the 1989 Draft Plan) will have detrimental effects on Alabama's water quality and wildlife, will contribute to economic losses, and will impede the exercise of Alabama's sovereign police powers.  FA ¶¶ 46-61, 65-91.  As this Court recognized in its Phase 1 order in finding that Alabama had standing to assert its claims, "[e]ven if annually the average flows are reduced by only a small amount, as the Georgia parties argue, the actual variation in flows can wreak havoc on the downstream uses of the water."  July 17, 2009 Order, Doc. 264, at 67.  Alabama plainly has met its burden to show an injury in fact.

There is an additional aspect to the constitutional injury-in-fact analysis.  The Eufaula National Wildlife Refuge ("ENWR") is a key fish and wildlife management facility in the ACF Basin, and part of it is located in Alabama.  FA ¶ 88.  There are at least two federally listed species – the wood stork and the American alligator – that use the refuge.  FA ¶ 89.  The reservoir level at Lake Walter F. George impacts the ENWR and its listed species, and releases (or the lack thereof) from upstream federal projects and from Lake Walter F. George by the Corps affect that reservoir level.  FA ¶¶ 90-91.  In the June 2008 BiOp, the Service recognized that a water control plan can impact the ENWR, and the Service recommended that those impacts be assessed in the future.  FA ¶ 92.  Alabama, however, has a concrete injury in fact <u>now</u> resulting from the failure to undertake the appropriate assessment of the effects of the 1989 Draft Plan on the ENWR and its listed species.

Having established a concrete injury in fact underpinning its NEPA procedural injury claim, Alabama's burden to establish causation and redressability is "generally more relaxed."  *Ouachita*, 463 F.3d at 1172.  Since the Corps failed to follow NEPA, it is clear that the Corps caused Alabama's injury.  *See id.* at 1173.  In addition, because the Court has the authority to order the Corps to comply with NEPA, Alabama's injury is redressable.  *See id.*

There also is no question that Alabama satisfies the prudential standing requirement to assert its claim based upon the failure to comply with NEPA.  The Corps' issuance of the RIOP and the corresponding EA and FONSI unquestionably constitutes final agency action.  Alabama has alleged environmental injury as a result of that final agency action.  "[S]ince the injury alleged is environmental, it falls within the zone of interests protected by NEPA (via the APA)."  *Id.*  Thus, Alabama has prudential standing to assert its NEPA claim.

27

### B.       Standing to Assert ESA Procedural Injury Claim

Just as Alabama has standing to assert its procedural injury claims arising from its failure to comply with NEPA, Alabama also has standing to assert its procedural injury claims arising under the APA based upon the failure of the Service to comply with the ESA. The analysis of whether Alabama has Article III standing to assert this claim overlaps almost completely with the Article III standing inquiry just discussed concerning NEPA.   The improper segmentation of the ESA analysis again arises from the failure to analyze the 1989 Draft Plan, and Alabama's environmental, wildlife, and economic interests have been threatened by virtue of the diminished releases resulting from operations under the 1989 Draft Plan.

For the same reasons discussed with regard to the claim based on the NEPA violation, Alabama easily satisfies the causation and redressability prongs of the constitutional standing analysis.

Alabama also meets the prudential standing requirements for its claim based upon the ESA procedural injury.  Alabama falls within the zone of interests protected by the ESA for two reasons.  First, there can be little dispute that Alabama's interest in the protection of listed species located at the ENWR in Alabama is within "the ESA's overall goal of species preservation."  *Bennett v. Spear*, 520 U.S. 154, 176-77 (1997).  Second, as an upstream stakeholder whose economic interests are affected by the failure to conduct a proper ESA analysis, Alabama also falls with the ESA's zone of interests.  *See id.* ("economic consequences are an explicit concern of the ESA").  *Id.*

C.  **Standing to Assert Substantive Claim That RIOP Violates Applicable Federal Law**

In addition to having standing to assert its Phase 2 procedural injury claims, Alabama has standing to assert its claim that the RIOP must be set aside because it conflicts with applicable federal law, namely the Water Supply Act.  This standing analysis is no different from the standing analysis that the Court considered during Phase 1.  The RIOP's acknowledgment that its provisions are designed to conserve storage at federal ACF projects to support water supply plainly demonstrates that the Corps in the RIOP is facilitating the water supply operations at Buford Dam that this Court has already determined to be illegal. For the same reasons that this Court concluded that Alabama had standing to challenge those operations in Phase 1, *see* July 17, 2009 Order, Doc. 264, at 64-67,[8] Alabama has standing to claim that the RIOP should be set aside on the same basis.

VII.  **CONCLUSION**

For the foregoing reasons, the Court should enter a partial judgment against the Federal Defendants on all Phase 2 claims asserted by Alabama in this litigation as described above.

---

[8] Alabama incorporates herein by reference its evidentiary submission in Phase 1 in support of standing.  In addition, Alabama has also submitted evidence in Phase 2 that establishes that it suffers environmental and economic injury as a result of the diminished flows in the Chattahoochee River that result from the RIOP's provisions.  FA ¶¶ 65-70, 75-92.

Respectfully submitted this 9th day of December, 2009.

**COUNSEL FOR THE STATE OF ALABAMA:**

William D. Little, III
Assistant Attorney General for the State of
Alabama
ATTORNEY GENERAL'S OFFICE
11 South Union Street
Montgomery, AL  36130

William S. Cox, III
W. Larkin Radney, IV
Lightfoot, Franklin & White, L.L.C.
400 North 20th Street
Birmingham, AL  35203
(205) 581-0700
wcox@lfwlaw.com
lradney@lfwlaw.com

/s/ Matthew H. Lembke
Matthew H. Lembke
Joel M. Kuehnert
Bradley Arant Boult Cummings, LLP
1819 5th Avenue North
Birmingham, AL  35203
(205) 521-8560
mlembke@babc.com
jkuehnert@babc.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was filed with the Clerk of the Court using the CM/ECF system, and was served upon counsel of record and all parties to this proceeding registered with the federal court system by electronic means on December 9, 2009.

/s/ Matthew H. Lembke