**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| In re: Tri State Water Rights Litigation | Case No. 3:07-MD-1-PAM |
| --- | --- |

**GEORGIA PARTIES' MOTION FOR SUMMARY JUDGMENT ON PHASE 2**
**CLAIMS AND BRIEF IN SUPPORT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

INTRODUCTION AND STATEMENT OF THE CASE ............................................. 1

FACTUAL BACKGROUND ....................................................................................... 3

    I.  Listing of the Species, Designation of Critical Habitat, and Causes of Their
Decline ............................................................................................................ 3

        A.  Sturgeon ............................................................................................... 4

        B.  Mussels ................................................................................................ 5

    II.  1989 Water Control Plan ................................................................................ 8

    III. Adoption of the IOP, ESA Section 7 Consultation, and Post Hoc NEPA
Analysis........................................................................................................... 8

    IV. Development of Revisions to the IOP, Subsequent Consultations, and NEPA
Analysis........................................................................................................... 10

    V.  The RIOP ........................................................................................................ 11

    VI. The Biological Opinion on the RIOP ............................................................. 12

PROCEDURAL HISTORY ......................................................................................... 13

ARGUMENT ............................................................................................................... 15

    I.  Fish and Wildlife Violated the ESA Section 7 By Erroneously Confusing
Natural Mortality with "Take" Caused by the RIOP ..................................... 15

        A.  Statutory Background ........................................................................... 18

        B.  Standard of Review .............................................................................. 22

        C.  Fish and Wildlife Erred by Using the Regulated Condition as the
Environmental Baseline ....................................................................... 23

        D.  Fish and Wildlife Also Erred by Including Water Withdrawals in the
Environmental Baseline, but that Error was Harmless ........................ 29

        E.  Fish and Wildlife Erred in the Incidental Takings Analysis By Confusing
Natural Mortality with "Take" Caused by the RIOP ............................ 29

1.  Fish and Wildlife Erred by Attributing Mortality Caused by Drought to the RIOP ..................................................................................................29

2.  Fish and Wildlife Erred by Attributing Potential Mortality Caused by Storms to the RIOP ...........................................................................................32

II.  The Corps Violated NEPA By Failing to Prepare an EIS for Its Operations in the ACF Basin ...........................................................................................................33

A.  Statutory Background ...............................................................................................35

B.  Standard of Review....................................................................................................37

C.  The Corps Violated NEPA By Failing to Prepare an EIS for Its Reservoir Operations within the ACF Basin .............................................................................38

1.  It is Irrelevant to the EIS Requirement Whether the IOP Was a "Major" or "Minor" Change to the 1989 Water Control Plan .............................40

2.  The Belated Environmental Assessment Did Not and Could Not Cure the NEPA Violation Caused by the Corps' Failure to Prepare an EIS *Before* Adopting the IOP ......................................................................................41

3.  To Cure the Violation, the Corps Should Be Directed to Prepare an EIS Including All Reasonable Alternatives ............................................................42

4.  The Pending EIS Will Not Cure the NEPA Violation...........................................45

III.  Conclusion ..........................................................................................................................47

CERTIFICATE OF SERVICE ...................................................................................................52

## INTRODUCTION AND STATEMENT OF THE CASE

The State of Georgia, the Water Supply Providers,[1] the Lake Lanier Association, and Gwinnett County, Georgia (the "Georgia Parties") hereby move for summary judgment on their Phase 2 claims against the United States Army Corps of Engineers (the "Corps") and the United States Fish and Wildlife Service ("Fish and Wildlife," or "the Service").  The Georgia Parties assert one claim against each defendant:  a claim against Fish and Wildlife based on erroneous conclusions in the Biological Opinion that the Corps' operations under the Revised Interim Operations Plan ("RIOP") will result in "incidental takings" of threatened and endangered species in the Apalachicola River; and a claim against the Corps based on its failure to prepare an Environmental Impact Statement ("EIS") for the RIOP as required by the National Environmental Policy Act ("NEPA").

With respect to the first claim, the Biological Opinion concludes that operations under the RIOP will *not* jeopardize the continued existence of any species and will *not* result in an adverse modification of any critical habitat.  Doc. 510, FWS AR Pages 013661-62.  The Georgia Parties do not challenge these findings, which are correct and should be upheld. Instead, the Georgia Parties challenge Fish and Wildlife's erroneous conclusion that the Corps' operations are likely to result in the "take" of listed species in the Apalachicola River and its corresponding decision to issue an "incidental take statement" containing mandatory "terms and conditions" governing the Corps' operations.  As a result of a critical legal error in the identification of the environmental baseline, Fish and Wildlife confused natural mortality with "take" caused by reservoir operations.  This legal error caused Fish and

---

[1] The "Water Supply Providers" consist of the Atlanta Regional Commission, the City of Atlanta, Fulton County, DeKalb County, the Cobb County-Marietta Water Authority, and the City of Gainesville.

Wildlife to exceed its authority by imposing mandatory conditions on the RIOP that are neither required nor authorized by the Endangered Species Act ("ESA").  These findings and conditions are arbitrary and capricious, an abuse of discretion, and contrary to law. Accordingly, they should be set aside, and the Biological Opinion should be reissued without them.

The second claim is even more straightforward:  the Corps has violated NEPA by failing to prepare an EIS for the RIOP or for any prior version of the operating plan for the ACF Basin.  As a result of this violation, decisionmakers in the ACF Basin have never been presented with a thorough and comprehensive analysis of alternatives for the management of the Corps' reservoir system.  The Georgia Parties have demonstrated through specific proposals that reservoir operations can be modified to meet the reasonable needs of all stakeholders, including the environment.  (FA ¶ 182).[2]  To be sure, this might require a change to the Corps' current operations, and it might even require additional statutory authorization, but the stakeholders and decisionmakers deserve a thorough analysis of these and other reasonable alternatives.  This is precisely the type of analysis that NEPA requires, and it is precisely the type of analysis that could lead to win-win solutions in the ACF Basin. The Corps' failure to prepare an EIS was arbitrary and capricious and contrary to law. Accordingly, the Corps should be directed to prepare an EIS considering all reasonable alternatives for its operations in the ACF Basin.

---

[2] In accordance with this Court's November 2, 2009 Order, Doc. 297, the Georgia Parties have prepared a Factual Appendix containing numbered paragraphs, which is filed concurrently with this motion for summary judgment.  For ease of reference, citations to the Factual Appendix will be given as (FA ¶ __).

**FACTUAL BACKGROUND**

The Apalachicola River, a large lowland river that begins at the Georgia-Florida border just below Jim Woodruff Lock and Dam, is home to four species currently listed under the ESA. These include three mussels, the fat threeridge, the purple bankclimber, and the Chipola slabshell, as well as the Gulf sturgeon, an anadromous fish that inhabits the Gulf of Mexico from Louisiana to Tampa Bay and that spawns and spends the early months of its life in the Apalachicola River and other rivers flowing into the Gulf.  (FA ¶¶ 53, 73).

The flow in the Apalachicola River, as well as the Chattahoochee River above it, is controlled to a certain degree by a series of five reservoirs constructed and operated by the Corps (the "ACF Reservoirs").  Located at the confluence of the Chattahoochee and Flint Rivers and at the head of the Apalachicola River, Jim Woodruff Lock & Dam is the lower-most reservoir in the system.  (FA ¶¶ 3-5).

I. **Listing of the Species, Designation of Critical Habitat, and Causes of Their Decline**

In the 1990s, Fish and Wildlife listed the Gulf sturgeon and the three mussel species as either threatened or endangered under the ESA.  GAII000511, GAII001188.  Fish and Wildlife designated critical habitat for the species in 2003 and 2007, respectively.  *See* 68 Fed. Reg. 13,370 (Mar. 19, 2003); 72 Fed. Reg. 64,286 (Nov. 15, 2007).  For the mussels, the designated critical habitat included 11 "units," including approximately 1,186 miles of rivers and streams across Georgia, Florida, and Alabama.  Doc. 510, FWS AR Page 13511.  This includes the main stem of the Apalachicola River and certain tributaries and distributaries, encompassing 105.2 river miles, which make up about 8% of the total designated critical habitat.  *See id.* at 13526.  For the Gulf sturgeon, the area designated was much larger and

included 14 separate units encompassing approximately 1,729 miles of riverine habitat and 2,333 square miles of estuarine and marine habitats along the Gulf Coast from Louisiana to Florida. *See id.* at 13499. The Apalachicola River and Bay make up approximately 10% and 12% of this critical habitat, respectively. *See id.* at 13560.

A. Sturgeon

As with so many environmental issues today, various factors have combined to cause the Gulf sturgeon and mussel populations to decline. In the case of the Gulf sturgeon, its long life span, delayed sexual maturity, and relatively low reproductive rates rendered it highly susceptible to overfishing. Yet for most of the past century, it supported a significant commercial fishery in Florida and Alabama, with the eggs used for caviar and the flesh for smoked fish, and its numbers declined rapidly as a result. (FA ¶¶ 44-51).

This was particularly true in the Apalachicola River, which historically "provided the largest and most economically important commercial sturgeon fishery in Florida." Doc. No. 309, FWS AR Page 7199. Approximately 84,000 pounds of Gulf sturgeon were taken by Florida commercial fisherman from the Apalachicola River and Bay in 1900. Doc. 292, FWS AR Page 6025. Anywhere from 20,000 to 60,000 pounds were landed per year between 1903 and 1917. *Id.* As early as 1917, however, the average size of commercially-caught Gulf sturgeon was decreasing, leading to concern that the species was over-exploited and nearing extinction. *Id.* Nevertheless, the fishery continued unabated. And although catches declined due to over-exploitation, the fishery continued throughout most of the twentieth century, with 10,600 pounds of Gulf sturgeon landed from the Apalachicola River and Bay in 1970. *See id.*; (FA ¶¶ 46-50).

In addition, the construction of dams on three major rivers within the range of the Gulf sturgeon has restricted sturgeon access to historic migration routes and spawning areas.  *See* GAII00513.  In the Apalachicola River, for example, the construction of Jim Woodruff Dam in the 1950s restricted Gulf sturgeon to 107 miles of the 636 miles of river habitat formerly available in the Apalachicola-Chattahoochee-Flint River System.  *Id*.  As a result, most Gulf sturgeon spawning activity in the Apalachicola River now occurs primarily at a rocky limestone outcrop immediately below Jim Woodruff Dam.  Doc. 510, FWS AR Page 13562.

Despite these challenges, the closure of the Gulf sturgeon fishery in the mid-1980s has allowed the population to begin to recover.  Studies estimating population sizes for the Gulf sturgeon in the Apalachicola River report that the population has increased from a low of 62 fish in 1989 to 350 fish in 2004.  Doc. 510, FWS AR Page 13544.

B.  Mussels

As with freshwater mussels in other parts of the country, several factors have been noted as causing the decline of the protected mussels in the Apalachicola River.  One cause is degraded water quality.  As a result of pollution from local point and non-point sources located in Florida, portions of the Apalachicola and Chipola Rivers do not meet water quality standards under the Clean Water Act and contain levels of pollutants that are toxic to aquatic species.  (FA ¶ 85).  Fish and Wildlife has identified these water quality problems as one cause of the species' decline in the Apalachicola River.  Doc. 510, FWS AR Page 13541.  Because they are filter-feeders, mussels, particularly juveniles, are susceptible to contaminants such as heavy metals, which can become trapped in sediments and thus remain toxic for many years, as well as other pollutants such as ammonia.  (FA ¶ 85).  Likewise, silt

and sedimentation from surface runoff can smother the bottom-dwelling mussels, clog their gills, and limit the mussels' ability to burrow.  Doc. 504.84, FWS AR at 65.

Mussels are also sensitive to water level declines.  A number of factors, including the construction of Jim Woodruff Dam and the diversion of flow through the Chipola Cutoff, have dramatically reduced the stage, or river elevation, of the Apalachicola River.  The construction of Jim Woodruff Dam, for example, has fundamentally altered the channel morphology of the Apalachicola River through a process known as entrenchment, or incision.  When dams are constructed, coarse sediment carried downstream along the riverbed is trapped in the reservoir behind the dam.  Water is released below the dam and tends to erode the riverbed, causing a gradual deepening and widening of the river channel.  GAII000820.  The lowering of the river bed and widening of the channel, in turn, requires more and more water to fill the river channel to a given depth.  (FA ¶¶ 16-20).

In 2006, the U.S. Geological Survey determined that the water level of the Apalachicola River is now 4.8 ft lower at a flow of 10,000 cfs than it was before the dam was constructed.  Doc. 694, FWS AR Page 18477.  This, in turn, contributes to the dewatering of intermittent loop streams and side habitats that would have been inundated prior to the dam's construction.  It can also affect the connectivity of floodplain habitats, which serve as nursery habitats for various fish species, including some upon which the mussels rely for their reproduction (the mussels have a parasitic larval stage that requires attachment to a "host fish").  And although there is no direct evidence that the number of host fish has been reduced or that any reduction has had an impact upon the mussels' capacity to reproduce, Fish and Wildlife has pointed to reduced floodplain connectivity associated with the

construction of Jim Woodruff Dam as an issue for the species.  Doc. 510, FWS AR Pages 13575-78.

Likewise, the diversion of flow into the Chipola Cutoff—a navigation channel created by the Corps to connect the Apalachicola and Chipola Rivers, south of Jim Woodruff Dam — has also significantly reduced the flow, and thus the water level, in the Apalachicola River. Indeed, up to 40% of the flow of the Apalachicola River is now diverted into the Chipola Cutoff, and as much as 70% of the flow of the lower Chipola River below the Cutoff now comes from the main channel of the Apalachicola River.  As a result, there is significantly less water in the Apalachicola River between the Cutoff and where the Chipola River enters the main stem of the Apalachicola River.  (FA ¶¶ 35-49).

Because the fat threeridge generally prefers to inhabit the margins of streams, in shallow water, the species is susceptible to mortality from natural variations in the stage of the river.   It is now known, however, that this species is capable of moving to track water levels as flows decline.  (FA ¶ 103).  Although the purple bankclimber is apparently less mobile, it prefers deeper water, and this preference makes the purple bankclimber less susceptible to stranding during low flow conditions.  The same preference, however, makes it more difficult to locate bankclimbers during surveys without scuba equipment.  In addition, the purple bankclimber's preference for deeper water is a reason that it is less common in much of the Apalachicola River and its distributaries.  The Apalachicola River represents less than a quarter of the bankclimber's total range.  (FA ¶¶ 118-19).

Recent data suggest that the fat threeridge is more abundant in the Apalachicola River than previously estimated.  Even after the large numbers of mussel deaths during the 2006-

2007 drought, the fat threeridge remains "remarkably abundant" within the Apalachicola

River basin.  In fact, during a recent survey, the fat threeridge comprised nearly 37% of all

mussels collected.  Experts have hypothesized that, had earlier studies been able to make use

of powerboats and divers, and conducted more intensive surveys at appropriate locations,

they would have concluded that the fat threeridge was common-to-abundant, suggesting that

the listing of the fat threeridge as endangered may have been unnecessary. (FA ¶¶ 91-97).

## II.   1989 Water Control Plan

Since 1989, the Corps has been operating the ACF reservoir system in accordance with a

"draft" Water Control Plan that was never formally adopted (the "1989 Draft Water Control

Plan").  GAII002499.  In 1989, the Corps prepared a draft Environmental Assessment ("EA")

to examine the environmental effects of that plan.  The EA concluded that it was not

necessary to prepare an EIS.  The EA was never finalized as a result of this litigation.  The

Corps continued to operate under the 1989 Draft Water Control Plan, apparently on the belief

that an agreement between the states would eventually be reached and that a revised water

control plan could then be prepared to implement that agreement.  GAII002500.

## III.  Adoption of the IOP, ESA Section 7 Consultation, and Post Hoc NEPA Analysis

The listing of the Gulf sturgeon and the three mussel species triggered the Corps'

obligation to consult with Fish and Wildlife under Section 7 of the ESA regarding the effect

of reservoir operations on the listed species.  In March of 2006, the Corps initiated formal

Section 7 consultation, seeking Fish and Wildlife's concurrence that the Corps' operation of

Jim Woodruff Dam and releases to the Apalachicola River were not likely to jeopardize the

continued existence of listed species or result in the adverse modification or destruction of

designated critical habitat.  GAII002499.[3]  In the letter requesting consultation, the Corps

also publicly revealed, for the first time, what it called the Interim Operations Plan for Jim

Woodruff Lock and Dam ("IOP"), *see id.*, which the Corps claimed was intended to avoid

and minimize any impact its reservoir operations might have on the listed species and their

designated critical habitat.  Doc. 347, FWS AR Page 9448.  Despite the fact that the Corps

had not solicited public comment on the IOP, and that the Corps had not modeled or

analyzed the impact of the IOP under extended drought conditions, the Corps immediately

implemented the IOP and it became the controlling operational plan for the ACF Basin.  (FA

¶¶ 140-45).

    After the Corps made a number of minor revisions to the IOP during the consultation

process, Fish and Wildlife issued a biological opinion evaluating the Corps' operations on

September 5, 2006.  (FA ¶¶ 146-51, 166).  In that opinion, Fish and Wildlife concluded that

he IOP would not jeopardize the protected species in the Apalachicola River and would not

adversely modify critical habitat.  Doc. 1, FWS AR Page 328, GAII005790.

    Before implementing the IOP, the Corps had not conducted any of the environmental

studies required under NEPA.  Indeed, it was not until October 2006—nearly seven months

after the IOP was adopted—that the Corps produced a post-hoc "environmental assessment"

and "Finding of No Significant Impact."  The Corps concluded that it was unnecessary to

prepare an EIS to study the environmental effects the IOP.  As a result, the Corps did not

consider the full range of feasible alternatives to the IOP.  Rather, it limited its consideration

---

[3] *See* FA ¶¶ 127 through 139 for a general discussion of the informal consultations between the Corps and
Fish and Wildlife from 2000 to 2006.

of alternatives to continued operations under the 1989 Draft Water Control Plan and certain revisions to minimum flow requirements and storage limitations.  (FA ¶¶ 170-74).

### IV.  Development of Revisions to the IOP, Subsequent Consultations, and NEPA Analysis

Although the Corps maintained that the IOP only governed releases to the Apalachicola River from Jim Woodruff Dam and that it did not control operations at other Corps projects, in reality the IOP dictated the Corps' operations of the entire ACF system.  The IOP imposed minimum flow requirements in the Apalachicola River.  *See* GAII005909.  Because Lake Seminole does not contain any significant conservation storage, however, the Corps must make special releases from the other projects in the ACF system to those minimum flow requirements.  GAII002499.  Moreover, the IOP imposed significant limits on the Corps' ability to store water during wet periods, requiring most, if not all, water coming into the system to be passed downstream and released into the Apalachicola River.  *See* GAII005909.

It quickly became clear that the IOP's combination of high minimum flows in the Apalachicola River and limits on the Corps' ability to store water during wet periods would be unsustainable during an extended drought.  Indeed, the State of Georgia sent numerous letters to the Corps providing the results of computer modeling that showed that the IOP could drain the federal reservoirs and deplete the flow of water in the ACF system if serious drought conditions continued for any extended period of time.  (FA ¶¶ 198-201).  Unfortunately, the Southeast entered into a record drought shortly after the Corps implemented the IOP and, as a result, the level of the federal reservoirs fell precipitously.  (FA ¶¶ 194-95).  By the fall of 2007, the conservation storage in the lower federal reservoirs was nearly exhausted and the level of Lake Lanier had fallen to a record low.  (FA ¶¶ 13, 15).

In response, the Corps developed and implemented its Exceptional Drought Operations ("EDO") in November 2007.  Intended as a temporary emergency measure, the EDO as implemented allowed the Corps to store additional water while the reservoirs remained at critically low levels, and to incrementally reduce the minimum flow requirement from 5,000 cfs down to 4,500 cfs if drought conditions did not improve.  As the Corps explained, the purpose of these changes was to ensure that sufficient water would be available in storage to allow the Corps to continue to supplement flows in the Apalachicola River for the benefit of the listed species during a severe multi-year drought.  (FA ¶¶ 213-220).  The Corps prepared an environmental assessment for the EDO and concluded that an EIS was not required.  (FA ¶¶ 221-23).

On November 15, 2007, Fish and Wildlife issued a supplemental biological opinion for the EDO.  As it had with the IOP, Fish and Wildlife concluded that the EDO would not jeopardize the continued existence of the listed mussels or Gulf sturgeon and would not destroy or adversely modify their designated critical habitat.  Doc. 481, FWS Page AR 12837.

## V.  The RIOP

In April 2008, the Corps proposed a Revised Interim Operations Plan for Jim Woodruff Dam ("RIOP").  (FA ¶ 238).  The RIOP incorporated a number of the provisions of the EDO along with other modifications designed to more efficiently operate the ACF system.  (FA ¶ 241).  The Corps implemented the RIOP in June of 2008 and has been operating its projects in the ACF system under the provisions of the RIOP since that time.  As it had with the IOP and EDO before it, the Corps prepared an environmental assessment under NEPA examining

the environmental impact of operations under the RIOP, and as with the EDO, the Corps used continued operation under the IOP as the no action alternative.  (FA ¶¶ 243-48).  The Corps concluded that its implementation of the RIOP would have no significant human or environmental impacts, and thus, that preparation of an EIS was not required.  (FA ¶ 349). As a result of that conclusion, the Corps again did not perform an EIS including consideration of reasonable and feasible alternatives to the RIOP.

## VI. The Biological Opinion on the RIOP

On June 1, 2008, Fish and Wildlife issued a new biological opinion for the RIOP (the "Biological Opinion"), which superseded its two previous biological opinions relating to the IOP and EDO.  Doc. 510, FWS AR Page 13484.  To evaluate the effects of the RIOP on listed species, Fish and Wildlife compared the flows that would result under the RIOP to the actual observed flows in the Apalachicola River from 1975 to 2007 (the period in which all federal projects in the ACF system have been in operation).  Fish and Wildlife also compared the RIOP to a "run-of-river" scenario, which it described as "the expected flow regime if the Corps maintained a constant water surface elevation on all of the ACF federal reservoirs, never diminishing basin inflow by raising reservoir levels and never augmenting basin inflow by lowering reservoir levels."  Doc. 510, FWS AR Page 13610.  This run-of-river scenario represented the flows that would have occurred if the Corps did not alter the Apalachicola River flow through the operation of its projects.  *See id.*

After comparing RIOP operations to these flow regimes, Fish and Wildlife concluded that the RIOP would not jeopardize the continued existence of the listed species or result in the destruction or adverse modification of their designated critical habitat.  Doc. 510, FWS

AR Pages 13661-62.  It found, however, that the Corps' operations could cause the incidental

take of mussels and Gulf sturgeon in two circumstances.  With respect to the mussels, Fish

and Wildlife found that incidental take could occur if the Corps allowed flows to fall below

5,000 cfs during drought operations.  Doc. 510, FWS AR Pages 13664-65.  Fish and Wildlife

did not discuss or analyze, however, whether this mortality would have occurred under the

run-of-river operations.  Thus, Fish and Wildlife did not distinguish mortality caused by

nature from mortality caused by the Corps' reservoir operations under the RIOP.

For the Gulf sturgeon, Fish and Wildlife determined that incidental take may occur in the

form of the loss of fertilized eggs or larvae when releases from Jim Woodruff Dam are less

than 40,000 cfs and the river stage declines more that 8 feet in less than 14 days during the

months of March, April, and May.  Doc. 510, FWS AR Page 13658.  As with the mussels,

however, and despite the express acknowledgement that flows above 30,000 cfs "are largely

uncontrollable by project operations," *see* Doc. 510, FWS AR Page 13616, Fish and Wildlife

did not discuss or analyze whether such river stage declines would occur under natural

conditions and in the absence of the Corps' operations.

## PROCEDURAL HISTORY

In the spring of 2007, the Judicial Panel on Multidistrict Litigation combined, for pre-trial

purposes, four cases dealing with the Corps' operations in the ACF Basin.  The Panel has

since added three additional actions to form the current proceeding.  This Court divided the

claims in the proceeding into two distinct phases.  This Court has already issued a ruling in

Phase 1 regarding the Corps' authority to operate Lake Lanier for water supply purposes.

Phase 2, which is now before the Court, concerns challenges to the IOP and its revisions, and challenges to Fish and Wildlife's Biological Opinion for the RIOP.

The Georgia Parties are both plaintiffs and defendants in Phase 2 of this action. The State of Georgia filed *Georgia v. United States Army Corps of Engineers*, 3:07-cv-251 ("*Georgia II*") to challenge the Corps' adoption of the IOP. The Georgia Parties filed amended complaints in *Georgia II* in response to the Corps' modifications to the IOP, with the most recent amended complaint being filed on October 15, 2008 to address the Corps' issuance of the RIOP. With the exception of Gwinnett County, the Georgia Parties intervened as defendants in *Florida v. United States Fish and Wildlife Service*, 3:07-cv-250 ("*Florida*") to defend against the State of Florida's claim that the IOP provided insufficient protection for the endangered and threatened species. Those parties also filed cross-claims against Fish and Wildlife to challenge certain findings of the Service's Biological Opinion; they amended their cross-claims in December 2008, to address the Fish and Wildlife's Biological Opinion for the RIOP. Finally, the Georgia Parties are defendants in *Alabama* and in *City of Apalachicola, Florida v. United States Army Corps of Engineers*, 3:08-cv-233, regarding Phase 2 claims in those cases concerning the IOP and RIOP.

On three separate occasions, the State of Florida filed motions in the *Alabama* case seeking injunctions to force the Corps to release more water into the Apalachicola River. In the first motion, filed in January 31, 2006, Florida sought a preliminary injunction that would require higher flows during the Gulf sturgeon's spawning season. The *Alabama* court denied the motion on the grounds that Florida had failed to show that the Corps' operations would result in any take of the Gulf sturgeon. (FA ¶¶ 252-68).

In June, 2006, Florida filed a motion for a temporary restraining order to force the Corps to release a minimum flow of 8,000 cfs in order to protect the endangered and threatened mussels in the Apalachicola River. Before reviewing any evidence from the defendants, the court temporarily granted the relief sought in the motion. At the hearing on the motion, the parties entered into a temporary settlement agreement. The settlement provided for a minimum flow and a designation of a certain amount of storage that Florida could direct the Corps to use to augment the minimum flow. (FA ¶¶ 269-74).

Upon termination of the settlement agreement in July 2006, Florida renewed its motion for TRO, this time seeking to compel the Corps to make a minimum release of 6,300 cfs. Following the submission of evidence by the parties and testimony from the Corps and Fish and Wildlife, the court denied the motion, finding that Florida had failed to establish that the Corps' operations, as opposed to natural conditions, would result in a take of the protected mussel species. (FA ¶¶ 275-99).

In response to the draining of the federal reservoirs under the provisions of the IOP, the State of Georgia filed a motion for preliminary injunction in *Georgia II* on October 19, 2007, requesting immediate modifications to the IOP. Georgia withdrew its motion on November 6, 2007 after the Corps announced its intention to implement the EDO to provide relief from the IOP during exceptional drought conditions. (FA ¶¶ 206, 218).

## ARGUMENT

### I. Fish and Wildlife Violated the ESA Section 7 By Erroneously Confusing Natural Mortality with "Take" Caused by the RIOP

Fish and Wildlife concludes in the Biological Opinion that the RIOP would not result in "jeopardy to the species" or in the "destruction or adverse modification" of critical habitat.

Doc. 510, FWS AR Page 13665.  These conclusions are clearly supported by the law and the factual record and should be upheld.  Other conclusions of the Biological Opinion, however, are unlawful, arbitrary, and not supported by the record.  In particular, the Service's conclusion that the RIOP would cause "incidental take" of federally-protected species, *see* Doc. 510, FWS AR Page 13663, is contrary to the Service's own findings and is based upon a legally erroneous standard of causation.

Fish and Wildlife has confused natural mortality with "take" caused by reservoir operations.  Species and habitat in the Apalachicola River are affected by a myriad of causes having nothing to do with reservoir operations.  The Biological Opinion nonetheless proceeds as if reservoir operations were the cause of all problems in the ACF Basin.  In reality, the Biological Opinion shows that the Corps' operation of the reservoirs is good, not bad, for the species.  This is not to say that the threatened and endangered species in the Apalachicola River are not facing problems.  Nor is it to deny that the construction of Jim Woodruff Dam in the 1950s has had an effect on the species and their habitat.  It is to say, however, that reservoir operations are not the cause of these problems.  Therefore the RIOP is not the cause of any "take."

This blurring of the distinction between take caused by reservoir operations and natural mortality has long been an issue in this case.  As the Northern District of Alabama noted in denying one of Florida's prior motions for injunctive relief in this case: "Takes that result from acts of nature do not fall within the prohibition of [the ESA] and cannot be blamed on the Corps."  *Alabama v. U.S. Army Corps of Eng'rs*, 441 F.Supp.2d 1123, 1134 (N.D. Ala. 2006).  Thus, before finding that a "taking" would occur, it first is necessary to establish a

"causal link" between the taking and some action by the Corps.  *Id.*  The *Alabama* court correctly ruled that Florida has failed to establish such a link with respect to the mortality of mussels in the Apalachicola River:

> The court is not convinced that the predicament faced by these protected mussels rests at the feet of the Corps. Instead, the weight of evidence points to other causes for the exposure of the mussels and harm to their habitat. No one disputes that the ACF basin suffers from severe drought conditions. Evidence from FWS indicates that drought conditions have become more severe than droughts were in the years prior to the constructing of dams on these affected rivers. While the presence of these dams may have contributed in some ways to the effects of this year's drought, Florida offered no evidence on this point. Because of decreased rainfall and increased evaporation, the amount of water available in the ACF basin has fallen sharply. The court cannot hold the Corps responsible for the absence of rain.

*Id.*

The causation error in the Biological Opinion flows at least in part from Fish and Wildlife's use of the wrong "environmental baseline" to analyze the effect of reservoir operations under the RIOP.  The environmental baseline—and in particular the "baseline flow regime"—is used to distinguish mortality caused by natural conditions (e.g., low flows caused by drought) from mortality caused by reservoir operations (e.g., low flows caused by the RIOP).  The baseline error caused Fish and Wildlife to attribute natural mortality to the RIOP.  This, in turn, led Fish and Wildlife to issue an "incidental take statement" even though the Biological Opinion demonstrates that the Corps would not be the legally relevant cause of any mortality that is likely to occur while the RIOP is in effect.  The same error caused Fish and Wildlife to exceed its ESA authority by requiring the Corps to minimize "take" that it did not cause.

The environmental baseline needs to be corrected and clarified, as its effects extend well beyond the current Biological Opinion.  Because the environmental baseline is fundamental to the analysis of causation, it is the key to determining what the ESA requires with respect to reservoir operations in the ACF Basin.  This error has already had a major effect in shaping the IOP and the RIOP, and it will continue to affect Fish and Wildlife's review of all future operating plans in the ACF Basin if it is not corrected.[4]

A.  Statutory Background

The key substantive provisions of the ESA, 16 U.S.C. §§ 1531-44, are Sections 9 and 7.  Section 9 prohibits the "take" of any endangered wildlife species by any person, including any federal agency.  16 U.S.C. § 1538(a)(1)(B) (prohibition); *id.* § 1532(13) (defining "person" to include federal agencies).[5]  "Take" is defined to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect."  16 U.S.C. § 1532(19).  The Supreme Court has emphasized that this definition is limited to "act[s] which actually kil[l] or injur[e] wildlife."  *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 697 n.9 (1995) (quoting 50 C.F.R. § 17.3 (1994)).

The Supreme Court also emphasized in *Babbitt* that the takings prohibition incorporates "ordinary requirements of proximate causation and foreseeability."  *Id*.  Therefore, it is well-established that the ESA does not impose liability for "takings" caused by acts of nature or acts by third parties.  *See Cold Mountain v. Garber*, 375 F.3d 884, 890 (9th Cir. 2004)

---

[4] Indeed, the error was first introduced in the Biological Opinion for the Original IOP, and in that case it led Fish and Wildlife to require significant modifications to the operating plan.  If the error is not corrected now, by ordering Fish and Wildlife to use run-of-river as the baseline flow regime, Fish and Wildlife will almost certainly repeat the error when it prepares the biological opinion for the new Water Control Plan.

[5] Although the statutory takings prohibition applies only to "endangered" species, Fish and Wildlife has extended this protection to "threatened" species by rule.  *See* 50 C.F.R. § 17.31(a).

(affirming dismissal of takings claim where plaintiffs "failed to establish a causal link" between "nest failure" and agency action); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1420 (9th Cir. 1990) (concluding that the evidence failed to establish a taking because the plaintiff failed to distinguish the effects of the agency action from the effects of other causes); *Alabama*, 441 F. Supp. 2d at 1133-34 (concluding that the Corps cannot be held responsible for alleged mortality caused by nature); *Morrill v. Lujan*, 802 F. Supp. 424, 431-32 (S.D. Ala. 1992) (dismissing takings claim where plaintiff failed to establish causal link between challenged project and harm to beach mouse).

In contrast to Section 9, Section 7 applies only to federal agencies. Section 7(a)(2) requires federal agencies to ensure that their discretionary actions are not likely "to jeopardize the continued existence of" any listed species or "to result in the destruction or adverse modification" of any critical habitat. 16 U.S.C. § 1536(a)(2). To ensure they do not violate these substantive prohibitions, all federal agencies are required to consult with either Fish and Wildlife or the Fisheries Service of the National Oceanic and Atmospheric Administration ("NOAA Fisheries")[6] before undertaking any discretionary action that "may affect" a listed species or its critical habitat. 50 C.F.R. § 402.14(a). The rules promulgated to implement Section 7 provide for both "formal" and "informal" consultation, but formal consultation is required for all actions that are likely to have an adverse effect on listed species. 50 C.F.R. § 402.14(b)(1). The end result of a formal consultation is a "biological opinion" stating whether the proposed action would violate Section 7—that is, whether the

---

[6] Jurisdiction under the ESA is divided between Fish and Wildlife and NOAA Fisheries. Fish and Wildlife has jurisdiction over all terrestrial and freshwater species whereas NOAA Fisheries has jurisdiction over maritime species and most anadromous fish. Fish and Wildlife and NOAA Fisheries share jurisdiction over the Gulf sturgeon.

proposed action is "likely to jeopardize the continued existence of the species" or to result in the "destruction or adverse modification" of critical habitat.  50 C.F.R. § 402.02; *id.* § 402.14(h)(3).  Because ordinary principles of causation apply to the ESA, the Ninth Circuit has held that agency action "can only 'jeopardize' a species' existence if that agency action causes some deterioration in the species' pre-action condition." *National Wildlife Fed'n v. National Marine Fisheries Serv. ("NWF v. NMFS")*, 524 F.3d 917, 930-31 (9th Cir. 2008).

In addition to the jeopardy and adverse modification analysis, the biological opinion is also required to state whether takings "incidental to the agency action" are likely to occur. Incidental takings are defined by federal regulations as "any taking otherwise prohibited, if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity."  50 C.F.R. § 17.3.  The standard for "taking" is identical for purposes of Section 7 and Section 9; therefore ordinary principles of proximate causation also apply to "incidental takings." *Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.*, 273 F.3d 1229, 1239-40, 1243 (9th Cir. 2001).  This point is underscored by the regulatory definition of "incidental take," which refers to the unintended "takings that result from . . . carrying out" the precise "activity conducted by the Federal agency or applicant."  50 C.F.R. § 402.02. *See also Ctr. for Biological Diversity v. HUD*, 541 F. Supp. 2d 1091, 1100-01 (D. Ariz. 2008) (granting summary judgment on Section 7 ESA claim upon finding that the agency was not the "legal cause" of takings)*; Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 538 F. Supp. 2d 242, 260-61 (D.D.C. 2008) (rejecting claim that Fish and Wildlife was required to issue an incidental take statement in a case where plaintiff failed to establish the causal link between mortality and the specific agency action at issue).

If Fish and Wildlife determines that the proposed action would cause a taking but would not result in jeopardy to the species or adverse modification of critical habitat, the Service is required to include an "incidental take statement" in the biological opinion.  16 U.S.C. § 1536(b)(4).  The incidental take statement authorizes the agency to cause takings that would otherwise be prohibited under Section 9, 16 U.S.C. § 1536(o)(2), subject to certain mandatory terms and conditions to minimize take.  *Id.* § 1536(b)(4)(C)(ii) & (iv).  Given the coercive effect of these conditions, Fish and Wildlife is not authorized to issue an incidental take statement unless it can show "to a reasonable certainty" that a "take will occur as a result of the anticipated . . . activity" (the proposed agency action).  *Arizona Cattle Growers' Ass'n*, 273 F.3d at 1242-43.

As the court in *Arizona Cattle Growers* explained, "a broad interpretation [of incidental take and Fish and Wildlife's ability to prescribe reasonable and prudent measures] would allow the Fish and Wildlife Service to engage in widespread . . . regulation even where no Section 9 liability could be imposed."  *Id.* at 1240.  This interpretation, the court explained, would turn the incidental take provision of the ESA "on its head."  *Id.*  Furthermore, issuance of an incidental take statement "when no take will occur as a result of [the] permitted activity is contrary to the plain meaning of the statute as well as the agency's own regulations."  *Id.* at 1242.  "[I]t would be unreasonable for the Fish and Wildlife Service to impose conditions on otherwise lawful land use if a take were not reasonably certain to occur as a result of that activity."  *Id.* at 1243.

This restriction on Fish and Wildlife's ability to impose conditions on agency activities is consistent with the structure and purpose of the ESA.  The prohibition under Section 7(a)(2)

is to do nothing that would "jeopardize the continued existence" of any species or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2). Section 7(a)(2) also requires an agency to comply with any "terms and conditions" imposed by Fish and Wildlife to minimize take caused by the agency's action. 16 U.S.C. § 1536(b)(4)(C)(iv). There is no mandate, however, requiring the agency to use its programs to benefit protected species to the detriment of other objectives.[7] As a result, the Corps is not required to choose the river flow regime alternative that "would be more beneficial to the protected species"—ESA constraints are satisfied if the selected alternative "complie[s] with the jeopardy standard." *See In re: Operation of the Missouri River Sys. Litig.*, 421 F. 3d 618, 636 (8th Cir. 2005) (the potential that another operating regime "would be more beneficial to the protected species" did not violate the ESA). Thus, so long as its actions do not violate Section 7(a)(2) and so long as the agency is not causing "take," the Corps has discretion to decide how to operate the ACF reservoir system and thus to balance the needs of threatened and endangered species against other purposes.

B. Standard of Review

Findings and conclusions in a biological opinion are subject to review under the Administrative Procedure Act to determine whether they are "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *Miccosukee Tribe of Indians of Fla. v. U.S. Fish & Wildlife Serv.*, 566 F.3d 1257, 1264 (11th Cir. 2009) (quoting 5 U.S.C. § 706(2)(A) and citing *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996)).

---

[7] ESA § 7(a)(1) and § 4(f) encourage—but do not compel—federal agencies to take actions that assist in the "conservation" of a species, including actions that improve the baseline conditions of a listed species or critical habitat. 16 U.S.C. §§ 1536(a)(1), 1533(f); 50 C.F.R. § 402.14 (j). *See* 51 Fed. Reg. 19926, 19955-56 (June 3, 1986).

The arbitrary and capricious standard is deferential.  *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008).  The court cannot substitute its judgment for that of Fish and Wildlife provided the agency's findings are rational, but it can rule that a finding is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Miccosukee*, 566 F.3d at 1263 (citing *Alabama-Tombigbee Rivers Coal. v, Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007); *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

     C.   <u>Fish and Wildlife Erred by Using the Regulated Condition as the Environmental Baseline</u>

The Biological Opinion concludes that the RIOP will result in "incidental take."  Doc. 510, FWS AR Page 13663.  As stated above, this erroneous conclusion follows from Fish and Wildlife's use of the wrong environmental baseline to analyze the effect of the RIOP. The regulations require the "effects of the action"—in this case, reservoir operations under the RIOP—to be measured by comparison to the species' status under the environmental baseline.  50 C.F.R. § 402.02 (defining "environmental baseline" in relation to "effects of the action"); *id.* § 402.14(g); *see also Miccosukee*, 566 F.3d at 1268; *In re: Operation of Missouri River Sys. Litig.*, 421 F.3d at 633.

In essence, the environmental baseline is the current status of the listed species and critical habitat, as it has been affected by all prior actions.  The environmental baseline provides the without-action status, which Fish and Wildlife compares to the future status of

the species, taking into consideration the effects of the action together with any "cumulative effects." 50 C.F.R. § 402.14(g) and (h). If the species' status would be improved by the proposed action in comparison to the environmental baseline, then the action is considered "beneficial." If the species' status would be diminished in comparison to the environmental baseline, however, then the action is considered "adverse." Because the effects of the action are measured against the environmental baseline, it should be readily apparent that the baseline is often the difference between "take" and "no take."

In a case involving reservoir operations, hydrological modeling is used to compare the environmental baseline to the proposed action. Modeling is essential because there is no other way to compare the effects of different operating plans under the same hydrologic conditions. For example, consider two operating plans labeled A and B, where A was in effect in the 1980s and B was in effect in the 1990s. Suppose it is demonstrated that river flows were higher in the third week of July 1985 than in the third week in July in 1995. How can one tell whether the higher flows were the result of reservoir operations or natural variations in the weather? The answer is to use models to examine the river flows that would be produced by each operating plan, A and B, under the same hydrologic conditions. This is what Fish and Wildlife purports to do, but failed to do correctly, in the Biological Opinion.

Fish and Wildlife used hydrological modeling to compare flows produced by the RIOP to what it called a "baseline" consisting of the actual flows produced by reservoir operations from 1975 to 2007 (the "Regulated Condition"). Doc. 510, FWS AR Page 13660-13. The decision to use the Regulated Condition from 1975 to 2007 as the baseline for this comparison is unlawful and arbitrary, however. The two appellate courts that have addressed

this question in the context of reservoir operating plans have determined that the "run-of-river" flow regime—and not the Regulated Condition—should be used as the baseline.  The run-of-river flow regime is the operating plan in which all dams and physical channel modifications are assumed to remain in place, but where the reservoirs are not operated to control the flow of water.  In other words, the run-of-river flow regime is what the Apalachicola River would look like if the Corps simply "turned off" the reservoirs and let the river flow without regulation.  The Eighth Circuit affirmed the use of the run-of-river flow regime as the baseline in *In re: Operation of the Missouri River Sys. Litig.,* 421 F.3d at 632. The Ninth Circuit *required* the use of run-of-river as the environmental baseline in *National Wildlife Federation v. National Marine Fisheries Service. See* 524 F.3d at 928-931 (holding that NOAA Fisheries committed legal error by including discretionary reservoir operations in the baseline flow regime).

The Regulated Condition cannot be used as the baseline because the Regulated Condition is the result of numerous discretionary actions by the Corps related to historic reservoir operations.  *See NWF v. NMFS*, 524 F.3d at 929-31.  Courts that have addressed the issue have held that discretionary federal actions must be excluded from the baseline.  *Id.*; *In re: Operation of the Missouri River Sys. Litig.,* 421 F.3d at 633.  Instead, the baseline must be limited to "the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process."  50 C.F.R. § 402.02.

Another reason that the Regulated Condition cannot be used to measure the effects of the RIOP is that it is impossible to associate the Regulated Condition from 1975 to 2007 with any one operating plan.  The Corps modified its operations many times, in many ways, during those years.  Doc. 510 FWS AR Page 13535.  Indeed, the RIOP Biological Opinion acknowledges that "it is not possible to describe a single set of reservoir operations that apply to the entire post-West Point period."  *Id.*  To the contrary, "[t]he Corps' operations have changed incrementally over the post-West Point period"; and, while many of these changes were documented in a draft water control plan in 1989, "[a]dditional incremental changes in water control operations have occurred since 1989."  *Id.*  As a result of these continual changes to the operating plan, it is impossible to determine whether a change in flows from one day to another was caused by a change in the weather or by a change in operations.  For the same reason, the Regulated Condition is useless for isolating the effects of reservoir operations—or for determining whether the operations under the RIOP would be better or worse than any other plan of operations.

As a result of using the wrong environmental baseline to evaluate the RIOP, Fish and Wildlife confused natural mortality—mortality that would have occurred in the run-of-river condition without any reservoir regulation—with "take" caused by the RIOP.  Based on that error, Fish and Wildlife imposed conditions requiring the Corps to minimize take it did not cause.  Another way to look at this problem is to consider what happens when agency programs produce benefits to a species over and above what is required by the ESA.  As the

Biological Opinion shows,[8] this is exactly what has happened in the ACF Basin:  the Regulated Condition from 1975 to 2007 is quite a bit better for the species than the run-of-river condition.

For example, consider Figure 4.2.2.B, which is pasted into this brief from the Biological Opinion.  Doc. 510, FWS AR Page 13640 (modified as explained in text)).  The dashed elements are superimposed on the image from the Biological Opinion to facilitate discussion.  This graph depicts the lower end of a "flow exceedance curve" at the Chattahoochee gage.  It shows the frequency (percent of days) that flows at the Chattahoochee gage would exceed a given flow under the different operating plans.  Consider points "a," "b", and "c."  Point c shows that the Regulated Condition—what the Biological Opinion calls the "baseline"—exceeded 6,000 cfs approximately 94% of the time from 1975 to 2007.  This was better than run-of-river (point a), which exceeded that flow only 89% of the time.  The RIOP (point b) is in the middle:  at 92%, still better than run-of-river, but not quite as good as the Regulated Condition from 1975 to 2007.

---

[8] To its credit, Fish and Wildlife did include the run-of-river ("ROR") flow regime as a reference point in most of its charts and figures.  Therefore, the effect of using the Regulated Condition as the baseline, instead of run-of-river, is readily apparent from charts and figures in the Biological Opinion itself.

*Biological Opinion Figure 4.2.2.B. Frequency (percent of days) and volume (acre feet per year) of flow alteration by operations of Lakes Lanier, West Point, and George, 1976 to 2007, as measured by daily changes in composite reservoir storage relative to current rates of 7-day basin inflow, for actual historic operations [the "Regulated Condition," which the Biological Opinion calls the "baseline"] and for the HEC-5 simulation of the RIOP*



As this shows, reservoir operations have been good, not bad, for the species. It does not follow, however, that any downward departure from the Regulated Condition in the RIOP should be considered an "adverse effect" causing "take" under the ESA. So long as the RIOP is better than the unregulated, run-of-river condition, reservoir operations cannot be considered the "legally relevant cause" of any mortality that occurs after the RIOP is implemented. Therefore there is no "take," and the Corps is free to alter its operating plan to achieve other important objectives, even if the new plan of operations would produce fewer benefits to the species than the prior Regulated Condition.

28

  D. <u>Fish and Wildlife Also Erred by Including Water Withdrawals in the</u>
    <u>Environmental Baseline, but that Error was Harmless</u>

The State of Florida has identified a separate error, which is Fish and Wildlife's inclusion

of all water withdrawals from the ACF Basin within the Environmental Baseline.  Florida is

correct to note that certain water withdrawals should have been excluded from the baseline—

namely, those withdrawals that constitute discretionary federal actions.  Distinguishing

withdrawals that should be excluded from the baseline from those that should be included

would require case-by-case analysis and hydrological modeling.  The Georgia Parties suggest

that this task should be left to Fish and Wildlife and the Corps to sort out in the first instance

on remand.

Because water withdrawals from the ACF Basin are minor in comparison to the overall

flow in the basin, this error will have only a negligible effect on the baseline flow regime.

Nonetheless, the Georgia Parties agree that it should be corrected on remand.

  E. <u>Fish and Wildlife Erred in the Incidental Takings Analysis By Confusing Natural</u>
    <u>Mortality with "Take" Caused by the RIOP</u>

The baseline error also carried over into the incidental taking analysis, causing Fish and

Wildlife to confuse natural mortality with "take" caused by the RIOP.

  1. <u>Fish and Wildlife Erred by Attributing Mortality Caused by Drought to the</u>
    <u>RIOP</u>

As to the mussels, Fish and Wildlife determined the RIOP might cause "incidental take"

when and if the 4,500 cfs minimum flow provision is ever triggered.  Doc. 510, FWS AR

Pages 13659, 13664-65.  As the Biological Opinion explains, this provision is not triggered

when the RIOP is simulated using historical hydrological conditions.  Doc. 510, FWS AR

Page 13664.  Fish and Wildlife concluded, however, that it is hypothetically possible that future inflow conditions could fall so low as to trigger the 4,500 cfs provision in an historic drought.  Doc. 510, FWS AR Pages 013659, 013664.  Based on the density and distribution of the listed mussels, Fish and Wildlife concluded that this reduction of the minimum flow could expose, and thus harm, up to 21,000 fat threeridge, 200 purple bankclimbers, and 100 Chipola slabshells.  Doc. 510, FWS AR Pages 13664-65.

Fish and Wildlife's conclusion that incidental take would occur is based solely on its determination that mussels would be exposed if flows are reduced to 4,500 cfs.  *See* Doc. 510, FWS AR Page 13664.  It is not sufficient to establish a taking, however, simply to show that mussels will be harmed when certain conditions occur.  Rather, to find that incidental take would occur, Fish and Wildlife must determine that flows will be reduced and mussels exposed *because of* the Corps' operations under the RIOP.  *See, e.g.*, 50 C.F.R. § 402.02 (defining "incidental take" as "takings that result from . . . carrying out an otherwise lawful activity conducted by the Federal agency or applicant"); *Babbitt*, 515 U.S. at 700 n.13 (explaining that "but for" causation is "obviously require[d]" to establish take); *Alabama*, 441 F. Supp. 2d at 1132 (discussing the need to establish "but for" causation between the challenged agency action and subsequent take).

In the Biological Opinion, Fish and Wildlife does not analyze or explain whether flows of 4,500 cfs would also occur under a run-of-river operating plan, that is, whether these flows would have occurred without the Corps' operations.  Thus, the Biological Opinion does not evaluate whether the mussels would not have been exposed but for the Corps' operations under the RIOP.  In the absence of such an analysis, Fish and Wildlife cannot simply

attribute all mortality that would occur at flows below 5,000 cfs to the RIOP, and its decision to do so in this case was arbitrary and capricious.

Moreover, contrary to Fish and Wildlife's assumption, the Biological Opinion actually demonstrates that reservoir operations under the RIOP will *reduce* the frequency and severity of low-flow events as compared to "run-of-river" operations. For example, the Biological Opinion expressly acknowledges that the RIOP would generally maintain a minimum flow of 5,000 cfs, while the run-of-river "flow regime, which estimates flows in the absence of reservoir operations, has flows less than 5,000 cfs in almost half the years" in the model analysis. Doc. 510, FWS AR Page 13659. Far from establishing "but for" and proximate causation, the Biological Opinion shows that natural mortality caused by low flows would be much worse *if not for* the Corps.

This was exactly the situation when Florida moved for a preliminary injunction based on alleged takings in 2006. At that time, Florida claimed that takings of mussels were occurring and demanded a flow of 6,300 cfs to mitigate these alleged takings. *See* Fla. Mot. for TRO to Protect Threatened and Endangered Mussels, *Alabama v. U.S. Army Corps of Eng'rs*, Civil Action No. 90-1331 (N.D. Ala.) [Doc. 460 at 1]. At the time of the hearing, however, it was established that the three-day Basin Inflow (the amount of water flowing into the ACF system) was only 1,886 cfs. *See id.*, Decl. of Doug Otto, [Doc. 502, Ex. 1., at 10]. Furthermore, the Corps was drawing substantial amounts of water from storage to augment the natural flow of water in the Apalachicola River; that is, to augment the flow that would have occurred if there were no human activity anywhere in the ACF Basin. *See id.*, Testimony of Doug Otto, Transcript of July 24, 2006 hearing at 80. Thus, Florida was

demanding that the reservoirs be used to provide flows greater than nature would have provided.  The *Alabama* Court had no trouble seeing that mortality under those conditions was caused by the drought, and not by the Corps.  *See Alabama*, 441 F. Supp. 2d at 1134.

In short, Fish and Wildlife cannot attribute mortality resulting from low flows to the Corps' actions *unless there is evidence that such flows would not have occurred under natural conditions*.  But the Biological Opinion failed to analyze or explain whether flows below 5,000 cfs would also occur under a run-of-river operating plan, and thus, whether the mortality would not have occurred but for the Corps' operations.  In the absence of such an analysis, Fish and Wildlife's finding that incidental take may occur as a result of the RIOP is arbitrary and capricious.

### 2. Fish and Wildlife Erred by Attributing Potential Mortality Caused by Storms to the RIOP

Fish and Wildlife also concluded that take of Sturgeon eggs and larvae might occur when the flow is less than 40,000 cfs and the stage of the river falls 8 feet or more within 14 days during the months from March through May.  Doc. 510, FWS AR Page 13663, 13666.  However, Fish and Wildlife frankly admitted that it could not determine whether such conditions would occur more or less often under the RIOP than under natural conditions, and that it was unable to "reliably estimate the frequency with which the proposed project operations might expose the hard-bottom habitat that sturgeon use for spawning."  Doc. 510, FWS AR Page 13617.  Nevertheless, and despite acknowledging that flows above 30,000 cfs are "largely uncontrollable by project operations," Fish and Wildlife concluded that the RIOP might result in the take of Gulf sturgeon "because the proposed operations do not *inherently*

*preclude* events that could expose eggs and larvae."  Doc. 510, FWS AR Pages 013616-17 (emphasis added).

As with Fish and Wildlife's flawed conclusion regarding the take of mussels, this conclusion is contrary to the clear mandates of the ESA.  Fish and Wildlife cannot attribute mortality of sturgeon eggs and larvae to the Corps' operations under the RIOP in the absence of evidence that it is caused by the Corps.  Yet Fish and Wildlife again does not analyze or explain whether this same mortality would occur under natural, run-of-river flow conditions. Lacking such an analysis, the Service's finding that the RIOP may result in the take of Gulf sturgeon is arbitrary and capricious.

## II.   The Corps Violated NEPA By Failing to Prepare an EIS for Its Operations in the ACF Basin

As shown above, Fish and Wildlife correctly concluded that the RIOP does not violate the ESA and will not cause jeopardy or adverse modification of critical habitat.  As compared to run-of-river operations, the RIOP is good, not bad, for the species.  That does not mean the RIOP is a good plan overall, however, and it does not mean that the RIOP strikes the right balance between environmental and human needs.  Nor does it mean that the RIOP is the only plan of operations that complies with the ESA.  Indeed, there are many different ways to operate a reservoir system, and some of them just might accommodate the needs of all stakeholders while *also* performing better than the RIOP for the environment and endangered species.  The Water Supply Providers have proposed one such plan, and the State of Georgia has proposed another.  (FA ¶ 184).  These alternatives deserve serious consideration.  Indeed, a careful examination of these and other alternatives will reveal that there is more than enough water in the ACF Basin to meet the reasonable needs of all stakeholders, including

the environment, provided the reservoirs are operated correctly.  The Corps should also study

other types of alternatives, apart from the different operating plans, to fix the root cause of

the problems such as channel degradation and siltation that have been noted in the

Apalachicola River.

For reasons that are perhaps understandable, given the politics of the controversy, the

Corps to date has been unwilling or unable to initiate a study of this type.  Even now, as it

prepares to update Water Control Plans for the ACF Basin, the Corps has declared that its

effort will be limited to documenting "existing operations," with the single exception, in light

of the Court's Phase 1 Order, that "existing operations" will be modified to eliminate water

supply as a project purpose.  *See* Notice of Intent To Revise Scope of Draft Environmental

Impact Statement for Updating the Water Control Manuals for the Apalachicola-

Chattahoochee-Flint River Basin To Account for Federal District Court Ruling, 74 Fed. Reg.

59,965, 59,966 (Nov. 19, 2009); Federal Defendants' Notice of Revisions to Water Control

Manual Update Process, [Doc. 300].  By restricting the scope of the new water control plan

so narrowly, the Corps has completely ruled out any meaningful consideration of alternatives

to its current operational plan.

This is neither constructive nor lawful.  Indeed, the Corps has a legal obligation under the

NEPA to consider a full range of alternatives to its current operations under the RIOP.

NEPA requires the preparation of an EIS before undertaking any "major Federal action[]

significantly affecting the quality of the human environment."  Reservoir operating plans

clearly trigger this requirement.  Consistent with NEPA, therefore, the Corps must

"[r]igorously explore and objectively evaluate all reasonable alternatives," to the RIOP; and

"for alternatives which were eliminated from detailed study," the Corps must "briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a).  The Corps has never done this for the ACF Basin.  It has never completed an EIS for any aspect of its ACF reservoir operations.  It did not do an EIS for the 1989 Water Control Plan, the Interim Operations Plan, the Revised Interim Operations Plan, or any other operating plan.  Whatever the reasons for this failure, it is a clear violation of NEPA.

As a result of this failure, decisionmakers in the ACF Basin have been deprived of factual information necessary to make good decisions.  Notwithstanding the fact that the controversy has been raging for two decades, remarkably little information is available about the costs and benefits and trade-offs inherent in the different operating plans.  The Georgia Parties urge the Court to remedy this situation by directing the Corps to prepare an EIS for the ACF Basin that includes consideration of a full range of alternatives to the RIOP.

A.  Statutory Background

NEPA was enacted in 1969 to put an end to the practice of establishing environmental policy "by default and inaction," and making major decisions "in small but steady increments" that perpetuate the mistakes of the past.  *See Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 836 (D.C. Cir 1972) (quoting S. Rep. No. 91-296, 91st Cong., 1st Sess. (1969) p. 5).  NEPA does this by requiring each federal agency to prepare an EIS before undertaking any "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  An EIS is a "detailed statement by the responsible official" of an agency that discusses the environmental impact of the proposed action, adverse environmental effects, alternatives to the proposed action, "the

relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity," and "any irreversible or irretrievable commitments of resources which would be involved in the proposed action should it be implemented."  *See* 42 U.S.C. § 4332(C).  "[B]y focusing the agency's attention on the environmental consequences of a proposed project," the requirement to prepare an EIS "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  The EIS also serves a larger informational role, however, by providing a springboard for public comment.  *Id*.

NEPA also created the Council on Environmental Quality ("CEQ") and directed it to promulgate regulations applicable to all federal agencies.  The CEQ regulations are found at 40 C.F.R. Parts 1500 to 1518.  They require preparation of an Environmental Assessment ("EA") to determine whether an EIS is required.  The primary purpose of an EA is to identify potential environmental effects and to determine whether such effects would be significant.  If the agency concludes on the basis of the EA that the effects will not be significant, the agency issues a Finding of No Significant Impact ("FONSI").  Otherwise the agency is required to prepare an EIS.

To be meaningful and to serve the purposes of the statute, the NEPA review must occur well before the agency takes the action under review.  "NEPA's effectiveness depends entirely on involving environmental considerations in the *initial* decisionmaking process."  *Metcalf v. Daley*, 214 F.3d 1135, 1145 (9th Cir. 2000) (emphasis added); *Protect Key West, Inc. v. Cheney*, 795 F. Supp. 1552, 1562 (S.D. Fla. 1992) (same).  This is essential because

NEPA "does not mandate particular results, but simply prescribes the necessary process."
*Robertson*, 490 U.S. at 350.  As explained by Justice Breyer, while still a judge on the First
Circuit, the statute foresees and accepts that decisionmakers may choose to inflict
environmental harm for perfectly good reasons; its aim is not to prevent such harm, but rather
to influence the decisionmaking process by making government officials notice
environmental issues and take them into account.  *Sierra Club v. Marsh*, 872 F.2d 497, 500
(1st Cir. 1989).  To fulfill this role, the CEQ regulations state that the EIS must be prepared
"early enough so that it can serve practically as an important contribution to the decision-
making process and will not be used to rationalize or justify decisions already made."  40
C.F.R. § 1502.5.  At a bare minimum, it follows that the EIS must be available to
decisionmakers before—not after—the agency has committed to a course of action.  *See, e.g.,
Balt. Gas & Elec. Co. v. Nat. Res. Defense Council*, 462 U.S. 87, 97 (1983) (holding that
NEPA imposes on agencies the obligation to "take a 'hard look' at the environmental
consequences *before* taking a major action") (citing *Kleppe v. Sierra Club,* 427 U.S. 390, 410
n.21 (1976) (emphasis added)).

    B.  Standard of Review

    The Corps' failure to perform an EIS is reviewed under the "arbitrary and capricious"
standard of the Administrative Procedure Act.  *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir.
1998) (citing *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of
Eng'rs*, 87 F.3d 1242, 1248 (11th Cir. 1996)); *North Buckhead Civic Ass'n v. Skinner*, 903
F.2d 1533, 1538 (11th Cir. 1990)).  If the administrative record does not support the agency's
failure to perform an EIS, the Court should remand the matter to the agency to take a "hard

look" at the issue and either perform an EIS or "make a convincing case in support of a finding of no significant impact." *Hill*, 144 F.3d at 1451 (citing *Coalition on Sensible Transp. v. Dole*, 826 F.2d 60, 66-67 (D.C. Cir. 1987)).

Where the decision not to prepare an EIS was based upon a flawed assumption that caused the agency to underestimate the impact of the action, the court should remand to the agency to correct the assumption and perform its NEPA review again. *Hill*, 144 F.3d at 1451 (holding that remand was necessary where Corps' FONSI determination for reservoir erroneously assumed that petroleum pipeline beneath proposed reservoir site would be relocated). Moreover, if the court decides that "the evidence in a complete administrative record demonstrates that the project or regulation may have a significant impact, then it is appropriate to remand with instructions to prepare an EIS." *Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1225 (9th Cir. 2008).

C.     The Corps Violated NEPA By Failing to Prepare an EIS for Its Reservoir
     Operations within the ACF Basin

Whatever the Corps' reasons for having failed to prepare an EIS for its operations in the ACF Basin, it is plainly required to do so. The Corps' own NEPA regulations acknowledge that "[p]roposed major changes in the operation and/or maintenance of completed projects" normally require an EIS. ER 200-2-2 (Mar. 4, 1988) at 6(c). This regulation reflects the common sense judgment of the Corps that reservoir operations may "have a significant impact on the quality of the human environment." *Id.* at 6.[9]

---

[9] Echoing the NEPA requirement for advance notice and comment, the court in *SeFPC v. Caldera*, a part of this MDL, held that the 1988 Water Resources Development Act ("WRDA") "imposes a notice-and-comment obligation on federal agencies *prior to* making changes in the operation of any reservoir which will … significantly affect any project purpose." *Southeastern Federal Power Customers, Inc. v. Caldera*, 301 F. Supp. 2d 26, 34 (D.D.C. 2004) (internal quotations omitted, emphasis added). The 1990 WRDA

Even if the Corps' regulations did not specifically address the requirement to prepare an EIS for the RIOP, the regulations promulgated by CEQ to implement NEPA state that, in determining whether the impact of a proposed action is likely to be "significant," the agency should consider the degree to which the action may adversely affect, not only endangered species and the natural environment, but also the human environment.  40 C.F.R. § 1508.27(b) (definition of "significantly").  Therefore, effects to public health and safety must be taken into consideration along with other economic and societal effects.  *Id.*; 40 C.F.R. § 1508.14 (definition of "human environment").  The regulations also state that the agency should consider the extent to which the action is likely to be "highly controversial," and the "degree to which the action may establish a precedent for future actions with significant effects." 40 C.F.R. § 1508.27(b)(4), (b)(6).  These factors dictate that the Corps must prepare an EIS for the RIOP.

Stakeholders throughout the ACF Basin predicted that the IOP would have significant consequences when it was first adopted.  (FA ¶¶ 154-67).  Their warnings were almost immediately confirmed when the IOP collided with a multi-year drought.  The change in operations mandated by the IOP resulted in a loss of "approximately 850,000 acre-feet of available storage within the ACF system" and reduced Lake Lanier to its lowest level in history.  Doc. No. 544, FWS AR Page 14121.  By November 2007, "only 33% of all conservation storage within the ACF system remained."  *Id.*  The Corps was forced by the impending crisis to revise the more extreme provisions of the IOP.  (FA ¶¶ 215-16).  In short,

---

reiterates the point, requiring that "all appropriate informational materials relating to proposed management decisions of the Corps be made available to the public sufficiently in advance of public hearings. 33 USC § 2319.

even as revised, the IOP represents the single most significant and highly controversial federal action to affect the ACF since the construction of the reservoirs themselves—and yet the record shows that it was hurriedly adopted by the Corps without any analysis of its effect on the system and without any modeling whatsoever.

Even if some argument could be made that the IOP were not a "major Federal action significantly affecting the quality of the human environment," the Corps would be foreclosed from asserting such a rationale due to its failure to prepare an environmental assessment before implementing the action.  As already stated, the CEQ regulations require that such determinations be made by preparing an EA.  The only exception is for actions that qualify for a categorical exclusion.  Far from establishing that a categorical exclusion applies, however, the Corps' regulations actually establish a presumption that an EIS is required.  *See* ER 200-2-2 (Mar. 4, 1988) at 6(c).  In this case, the Corps did not prepare an EA until October 2006—seven months after the IOP had been adopted and fully implemented (FA ¶ 172), and the Corps has never given a convincing or even plausible justification for concluding that the IOP and RIOP would not significantly affect the environment.

        1.   <u>It is Irrelevant to the EIS Requirement Whether the IOP Was a "Major" or "Minor" Change to the 1989 Water Control Plan</u>

The Corps might respond by arguing that an EIS was not required for the IOP because the IOP was just a small change to the prior plan of operations under the 1989 Water Control Plan.  As shown above, it is simply not credible to suggest that the changes wrought by the IOP were "insignificant."  But even if it were, the argument is foreclosed by the fact that the Corps did not do an EIS for the 1989 Water Control Plan, either.

CEQ regulations state that "[s]ignificance cannot be avoided by . . . breaking [an action] down into small component parts."  40 C.F.R. § 1508.27(b)(7).  The IOP and the 1989 Water Control Plan constitute "cumulative actions" that have "cumulatively significant impacts and should therefore be discussed in the same impact statement."  40 C.F.R. § 1508.25(a)(2).  When the 1989 Water Control Plan and the IOP/RIOP are taken together, as they must be, there is no colorable argument that an EIS is not required.

2.  The Belated Environmental Assessment Did Not and Could Not Cure the NEPA Violation Caused by the Corps' Failure to Prepare an EIS *Before* Adopting the IOP

The Corps might also argue that it cured the NEPA violation by preparing an EA in October 2006, seven months after the IOP was adopted and fully implemented.  This argument must be rejected, however, because post-hoc NEPA documentation is always inadequate, by definition, and also because a post-hoc EA is still just an EA—as opposed to an EIS, which is what the statute requires.

Courts have unanimously rejected the "commit first, ask questions later" approach to NEPA compliance.  *See, e.g., Protect Key West,* 795 F. Supp. at 1561 (criticizing the U.S. Navy for preparing "no written studies, analyses or reports on any environmental issue" until after the agency had committed to the project at issue and stating that the Navy's approach "would violate the letter and spirit of NEPA").  NEPA's effectiveness depends entirely on involving environmental considerations in the *initial* decision-making process.  As stated by then-Judge Breyer in *Sierra Club v. Marsh,* "when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered."  *Marsh*, 872 F.2d at 500.  In further

explanation of the need to prepare the required NEPA documentation early in the process, Judge Breyer referred to "[t]he difficulty of stopping a bureaucratic steam roller, once started." *Id.* at 504.

Even were it possible to cure a NEPA violation by preparing the required documentation after the decisions have already been made, which it is not, the documentation would, at a minimum, have to take the form of an EIS. The statute requires an EIS, and an environmental assessment is no substitute for an EIS because the two documents serve very different purposes. *See Sierra Club v. Marsh*, 769 F.2d 868, 875 (1st Cir. 1985). The purpose of an EA is simply to help the agencies decide if an EIS is needed, and therefore its principal aim is to identify and assess the significance of potential impacts on the environment. *Id.* "The [environmental assessment] does not balance different kinds of positive and negative environmental effects, one against the other; nor does it weigh negative environmental impacts against a project's other objectives, such as, for example, economic development." *Id.* That is the job of an EIS. Therefore it is the EIS and its analysis of alternatives, and not a mere environmental assessment, that would serve the purposes of NEPA and assist decisionmakers in resolving the controversy in the ACF Basin.

### 3. To Cure the Violation, the Corps Should Be Directed to Prepare an EIS Including All Reasonable Alternatives

To cure the NEPA violation, the Corps should be directed to prepare an EIS including an assessment of all reasonable alternatives. As stated above, there is enough water in the ACF Basin to meet the needs of all stakeholders if the reservoirs are operated properly. These operational alternatives need to be considered.

Moreover, there are many alternatives that go beyond changes to reservoir operations. For instance, raising the pool of Lake Lanier by two feet, from 1071' to 1073,' would increase the amount of conservation storage by almost 10%.  The lake has actually seen that type of additional volume given the recent extraordinary rains, without any ill effects to other Corps operations.  A similar strategy for increasing system storage would be to reduce the "winter drawdown" at West Point Dam.  The Corps could also consider refurbishing Jim Woodruff Lock and Dam to increase the "head limit" for this facility; this is a structural issue that caused the Corps to waste a substantial amount of water that could otherwise have been preserved in storage during the height of the drought.

Moreover, if the Corps' objective is to protect threatened and endangered species, the Corps should broaden the scope of the EIS to address the root cause of the problems confronting them.  The construction of Jim Woodruff Dam and the Corps' historical maintenance of the Apalachicola River channel have significantly affected the habitat available for the federally-listed species by deepening and widening the river channel and by depositing dredged material in the floodplain.  (FA ¶¶ 16-27).  For example, the lowering of the bed of the Apalachicola River at RM 105.5 that has occurred as a result of channel degradation has an impact on the elevation of the water at that location 30 times greater than does the total consumptive water use of the metropolitan Atlanta area.  Whereas dredging and scour at RM 105.5 have reduced the stage of the river at this point by about 5 feet (FA ¶ 70), metro-area withdrawals lower it by about 2 inches.  Thus, as an alternative to using the ACF Basin's scarce water resources to mitigate a problem caused by the degraded condition of the riverbed below Jim Woodruff Dam, the Corps might consider fixing the riverbed.  *See*

*Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 863 (9th Cir. 2004) (affirming the Department of Interior's EIS in the context of reservoir management where it included "the use of non-flow measures, such as the mechanical removal of vegetation on the banks, the reshaping of the riverbed and banks, and the placement of appropriately sized gravel, to promote and sustain natural salmonid production" as aspects of various alternatives).

Similarly, Swift Slough—a distributary that supported mussel populations until the most recent drought—is threatened by a combination of channel incising and sedimentation caused by numerous factors having little or nothing to do with reservoir operations.  (FA ¶¶ 112, 116-17).  The Corps should consider addressing these issues through targeted dredging or by pumping water into the slough.  (FA ¶ 118).  It should also consider ways to address the enormous diversion of flow into the Chipola Cutoff immediately upstream of Swift Slough. The Chipola Cutoff is claiming an ever-increasing share of the mainstream of the river, now up to 40%.  (FA ¶¶ 38-40).  The effect of this diversion on the stage of the river at the head of Swift Slough is far greater than any effect caused by the operation of the reservoirs on the Chattahoochee River.  Therefore the Corps should study alternatives to address this problem.

Other alternatives need to be explored to address any salinity issues that might exist in Apalachicola Bay.  To the extent salinity affects the species, the root cause of any impact needs to be determined and mitigation options considered.  The Corps should study the effect of Sikes Cut in particular.  Sikes Cut is the man-made navigation channel that was cut through St. George Island, the barrier island that separates the bay from the Gulf of Mexico. (FA ¶ 73).  The cut allows salt water to pour into the bay on a continuous basis.  Although additional analysis is needed, Sikes Cut likely has a far greater impact on salinity in the bay

than any minor effect of flows due to reservoir operations.  The Corps should study the effect that Sikes Cut is having on Apalachicola Bay and any alternatives that could mitigate this effect.

### 4.   The Pending EIS Will Not Cure the NEPA Violation

The Corps is currently planning to update the Water Control Plan for the ACF Basin and has stated that it will prepare an EIS.  Already, however, it is clear that the new EIS will fall well short of the standard required by NEPA.  Although a legally-sufficient EIS would have to address a full range of alternatives, including some or all of the operational and structural alternatives described above, that is simply not what the Corps has in mind.  Even before the Court's ruling in Phase 1, the Corps stated publicly that the new water control plan would merely document "existing operations."  Alternatives to the RIOP and to the 1989 Water Control Plan were therefore taken off of the table before the process even began.  The Corps has now restricted the scope of the EIS even further, stating that it will only consider options consistent with the ruling in Phase 1 of this litigation.  *See* 74 Fed. Reg. at 59,966; Federal Defendants' Notice of Revisions to Water Control Manual Update Process, [Doc. 300].

These restrictions on the scope of the EIS violate both the spirit and the letter of NEPA.  The Georgia Parties argued in Phase 1 that the Corps has authority to reallocate storage in Lake Lanier for water supply.  While they respectfully acknowledge the Court's ruling on that issue, NEPA nonetheless specifically requires the Corps to consider all reasonable alternatives for operating the reservoirs to meet the reasonable needs of all stakeholders.  The Corps' consideration of alternatives must even include alternatives, such as operations for water supply, that may be deemed to exceed the agency's jurisdiction.  40 C.F.R.

§ 1502.14(c).  The EIS is required to include alternatives that exceed the Corps' current authority because this information may be useful to the President, to Congress, and to the public in shaping policy on a larger scale.  *See Natural Res. Defense Council, Inc. v. Morton*, 458 F.2d 827, 836-37 (D.C. Cir. 1972).

Indeed, the Corps' public statements restricting the scope of the new EIS would seem to confirm that the new Water Control Plan will simply continue the Corps' long-standing practice of making decisions in the ACF Basin by default and inaction.  To reiterate, the Corps adopted the existing water control plan in 1989 without an EIS.  The Corps has stated on numerous occasions that it would not consider any alternative that would "require a change to the existing water control plan."  *See, e.g.,* RPM3 EA at EA-14 (Mar. 6, 2007). Then it adopted the IOP in 2006 without an EIS, or even an EA.  Then it adopted the RIOP in 2008 without an EIS.  At that time, it stated again that it would not consider any alternatives to the basic framework established by the 1989 Water Control Plan or the IOP.  Now, in 2009, the Corps is finally going through the motions of preparing an EIS—but it has already stated publicly that it will not consider any alternatives to its "existing operations," except insofar as may be necessary to eliminate water supply as a project purpose.  The Corps has thus defined the scope of the pending EIS so narrowly so as to guarantee that the "new" Water Control Plan will simply perpetuate the mistakes of the past.  The Georgia Parties urge the Court to put an end to this pattern by directing the Corps to prepare, for the first time, an EIS for the ACF Basin that includes a full range of alternatives to the current operations.

### III. Conclusion

In sum, Fish and Wildlife committed legal error by confusing take caused by reservoir operations with natural mortality.  The causation error is the result, at least in part, of the Service's use of the wrong environmental baseline and therefore the wrong legal standard for identifying the effects of the RIOP.  The findings and conditions that flow from this error are arbitrary and capricious and contrary to law and should be set aside.  Fish and Wildlife should be directed to reissue the Biological Opinion to correct these errors and to make clear that the Corps is not required to mitigate effects that its discretionary reservoir operations will not cause.

More generally, the single most constructive step that could be taken toward resolving this controversy would be to require the Corps to prepare an EIS that includes a comprehensive study of the causes of and potential solutions to the environmental problems that have been noted in the Apalachicola River.  Far from causing these problems, reservoir operations help to mitigate them.  Moreover, the Georgia Parties have shown that there is more than enough water in the ACF Basin to meet the reasonable needs of all stakeholders if the reservoirs are operated correctly.  These and other alternatives should be studied in the EIS.  The decisionmakers and stakeholders in the ACF Basin deserve nothing less.

For the foregoing reasons, pursuant to the Court's Fifth Amended Scheduling Order, the Georgia Parties hereby move the Court for the following relief:

1.  An order in Florida v. United States Fish and Wildlife Service, Civil Action No. 3:07-cv-250:

(a) declaring that Fish and Wildlife committed legal error by using the wrong

environmental baseline and standard of causation to determine whether the RIOP

is likely to cause adverse effects, or take, to listed species;

(b) declaring that Fish and Wildlife's findings that Corps' operations are likely to

result in the take of listed species in the Apalachicola River, and its corresponding

decision to issue an "incidental take statement" containing "terms and conditions"

governing the Corps' operations, are arbitrary and capricious and contrary to law;

(c) remanding, without vacatur, the Biological Opinion to Fish and Wildlife to: (i)

correct its findings in accordance with the Court's rulings that (A) the correct

environmental baseline is run-of-river operations (adjusted for any water

withdrawals that constitute discretionary federal actions), and (B) the Corps is not

legally responsible for harm to the listed species that is caused by drought or

actions of third parties whom the Corps does not control; and (ii) issue a new

Biological Opinion in accordance with these rulings;

2. An order in *Georgia v. United States Army Corps of Engineers*, Civil Action No. 3:07-
cv-251:

(a) declaring that the Corps' failure to prepare an EIS for the IOP, as subsequently

revised, was arbitrary and capricious and contrary to law; and,

(b) remanding the matter to the Corps to prepare an EIS for its reservoir operations

within the ACF Basin that includes a thorough evaluation of all reasonable

alternatives, including alternatives which may be deemed to exceed the Corps'

jurisdiction.

Respectfully submitted this 9th day of December, 2009,

*Attorneys for the State of Georgia*

Thurbert E. Baker
Attorney General
Georgia Bar No. 033887
Isaac Byrd
Georgia Bar No. 101150
Deputy Attorney General
Robert S. Bomar
Georgia Bar No. 066400

/s/ R. Todd Silliman
Bruce P. Brown
Georgia Bar No. 064460
R. Todd Silliman
Georgia Bar No. 646005
John C. Allen
Georgia Bar No. 159073

McKenna Long & Aldridge, LLP
303 Peachtree Street, N.E.
Suite 5300
Atlanta, Georgia 30308
Phone: (404) 527-4000
Fax: (404) 527-4198

Of Counsel:

Steven P. Quarles
Thomas R. Lundquist
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone:  (202) 624-2500
Fax:  (202) 628-5116

*Attorneys for the Water Supply Providers*

/s/ Lewis B. Jones
Lewis B. Jones
Georgia Bar No. 042498
Patricia T. Barmeyer
Georgia Bar No. 038500

KING & SPALDING LLP
1180 Peachtree Street, N.E.
Phone: (404) 572-4600
Fax: (404) 572-5100
lbjones@kslaw.com


*Attorneys for Gwinnett County, Georgia*

/s/ William M. Droze
William M. Droze
Georgia. Bar No. 231039
Gregory W. Blount
Georgia. Bar No. 064375
Natalie D. Sacha
Georgia Bar No. 558276

TROUTMAN SANDERS
Bank of America Plaza
600 Peachtree Street, N.E.
Suite 5200
Atlanta, Georgia 30308
Phone: (404) 885-3000
Fax: (404) 885-3900

*Attorney for Lake Lanier Association*

/s/ Clyde Y. Morris
Clyde Y. Morris
Georgia. Bar No. 523725
2375 Whippoorwill Lane
Gainesville, Georgia 30501
Phone: (404) 403-4625
Fax: (678) 943-1817

**CERTIFICATE OF SERVICE**

This is to certify that on December 9, 2009, a copy of the foregoing **GEORGIA PARTIES' MOTION FOR SUMMARY JUDGMENT ON PHASE 2 CLAIMS AND BRIEF IN SUPPORT** was electronically filed with the Clerk of Court by using the CM/ECF System and served to all counsel of record for all parties to this proceeding by means of electronic notification.

/s/ Lewis B. Jones
*Attorney for the Water Supply Providers*